## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT QUILL, | : | |
| | : | |
|    Plaintiff, | : | |
| | : | |
| v. | : | C.A.No. |
| | : | |
| CATHOLIC DIOCESE OF WILMINGTON, | : | |
| INC., a Delaware corporation; ST. | : | |
| ELIZABETH'S CATHOLIC CHURCH, a | : | |
| Delaware corporation;  Rev. FRANCIS G. | : | |
| DELUCA, individually and in his official | : | |
| capacity; and Rev. MICHAEL A. | : | Jury Trial Demanded |
| SALTARELLI, in his official capacity, | : | |
| | : | |
|    Defendants. | : | |

## COMPLAINT

1.  This is a diversity case arising from the July 10, 2007 enactment of the Delaware Child

Victims Act of 2007 (the "Act") and Delaware common law regarding childhood sexual abuse.  It

seeks monetary damages for personal injuries arising from childhood sexual abuse by a pedophile

Roman Catholic priest.  From the age of thirteen to nineteen Robert Quill was the victim of at

least 300 acts of sexual molestation by Rev. Francis G. DeLuca, a convicted child molester and

priest employed by the defendants.  DeLuca was employed recklessly despite the fact that the

defendants had prior actual knowledge that he was a child molester and that they owed a duty of

care to protect plaintiff from him.

### I.  JURISDICTION

2.  The diversity jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1332, 2201

and 2202.  This case arises between citizens of different States and the matter in controversy

exceeds the sum or value of $75,000, exclusive of interest and costs.

3.  Venue is appropriate pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## II.  THE PARTIES

4.  Robert Quill ("plaintiff") resides in Marathon, Florida and is a citizen of that State. He is presently 52 years old.  He was last employed as a Supervisory Staff Attorney for the United States Court of Appeals for the Eleventh Circuit, in Atlanta, Georgia.  At the times he was sexually molested and victimized, he ranged from ages thirteen to nineteen.

5.  Defendant Catholic Diocese of Wilmington, Inc. ("Diocese") is a Delaware corporation, file number 0787107.  It serves as its own registered agent at 1626 N. Union St., Wilmington, DE 19806.   It is authorized to do business and is doing business in the States of Delaware and Maryland as a Roman Catholic religious enterprise.

6. On information and belief, defendant St. Elizabeth's Roman Catholic Church ("St. Elizabeth's"), is a Title 27 or a Title 8 Delaware Corporation located in Wilmington, DE, which operates under the auspices of defendant Diocese.  It is authorized to do business and is doing business in the State of Delaware as private religious institution, operating both a church and elementary and high school, each of which plaintiff attended.

7.  Defendant Francis G. DeLuca ("DeLuca") is a Roman Catholic priest. He was employed by the Diocese from 1958 until 1993.  He is a convicted child molester.  He is presently 77 years old and resides at 100 Pastime Drive, Syracuse, New York.  He is a citizen of Delaware. He is sued in his official and individual capacities.

8.  DeLuca was the assistant pastor at St. Elizabeth's as well as a staff member and

2

religion teacher at the St. Elizabeth's elementary and high schools from 1966 to 1969 where he sexually abused numerous young male parishioners in addition to plaintiff.

9.   Defendant Rev. Michael A. Saltarelli ("Saltarelli") is currently employed as the Roman Catholic Bishop of the Diocese.  He is sued only in his official capacity as agent or alter ego of the Diocese for purposes of collecting a money judgment against the Diocese, should its assets be titled in his name. He is a citizen of Delaware.

10.   Diocese was responsible at all times for licensing DeLuca to perform priestly functions as one of its employees.  Without the explicit authorization and sanction of Diocese, he could not have performed priestly functions including spiritual and personal counseling, the conduct of religious services, days of spiritual recollection, and the administration of Roman Catholic sacraments.

11.   At all times relevant hereto, Diocese was responsible for the management and control of its parishes, including St. John the Beloved, St. Elizabeth's, Holy Spirit and St. Matthew's, and was responsible for employing priests, staff and other agents to operate those parishes.

12.   At all times relevant hereto, Diocese had actual or constructive knowledge of prior criminal conduct by DeLuca where he sexually abused young boys.  For example, Diocese was notified by Mike Schulte and his family that he had been abused by DeLuca while assigned to St. John the Beloved Parish in Wilmington, DE in the early 1960s before he was transferred to St. Elizabeth's Parish in 1966 where he abused plaintiff for years.

13.   Diocese and St. Elizabeth's also had actual or constructive knowledge of the childhood sexual abuse which was being committed upon plaintiff by DeLuca.

14.   DeLuca's misconduct also was authorized, sanctioned, ratified, acquiesced in or

3

approved by Diocese and St. Elizabeth's. All his acts were taken within the scope of his authority and for the benefit of Diocese and St. Elizabeth's during the normal course of his routine and regular job duties.

### III.  FACTS GIVING RISE TO THE ACTION

### A. Institutional Knowledge of Clergy Sexual Abuse Leading to the Underlying Gross Negligence

15. Diocese, St. Elizabeth's and the Roman Catholic Church have been aware of the serious problem of clergy sexual abuse of children throughout their history.

16. Canon law records, dating back to the 4th century, reveal a consistent pattern of attempts by Church leadership to deal effectively with clergy sexual abuse.

17. In the era when regional conferences of bishops met to enact legislation, there is regular mention of laws and canons which were enacted to punish clerics whose offenses were the sexual abuse of youths.

18. Between the 15th and 17th centuries, Roman Catholic Church courts would often put a child abuser on trial, defrock him and turn him over to the civil authorities for prosecution and punishment, including death.

19. There is evidence that in monasteries in the medieval period, clerics who sexually abused children were inflicted with severe physical punishments amounting to imprisonment and life-long restriction and monitoring, even after a sentence of strict confinement had been served.

20. In the 11th century, a book entitled "Book of Gomorrah" was written by Cardinal, and later St. Peter Damian, which was devoted entirely to exposing and providing suggested remedies for clergy sexual abuse.

21.  The Roman Catholic Church made other attempts at curbing the sexual abuse of children, including specific canons or laws, regulating and disciplining abusers, which were enacted at synods or gatherings of bishops.

22.  The Pope also acknowledged the clergy sexual abuse problem in public documents such as "Horrendum est" (August, 1568), which declared that priests who sexually abused children were to be deprived of all sources of income, degraded or evicted from the clerical state, and turned over to secular authorities for additional punishment.

23.  The act of sexually abusing a minor under the age of sixteen was included as a specific canonical crime in the first codification of Roman Catholic Church law in 1917, and is  repeated in the present edition in canon 1395.

24.  However, Diocese, St. Elizabeth's and the Roman Catholic Church changed course and for at least the last 60 years have handled reports of clergy sexual abuse with extreme secrecy.

25.  Diocese and Roman Catholic Church authorities often use tactics with victims and their families to coerce or intimidate them from disclosing the abuse or filing a lawsuit.

26.  Diocese and Roman Catholic Church authorities often transfer perpetrators from one assignment to another, without telling the incoming assignment of the priest's past history of child abuse.

27.  Secrecy also was enabled by the fact that child abuse victims are often afraid that by saying anything negative about a priest they are sinning and will be punished by God.

28.  When they are molested, victims are told the abusive sexual act is God's will for them and God has chosen their priest to initiate them into secrets of sexual love.  DeLuca regularly incorporated religion into his sexual abuse and used his position as a priest as a means to force

himself on minor children, including plaintiff. For example, sometimes he would sexually abuse

and molest plaintiff and other young boys while purportedly praying or engaging in spiritual

discussions with these young boys, such as explaining the mystery of the Eucharist or reading the

Bible.

29.  In 1962 the Vatican also issued a secret document - *Crimen Sollicitationis* - which

outlined the rules to be followed in the Church's processing of cases where priests were accused

of solicitation of sex in the confessional. Title 5 of this document governs other clergy sexual

crimes such as having sex with a minor and bestiality. This document included regulations that

placed everyone who dealt with such cases under the Secret of the Holy Office, the highest degree

of Vatican secrecy. Violation of the promise to keep knowledge of such a case secret would

result in automatic ex-communication, which could only be absolved by the Pope. This document

remained in force until 2001 and is an example of the extreme secrecy surrounding clergy sex

abuse cases in the Diocese and Roman Catholic Church.

30.  The laws which govern the entire Roman Catholic Church are codified in the

Code of Canon Law, which governed Diocese, St. Elizabeth's and their secrecy at all times

relevant hereto.

31.  Canon Law (cc.486-488) states that every Diocese must maintain a secret archive in

which the instruments and writings pertaining to the spiritual and temporal affairs of the Diocese

are kept.

32.  There is also a secret archive in every Diocese where more sensitive materials are

kept. (cc.489-490). It is in this secret archive that information regarding sexual misconduct of

DeLuca and other clergy are housed. Such documents held in the secret archive are only available

6

to the bishop and the chancellor.

33.  Diocese also keeps a personnel file on all clerics incardinated or on loan to the Diocese, which often contain biographical and academic information, records of assignments, letters sent about clerics, medical and psychiatric records.

34.  When an allegation of an offense is made known to a Bishop, he is obliged by Canon Law to conduct a preliminary investigation either personally or through another person. (cc. 1717).  Canon 1710 refers to the acts of the investigation, the written records of which are to be held in the secret archives.

35.  Certain documents from the secret archives, such as documents relating to criminal cases or cases involving an allegation of a canonical crime, are required to be destroyed if they pertain to a person accused of a crime who has died or documents pertain to a criminal case ten years after it has been closed.  Even when such documentation is destroyed, a summary of the case is to be kept along with the sentence of the tribunal if the case was subjected to a complete canonical trial.

36.  The long history of child sexual abuse by priests since the 4th Century and recent efforts at secrecy about such abuse prove that at all times the Diocese and St. Elizabeth's were on notice of the threat of injury to children from its clergy such as DeLuca.

**B. DeLuca's History of Pedophile Sexual Molestation and the Underlying Intentional and Negligent Tort Claims**

37.  From 1958 and throughout his tenure in Delaware, Diocese and St. Elizabeth's had actual and constructive knowledge that DeLuca was sexually molesting young male children, such as plaintiff.

38.    On information and belief, from 1958 forward, Diocese knew that DeLuca was sexually abusing young boys and it continued to allow him to serve as a priest for a generation.

39.    Diocese and St. Elizabeth's knew DeLuca was sexually abusing young boys in 1966.

40.    Diocese and St. Elizabeth's had a duty, arising from the licensing and employment of DeLuca to operate as a priest, to ensure that he did not sexually molest young male children when he operated as a priest, confidant, counselor or teacher in homes, hospitals, parishes, schools and churches.

41.    Diocese and St. Elizabeth's had a duty arising from the special relationship that existed with plaintiff's parents and other parents of young, innocent, vulnerable children who attended St. Elizabeth's Roman Catholic Church, its elementary and high schools, as well as other parishes and schools in the Diocese.  This special relationship arose because of the high degree of vulnerability of the children entrusted to its care.  As a result of this high degree of vulnerability and risk of sexual abuse inherent in such a special relationship, Diocese and St. Elizabeth's had a duty to establish measures of protection not necessary for persons who are older and better able to safeguard themselves.  Such measures included, *inter alia*, prohibiting unsupervised contact between a child and an employee or agent, conducting background checks and not knowingly putting a child molester into a room full of vulnerable children, and other reasonable measures.

42.    Diocese and St. Elizabeth's also had a duty, arising from their actual knowledge that DeLuca was a child molester and pedophile, to ensure that he was not in a position to molest young male minors or any other children.  They also had a duty to use reasonable care to protect and supervise the children in their care, and plaintiff.

43.    In breach of these duties, DeLuca repeatedly sexually molested numerous young male

8

children, including plaintiff and others, some of whose names have been publicized subsequently in the Wilmington News Journal and elsewhere, when he operated in Delaware as agent for Diocese and St. Elizabeth's.

44. Diocese has publicly admitted that DeLuca sexually molested and abused young male children parishioners since at least 1962.

45. DeLuca intentionally and without plaintiff's consent caused plaintiff repeatedly to be in fear of immediate harmful or offensive physical contacts by DeLuca.

46. DeLuca intentionally and without plaintiff's consent repeatedly made unpermitted physical contact with plaintiff in a harmful and offensive way. These contacts would offend an ordinary person's reasonable sense of personal dignity, and it repeatedly offended plaintiff.

## C. Agency

47. At all times relevant hereto DeLuca was a priest employed by the Diocese and St. Elizabeth's to operate in their homes, hospitals, parishes, schools and churches. Without Roman Catholic Church, Diocesan, and St. Elizabeth's approval he could perform no sacerdotal functions or function as a priest in any manner whatsoever.

48. DeLuca was at all times a licensed priest of Diocese which was responsible for employing, licensing, and supervising him.

49. At all times and in all matters relevant hereto, Diocese and St. Elizabeth's were the principals of their agent DeLuca. Diocese and St. Elizabeth's manifested an intention that DeLuca become their agent and act on their behalf. DeLuca was empowered by Diocese and St. Elizabeth's to perform duties and functions undertaken on behalf of Diocese and St. Elizabeth's. DeLuca accepted and consented to serve and act on their behalf as their agent. DeLuca

consented to be subject to Diocese and St. Elizabeth's control.

50.  Diocese and St. Elizabeth's gave DeLuca the power to act on their behalf and to produce changes in legal relations by performing or not performing legal acts.  They conferred upon DeLuca the authority (express, implied, apparent or inherent) to affect legal relations by performing acts in accordance with their manifestations of consent.  At all times, DeLuca acted within the scope of that consent.

51.  All acts, if any, initially done outside the scope of that consent were ratified, affirmed, adopted, acquiesced in, and not repudiated by Diocese or St. Elizabeth's.  Such acts were enabled by the agency relationship.

52. DeLuca's actions were of the kind Diocese and St. Elizabeth's expected him to perform.  His conduct was not unexpected by Diocese and St. Elizabeth's.  His actions occurred substantially within the authorized time and space limits placed upon him by Diocese or St. Elizabeth's.  DeLuca was actuated at least in part by a purpose to serve Diocese and St. Elizabeth's.

53.  DeLuca was employed by Diocese and St. Elizabeth's, participated in Diocese's retirement plan and retired from Diocese.  All his contacts with plaintiff were made pursuant to his routine and regular job duties.

### D.  Fiduciary Relationships

54.  Fiduciary relationships existed between plaintiff and his parents on the one hand, and DeLuca,  Diocese, and St. Elizabeth's on the other.  These relationships are characterized by the highest degree of trust, confidence, good faith, honesty and candor, as well as a prohibition against self-dealing.

10

55.  Similar or identical to the fiduciary relationships that characterize the lawyer-client, doctor-patient and clergyman-church member relationships, such special relationships also existed in this case between plaintiff and his parents (who were members of the Roman Catholic Church and religion and faithful adherents to its doctrines, rituals, hierarchical organization and precepts) and DeLuca, Diocese, and St. Elizabeth's.

56.  This special fiduciary relationship was formed due to defendants' positions of the highest trust and spiritual authority in the Roman Catholic religion to which plaintiff and his parents were adherents.  It was formed when plaintiff and plaintiff's parents placed trust in the faithful integrity of defendants and their agents as religious authorities and leaders.

57.  This special fiduciary relationship also was formed due to the actions of plaintiff's parents entrusting plaintiff to defendants' care in both church and school settings throughout the Diocese.

58.  As a result of placing this trust, defendants gained influence, superiority and assumed religious control and responsibility over plaintiff and plaintiff's parents.  Defendants assumed a duty to act for or give advice to these parents regarding matters falling within the scope of the relationship.

59.  Such a special fiduciary relationship also was formed through the giving of regular sums of money by plaintiff's parents, through participation in religious rituals and celebrations and through organizational membership.

### E.  Plaintiff's Background

60.  Robert Quill was born on March 22, 1955 in Wilmington, DE.  He and his family, including six siblings, were devout Roman Catholics and  members of St. Elizabeth's

11

Parish.

61.  Plaintiff was an Eagle Scout in the Boy Scouts of America.  He was selected by his high school faculty to attend the American Legion Boys State, and from there, he was elected to represent the State of Delaware at Boys Nation in Washington, DC.  In the summer following his sophomore year of high school, he was selected as one of 20 students in Delaware to participate in a Title IX funded, marine biology, two-week, summer seminar held at the University of Delaware's Cape Henlopen facility.  He was recognized by the National Elks for his achievements.

62.  Plaintiff was a Dean's List student at St. Meinrad College (Indiana), where he graduated in 1978 with a B.S. in Biology, with minors in Chemistry, Philosophy, and Theology.

63.  Plaintiff then joined the United States Navy in 1980, where he became a Commissioned Officer and attained the rank Lieutenant (O-3).

64.  Following his Navy tour, plaintiff attended law school at Georgia State University and graduated in 1989.

65.  Thereafter, he began working for the Atlanta Legal Aid Society.

66.  In 1991, plaintiff was selected to be a Staff Attorney for the United States Court of Appeals for the Eleventh Circuit, in Atlanta, Georgia.  His tenure at the Court lasted 13 years, nine of which were as a Supervisory Staff Attorney for the Court.

67.  He was placed on "Full and Permanent Disability" status by his psychiatrist, Dr. Lathrop, on October 15, 2002 after a diagnosis of severe Post Traumatic Stress Disorder Syndrome (PTSDS).  His PTSDS was a direct result of the many years of sexual abuse he had been subjected to as a child by DeLuca.  His disability was approved without opposition by the

federal Office of Personnel Management, as well as by the Social Security Administration.  He was quickly retired by the Eleventh Circuit.

### F.  DeLuca's Earlier Sexual Crimes

68.  DeLuca was ordained as a priest by the Diocese of Wilmington in 1958.  He was assigned to serve at St. John the Beloved parish, in Wilmington, in 1961.

69.  Mike Schulte ("Schulte") was first molested by DeLuca in the early 1960s during a trip to Philadelphia.  The two shared a hotel room, which had two beds, and Schulte woke up face down on his bed, being sexually abused by DeLuca who was on top of him.  Later, on a trip to Virginia with the priest, Schulte had a blackout.  He believes the priest put a sedative in his drink so he would pass out.

70.  About three years later, Schulte told his parents about the incident when he noticed DeLuca with another altar boy and feared that the same thing would happen to him.

71.  When Schulte's parents called church officials, his allegations were investigated by the Reverend Douglas Dempster ("Dempster").

72.  Dempster told Schulte and his family never to mention the incident to anyone and that the Diocese would handle the matter.  The Schultes believed Diocese officials would handle DeLuca in a way that would prevent further sexual abuse of children by DeLuca.

73.  But in keeping with the 60 year policy of secrecy surrounding child abuse and pedophilia in the Roman Catholic Church, the Diocese intentionally, willfully, and with a conscious disregard for the obvious risks to any child who came into contact with DeLuca, failed to warn or disclose DeLuca's abuse to public authorities or to the community and failed to warn parents or children, including plaintiff, of DeLuca's actions and nature.

74. Dempster has stated that he informed the Diocese and that was the extent of his duty as investigator.

75. On information and belief, recent allegations reveal that civil suits were filed against DeLuca in 1958 in Indiana and Eastern Maryland in 1960, each of which mysteriously disappeared from the dockets.

76. The Diocese knew of these allegations.

77. Similar allegations from former altar boys at St. John the Beloved, dating back to the mid 1960's, have recently appeared, which detail official business trips to Wildwood, New Jersey with DeLuca where he would inappropriately touch and have sex with the boys.

78. On May 29, 2007, in sworn testimony before the State of Delaware House of Representatives, Diocese attorney Anthony Flynn publically admitted that the Diocese had information about DeLuca sexually abusing children dating back to 1962.

79. DeLuca was transferred by the Diocese to St. Elizabeth's Parish in 1966 where he exercised full powers as a priest and teacher, despite the many instances of child abuse of which the Diocese had actual knowledge.

### G. Further Reckless and Gross Breach of Duty

80. The Diocese's and St. Elizabeth's retention of DeLuca, who they knew or should have known was a threat to children, constituted an intentional failure to perform a manifest duty in reckless disregard of the consequences to all foreseeable victims of DeLuca, including plaintiff.

81. The Diocese's and St. Elizabeth's retention of DeLuca, who they knew or should have known was a threat to children, evidenced a conscious disregard for the safety of those children, including plaintiff.

14

82.  The Diocese's and St. Elizabeth's failure to warn their parishioners of the danger posed by DeLuca constituted an intentional failure to perform a manifest duty in reckless disregard of the consequences to all foreseeable victims of DeLuca, including plaintiff.

83.  The Diocese's and St. Elizabeth's failure to warn their parishioners of the danger posed by DeLuca evidenced a conscious disregard for the safety of those children, including plaintiff.

84.  The Diocese's and St. Elizabeth's failure to use reasonable care to protect and supervise the children under their care constituted an intentional failure to perform a manifest duty in reckless disregard of the consequences to all foreseeable victims of DeLuca, including plaintiff.

85.  The Diocese's and St. Elizabeth's failure to use reasonable care to protect and supervise the children under their care evidenced a conscious disregard for the safety of those children, including plaintiff

86.  The Diocese's and St. Elizabeth's failure to use reasonable care to properly supervise DeLuca constituted an intentional failure to perform a manifest duty in reckless disregard of the consequences to all foreseeable victims of DeLuca, including plaintiff.

87.  The Diocese's and St. Elizabeth's failure to use reasonable care to properly supervise DeLuca  evidenced a conscious disregard for the safety of children within their care, including plaintiff.

### H. DeLuca's Sexual Crimes Against Plaintiff

88.  Plaintiff attended St. Elizabeth's elementary school.  He graduated from St. Elizabeth's High School in 1973.

89.  Plaintiff was raised in a devout Roman Catholic family.  He regularly attended Mass

and received the sacraments of that Church.  He participated in many Church related activities.

90.   After being recruited by DeLuca while attending St. Elizabeth's schools, he was an altar boy from the sixth grade through high school.  DeLuca was his supervisor as an altar boy.  One of DeLuca's official job duties was to supervise plaintiff as an altar boy.  Plaintiff was a direct participant in liturgical  exercises with DeLuca at the Roman Catholic Mass.

91.   As a priest,  DeLuca was a person of great influence and persuasion.  He was revered as an authority figure and purported holy man.

92.   DeLuca frequented plaintiff's parents' home as part of his job duties where he deceitfully befriended plaintiff's parents and won their trust and confidence, becoming  a personal spiritual advisor.  He was often asked to stay overnight if he had too much to drink or if the weather was bad.

93.   Every Christmas after he finished his Mass schedule he came to plaintiff's house as a spiritual advisor and would spend every Christmas and the following week with plaintiff's family.

94.   DeLuca took plaintiff and his twin brother to the beach, to New York City, to Washington, DC, and for dinners at the Hotel DuPont.

95.   Beginning in 1968, when plaintiff was thirteen years old, DeLuca began a course of unpermitted, harmful, and offensive sexual contact upon plaintiff.

96.   The first incident of sexual abuse occurred during an official job related trip to Wildwood, New Jersey in the summer of 1968.  On the first night of the trip, DeLuca sat on plaintiff's bed and began rubbing him and touching plaintiff's genitals.  He then pulled plaintiff's underwear off, rolled him over onto his back, laid down on top of plaintiff naked, and ejaculated on him.  DeLuca sexually molested plaintiff in the same way every night of that week long trip.

16

97.  On numerous occasions between 1968 and 1975 DeLuca engaged in non-consensual sexual conduct with the plaintiff, then a minor, at various locations, at least 300 times.

98.  The sexual abuse of plaintiff occurred at the following places: on official altar boy trips to Wildwood, New Jersey and to New York City, in rectory workplaces, and on his senior high school class ski trip in Pennsylvania where DeLuca chaperoned.  DeLuca also sexually attacked plaintiff in his parents' house in Wilmington.  He even molested him on his older brother Joe's wedding day at his parents' house.

99.  It was widely known by Diocese and St. Elizabeth's during this time that DeLuca had an affinity for young boys and that this was the reason he was transferred from St. Elizabeth's to Holy Spirit Church in 1969.

100.  Even after he was transferred to Holy Spirit Church, and to St. Matthew's Church, DeLuca still stalked and sexually molested plaintiff.  He persuaded plaintiff's mother to allow him to stay with DeLuca at the rectory workplace on occasion.

101.  Finally, in 1993 Diocese quietly removed DeLuca after decades of knowledge of his abuse of children and allowed him to retire.  He chose to move to his hometown, Syracuse, New York, where in October 2006 he was arrested for sexually molesting a boy for four to five years.  On June 28, 2007, DeLuca plead guilty to numerous counts of sexually abusing this young boy.

102.  Only after DeLuca's initial arrest, and the widespread publicity that the arrest received, did the Diocese, on November 16, 2006, release the secret names of other of its priests who had substantiated claims of child sexual abuse brought against them.

103.  When plaintiff read the news article about DeLuca being arrested in New York which was posted on delawareonline.com on October 22, 2006, a flood of memories were

17

unleashed.

104.  Plaintiff used one or more of the following coping mechanisms over the years to protect his psyche from the trauma of what DeLuca did to him: memory repression, denial, and dissociation.

105.  Memory repression or traumatic amnesia is the memory loss of the abuse as a result of the overwhelming emotional state during the abuse.

106.  Denial is the minimization or complete lack of acknowledgment of the abuse.

107.  Dissociation is the disconnecting or numbing of oneself with regard to the abuse.

108.  These coping mechanisms operated to remove or guard plaintiff from the effects of his abuse.  The survivor is not able to confront the abuse until much later.

## I.  Causation

109.  The willful, wanton, and reckless actions of the defendants were the proximate cause of separate and distinct immediate and long term injuries and conditions which plaintiff suffered. The actions of each defendant played a determinative role in these injuries.  The gross negligence of the Diocese and St. Elizabeth's was a substantial or motivating factor in causing plaintiff's injuries.

## J.  Injuries

110.  Because of the childhood sexual abuse plaintiff suffered at the hands of DeLuca, plaintiff has had struggles in forming successful relationships with men, women, and even his own family.

111.  Plaintiff became withdrawn, isolated, ashamed, detached, glum, somber, and humorless after the first time DeLuca sexually molested him and increasingly more so as time, and

18

the abuse, went on.

112.  Plaintiff is an insomniac and uses sleep aids.  He also surrounds himself with dogs and guns to feel more protected as a result of what DeLuca did to him.

113.  Plaintiff became depressed and suicidal, and to this day struggles with depression and suicidal ideation.

114.  Plaintiff saw a psychiatrist, Dr. Lathrop, from 2001 until 2002, who observed that his psycho/sexual/emotional development ended abruptly at age 13, that he was still a 13 year old in all those ways, and was incapable of being "fixed," or of recovery.  Plaintiff's injuries are permanent.

115.  Plaintiff was placed on "Full and Permanent Disability" status by his psychiatrist on October 15, 2002 after a diagnosis of severe Post Traumatic Stress Disorder Syndrome (PTSDS).  His PTSDS was a direct result of the many years of sexual abuse he had been subjected to as a child by DeLuca.  His disability was approved without opposition by the federal Office of Personnel Management.

116.  Plaintiff's loss of salary as a result of being forced to retire early is in the range of $1.5 million.  His pension loss exceeds $1 million.

117.  Plaintiff's separate and distinct immediate and long term injuries and conditions, which were the result of childhood sexual abuse, include, but are not limited to,  the above mentioned injuries and also sexual dysfunction, lack of intimacy, guilt, emotional pain, fear, fright, shame, humiliation, anger, loss of enjoyment of life, embarrassment, and other temporary or permanent personal injury.

## COUNT I (Assault and Battery)

118.   Plaintiff repeats and realleges paragraphs 1-117 set forth above.

119.   The acts of DeLuca toward plaintiff are crimes in Delaware under, *inter alia*, 11 Del. C. §§ 615, 769, and 778.  They also constituted civil assault and battery.  These intentional torts occurred during the normal course of his routine and regular employment duties.  Under agency principles his employers, Diocese and St. Elizabeth's, are legally responsible for these torts.

120. The actions of DeLuca, Diocese, and St. Elizabeth's were willful, wanton or oppressive and merit an award of punitive damages.

121.   Plaintiff's right be free of assault and battery has been denied under the common law of the State of Delaware and the Act.

## COUNT II (Negligence)

122.   Plaintiff repeats and realleges paragraphs 1-121 set forth above.

123.   Defendant DeLuca owed a duty of care to the plaintiff under the circumstances then existing.

124.   Defendant breached his duty by sexually molesting plaintiff for eight years.

125.   As a direct and proximate result of defendant's negligence, plaintiff has been injured.

126.   The actions of DeLuca were willful, wanton or oppressive and merit an award of punitive damages.

127.   Plaintiff's right be free of negligence has been denied under the common law of the State of Delaware and the Act.

20

## COUNT III (Gross Negligence)

128.  Plaintiff repeats and realleges paragraphs 1-127 set forth above.

129.  Defendants Diocese and St. Elizabeth's owed a duty of care to the plaintiff under the circumstances then existing.

130.  Defendants Diocese and St. Elizabeth's intentionally, willfully, wantonly, recklessly, and with gross negligence breached their duty to the plaintiff by retaining and not supervising DeLuca, failing to warn plaintiff, and failing to protect the plaintiff from the foreseeable criminal acts of DeLuca when they knew or should have known that DeLuca posed a danger to plaintiff.

131.  Diocese's and St. Elizabeth's breach of duty constituted an intentional failure to perform a manifest duty in reckless disregard of the consequences to all foreseeable victims of DeLuca, including Plaintiff.

132.  Defendants Diocese and St. Elizabeth's evidenced a conscious disregard for the risk of harm to the foreseeable victims of DeLuca, all children in the Diocese, including plaintiff.

133.  As a direct and proximate result of the Defendants' gross negligence and intentional, willful, wanton, and reckless acts, plaintiff has been injured.

134.  The actions of the Diocese and St. Elizabeth's were willful, wanton or oppressive and merit an award of punitive damages.

135.  Plaintiff's right be free of gross negligence by Diocese and St. Elizabeth's has been denied under the common law of the State of Delaware and the Act.

## COUNT IV (Breach of Fiduciary Duty)

136.  Plaintiff repeats and realleges paragraphs 1-135 set forth above.

137.  Defendants Diocese, St. Elizabeth's and DeLuca owed various fiduciary duties to

21

plaintiff.

138. Defendants Diocese, St. Elizabeth's and DeLuca grossly breached those fiduciary duties.

139. As a direct and proximate result of the Diocese's, St. Elizabeth's and DeLuca's breach of fiduciary duties, plaintiff has been injured.

140. The actions of the defendants Diocese, St. Elizabeth's and DeLuca were willful, wanton or oppressive and merit an award of punitive damages.

141. Plaintiff's rights have been denied under the common law of the State of Delaware and the Act.

## COUNT V (Fraud)

142. Plaintiff repeats and realleges paragraphs 1-141 set forth above.

143. Diocese and St. Elizabeth's, by licensing and employing DeLuca, falsely represented to the plaintiff that DeLuca was a religious authority and leader of integrity and worthy of plaintiff's trust.

144. Diocese and St. Elizabeth's knew that representation was false, or it was made with reckless indifference to the truth.

145. The representation was made with an intent to induce the plaintiff to engage with and associate with DeLuca, such as by serving as an altar boy with him in Roman Catholic liturgy.

146. Plaintiff's engagement and association with DeLuca were done in justifiable reliance upon the representation.

147. As a direct and proximate result of defendant's false representations, plaintiff was injured.

22

148.  The actions of Diocese and St. Elizabeth's were willful, wanton or oppressive and merit an award of punitive damages.

149.  Plaintiff's rights have been denied under the common law of the State of Delaware and the Act.

## COUNT VI (Repressed Memory - Assault and Battery)

150.  Plaintiff repeats and realleges paragraphs 1-149 set forth above.

151.  The acts of DeLuca toward plaintiff are crimes in Delaware under, *inter alia*, 11 Del. C. §§ 615, 769, and 778.  They also constituted civil assault and battery.  These intentional torts occurred during the normal course of his routine and regular employment duties.  Under agency principles his employers, Diocese and St. Elizabeth's, are legally responsible for these torts.

152. The actions of DeLuca, Diocese, and St. Elizabeth's were willful, wanton or oppressive and merit an award of punitive damages.

153.  It was not until October 2006 when plaintiff first understood or discovered that he had been the victim of years of sexual molestation by DeLuca between 1968-1975 because these traumatic events disrupted his memory function and cognition.

154.  This was inherently unknowable until that date.  Plaintiff was blamelessly ignorant of the assault and battery.

155.  Plaintiff's right be free of assault and battery has been denied under the common law of the State of Delaware.

## COUNT VII (Repressed Memory - Negligence)

156.  Plaintiff repeats and realleges paragraphs 1-155 set forth above.

23

157.  Defendants Diocese, St. Elizabeth's and DeLuca owed a duty of care to the plaintiff under the circumstances then existing.

158.  Defendants Diocese, St. Elizabeth's and DeLuca intentionally, willfully, wantonly, recklessly, and negligently breached their duty to the plaintiff by retaining and not supervising DeLuca, failing to warn plaintiff, and failing to protect the plaintiff from the foreseeable criminal acts of DeLuca when they knew or should have known that DeLuca posed a danger to plaintiff.

159.  In October 2006 plaintiff first understood that he had been the victim of defendants' negligence.  This was inherently unknowable until October of 2006.  Plaintiff was blamelessly ignorant of this negligence.

160.  The actions of the Diocese, St. Elizabeth's and DeLuca were willful, wanton or oppressive and merit an award of punitive damages.

161.  Plaintiff's right be free of negligence by Diocese and St. Elizabeth's has been denied under the common law of the State of Delaware.

**Wherefore**, Plaintiff prays that the Court:

    (a)    Enter judgment against the defendants, jointly and severally.

    (b)    Enter a judgment against the defendants, jointly and severally, for compensatory and punitive damages.

    ( c)    Enter a judgment against defendants, jointly and severally, for costs and pre and post judgment interest.

    (d)    Require such other and further relief as the Court deems just and proper under the circumstances.

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQUIRE (#243)**
**STEPHEN J. NEUBERGER, ESQUIRE (#4440)**
**RAEANN WARNER, ESQUIRE (#4931)**
Two East Seventh Street, Suite 302
Wilmington, DE  19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com
RW@NeubergerLaw.com

**JACOBS & CRUMPLAR, P.A.**

/s/ Robert Jacobs
**ROBERT JACOBS, ESQUIRE (#244)**
**THOMAS C. CRUMPLAR, ESQUIRE (#942)**
Two East Seventh Street, Suite 400
Wilmington, DE 19801
(302) 656-5445
Bob@JandCLaw.com
Tom@JandCLaw.com

Dated: July 12, 2007

/ Quill, Robert / Pleadings / Complaint.final

25

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
ROBERT QUILL

## DEFENDANTS
CATHOLIC DIOCESE OF WILMINGTON, INC., ST. ELIZABETH'S CATHOLIC CHURCH, REV. FRANCIS G. DELUCA, AND REV. MICHAEL A. SALTARELLI.

(b) County of Residence of First Listed Plaintiff    Monroe County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed    New Castle County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
THE NEUBERGER FIRM, P.A.
TWO EAST SEVENTH STREET, SUITE 302
WILMINGTON, DE 19801
302-655-0582        (SEE ATTACHED)

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1   U.S. Government    Plaintiff

☐ 3   Federal Question
     (U.S. Government Not a Party)

☐ 2   U.S. Government    Defendant

X 4   Diversity
     (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PLF | DEF | | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | X 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | X 4 |
| Citizen of Another State | X 2 | ☐ 2 | Incorporated and Principal of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product |    Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument |    Liability | ☐ 365 Personal Injury — |    of Property 21 USC 881 |    28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & |    Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
|    & Enforcement of Judgment |    Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' |    Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights |    Corrupt Organizations |
| ☐ 152 Recovery of Defaulted |    Liability |    Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
|    Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** |    Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
|    (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | |    Exchange |
| ☐ 153 Recovery of Overpayment |    Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) |    12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle |    Property Damage |    Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract |    Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | X 360 Other Personal Injury |    Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** |    & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment |    Sentence | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee Determination Under |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ |    Habeas Corpus: | |    or Defendant) |    Equal Access to Justice |
| ☐ 240 Torts to Land |    Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty |    Security Act |    26 USC 7609 |    State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

X 1 Original Proceeding     ☐ 2 Removed from State Court     ☐ 3 Remanded from Appellate Court     ☐ 4 Reinstated or Reopened     ☐ 5 Transferred from another district (specify)     ☐ 6 Multidistrict Litigation     ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

This is a diversity action under 28 U.S.C. Sec.1332 for personal injuries for childhood sexual abuse.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ OVER $75,000    CHECK YES only if demanded in complaint:
JURY DEMAND:    X Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE    SEE ATTACHED.    DOCKET NUMBER

DATE   7/12/07     SIGNATURE OF ATTORNEY OF RECORD   Stephen J. Neuberger

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**I.(c)    ATTACHMENT TO CIVIL COVER SHEET: ATTORNEYS OF RECORD:**

**THE NEUBERGER FIRM, P.A.**

**THOMAS S. NEUBERGER, ESQUIRE (#243)**
**STEPHEN J. NEUBERGER, ESQUIRE (#4440)**
**RAEANN WARNER, ESQUIRE (#4931)**
Two East Seventh Street, Suite 302
Wilmington, DE  19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com
RW@NeubergerLaw.com

**JACOBS & CRUMPLAR, P.A.**
**ROBERT JACOBS, ESQUIRE (#244)**
**THOMAS C. CRUMPLAR, ESQUIRE (#942)**
Two East Seventh Street, Suite 400
Wilmington, DE 19801
(302) 656-5445
Bob@JandCLaw.com
Tom@JandCLaw.com

VIII.  Related Case(s) If Any:

Whitwell v. Smith, C.A.No. 05-796-SLR (D.Del.)

Judge: Robinson
Docket Number: 05-796-SLR

**A.  Introduction.**  The issues in the present Quill diversity action are substantially similar to those in the Whitwell diversity action.  Because the Court is already familiar with many of the legal issues, see Whitwell v. Archmere Academy, Inc., 463 F.Supp.2d 482 (D.Del. 2006), and factual issues from its presiding over a two day trial in March 2006, plaintiff respectfully submits that judicial economy, efficiency and consistency would be served by assignment of this case to Judge Robinson.

**B.  Subject Matter.**  The subject matter of each case is identical - childhood sexual molestation, abuse and rape of a young child by a priest at their parish/school and the knowledge of the abuse by the institutional defendants.

**C.  Legal Issues.**  The legal issues also are very similar.

**1.  Priest Perpetrator.**  Each case involves the same assault and battery issues arising out of sexual abuse of a young child whose family was first befriended by the defendant priest.

**2.  Institutional Defendants.**  Each case also involves the same issues of negligence and breach of fiduciary duty by the institutional defendants.

**3.  Conflict of Laws.**  Because the sexual abuse took place in numerous states - including Delaware, New York, New Jersey and Pennsylvania, plaintiff expects the defense will raise the same conflict of law arguments raised in the earlier action and addressed by the Court in its reported opinion in Whitwell v. Archmere Academy, Inc., 463 F.Supp.2d 482 (D.Del. 2006).

**D.  Factual Issues - Memory Repression and Damages.**  The memory repression and damages evidence also is expected to be similar: psychological and psychiatric evidence about the impact on a young child's psyche of being sexually abused by a trusted God-figure and the havoc such actions cause on their emotional, psychological and sexual development as human beings.

**E.  Same Parties and Counsel.**  The Diocese of Wilmington is a party to each of these lawsuits.  It is expected that the Diocese will be represented by the same counsel, Mr. Anthony Flynn.  Additionally, plaintiff's counsel are the same in both the Whitwell and Quill actions.

**F.  Judicial Economy.**  Judicial economy in both the state and federal systems also would be served by assignment of this case to Judge Robinson.

The issues raised in this case are high profile ones in which the public has taken a special interest. This case is the first to be filed under the new Delaware state law known as the Child Victim's Act which was unanimously passed by both houses of the Delaware General Assembly and signed into law by Governor Minner on July 10, 2007.

It is reasonably expected that this filing will be met with a motion to dismiss the Complaint by the defendants, challenging the constitutionality of the Child Victim's Act due to its impact on the statute of limitations. This will result in extensive briefing on the Fourteenth Amendment due process issues raised and whether the U.S. Constitution permits such legislative intervention.

There is a strong public policy interest in having this federal constitutional issue promptly decided by a sitting judge of this federal Court. The Court's resolution of this serious constitutional issue will have immediate impact on the numerous childhood sexual abuse cases expected to be filed in the near future.

**G. Conclusion.** For the reasons discussed above, plaintiff respectfully submits that judicial economy, efficiency and consistency would be served by assignment of the case to Judge Robinson.

Alternatively, due to the above mentioned public policy interest in a prompt adjudication of federal constitutional issues, the case should be assigned to one of our three sitting judges and not the vacant judicial position where the constitutional determination would languish.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _O7-435_

**ACKNOWLEDGMENT**
**OF RECEIPT FOR AO FORM 85**

*UNITED STATES MAGISTRATE JUDGE*
*TO EXERCISE JURISDICTION*

*NOTICE OF AVAILABILITY OF A*

I HEREBY ACKNOWLEDGE RECEIPT OF ___4___ COPIES OF AO FORM 85.

JUL 1 2 2007
_____
(Date forms issued)

_____
(Signature of Party or their Representative)

Raeann Warner
_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action