# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT QUILL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A.No. 07-435-SLR |
| | : | |
| CATHOLIC DIOCESE OF WILMINGTON, | : | |
| INC., a Delaware corporation; ST. | : | |
| ELIZABETH'S CATHOLIC CHURCH, a | : | |
| Delaware corporation;  Rev. FRANCIS G. | : | |
| DELUCA, individually and in his official | : | |
| capacity; and Rev. MICHAEL A. | : | |
| SALTARELLI, in his official capacity, | : | |
| | : | |
| Defendants. | : | |

## APPENDIX TO PLAINTIFF'S OPENING BRIEF IN SUPPORT OF HIS RULE 12(c) MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS, AND/OR RULE 56(a), (c) AND (d) MOTION FOR PARTIAL SUMMARY JUDGMENT, ON THE CONSTITUTIONALITY OF THE CHILD VICTIM'S ACT AS WRITTEN UNDER THE U.S. CONSTITUTION
### (A1-A319)

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
RAEANN WARNER, ESQ. (#4931)
Two East Seventh Street, Suite 302
Wilmington, DE  19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com
RW@NeubergerLaw.com

Dated: October 16, 2007

JACOBS & CRUMPLAR, P.A.
ROBERT JACOBS, ESQ. (#244)
THOMAS C. CRUMPLAR, ESQ. (#942)
Two East Seventh Street, Suite 400
Wilmington, DE 19801
(302) 656-5445
Bob@JandCLaw.com
Tom@JandCLaw.com

Attorneys for Plaintiff

## TABLE OF CONTENTS

Item                                                                                          Page

First Amended Complaint.......................................................................................A00001

Answer of Catholic Diocese of Wilmington and Bishop Saltarelli.....................................A00030

Answer of St. Elizabeth's Catholic Church..............................................................A00069

Text of S.B. 29, Child Victim's Act.........................................................................A00102

Transcribed Senate Hearing and Vote on S.B. 29, April 4, 2007........................................A00104

Word Index for Senate Hearing and Vote on S.B. 29, April 4, 2007...................................A00133

Official Minutes of House Judiciary Committee Hearing, Day 1, May 10, 2007...............A00315

Transcribed House Judiciary Committee Hearing, Day 2, May 29, 2007............................A00153

Word Index for House Judiciary Committee Hearing, Day 2, May 29, 2007....................A00208

Transcribed House Hearing and Vote on S.B. 29, June 19, 2007........................................A00247

Word Index for House Hearing and Vote on S.B. 29, June 19, 2007..................................A00287

Text of Child Victim's Act, DE STATE TITLE 10 § 8145.................................................A00313

Governor Minner Signing Statement Senate Bill 29......................................................A00314

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT QUILL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A.No. 07-435-SLR |
| | : | |
| CATHOLIC DIOCESE OF WILMINGTON, | : | |
| INC., a Delaware corporation; ST. | : | |
| ELIZABETH'S CATHOLIC CHURCH, a | : | |
| Delaware corporation;  Rev. FRANCIS G. | : | |
| DELUCA, individually and in his official | : | |
| capacity; and Rev. MICHAEL A. | : | Jury Trial Demanded |
| SALTARELLI, in his official capacity, | : | |
| | : | |
| Defendants. | : | |

## FIRST AMENDED COMPLAINT[1]

1.  This is a diversity case arising from the July 10, 2007 enactment of the Delaware

Child Victims Act of 2007 (the "Act") and Delaware common law regarding childhood sexual

abuse.  It seeks monetary damages for personal injuries arising from childhood sexual abuse by a

pedophile Roman Catholic priest.  From the age of thirteen to nineteen Robert Quill was the

victim of at least 300 acts of sexual molestation by Rev. Francis G. DeLuca, a convicted child

molester and priest employed by the defendants.  DeLuca was employed recklessly despite the

fact that the defendants had prior actual knowledge that he was a child molester and that they

owed a duty of care to protect plaintiff from him.

## I.  JURISDICTION

2.  The diversity jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1332, 2201

---

[1]  No Answer having been filed, pursuant to Fed.R.Civ.P. 15(a), plaintiff amends his
Complaint as of right.  Minor changes have been made to section III and Count VIII has been
added.

and 2202.  This case arises between citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

3.  Venue is appropriate pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## II.  THE PARTIES

4.  Robert Quill ("plaintiff") resides in Marathon, Florida and is a citizen of that State. He is presently 52 years old.  He was last employed as a Supervisory Staff Attorney for the United States Court of Appeals for the Eleventh Circuit, in Atlanta, Georgia.  At the times he was sexually molested and victimized, he ranged from ages thirteen to nineteen.

5.  Defendant Catholic Diocese of Wilmington, Inc. ("Diocese") is a Delaware corporation, file number 0787107.  It serves as its own registered agent at 1626 N. Union St., Wilmington, DE 19806.   It is authorized to do business and is doing business in the States of Delaware and Maryland as a Roman Catholic religious enterprise.

6.  On information and belief, defendant St. Elizabeth's Roman Catholic Church ("St. Elizabeth's"), is a Title 27 or a Title 8 Delaware Corporation located in Wilmington, DE, which operates under the auspices of defendant Diocese.  It is authorized to do business and is doing business in the State of Delaware as private religious institution, operating both a church and elementary and high school, each of which plaintiff attended.

7.  Defendant Francis G. DeLuca ("DeLuca") is a Roman Catholic priest. He was employed by the Diocese from 1958 until 1993.  He is a convicted child molester.  He is presently 77 years old and resides at 100 Pastime Drive, Syracuse, New York.  He is a citizen of Delaware.  He is sued in his official and individual capacities.

2

8. DeLuca was the assistant pastor at St. Elizabeth's as well as a staff member and religion teacher at the St. Elizabeth's elementary and high schools from 1966 to 1969 where he sexually abused numerous young male parishioners in addition to plaintiff.

9. Defendant Rev. Michael A. Saltarelli ("Saltarelli") is currently employed as the Roman Catholic Bishop of the Diocese. He is sued only in his official capacity as agent or alter ego of the Diocese for purposes of collecting a money judgment against the Diocese, should its assets be titled in his name. He is a citizen of Delaware.

10. Diocese was responsible at all times for licensing DeLuca to perform priestly functions as one of its employees. Without the explicit authorization and sanction of Diocese, he could not have performed priestly functions including spiritual and personal counseling, the conduct of religious services, days of spiritual recollection, and the administration of Roman Catholic sacraments.

11. At all times relevant hereto, Diocese was responsible for the management and control of its parishes, including St. John the Beloved, St. Elizabeth's, Holy Spirit and St. Matthew's, and was responsible for employing priests, staff and other agents to operate those parishes.

12. At all times relevant hereto, Diocese had actual or constructive knowledge of prior criminal conduct by DeLuca where he sexually abused young boys. For example, Diocese was notified by Mike Schulte and his family that he had been abused by DeLuca while assigned to St. John the Beloved Parish in Wilmington, DE in the early 1960s before he was transferred to St. Elizabeth's Parish in 1966 where he abused plaintiff for years.

13. Diocese and St. Elizabeth's also had actual or constructive knowledge of the childhood sexual abuse which was being committed upon plaintiff by DeLuca.

3

14. DeLuca's misconduct also was authorized, sanctioned, ratified, acquiesced in or approved by Diocese and St. Elizabeth's. All his acts were taken within the scope of his authority and for the benefit of Diocese and St. Elizabeth's during the normal course of his routine and regular job duties.

### III.  FACTS GIVING RISE TO THE ACTION

#### A. Institutional Knowledge of Clergy Sexual Abuse Leading to the Underlying Gross Negligence

15.  As was recently admitted under oath by Monseigneur Thomas Cini, the Vicar General for Administration of the Diocese, the Diocese, the Roman Catholic Church, and by implication St. Elizabeth's, have been aware of the serious problem of clergy sexual abuse of children since at least the early 1800s.

16.  In 1917 section 1395 of Canon Law was formally enacted for all Roman Catholic priests and it punished clergy sexual abuse of children.

17.  The current codification of Canon Law enacted in the 1980s reenacted this prohibition and carried forth this duty to protect children.

18.  The Diocese, St. Elizabeth's and the Roman Catholic Church have been aware of the serious problem of clergy sexual abuse of children throughout their history, and even long before the early 1800s.

19.  Canon law records, dating back to the 4th century, reveal a consistent pattern of attempts by Church leadership to deal effectively with clergy sexual abuse.

20.  In the era when regional conferences of bishops met to enact legislation, there is regular mention of laws and canons which were enacted to punish clerics whose offenses were

4

the sexual abuse of youths.

21.  Between the 15th and 17th centuries, Roman Catholic Church courts would often put a child abuser on trial, defrock him and turn him over to the civil authorities for prosecution and punishment, including death.

22.  There is evidence that in monasteries in the medieval period, clerics who sexually abused children were inflicted with severe physical punishments amounting to imprisonment and life-long restriction and monitoring, even after a sentence of strict confinement had been served.

23.  In the 11th century, a book entitled "Book of Gomorrah" was written by Cardinal, and later St. Peter Damian, which was devoted entirely to exposing and providing suggested remedies for clergy sexual abuse.

24.  The Roman Catholic Church made other attempts at curbing the sexual abuse of children, including specific canons or laws, regulating and disciplining abusers, which were enacted at synods or gatherings of bishops.

25.  The Pope also acknowledged the clergy sexual abuse problem in public documents such as "Horrendum est" (August, 1568), which declared that priests who sexually abused children were to be deprived of all sources of income, degraded or evicted from the clerical state, and turned over to secular authorities for additional punishment.

**B.  Institutional Secrecy Regarding Clergy Sexual Abuse Leading to the Underlying Gross Negligence.**

26.  However, Diocese, St. Elizabeth's and the Roman Catholic Church changed course and for at least the last 60 years have handled reports of clergy sexual abuse with extreme secrecy.

5

27.  Diocese, St. Elizabeth's and Roman Catholic Church authorities often use tactics with victims and their families to coerce or intimidate them from disclosing the abuse or filing a lawsuit.

28.  Diocese, St. Elizabeth's and Roman Catholic Church authorities often transfer perpetrators from one assignment to another, without telling the incoming assignment of the priest's past history of child abuse.

29.  Secrecy also was enabled by the fact that child abuse victims are often afraid that by saying anything negative about a priest they are sinning and will be punished by God.

30.  When they are molested, victims are told the abusive sexual act is God's will for them and God has chosen their priest to initiate them into secrets of sexual love.  DeLuca regularly incorporated religion into his sexual abuse and used his position as a priest as a means to force himself on minor children, including plaintiff.  For example, sometimes he would sexually abuse and molest plaintiff while purportedly praying or engaging in spiritual discussions which was part of his job duties as a priest.

31.  In 1962 the Vatican also issued a secret document - *Crimen Sollicitationis* - which outlined the rules to be followed in the Church's processing of cases where priests were accused of solicitation of sex in the confessional. Title V of this document governs other clergy sexual crimes such as having sex with a minor and bestiality.  This document included regulations that placed everyone who dealt with such cases under the Secret of the Holy Office, the highest degree of Vatican secrecy.  Violation of the promise to keep knowledge of such a case secret resulted in automatic ex-communication, which could only be absolved by the Pope.  This document remained in force until 2001 and is an example of the extreme secrecy surrounding

6

A6

clergy sexual abuse followed by Diocese, St. Elizabeth's and the Roman Catholic Church.

32.   Records regarding clergy sexual abuse of children are also kept top secret.

33.   Canon Law (cc.486-488) states that every Diocese must maintain a secret archive in which the instruments and writings pertaining to the spiritual and temporal affairs of the Diocese are kept.

34.   There is also a secret archive in every Diocese where more sensitive materials are kept. (cc.489-490).  It is in this secret archive that information regarding sexual misconduct of DeLuca and other clergy are housed.  Such documents held in the secret archive are only available to the bishop and the chancellor.

35.   The long history of child sexual abuse by priests since the 4th Century and recent efforts at secrecy about such abuse prove that at all times, Diocese and St. Elizabeth's were on notice of the threat of injury to children from its clergy such as Smith.

### C. DeLuca's History of Pedophile Sexual Molestation and the Underlying Intentional and Negligent Tort Claims

36.   From 1958 and throughout his tenure in Delaware, Diocese and St. Elizabeth's had actual and constructive knowledge that DeLuca was sexually molesting young male children, such as plaintiff.

37.   On information and belief, from 1958 forward, Diocese knew that DeLuca was sexually abusing young boys and it continued to allow him to serve as a priest for a generation.

38.   Diocese and St. Elizabeth's knew DeLuca was sexually abusing young boys in 1966.

39.   Diocese and St. Elizabeth's had a duty, arising from the licensing and employment of DeLuca to operate as a priest, to ensure that he did not sexually molest young male children

7

when he operated as a priest, confidant, counselor or teacher in homes, hospitals, parishes, schools and churches.

40.  Diocese and St. Elizabeth's had a duty arising from the special relationship that existed with plaintiff's parents and other parents of young, innocent, vulnerable children who attended St. Elizabeth's Roman Catholic Church, its elementary and high schools, as well as other parishes and schools in the Diocese.  This special relationship arose because of the high degree of vulnerability of the children entrusted to its care.  As a result of this high degree of vulnerability and risk of sexual abuse inherent in such a special relationship, Diocese and St. Elizabeth's had a duty to establish measures of protection not necessary for persons who are older and better able to safeguard themselves.  Such measures included, *inter alia*, prohibiting unsupervised contact between a child and an employee or agent, conducting background checks and not knowingly putting a child molester into a room full of vulnerable children, and other reasonable measures.

41.  Diocese and St. Elizabeth's also had a duty, arising from their actual knowledge that DeLuca was a child molester and pedophile, to ensure that he was not in a position to molest young male minors or any other children.  They also had a duty to use reasonable care to protect and supervise the children in their care, and plaintiff.

42.  In breach of these duties, DeLuca repeatedly sexually molested numerous young male children, including plaintiff and others, some of whose names have been publicized subsequently in the Wilmington News Journal and elsewhere, when he operated in Delaware as agent for Diocese and St. Elizabeth's.

43.  Diocese has publicly admitted that DeLuca sexually molested and abused young male

8

children parishioners since at least 1962.

44.  DeLuca intentionally and without plaintiff's consent caused plaintiff repeatedly to be in fear of immediate harmful or offensive physical contacts by DeLuca.

45.  DeLuca intentionally and without plaintiff's consent repeatedly made unpermitted physical contact with plaintiff in a harmful and offensive way.  These contacts would offend an ordinary person's reasonable sense of personal dignity, and it repeatedly offended plaintiff.

### D.  Agency

46.  At all times relevant hereto DeLuca was a priest employed by the Diocese and St. Elizabeth's to operate in their homes, hospitals, parishes, schools and churches.  Without Roman Catholic Church, Diocesan, and St. Elizabeth's approval he could perform no sacerdotal functions or function as a priest in any manner whatsoever.

47.  DeLuca was at all times a licensed priest of Diocese which was responsible for employing, licensing, and supervising him.

48.  At all times and in all matters relevant hereto, Diocese and St. Elizabeth's were the principals of their agent DeLuca.  Diocese and St. Elizabeth's manifested an intention that DeLuca become their agent and act on their behalf.  DeLuca was empowered by Diocese and St. Elizabeth's to perform duties and functions undertaken on behalf of Diocese and St. Elizabeth's. DeLuca accepted and consented to serve and act on their behalf as their agent.  DeLuca consented to be subject to Diocese and St. Elizabeth's control.

49.  Diocese and St. Elizabeth's gave DeLuca the power to act on their behalf and to produce changes in legal relations by performing or not performing legal acts.  They conferred upon DeLuca the authority (express, implied, apparent or inherent) to affect legal relations by

performing acts in accordance with their manifestations of consent.  At all times, DeLuca acted within the scope of that consent.

50.  All acts, if any, initially done outside the scope of that consent were ratified, affirmed, adopted, acquiesced in, and not repudiated by Diocese or St. Elizabeth's.  Such acts were enabled by the agency relationship.

51.  DeLuca's actions were of the kind Diocese and St. Elizabeth's expected him to perform.  His conduct was not unexpected by Diocese and St. Elizabeth's.  His actions occurred substantially within the authorized time and space limits placed upon him by Diocese or St. Elizabeth's.  DeLuca was actuated at least in part by a purpose to serve Diocese and St. Elizabeth's.

52.  DeLuca was employed by Diocese and St. Elizabeth's, participated in Diocese's retirement plan and retired from Diocese.  All his contacts with plaintiff were made pursuant to his routine and regular job duties.

### E.  Fiduciary Relationships

53.  Fiduciary relationships existed between plaintiff and his parents on the one hand, and DeLuca,  Diocese, and St. Elizabeth's on the other.  These relationships are characterized by the highest degree of trust, confidence, good faith, honesty and candor, as well as a prohibition against self-dealing.

54.  Similar or identical to the fiduciary relationships that characterize the lawyer-client, doctor-patient and clergyman-church member relationships, such special relationships also existed in this case between plaintiff and his parents (who were members of the Roman Catholic Church and religion and faithful adherents to its doctrines, rituals, hierarchical organization and

10

precepts) and DeLuca, Diocese, and St. Elizabeth's.

55.  This special fiduciary relationship was formed due to defendants' positions of the highest trust and spiritual authority in the Roman Catholic religion to which plaintiff and his parents were adherents.  It was formed when plaintiff and plaintiff's parents placed trust in the faithful integrity of defendants and their agents as religious authorities and leaders.

56.  This special fiduciary relationship also was formed due to the actions of plaintiff's parents entrusting plaintiff to defendants' care in both church and school settings throughout the Diocese.

57.  As a result of placing this trust, defendants gained influence, superiority and assumed religious control and responsibility over plaintiff and plaintiff's parents.  Defendants assumed a duty to act for or give advice to these parents regarding matters falling within the scope of the relationship.

58.  Such a special fiduciary relationship also was formed through the giving of regular sums of money by plaintiff's parents, through participation in religious rituals and celebrations and through organizational membership.

### F.  Plaintiff's Background

59.  Robert Quill was born on March 22, 1955 in Wilmington, DE.  He and his family, including six siblings, were devout Roman Catholics and members of St. Elizabeth's Parish.

60.  Plaintiff was an Eagle Scout in the Boy Scouts of America.  He was selected by his high school faculty to attend the American Legion Boys State, and from there, he was elected to represent the State of Delaware at Boys Nation in Washington, DC.  In the summer following his

11

A11

sophomore year of high school, he was selected as one of 20 students in Delaware to participate in a Title IX funded, marine biology, two-week, summer seminar held at the University of Delaware's Cape Henlopen facility.  He was recognized by the National Elks for his achievements.

61.  Plaintiff was a Dean's List student at St. Meinrad College (Indiana), where he graduated in 1978 with a B.S. in Biology, with minors in Chemistry, Philosophy, and Theology.

62.  Plaintiff then joined the United States Navy in 1980, where he became a Commissioned Officer and attained the rank Lieutenant (O-3).

63.  Following his Navy tour, plaintiff attended law school at Georgia State University and graduated in 1989.

64.  Thereafter, he began working for the Atlanta Legal Aid Society.

65.  In 1991, plaintiff was selected to be a Staff Attorney for the United States Court of Appeals for the Eleventh Circuit, in Atlanta, Georgia.  His tenure at the Court lasted 13 years, nine of which were as a Supervisory Staff Attorney for the Court.

66.  He was placed on "Full and Permanent Disability" status by his psychiatrist, Dr. Lathrop, on October 15, 2002 after a diagnosis of severe Post Traumatic Stress Disorder Syndrome (PTSDS).  His PTSDS was a direct result of the many years of sexual abuse he had been subjected to as a child by DeLuca.  His disability was approved without opposition by the federal Office of Personnel Management, as well as by the Social Security Administration.  He was quickly retired by the Eleventh Circuit.

### G.  DeLuca's Earlier Sexual Crimes

67.  DeLuca was ordained as a priest by the Diocese of Wilmington in 1958.  He was

12

assigned to serve at St. John the Beloved parish, in Wilmington, in 1961.

68.  Mike Schulte ("Schulte") was first molested by DeLuca in the early 1960s during a trip to Philadelphia.  The two shared a hotel room, which had two beds, and Schulte woke up face down on his bed, being sexually abused by DeLuca who was on top of him.  Later, on a trip to Virginia with the priest, Schulte had a blackout.  He believes the priest put a sedative in his drink so he would pass out.

69.  About three years later, Schulte told his parents about the incident when he noticed DeLuca with another altar boy and feared that the same thing would happen to him.

70.  When Schulte's parents called church officials, his allegations were investigated by the Reverend Douglas Dempster ("Dempster").

71.  Dempster told Schulte and his family never to mention the incident to anyone and that the Diocese would handle the matter.  The Schultes believed Diocese officials would handle DeLuca in a way that would prevent further sexual abuse of children by DeLuca.

72.  But in keeping with the 60 year policy of secrecy surrounding child abuse and pedophilia in the Roman Catholic Church, the Diocese intentionally, willfully, and with a conscious disregard for the obvious risks to any child who came into contact with DeLuca, failed to warn or disclose DeLuca's abuse to public authorities or to the community and failed to warn parents or children, including plaintiff, of DeLuca's actions and nature.

73.  Dempster has stated that he informed the Diocese and that was the extent of his duty as investigator.

74.  On information and belief, recent allegations reveal that civil suits were filed against DeLuca in 1958 in Indiana and Eastern Maryland in 1960, each of which mysteriously

13

A13

disappeared from the dockets.

75.  The Diocese knew of these allegations.

76.  Similar allegations from former altar boys at St. John the Beloved, dating back to the mid 1960's, have recently appeared, which detail official business trips to Wildwood, New Jersey with DeLuca where he would inappropriately touch and have sex with the boys.

77.  On May 29, 2007, in sworn testimony before the State of Delaware House of Representatives, Diocese attorney Anthony Flynn publically admitted that the Diocese had information about DeLuca sexually abusing children dating back to 1962.

78.  DeLuca was transferred by the Diocese to St. Elizabeth's Parish in 1966 where he exercised full powers as a priest and teacher, despite the many instances of child abuse of which the Diocese had actual knowledge.

### H.  Further Reckless and Gross Breach of Duty

79.  The Diocese's and St. Elizabeth's retention of DeLuca, who they knew or should have known was a threat to children, constituted an intentional failure to perform a manifest duty in reckless disregard of the consequences to all foreseeable victims of DeLuca, including plaintiff.

80.  The Diocese's and St. Elizabeth's  retention of DeLuca, who they knew or should have known was a threat to children, evidenced a conscious disregard for the safety of those children, including plaintiff.

81.  The Diocese's and St. Elizabeth's failure to warn their parishioners of the danger posed by DeLuca constituted an intentional failure to perform a manifest duty in reckless disregard of the consequences to all foreseeable victims of DeLuca, including plaintiff.

14

82.  The Diocese's and St. Elizabeth's failure to warn their parishioners of the danger posed by DeLuca evidenced a conscious disregard for the safety of those children, including plaintiff.

83.  The Diocese's and St. Elizabeth's failure to use reasonable care to protect and supervise the children under their care constituted an intentional failure to perform a manifest duty in reckless disregard of the consequences to all foreseeable victims of DeLuca, including plaintiff.

84.  The Diocese's and St. Elizabeth's failure to use reasonable care to protect and supervise the children under their care evidenced a conscious disregard for the safety of those children, including plaintiff

85.  The Diocese's and St. Elizabeth's failure to use reasonable care to properly supervise DeLuca constituted an intentional failure to perform a manifest duty in reckless disregard of the consequences to all foreseeable victims of DeLuca, including plaintiff.

86.  The Diocese's and St. Elizabeth's failure to use reasonable care to properly supervise DeLuca  evidenced a conscious disregard for the safety of children within their care, including plaintiff.

### I.  DeLuca's Sexual Crimes Against Plaintiff

87.  Plaintiff attended St. Elizabeth's elementary school.  He graduated from St. Elizabeth's High School in 1973.

88.  Plaintiff was raised in a devout Roman Catholic family.  He regularly attended Mass and received the sacraments of that Church.  He participated in many Church related activities.

89.  After being recruited by DeLuca while attending St. Elizabeth's schools, he was an

15

altar boy from the sixth grade through high school.  DeLuca was his supervisor as an altar boy.

One of DeLuca's official job duties was to supervise plaintiff as an altar boy.  Plaintiff was a

direct participant in liturgical  exercises with DeLuca at the Roman Catholic Mass.

90.  As a priest,  DeLuca was a person of great influence and persuasion.  He was revered

as an authority figure and purported holy man.

91.  DeLuca frequented plaintiff's parents' home as part of his job duties where he

deceitfully befriended plaintiff's parents and won their trust and confidence, becoming  a

personal spiritual advisor.  He was often asked to stay overnight if he had too much to drink or if

the weather was bad.

92.  Every Christmas after he finished his Mass schedule he came to plaintiff's house as a

spiritual advisor and would spend every Christmas and the following week with plaintiff's

family.

93.  DeLuca took plaintiff and his twin brother to the beach, to New York City, to

Washington, DC, and for dinners at the Hotel DuPont.

94.  Beginning in 1968, when plaintiff was thirteen years old, DeLuca began a course of

unpermitted, harmful, and offensive sexual contact upon plaintiff.

95.  The first incident of sexual abuse occurred during an official job related trip to

Wildwood, New Jersey in the summer of 1968.  On the first night of the trip, DeLuca sat on

plaintiff's bed and began rubbing him and touching plaintiff's genitals.  He then pulled plaintiff's

underwear off, rolled him over onto his back, laid down on top of plaintiff naked, and ejaculated

on him.  DeLuca sexually molested plaintiff in the same way every night of that week long trip.

96.  On numerous occasions between 1968 and 1975 DeLuca engaged in non-consensual

16

sexual conduct with the plaintiff, then a minor, at various locations, at least 300 times.

97.  The sexual abuse of plaintiff occurred at the following places: on official altar boy trips to Wildwood, New Jersey and to New York City, in rectory workplaces, and on his senior high school class ski trip in Pennsylvania where DeLuca chaperoned.  DeLuca also sexually attacked plaintiff in his parents' house in Wilmington.  He even molested him on his older brother Joe's wedding day at his parents' house.

98.  It was widely known by Diocese and St. Elizabeth's during this time that DeLuca had an affinity for young boys and that this was the reason he was transferred from St. Elizabeth's to Holy Spirit Church in 1969.

99.  Even after he was transferred to Holy Spirit Church, and to St. Matthew's Church, DeLuca still stalked and sexually molested plaintiff.  He persuaded plaintiff's mother to allow him to stay with DeLuca at the rectory workplace on occasion.

100.  Finally, in 1993 Diocese quietly removed DeLuca after decades of knowledge of his abuse of children and allowed him to retire.  He chose to move to his hometown, Syracuse, New York, where in October 2006 he was arrested for sexually molesting a boy for four to five years.  On June 28, 2007, DeLuca plead guilty to numerous counts of sexually abusing this young boy.

101.  Only after DeLuca's initial arrest, and the widespread publicity that the arrest received, did the Diocese, on November 16, 2006, release the secret names of other of its priests who had substantiated claims of child sexual abuse brought against them.

102.  When plaintiff read the news article about DeLuca being arrested in New York which was posted on delawareonline.com on October 22, 2006, a flood of memories were unleashed.

17

A17

103.  Plaintiff used one or more of the following coping mechanisms over the years to protect his psyche from the trauma of what DeLuca did to him: memory repression, denial, and dissociation.

104.  Memory repression or traumatic amnesia is the memory loss of the abuse as a result of the overwhelming emotional state during the abuse.

105.  Denial is the minimization or complete lack of acknowledgment of the abuse.

106.  Dissociation is the disconnecting or numbing of oneself with regard to the abuse.

107.  These coping mechanisms operated to remove or guard plaintiff from the effects of his abuse.  The survivor is not able to confront the abuse until much later.

## J.  Causation

108.  The willful, wanton, and reckless actions of the defendants were the proximate cause of separate and distinct immediate and long term injuries and conditions which plaintiff suffered.  The actions of each defendant played a determinative role in these injuries.  The gross negligence of the Diocese and St. Elizabeth's was a substantial or motivating factor in causing plaintiff's injuries.

## K.  Injuries

109.  Because of the childhood sexual abuse plaintiff suffered at the hands of DeLuca, plaintiff has had struggles in forming successful relationships with men, women, and even his own family.

110.  Plaintiff became withdrawn, isolated, ashamed, detached, glum, somber, and humorless after the first time DeLuca sexually molested him and increasingly more so as time, and the abuse, went on.

18

111.  Plaintiff is an insomniac and uses sleep aids.  He also surrounds himself with dogs and guns to feel more protected as a result of what DeLuca did to him.

112.  Plaintiff became depressed and suicidal, and to this day struggles with depression and suicidal ideation.

113.  Plaintiff saw a psychiatrist, Dr. Lathrop, from 2001 until 2002, who observed that his psycho/sexual/emotional development ended abruptly at age 13, that he was still a 13 year old in all those ways, and was incapable of being "fixed," or of recovery.  Plaintiff's injuries are permanent.

114.  Plaintiff was placed on "Full and Permanent Disability" status by his psychiatrist on October 15, 2002 after a diagnosis of severe Post Traumatic Stress Disorder Syndrome (PTSDS).  His PTSDS was a direct result of the many years of sexual abuse he had been subjected to as a child by DeLuca.  His disability was approved without opposition by the federal Office of Personnel Management.

115.  Plaintiff's loss of salary as a result of being forced to retire early is in the range of $1.5 million.  His pension loss exceeds $1 million.

116.  Plaintiff's separate and distinct immediate and long term injuries and conditions, which were the result of childhood sexual abuse, include, but are not limited to,  the above mentioned injuries and also sexual dysfunction, lack of intimacy, guilt, emotional pain, fear, fright, shame, humiliation, anger, loss of enjoyment of life, embarrassment, and other temporary or permanent personal injury.

### COUNT I (Assault and Battery)

117.  Plaintiff repeats and realleges paragraphs 1-116 set forth above.

19

118.   The acts of DeLuca toward plaintiff are crimes in Delaware under, *inter alia*, 11 Del. C. §§ 615, 769, and 778.   They also constituted civil assault and battery.   These intentional torts occurred during the normal course of his routine and regular employment duties.   Under agency principles his employers, Diocese and St. Elizabeth's, are legally responsible for these torts.

119. The actions of DeLuca, Diocese, and St. Elizabeth's were willful, wanton or oppressive and merit an award of punitive damages.

120.   Plaintiff's right be free of assault and battery has been denied under the common law of the State of Delaware and the Act.

### COUNT II (Negligence)

121.   Plaintiff repeats and realleges paragraphs 1-120 set forth above.

122.   Defendant DeLuca owed a duty of care to the plaintiff under the circumstances then existing.

123.   Defendant breached his duty by sexually molesting plaintiff for eight years.

124.   As a direct and proximate result of defendant's negligence, plaintiff has been injured.

125.   The actions of DeLuca were willful, wanton or oppressive and merit an award of punitive damages.

126.   Plaintiff's right be free of negligence has been denied under the common law of the State of Delaware and the Act.

### COUNT III (Gross Negligence)

127.   Plaintiff repeats and realleges paragraphs 1-126 set forth above.

20

128.   Defendants Diocese and St. Elizabeth's owed a duty of care to the plaintiff under the circumstances then existing.

129.   Defendants Diocese and St. Elizabeth's intentionally, willfully, wantonly, recklessly, and with gross negligence breached their duty to the plaintiff by retaining and not supervising DeLuca, failing to warn plaintiff, and failing to protect the plaintiff from the foreseeable criminal acts of DeLuca when they knew or should have known that DeLuca posed a danger to plaintiff.

130.   Diocese's and St. Elizabeth's breach of duty constituted an intentional failure to perform a manifest duty in reckless disregard of the consequences to all foreseeable victims of DeLuca, including Plaintiff.

131.   Defendants Diocese and St. Elizabeth's evidenced a conscious disregard for the risk of harm to the foreseeable victims of DeLuca, all children in the Diocese, including plaintiff.

132.   As a direct and proximate result of the Defendants' gross negligence and intentional, willful, wanton, and reckless acts, plaintiff has been injured.

133.   The actions of the Diocese and St. Elizabeth's were willful, wanton or oppressive and merit an award of punitive damages.

134.   Plaintiff's right be free of gross negligence by Diocese and St. Elizabeth's has been denied under the common law of the State of Delaware and the Act.

### COUNT IV (Breach of Fiduciary Duty)

135.   Plaintiff repeats and realleges paragraphs 1-134 set forth above.

136.   Defendants Diocese, St. Elizabeth's and DeLuca owed various fiduciary duties to plaintiff.

21

137.   Defendants Diocese, St. Elizabeth's and DeLuca grossly breached those fiduciary duties.

138.   As a direct and proximate result of the Diocese's, St. Elizabeth's and DeLuca's breach of fiduciary duties, plaintiff has been injured.

139.   The actions of the defendants Diocese, St. Elizabeth's and DeLuca were willful, wanton or oppressive and merit an award of punitive damages.

140.   Plaintiff's rights have been denied under the common law of the State of Delaware and the Act.

## COUNT V (Fraud)

141.   Plaintiff repeats and realleges paragraphs 1-140 set forth above.

142.   Diocese and St. Elizabeth's, by licensing and employing DeLuca, falsely represented to the plaintiff that DeLuca was a religious authority and leader of integrity and worthy of plaintiff's trust.

143.   Diocese and St. Elizabeth's knew that representation was false, or it was made with reckless indifference to the truth.

144.   The representation was made with an intent to induce the plaintiff to engage with and associate with DeLuca, such as by serving as an altar boy with him in Roman Catholic liturgy.

145.   Plaintiff's engagement and association with DeLuca were done in justifiable reliance upon the representation.

146.   As a direct and proximate result of defendant's false representations, plaintiff was injured.

22

147.  The actions of Diocese and St. Elizabeth's were willful, wanton or oppressive and merit an award of punitive damages.

148.  Plaintiff's rights have been denied under the common law of the State of Delaware and the Act.

### COUNT VI (Repressed Memory - Assault and Battery)

149.  Plaintiff repeats and realleges paragraphs 1-148 set forth above.

150.  The acts of DeLuca toward plaintiff are crimes in Delaware under, *inter alia*, 11 Del. C. §§ 615, 769, and 778.  They also constituted civil assault and battery.  These intentional torts occurred during the normal course of his routine and regular employment duties.  Under agency principles his employers, Diocese and St. Elizabeth's, are legally responsible for these torts.

151.  The actions of DeLuca, Diocese, and St. Elizabeth's were willful, wanton or oppressive and merit an award of punitive damages.

152.  It was not until October 2006 when plaintiff first understood or discovered that he had been the victim of years of sexual molestation by DeLuca between 1968-1975 because these traumatic events disrupted his memory function and cognition.

153.  This was inherently unknowable until that date.  Plaintiff was blamelessly ignorant of the assault and battery.

154.  Plaintiff's right be free of assault and battery has been denied under the common law of the State of Delaware.

### COUNT VII (Repressed Memory - Negligence)

155.  Plaintiff repeats and realleges paragraphs 1-154 set forth above.

23

156. Defendants Diocese, St. Elizabeth's and DeLuca owed a duty of care to the plaintiff under the circumstances then existing.

157. Defendants Diocese, St. Elizabeth's and DeLuca intentionally, willfully, wantonly, recklessly, and negligently breached their duty to the plaintiff by retaining and not supervising DeLuca, failing to warn plaintiff, and failing to protect the plaintiff from the foreseeable criminal acts of DeLuca when they knew or should have known that DeLuca posed a danger to plaintiff.

158. In October 2006 plaintiff first understood that he had been the victim of defendants' negligence. This was inherently unknowable until October of 2006. Plaintiff was blamelessly ignorant of this negligence.

159. The actions of the Diocese, St. Elizabeth's and DeLuca were willful, wanton or oppressive and merit an award of punitive damages.

160. Plaintiff's right be free of negligence by Diocese and St. Elizabeth's has been denied under the common law of the State of Delaware.

### COUNT VIII (Breach of Contract / Breach of Implied Covenant of Good Faith and Fair Dealing)

161. Plaintiff repeats and realleges paragraphs 1-160 set forth above.

162. Each school year, a contract was formed between plaintiff's parents and Diocese and St. Elizabeth's when plaintiff's parents agreed to send him to attend St. Elizabeth's elementary and high schools to receive his education. Plaintiff's parents agreed to pay Diocese and St. Elizabeth's tuition and in consideration, the Diocese and St. Elizabeth's agreed to educate plaintiff.

163. At the end of each school year, a new contract was formed for the next year.

164. One of the implied terms of these contracts was to keep plaintiff safe.

24

165. Another of the implied terms was that Diocese, St. Elizabeth's and their employees, priests, teachers, campus ministers and agents would not allow plaintiff to be sexually molested, abused and raped by teachers and priests at the school.

166. Another of the implied terms was that if teachers, priests or other employees of Diocese and St. Elizabeth's observed plaintiff being sexually abused by a priest, they would immediately step in and stop such blatantly inappropriate conduct.

167. Defendants and their priests, teachers, employees and agents breached these duties.

168. Plaintiff has endured a lifetime of injuries as a result of this breach.

169. Plaintiff was a third party beneficiary of this contract. Both plaintiff's parents and defendants intended this contract to be for plaintiff's benefit and intended to confer third party beneficiary status upon him. Both plaintiff's parents and defendants intended that plaintiff have enforceable rights under this contract.

170. Additional contracts were formed between plaintiff's parents and Diocese, St. Elizabeth's and DeLuca when plaintiff's parents agreed to allow him to serve as an altar boy and aid in religious ceremonies and celebrations in consideration for defendants' agreement to teach him these skills.

171. One of the implied terms of these contracts was to keep plaintiff safe.

172. Another of the implied terms was that defendants and their employees, priests, teachers, campus ministers and agents would not allow plaintiff to be sexually molested, abused and raped.

173. Another of the implied terms was that if priests or other employees of defendants observed plaintiff being sexually abused by a priest, they would immediately step in and stop such

25

A25

blatantly inappropriate conduct.

174.   Defendants breached these duties.

175.   Plaintiff has endured a lifetime of injuries as a result of this breach.

176.   Plaintiff was a third party beneficiary of this contract.  Both plaintiff's parents and Diocese, St. Elizabeth's and DeLuca intended these contracts to be for plaintiff's benefit and intended to confer third party beneficiary status upon him.  Both plaintiff's parents and defendants Diocese, St. Elizabeth's and DeLuca intended that plaintiff have enforceable rights under this contract.

177.   Further contracts were formed between plaintiff's parents and Diocese, St. Elizabeth's and DeLuca when DeLuca traveled with plaintiff or gave him rides or traveled with him in and around Delaware as well as to New York, New Jersey, Pennsylvania, Washington, D.C. and other locations, for altar boy trips, school trips and other reasons.  Plaintiff's parents agreed to allow DeLuca the pleasure of plaintiff's company in consideration for DeLuca's agreement to take care of plaintiff, keep him safe and take him on trips.

178.   One of the express and implied terms of these contracts was to keep plaintiff safe.

179.   Another of the implied terms was that defendants and their employees, priests, teachers, campus ministers and agents would not allow plaintiff to be sexually molested, abused and raped.

180.   Defendants breached these duties.

181.   Plaintiff has endured a lifetime of injuries as a result of this breach.

182.   Plaintiff was a third party beneficiary of this contract.  Both plaintiff's parents and defendants Diocese, St. Elizabeth's and DeLuca intended this contract to be for plaintiff's benefit

26

A26

and intended to confer third party beneficiary status upon him. Both plaintiff's parents and defendants Diocese, St. Elizabeth's and DeLuca intended that plaintiff have enforceable rights under this contract.

183. Plaintiff's rights have been denied under the common law of the State of Delaware and the Act.

**Wherefore**, Plaintiff prays that the Court:

(a)     Enter judgment against the defendants, jointly and severally.

(b)     Enter a judgment against the defendants, jointly and severally, for compensatory and punitive damages.

( c)     Enter a judgment against defendants, jointly and severally, for costs and pre and post judgment interest.

(d)     Require such other and further relief as the Court deems just and proper under the circumstances.

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQUIRE (#243)**
**STEPHEN J. NEUBERGER, ESQUIRE (#4440)**
**RAEANN WARNER, ESQUIRE (#4931)**
Two East Seventh Street, Suite 302
Wilmington, DE  19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com
RW@NeubergerLaw.com

**JACOBS & CRUMPLAR, P.A.**

/s/ Robert Jacobs
**ROBERT JACOBS, ESQUIRE (#244)**
**THOMAS C. CRUMPLAR, ESQUIRE (#942)**
Two East Seventh Street, Suite 400

27

Wilmington, DE 19801
(302) 656-5445
Bob@JandCLaw.com
Tom@JandCLaw.com

Dated: August 8, 2007

28

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

August 8, 2007, I electronically filed this **Pleading** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:

> Anthony G. Flynn, Esquire
> Young Conaway Stargatt & Taylor LLP
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, DE 19899-0391
> aflynn@ycst.com

I also certify that I served this **Pleading** by U.S. Mail on the following individual:

> Stephen P. Casarino, Esquire
> Casarino Christman & Shalk, P.A.
> 800 North King Street, Suite 200
> P.O. Box 1276
> Wilmington, DE 19899
> scasarino@casarino.com

> /s/ Stephen J. Neuberger
> **STEPHEN J. NEUBERGER, ESQ.**

/ Quill, Robert / Pleadings / First Amended Complaint.final

29

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBERT QUILL,

     Plaintiff,

  v.

CATHOLIC DIOCESE OF
WILMINGTON, INC., a Delaware
corporation; ST. ELIZABETH'S
CATHOLIC CHURCH, a Delaware
corporation; Rev. FRANCIS G.
DELUCA, individually and in his
official capacity; and Rev. MICHAEL
A. SALTARELLI, in his official
capacity,

     Defendants

C.A. No. 07-435-SLR

Jury Trial Demanded

## ANSWER OF DEFENDANTS
## CATHOLIC DIOCESE OF WILMINGTON, INC.
## AND BISHOP MICHAEL A. SALTARELLI

    1.    This paragraph of the First Amended Complaint includes plaintiff's

description of the nature of his legal claims, which requires no response from Defendants

Catholic Diocese of Wilmington, Inc. (the "Diocese") and Rev. Michael A. Saltarelli

("Bishop Saltarelli") (collectively, "Answering Defendants"). Regarding the factual

averments in this paragraph, Answering Defendants admit that Rev. Francis G. DeLuca

("Fr. DeLuca"), was a priest of the Diocese from 1958 until 1993. On information and

belief, Answering Defendants also admit that Fr. DeLuca was convicted in 2007 of

sexual abuse and endangering the welfare of a child, crimes which he committed during

and after 2002. To the extent that the averments in the last sentence of this paragraph are

directed to Answering Defendants, they are denied. Answering Defendants are without

knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

## I.     JURISDICTION

2.     Answering Defendants admit that plaintiff purports to invoke diversity jurisdiction pursuant to 28 U.S.C. § § 1332, 2201 and 2202.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

3.     Answering Defendants admit that plaintiff contends that venue is appropriate in this judicial district.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

## II.     THE PARTIES

4.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

5.     Denied that the registered corporate address for Defendant Diocese is 1626 N. Union St., but admitted that its corporate address is 1925 Delaware Avenue, Wilmington, Delaware 19806.  Otherwise, the averments of this paragraph 6 are admitted.

6.     Admitted that St. Elizabeth's Roman Catholic Church ("St. Elizabeth's) is

a religious corporation organized and existing under Tile 27 of the Delaware Code, and that it is located in Wilmington, Delaware, that it was founded by the Bishop of Wilmington, and that it operates as a parish within the Diocese in accordance with the norms of the Roman Catholic Church. Admitted further that St. Elizabeth's is authorized to do business and is doing business in the State of Delaware as a private religious institution, operating both a church and an elementary and high school. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

7.      Admitted that Fr. DeLuca is a Roman Catholic Priest who was a parish priest in the Diocese from 1958 until 1993. On information and belief it is further admitted that Fr. DeLuca is 78 years old and formerly resided at 100 Pastime Drive, Syracuse, New York. On information and belief, it is further admitted that in 2007 Fr. DeLuca was convicted of sexual abuse and endangering the welfare of a child, crimes which he committed during and after 2004. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

8.      Admitted that Fr. DeLuca was an assistant pastor of St. Elizabeth's from 1966 until 1969. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

9.      Admitted that Defendant Rev. Michael A. Saltarelli is the current Bishop

3

099999.1636

of the Diocese of Wilmington, and that he is a citizen of Delaware. The remaining

allegations of paragraph 9 are legal conclusions to which no response is required.

10. Admitted that the Diocese granted faculties to Fr. DeLuca to publicly

perform priestly office in the Diocese of Wilmington. Admitted further that Fr. DeLuca

could not publicly perform priestly office within the Diocese of Wilmington without the

permission of the Diocese, and, of course, without having been ordained a Roman

Catholic Priest. Otherwise, the averments of paragraph 10 are denied.

11. Admitted that the Diocese was and is responsible for overseeing its

parishes, including St. John the Beloved, St. Elizabeth's, Holy Spirit and St. Matthew's,

in accordance with the norms of the Roman Catholic Church, including the assignment of

priests to those parishes. Otherwise, the averments of paragraph 11 are denied.

12. On information and belief, admitted that the Diocese was notified by the

family of Michael Schulte that he had been abused by Fr. DeLuca while assigned to St.

John the Beloved Parish, before he was assigned to St. Elizabeth's. Otherwise,

Answering Defendants are without knowledge or information sufficient to form a belief

as to the truth of the balance of the averments of this paragraph, and, to avoid implied

admission, the same are denied.

13. Denied as to Answering Defendants. Answering Defendants are without

knowledge or information sufficient to form a belief as to the balance of the averments of

this paragraph, and to avoid implied admission they are denied.

14.     Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

### III.     FACTS GIVING RISE TO THE ACTION
### A.     Institutional Knowledge of Clergy Sexual Abuse Leading to The Underlying Gross Negligence

15.     Admitted that Monsignor J. Thomas Cini is Vicar General for Administration of the Diocese, and that he testified under oath in July, 2007, that rules and regulations of the Roman Catholic Church in the 1800s contained a provision designed to prevent child sexual abuse from happening.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

16.     Admitted.

17.     Admitted that Canon 1395 was enacted with the recodification of the Code of Canon Law in 1983.  The text of Canon 1395 speaks for itself.

18.     Denied as stated as to Answering Defendants.  Otherwise, Answering Defendants are without knowledge or information sufficient to form a belief as to the averments of this paragraph, and to avoid implied admission the same are denied.

19.     Answering Defendants are without knowledge or information sufficient to form a belief as to averments of this paragraph.

DB02:6195593.1                                                                    099999.1636

20.     Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph, and to avoid implied admission the same are denied.

21.     Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph, and to avoid implied admission the same are denied.

22.     Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph, and to avoid implied admission the same are denied.

23.     Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph, and to avoid implied admission the same are denied.

24.     Admitted that the Roman Catholic Church has made attempts to curb sexual abuse of children, including by promulgating canonical norms and other policies, including those adopted by the National Conference of Catholic Bishops, later the United States Conference of Catholic Bishops.  Otherwise, Answering Defendants are without knowledge or in formation sufficient to form a belief as to the averments of this paragraph.

25.     Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

6

**B.** **Institutional Secrecy Regarding Clergy Sexual Abuse Leading to the Underlying Gross Negligence**

26.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

27.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

28.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

29.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

30.    Answering Defendants are without knowledge or information sufficient to form a belief as to the averments of this paragraph, and, to avoid implied admission, they are denied.

31.    Admitted that an Instruction on the Manner of Proceeding in Cases of Solicitation, issued by the Supreme and Holy Congregation of the Holy Office, was published by The Vatican Press in 1962. The Instruction speaks for itself. Otherwise Answering Defendants are without knowledge or information sufficient to form a belief

7

as to the averments in this paragraph.

32.     Admitted that the Diocese maintains in a confidential manner certain documents regarding clergy sexual abuse of minors. Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

33.     Admitted that Canons 486-488 provide for the maintenance of general archives, including provisions regarding security and access thereto, and removal of documents. These Canons speak for themselves.

34.     As to Answering Defendants, admitted that a secret archive is maintained in accordance with Canon 489, and that certain records regarding Fr. DeLuca are housed in this archive. Otherwise, the averments of this paragraph are denied.

35.     Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

### C.     DeLuca's History of Pedophilic Sexual Molestation and the Underlying Intentional and Negligent Tort Claims

36.     Denied as stated as to Answering Defendants. Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

37.     Denied as stated.

8

38. On information and belief, admitted that in 1966 the parents of a victim reported that their son had been sexually abused by Fr. DeLuca. Otherwise the averments of this paragraph are denied as they relate to Answering Defendants. As they relate to other defendants, Answering Defendants are without knowledge or information sufficient to form a belief regarding the averments of this paragraph

39. This paragraph contains legal contentions of plaintiff that require no response from Answering Defendants at this time. Admitted that the Diocese had a duty to protect children from clerical sexual abuse. To the extent this paragraph contains a factual averment, Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the averment, and to avoid implied admission the same are denied.

40. This paragraph contains legal contentions of plaintiff that require no response from Answering Defendants at this time. Admitted that the Diocese had a duty to protect children from clerical sexual abuse. To the extent this paragraph contains a factual averment, Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the averment, and to avoid implied admission the same are denied.

41. This paragraph contains legal contentions of plaintiff that require no response from Answering Defendants at this time. Admitted that the Diocese had a duty to protect children from clerical sexual abuse. To the extent this paragraph contains a factual averment, Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the averment, and to avoid implied admission the same

9

are denied.

42.    Admitted that the identity of at least one victim of Fr. DeLuca has been publicized. Denied that Fr. DeLuca was an agent of the Diocese. Denied that the Diocese breached any duty. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

43.    Admitted that the Diocese has publicly admitted that it has received admitted, corroborated or otherwise substantiated allegations of sexual abuse of minors by Fr. DeLuca. The balance of the averment of this paragraph is denied.

44.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

45.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

### D.    Agency

46.    Admitted that the Diocese granted faculties to Fr. DeLuca to publicly perform priestly office in the Catholic Diocese of Wilmington. Admitted further that Fr. DeLuca could not publicly perform priestly office within the Diocese of Wilmington without the permission of the Diocese, and, of course, without having been ordained as a

10

Roman Catholic priest. Otherwise the averments of this paragraph are denied.

47.    This paragraph contains legal contentions of plaintiff which require no response at this time. Admitted that the Diocese granted faculties to Fr. DeLuca to publicly perform priestly office within the Diocese. Further admitted that the Diocese assigned Fr. DeLuca to the parishes where he worked throughout his tenure as a priest of the Diocese in public ministry.

48.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

49.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

50.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

51.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

52.    Admitted that the Diocese granted faculties to Fr. DeLuca to publicly perform priestly office in the Catholic Diocese of Wilmington, and that the Diocese

DB02:6195593.1                                                                                      099999.1636

assigned Fr. DeLuca to the various parishes where he worked during his tenure as a priest

of the Diocese in public ministry.  Further admitted that Fr. DeLuca retired, and receives

benefits pursuant to the pension plan of the Diocese.  Otherwise, the balance of the

averments in this paragraph are denied.

### E.  Fiduciary Relationships

53.  This paragraph contains legal contentions of plaintiff that require no

response from Answering Defendants at this time.  Answering Defendants are without

knowledge or information sufficient to form a belief as to the truth of the factual

averments of this paragraph, and to avoid implied admission the same are denied.

54.  This paragraph contains legal contentions of plaintiff that require no

response from Answering Defendants at this time.  Answering Defendants are without

knowledge or information sufficient to form a belief as to the truth of the factual

averments of this paragraph, and to avoid implied admission the same are denied.

55.  This paragraph contains legal contentions of plaintiff that require no

response from Answering Defendants at this time.  Answering Defendants are without

knowledge or information sufficient to form a belief as to the truth of the factual

averments of this paragraph, and to avoid implied admission the same are denied.

56.  This paragraph contains legal contentions of plaintiff that require no

response from Answering Defendants at this time.  Answering Defendants are without

knowledge or information sufficient to form a belief as to the truth of the factual

12

averments of this paragraph, and to avoid implied admission the same are denied.

57.     This paragraph contains legal contentions of plaintiff that require no response from Answering Defendants at this time.  Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the factual averments of this paragraph, and to avoid implied admission the same are denied.

58.     This paragraph contains legal contentions of plaintiff that require no response from Answering Defendants at this time.  Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the factual averments of this paragraph, and to avoid implied admission the same are denied.

### F.     Plaintiff's Background

59.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

60.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

61.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

62.     Answering Defendants lack knowledge or information sufficient to form a

13

belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

63. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

64. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

65. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

66. This paragraph contains legal contentions of plaintiff that require no response from Answering Defendants at this time. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the factual averments of this paragraph, and to avoid implied admission the same are denied.

## G.     DeLuca's Earlier Sexual Crimes

67. On information and belief, admitted that Fr. DeLuca was ordained a priest for the Diocese on February 3, 1958. Admitted further that Fr. DeLuca was assigned to serve at St. John the Beloved Parish, in Wilmington, in 1961. The balance of the averment of this paragraph is denied.

14

68.     Admitted that Michael Schulte reported that he was sexually abused by Fr. DeLuca sometime during the early 1960's.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments in this paragraph.

69.     Admitted that Michael Schulte informed his parents of that he had been sexually abused by Fr. DeLuca sometime after it occurred.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments in this paragraph.

70.     Admitted on information and belief.

71.     Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

72.     Admitted that, until 2002, the Diocese did not disclose to law enforcement authorities the report of abuse by Michael Schulte and his parents, and did not otherwise disclose to the public information regarding his abuse by Fr. DeLuca until 2006. Otherwise, Answering Defendants deny the averments of this paragraph.

73.     Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

74.     Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

15

75.    Denied.

76.    Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

77.    Admitted that, on May 29, 2007, the Diocesan Attorney testified at a public hearing in the House of Representatives that the Diocese had information concerning a report in 1966 of sexual abuse of a minor by Fr. DeLuca. Otherwise, the averments of this paragraph are denied.

78.    Admitted that Fr. DeLuca was transferred to St. Elizabeth's Parish in 1966 where he served as assistant pastor. Denied that the Diocese had knowledge of more than one report of child abuse by Fr. DeLuca at the time of his transfer. Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

**H.    Further Reckless and Gross Breach of Duty**

79.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

80.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

81.    Denied as to Answering Defendants. Answering Defendants are without

16

knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

82. Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

83. Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

84. Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

85. Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

86. Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

## I. DeLuca's Sexual Crimes Against Plaintiff

87. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission

17

the same are denied.

88.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

89.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

90.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

91.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

92.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

93.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

18

94.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

95.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

96.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

97.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

98.    Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

99.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

100.    Admitted that Fr. DeLuca was removed from ministry by the Diocese in 1993, and retired to Syracuse, New York.  On information and belief, admitted further

19

that in October, 2006, Fr. DeLuca was arrested in Syracuse on charges relating to sexual

abuse of a minor over a period of years. On information and belief, admitted further that,

in June, 2007, Fr. DeLuca pleaded guilty to two charges of sexual abuse and one charge

of endangering the welfare of a child. Otherwise, the balance of the averments in this

paragraph are denied.

101.    Admitted that in November, 2006, the Diocese publicized the names of

priests of the Diocese as to whom the Diocese had received admitted, corroborated or

otherwise substantiated allegations of sexual abuse of a minor. Otherwise, the balance of

the averments in this paragraph are denied.

102.    Answering Defendants lack knowledge or information sufficient to form a

belief as to the truth of the averments in this paragraph, and to avoid implied admission

the same are denied.

103.    Answering Defendants lack knowledge or information sufficient to form a

belief as to the truth of the averments in this paragraph, and to avoid implied admission

the same are denied.

104.    Answering Defendants lack knowledge or information sufficient to form a

belief as to the truth of the averments in this paragraph, and to avoid implied admission

the same are denied.

105.    Answering Defendants lack knowledge or information sufficient to form a

belief as to the truth of the averments in this paragraph, and to avoid implied admission

DB02:6195593.1

099999.1636

the same are denied.

106.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

107.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

### J.     Causation

108.     Denied as to Answering Defendants.

### K.     Injuries

109.     Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

110.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

111.     Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

21

112.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

113.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

114.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

115.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

116.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

### COUNT I (Assault and Battery)

117.    Paragraph 117 repeats and re-alleges paragraphs 1 through 116 of the First Amended Complaint. Answering Defendants adopt and incorporate by references herein their answers to paragraphs 1 through 116 of the First Amended Complaint as if each such answer was separately set forth here at length.

22

118.    Denied that the Diocese is legally responsible for any tortious misconduct of Fr. DeLuca.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

119.    Denied as to the Diocese.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

120.    Denied that Answering Defendants have denied any right of plaintiff. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

## COUNT II (Negligence)

121.    Paragraph 121 repeats and re-alleges paragraphs 1 through 120 of the First Amended Complaint.  Answering Defendants adopt and incorporate by reference herein their answers to paragraphs 1 through 120 of the First Amended Complaint as if each such answer was separately set forth here at length.

122.    This paragraph contains legal contentions of plaintiff that require no response from Answering Defendants at this time.  To the extent that this paragraph contains a factual averment, Answering Defendants lack knowledge or information sufficient to form a belief as to its truth, and to avoid implied admission the same are denied.

23

123.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

124.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

125.    Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph, and to avoid implied admission the same are denied.

126.    To the extent the averments of this paragraph relate to Answering Defendants, denied that they denied any right of plaintiff. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the balance averments in this paragraph, and to avoid implied admission the same are denied.

### COUNT III (Gross Negligence)

127.    Paragraph 127 repeats and re-alleges paragraphs 1 through 126 of the First Amended Complaint. Answering Defendants adopt and incorporate by reference herein their answers to paragraphs 1 through 126 of the First Amended Complaint as if each such answer was separately set forth here at length.

128.    Admitted that the Diocese had a duty to protect minors, including plaintiff, from sexual abuse. Otherwise denied as to Answering Defendants. As they relate to other defendants, Answering Defendants are without knowledge or information sufficient

24

to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

129.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

130.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

131.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

132.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

133.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

134.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

DB02:6195593.1

099999.1636

## COUNT IV (Breach of Fiduciary Duty)

135.     Paragraph 135 repeats and re-alleges paragraphs 1 through 134 of the First Amended Complaint.  Answering Defendants adopt and incorporate by reference herein their answers to paragraphs 1 through 134 of the First Amended Complaint as if each such answer was separately set forth here at length.

136.     This paragraph contains a vague legal contention by plaintiff, to which no response is required at this time.  To the extent this paragraph is deemed to contain a factual averment, it is denied as to the Diocese.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

137.     Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

138.     Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

139.     Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

140.     Denied as to Answering Defendants.  Answering Defendants are without

26

knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

## COUNT V (Fraud)

141.    Paragraph 141 repeats and re-alleges paragraphs 1 through 140 of the First Amended Complaint.  Answering Defendants adopt and incorporate by reference herein their answers to paragraphs 1 through 140 of the First Amended Complaint as if each such answer was separately set forth here at length.

142.    Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

143.    Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

144.    Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

145.    Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

146.    Denied as to Answering Defendants.  Answering Defendants are without

27

knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

147.   Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

148.   Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

### COUNT VI (Repressed Memory – Assault and Battery)

149.   Paragraph 149 repeats and re-alleges paragraphs 1 through 148 of the First Amended Complaint.  Answering Defendants adopt and incorporate by reference herein their answers to paragraphs 1 through 148 of the First Amended Complaint as if each such answer was separately set forth here at length.

150.   Denied that the Diocese is legally responsible for the torts of Fr. DeLuca. This paragraph also contains legal contentions of plaintiff that require no response from Answering Defendants at this time.  To the extent this paragraph contains factual averments, Answering Defendants are without knowledge or information sufficient to form a belief as to them, and to avoid implied admission they are denied.

151.   Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

28

152.    Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

153.    Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

154.    Denied that the Diocese denied any right of plaintiff. Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

## COUNT VII (Repressed Memory – Negligence)

155.    Paragraph 155 repeats and re-alleges paragraphs 1 through 154 of the First Amended Complaint. Answering Defendants adopt and incorporate by reference herein their answers to paragraphs 1 through 154 of the First Amended Complaint as if each such answer was separately set forth here at length.

156.    Admitted that the Diocese had a duty to protect minors, including plaintiff, from sexual abuse. Otherwise denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

157.    Denied as to Answering Defendants. Answering Defendants are without

29

knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

158.     Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

159.     Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

160.     Denied as to the Diocese.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

### COUNT VIII (Breach of Contract/Breach of Implied Covenant of Good Faith and Fair Dealing)

161.     Paragraph 161 repeats and re-alleges paragraphs 1 through 160 of the First Amended Complaint.  Answering Defendants adopt and incorporate by reference herein their answers to paragraphs 1 through 160 of the First Amended Complaint as if each such answer was separately set forth here at length.

162.     Denied as to the Diocese.  Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

30

163.     Denied as to the Diocese.  Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

164.     Denied there was any contract with the Diocese.  Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

165.     Denied there was any contract with the Diocese.  Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

166.     Denied there was any contract with the Diocese.  Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

167.     Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

168.     Denied there was any such breach by Answering Defendants.  Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

169.     Denied there was any such contract with the Diocese.  Otherwise

31

Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

170.     Denied as to Answering Defendants.

171.     Denied there were any such contracts with the Diocese.  Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

172.     Denied there were any such contracts with the Diocese.  Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

173.     Denied there were any such contracts with the Diocese.  Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

174.     Denied as to Answering Defendants.  Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

175.     Denied there was any such breach by Answering Defendants.  Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

DB02:6195593.1

099999.1636

A61

176. Denied there was any such contract with the Diocese. Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

177. Denied there were any such further contracts with the Diocese. Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

178. Denied there were any such further contracts with the Diocese. Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

179. Denied there were any such further contracts with the Diocese. Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

180. Denied as to Answering Defendants. Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

181. Denied there was any contract between plaintiff's parents and the Diocese, and that there was any breach by Answering Defendants. Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

33

182.    Denied there was any contract between plaintiff's parents and the Diocese, and that there was any breach by Answering Defendants. Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the averments in this paragraph.

183.    Denied that Answering Defendants have denied any rights of plaintiff. Otherwise Answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the averments of this paragraph, and to avoid implied admission they are denied.

## DEFENSES

### First Defense

184.    Plaintiff's claims fail to state a claim upon which relief may be granted.

### Second Defense

185.    This Court may lack jurisdiction over the subject matter of this action as it relates to certain parties and claims.

### Third Defense

186.    Plaintiff's claims are barred by the applicable statute of limitations.

### Fourth Defense

187.    Plaintiff's claims are barred by the doctrine of laches.

### Fifth Defense

188.    At all relevant times, the knowledge of other persons and entities, and the

34

ability of such other persons and entities to take action to prevent the injuries of which the plaintiff now complains, may have been superior to that of Answering Defendants, and therefore, if there was any duty to intercede to protect plaintiff, the duty may have been on those other persons and entities and not on Answering Defendants.

### Sixth Defense

189.   Plaintiff's alleged injuries, if any, may have been the result of acts or omissions of individuals or parties over which Answering Defendants had no control.

### Seventh Defense

190.   Answering Defendants at all times relevant hereto complied with all applicable standards, policies and federal, state and other regulations and laws.

### Eighth Defense

191.   Any negligence allegedly attributable to Answering Defendants was not the proximate cause of plaintiff's alleged injuries.

### Ninth Defense

192.   Answering Defendants are not liable for the intentional torts committed by other individuals or parties who are not Answering Defendants.

### Tenth Defense

193.   Plaintiff's claims for punitive damages, breach of contract, breach of implied covenant of good faith and fair dealing, gross negligence, and/or negligence are barred and/or limited by applicable state and federal constitutional provisions.

35

## Eleventh Defense

194.    The First Amended Complaint fails to specify any willful or wanton conduct on the part of Answering Defendants, and therefore, all claims for and references to the recovery of special damages in the First Amended Complaint must be stricken.

## Thirteenth Defense

195.    The First Amended Complaint fails to allege with specificity any acts, actions or conduct on the part of Answering Defendants which constitute fraud as required by Delaware law, and therefore, all claims and/or damages based upon allegations of fraud must be stricken.

## Fourteenth Defense

196.    The First Amended Complaint fails to allege with specificity any acts, actions or conduct on the part of Answering Defendants which constitute conspiracy as required by Delaware law, and therefore, all claims and/or damages based upon allegations of conspiracy must be stricken.

## Fifteenth Defense

197.    Specifically as to any alleged breach of contract claim or breach of the implied covenant of good faith and fair dealing, the plaintiff fails to state a claim as to the existence or breach of any such alleged contract and/or covenant.

## Sixteenth Defense

198.    To the extent plaintiff's claims are based on any purported contract or other agreement, they are barred by the statute of frauds.

36

### Seventeenth Defense

199.    To the extent plaintiff's claims are based on repressed or recovered memory, they are not cognizable in this Court.

### Eighteenth Defense

200.    Application of the so-called repressed or recovered memory theory under the circumstances in this case is barred by state and federal constitutional provisions.

### Nineteenth Defense

201.    The "Child Victims Act," 10 DEL. C. § 8145, violates the Delaware Constitution and the United States Constitution.

### Twentieth Defense

202.    Application of the "Child Victims Act," 10 DEL. C. § 8145 under the circumstances in this case is barred by state and federal constitutional provisions.

### Twenty-First Defense

203.    Specifically as it relates to Defendant Bishop Saltarelli, the First Amended Complaint fails to state a claim upon which relief may be granted as a matter of applicable Delaware corporate law.

### Twenty-Second Defense

204.    Answering Defendants adopt, invoke and incorporate by reference any affirmative defense asserted by any other defendant.

### MOTION TO STRIKE

205.    The First Amended Complaint, particularly in sections III.A. and B., contains redundant, immaterial and impertinent matter which must be stricken.

206.   The First Amended Complaint fails to allege any acts, actions or conduct on the part of Answering Defendants that would constitute fraud or conspiracy with specificity as required by Delaware law, and, therefore, all claims and/or damages based on the allegations of fraud or conspiracy must be stricken as to Answering Defendants.

## CROSSCLAIMS FOR CONTRIBUTION AND INDEMNIFICATION

207.   Answering Defendants deny that they are liable to the plaintiff in any respect.  However, in the event that Answering Defendants are held liable to the plaintiff, then they cross claim against each and every co-defendant, on the grounds that the conduct of one or several co-defendants was the primary cause of the damage sustained by the plaintiff and that Answering Defendants, if liable at all, are only secondarily liable. Answering Defendants, therefore, are entitled to indemnification from each and every co-defendant.

208.   In the event Answering Defendants are held primarily liable to the plaintiff, then the alleged wrongful acts of the co-defendants are contributing causes of the damages sustained by the plaintiff and Answering Defendants are entitled to contribution in any amount which it may be required to pay the plaintiff as a result of the co-defendants' wrongful acts, based on the relative degrees of fault determined pursuant to the provisions of Delaware's Uniform Contribution Among Tortfeasor's Law, 10 DEL. C. § 6208.

## ANSWERS TO CROSSCLAIMS

209.   Answering Defendants deny any allegations of any cross claim which has been or may be asserted against it and demands that any such cross claim be dismissed.

38

Further, it is asserted that if liability is found, there should be an apportionment made by the trier of fact.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anthony G. Flynn (Supr. Ct. ID #74)
Neilli Mullen Walsh (Supr. Ct. ID #2707)
Jennifer M. Kinkus (Supr. Ct. ID #4289)
Mary F. Dugan (Supr. Ct. ID #4704)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391

Attorneys for Defendants
Catholic Diocese of Wilmington, Inc.
and Bishop Michael A. Saltarelli

DATED:  September 12, 2007

DB02:6195593.1

099999.1636

A68

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ROBERT QUILL,                                    :
                                                 :
    Plaintiff,                :
                                                 :
v.                                               :
                                                 :
CATHOLIC DIOCESE OF WILMINGTON,                  :    C.A. No. 07-435-SLR
INC., a Delaware corporation; ST.                :
ELIZABETH'S CATHOLIC CHURCH, a                   :
Delaware corporation; Rev. FRANCIS G.            :    Jury Trial Demanded
DELUCA, individually and in his official         :
capacity; and Rev. MICHAEL A.                    :
SALTARELLI, in his official capacity,            :
                                                 :
    Defendants.               :

## DEFENDANT ST. ELIZABETH'S CATHOLIC CHURCH'S
## ANSWER TO THE FIRST AMENDED COMPLAINT

1.     Plaintiff's recitation of his legal claims requires no response from Defendant, St. Elizabeth's Catholic Church ("Answering Defendant"). As to the factual averments in this paragraph, Answering Defendant admits that Rev. Francis G. DeLuca was a priest in the Diocese of Wilmington. Answering Defendant admits that Rev. DeLuca was employed by St. Elizabeth's Catholic Church from February 28, 1966 to June 3, 1969. Answering Defendant further admits that, upon information and belief, Rev. DeLuca was convicted in 2007 in the State if New York for crimes he committed during and after 2002. The balance of the averments in this paragraph are denied as to Answering Defendant.

1

# I.    JURISDICTION

2.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of these averments; therefore, they are denied.

3.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of these averments; therefore, they are denied.

# II.    THE PARTIES

4.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of these averments; therefore, they are denied.

5.    Denied as to any allegations of wrongdoing directed to Answering Defendant.   Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

6.    Answering Defendant admits that St. Elizabeth's is incorporated in Delaware and operates within the Diocese of Wilmington.   It further admits that St. Elizabeth's is authorized to operate as a church and a school within the State of Delaware.   Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

7.    Answering Defendant admits that Rev. DeLuca is a Roman Catholic priest who was employed by the Diocese from 1958 to 1993.   On information and belief, Answering Defendant admits that Rev. DeLuca is 78 years old and that he once lived at 100 Pastime Drive, Syracuse, New York.   On information and belief, it is further admitted that Rev. DeLuca was convicted of sexual abuse and endangering the welfare of

A70

a child, crimes he committed after he departed Delaware. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

8.      Answering Defendant admits that Rev. DeLuca was the assistant pastor at St. Elizabeth's from 1966 to 1969. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

9.      Denied as to any allegations of wrongdoing directed to Answering Defendant. Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

10.     Denied as to any allegations of wrongdoing directed to Answering Defendant. Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

11.     Denied as to any allegations of wrongdoing directed to Answering Defendant. Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

12.     Denied as to any allegations of wrongdoing directed to Answering Defendant. Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

13.    Denied as to Answering Defendant.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

14.    Denied as to Answering Defendant.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

### III.    FACTS GIVING RISE TO THE ACTION

**A.    Institutional Knowledge of Clergy Sexual Abuse Leading to the Underlying Gross Negligence**

15.    Answering Defendant admits that Monsignor J. Thomas Cini is the Vicar General for Administration of the Diocese and that he testified under oath in July 2007 that the Catholic Church has designed provisions to prevent child abuse since the 1880s. Denied as to any allegations of wrongdoing directed to Answering Defendant.  Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

16.    Admitted.

17.    Admitted.

18.    Denied as to Answering Defendant.

19.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

20.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

4

21.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

22.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

23.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

24.     Answering Defendant admits that the Catholic Church has made efforts to curb the sexual abuse of children.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

25.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

**B.      Institutional Secrecy Regarding Clergy Sexual Abuse Leading to the Underlying Gross Negligence.**

26.     Denied as to Answering Defendant.   Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

27.     Denied as to Answering Defendant.   Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

28.     Denied as to Answering Defendant.   Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

29.     Denied as to any allegations of wrongdoing directed to Answering Defendant.   Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

30.     Denied as to any allegations of wrongdoing directed to Answering Defendant.   Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

31.     Denied as to any allegations of wrongdoing directed to Answering Defendant.   Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

32.     Denied as to any allegations of wrongdoing directed to Answering Defendant.   Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

33.     Denied as to any allegations of wrongdoing directed to Answering Defendant.   Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

34.     Denied as to any allegations of wrongdoing directed to Answering Defendant.   Further, Answering Defendant is without knowledge or information

sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

35.     Denied as to Answering Defendant.   Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

**C.     DeLuca's History of Pedophilic Sexual Molestation and the Underlying Intentional and Negligent Tort Claims.**

36.     Denied as to Answering Defendant.   Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

37.     Denied as to any allegations of wrongdoing directed to Answering Defendant.   Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

38.     Denied as to any allegations of wrongdoing directed to Answering Defendant.   On information and belief, admitted that parents of a victim in 1966 alleged that their son had been abused by Rev. DeLuca.   Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

39.     Plaintiff's legal contentions require no response from Answering Defendant at this time.   Answering Defendant admits is had a duty to protect children from clerical abuse.   Answering Defendant is without knowledge or information

7

sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

40.      Plaintiff's legal contentions require no response from Answering Defendant at this time.  Answering Defendant admits is had a duty to protect children from clerical abuse.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

41.      Plaintiff's legal contentions require no response from Answering Defendant at this time.  Answering Defendant admits is had a duty to protect children from clerical abuse.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

42.      Answering Defendant admits that the name of at least one alleged victim of Rev. DeLuca has been made public.  It is denied that Rev. DeLuca was an agent of Answering Defendant.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

43.      Answering Defendant admits the Diocese has made public its receipt of admitted, corroborated, or otherwise substantiated allegations of sexual abuse of minors by Rev. DeLuca.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

8

44.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

45.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

### D.     Agency

46.     Answering Defendant admits that Rev. DeLuca was permitted to perform priestly duties within the Diocese.  Admitted further that Rev. DeLuca performed priestly duties for Answering Defendant.  The balance of the averments in this paragraph are denied.

47.     Plaintiff's legal contentions require no response from Answering Defendant at this time.  Answering Defendant admits that Rev. DeLuca was a priest permitted to perform in the Diocese.

48.     Denied as to Answering Defendant.  Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

49.     Denied as to Answering Defendant.  Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

50.     Denied as to Answering Defendant.  Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

51.    Denied as to Answering Defendant.  Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

52.    Denied as to any allegations of wrongdoing directed to Answering Defendant.  Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

### E.    Fiduciary Duties

53.    Plaintiff's legal contentions require no response from Answering Defendant at this time.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

54.    Plaintiff's legal contentions require no response from Answering Defendant at this time.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

55.    Plaintiff's legal contentions require no response from Answering Defendant at this time.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

56.    Plaintiff's legal contentions require no response from Answering Defendant at this time.  Answering Defendant is without knowledge or information

sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

57.     Plaintiff's legal contentions require no response from Answering Defendant at this time.   Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

58.     Plaintiff's legal contentions require no response from Answering Defendant at this time.   Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

**F.     Plaintiff's Background**

59.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

60.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

61.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

62.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

63.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

64.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

65.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

66.     Plaintiff's legal contentions require no response from Answering Defendant at this time.   Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

### G.     DeLuca's Earlier Sexual Crimes

67.     Denied as to any allegations of wrongdoing directed to Answering Defendant.     Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

68.     Denied as to any allegations of wrongdoing directed to Answering Defendant.     Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

69.     Denied as to any allegations of wrongdoing directed to Answering Defendant.     Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

70.     Denied as to any allegations of wrongdoing directed to Answering Defendant.     Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

12

71.     Denied as to any allegations of wrongdoing directed to Answering Defendant.   Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

72.     Denied as to any allegations of wrongdoing directed to Answering Defendant.   Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

73.     Denied as to any allegations of wrongdoing directed to Answering Defendant.   Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

74.     Denied as to any allegations of wrongdoing directed to Answering Defendant.   Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

75.     Denied as to any allegations of wrongdoing directed to Answering Defendant.   Further, Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

76.     Denied as to any allegations of wrongdoing directed to Answering Defendant.   Further, Answering Defendant is without knowledge or information

13

sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

77.     Answering Defendant admits that the Diocesan attorney testified before the House of Representatives on May 29, 2007, regarding a 1966 report of abuse by Rev. DeLuca.  The balance of the averments in this paragraph are denied.

78.     Answering Defendant admits that Rev. DeLuca was transferred to St. Elizabeth's Parish in 1966.  The balance of the averments in this paragraph are denied.

### H.       Further Reckless and Gross Breach of Duty

79.     Denied as to Answering Defendant.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

80.     Denied as to Answering Defendant.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

81.     Denied as to Answering Defendant.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

82.     Denied as to Answering Defendant.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

83.     Denied as to Answering Defendant.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

14

84.     Denied as to Answering Defendant.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

85.     Denied as to Answering Defendant.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

86.     Denied as to Answering Defendant.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

## I.      DeLuca's Sexual Crimes Against Plaintiff

87.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

88.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

89.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

90.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

91.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

92.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

15

A83

93.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

94.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

95.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

96.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

97.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

98.     Denied as to Answering Defendant.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

99.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

100.     Answering Defendant admits that Rev. DeLuca was removed by the Diocese in 1993 and that he moved to Syracuse, New York.  It is further admitted, on information and belief, that Rev. DeLuca was arrested in Syracuse, New York in October 2006 on charges stemming from the sexual abuse of a minor.  It is further admitted, on information and belief, that in June 2007 Rev. DeLuca pleaded guilty to two charges of sexual abuse and one charge of endangering the welfare of a child.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

16

101.    Answering Defendant admits that in November 2006 the Diocese publicized the names of priests about whom the Diocese had received substantiated allegations of sexual abuse of a minor. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

102.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

103.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

104.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

105.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

106.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

107.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

### J.    Causation

108.    Denied as to Answering Defendant.

### K.    Injuries

109.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

17

110.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

111.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

112.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

113.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

114.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

115.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

116.     Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

### COUNT I (Assault and Battery)

117.     Answering Defendant incorporates its responses to paragraphs 1 through 116 as though set forth fully herein.

118.     Answering Defendant denies that it is legally responsible for any intentional torts of Rev. DeLuca.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

18

119.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

120.    Answering Defendant denies that it has denied any right of the plaintiff. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

## COUNT II (Negligence)

121.    Answering Defendant incorporates its responses to paragraphs 1 through 120 as though set forth fully herein.

122.    Plaintiff's legal contentions require no response from Answering Defendant at this time.   Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

123.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

124.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

125.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph; therefore, they are denied.

126.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

## COUNT III (Gross Negligence)

127.    Answering Defendant incorporates its responses to paragraphs 1 through 126 as though set forth fully herein.

128.    Answering Defendant admits that it had a duty to protect minors, including plaintiff, from sexual abuse.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

129.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

130.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

131.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

132.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

133.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

20

134.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

### COUNT IV (Breach of Fiduciary Duty)

135.    Answering Defendant incorporates its responses to paragraphs 1 through 134 as though set forth fully herein.

136.    Plaintiff's legal contentions require no response from Answering Defendant at this time.    Denied as to any allegations of wrongdoing directed to Answering Defendant.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

137.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

138.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

139.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

140.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

## COUNT V (Fraud)

141.    Answering Defendant incorporates its responses to paragraphs 1 through 140 as though set forth fully herein.

142.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

143.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

144.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

145.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

146.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

147.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

148.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

**COUNT VI (Repressed Memory – Assault and Battery)**

149.    Answering Defendant incorporates its responses to paragraphs 1 through 148 as though set forth fully herein.

150.    Answering Defendant denies that it is legally responsible for any intentional torts of Rev. DeLuca.  Plaintiff's legal contentions require no response from Answering Defendant at this time.    Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

151.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

152.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

153.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

154.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

## COUNT VII (Repressed Memory – Negligence)

155.    Answering Defendant incorporates its responses to paragraphs 1 through 154 as though set forth fully herein.

156.    Answering Defendant admits that it had a duty to protect minors, including plaintiff, from sexual abuse.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

157.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

158.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

159.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

160.    Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

## COUNT VIII (Breach of Contract/Breach of Implied Covenant of Good Faith and Fair Dealing)

161.    Answering Defendant incorporates its responses to paragraphs 1 through 160 as though set forth fully herein.

24

162. Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

163. Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

164. Answering Defendant denies that there was a contract with the plaintiff. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

165. Answering Defendant denies that there was a contract with the plaintiff. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

166. Answering Defendant denies that there was a contract with the plaintiff. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

167. Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

168. Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

169.     Answering Defendant denies that there was a contract. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

170.     Answering Defendant denies that there was a contract. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

171.     Answering Defendant denies that there was a contract. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

172.     Answering Defendant denies that there was a contract. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

173.     Answering Defendant denies that there was a contract. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

174.     Denied as to Answering Defendant.

175.     Denied as to Answering Defendant. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

176.     Answering Defendant denies that there was a contract. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

177.     Answering Defendant denies that there was a contract or any further contracts. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

178.     Answering Defendant denies that there was a contract or any further contracts. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

179.     Answering Defendant denies that there was a contract or any further contracts. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

180.     Denied as to Answering Defendant.

181.     Answering Defendant denies that there was a contract or any further contracts.  Answering Defendant denies that there was any breach by Answering Defendant.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

182.     Answering Defendant denies that there was a contract or any further contracts.  Answering Defendant denies that there was any breach by Answering Defendant.  Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

27

183.    Answering Defendant denies that it has denied any right of the plaintiff. Answering Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the averments in this paragraph; therefore, they are denied.

## AFFIRMATIVE DEFENSES

## AFFIRMATIVE DEFENSES
## FIRST AFFIRMATIVE DEFENSE

184.    The Complaint fails to state a claim upon which relief can be granted as to answering defendant.

## SECOND AFFIRMATIVE DEFENSE

185.    The Court lacks jurisdiction over the subject matter as it relates to certain parties and claims.

## THIRD AFFIRMATIVE DEFENSE

186.    Plaintiff's claims are barred by the applicable statute of limitations.

## FOURTH AFFIRMATIVE DEFENSE.

187.    Plaintiff's claims are barred by the doctrine of laches.

## FIFTH AFFIRMATIVE DEFENSE

188.    At all relevant times, the knowledge of other persons and entities, and the ability of such other persons and entities to take action to prevent the injuries of which the plaintiff now complains, was superior to that of the answering defendant, and, therefore, if there was any duty to intercede to protect plaintiff, the duty was on those other persons and entities and not on the answering defendant.

## SIXTH AFFIRMATIVE DEFENSE

189.    Plaintiff's injuries from the alleged allegations, if any, were solely and proximately caused by the negligence or acts of some person or persons, or some other entity not a party to this lawsuit, or were solely and proximately caused by the acts of some other person and not by the answering defendant.

## SEVENTH AFFIRMATIVE DEFENSE

190.    The answering defendant at all times relevant hereto complied with all applicable standards, policies and federal, state and other regulations and laws.

## EIGHTH AFFIRMATIVE DEFENSE

191.    Answering Defendant is not liable for the intentional torts of any of its predecessors-in-interest or intentional torts committed by other individuals or parties who are not the answering defendant.

## NINTH AFFIRMATIVE DEFENSE

192.    Plaintiff's claims for punitive damages, breach of contract, breach of implied covenant of good faith and fair dealing, gross negligence, and/or negligence are barred and/or limited by applicable state and federal constitutional provisions.

## TENTH AFFIRMATIVE DEFENSE

193.    The First Amended Complaint fails to specify any willful or wanton conduct on the part of the Answering Defendant which constitute fraud as required by Delaware law, and therefore all claims and/or damages based upon allegations of fraud must be stricken.

**ELEVENTH AFFIRMATIVE DEFENSE**

194.     The First Amended Complaint fails to specify any willful or wanton conduct on the part of the Answering Defendant, and therefore all claims for and references to the recovery of special damages in the First Amended Complaint must be stricken.

**TWELFTH AFFIRMATIVE DEFENSE**

195.     The First Amended Complaint fails to allege with specificity any acts, actions, or conduct on the part of Answering Defendant which constitute conspiracy as required by Delaware Law, and therefore all claims and/or damages based upon allegations of conspiracy must be stricken.

**THIRTEENTH AFFIRMATIVE DEFENSE**

196.     As to any alleged breach of contract claim or breach of the implied covenant of good faith and fair dealing, the plaintiff fails to state a claim as to the existence or breach of any such alleged contract and/or covenant.

**FOURTEENTH AFFIRMATIVE DEFENSE**

197.     To the extent plaintiff's claims are based on any purported contract or other agreement, they are barred by the statute of frauds.

**FIFTEENTH AFFIRMATIVE DEFENSE**

198.     To the extent plaintiff's claims are based on a legal theory of repressed or recovered memory, they are not cognizable in this Court.

## SIXTEENTH AFFIRMATIVE DEFENSE

199.    Application of the so-called repressed or recovered memory theory under the circumstances in this case is barred by state and federal constitutional provisions.

## SEVENTEENTH AFFIRMATIVE DEFENSE

200.    Any negligence allegedly attributable to Answering Defendant was not the proximate cause of plaintiff's alleged injuries.

## EIGHTEENTH AFFIRMATIVE DEFENSE

201.    The "Child Victim's Act," 10 Del. C. § 8145, violated the Delaware Constitution and the United States Constitution.

## NINETEENTH AFFIRMATIVE DEFENSE

202.    Application of the "Child Victim's Act," 10 Del. C. § 8145, under the circumstances in this case is barred by state and federal constitutional provisions.

## TWENTIETH AFFIRMATIVE DEFENSE

203.    Answering Defendant adopts, invokes, and incorporates by reference any affirmative defense asserted by any other defendant.

## MOTION TO STRIKE

204.    The First Amended Complaint fails to allege any acts, actions, or conduct on the part of Answering Defendant that constitutes fraud or conspiracy with specificity as required by Delaware law; therefore, all claims and/or damages based on the allegations of fraud or conspiracy must be stricken as to Answering Defendant.

## MOTION TO DISMISS

205.    The First Amended Complaint must be dismissed against Answering Defendant on the basis of this Court's lack of subject matter jurisdiction pursuant to

31

FRCP 12(b)(1).  Plaintiff relies on 10 Del. C. § 8145 (Senate Bill 29 – "Child Victim's Act") in order to revive and bring claims of abuse dating back nearly forty (40) years.  However, the text of the Child Victim's Act clearly requires that claims brought pursuant to the Act are to be brought in the Superior Court of Delaware.  Therefore, plaintiff's claims must be dismissed from the United States District Court for the District of Delaware.

**CROSSCLAIMS FOR CONTRIBUTION AND INDEMNIFICATION**

206.    The answering defendant denies that it is liable to the plaintiff in any respect.  However, in the event that the answering defendant is held liable to the plaintiff, then it cross claims against each and every co-defendant, on the grounds that the conduct of one or several co-defendants, was the primary cause of the damage sustained by the plaintiff and that the answering defendant, if liable at all, is only secondarily liable.  The answering defendant, therefore, is entitled to indemnification from each and every co-defendant.

207.    In the event the answering defendant is held primarily liable to the plaintiff, then the alleged wrongful acts of the co-defendants are contributing causes of the damages sustained by the plaintiff, and the answering defendant is entitled to contribution in any amount which they may be required to pay the plaintiff as a result of the co-defendants' wrongful acts, based on the relative degrees of fault determined pursuant to the provisions of Delaware's Uniform Contribution Among Tortfeasors's Law, 10 Del. C. § 6208.

32

A100

## ANSWERS TO CROSSCLAIMS

208.    The answering defendant denies allegations of any cross claim which has been or may be asserted against it and demands that any such cross claim be dismissed. Further, it is asserted that if liability is found, there should be apportionment made by the trier of fact.

**WHEREFORE**, St. Elizabeth's Catholic Church respectfully demands the Complaint be dismissed with costs assessed to the plaintiff.


ELZUFON AUSTIN REARDON
TARLOV & MONDELL, P.A.

/s/ *Mark L. Reardon*
_____
MARK L. REARDON (No. 2627)
PENELOPE B. O'CONNELL (No. 4898)
300 Delaware Avenue, 17th Floor
P. O. Box 1630
Wilmington, DE   19899-1630
PH:  1.302.428.3181
FX:  1.302.428.3180
E-Mail: mreardon@elzufon.com
Attorneys for  St.  Elizabeth's  Catholic
Church

Dated:  September 28, 2007
G:\Docs\CLIENT\131446\19227\pleading\00418181.DOC

33

SPONSOR:  Sen. Peterson & Sen. McBride ;  Rep. Hudson & Rep. Lavelle

| Sens. | Reps. | Longhurst |
|---|---|---|
| Sorenson | Gilligan | Plant |
| Sokola | Mitchell | Carey |
| Bunting | Keeley | Cathcart |
| Blevins | Ennis | Hocker |
| Connor | Mulrooney | Lee |
| Copeland | Johnson | Maier |
| Henry | McWilliams | Manolakos |
| Cook | M Marshall | Miro |
| Cloutier | Schooley | Short |
| Amick | Hall-Long | Valihura |
| & | Kowalko | Brady |
| Marshall | | Spence |
| | | Smith |
| | | Ewing |
| | | & |
| | | Lofink |

DELAWARE STATE SENATE
144th GENERAL ASSEMBLY

SENATE BILL NO. 29

AN ACT TO AMEND TITLE 10 OF THE DELAWARE CODE BY REMOVING THE STATUTE OF LIMITATIONS FOR CIVIL SUITS RELATING TO CHILD SEXUAL ABUSE AND ADDING RELATED PROVISIONS REGARDING SUCH SUITS.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE:

1    Section 1.  Title 10 of the Delaware Code is hereby amended by adding to Chapter 81 a new Section 8145 which

2    shall read as follows:

3        "§8145.  Civil suits for damages based upon sexual abuse of a minor by an adult.

4    (a)  A cause of action based upon the sexual abuse of a minor by an adult may be filed in the Superior Court of

5        this State at any time following the commission of the act or acts that constituted the sexual abuse.  A civil

6        cause of action for sexual abuse of a minor shall be based upon sexual acts that would constitute a criminal

7        offense under the Delaware Code.

8    (b)  For a period of two years following the effective date of this bill, victims of child sexual abuse that occurred

9        in this State who have been barred from filing suit against their abusers by virtue of the expiration of the

10       former civil statute of limitations, shall be permitted to file those claims in the Superior Court of this State.  If

11       the person committing the act of sexual abuse against a minor was employed by an institution, agency, firm,

12       business, corporation, or other public or private legal entity that owned a duty of care to the victim, or the

13       accused and the minor were engaged in some activity over which the legal entity had some degree of

SD : JJC : rma
2381440001

A102

14          responsibility or control, damages against the legal entity shall be awarded under this subsection only if there

15          is a finding of gross negligence on the part of the legal entity

16    (c)    A person against whom a suit is filed may recover attorney's fees where the Court determines that a false

17          accusation was made with no basis in fact and with malicious intent.  A verdict in favor of the accused shall

18          not be the sole basis for a determination that an accusation was false.  The Court must make an independent

19          finding of an improper motive to award attorneys' fees under this section."

20    Section 2.  This bill shall be known as the "Child Victim's Act".

21    Section 3.  If any provision of this act or the applications thereof to any person or circumstance is held invalid, the

22          invalidity shall not affect other provisions or applications of the act which shall be given effect without the invalid

23          provision or application; and, to that end, the provisions of this act are declared to be severable.

<u>SYNOPSIS</u>

This Bill repeals the statute of limitations in civil suits relating to child sexual abuse cases and provides a two-year "window" in which victims can bring a civil action in cases previously barred by the current statute.

Author:  Senator Peterson

SD : JJC : rma
2381440001



In The Matter Of:

# Sentate of Delaware

---

### Senate Bill 29

### Tape Recorded Hearing

### April 4, 2007

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Tape Recorded Hearing

Before the Senate of Delaware

IN RE:  SENATE BILL 29:  An Act to amend Title 10 of the
Delaware Code by removing the statute of limitations for
civil suits relating to child sexual abuse and adding
related provisions regarding such suits.

The following is an audiotaped hearing before
the House Judiciary Committee held on April 4, 2007,
transcribed by Elaine G. Parrish, RPR, CRR.

WILCOX & FETZER

1330 King Street - Wilmington, Delaware  19801

(302) 655-0477

www.wilfet.com

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 2

1      SENATOR McBRIDE:  You know, I can only
2   imagine, I was sitting here listening to that, listening
3   to some of these other people, like, you know, can't
4   even begin to imagine unless you're a victim, I mean,
5   what you go through in something like that.  But I guess
6   it's very unfortunate but I assume there are many people
7   that go to their grave and never came forward.
8      MS. MARCI HAMILTON:  Some of the most
9   moving e-mails I have received are from people who are
10   in their 70s and 80s who are only coming forward to me
11   because it's anonymous, it's on e-mail.  They know that
12   I'm -- care about the issue.  But they want to tell
13   someone before they die.
14      SENATOR McBRIDE:  This Bill that we have
15   before us, it seems to me, and it seems from what you're
16   saying, would provide yet another mechanism, another
17   incentive, if you will, for people to come forward and
18   talk about a very tragic part of their life.
19      MS. MARCI HAMILTON:  Well, once one victim
20   identifies a perpetrator we didn't know about before you
21   can be sure that five, six, ten, 20 victims are down the
22   road and that's what we found out in California.
23      SENATOR McBRIDE:  Well, that happened here
24   in Delaware.

Page 3

1      MS. MARCI HAMILTON:  Yeah.
2      SENATOR McBRIDE:  If you look at the DeLuca
3   case and I am going to talk about it later because there
4   is in my opinion no better example of why we want to
5   pass this Bill because of what happened right here in
6   Delaware.  Thank you.
7      SENATOR ADAMS:  Thank you, Senator McBride.
8   Senator Peterson.
9      SENATOR PETERSON:  Yes, Mr. President, if
10   there are no other questions, I ask that the witness be
11   excused.
12      SENATOR ADAMS:  Seeing no further
13   questions, the witness may be excused.  Thank you,
14   Professor Hamilton.  Senator Peterson.
15      SENATOR PETERSON:  We're not allowed to do
16   that.
17      SENATOR ADAMS:  Not supposed to do that.  I
18   didn't bang the gavel too hard.  Senator Peterson.
19      SENATOR PETERSON:  Thank you,
20   Mr. President.
21      Mr. President, I'd like to request personal
22   privilege of the floor for Father Tom Doyle.
23      SENATOR ADAMS:  Privilege of the floor has
24   been requested for Father Tom Doyle.  Seeing no

Page 4

1   objection, please come forward, and please restate your
2   name for the record and who you represent.
3      FATHER THOMAS DOYLE:  My name is Thomas
4   Doyle.
5      SENATOR ADAMS:  Thank you, Father Doyle.
6   Senator Peterson.
7      SENATOR PETERSON:  Thank you,
8   Mr. President.  Father Doyle, welcome to the Delaware
9   State Senate and thank you for driving from Virginia to
10   be here today.
11      FATHER THOMAS DOYLE:  Thank you.
12      SENATOR PETERSON:  Would you please tell
13   the members of the Senate about your background and
14   credentials and the findings of the extensive research
15   that you have done on the subject of child sexual abuse
16   cases?
17      FATHER THOMAS DOYLE:  Thank you.
18   Mr. President, Senators, guests, and most important,
19   victims and survivors who are here today.  My name is
20   Father Thomas Doyle.  I am a Roman Catholic priest.  I
21   was ordained in 1970 which is a few years ago.  I belong
22   to the Dominican order which was founded in the 13th
23   century and still exists.  In my years as a priest I
24   have served in a number of different types of

Page 5

1   assignments:  As a parish priest, an administrator, a
2   university professor.  I have worked in a number of
3   places throughout the world.  The assignment, the
4   ministry I have been most happy with and proud of is I
5   served as a Catholic chaplain in the United States Air
6   Force for almost 20 years.  In fact, my first assignment
7   was here at Dover Air Force base which brings back many,
8   many happy memories being here in this state and at that
9   base.  While I was on active duty I served in a number
10   of conflicts, the most recent one being Operation Iraqi
11   Freedom in Iraq in 2003.
12      I was asked to offer my professional
13   credentials which I do with, doesn't sound like with it
14   but with humility.  I have five Master's Degrees in
15   among other things, philosophy, theology, Soviet
16   studies, political science and administration, I have a
17   doctorate in canon law, and I'm also a certified
18   licensed addictions therapist.  My involvement in the
19   area of sexual abuse is primarily in the area of sexual
20   abuse by the clergy and sexual abuse by members of
21   institutions, both ecclesiastical or church institutions
22   and private institutions.
23      It began in 1983 when at that time I was
24   working in the Vatican Embassy in Washington, D.C.  I

2 (Pages 2 to 5)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 6

1  was the staff lawyer, the staff canon lawyer or church
2  lawyer, and while serving in this position I was simply
3  asked to monitor the correspondence concerning a fairly
4  -- a very tragic case that arose out of the Diocese of
5  Lafayette in Louisiana.  This case, which came to our
6  attention in 1984, received significant media attention
7  because of the extensive coverup that was revealed by
8  the Bishop and the Diocese of the perpetrator.  The
9  perpetrator himself was eventually sentenced to 20 years
10 in prison and served ten years in prison, and shortly
11 after his release from prison he was rearrested for
12 having sexually abused the three-year-old son of his
13 next door neighbor.  No one knows exactly how many young
14 boys this man violated.  What is known is that they were
15 in the hundreds and several committed suicide as a
16 result of the trauma and the pain they suffered.
17        Since that time I have been deeply involved
18 in the issue of sexual abuse, primarily sexual abuse by
19 the clergy.  I have been involved in helping victims
20 find support, healing and justice.  I have worked with
21 several hundred as a pastoral minister, as a supporter,
22 and as a friend.  I have been with their families, with
23 their friends, with their attorneys and their
24 therapists.  I have also had the opportunity over the

Page 7

1  years to work with a number of accused priests who have
2  called on my assistance for legal aid, support,
3  assistance and advice.
4        Of all of the things I have done in
5  relation to the victims, which go over a period of 23
6  years, I consider the most important and the most
7  painful the fact that when I have been with them and
8  have been able to gain a bit of the trust I have
9  apologized to these men and women and their families for
10 what men in my profession and my church have done to
11 them.  Without exception, and I have done this several
12 hundred times, without exception, I have been told that
13 this is the first time anyone from their church has
14 apologized to them or spoken to them in an understanding
15 and supportive way.  And on reflecting upon this I find
16 it to be not only tragic but absolutely scandalous, that
17 a religious entity, a body that exists to serve and help
18 others with compassionate care, has allowed this
19 terrible tragedy to continue in its midst.
20        I have been a consultant and an expert
21 witness in hundreds of civil cases and in some criminal
22 cases throughout the United States, in Canada, Ireland,
23 the United Kingdom, Australia, New Zealand, Mexico and
24 Israel.  I have also been called upon to advise

Page 8

1  attorneys and victims in several other countries and in
2  hundreds more cases.  I have published articles in
3  professional journals.  I have been the author of
4  several sections of books and I have co-authored a book
5  on the history of this issue in the Roman Catholic
6  Church.  And in the course of this very painful,
7  shocking and scandalous journey I have been forced to
8  accept the very painful fact and the shameful fact that
9  the church to which I have been associated and in which
10 has been an essential part of my own life, has
11 intentionally placed its own image, its power and its
12 financial stability far above the lives of the most
13 vulnerable in its midst.  And I have regretfully
14 accepted the fact that those in positions of power have
15 forgotten that the church is not the clergy, it's not
16 the buildings, it's not the power structures, but it is
17 the people, and among those people, by far the most
18 important, are the most vulnerable, the most
19 marginalized and the most hurt.
20        It's really shocking what any of us realize
21 when faced with the incontrovertible evidence that the
22 people most grievously harmed by religious bodies, by
23 churches in general, are their own faithful, devoted
24 followers.

Page 9

1        Since 2002 the public has been exposed to
2  this terrible, dark underside that exists not only in
3  the Catholic Church but in other religious denominations
4  and in public and private institutions as well.  The
5  proposed changes to the State Legislation here in
6  Delaware, these changes that are being urged in this
7  State and in several other States are not only about the
8  Catholic Church or about religious bodies, they are
9  about institutions and about our society in general.  If
10 anything, the explosive experience of the Catholic
11 Church has served as a catalyst that has set off a
12 number of revelations about public institutions and
13 private life as well.
14        And these revelations I believe can be
15 summed up thus:  Number one, children and the vulnerable
16 have been devalued by institutions and by society
17 because they are powerless.  They are overshadowed by
18 the specter of money and power.  The churches and our
19 institutions in general will speak out about injustices
20 in institutions and in political situations other than
21 their own.  We will cry out in vain oftentimes, we will
22 cry out loudly and impassionately for injustices that
23 are happening at someone else's hand.  But when it's the
24 injustices and the harm and the hurt that we cause

3 (Pages 6 to 9)

Page 10

1  amongst our own we remain silent, we circle the wagons,
2  we defend our own interests.
3        Churches and institutions tend to hide and
4  deny internal problems that are less socially acceptable
5  and more potentially damaging than the problems that are
6  less so.  The churches especially have hidden behind the
7  protections of the First Amendment in order to avoid
8  legal accountability for criminal behavior in their own
9  midst.  The First Amendment protections do not allow my
10  church or any church to condone criminal behavior,
11  especially behavior that absolutely destroys the lives
12  of the most vulnerable and defenseless in their midst.
13        We have learned a great deal about the
14  complex nature of sexual abusers, and, most important,
15  about sexual abuse and the violation of persons over the
16  past 25 years.  When we look at the legislative changes
17  that are being proposed, one of the common objections,
18  one of the questions is why didn't these people speak
19  up.  Why didn't these children run to a lawyer five days
20  after they were sexually abused.  We have learned
21  because of this nightmare that sexual abuse is a
22  profound violation that has tragic physical, emotional,
23  psychological and spiritual consequences.  That most
24  often - and I speak from a massive amount of experience

Page 11

1  here - children who are sexually abused do not even know
2  the language to use to reveal this.  They don't know
3  what happened to them.
4        I spoke not long ago with a young woman who
5  was raped by a priest at the age of 13 in the hallway of
6  a building, in a hallway that connected the church and
7  the residence.  She said I knew something terrible was
8  happening to me but I didn't know what it was.  I didn't
9  know how to describe it to my mother.  It felt shameful.
10  It felt dirty.  It felt awful.  This is common.  This
11  young lady was not an exception.
12        And I speak from personal experience, and I
13  will share this.  In my own family, a member of my own
14  family now reaching the age of 19 was raped at the age
15  of 13 by two men, two adult men, and it was only until
16  very recently within the past couple of weeks that she
17  was able with a great deal of help from therapists to
18  acknowledge what had happened to her.  Her life was
19  spiraling toward the end and her mother said to me, my
20  own sister, she said I'm thinking of the fact that
21  Regan, my niece, is going to have a very short lifespan.
22  That's duplicated by the thousands, by victims of
23  incest, victims of rape, victims of child abuse, by
24  members of institutions and by the clergy.  They need

Page 12

1  adults, they need our social, our political institutions
2  to help protect them.
3        Most younger victims are abused around the
4  age of 12 and most only reveal their abuse by the age of
5  40.  It's not that they will not come forward, it's that
6  they can not.  They're engulfed by grief, by fear, by
7  shame, by an inability to even think that others have
8  experienced the same nightmare.
9        The victims of clergy sexual abuse,
10  especially Catholic clergy sexual abuse, are especially
11  impacted because of the toxicity of the relationship
12  between the priest and the victim.  Here we have victims
13  who were violated by those whom they placed almost total
14  and complete trust in and whom they believed takes the
15  place of God.  And oftentimes when they're violated, and
16  I have heard this countless times, I thought God was
17  rejecting me.  Why was this happening to me?  What did I
18  do wrong?  And this feeling of guilt and shame remains
19  for a lifetime.
20        Why is legislative reform necessary?  I
21  believe it's needed, especially in the cases -- case of
22  institutions and churches because these institutions and
23  the churches will not make the needed reforms on their
24  own.  They will not take proactive measures to reach out

Page 13

1  to victims.  They will not take proactive measures to
2  intervene with sexual predators or to change a toxic
3  climate that protects sexual predators.  In the case of
4  the Catholic Church, the State Catholic conferences in
5  many instances have bragged about the fact that the
6  Catholic Church has done more than any other institution
7  to bring about changes for the protection of children,
8  but the fact remains is that they have known about the
9  violation of children for decades and it has only been
10  since 2002, or perhaps a couple of years earlier in some
11  instances, that protection -- protective measures and
12  policies have been put in place.  Why?  For one reason
13  only, because of the intense pressure from the media and
14  from the civil courts and the Legislators that have
15  forced these actions to take place and yet they remain
16  defensive actions.
17        The only thing that will change the
18  churches and private institutions and perhaps even
19  public institutions is a power greater than these, and
20  that comes from places like the State Senate of
21  Delaware.  When legislation and the courts get involved
22  they are a power greater than the churches and they can
23  force them to act responsibly and to accept
24  accountability.

4 (Pages 10 to 13)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 14

1    I'd like to speak to some of the objections
2    that are often brought up with respect to legislative
3    change. One of the most common one is that this is a
4    ploy between greedy plaintiff attorneys and greedy
5    plaintiffs to get as much money as possible. This
6    objection on its face is insulting and re-victimizing.
7    The fact remains that most, if not all of the attorneys
8    representing plaintiffs do so on a contingency basis and
9    I have known hundreds in my involvement as an expert
10   witness and a consultant over 20 years, I have known a
11   number of attorneys who have taken countless cases on a
12   pro bono basis who have taken massive financial hits
13   themselves, but I do not know any attorneys who have
14   represented any religious denomination who have done so
15   on a pro bono basis, who have not continued to take
16   hourly fees and these hours mount up and the dollars
17   mount up.
18       I was asked one time when I was giving
19   testimony by a particularly aggressive and insulting
20   attorney who represented a Diocese, he said, are you
21   taking a fee for this? I looked him straight in the eye
22   and I said, yeah. Are you? He said, that's not the
23   point. I said, yes, it is the point.
24       I have already said that the vast majority

Page 15

1    of adult victims are not so much unwilling, they are not
2    unwilling to come forward, they are incapable of coming
3    forward until they feel around them the support and the
4    care and the understanding and the belief. I, myself,
5    in my 20 some years in dealing with victims have met,
6    counseled with and cried with a number who we would
7    consider to be senior citizens, the oldest of which is a
8    92-year-old woman who only came forward at the age of 89
9    when she finally felt she would be believed and
10   supported. I have met and listened to the
11   heart-wrenching stories of men and women in their 70s,
12   late 60s and 70s, and all have said we had this terrible
13   burden we have carried for our entire lives, we felt we
14   could never bring it forward because no one would
15   believe us and what good would it do? There was nothing
16   there for us. And I can tell you from my experience
17   that in many, many instances the attorneys who have
18   represented victims, young and old, have done for them
19   what the clergymen should have done. They have offered
20   support, a shoulder to cry on, belief that this
21   happened, support that you can continue on with your
22   life. And in many, many of these instances the
23   attorneys have gone far and above their legal duties and
24   provided this friendship and this support that many were

Page 16

1    not even equipped to do but they did.
2        Legislation that looks back and allows
3    victims to come to court is legislation, I believe, as
4    Professor Hamilton said, that will open the courthouse
5    doors. The lawmakers are not being asked to judge the
6    cases and determine if there is enough evidence. It's
7    commonly said that how can we deal with these old cases?
8    They're sterile. They're old. The events happened many
9    years ago. The events may have happened many years ago
10   but the trauma and the pain has not only endured, it's
11   increased, and in many instances the perpetrators are
12   still around.
13       In the case of the churches, especially the
14   Catholic Church, there are ample records available. The
15   Catholic Church has the most extensive, detailed and
16   effective record-keeping system of probably any
17   organization on the face of the earth. And what they're
18   fighting so hard to do in case after case is prevent the
19   disclosure through discovery of these records. That's
20   what the bankruptcies are about. It's not protecting
21   the money. There is plenty of money. The Diocese of
22   Los -- of San Diego is presently appealing for
23   bankruptcy protection. This is the most land-rich
24   Diocese in the United States, but it's about protecting

Page 17

1    the secrets. Professor Hamilton said it and I will
2    reaffirm what she said, it's about protecting the
3    secrets, protecting further revelations of a culture,
4    culture that allowed abuse to happen rampantly, where
5    the institution was protected at the expense of the most
6    vulnerable.
7        Let me wrap up by speaking directly to some
8    of the objections. I have already mentioned the fact
9    that some objected the cases are too old to defend.
10   Well, that's the court's job. That's what the courts
11   are for. They will defend them.
12       Opening the window will allow victims to
13   come forward, and as Professor Hamilton has said, and I
14   have seen this in my experience and in fact, it will
15   track down and tag a number of perpetrators who are
16   still on the loose. If you want to see something that
17   will shock you, get your hands on the movie "Deliver Us
18   From Evil" which was a runner-up for an Academy Award.
19   Look at the interviews with Father Oliver O'Grady, a
20   defrocked priest who after getting out of 12 years in
21   prison was deported to Ireland. He's still loose. Just
22   recently his neighbors in Dublin called in an address
23   and said why is this man still on the street? We have
24   young children here. Watch in this movie actual footage

5 (Pages 14 to 17)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

A109

Page 18

1   of this man hanging around parks and playgrounds. The
2   average pedophile has 75 to 80 victims and he doesn't
3   lose his steam until he's in his late 80s or maybe in
4   his coffin.
5           There will be a deluge of false claims.
6   This is patently untrue. I have been involved in this
7   longer than probably anyone. I have probably been
8   directly involved in more cases in the civil courts,
9   both criminal and civil, than anyone else, including the
10  attorneys. I know of two false claims in the State of
11  California that resulted from the opening of the window
12  there and in my experience I can count six out of
13  probably several thousands. These were unscrupulous
14  sociopathic people that tried to jump on the band wagon
15  and make some monetary gain from the unfortunate --
16  misfortune of others. But I can also attest to the fact
17  that the attorneys that I know put their potential
18  clients through such a rigorous screening that no one in
19  their right mind would want to get involved in one of
20  these litigation processes unless that process was going
21  to actually help heal harm that had been done to them.
22          Some have said that the deluge of false
23  claims will cause a severe curtailment at least of the
24  Catholic Church's good works such as parish and

Page 19

1   charitable ministries and that these Dioceses will end
2   up in bankruptcy, one can say the same for the other
3   churches or some private institutions. Speaking for the
4   Catholic Church, most of its actual charitable work
5   happens through an organization called Catholic
6   Charities and between 80 and 92 percent of all of the
7   funding throughout the country from Catholic Charities
8   comes from federal and state financial aid. A tiny
9   percentage comes from the Dioceses itself. In no
10  Diocese in the United States or any other country has
11  any ministry, parish or school been forced to close or
12  curtail its activities because of the settlements or
13  court awards given to victims of childhood sexual abuse.
14          But if you look on the other end of the
15  spectrum, the awards given to the victims of childhood
16  sexual abuse, these are children and now men and women
17  in most cases who lives have been irreparably ruined not
18  only by perpetrating dysfunctional clerics but by the
19  neglect and the malevolent neglect of the church's
20  leadership. The policy in the Catholic Church and in
21  other denominations has not been to disclose
22  perpetrators to law enforcement authorities or child
23  welfare institutions. It has been to cover it up and to
24  transfer them from one place to another using the

Page 20

1   geographic solution. He didn't work out in this place,
2   we'll send him over there. Slap him on the wrist,
3   problem is taken care of. But it has not worked and it
4   all came back to haunt at least my denomination and
5   using that as a catalyst other denominations beginning
6   in 1984.
7           The church leadership of many churches have
8   said we have learned so much, we didn't understand then
9   how serious child sexual abuse was. No normal, sane
10  adult human being can claim that they didn't understand
11  that sex between an adult and a child is not harmful.
12  But what the churches didn't understand then and what
13  they understand now is that they can no longer get away
14  with it.
15          These claims will certainly not drive any
16  church into bankruptcy. The five Dioceses in the United
17  States that have filed for bankruptcy protection have
18  not gone into bankruptcy. They have filed for
19  protection to forestall and to curtail the trial
20  processes that Marci Hamilton mentioned have been
21  stopped because of the fear of disclosure of the
22  secrets.
23          And I think perhaps the most bizarre of the
24  oppositions or the objections has been the fact that

Page 21

1   this is in the case of the Catholic Church Catholic
2   bashing. It's a conspiracy. It's persecution of the
3   church. Even on its face that is utterly ridiculous
4   because what this is about is a call to accountability
5   of an institution and of many institutions that hid
6   behind their institutional identity to prevent
7   accountability for its members and its leadership at the
8   expense of the most vulnerable and the most innocent.
9   If calling forth and publicly exposing wrongdoing,
10  criminal behavior and evil-doing by members of an
11  institution is bashing that institution, then the
12  institution needs to be bashed. That is not bashing or
13  prejudice. It's truth telling.
14          Is there an upside? I believe there is. I
15  believe that the legacy of civil suits, the grand jury
16  investigations and their devastating reports and the
17  attempts to make -- bring about legislative reforms in
18  this State and other states will prove to be a blessing
19  for churches and for private institutions alike because
20  it will continue to force them to reevaluate what their
21  meaning and mission is all about. The mission of no
22  church should be its own financial stability or the
23  creation of a series and a network of beautifully
24  trimmed physical plants. The mission of no church

6 (Pages 18 to 21)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

A110

Page 22

1 should be simply the sustenance of a controlling
2 governmental body, but it should be the compassionate
3 care and love to all of its members, especially those
4 most in need of it.
5        What has been happening in our country in
6 the past 20 some years has spread to other countries.
7 This is not an American problem. It's not an
8 English-speaking problem. It's not a Catholic problem.
9 It's a societal problem and it's been buried deeply
10 because we as a society and other societies are afraid
11 to confront the fact that we have devalued children and
12 the vulnerable so much that we have allowed them to
13 become abused and to remain wallowing in this abuse and
14 in this trauma for a lifetime. The institutions and the
15 churches need legislation to help remind them what they
16 are really about. You are helping to provide
17 accountability and honesty and a rebirth into what it
18 should be and not what it has been.
19        I'd like to thank you for the opportunity
20 to have been here today to speak with you on behalf of
21 the many thousands of victims that I have met,
22 especially the older ones, the men and the women whose
23 lives have been lonely, who have been trapped in trauma
24 and tragedy and pain and regret and suffering. The

Page 23

1 legislative changes will offer some small opportunity
2 and hope to many of these to escape from this nightmare.
3 And it will also offer the impetus of fear to
4 perpetrators who are still running loose and to those
5 who would enable them, those institution leaders that
6 would enable them that as the gentleman said a few
7 minutes ago, we're sick of this, we're tired of it, we
8 will no longer allow our present and our future to be
9 ruined by this selfishness and greed. Thank you.
10        SENATOR ADAMS: Thank you, Father Doyle.
11 Senator Still.
12        SENATOR STILL: Thank you, Mr. President.
13 Father Doyle, thank you for your clear explanation and
14 opinion on the issue and your testimony. It is greatly
15 appreciated. The Bill provides for those very small
16 number of falsified claims, as you have illuminated,
17 that only attorney fees are payable. In the event
18 someone has an ax to grind with someone else and does
19 falsely testify, it would seem to me that attorney fees,
20 outside of the statute, solely attorney fees (inaudible
21 to reporter) would be a very small amount of money to
22 recover; are there other provisions in the code where a
23 person could seek repair of their reputation in the
24 event of a false claim?

Page 24

1        SENATOR PETERSON: Mr. President, excuse
2 me, that question is probably better answered by
3 Mr. Clark and I'll ask him to respond to that. Father
4 Doyle is not an attorney and he's not familiar with
5 Delaware law.
6        FATHER THOMAS DOYLE: I'm not a civil --
7 I'm a church, a canon lawyer.
8        SENATOR STILL: He is a lawyer.
9        SENATOR PETERSON: A canon lawyer.
10        FATHER THOMAS DOYLE: A canon lawyer. It's
11 a different kind. I have specialized in medieval law.
12 Now, if you're interested in talking about graphic
13 regulations in 1412 I'm your man.
14        SENATOR STILL: No, I don't want to go back
15 that far, Father, but thank you. It's -- I had a couple
16 other questions if I could get to those. You talked
17 about the call to accountability and you have -- you're,
18 if I remember what you said correctly, most of what you
19 deal with are priests and that section of child abuse,
20 not into the familial relationships or family
21 relationships.
22        FATHER THOMAS DOYLE: I have dealt
23 primarily with clergy but because of the fact that I
24 have been involved with that I have also had to become

Page 25

1 involved in some instances with incestuous situations
2 and I have -- I have some experience with clergy of a
3 number of denominations, institutional abuse and
4 incestuous abuse.
5        SENATOR STILL: In your opinion, you have
6 five Master's degrees and a law degree, irrespective of
7 what section of time you're talking about.
8        FATHER THOMAS DOYLE: Yeah, well, I still
9 got to pay for the bus, you know.
10        SENATOR STILL: Your opinion of the
11 legislation that its time has come because the
12 institution has not dealt effectively with this issue.
13        FATHER THOMAS DOYLE: In my own opinion, my
14 personal area of expertise, it's not just the private
15 institutions or the churches but I think society in
16 general has not come to grips with the -- the incidence
17 -- in most instances of incestuous sexual abuse the main
18 enabler is the other spouse, the wife or the husband.
19        SENATOR STILL: Right.
20        FATHER THOMAS DOYLE: And oftentimes the
21 police are loathe to get involved because of perhaps the
22 reputation of the offending party - the stories are
23 legion - but it's a very embarrassing and a very
24 debilitating situation to get in and we don't want to

7 (Pages 22 to 25)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 26

1  deal with it.
2        SENATOR STILL: I asked this question of
3  Professor Hamilton, I'll ask you the same question. The
4  Tort Reform Association has recommended in their letter
5  that we consider a six or 12-year look-back period.
6  Your opinion of that would be what, if we're going to
7  look-back, why don't we just look-back all the way?
8  Why --
9        FATHER THOMAS DOYLE: I'm not quite I -- I
10  didn't see the letter, so I'm not quite sure I
11  understand -- I didn't understand what it meant when you
12  mentioned it with Professor Hamilton.  Does that mean
13  you can only look back 12 or six years?
14        SENATOR STILL: Right.
15        FATHER THOMAS DOYLE: I think that's
16  ridiculous.  I think it has to go all the way because
17  the fact is that most adult victims wait 30 years, the
18  majority wait at least 30 years to come forward.
19        SENATOR STILL: Okay.  That's fair.  I
20  really don't have any other questions.  You have
21  explained your position pretty clearly and I appreciate
22  that.
23        FATHER THOMAS DOYLE: Thank you very much,
24  sir.

Page 27

1        SENATOR ADAMS: Thank you, Senator Still.
2  Senator Simpson.
3        SENATOR SIMPSON: Thank you, Mr. President.
4  Father Doyle, it was a very moving, emotional experience
5  for me to hear your testimony.  I don't know how to get
6  my hands around this whole issue but it is pervasive in
7  society.  You know you know the extent of the problem
8  probably better than anyone probably in this room,
9  especially the extent of the problem in the Catholic
10  Church.  What worries me a bit is if we and every other
11  state pass similar legislation, that we're going to
12  potentially destroy the Catholic Church.  Could you talk
13  about that?  You know the extent of the problem.  And if
14  we and other states pass this legislation does it have
15  the potential to destroy the Catholic Church?
16        FATHER THOMAS DOYLE: It does not have the
17  potential of destroying the Catholic Church.  If
18  anything, it has the potential of building it up.
19  Building it up so -- so that the Catholic Church
20  realizes --
21        SENATOR DeLUCA: Mr. President.
22        SENATOR ADAMS: Excuse me.  Senator DeLuca.
23        SENATOR DeLUCA: With all due respect, I
24  have nothing but empathy and respect for the people that

Page 28

1  are here testifying today.  I would respectfully request
2  that you show the same respect to our chamber and abide
3  by our rules, no matter how difficult it is, we ask that
4  you not demonstrate for or against any issue.  We are
5  charged with the responsibility here, which we take very
6  seriously, of considering legislation and of paying
7  respect to our witnesses, and our witnesses today have
8  been very respectful of us and I appreciate that.  It is
9  very hard to stand up here under some of this emotional
10  testimony, but before the Lieutenant Governor has to
11  rule somebody in a manner we don't want to hear it I
12  would just suggest that our guests here today abide by
13  our rules and refrain from any further outburst.
14        SENATOR ADAMS: Thank you, Senator DeLuca.
15  And I would reinforce that sentiment and ask all those
16  visitors in the chamber please to respect our procedures
17  and not either cheer or jeer when testimony is given.
18  Thank you for that respect.
19        FATHER THOMAS DOYLE: I would like to
20  apologize for becoming perhaps a bit too emotional in my
21  testimony and I want to say why, though, because I have
22  known and have known for 20 some years intimately the
23  victims and their mothers and fathers, and I believe
24  that one of the problems in my own denomination, and one

Page 29

1  of the reasons for the lack of empathy and concern for
2  the victims, is that the men who are in charge of the
3  Catholic Church have no idea what parenthood is all
4  about or what intimacy is all about or what loving a
5  child is all about.
6        To answer your question I -- let me just
7  hold up something.  The opposition to this legislation
8  from the Catholic Church in particular and the strongest
9  and most vociferous opposition in every state that I
10  have been involved in to any legislative change has come
11  from the Roman Catholic Church, and the Catholic Church
12  has been singled out by society, by the lawmakers, by a
13  number of other institutions in this regard is because
14  it has been the most egregious offender, not just
15  because it's the Catholic Church, not because people are
16  anti Catholic or anti religious.  It's because we have a
17  track record that is horrendous.
18        When I came in I was given a full-page
19  advertisement to read by Senator Peterson.  Many of you
20  probably saw this.  It appeared in June 16th, 2006
21  edition of the News Journal.  It's by an outfit called
22  the American Society For Tradition Family Property.
23  About the only statement on this page that I can
24  guarantee is true is the date.  It's filled with half

8 (Pages 26 to 29)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 30

1  truths, untruths, erroneous spins and everything else,
2  all based on your opinion, sir, will this destroy the
3  Catholic Church. It will not. Absolutely not. There
4  is no evidence for this. There is no evidence of a
5  flood of false cases, of bankruptcies, of churches going
6  out of business. Nothing whatsoever. What it will do
7  is cause the churches to remember what they are really
8  supposed to be about.
9       SENATOR ADAMS: Senator Simpson.
10      SENATOR SIMPSON: This question relates to
11  church law and as a Catholic. If a priest hears
12  confession, someone that is abusing their child or any
13  child, are they -- what does church law say about them
14  turning that person in to --
15      FATHER THOMAS DOYLE: I understand the
16  question very well. It's something that comes up quite
17  often. The issue is can a priest hearing confession
18  disclose to anyone if a person confesses to him that he
19  has sexually abused a child and the answer is this:
20  Under no circumstances can a priest hearing confession
21  disclose to anyone the identity of anyone who has gone
22  to confession to him or what he has heard. The best he
23  can do would be to urge the person to seek assistance,
24  to seek help or to turn himself in.

Page 31

1       SENATOR ADAMS: Senator Simpson.
2       SENATOR SIMPSON: Doesn't that sort of put
3  us in a Catch 22 then because then they are condoning,
4  if you will, sexual abuse and doesn't that give them a
5  degree of negligence that they can later be sued for by
6  the victim?
7       FATHER THOMAS DOYLE: It does quite
8  possibly give them, it's never happened that I have
9  known of. In fact, in my years of experience the only
10  time I have known where there has been a connection
11  between sexual abuse and confession is when priests have
12  used confession to begin to groom and to get access to
13  their victims, but I know of no instances where a person
14  has said I confess this to a priest, I confess that I
15  was an abuser or had that happened to me and I'm going
16  to sue because of this. It's a very -- it's almost a
17  non problem, sir, to be honest with you. And the best a
18  confessor can do, and, quite frankly, I have heard
19  confessions where it's been brought up to me, is to urge
20  the person to seek help but that is one area where
21  privileged communication is almost total.
22      SENATOR SIMPSON: What does the courts say
23  about that?
24      FATHER THOMAS DOYLE: The courts in a

Page 32

1  couple of states, several states, I'm not sure of the
2  courts but I know in several states the clergy penitent
3  privilege has been waived with regard to reporting child
4  sexual abuse or child abuse. In other words, you can't
5  claim clergy penitent privilege. But I know of no state
6  - and I have tried to follow this fairly closely - where
7  there has actually been a cause brought on that regard,
8  where there has actually been a case alleging that a
9  priest should have reported but did not. I believe,
10  first off, you know, not too many people go to
11  confession any more anyway, but I mean that's a whole
12  other issue.
13      SENATOR ADAMS: Senator Simpson. Senator
14  McDowell.
15      SENATOR McDOWELL: Thank you, Father Doyle.
16  Father Doyle, I want to thank you for your testimony
17  today and certainly just a couple things. First of all,
18  I want to say I think that maybe your testimony was all
19  well thought out and intended but I think there is maybe
20  something you just recently said that is perhaps not
21  intended. You said that - and I think maybe due to your
22  -- your deep feeling for the subject which is certainly
23  appreciated - but you said that priests are not able to
24  relate to some of these issues because they don't know

Page 33

1  anything about family or being married or having
2  children, rearing children, and I just want to say that,
3  and I think maybe it's important I say this, I'm a non
4  Catholic, I'm of Scotts and Irish descent, we don't know
5  exactly which, my family doesn't even know where we're
6  from and that's probably because they were hiding from
7  the law in the Inner Hebrides somewhere and Scotts,
8  English and Irish law combined, but in my experience,
9  both here in Delaware and in Georgetown University where
10  I received part of my education, an important part of my
11  education, I have met many priests who are the most
12  compassionate, caring, understanding people that I have
13  ever run across and I'm sure you didn't mean to leave
14  the impression that simply by being a priest they
15  couldn't care, couldn't concern, couldn't have feeling
16  and empathy for people who are destroyed and so I wanted
17  to give you an opportunity to -- I don't think you need
18  to, I'm sure you didn't and I think we can leave it
19  there, that you did not mean to imply that.
20      FATHER THOMAS DOYLE: I'd like to express
21  my gratitude for bringing that up. I did not want to
22  leave that impression. I have been a priest myself and
23  some of the finest men I know have been brother priests.
24  What I wanted to give the impression is that I believe

9 (Pages 30 to 33)

1  one of the reasons that the institutional leadership in
2  the Catholic Church has not been able to be as
3  compassionately understanding or at least comprehensive
4  of the depth of this problem is because they are not
5  parents, and I'm not a parent, and I will admit that I'm
6  not as -- as compassionately understanding. I don't get
7  the full picture. I have been with parents. I have
8  been with victims. And there is something in the mix
9  that happens between a parent and a child that you would
10 have an especially poignant pain when one of your
11 children is abused or hurt that I would never
12 understand. That's all I'm trying to say. It doesn't
13 mean that Bishops and priests and ministers and rabbis
14 are not compassionate and understanding and sympathetic.
15 They are. They are.
16      SENATOR McDOWELL: Thank you. Thank you,
17 Father. One of the other things I wanted to ask about,
18 it was a little confusing and it may be that I had lost
19 full concentration at that point in time, I had a
20 document that I had to sign placed here, but it seemed
21 to me I heard you say that in terms of discovering false
22 claims I think was the area that was being discussed you
23 said that the courts would -- would defend --
24      FATHER THOMAS DOYLE: I'm sorry, sir?

1      SENATOR McDOWELL: I thought I heard you
2  say the courts would defend those who are falsely -- may
3  be falsely accused.
4      FATHER THOMAS DOYLE: No, not at all. No.
5      SENATOR McDOWELL: Okay. Then I did --
6      FATHER THOMAS DOYLE: All I meant is that I
7  think the courts would be able to dispense with the
8  false claims, to determine the false claims.
9      SENATOR McDOWELL: Okay. And there is a
10 difference there --
11      FATHER THOMAS DOYLE: Oh, yeah. Certainly
12 not defend them. I have no use for people who take
13 advantage and hurt the many authentic victims who want
14 to do it for their own self aggrandizement making false
15 claims.
16      SENATOR McDOWELL: Okay. Because I do
17 think we have an adversarial system and the court is
18 basically a neutral between two competing adversaries
19 whatever the issue brought initially to the court.
20      FATHER THOMAS DOYLE: I agree. No, I
21 perhaps didn't phrase it as clearly as I wanted to, but
22 I was trying to say, you know, that the courts
23 themselves, if the lawyers don't weed them out
24 beforehand, which it's been my experience that they do,

1  when you get an unscrupulous lawyer and an even more
2  unscrupulous client you're in for a problem and
3  hopefully that's where the courts will step in and say
4  that's enough, you're wasting our time and you're
5  wasting our money.
6      SENATOR McDOWELL: Thank you. And I would
7  hope that would be the case also. But I do -- lastly, I
8  want to thank you for a refreshing point of view that we
9  don't usually hear because you said you're an attorney
10 that -- you're a lawyer that specializes in canon law
11 and therefore you don't really know about some of the
12 issues of law and that's quite refreshing here on this
13 floor because most of the lawyers who come before us
14 claim that they're experts in absolutely everything, so
15 I thank you for your candor.
16      FATHER THOMAS DOYLE: Thank you.
17      SENATOR ADAMS: Thank you, Senator
18 McDowell. Senator DeLuca.
19      SENATOR DeLUCA: Thank you, Mr. President.
20 Father, thank you for your testimony today. I wanted to
21 give you an opportunity to comment on and follow up on
22 some of Senator Simpson's questions because he asked you
23 about confession and I thoroughly understand your answer
24 about the confidentiality of confession, but that

1  doesn't go to the issue of systematically moving clergy
2  from one place to another to cover up the issue and
3  that's not covered by the confessional and I think you
4  deserve the opportunity to address that because the
5  obligation of a priest to remain silent about what he
6  hears in confession is a singular issue but it nowhere
7  near comes close to the systematic moving of clergy from
8  one place to the other and the hierarchy setting up
9  policies where they refuse to admit what was going on.
10 I wanted to give you the opportunity to once again
11 comment.
12      FATHER THOMAS DOYLE: Thank you, sir. That
13 is not at all related to confession, as you so clearly
14 said. The issue has been, and the experience has been
15 in the courts and in the grand jury investigations in
16 our country and in similar investigations in other
17 countries and the reason that the thousands of people
18 have brought cases to court has been precisely that,
19 because the institutional leaders, the church's bosses
20 knew that men were sexually abusing children and rather
21 than pull them off line, send them to treatment centers,
22 suspend them or whatever, what happened in most, but not
23 all cases, was simply to transfer them from one place to
24 another to another. This has nothing to do with

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 38

1  privileged communication, with the First Amendment
2  protections of the rights of Bishops and priests and
3  rabbis to conduct religious affairs in their own
4  denominations. What this is is an intentional enabling
5  of criminal behavior which in itself is criminal.
6         SENATOR ADAMS: Senator Copeland.
7         SENATOR COPELAND: Thank you,
8  Mr. President. I just wanted to try to get my own
9  understanding of sort of the dynamics here. You said
10 that -- that a pedophile has on average 75 to 80
11 victims. Now, I'm assuming that would not be the case
12 for an incestuous relationship or is that man, because I
13 think most of the time it probably is, you know, sort of
14 doing the whole neighborhood sort of thing. I mean I'm
15 trying to understand. I can see in a priest situation
16 where there is almost a continuous flow that you would
17 have repeat victims over and over and over. Could you
18 talk about that just a little bit?
19        FATHER THOMAS DOYLE: Sure. First off, I'm
20 not a clinical psychologist, as you know. I'm an
21 addiction therapist. But what I meant, and the
22 statement is this, and I believe there is a clinical
23 psychologist who is going to follow me. First, let me
24 make a distinction between a pedophile, that's a man and

Page 39

1  rarely a woman, who receives sexual gratification from
2  prepubescent children, boys or girls before they hit
3  puberty. A small minority of the actual clergy
4  perpetrators are true pedophiles. The majority are what
5  are called ephebophiles which are men or women who
6  receive sexual gratification or excitement from becoming
7  sexually involved with young adolescent children. A
8  pedophile is a highly, highly compulsive disorder.
9  These are the men who generally will have multiple
10 victims, 75 to 80 victims. That's the numbers I have
11 read in the professional journals. The ephebophiles
12 oftentimes will be less, less than the numbers, although
13 some who are highly compulsive and fixated will have
14 vast numbers but those numbers are significantly less.
15        I don't know the statistics for incest, how
16 many incestuous relationships are truly pedophilic and
17 how many involve young adolescents. In the case of
18 clergy, most of the victims have been young adolescents.
19 The highest number of victims that I have known of was
20 one priest who admitted to at least 500, possibly 550.
21 I have dealt with a number of cases over the years where
22 the victims have said from 75 to 150 and occasionally
23 there are a small number. If the man says there was
24 only one, inevitably that means there were maybe ten or

Page 40

1  maybe five. I can't speak authoritatively with regard
2  to incest because I'm not up to speed on it.
3         SENATOR COPELAND: All right. I appreciate
4  the answer and I guess part of the reason is, you know,
5  just sort of looking at the numbers, I mean Delaware is
6  a small State. We have got 800,000 some residents and
7  if half of those are below the age of 18 and one in five
8  is being sexually assaulted, that gives you about 80,000
9  kids and if it's 80 per, that's a thousand perpetrators.
10        FATHER THOMAS DOYLE: That's right.
11        SENATOR COPELAND: I'm a numbers guy and
12 everybody sort of knows that here. I mean that just to
13 me is a stunning number, but if it's only five, that
14 number could be 10,000 people.
15        FATHER THOMAS DOYLE: True. It's shocking
16 and it's something that I still with all my experience I
17 still can't wrap my mind around the numbers and the
18 reality that I witnessed first hand. 24 years ago when
19 I first got involved no one thought there would be this
20 vast number out there and then as we kept digging more
21 and more victims would come forward and it's still going
22 on in the churches. I know for a fact it's still going
23 on. Perpetrators are still being covered in the
24 Catholic Church and known offenders are still being

Page 41

1  shuffled around. That's a fact.
2         SENATOR COPELAND: Thank you.
3         FATHER THOMAS DOYLE: Thank you.
4         SENATOR ADAMS: Thank you, Senator
5  Copeland. Senator Peterson.
6         SENATOR PETERSON: Yes. Thank you,
7  Mr. President. If there are no other questions, I ask
8  that the witness be excused.
9         SENATOR ADAMS: The witness may be excused.
10 Thank you, Father.
11        SENATOR PETERSON: And Mr. President, I
12 know that Father Doyle is a speaker tonight at the
13 University of Delaware and has to leave and hopefully
14 all of the questions have been asked of him. Professor
15 Hamilton is still in the building and will be back.
16        I have one more witness. I appreciate your
17 attention and your patience, and I would at this time
18 like to request personal privilege of the floor for
19 Dr. Carol Tavani.
20        SENATOR ADAMS: Privilege of the floor has
21 been requested for Dr. Carol Tavani. Seeing no
22 objection please come forward. Please restate your name
23 for the record and who you represent. You'll have to
24 pull that -- there you go.

11 (Pages 38 to 41)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 42

1      DR. CAROL TAVANI:  I am Dr. Carol Tavani.
2  I am a board certified neuropsychologist and I was asked
3  to testify today.
4      SENATOR ADAMS:  Thank you, Dr. Tavani.
5  Senator Peterson.
6      SENATOR PETERSON:  Yes.  Thank you,
7  Mr. President.  Dr. Tavani, welcome to the Delaware
8  State Senate and thank you for your patience.
9      DR. CAROL TAVANI:  You're very welcome.
10      SENATOR PETERSON:  Would you please add to
11  the testimony that you have heard what you know about
12  the victims and in particular the long-term effects of
13  child sexual abuse.
14      DR. CAROL TAVANI:  Okay.  Maybe can I just
15  frame it by telling them what I do for a living?
16      SENATOR PETERSON:  Yes, please.
17      DR. CAROL TAVANI:  I am a board certified
18  neuropsychiatrist.  I have been here in Delaware over 20
19  years.  I founded the psychiatric consultation service
20  at Christiana Hospital where I subsequently became
21  president of the staff, first woman for that, and I have
22  been also the first woman president of the State Medical
23  Society, have represented it at the AMA and now
24  represent Christiana there.

Page 43

1      Really at heart I am a clinical
2  in-the-trenches doctor.  It's a fairly frequent
3  occurrence on rounds at Christiana in the med-surg beds
4  that I talk to somebody who has an unexplained syndrome,
5  abdominal pain, pelvic pain, a funny rash someplace
6  where nobody can figure out what's causing it.  The mind
7  and the body are intimately related.  Those sorts of
8  complaints raise a real red flag to me.  The other huge
9  red flag is when I'm trying to get a history from
10  somebody and they say to me I don't remember anything
11  before the age of eight or whatever age.  That's
12  abnormal and there is a reason for that.  And darned if
13  it doesn't turn out to be that that person is a victim
14  of abuse.  And we have some demographics that Senator
15  Peterson shared with you, but what I can tell you is if
16  I see it every day and I do some 2,000 consults a year
17  in that base, it can't be rare.  It's -- it's prevalent.
18      I was asked by Senator Peterson to be the
19  one to do the wrap-up today and I'll try to be brief and
20  the hour is late and I don't know what time you break
21  for dinner here but I'll try to facilitate that.  You
22  heard, and I want to just recap what you heard today and
23  then I have a couple brief points I want to make myself.
24  He devastated my life.  He took my childhood.  It

Page 44

1  burdens the soul and breaks the spirit, and these are
2  first-hand accounts of the very brave men and women who
3  came to talk to you today and might I remind you that
4  those are the healthier ones you heard.
5      For three and a half years spent about
6  ten or 15 hours a week going over to the prisons trying
7  sort of single-handedly to make things better over there
8  and I will tell you that over at BWCI at the women's
9  prison I would go whole days when I never talked to one
10  person in there, one woman, who had not been abused.  It
11  was so prevalent.  Obviously something happens to these
12  people to result in such a downward drift in their lives
13  that they wind up incarcerated.  You heard today shame,
14  guilt, fear, suicide attempts, permanent disability of a
15  highly functional individual, an attorney in a highly
16  prestigious position, this was somebody obviously with
17  very strong premorbid coping mechanisms, and if it can
18  happen to somebody like that I submit it can happen to
19  any of us.  This could have been you or I or, God
20  forbid, our children and maybe it has.
21      They can't trust anybody any more.  They
22  can't establish a solid relationship.  For some reason
23  that the psyche does to you they often will tend to
24  gravitate into abusive relationships, and if they do

Page 45

1  pick a good person it's awfully hard to live with
2  somebody who has all those issues and that you can't get
3  near or they recoil.  I mean that's kind of hard to --
4  to live with.  I -- I am occasionally asked to give a
5  forensic expert witness opinion.  I have done that in
6  the civil courts in constitutional law cases,
7  particularly in a lot of criminal cases and also in
8  Chancery Court.  I do a lot of profiling as well for
9  dangerousness.
10      The problem is very -- is very prevalent.
11  You get -- you start to put profiles together of what
12  these people have been through and what happens to them.
13  What you didn't hear, though, because they're not here
14  to tell you, are in all these incarcerated women who
15  have been abused is that they self medicate, often with
16  drugs.  There is a tremendous prevalence of substance
17  abuse and addiction in people who have been abused.  Now
18  only about a quarter of the people in this country who
19  need a good psychiatrist get to see one.  It's kind of
20  unfortunate for a number of reasons, but they
21  self-medicate.  They don't know what else to do and
22  they're not big on telling because of the aforementioned
23  shame and guilt and fear.  So they do the best they can
24  with it which sometimes isn't very good themselves.

12  (Pages 42 to 45)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 46

1    They -- there are -- there is a ripple
2  effect then of the drug abuse.  They prostitute for drug
3  money because they get desperate.  They get beat up in
4  the abusive relationships.  They get all sorts of
5  horrible physical diseases like AIDS and Hepatitis C
6  related to those terrible risky behaviors and on and on
7  and on and there are lots of things you didn't hear
8  today because we only have one afternoon to hear about
9  it, but I just thought I wanted to add those -- those
10  things.
11    So you have heard the sequelae.  What
12  happens to kids when they're being abused is - and the
13  younger they are the easier this happens - is that the
14  mind sort of goes on vacation.  It -- what's happening
15  is too painful right then to endure and so the mind kind
16  of goes somewhere else while the body is enduring that
17  and that's called dissociation and what happens then is
18  that the mind of the victim gets very good at that.
19  Well, at the moment it might be adaptive but later in
20  life it's not adaptive and so they -- they develop
21  maladaptive behaviors.
22    One of the very criteria in post-traumatic
23  stress disorder in the DSM 4, that's the psychiatric
24  Bible of diagnoses, is the inability to remember

Page 47

1  important parts of a trauma.  The mind protects us from
2  what's too painful to think about and it gets to a point
3  where you actually sort of forget it.  And you can't
4  conjure it up and maybe it's not a good thing because
5  the mind kind of lets you see it when it's ready, and
6  oftentimes that's why fragments of things will come back
7  and then they start to come back and people get greatly
8  distressed when that happens.  But there certainly is
9  such a thing as repression of memory and dissociative
10  amnesia and that sort of thing, and I'm giving you an
11  oversimplified explanation but it's a question that
12  always gets asked.
13    Are there people who would try to exploit
14  that?  Yeah, sure there are people who will try to
15  exploit that.  Probably not a lot as you have heard
16  before from some very prestigious speakers here, but
17  there will be some.  That can be weeded out.  And are
18  there instances where maybe a less than qualified
19  therapist will not ask questions in the right way and
20  will suggest something to somebody that they then come
21  to believe?  Yes, and that's happened, but that can be
22  dealt with, too.  That's not a reason not to go ahead
23  and right something that needs to be righted and do the
24  proper thing.

Page 48

1    Another thing I wanted to mention about
2  what happens to these victims is we know so much more
3  now - and this is my area, is neuropsychiatry is the
4  brain and sort of the head bone is connected to the neck
5  bone - we know so much more now about the neurology of
6  the brain and trauma.  Memory is not laid down the same
7  way because the adrenaline is pouring out and so memory
8  gets -- it's kind of squelched and the brain actually
9  gets re-hardwired and, in fact, some of the treatments
10  we have developed for say post-traumatic stress disorder
11  work at re-hardwiring the brain.  It's an arduous
12  process.  It's a daunting process to try to right that
13  if it ever can be righted.  These people are scarred and
14  it's something they carry with them forever and ever.
15    As I mentioned, I did the Whitwell case
16  last week.  I examined him and then testified in that
17  trial.  The man can't say I love you to his wife.  He
18  can't hold her hand.  He can't buy her flowers because
19  the priest told him that all women are bad news and they
20  want you to buy them flowers and things like that.  He
21  can't make a good relationship with the loveliest lady
22  and the most understanding lady and a psychiatric nurse
23  at that that you'd ever want to meet.  He's so
24  frightened that this is going to happen to his children

Page 49

1  that he's going to quit his job as a Navy commander and
2  a Top Gun pilot so that he can stay home and watchdog
3  his kids as if you could do that 24/7.  So these are the
4  kinds of things that happen to people.
5    You have heard that we are shielding the
6  perpetrators.  By the way, I have also talked to
7  hundreds of perpetrators and probably thousands of
8  victims.  They offend again.  They target the helpless.
9  They pick out the weak ones, the sensitive ones.
10  They're very good at it.  They prey on the helpless.  We
11  can't let them do that.  When I came to Delaware to
12  intern, I didn't know one person here.  Delaware has
13  been very good to me.  I love this state.  This is home.
14  I'm very proud of Delaware.  We're very progressive.
15  We're nimble enough and small enough to do things that
16  you couldn't get done elsewhere.  I would like for us to
17  be able to continue to be proud of our stewardship of
18  this State, as hokey as that may sound, I'm kind of
19  speaking from the heart as well as a professional, so I
20  would ask you Senators to do the right thing and open
21  those courthouse doors.  I thank you.
22    SENATOR ADAMS:  Thank you, Dr. Tavani.
23  Senator Peterson.
24    SENATOR PETERSON:  If there are no

13  (Pages 46 to 49)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 50

1  questions for Dr. Tavani.
2       SENATOR ADAMS:  Senator Cloutier.
3       SENATOR CLOUTIER:  Thank you.  I'd like to
4  be marked present, please.
5       SENATOR ADAMS:  You may.
6       SENATOR PETERSON:  I'd ask that the witness
7  be excused.  Oh, I'm sorry.
8       SENATOR CLOUTIER:  Yes.  I would have a
9  question.  Thank you.  Some families accept incest as
10  natural and okay and they keep it all quiet as long as
11  it's with a family member and I know this goes on with
12  generation through generation.  What is going on here?
13  Okay.
14       DR. CAROL TAVANI:  That's true.
15       SENATOR CLOUTIER:  How far back, I have
16  three questions and they may not be in the right order.
17  But first of all, this wrong that we're addressing, it
18  is -- it is just the worst thing that families can go
19  through and I'm glad that there are so many sponsors are
20  on the Bill because it is reprehensible.
21       The questions that I have are how far back
22  can a child who hasn't been molested remember and then
23  possibly the child that has, you mentioned eight years
24  old?

Page 51

1       DR. CAROL TAVANI:  How far back can a child
2  remember who hasn't been molested?
3       SENATOR CLOUTIER:  Because you're talking
4  about how an eight year old can't remember.
5       DR. CAROL TAVANI:  In normal development
6  many children will remember back to two or in some cases
7  earlier, but about two.
8       SENATOR CLOUTIER:  Okay.  So the child that
9  was molested since the child was two and has been maybe
10  diagnosed with a detachment disorder or disassociation,
11  will that -- what are the chances that that child would
12  become a molester or perpetrator?
13       DR. CAROL TAVANI:  I don't think I can give
14  you any odds.  It depends on an awful lot of things.  It
15  depends on if that person gets treatment early on the
16  prognosis would be better.  It depends on both nature
17  and nurture.  It depends on other aspects of their
18  upbringing.  If there were a lot of good things about
19  their upbringing, too, that person may have developed
20  better coping mechanisms.
21       Unfortunately, however, this conspiracy of
22  silence happens and you learn what you live and so if --
23  if it's a family who keeps secrets, the classic
24  dysfunctional family, then -- then it's not going to get

Page 52

1  dealt with.  I don't think there are good statistics
2  really because most of it's unidentified as we heard
3  before about exactly how many will become perpetrators.
4  But I can tell you that I have certainly talked to
5  people who have been offenders, sexual and otherwise,
6  and when you really probe and if they remember
7  oftentimes the same thing was done to them.
8       SENATOR CLOUTIER:  Can we in the General
9  Assembly pass any legislation that may help stop it at a
10  young age instead of waiting until they are -- become
11  abusers?  Is there something that we can do so that we
12  can add to this Bill and I don't believe we can do that.
13  We're not doing any amendments?
14       DR. CAROL TAVANI:  In terms of legislation
15  I think what you would do by passing this Bill is to
16  identify many more perpetrators than would be identified
17  and to protect from here forward many, many thousands
18  more children in Delaware.  So there would be certainly
19  a secondary prevention going on.  In terms of primary
20  prevention, I think the answer to that, in other words,
21  stopping it before it starts, would be education.  And I
22  think we have taken some measures in our schools to say
23  to children this is okay touching, this is not okay
24  touching, that sort of thing.  I think those efforts

Page 53

1  have happened as the problem of childhood sexual abuse
2  has become more prevalent and that would be the best
3  answer I can give you.
4       SENATOR CLOUTIER:  Well, I do commend your
5  work and I appreciate the answers.
6       DR. CAROL TAVANI:  Thank you.  Thank you.
7       SENATOR ADAMS:  Thank you, Senator
8  Cloutier.  Senator Peterson.
9       SENATOR PETERSON:  Yes, Mr. President.  I
10  ask that the witness be excused.
11       SENATOR ADAMS:  The witness may be excused.
12  Thank you, Dr. Tavani.  Senator Peterson.
13       SENATOR PETERSON:  Mr. President, that
14  concludes my list of witnesses and before I request
15  personal privilege of the floor for our attorney to
16  respond to Senator Simpson and Senator Still's questions
17  I would ask that staff distribute the list of
18  organizations who have joined this coalition in support
19  of the Bill along with comments that have been posted on
20  the coalition's website.
21       SENATOR ADAMS:  Thank you, Senator
22  Peterson.  Ask staff to please distribute the list and
23  the comments.  Thank you very much.  Senator Peterson.
24  Senator Peterson, and I assume that you want those

14 (Pages 50 to 53)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

A118

Page 54

1  entered into the record as well?
2       SENATOR PETERSON: Yes.
3       SENATOR ADAMS: They will be entered into
4  the record.
5       SENATOR PETERSON: Mr. President, I would
6  request personal privilege of the floor for Mr. Jeff
7  Clark.
8       SENATOR ADAMS: Privilege of the floor has
9  been requested for Mr. Jeffrey Clark. Seeing no
10 objection, please come forward.
11      Please restate your name for the record.
12      MR. JEFF CLARK: Jeff Clark, Senate
13 attorney.
14      SENATOR ADAMS: Thank you, Mr. Clark.
15 Senator Peterson.
16      SENATOR PETERSON: Mr. President, I would
17 yield to Senator Still or Senator Simpson. They both
18 had questions. I don't --
19      SENATOR ADAMS: Senator Still.
20      SENATOR STILL: Thank you, Mr. President.
21 Jeff, it's been a long time. I haven't seen you on the
22 floor yet today. Welcome.
23      MR. JEFF CLARK: Yes, sir.
24      SENATOR STILL: A couple bills, a couple

Page 55

1  questions on the Bill. Line three, a definition of a
2  minor, a definition of an adult so we get that clear for
3  the record.
4       MR. JEFF CLARK: Sir, a minor is 18 or
5  under, under 18. Adult is 18 or over.
6       SENATOR STILL: So 18 is the magic number
7  not 16?
8       MR. JEFF CLARK: Yes, sir.
9       SENATOR STILL: Is that different in any
10 other section of the Code or is it always 18?
11      MR. JEFF CLARK: It's -- to my knowledge
12 it's always 18, Senator. I know in the Criminal Code it
13 is 18 as well.
14      SENATOR STILL: So there is consistency in
15 the Code in that regard?
16      MR. JEFF CLARK: Yes, sir.
17      SENATOR STILL: Lines five through seven,
18 talks about a civil cause for action and then it goes on
19 to talk about what constitutes a criminal offense under
20 the Delaware code. Would we classify this as a
21 misdemeanor or a felony normally under the Criminal
22 Code?
23      MR. JEFF CLARK: Senator, the list of
24 offenses that it's referring to would include both

Page 56

1  misdemeanor and felony.
2       SENATOR STILL: Can you put on the record
3  what those would be for each one?
4       MR. JEFF CLARK: Yes, sir.
5       SENATOR STILL: Can you speak directly into
6  the mic?
7       MR. JEFF CLARK: Yes, sir. Sexual
8  harassment is an unclassified misdemeanor. Indecent
9  exposure in the second degree is a misdemeanor.
10 Indecent exposure in the first degree is a misdemeanor.
11 Incest is a misdemeanor. Unlawful sexual contact in the
12 third degree is a misdemeanor. Unlawful sexual contact
13 in both the second degree and the first degree are both
14 felonies. Rape, all four degrees are felonies, and also
15 sexual extortion is a Class A felony. Bestiality -- I
16 don't believe bestiality would be included but that's a
17 felony. Continuous sexual abuse of a child is also a
18 felony. And that's the extent of the law.
19      SENATOR STILL: Thank you, sir. So what we
20 would be doing is taking those specific offenses and
21 then under this Bill and enabling a civil remedy?
22      MR. JEFF CLARK: That's correct, Senator.
23      SENATOR STILL: Okay. Line eight: For a
24 period of two years, why not three years? Why not one

Page 57

1  year?
2       MR. JEFF CLARK: That's a policy choice,
3  Senator. I mean just as in any statute of limitations
4  it's a decision by the General Assembly how long someone
5  has to file a lawsuit. Current statute of limitations
6  is two years from the date of injury. This would be a
7  policy choice.
8       SENATOR STILL: Okay. Is there a reason
9  there is two years? Do we have it in other sections of
10 the Code for a look-back period at all anywhere else?
11      MR. JEFF CLARK: I'm not aware, Senator, of
12 a look-back period in the Code anywhere other than
13 for -- and there may be, I'm just not aware of any,
14 although there was an Agent Orange provision I think was
15 a six-month look-back provision was the only one with a
16 cursory review that I found.
17      SENATOR STILL: Okay. Line 12 it talks
18 about different organizations, institutions, public or
19 private, I'm assuming that means the State of Delaware
20 employees would be covered under this as State employees
21 in the public enterprise?
22      MR. JEFF CLARK: Yes, sir, they would be.
23      SENATOR STILL: So the sovereign immunity
24 rule would not apply in these cases?

15 (Pages 54 to 57)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 58

1       MR. JEFF CLARK:  Sir, it's my opinion that
2  as far as sovereign immunity is concerned this doesn't
3  add to that or take away from it.  It is consistent with
4  it but the civil statute of limitations is a different
5  issue than sovereign immunity.  They're essentially two
6  separate offenses to an action and this is not -- I
7  mean, it doesn't either add to that or take away from
8  that.
9       SENATOR STILL:  Okay.  Is the State limit
10 of liability under sovereign immunity still $300,000?
11      MR. JEFF CLARK:  Yes, sir, it is.
12      SENATOR STILL:  So this doesn't change
13 that?
14      MR. JEFF CLARK:  No, sir.  It has no effect
15 on it.
16      SENATOR STILL:  That would be the
17 limitation if there is a problem in our foster care
18 group and let's say we find somebody who is use the word
19 perpetrator in there and that's adjudicated under the
20 civil remedy here, the most that could be paid out, if
21 I'm correct, under a civil suit would be $300,000?
22      MR. JEFF CLARK:  That's my understanding,
23 Senator.  I mean the one thing I can say with certainty
24 is that it doesn't change whatever the current law is

Page 59

1  for any type of a tort action of that nature now.
2       SENATOR STILL:  Thank you.  Thank you.
3  Duty of care under number 12, now typically in the
4  investment field we have to follow the prudent man rule.
5  Is there a definition of duty of care?  Is it a high
6  duty of care, an average duty of care, or any duty of
7  care?  What's the standard here that we're considering?
8  That's line 12, last few words in that sentence.
9       MR. JEFF CLARK:  Sir, I mean in this
10 context, I mean, it would be just the common, ordinary
11 meaning of duty of care.  In a tort action for personal
12 injury of any nature, it's ultimately the court's
13 decision or a court's assessment of what the legal duty
14 is.  It defines it based on common law and also
15 statutory provisions.  And, I mean, I think it would --
16 it looked to what similar cases have decided with regard
17 to that.
18      SENATOR STILL:  So if I hired a sales
19 Representative from my insurance agency I have a duty of
20 care to protect my employees, none of which
21 unfortunately in this case would be children because
22 they're not old enough to sell insurance, but let's for
23 this case, an example, say I could hire a child to clean
24 my office.  I have a duty of care to make sure that

Page 60

1  possibly there should be somebody else present in their
2  midst, I do a background check on the individual, I have
3  to do something that would represent to a court that I
4  took reasonable, prudent measures to assure myself that
5  this person was a safe person for my employees to be
6  around.
7       MR. JEFF CLARK:  There -- I mean the court
8  would have to take -- make an analysis or make a
9  decision there under the circumstances of your case
10 whether there was an affirmative duty for you to take
11 such action.  Of course, in an employment setting there
12 is a workers' comp exclusivity rule so no one could sue
13 you in the courts for such an action anyway.
14      SENATOR STILL:  Okay.  I think I got that
15 now.  Line 15 deals with not simple negligence but gross
16 negligence.  I assume that gross negligence is a higher
17 standard?
18      MR. JEFF CLARK:  Yes, sir.  Gross
19 negligence is defined by Delaware courts as being an
20 extreme departure from the ordinary standard of care.
21 Simple negligence is a simple departure from the
22 ordinary standard of care.  An extreme departure is
23 gross negligence.  Next up on the chain of the courts --
24 of the fact finder's tree of analysis, I guess you could

Page 61

1  say, would be recklessness.  So it's between negligence
2  and recklessness.
3       SENATOR STILL:  Can you give me a clear,
4  concrete example I could put my arms around as a layman?
5       MR. JEFF CLARK:  Sure.  I mean gross -- an
6  extreme departure from the standard of care is difficult
7  to do that, sir, because the way -- the way it's done
8  with the finder of fact in a jury setting, for instance,
9  the judge, through jury instructions, will define what
10 the legal duty is, and if it's a case of simple
11 negligence it will tell the jury to determine based on
12 its common experience whether or not the defendant
13 breached that duty of care, did not follow it.  In a
14 jury instruction that it would provide for gross
15 negligence it would be told to find liability only if
16 there is an extreme departure from that.  Recklessness
17 is a conscious disregard of a known risk.  It's a
18 different standard.  Sir, I'm not trying to dodge your
19 question but any fact finder you hear got -- may find --
20 may make a different decision with regard to any set of
21 facts.
22      SENATOR STILL:  Thank you, Mr. Clark, and
23 for the record I wanted to make sure that some of these
24 things were on the record because I suspect that a judge

16 (Pages 58 to 61)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 62

1  may want to come back and get a copy of this and look
2  what we considered here.  That's done in some extreme
3  cases and I think it's important that there is clarity.
4  And so I appreciate the patience of the sponsor on the
5  Bill.
6        Last question.  Lines 17 through 19:  A
7  verdict in favor of the accused shall not be the sole
8  basis for the determination that an accusation was
9  false.  So if I read this in conjunction with line 16
10 through 17, it says that a person could recover their
11 attorneys fees where the court determines that a false
12 accusation was made with no basis in fact and with
13 malicious intent.  So if it's -- if it's -- it's false
14 but not malicious there is no recovery of the attorney
15 fees.  If the person suppressed their memory and they
16 thought they had this done but they really -- and there
17 is no maliciousness and they have proven wrong and they
18 lose, there is no attorneys fees to be paid?
19       MR. JEFF CLARK:  That would be correct,
20 Senator.
21       SENATOR STILL:  Okay.  Now, it says the
22 court must make an independent finding of an improper
23 motive.  What do you mean by improper motive here?
24       MR. JEFF CLARK:  Sir, I mean, in reading

Page 63

1  subsection C an improper motive would be an accusation
2  made with no basis in fact and with malicious intent.  I
3  mean, that's -- that's defined by the two terms above
4  it, I believe.
5        SENATOR STILL:  Is that also defined
6  elsewhere in the code, improper motive, or is this --
7        MR. JEFF CLARK:  It's a common, ordinary
8  meaning situation, Senator, but based on the context of
9  subsection C I believe it would be clear it would have
10 to be made with no basis in fact and with malicious
11 intent.
12       SENATOR STILL:  Thank you, Mr. Clark.  I
13 have no further questions.
14       SENATOR ADAMS:  Thank you, Senator Still.
15 Other questions of the witness?  Senator Peter --
16 Senator Copeland.
17       SENATOR COPELAND:  Thank you,
18 Mr. President.  I don't believe that Senator Still
19 covered it, and maybe he did and I just missed it or
20 didn't understand the answer, so I am going to ask -- I
21 have got one question I wanted to ask.  In line 14 where
22 it says that damages against legal entities shall be
23 awarded under this subsection only if there is a finding
24 of gross negligence; does that phrasing mean that

Page 64

1  someone found that under subsection A gross negligence
2  is not the standard?
3        MR. JEFF CLARK:  Sir, the qualification of
4  gross negligence for institutional liability applies
5  only to subsection B, the look-back provision.
6        SENATOR COPELAND:  So there is no
7  institutional liability in subsection A?
8        MR. JEFF CLARK:  No, Senator.  There could
9  potentially be.  It would be under a normal tort law
10 standard of negligence under subsection A, and that
11 would be from the point of the effective date of the
12 Bill going forward.  During the look-back provision
13 there would be a heightened standard or a heightened
14 requirement of culpability, that being gross negligence
15 for an institution.
16       SENATOR COPELAND:  Does that mean that the
17 State due to sovereign immunity is not subject to this
18 section in -- toward looking out since it's only a
19 negligent standard versus a gross negligent standard?
20       MR. JEFF CLARK:  Sir, and perhaps I was --
21 painted too broad of a brush with that last statement.
22 This, both subsection A and subsection B, would not have
23 any impact regarding either taking away from or adding
24 to sovereign immunity in my opinion.  I mean, they --

Page 65

1  the -- under subsection A looking forward you could
2  still sue the State if sovereign -- if qualified
3  sovereign immunity was waived under the circumstances.
4  But --
5        SENATOR COPELAND:  How do you go about
6  waiving sovereign immunity?  I mean, I just don't
7  understand it.  That's --
8        MR. JEFF CLARK:  Sir, the action has to be
9  taken either in bad faith, the actor has to be grossly
10 negligent, or it has to be taken not in the performance
11 of official duty, in exercising the discretion of
12 performing that official duty.  And what -- I mean what
13 this -- if those circumstances -- one of those criterion
14 were not met, and sovereign immunity which has been
15 waived in a different section which isn't impacted by
16 this section, if one of those criteria that gives the
17 State its protection is not met under the circumstances
18 and the plaintiff, the person suing, can prove that one
19 of those criteria did not apply, then the
20 forward-looking provision here would apply to the State.
21       SENATOR COPELAND:  So if I have identical
22 facts with a -- with a, you know, the -- an Episcopalian
23 Diocese and the State of Delaware in a, you know, child
24 care center or what have you, identical facts, if it --

17 (Pages 62 to 65)

Page 66

1  if the court finds guilt by reason of just negligence,
2  the Episcopal Diocese is liable but State would not be?
3          MR. JEFF CLARK: Looking forward, yes, sir.
4  Not under the look-back.
5          SENATOR COPELAND: Only if we reach the
6  level of gross negligence does the State ultimately gain
7  responsibility?
8          MR. JEFF CLARK: That's correct, Senator.
9          SENATOR COPELAND: So there are different
10  standards looking out whether it's the public or
11  private.
12          MR. JEFF CLARK: Yes, sir, but just the
13  point I'd like to make is the different standards are
14  imposed already by the General Assembly in the State
15  Tort Claims Act. This really is just a different layer.
16  It's a different defense. It's a different statute that
17  lays out what the timing requirements are for a suit,
18  and, I mean, as now the General Assembly has spoken and
19  has said that you have two years to file one of these
20  suits, if this Bill passes and becomes law then that
21  policy decision is going to change and there is a
22  look-back provision and there is a forward-looking
23  provision. And it would apply -- I mean, I guess in
24  that vein I mean the best way to describe it is that

Page 67

1  this waiver or this change in the statute of limitations
2  would apply equally to everybody. That would be one
3  threshold issue. Then you get to the sovereign
4  immunity. Then you get to agency. Then you get to
5  other issues when you're a plaintiff and trying to meet
6  your burden of proof in such cases.
7          SENATOR COPELAND: So if I understand your
8  answer, relative to forward looking, the State already
9  is only subject to the gross negligence standard where a
10  private entity is subject to just a negligent standard
11  and but in this case all we're doing is both of them is
12  removing the statute of limitations, you know, into the
13  future but the standard that each one is being held to
14  is still different, not being affected by this
15  legislation.
16          MR. JEFF CLARK: As far as forward looking,
17  yes.
18          SENATOR COPELAND: Yes.
19          MR. JEFF CLARK: Yes, sir, that's correct.
20          SENATOR COPELAND: You know, I'm obviously
21  very supportive of the Bill. I think that the child and
22  the family doesn't actually care what entity is
23  negligent in the abuse of their child, they should be
24  held to a similar standard, you know, but I, you know,

Page 68

1  obviously I'm very supportive of the Bill and (inaudible
2  to reporter).
3          SENATOR ADAMS: Thank you, Senator
4  Copeland. Senator Peterson.
5          SENATOR PETERSON: Mr. President, if there
6  are no other questions for Mr. Clark, I ask that the
7  witness be excused.
8          SENATOR ADAMS: Seeing no further questions
9  the witness may be excused. Senator Simpson.
10          SENATOR SIMPSON: I'd ask for privilege of
11  the floor for Dr. Janice Chester.
12          SENATOR ADAMS: Privilege of the floor has
13  been requested. Dr. Chester, seeing no objection,
14  please come forward. Please restate your name for the
15  record and who you represent.
16          DR. JANICE CHESTER: My name is Dr. Janice
17  Chester and I'm representing myself.
18          SENATOR ADAMS: Thank you, Dr. Chester.
19  Senator Peterson. My mistake. Senator -- it's been a
20  long afternoon. I have been saying Senator Peterson
21  most of the time. Senator Simpson.
22          SENATOR SIMPSON: I know. Thank you,
23  Mr. President. Dr. Chester, could you give us a little
24  bit about your credentials and your understanding of

Page 69

1  repression of memory?
2          DR. JANICE CHESTER: Yes. Thank you very
3  much. My name is Dr. Janice Chester. I'm board
4  certified in psychiatry and I have subspecialty training
5  and board certification in geriatric psychiatry which
6  gives me some special expertise in the area of memory.
7  And I'm here today to -- well, let me finish my
8  credentials first. I completed medical school at
9  Columbia. I completed my residency at Cornell. I'm on
10  the medical staff -- on the faculty of Jefferson Medical
11  College. I'm the past president of the Psychiatric
12  Society of Delaware and currently serve as their
13  legislative representative, and also active in the
14  Medical Society of Delaware and serve on the Public Laws
15  Committee. I came to Delaware in 1998 to serve as the
16  Chair of the Department of Psychiatry for Bay Health
17  Medical Center and served there for five years and
18  remained here in full-time private practice after I
19  completed five years of serving as chair.
20          As I said, I'm speaking today on my own
21  behalf and I am here to speak against the Bill as
22  written. So -- oh, I left out one other credential I
23  have. I also serve on the Board of the National
24  Association of Mental Illness in Delaware. Which would

18 (Pages 66 to 69)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 70

1  lead somebody to wonder why as somebody who is proud of
2  my profession and very invested in it, and somebody who
3  is very dedicated to my patients, as well as somebody
4  who is dedicated to be a patient advocate in my work
5  with NAMI why would I speak against a Bill which on the
6  surface of it appears to be something that would protect
7  patients.
8        And basically there are two reasons for it:
9  One is to do with memory and the statute of limitations
10  and how those two things intertwine and in that sense I
11  want to go back to the idea of removing the statute of
12  limitations for life and the idea that a lot of the
13  victims of sexual abuse can't come forward after the
14  abuse or after they reach the age of majority because
15  they don't have the memory and it's not accessible to
16  them until many years or many decades have passed. And
17  I'm here to tell you that that is a highly debated
18  subject in psychiatry and it's not something that would
19  fall into the category of what nowadays is called
20  evidence-based medicine. And the debate about whether
21  you have -- when you have a memory of something, whether
22  that makes it true, goes back to the time of Freud, as
23  does this very issue.
24        So when Freud's patients came forward with

Page 71

1  repressed memories he first took them at face value and
2  thought that if it's a memory it's the truth and treated
3  it as such. He later reversed himself and thought that
4  coming forward with a memory many years later was
5  material to deal with in the therapy but it didn't
6  actually make it true. And as he went on he
7  flip-flopped. So even Freud couldn't decide where
8  somebody coming forward years later whether that made it
9  true.
10        And I think that what Delaware has done by
11  removing the statute of limitations for criminal cases
12  makes good sense because then you have somebody who
13  might come forward with an accusation years and years
14  later but you have what's missing in the civil law
15  because you have the police and the police can act as
16  corroborators, because there has been a lot of work done
17  in this -- in this field of -- when somebody has a
18  memory that comes back to them after several years is it
19  true. Proponents who think that it is true call it
20  recovered memory, and the people who think that it's not
21  always true call it false memory syndrome, and neither
22  side has prevailed as of yet.
23        And what the false memory syndrome people
24  have demonstrated - and many of them are at Johns

Page 72

1  Hopkins University, so they're pretty well credentialed
2  - what they have demonstrated is that it doesn't really
3  matter how vivid your memory is or how strongly you feel
4  the emotion when you report your memory, that all of
5  that doesn't prove that it's true. And they have also
6  gone on to do work of showing that in normal children
7  and normal adults that it's pretty easy to - if you set
8  the circumstances up right - to convince somebody that
9  something happened to them that didn't actually happen.
10  So you can implant a memory in a normal population, and
11  there is also some work to show that if you can do that
12  to a normal population that it must be even easier to do
13  to a fragile population.
14        So, in the criminal law removing the
15  statute of limitations, as I said, makes sense because
16  you have what's missing, the missing ingredient of
17  deciding when you're the psychiatrist or whoever you are
18  that's hearing the story and you're trying to decide is
19  this memory a memory and I don't have to judge it for
20  truth, or is this memory truth, as you have what's
21  missing which is the corroboration. And most of the
22  professional societies, such as the American Psychiatric
23  Association, because the, pardon the expression, but the
24  jury is still out on whether these are recovered

Page 73

1  memories in all cases or whether there is really the
2  existence of the false memory syndrome, what they do is
3  that they have come down squarely on both sides of the
4  issue. Because I looked up the policy before coming
5  here and what they said is that, well, as a psychiatrist
6  or the psychologists have a policy on it, too, when you
7  get this kind of material from your patients just treat
8  it as material and don't try to get to the truth, try to
9  help the patient decide what's true for them. So, you
10  know, they really do straddle the fence on it.
11        Now, I think that the principle behind the
12  law is a good one, and there are some changes that could
13  be made to the law under which I would feel that I could
14  support it. And I think there are two problems in the
15  way -- why I said I'm speaking against the Bill as
16  written. And the two problems in the Bill, one was
17  brought up during the attorney's testimony is the
18  business about malicious intent. And people who have
19  been tarred by the brush, families, mostly it's families
20  because this false memory syndrome came about when
21  people were tarred with false accusations and so then
22  the family members, usually accused of incest, banded
23  together and generated a whole new generation of
24  research, et cetera. And so if -- and their lives

19 (Pages 70 to 73)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

A123

Page 74

1  generally, especially if they have been -- if they're
2  rightfully accused nobody is going to feel too sorry for
3  them, but if they're falsely accused their lives are
4  over, too. And it's not just attorneys fees. They have
5  generally lost credibility at work, in the neighborhood,
6  being able to go to the soccer game, you name it and,
7  you know, nobody wants them living next door any more.
8        And the standard in this legislation, the
9  way it's written, saying that the most you can get back
10 is attorneys fees, and the standard for getting it back
11 is not just that you have to be not guilty or innocent,
12 but you have to prove malicious intent I think is - I'm
13 not a lawyer obviously - but I think nobody will ever be
14 able to meet that standard. So that standard would have
15 to be lower so that a person who was falsely accused
16 would have a chance to get reparations back for
17 themselves, financial or otherwise, to clear their good
18 name, but also to take away that language of them having
19 to prove malicious intent.
20       And the other thing that I think would make
21 it a fair Bill would be to look at saying well, there
22 can be a statute of limitations, but rather than
23 starting at the time that the event took place when you
24 were five or 14, that it should start at the age of

Page 75

1  majority, and so, you know, once you're an adult you
2  have the decision to make, and I believe in Delaware
3  that would be 18, that you have, you know, a statute of
4  limitations where the clock starts ticking then about
5  whether or not you're prepared to face your accuser
6  within -- within, you know, a certain number of years.
7  And somebody, I believe it was you, Senator Simpson,
8  asked the question before about malpractice and I'm not
9  a hundred percent sure but I think for malpractice cases
10 I think it's two years. So, you know, a group would
11 have to get together to look at what would be a number
12 that would make sense for a Bill like this, but I think
13 something like that would sit well, you know, with me
14 and I think also with the profession.
15       Thank you for your time.
16       SENATOR ADAMS: Thank you very much.
17 Senator Simpson.
18       SENATOR SIMPSON: If there are no questions
19 I'll ask that the witness be excused.
20       SENATOR ADAMS: Seeing no questions, the
21 witness may be excused. Thank you very much. Senator
22 Peterson.
23       SENATOR PETERSON: Mr. President, I would
24 like to request the personal privilege of the floor for

Page 76

1  Dr. Tavani.
2        SENATOR ADAMS: Privilege of the floor has
3  been requested for Dr. Tavani. Seeing no objection,
4  please come forward.
5        Please restate your name for the record.
6        DR. CAROL TAVANI: Dr. Carol Tavani.
7        SENATOR ADAMS: Thank you, Dr. Tavani.
8  Senator Peterson.
9        SENATOR PETERSON: Yes, Dr. Tavani, I
10 assume that you just heard the testimony that was just
11 given.
12       DR. CAROL TAVANI: I did.
13       SENATOR PETERSON: And I would ask you to
14 respond to it, please.
15       DR. CAROL TAVANI: Yeah, I'd like to
16 respond to it. With due respect to Dr. Chester, she's a
17 colleague who speaks against the Bill, Dr. Chester is
18 saying that the studies are dated. What's interesting
19 is that when we look at the DSM 4 which was a very
20 conservatively-written document, it is in itself very
21 conservative with regard to matters like dissociative
22 amnesia and the inability to recall aspects of trauma in
23 post-traumatic stress disorder. The DSM 4, the fourth
24 version of it, was written in 1993. The reams of data

Page 77

1  and studies that were done that support the issue, the
2  concept of repressed memory and dissociative amnesia,
3  were done subsequent to the publication of the DSM 4.
4  So that -- that research is hardly dated.
5        Secondly, with regard to Freud as the be
6  all and the end all, not all of us espouse him as the
7  last word. He certainly didn't understand women very
8  well, and there are those of us who are not of that
9  school, so I wouldn't take that as the final word.
10       Next, with regard to the false memory thing
11 and the recovered -- the issue of recovered memory, you
12 know, most people who recover memory weren't exactly
13 asking to recover it. It comes up. Something triggers
14 it. Many people were doing reasonably well except they
15 have these strange things that are happening until the
16 memory gets recovered and then life goes to hell in a
17 hand basket. So it's not as if they wanted to dream
18 this up. And then it comes back in a very fragmented
19 fashion and it's -- it's rather unusual that it never
20 really happened.
21       Certainly, as I said before, it's possible
22 that if somebody has an inept therapist who puts ideas
23 in somebody's head and doesn't ask questions in an
24 open-ended fashion and somebody is very suggestible then

20 (Pages 74 to 77)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

1  something like a false memory can -- can occur, but the
2  whole idea of false memory has really fallen into
3  disrepute and that is not dated. Thank you.
4      SENATOR PETERSON: Doctor -- Mr. President.
5      SENATOR ADAMS: Senator Peterson.
6      SENATOR PETERSON: Dr. Tavani, one of the
7  things that Dr. Chester said is that this is not an
8  issue in criminal cases because the police are between
9  the accuser and the accused.
10     DR. CAROL TAVANI: Uh-huh.
11     SENATOR PETERSON: Would you agree that the
12 police never plant ideas in people's heads?
13     DR. CAROL TAVANI: People -- police plant
14 ideas in people's heads all the time. I wish I had a
15 nickel for every time I watched a videotape of an
16 interrogation. They suggest, they strong arm, not all
17 police, but some of them do. They certainly -- and also
18 they're not expected to be experts in how to ask a
19 question.
20     SENATOR PETERSON: So just like there --
21 I'm sorry, Mr. President, just like there are therapists
22 whose ethics are a little bit weak so, too, are there
23 police officers whose ethics might be a little weak, so
24 one doesn't serve as a better buffer than the other

1  necessarily?
2      DR. CAROL TAVANI: That's certainly
3  possible and some of it may go to ethics, but it also
4  may go to just not knowing how to ask a question that is
5  going to elicit the most valid possible answer. There
6  are ways to ask things and there are very open-ended
7  ways that are not leading the person.
8      SENATOR PETERSON: Dr. Tavani, are you
9  familiar with the Eric Eden case?
10     DR. CAROL TAVANI: Very familiar with it.
11     SENATOR PETERSON: Okay. Was suppressed
12 memory at issue in that case?
13     DR. CAROL TAVANI: I have examined Eric
14 Eden twice, in fact.
15     SENATOR PETERSON: Do you know what the
16 court said about that whole issue?
17     DR. CAROL TAVANI: I don't know what the
18 court said but he clearly had repression of memories,
19 and, again, he wasn't really asking to remember them.
20 He had some -- some difficulties in his relationships
21 and in other -- in other arenas and he had a lot of
22 psychosomatic things that turned out to be directly
23 referable to the manner in which he was abused.
24     SENATOR PETERSON: If there are no other

1  questions.
2      SENATOR ADAMS: Senator Venables.
3      SENATOR VENABLES: Thank you,
4  Mr. President. Listening to these two experts on
5  different sides it brought to my mind the issue that
6  happened a few years ago in California in relationship
7  to daycare centers and I think that it was pretty
8  evident five years later that these accusations,
9  according to what I read, had been told these children
10 so many times that they finally believed it and, in
11 turn, the jury believed it, and those people were
12 absolutely ruined.
13     DR. CAROL TAVANI: Uh-huh.
14     SENATOR VENABLES: And then the truth came
15 out, and yet you testified that there is no such thing
16 as repressed memories, that a psychiatrist can instill
17 into these people this? That's what I understood you to
18 say.
19     DR. CAROL TAVANI: I didn't say there is no
20 such thing as a repressed memory. What I said is that
21 if -- if people are asked a question in the wrong way
22 and they're suggestible, that idea can be planted in
23 their heads. So, you're right.
24     SENATOR VENABLES: Well, is that what

1  happened in this case, to clear it up in my mind, in
2  California?
3      DR. CAROL TAVANI: In the California case.
4      SENATOR VENABLES: That was child -- they
5  accused them of molesting these children and were
6  convicted of it and then, you know, evidence came out
7  later that it wasn't true but it was based on the
8  testimony of the children saying that it did happen and
9  then the article said that that testimony that they
10 thought these things were happening because the
11 psychiatrist had said to them so many times - I don't
12 know whether they said it did happen or it didn't happen
13 - they kept prodding them so much that it became part of
14 the memory.
15     DR. CAROL TAVANI: It sounds from what
16 you're describing, I'm not terrible familiar with that
17 case - I remember reading about it but I didn't study it
18 - but it sounds as though it's certainly possible that
19 whoever the psychiatrist was did not interview the
20 children in the proper way and therefore suggested
21 things. Now, I would add to that, that it's always very
22 important to try, as is the case in any suit, to get the
23 best corroboration that one can get, and the more
24 corroboration you have, the more helpful that is.

21 (Pages 78 to 81)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 82

1    SENATOR VENABLES:  Well, I was just
2  wondering, if, you know, the childhood memory which I
3  think she indicated that it would be better, you know,
4  to not have the statute of limitations go back that
5  wrong, could get it mixed up very similar of what
6  happened in the daycare center.
7    DR. CAROL TAVANI:  Well, I think there is
8  --
9    SENATOR VENABLES:  My theory on this Bill,
10  and I'm probably going to vote for it, I'm scared of it,
11  I have got to tell you that and I have expressed this to
12  Senator Peterson that I am and I told her the reasons.
13  And I'm afraid of false accusations.  And I know that
14  there has been a lot of testimony here today that
15  relieve my mind to some degree.  I heard testimony, you
16  know, that there are going to be false, and then, of
17  course, I was surprised to hear that we're one of the
18  first states I guess other than California that is
19  tackling this type of legislation, it does scare me
20  about the broad aspects of what might happen.  I think
21  about Boy Scouts troops, I think about Boys and Girls
22  Clubs, all these things run through my mind, you know,
23  what's the repercussion to them with the liability
24  insurance, something that might come up.  I even think

Page 83

1  about statutory rape.  Back when I was growing up it was
2  not unusual at all for 20-year-old men that I called to
3  be going with 13-year-old girls, in fact, there were a
4  lot of cases where they married them.  I hope that some
5  of that repressed memory where some of those don't use
6  that opportunity to come back because I assume that this
7  covers statutory rape.
8    DR. CAROL TAVANI:  I can certainly
9  understand your concern but I think to eliminate the
10  look-back would render it largely meaningless, because
11  as you heard from Professor Hamilton people have to be
12  able to come forward when they are ready, and they don't
13  get ready for maybe 30 years.  So without that it's sort
14  of gutted.
15    SENATOR VENABLES:  That's what I -- and
16  certainly the witnesses that I heard, you know, telling
17  their stories was clear and convincing to me and I
18  assume it would be to a jury and I would think that what
19  they said here today in expressions that they had and
20  the tears that they shed they're not that good of
21  actors.
22    DR. CAROL TAVANI:  Well, that's -- that's
23  where help from the experts come in because you can --
24  you can do certain kinds of testing on people.  For

Page 84

1  example, to look at, you know, whether -- look at the
2  validity of what they're saying.  If they're consciously
3  making this up there is testing that will indicate that.
4  So I think that's where the role of the experts come in
5  and due diligence in efforts at corroboration.
6    SENATOR VENABLES:  Well, thank you.
7    DR. CAROL TAVANI:  You're welcome.
8    SENATOR ADAMS:  Thank you, Senator
9  Venables.  Senator McDowell.
10    SENATOR McDOWELL:  Thank you,
11  Mr. President.  Dr. Tavani, I want to -- I hesitate to
12  step between feuding psychiatrists, I don't think I can
13  win in that event, but it seemed to me, I want to make
14  sure, but it seemed to me that Dr. Chester did not imply
15  that repressed memory is either all or nothing, but,
16  rather, I think her testimony suggested that there could
17  be instances of repressed memory and there could be
18  instances when apparent repressed memory is not really
19  there, that it's something else.  I don't even think she
20  suggested what it is.
21    Are you suggesting that - and it seems to
22  me that you have been to some degree, at least by
23  implication - leaving that it's all or nothing, there
24  either is repressed memory and it's always -- if it

Page 85

1  comes forward it's always accurate?
2    DR. CAROL TAVANI:  No.  In fact, when I had
3  the floor before I think I said something to the effect
4  of, number one, are there unscrupulous people who will
5  try to imply that something false happened?  Yes, there
6  can always be.  Those people are always out there,
7  whether it's a criminal case or a civil case or no
8  matter what the accusations are, and, also, there can be
9  memories that as suggested to somebody that then the
10  person believes as a false memory.  It's been relatively
11  infrequent so far as we know, but it's not all or
12  nothing.
13    SENATOR McDOWELL:  Okay.  So it would have
14  to be either an unscrupulous person or somebody who was
15  misled?  It couldn't come from any other -- spring from
16  any other source?
17    DR. CAROL TAVANI:  It could come from a
18  number of intentions, if you will.  It could be a
19  deliberate fabrication or it could be a misperception --
20    SENATOR McDOWELL:  Thank you.
21    DR. CAROL TAVANI:  -- or something that
22  wasn't accurate for a variety of reasons.  Somebody
23  could be floridly paranoid and psychotic and the
24  ideation would be delusional, for example, but that

22 (Pages 82 to 85)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

A126

Page 86

1  could be sorted out.
2      SENATOR ADAMS:  Thank you, Senator
3  McDowell.  Senator Peterson.
4      SENATOR PETERSON:  No further questions for
5  the witness.
6      SENATOR ADAMS:  Senator Simpson.
7      SENATOR SIMPSON:  Thank you, Mr. President.
8  I think Dr. Chester did say there can be repressed
9  memory and there can be false memory, and you would
10  agree with that, is that correct?
11     DR. CAROL TAVANI:  Yes.
12     SENATOR SIMPSON:  Regardless of why that
13  false memory is there, whether it was implanted by a
14  suggestion from someone or it's just a false -- false
15  memory?
16     DR. CAROL TAVANI:  It's possible, yes, but
17  to disenfranchise all the people for whom --
18     SENATOR SIMPSON:  I'm not saying that.  I'm
19  just repeating what Dr. Chester said --
20     DR. CAROL TAVANI:  The answer would be --
21     SENATOR SIMPSON:  -- that there are
22  repressed memory and there can be false memory?
23     DR. CAROL TAVANI:  The answer would be that
24  there can be false memory but it's relatively infrequent

Page 87

1  so far as we know.
2      SENATOR ADAMS:  Thank you, Senator Simpson.
3  Senator Peterson.
4      SENATOR PETERSON:  Request that the witness
5  be excused.
6      SENATOR ADAMS:  The witness may be excused.
7  Thank you, Dr. Tavani.  Senator Peterson.
8      SENATOR PETERSON:  Mr. President, I'd like
9  to request personal privilege of the floor for Professor
10  Hamilton.
11     SENATOR ADAMS:  Privilege of the floor has
12  been requested for Professor Hamilton.  Seeing no
13  objection please come forward.
14     Please restate your name for the record,
15  please.
16     MS. MARCI HAMILTON:  My name is Marci
17  Hamilton.
18     SENATOR ADAMS:  Thank you, Professor
19  Hamilton.  Senator Peterson.
20     SENATOR PETERSON:  Professor Hamilton,
21  would you care to respond to the statements that were
22  made earlier by Dr. Chester based on your experience?
23     MS. MARCI HAMILTON:  Dr. Chester's comments
24  were started on a miscalculation.  She said that she

Page 88

1  associated the idea that victims don't come forward with
2  repressed memory.  Those are two completely different
3  things.  What you heard today was four victims testify
4  to their tortuous memories.  You didn't have a repressed
5  memory victim in here.  What they told you is they
6  couldn't live with the memories.  In all the cases that
7  I have had across the country in a variety of
8  denominations I have not had a victim who has claimed
9  repressed memory.  I have had hundreds who have
10  devastating memories but it's that torture and the
11  inability to tell other people about it and the
12  immaturity of the child that makes it hard to come
13  forward.  So I just wanted to make sure you understood.
14  Repressed memory is a tiny, tiny aspect of this issue.
15  The key is those who were abused, who never got to court
16  because they were psychologically unprepared, not
17  because they forgot about it, they just couldn't do it,
18  and those are the ones why -- that are the reason you'd
19  open the window.
20     SENATOR ADAMS:  Senator Simpson.
21     SENATOR SIMPSON:  I guess I would have a
22  little bit of a problem with that because you look at it
23  from the legal aspect of what you have seen come forth
24  in the court system, not as a psychiatrist who may have

Page 89

1  heard actual questioning from many clients of hers that
2  do have repressed memories.  So, you know, while I
3  respect your -- your legal opinion of what you have seen
4  in court, you may not have seen or heard or reviewed the
5  number of psychiatric cases that the two psychiatrists
6  in question here today have presented.
7      MS. MARCI HAMILTON:  But what I'm
8  explaining is that litigators don't see many repressed
9  memory cases and that's all we're dealing with here.
10  We're dealing with legal action.  If they're in the
11  psychiatric offices, that's one thing, but we're dealing
12  with who actually comes to the litigators and who the
13  litigators choose to represent, and litigators are not
14  keen on those with false representations.  So the fact
15  of the matter is, in California it's just not been an
16  issue despite the fact there is a window.
17     I also wanted to add that the day care case
18  you're talking about was in California, and California
19  is the state that has the window that's had no problems
20  with it.  So that particular experience which was very
21  vivid in Los Angeles has not undermined the validity or
22  the goodness of the window there.
23     SENATOR ADAMS:  Senator Still.
24     SENATOR STILL:  Thank you, Mr. President.

23  (Pages 86 to 89)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 90

1  Professor Hamilton, on a different issue I have two
2  points that would help me clarify my position on the
3  Bill.  I asked one individual who testified why there
4  was a two-year following the effective date of the Bill.
5  From your legal perspective across the United States on
6  line eight of the Bill it says for a period of two years
7  following the effective date and then it goes on, is two
8  years sufficient?  Would one year be sufficient?  Why
9  two years?  I'm sure you must have had some import and
10  impact into the drafting of this Bill given your
11  testimony.
12      MS MARCI HAMILTON:  Actually not this
13  particular Bill but model Bills.  What we found in
14  California was that one year was enough for many to come
15  forward, roughly a thousand, and it was a mix of
16  individuals.  But groups that had horrendous abuse, like
17  the Children of God which was a sex cult that started in
18  California and involved incest and group sex from the
19  age of three, those victims were not capable of coming
20  forward within the year.  They -- they were -- they
21  didn't get the information, they didn't understand what
22  they needed to do and they were psychologically
23  debilitated.  Two years, I think -- I started hearing
24  from the Children of God victims about six months after

Page 91

1  the window had closed.  So two years might have been
2  better.
3      Look, if I had my way I would abolish it
4  forward and backward and just move on.  But I understand
5  that there is going to be a lot more resistance to that
6  than the two years.  So the two years is the compromise.
7      SENATOR STILL:  Okay.  That explains that
8  from your point of view.
9      MS. MARCI HAMILTON:  From my point of view.
10      SENATOR STILL:  The last question I had
11  dealt with the malicious intent provision and being
12  unjustly accused.  From your testimony and the others
13  before us, it would appear that it's a very, very small
14  percentage of people who falsely accuse.
15      MS MARCI HAMILTON:  Yes.
16      SENATOR STILL:  I mean almost (inaudible to
17  reporter).
18      MS. MARCI HAMILTON:  Yes.
19      SENATOR STILL:  However, if it's as
20  important to you and the sponsors of the Bill to enable
21  these people to be brought to accountability, whether
22  it's one or ten, I would think it would be just as
23  important, absent any other provisions in the Code for
24  the ability to recover your good name or reputation to

Page 92

1  protect the one person who chooses to grind that ax and
2  destroy some person's reputation.  Can you honestly tell
3  me that when that happens to that one person that I'm
4  only entitled to my legal fees?
5      MS. MARCI HAMILTON:  You mean in other than
6  damages or?  The reason for that type of provision is
7  that you have to draw a balance between the defendant
8  and the victims, right?  And so there is this
9  possibility you might have false accusations, as I have
10  stated it's very small, and so what are you going to do
11  in a circumstance where you have that rare case, and
12  what the Bill says is if the victim was acting
13  maliciously --
14      SENATOR STILL:  Right.
15      MS. MARCI HAMILTON:  -- in those
16  circumstances then the attorneys fees go forward.  But
17  if there is lack of malice, what you're doing is you're
18  balancing.  This is public policy.  You're balancing
19  the interest of the adults and the interests of the
20  children and what we have done in the past is we have
21  always balanced the interests of the adults always more
22  heavily always than the children so that's -- go ahead.
23      SENATOR STILL:  What I'd like is your
24  perspective in other states in how this is handled

Page 93

1  versus what Mr. Clark will provide regarding Delaware
2  law.  So in your case from your perspective nationally
3  are other states just awarding attorneys fees for that
4  type of situation or are they also enabling that person
5  to get compensatory damages as well?
6      MS. MARCI HAMILTON:  I don't know of
7  another Bill that provides for even the attorneys fees.
8      SENATOR STILL:  So that -- that poor soul
9  that's accused unjustly, maliciously would only hope
10  that they might have recourse in another provision of
11  the Code for slander and liable?
12      MS. MARCI HAMILTON:  Right, for defamation
13  and liable.
14      SENATOR ADAMS:  Thank you, Senator Still.
15  Senator Peterson.
16      SENATOR PETERSON:  Yes, Mr. President, just
17  one comment to that.  The attorneys fees called for in
18  section C are not the exclusive remedies.  You can also,
19  as Mr. Durashel testified last week at the hearing, you
20  can also sue for malicious prosecution, you can sue for
21  slander, so there are other remedies.  The remedy that's
22  in there really was trying to address issues that you
23  and Senator Venables raised last year when we debated
24  House Bill 450 and I just wanted to give you some

24  (Pages 90 to 93)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

A128

Page 94

1   comfort level on the possibility of false claims.
2       If there are no other questions for the
3   witness, I would ask that she be excused.
4       SENATOR ADAMS:  Seeing no further
5   questions, the witness may be excused.  Thank you very
6   much.  Senator Peterson.
7       Senator Amick.
8       SENATOR AMICK:  Mr. President, this has
9   been a very difficult Bill for me.  There is a reason
10  why we have statute of limitations and in my opinion
11  that reason has to do with the difficulty of a defendant
12  to prove where he or she were on a given date some 20
13  years or 30 years out and what happened to the witnesses
14  that are gone and not available.  That's very
15  troublesome to me.  It's a little different with murder
16  just because of the fact that murder is a major event in
17  anybody's life and being a witness to a murder is
18  something that no one tends to forget.  And while this
19  is something that's very difficult sometimes for
20  individuals to reconstruct.
21      However, I had lengthy conversations with a
22  number of the victims and certainly they have
23  significant stories and they deserve the opportunity to
24  seek redress.  That's why it's been very difficult and I

Page 95

1   have reflected on the -- I'm sorry about that.  This is
2   becoming more and more a struggle, I'm afraid.  They
3   certainly deserve that redress of their grievance.  The
4   part of this that I guess gives me the most concern is
5   that the question of the statute of limitations, but in
6   consultation with the victims I think they do deserve it
7   and I guess I reflected upon the fact that I have great
8   trust in the courts and the courts have the ability to
9   determine what is false, what is provable, and so in
10  light of that I made the determination to join Senator
11  Peterson in the sponsor of the Bill and I intend to vote
12  for it with some trepidations but it does seem to me
13  that it's something we need to resolve for the benefit
14  of the kids in this State.
15      SENATOR ADAMS:  Thank you, Senator Amick.
16  Senator Peterson.
17      SENATOR PETERSON:  Mr. President, if there
18  are no other comments or questions.
19      SENATOR ADAMS:  Senator Still.
20      SENATOR STILL:  To the Bill?
21      SENATOR PETERSON:  Yes.
22      SENATOR STILL:  Senator Peterson, I think
23  you have done a remarkable job with a very difficult
24  issue.  Your testimony from your witnesses has been

Page 96

1   exemplary from my point of view.  As a victim of child
2   molestation myself as a young man, when I had a phone
3   call from two individual dentists who called me to
4   support the Bill I put that aside and said I'd have to
5   really hear the testimony first because we have a
6   responsibility here to balance the scales of justice and
7   make sure that each person has an opportunity to be
8   heard, that the Bill needs to be vetted, and yes, I
9   remember Senate Bill 450 and I thank you for that
10  accommodation on the attorneys fees.  That probably is
11  the only provision that I now have a real concern with
12  in that the one person who loses their reputation, their
13  business, their assets because of some malicious intent
14  may not have proper recourse from a person who may not
15  have any assets.  They could lose it all.  I have to
16  balance that with the damage that is done by an
17  individual to a family member purposely, willfully, with
18  no accountability today.  I have done that in my own
19  mind.  I'm satisfied that with the testimony today that
20  the recourse that's in this Bill is what we need to have
21  done.
22      I don't say that with any glee in my heart.
23  I don't say that with any recourse or accountability to
24  the person that did that to me.  I have forgiven that

Page 97

1   person but I have never forgotten it.  It was when I was
2   six years old.  It wasn't a family member but it was a
3   friend of the family and the testimony makes it clear
4   that that's where the majority of the cases are.
5       I have never really gotten to talk about
6   that and I don't want to talk about it a whole lot
7   because it's something I have really - I guess to use
8   some of their phraseology here - I have developed some
9   mechanisms to deal with it and I have overcome it, but I
10  only hope and pray that the man who did it to me who was
11  16, maybe 17 years old has gotten over it but I doubt it
12  because I know for a fact - and I'm not repressing my
13  memory and I don't have a false memory of it, I can give
14  you the exact circumstances, the date and the time and
15  how it felt - I know that he did it to his sister.  He
16  has a problem and he's still out there.  He's not in the
17  church and the church today was portrayed as the evil
18  victim.  They are part of the problem, 70 or 80 percent
19  of the problem.  It's mostly a family problem.
20      The Bill will give us recourse.  Will it
21  correct the problem?  I -- I don't know about that.
22  Only society will correct that problem, but I do know
23  when those two dentists called me that they were
24  genuinely concerned about their child, that they

25 (Pages 94 to 97)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

1 overlooked the issues of that child when the child came
2 to them and said I want to die, daddy, I don't want to
3 live any more. I never got to that problem with my
4 situation, but I could really understand where they were
5 coming from. I think we have done the best we can with
6 this Bill and I am going to support it.
7      SENATOR ADAMS: Thank you, Senator Still.
8 Senator DeLuca.
9      SENATOR DeLUCA: Thank you, Mr. President.
10 I don't want to delay it. I appreciate everybody's
11 patience today. The doctor made a comment earlier today
12 that what we have heard -- what we heard was shame, fear
13 and guilt, and I would just like to tell her that in
14 light of the testimony that I heard it came out as
15 courage from the witnesses that we have had here today,
16 to have the guts to stand up in front of the General
17 Assembly and bare their soul to represent not only them
18 but the other victims that haven't quite got to the
19 point where they have is nothing but a badge of courage
20 that they -- and I certainly hope that it helps.
21      SENATOR ADAMS: Thank you, Senator DeLuca.
22 Senator McDowell.
23      SENATOR McDOWELL: Thank you,
24 Mr. President. I think that the previous speakers have

1 expressed a lot of people's opinions here. I think
2 particularly Senator Amick who talked about having
3 trepidation and weighing, weighing in the balance the
4 issues and we often, every day almost that we're in
5 session we have to do that. We'll probably be here
6 tomorrow weighing considerations between two different
7 paths that are opposed and we'll have to decide. And in
8 this particular case, in spite of my concerns that we
9 could make a mistake, we could hurt somebody, the
10 overwhelming factor is those people who have spoken to
11 us, the victims, indeed, we will hope that the process
12 will when it leaves this building and becomes enacted
13 will function correctly so that mistakes won't happen,
14 the people won't be hurt wrongly, but we do, I think,
15 need to provide this for the victims.
16      There is one thing, though, that I'd like
17 to address briefly and that is there are several things
18 that have disturbed me in the testimony and I don't mean
19 disturbed the way disturbed by having empathy for the
20 victims who have come forward, as Tony said -- as
21 Senator DeLuca says, courageously come forward, but it's
22 the numbers. I'm very disturbed about what I hear about
23 the numbers. If I take the testimony on numbers and I
24 sort of put certain parts of it together, one of which

1 said we have -- we have females of -- one gender in six,
2 one in six and one in four, if you average that out to
3 five, that means we have 150,000 Delawareans that are
4 victims of abuse, and then if you combine that with some
5 other statistics that we heard, we heard one of the
6 testimonies today that there is a high likelihood that
7 the abused will become abusers, and so if we put just a
8 conservative number to that, such as ten percent, that's
9 15,000, and if we take some of the other numbers we
10 heard, that it's between dozens and hundreds of
11 individuals abuses that an abuser will in their lifetime
12 approach, we're in enormous numbers.
13      Now, I don't know how much of that is
14 accurate and how much is not, and it makes no difference
15 relative to the action we're taking here today, but I
16 think it does point one thing out and I hope we will not
17 walk away and leave this undone, we have woefully
18 inadequately funded mental health services in this State
19 and when you take those kinds of numbers we need to come
20 back and address that. I realize, Mr. President, I'm
21 slightly off --
22      SENATOR ADAMS: Senator McDowell, you're --
23      SENATOR McDOWELL: But it is something that
24 cannot be ignored when you look at those numbers and we

1 must come back and look at that. Thank you,
2 Mr. President.
3      SENATOR ADAMS: Thank you, Senator
4 McDowell. Senator Connor.
5      SENATOR CONNOR: Thank you, Mr. President.
6 Many of you have maybe heard me say that each day
7 when my feet hit the floor I say a little mantra, and
8 I'm proud today to say, and I'll repeat it again, every
9 day a decision I make, a vote I cast, an advice I give
10 changes the course of someone's life. We have done that
11 here today. And I am proud to say it. For those that
12 are in the balcony we appreciate your attendance and I
13 can't tell you the last time I have seen it this full.
14 If that doesn't send a message to the other chamber I
15 don't know what does. They're going to need your help
16 over there, too. So you need to stand tall, and Madam
17 Senator, I'm so proud of you today, you have done a
18 remarkable job, Senator Peterson. Thank you.
19      SENATOR ADAMS: Thank you, Senator Connor.
20 Senator Sokola.
21      SENATOR SOKOLA: Thank you, Mr. President.
22 You know, we almost never get an issue that is
23 controversial that doesn't have more opposition than
24 support and we're seeing overwhelming support in just

26 (Pages 98 to 101)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3

Page 102

1  the general comments from people on the web guest book
2  as well as the organizations and individuals who showed
3  support on the child victim voice.  We have heard and
4  Senator DeLuca said it very well about the victims who
5  did come forward, but that's very difficult for people
6  to do.  We heard that taking the abuse was less painful
7  than stopping it.  And over my 17 years we have had
8  issues relating to child sex abuse come up time and time
9  again and that's the one consistent element that we have
10 heard repeatedly.  This is a very important step for the
11 State and I thank Senator Peterson for her leadership
12 and I intend to support it.
13      SENATOR ADAMS:  Thank you, Senator Sokola.
14 Senator McBride.
15      SENATOR McBRIDE:  Thank you, Mr. President.
16 You know, I have during the debate today I was thinking
17 about back in 19 -- in the 1980s when this chamber
18 started to think about a Victims Bill of Rights we were
19 in 1993, the next to the last state to pass a Victims
20 Bill of Rights.  Today we had testimony that was quite
21 striking and I was going to go into a particular case in
22 Delaware but the hour is late so I'll bypass that, but
23 what we heard today, it wasn't used, but the term is
24 taking out the trash or spreading the garbage, and what

Page 103

1  had happened in the 90s, the school districts, not only
2  the Catholic Church, school districts had reassigned
3  these abusers to another location where they could abuse
4  victims again.  So I think today is the day that
5  Delaware, the state that started the nation, has a
6  chance to lead in the United States of America.  This
7  would be the strongest, we're only the second state to
8  pass something like this, we have an opportunity today
9  for the victims and the survivors, some of whom we have
10 heard today, but there are many others.  There are some
11 in the building obviously and there are many others
12 outside this building that are counting on us to help
13 them.  As a witness said, this Bill does nothing more
14 than open the courthouse door for the victims and
15 survivors and I sure hope it passes.
16      SENATOR ADAMS:  Thank you, Senator McBride.
17 Senator Peterson.
18      SENATOR PETERSON:  Mr. President, I think
19 we have come to the end of a long, painful debate,
20 painful for the victims who have come forward and I can
21 tell you that around the chambers and up in the balcony
22 there are dozens more who could have come up to the
23 lectern and talked about their own abuse but I think you
24 got the picture.  And in closing, I'd like to say that

Page 104

1  this Bill is about the children.  It's about the
2  children who had no power, who had no voice, who had no
3  opportunity to bring their tormenters to justice.  This
4  Bill is about the Gene Langes, the Rob Quills, the Susan
5  Days, the Christine Guislers, John Stills, countless
6  others whose lives have been forever changed and in some
7  cases destroyed.  Some of these -- some of the victims
8  are not here today because they committed suicide.  We
9  have heard a number of stories about that.  These
10 children, many of whom are adults now, are still paying
11 the price for what was done to them.  There was no
12 statute of limitations on their pain, but their abusers
13 walk free to abuse again and again.
14      Who will speak for these children,
15 Mr. President?  Who will protect them?  I hope that it
16 will be the 144th General Assembly.  With that,
17 Mr. President, I call for the roll.
18      SENATOR ADAMS:  Thank you, Senator
19 Peterson.
20      Mr. Secretary, will you please call the
21 roll on Senate Bill number 29?
22      THE CLERK:  Senator Adams.  Yes.
23      Senator Amick.
24      Senator Blevins.  Yes.

Page 105

1      Senator Bonini, absent.
2      Senator Bunting.  Yes.
3      Senator Cloutier.
4      SENATOR CLOUTIER:  Yes.
5      THE CLERK:  Yes.
6      Senator Connor.
7      SENATOR CONNOR:  Yes.
8      THE CLERK:  Yes.
9      Senator Cook.  Yes.
10     Senator Copeland.
11     SENATOR COPELAND:  Yes.
12     THE CLERK:  Yes.
13     Senator DeLuca.
14     SENATOR DeLUCA:  Yes.
15     THE CLERK:  Yes.
16     Senator Henry.
17     SENATOR HENRY:  Yes.
18     THE CLERK:  Yes.
19     Senator Marshall.
20     SENATOR MARSHALL:  Yes.
21     THE CLERK:  Yes.
22     Senator McBride.
23     SENATOR McBRIDE:  Yes.
24     THE CLERK:  Yes.

27  (Pages 102 to 105)

Page 106

1      Senator McDowell.
2      SENATOR McDOWELL:  Yes.
3      THE CLERK:  Yes.
4      Senator Peterson.
5      SENATOR PETERSON:  Yes.
6      THE CLERK:  Yes.
7      Senator Simpson.
8      SENATOR SIMPSON:  Yes.
9      THE CLERK:  Yes.
10     Senator Sokola.  Yes.
11     Senator Sorenson.
12     SENATOR SORENSON:  Yes.
13     THE CLERK:  Yes.
14     Senator Still.
15     SENATOR STILL:  Yes.
16     THE CLERK:  Yes.
17     Senator Vaughn, absent.
18     Senator Venables.
19     SENATOR VENABLES:  Yes.
20     THE CLERK:  Yes.  Mr. President, the roll
21  call on Senate Bill number 29, 19 yes and two absent.
22     SENATOR ADAMS:  Senate Bill number 29,
23  having received the required number of votes, declared
24  passed the Senate.

Page 107

1   State of Delaware        }
2                            }
3   County of New Castle     }
4
5
6
7        C E R T I F I C A T E
8
9      I, Elaine G. Parrish, Registered Professional
10  Reporter and Notary Public, do hereby certify that the
11  foregoing record, pages 1 to 107 inclusive, is a
12  transcript of my stenographic notes taken from an
13  audiotape in the above-captioned matter.
14        IN WITNESS WHEREOF, I have hereunto set my
15  hand and seal this 3rd day of October, 2007, at
16  Wilmington.
17
18
19     _____
20     Elaine G. Parrish
21     Certification No. 170-RPR
22     (Expires January 31, 2009)
23
24

28  (Pages 106 to 107)

d26f3ec7-a179-48cf-9176-d057bc2ab3f3



**WILCOX & FETZER LTD.**

## In The Matter Of:

# Sentate of Delaware

---

### Senate Bill 29

### Tape Recorded Hearing

### April 4, 2007

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

**A**

**abdominal** 43:5
**abide** 28:2,12
**ability** 91:24 95:8
**able** 7:8 11:17
  32:23 34:2 35:7
  49:17 74:6,14
  83:12
**abnormal** 43:12
**abolish** 91:3
**above-captioned**
  107:13
**absent** 91:23 105:1
  106:17,21
**absolutely** 7:16
  10:11 30:3 36:14
  80:12
**abuse** 1:8 4:15 5:19
  5:20,20 6:18,18
  10:15,21 11:23
  12:4,9,10 17:4
  19:13,16 20:9
  22:13 24:19 25:3
  25:4,17 31:4,11
  32:4,4 42:13
  43:14 45:17 46:2
  53:1 56:17 67:23
  70:13,14 90:16
  100:4 102:6,8
  103:3,23 104:13
**abused** 6:12 10:20
  11:1 12:3 22:13
  30:19 34:11 44:10
  45:15,17 46:12
  79:23 88:15 100:7
**abuser** 31:15
  100:11
**abusers** 10:14
  52:11 100:7 103:3
  104:12
**abuses** 100:11
**abusing** 30:12
  37:20
**abusive** 44:24 46:4
**Academy** 17:18
**accept** 8:8 13:23
  50:9
**acceptable** 10:4

**accepted** 8:14
**access** 31:12
**accessible** 70:15
**accommodation**
  96:10
**accountability** 10:8
  13:24 21:4,7
  22:17 24:17 91:21
  96:18,23
**accounts** 44:2
**accurate** 85:1,22
  100:14
**accusation** 62:8,12
  63:1 71:13
**accusations** 73:21
  80:8 82:13 85:8
  92:9
**accuse** 91:14
**accused** 7:1 35:3
  62:7 73:22 74:2,3
  74:15 78:9 81:5
  91:12 93:9
**accuser** 75:5 78:9
**acknowledge** 11:18
**act** 1:6 13:23 66:15
  71:15
**acting** 92:12
**action** 55:18 58:6
  59:1,11 60:11,13
  65:8 89:10 100:15
**actions** 13:15,16
**active** 5:9 69:13
**activities** 19:12
**actor** 65:9
**actors** 83:21
**actual** 17:24 19:4
  39:3 89:1
**Adams** 3:7,12,17
  3:23 4:5 23:10
  27:1,22 28:14
  30:9 31:1 32:13
  36:17 38:6 41:4,9
  41:20 42:4 49:22
  50:2,5 53:7,11,21
  54:3,8,14,19
  63:14 68:3,8,12
  68:18 75:16,20
  76:2,7 78:5 80:2

84:8 86:2,6 87:2,6
  87:11,18 88:20
  89:23 93:14 94:4
  95:15,19 98:7,21
  100:22 101:3,19
  102:13 103:16
  104:18,22 106:22
**adaptive** 46:19,20
**add** 42:10 46:9
  52:12 58:3,7
  81:21 89:17
**addiction** 38:21
  45:17
**addictions** 5:18
**adding** 1:8 64:23
**address** 17:22 37:4
  93:22 99:17
  100:20
**addressing** 50:17
**adjudicated** 58:19
**administration**
  5:16
**administrator** 5:1
**admit** 34:5 37:9
**admitted** 39:20
**adolescent** 39:7
**adolescents** 39:17
  39:18
**adrenaline** 48:7
**adult** 11:15 15:1
  20:10,11 26:17
  55:2,5 75:1
**adults** 12:1 72:7
  92:19,21 104:10
**advantage** 35:13
**adversarial** 35:17
**adversaries** 35:18
**advertisement**
  29:19
**advice** 7:3 101:9
**advise** 7:24
**advocate** 70:4
**affairs** 38:3
**affirmative** 60:10
**aforementioned**
  45:22
**afraid** 22:10 82:13
  95:2

**afternoon** 46:8
  68:20
**age** 11:5,14,14 12:4
  12:4 15:8 40:7
  43:11,11 52:10
  70:14 74:24 90:19
**agency** 59:19 67:4
**Agent** 57:14
**aggrandizement**
  35:14
**aggressive** 14:19
**ago** 4:21 11:4 16:9
  16:9 23:7 40:18
  80:6
**agree** 35:20 78:11
  86:10
**ahead** 47:22 92:22
**aid** 7:2 19:8
**AIDS** 46:5
**Air** 5:5,7
**alike** 21:19
**alleging** 32:8
**allow** 10:9 17:12
  23:8
**allowed** 3:15 7:18
  17:4 22:12
**allows** 16:2
**AMA** 42:23
**amend** 1:6
**Amendment** 10:7,9
  38:1
**amendments** 52:13
**America** 103:6
**American** 22:7
  29:22 72:22
**Amick** 94:7,8 95:15
  99:2 104:23
**amnesia** 47:10
  76:22 77:2
**amount** 10:24
  23:21
**ample** 16:14
**analysis** 60:8,24
**Angeles** 89:21
**anonymous** 2:11
**answer** 29:6 30:19
  36:23 40:4 52:20
  53:3 63:20 67:8

79:5 86:20,23
**answered** 24:2
**answers** 53:5
**anti** 29:16,16
**anybody** 44:21
**anybody's** 94:17
**anyway** 32:11
  60:13
**apologize** 28:20
**apologized** 7:9,14
**apparent** 84:18
**appealing** 16:22
**appear** 91:13
**appeared** 29:20
**appears** 70:6
**applies** 64:4
**apply** 57:24 65:19
  65:20 66:23 67:2
**appreciate** 26:21
  28:8 40:3 41:16
  53:5 62:4 98:10
  101:12
**appreciated** 23:15
  32:23
**approach** 100:12
**April** 1:15
**arduous** 48:11
**area** 5:19,19 25:14
  31:20 34:22 48:3
  69:6
**arenas** 79:21
**arm** 78:16
**arms** 61:4
**arose** 6:4
**article** 81:9
**articles** 8:2
**aside** 96:4
**asked** 5:12 6:3
  14:18 16:5 26:2
  36:22 41:14 42:2
  43:18 45:4 47:12
  75:8 80:21 90:3
**asking** 77:13 79:19
**aspect** 88:14,23
**aspects** 51:17 76:22
  82:20
**assaulted** 40:8
**Assembly** 52:9

57:4 66:14,18
98:17 104:16
**assessment** 59:13
**assets** 96:13,15
**assignment** 5:3,6
**assignments** 5:1
**assistance** 7:2,3
30:23
**associated** 8:9 88:1
**Association** 26:4
69:24 72:23
**assume** 2:6 53:24
60:16 76:10 83:6
83:18
**assuming** 38:11
57:19
**assure** 60:4
**attempts** 21:17
44:14
**attendance** 101:12
**attention** 6:6,6
41:17
**attest** 18:16
**attorney** 14:20
23:17,19,20 24:4
36:9 44:15 53:15
54:13 62:14
**attorneys** 6:23 8:1
14:4,7,11,13
15:17,23 18:10,17
62:11,18 74:4,10
92:16 93:3,7,17
96:10
**attorney's** 73:17
**audiotape** 107:13
**audiotaped** 1:14
**Australia** 7:23
**authentic** 35:13
**author** 8:3
**authoritatively**
40:1
**authorities** 19:22
94:14
**available** 16:14
94:14
**average** 18:2 38:10
59:6 100:2
**avoid** 10:7
**Award** 17:18

**awarded** 63:23
**awarding** 93:3
**awards** 19:13,15
**aware** 57:11,13
**awful** 11:10 51:14
**awfully** 45:1
**ax** 23:18 92:1

**B**

**B** 64:5,22
**back** 5:7 16:2 20:4
24:14 26:13 41:15
47:6,7 50:15,21
51:1,6 62:1 70:11
70:22 71:18 74:9
74:10,16 77:18
82:4 83:1,6
100:20 101:1
102:17
**background** 4:13
60:2
**backward** 91:4
**bad** 48:19 65:9
**badge** 98:19
**balance** 92:7 96:6
96:16 99:3
**balanced** 92:21
**balancing** 92:18,18
**balcony** 101:12
103:21
**band** 18:14
**banded** 73:22
**bang** 3:18
**bankruptcies** 16:20
30:5
**bankruptcy** 16:23
19:2 20:16,17,18
**bare** 98:17
**base** 5:7,9 43:17
**based** 30:2 59:14
61:11 63:8 81:7
87:22
**bashed** 21:12
**bashing** 21:2,11,12
**basically** 35:18
70:8
**basis** 14:8,12,15
62:8,12 63:2,10
**basket** 77:17

**Bay** 69:16
**beat** 46:3
**beautifully** 21:23
**becoming** 28:20
39:6 95:2
**beds** 43:3
**began** 5:23
**beginning** 20:5
**behalf** 22:20 69:21
**behavior** 10:8,10
10:11 21:10 38:5
**behaviors** 46:6,21
**belief** 15:4,20
**believe** 9:14 12:21
15:15 16:3 21:14
21:15 28:23 32:9
33:24 38:22 47:21
52:12 56:16 63:4
63:9,18 75:2,7
**believed** 12:14 15:9
80:10,11
**believes** 85:10
**belong** 4:21
**benefit** 95:13
**best** 30:22 31:17
45:23 53:2 66:24
81:23 98:5
**bestiality** 56:15,16
**better** 3:4 24:2 27:8
44:7 51:16,20
78:24 82:3 91:2
**Bible** 46:24
**big** 45:22
**Bill** 1:6 2:14 3:5
23:15 50:20 52:12
52:15 53:19 55:1
56:21 62:5 64:12
66:20 67:21 68:1
69:21 70:5 73:15
73:16 74:21 75:12
76:17 82:9 90:3,4
90:6,10,13 91:20
92:12 93:7,24
94:9 95:11,20
96:4,8,9,20 97:20
98:6 102:18,20
103:13 104:1,4,21
106:21,22

**bills** 54:24 90:13
**Bishop** 6:8
**Bishops** 34:13 38:2
**bit** 7:8 27:10 28:20
38:18 68:24 78:22
88:22
**bizarre** 20:23
**blessing** 21:18
**Blevins** 104:24
**board** 42:2,17 69:3
69:5,23
**bodies** 8:22 9:8
**body** 7:17 22:2
43:7 46:16
**bone** 48:4,5
**Bonini** 105:1
**bono** 14:12,15
**book** 8:4 102:1
**books** 8:4
**Boy** 82:21
**boys** 6:14 39:2
82:21
**bragged** 13:5
**brain** 48:4,6,8,11
**brave** 44:2
**breached** 61:13
**break** 43:20
**breaks** 44:1
**brief** 43:19,23
**briefly** 99:17
**bring** 13:7 15:14
21:17 104:3
**bringing** 33:21
**brings** 5:7
**broad** 64:21 82:20
**brother** 33:23
**brought** 14:2 31:19
32:7 35:19 37:18
73:17 80:5 91:21
**brush** 64:21 73:19
**buffer** 78:24
**building** 11:6 27:18
27:19 41:15 99:12
103:11,12
**buildings** 8:16
**Bunting** 105:2
**burden** 15:13 67:6
**burdens** 44:1

**buried** 22:9
**bus** 25:9
**business** 30:6 73:18
96:13
**buy** 48:18,20
**BWCI** 44:8
**bypass** 102:22

**C**

**C** 46:5 63:1,9 93:18
107:7,7
**California** 2:22
18:11 80:6 81:2,3
82:18 89:15,18,18
90:14,18
**call** 21:4 24:17
71:19,21 96:3
104:17,20 106:21
**called** 7:2,24 17:22
19:5 29:21 39:5
46:17 70:19 83:2
93:17 96:3 97:23
**calling** 21:9
**Canada** 7:22
**candor** 36:15
**canon** 5:17 6:1 24:7
24:9,10 36:10
**capable** 90:19
**care** 2:12 7:18 15:4
20:3 22:3 33:15
58:17 59:3,5,6,6,7
59:11,20,24 60:20
60:22 61:6,13
65:24 67:22 87:21
89:17
**caring** 33:12
**Carol** 41:19,21
42:1,1,9,14,17
50:14 51:1,5,13
52:14 53:6 76:6,6
76:12,15 78:10,13
79:2,10,13,17
80:13,19 81:3,15
82:7 83:8,22 84:7
85:2,17,21 86:11
86:16,20,23
**carried** 15:13
**carry** 48:14
**case** 3:3 6:4,5 12:21

13:3 16:13,18,18
21:1 32:8 36:7
38:11 39:17 48:15
59:21,23 60:9
61:10 67:11 79:9
79:12 81:1,3,17
81:22 85:7,7
89:17 92:11 93:2
99:8 102:21
**cases** 4:16 7:21,22
8:2 12:21 14:11
16:6,7 17:9 18:8
19:17 30:5 37:18
37:23 39:21 45:6
45:7 51:6 57:24
59:16 62:3 67:6
71:11 73:1 75:9
78:8 83:4 88:6
89:5,9 97:4 104:7
**cast** 101:9
**Castle** 107:3
**catalyst** 9:11 20:5
**Catch** 31:3
**category** 70:19
**Catholic** 4:20 5:5
8:5 9:3,8,10 12:10
13:4,4,6 16:14,15
18:24 19:4,5,7,20
21:1,1 22:8 27:9
27:12,15,17,19
29:3,8,11,11,15
29:16 30:3,11
33:4 34:2 40:24
103:2
**cause** 9:24 18:23
30:7 32:7 55:18
**causing** 43:6
**center** 65:24 69:17
82:6
**centers** 37:21 80:7
**century** 4:23
**certain** 75:6 83:24
99:24
**certainly** 20:15
32:17,22 35:11
47:8 52:4,18 77:7
77:21 78:17 79:2
81:18 83:8,16

94:22 95:3 98:20
**certainty** 58:23
**certification** 69:5
107:21
**certified** 5:17 42:2
42:17 69:4
**certify** 107:10
**cetera** 73:24
**chain** 60:23
**chair** 69:16,19
**chamber** 28:2,16
101:14 102:17
**chambers** 103:21
**chance** 74:16 103:6
**Chancery** 45:8
**chances** 51:11
**change** 13:2,17
14:3 29:10 58:12
58:24 66:21 67:1
**changed** 104:6
**changes** 9:5,6
10:16 13:7 23:1
73:12 101:10
**chaplain** 5:5
**charge** 29:2
**charged** 28:5
**charitable** 19:1,4
**Charities** 19:6,7
**check** 60:2
**cheer** 28:17
**Chester** 68:11,13
68:16,17,18,23
69:2,3 76:16,17
78:7 84:14 86:8
86:19 87:22
**Chester's** 87:23
**child** 1:8 4:15
11:23 19:22 20:9
20:11 24:19 29:5
30:12,13,19 32:3
32:4 34:9 42:13
50:22,23 51:1,8,9
51:11 56:17 59:23
65:23 67:21,23
81:4 88:12 96:1
97:24 98:1,1
102:3,8
**childhood** 19:13,15

43:24 53:1 82:2
**children** 9:15 10:19
11:1 13:7,9 17:24
19:16 22:11 33:2
33:2 34:11 37:20
39:2,7 44:20
48:24 51:6 52:18
52:23 59:21 72:6
80:9 81:5,8,20
90:17,24 92:20,22
104:1,2,10,14
**choice** 57:2,7
**choose** 89:13
**chooses** 92:1
**Christiana** 42:20
42:24 43:3
**Christine** 104:5
**church** 5:21 6:1
7:10,13 8:6,9,15
9:3,8,11 10:10,10
11:6 13:4,6 16:14
16:15 19:4,20
20:7,16 21:1,3,22
21:24 24:7 27:10
27:12,15,17,19
29:3,8,11,11,15
30:3,11,13 34:2
40:24 97:17,17
103:2
**churches** 8:23 9:18
10:3,6 12:22,23
13:18,22 16:13
19:3 20:7,12
21:19 22:15 25:15
30:5,7 40:22
**church's** 18:24
19:19 37:19
**circle** 10:1
**circumstance**
92:11
**circumstances**
30:20 60:9 65:3
65:13,17 72:8
92:16 97:14
**citizens** 15:7
**civil** 1:8 7:21 13:14
18:8,9 21:15 24:6
45:6 55:18 56:21

58:4,20,21 71:14
85:7
**claim** 20:10 23:24
32:5 36:14
**claimed** 88:8
**claims** 18:5,10,23
20:15 23:16 34:22
35:8,8,15 66:15
94:1
**clarify** 90:2
**clarity** 62:3
**Clark** 24:3 54:7,9
54:12,12,14,23
55:4,8,11,16,23
56:4,7,22 57:2,11
57:22 58:1,11,14
58:22 59:9 60:7
60:18 61:5,22
62:19,24 63:7,12
64:3,8,20 65:8
66:3,8,12 67:16
67:19 68:6 93:1
**Class** 56:15
**classic** 51:23
**classify** 55:20
**clean** 59:23
**clear** 23:13 55:2
61:3 63:9 74:17
81:1 83:17 97:3
**clearly** 26:21 35:21
37:13 79:18
**clergy** 5:20 6:19
8:15 11:24 12:9
12:10 24:23 25:2
32:2,5 37:1,7 39:3
39:18
**clergymen** 15:19
**clerics** 19:18
**CLERK** 104:22
105:5,8,12,15,18
105:21,24 106:3,6
106:9,13,16,20
**client** 36:2
**clients** 18:18 89:1
**climate** 13:3
**clinical** 38:20,22
43:1
**clock** 75:4

**close** 19:11 37:7
**closed** 91:1
**closely** 32:6
**closing** 103:24
**Cloutier** 50:2,3,8
50:15 51:3,8 52:8
53:4,8 105:3,4
**Clubs** 82:22
**coalition** 53:18
**coalition's** 53:20
**code** 1:7 23:22
55:10,12,15,20,22
57:10,12 63:6
91:23 93:11
**coffin** 18:4
**colleague** 76:17
**College** 69:11
**Columbia** 69:9
**combine** 100:4
**combined** 33:8
**come** 2:17 4:1 12:5
15:2 16:3 17:13
25:11,16 26:18
29:10 36:13 40:21
41:22 47:6,7,20
54:10 62:1 68:14
70:13 71:13 73:3
76:4 82:24 83:6
83:12,23 84:4
85:15,17 87:13
88:1,12,23 90:14
99:20,21 100:19
101:1 102:5,8
103:19,20,22
**comes** 13:20 19:8,9
30:16 37:7 71:18
77:13,18 85:1
89:12
**comfort** 94:1
**coming** 2:10 15:2
71:4,8 73:4 90:19
98:5
**commander** 49:1
**commend** 53:4
**comment** 36:21
37:11 93:17 98:11
**comments** 53:19,23
87:23 95:18 102:1

**committed** 6:15
104:8
**Committee** 1:15
69:15
**common** 10:17
11:10 14:3 59:10
59:14 61:12 63:7
**commonly** 16:7
**communication**
31:21 38:1
**comp** 60:12
**compassionate**
7:18 22:2 33:12
34:14
**compassionately**
34:3,6
**compensatory** 93:5
**competing** 35:18
**complaints** 43:8
**complete** 12:14
**completed** 69:8,9
69:19
**completely** 88:2
**complex** 10:14
**comprehensive**
34:3
**compromise** 91:6
**compulsive** 39:8,13
**concentration**
34:19
**concept** 77:2
**concern** 29:1 33:15
83:9 95:4 96:11
**concerned** 58:2
97:24
**concerning** 6:3
**concerns** 99:8
**concludes** 53:14
**concrete** 61:4
**condone** 10:10
**condoning** 31:3
**conduct** 38:3
**conferences** 13:4
**confess** 31:14,14
**confesses** 30:18
**confession** 30:12
30:17,20,22 31:11
31:12 32:11 36:23

36:24 37:6,13
**confessional** 37:3
**confessions** 31:19
**confessor** 31:18
**confidentiality**
36:24
**conflicts** 5:10
**confront** 22:11
**confusing** 34:18
**conjunction** 62:9
**conjure** 47:4
**connected** 11:6
48:4
**connection** 31:10
**Connor** 101:4,5,19
105:6,7
**conscious** 61:17
**consciously** 84:2
**consequences**
10:23
**conservative** 76:21
100:8
**conservatively-w...**
76:20
**consider** 7:6 15:7
26:5
**considerations**
99:6
**considered** 62:2
**considering** 28:6
59:7
**consistency** 55:14
**consistent** 58:3
102:9
**conspiracy** 21:2
51:21
**constitutes** 55:19
**constitutional** 45:6
**consultant** 7:20
14:10
**consultation** 42:19
95:6
**consults** 43:16
**contact** 56:11,12
**context** 59:10 63:8
**contingency** 14:8
**continue** 7:19
15:21 21:20 49:17

**continued** 14:15
**continuous** 38:16
56:17
**controlling** 22:1
**controversial**
101:23
**conversations**
94:21
**convicted** 81:6
**convince** 72:8
**convincing** 83:17
**Cook** 105:9
**Copeland** 38:6,7
40:3,11 41:2,5
63:16,17 64:6,16
65:5,21 66:5,9
67:7,18,20 68:4
105:10,11
**coping** 44:17 51:20
**copy** 62:1
**Cornell** 69:9
**correct** 56:22 58:21
62:19 66:8 67:19
86:10 97:21,22
**correctly** 24:18
99:13
**correspondence**
6:3
**corroboration**
72:21 81:23,24
84:5
**corroborators**
71:16
**counseled** 15:6
**count** 18:12
**counting** 103:12
**countless** 12:16
14:11 104:5
**countries** 8:1 22:6
37:17
**country** 19:7,10
22:5 37:16 45:18
88:7
**County** 107:3
**couple** 11:16 13:10
24:15 32:1,17
43:23 54:24,24
**courage** 98:15,19

**courageously** 99:21
**course** 8:6 60:11
82:17 101:10
**court** 16:3 19:13
35:17,19 37:18
45:8 60:3,7 62:11
62:22 66:1 79:16
79:18 88:15,24
89:4
**courthouse** 16:4
49:21 103:14
**courts** 13:14,21
17:10 18:8 31:22
31:24 32:2 34:23
35:2,7,22 36:3
37:15 45:6 60:13
60:19,23 95:8,8
**court's** 17:10 59:12
59:13
**cover** 19:23 37:2
**covered** 37:3 40:23
57:20 63:19
**covers** 83:7
**coverup** 6:7
**co-authored** 8:4
**creation** 21:23
**credential** 69:22
**credentialed** 72:1
**credentials** 4:14
5:13 68:24 69:8
**credibility** 74:5
**cried** 15:6
**criminal** 7:21 10:8
10:10 18:9 21:10
38:5,5 45:7 55:12
55:19,21 71:11
72:14 78:8 85:7
**criteria** 46:22
65:16,19
**criterion** 65:13
**CRR** 1:16
**cry** 9:21,22 15:20
**culpability** 64:14
**cult** 90:17
**culture** 17:3,4
**current** 57:5 58:24
**currently** 69:12
**cursory** 57:16

**curtail** 19:12 20:19
**curtailment** 18:23

**D**

**daddy** 98:2
**damage** 96:16
**damages** 63:22
92:6 93:5
**damaging** 10:5
**dangerousness**
45:9
**dark** 9:2
**darned** 43:12
**data** 76:24
**date** 29:24 57:6
64:11 90:4,7
94:12 97:14
**dated** 76:18 77:4
78:3
**daunting** 48:12
**day** 43:16 89:17
99:4 101:6,9
103:4 107:15
**daycare** 80:7 82:6
**days** 10:19 44:9
104:5
**deal** 10:13 11:17
16:7 24:19 26:1
71:5 97:9
**dealing** 15:5 89:9
89:10,11
**deals** 60:15
**dealt** 24:22 25:12
39:21 47:22 52:1
91:11
**debate** 70:20
102:16 103:19
**debated** 70:17
93:23
**debilitated** 90:23
**debilitating** 25:24
**decades** 13:9 70:16
**decide** 71:7 72:18
73:9 99:7
**decided** 59:16
**deciding** 72:17
**decision** 57:4 59:13
60:9 61:20 66:21
75:2 101:9

**declared** 106:23
**dedicated** 70:3,4
**deep** 32:22
**deeply** 6:17 22:9
**defamation** 93:12
**defend** 10:2 17:9
  17:11 34:23 35:2
  35:12
**defendant** 61:12
  92:7 94:11
**defense** 66:16
**defenseless** 10:12
**defensive** 13:16
**define** 61:9
**defined** 60:19 63:3
  63:5
**defines** 59:14
**definition** 55:1,2
  59:5
**defrocked** 17:20
**degree** 25:6 31:5
  56:9,10,12,13,13
  82:15 84:22
**degrees** 5:14 25:6
  56:14
**Delaware** 1:2,7,22
  2:24 3:6 4:8 9:6
  13:21 24:5 33:9
  40:5 41:13 42:7
  42:18 49:11,12,14
  52:18 55:20 57:19
  60:19 65:23 69:12
  69:14,15,24 71:10
  75:2 93:1 102:22
  103:5 107:1
**Delawareans** 100:3
**delay** 98:10
**deliberate** 85:19
**Deliver** 17:17
**DeLuca** 3:2 27:21
  27:22,23 28:14
  36:18,19 98:8,9
  98:21 99:21 102:4
  105:13,14
**deluge** 18:5,22
**delusional** 85:24
**demographics**
  43:14

**demonstrate** 28:4
**demonstrated**
  71:24 72:2
**denomination**
  14:14 20:4 28:24
**denominations** 9:3
  19:21 20:5 25:3
  38:4 88:8
**dentists** 96:3 97:23
**deny** 10:4
**Department** 69:16
**departure** 60:20,21
  60:22 61:6,16
**depends** 51:14,15
  51:16,17
**deported** 17:21
**depth** 34:4
**descent** 33:4
**describe** 11:9 66:24
**describing** 81:16
**deserve** 37:4 94:23
  95:3,6
**desperate** 46:3
**despite** 89:16
**destroy** 27:12,15
  30:2 92:2
**destroyed** 33:16
  104:7
**destroying** 27:17
**destroys** 10:11
**detachment** 51:10
**detailed** 16:15
**determination** 62:8
  95:10
**determine** 16:6
  35:8 61:11 95:9
**determines** 62:11
**devalued** 9:16
  22:11
**devastated** 43:24
**devastating** 21:16
  88:10
**develop** 46:20
**developed** 48:10
  51:19 97:8
**development** 51:5
**devoted** 8:23
**diagnosed** 51:10

**diagnoses** 46:24
**die** 2:13 98:2
**Diego** 16:22
**difference** 35:10
  100:14
**different** 4:24
  24:11 55:9 57:18
  58:4 61:18,20
  65:15 66:9,13,15
  66:16,16 67:14
  80:5 88:2 90:1
  94:15 99:6
**difficult** 28:3 61:6
  94:9,19,24 95:23
  102:5
**difficulties** 79:20
**difficulty** 94:11
**digging** 40:20
**diligence** 84:5
**dinner** 43:21
**Diocese** 6:4,8 14:20
  16:21,24 19:10
  65:23 66:2
**Dioceses** 19:1,9
  20:16
**directly** 17:7 18:8
  56:5 79:22
**dirty** 11:10
**disability** 44:14
**disassociation**
  51:10
**disclose** 19:21
  30:18,21
**disclosure** 16:19
  20:21
**discovering** 34:21
**discovery** 16:19
**discretion** 65:11
**discussed** 34:22
**diseases** 46:5
**disenfranchise**
  86:17
**disorder** 39:8
  46:23 48:10 51:10
  76:23
**dispense** 35:7
**disregard** 61:17
**disrepute** 78:3

**dissociation** 46:17
**dissociative** 47:9
  76:21 77:2
**distinction** 38:24
**distressed** 47:8
**distribute** 53:17,22
**districts** 103:1,2
**disturbed** 99:18,19
  99:19,22
**doctor** 43:2 78:4
  98:11
**doctorate** 5:17
**document** 34:20
  76:20
**dodge** 61:18
**doing** 38:14 52:13
  56:20 67:11 77:14
  92:17
**dollars** 14:16
**Dominican** 4:22
**door** 6:13 74:7
  103:14
**doors** 16:5 49:21
**doubt** 97:11
**Dover** 5:7
**downward** 44:12
**Doyle** 3:22,24 4:3,4
  4:5,8,11,17,20
  23:10,13 24:4,6
  24:10,22 25:8,13
  25:20 26:9,15,23
  27:4,16 28:19
  30:15 31:7,24
  32:15,16 33:20
  34:24 35:4,6,11
  35:20 36:16 37:12
  38:19 40:10,15
  41:3,12
**dozens** 100:10
  103:22
**Dr** 41:19,21 42:1,1
  42:4,7,9,14,17
  49:22 50:1,14
  51:1,5,13 52:14
  53:6,12 68:11,13
  68:16,16,18,23
  69:2,3 76:1,3,6,6
  76:7,9,12,15,16

76:17 78:6,7,10
78:13 79:2,8,10
79:13,17 80:13,19
81:3,15 82:7 83:8
83:22 84:7,11,14
85:2,17,21 86:8
86:11,16,19,20,23
87:7,22,23
**drafting** 90:10
**draw** 92:7
**dream** 77:17
**drift** 44:12
**drive** 20:15
**driving** 4:9
**drug** 46:2,2
**drugs** 45:16
**DSM** 46:23 76:19
  76:23 77:3
**Dublin** 17:22
**due** 27:23 32:21
  64:17 76:16 84:5
**duplicated** 11:22
**Durashel** 93:19
**duties** 15:2
**duty** 5:9 59:3,5,6,6
  59:6,11,13,19,24
  60:10 61:10,13
  65:11,12
**dynamics** 38:9
**dysfunctional**
  19:18 51:24
**D.C** 5:24

_____

E

**E** 107:7,7
**earlier** 13:10 51:7
  87:22 98:11
**early** 51:15
**earth** 16:17
**easier** 46:13 72:12
**easy** 72:7
**ecclesiastical** 5:21
**Eden** 79:9,14
**edition** 29:21
**education** 33:10,11
  52:21
**effect** 46:2 58:14
  85:3
**effective** 16:16

64:11 90:4,7
**effectively** 25:12
**effects** 42:12
**efforts** 52:24 84:5
**egregious** 29:14
**eight** 43:11 50:23
51:4 56:23 90:6
**either** 28:17 58:7
64:23 65:9 84:15
84:24 85:14
**Elaine** 1:16 107:9
107:20
**element** 102:9
**elicit** 79:5
**eliminate** 83:9
**else's** 9:23
**embarrassing**
25:23
**Embassy** 5:24
**emotion** 72:4
**emotional** 10:22
27:4 28:9,20
**empathy** 27:24
29:1 33:16 99:19
**employees** 57:20
57:20 59:20 60:5
**employment** 60:11
**enable** 23:5,6 91:20
**enabler** 25:18
**enabling** 38:4
56:21 93:4
**enacted** 99:12
**endure** 46:15
**endured** 16:10
**enduring** 46:16
**enforcement** 19:22
**English** 33:8
**English-speaking**
22:8
**engulfed** 12:6
**enormous** 100:12
**entered** 54:1,3
**enterprise** 57:21
**entire** 15:13
**entities** 63:22
**entitled** 92:4
**entity** 7:17 67:10
67:22

**ephebophiles** 39:5
39:11
**Episcopal** 66:2
**Episcopalian** 65:22
**equally** 67:2
**equipped** 16:1
**Eric** 79:9,13
**erroneous** 30:1
**escape** 23:2
**especially** 10:6,11
12:10,10,21 16:13
22:3,22 27:9
34:10 74:1
**espouse** 77:6
**essential** 8:10
**essentially** 58:5
**establish** 44:22
**et** 73:24
**ethics** 78:22,23
79:3
**event** 23:17,24
74:23 84:13 94:16
**events** 16:8,9
**eventually** 6:9
**everybody** 40:12
67:2
**everybody's** 98:10
**evidence** 8:21 16:6
30:4,4 81:6
**evidence-based**
70:20
**evident** 80:8
**evil** 17:18 97:17
**evil-doing** 21:10
**exact** 97:14
**exactly** 6:13 33:5
52:3 77:12
**examined** 48:16
79:13
**example** 3:4 59:23
61:4 84:1 85:24
**exception** 7:11,12
11:11
**excitement** 39:6
**exclusive** 93:18
**exclusivity** 60:12
**excuse** 24:1 27:22
**excused** 3:11,13

41:8,9 50:7 53:10
53:11 68:7,9
75:19,21 87:5,6
94:3,5
**exemplary** 96:1
**exercising** 65:11
**existence** 73:2
**exists** 4:23 7:17 9:2
**expected** 78:18
**expense** 17:5 21:8
**experience** 9:10
10:24 11:12 15:16
17:14 18:12 25:2
27:4 31:9 33:8
35:24 37:14 40:16
61:12 87:22 89:20
**experienced** 12:8
**expert** 7:20 14:9
45:5
**expertise** 25:14
69:6
**experts** 36:14
78:18 80:4 83:23
84:4
**Expires** 107:22
**explained** 26:21
**explaining** 89:8
**explains** 91:7
**explanation** 23:13
47:11
**exploit** 47:13,15
**explosive** 9:10
**exposed** 9:1
**exposing** 21:9
**exposure** 56:9,10
**express** 33:20
**expressed** 82:11
99:1
**expression** 72:23
**expressions** 83:19
**extensive** 4:14 6:7
16:15
**extent** 27:7,9,13
56:18
**extortion** 56:15
**extreme** 60:20,22
61:6,16 62:2
**eye** 14:21

**e-mail** 2:11
**e-mails** 2:9

**F**

**F** 107:7
**fabrication** 85:19
**face** 14:6 16:17
21:3 71:1 75:5
**faced** 8:21
**facilitate** 43:21
**fact** 5:6 7:7 8:8,8
8:14 11:20 13:5,8
14:7 17:8,14
18:16 20:24 22:11
24:23 26:17 31:9
40:22 41:1 48:9
60:24 61:8,19
62:12 63:2,10
79:14 83:3 85:2
89:14,16 94:16
95:7 97:12
**factor** 99:10
**facts** 61:21 65:22
65:24
**faculty** 69:10
**fair** 26:19 74:21
**fairly** 6:3 32:6 43:2
**faith** 65:9
**faithful** 8:23
**fall** 70:19
**fallen** 78:2
**false** 18:5,10,22
23:24 30:5 34:21
35:8,8,14 62:9,11
62:13 71:21,23
73:2,20,21 77:10
78:1,2 82:13,16
85:5,10 86:9,13
86:14,14,22,24
89:14 92:9 94:1
95:9 97:13
**falsely** 23:19 35:2,3
74:3,15 91:14
**falsified** 23:16
**familiar** 24:20
**familiar** 24:4 79:9
79:10 81:16
**families** 6:22 7:9
50:9,18 73:19,19

**family** 11:13,14
24:20 29:22 33:1
33:5 50:11 51:23
51:24 67:22 73:22
96:17 97:2,3,19
**far** 8:12,17 15:23
24:15 50:15,21
51:1 58:2 67:16
85:11 87:1
**fashion** 77:19,24
**Father** 3:22,24 4:3
4:5,8,11,17,20
17:19 23:10,13
24:3,6,10,15,22
25:8,13,20 26:9
26:15,23 27:4,16
28:19 30:15 31:7
31:24 32:15,16
33:20 34:17,24
35:4,6,11,20
36:16,20 37:12
38:19 40:10,15
41:3,10,12
**fathers** 28:23
**favor** 62:7
**fear** 12:6 20:21
23:3 44:14 45:23
98:12
**federal** 19:8
**fee** 14:21
**feel** 15:3 72:3 73:13
74:2
**feeling** 12:18 32:22
33:15
**fees** 14:16 23:17,19
23:20 62:11,15,18
74:4,10 92:4,16
93:3,7,17 96:10
**feet** 101:7
**felonies** 56:14,14
**felony** 55:21 56:1
56:15,17,18
**felt** 11:9,10,10 15:9
15:13 97:15
**females** 100:1
**fence** 73:10
**FETZER** 1:21
**feuding** 84:12

**field** 59:4 71:17
**fighting** 16:18
**figure** 43:6
**file** 57:5 66:19
**filed** 20:17,18
**filled** 29:24
**final** 77:9
**finally** 15:9 80:10
**financial** 8:12
    14:12 19:8 21:22
    74:17
**find** 6:20 7:15
    58:18 61:15,19
**finder** 61:8,19
**finder's** 60:24
**finding** 62:22 63:23
**findings** 4:14
**finds** 66:1
**finest** 33:23
**finish** 69:7
**first** 5:6 7:13 10:7,9
    32:10,17 38:1,19
    38:23 40:18,19
    42:21,22 50:17
    56:10,13 69:8
    71:1 82:18 96:5
**first-hand** 44:2
**five** 2:21 5:14 10:19
    20:16 25:6 40:1,7
    40:13 55:17 69:17
    69:19 74:24 80:8
    100:3
**fixated** 39:13
**flag** 43:8,9
**flip-flopped** 71:7
**flood** 30:5
**floor** 3:22,23 36:13
    41:18,20 53:15
    54:6,8,22 68:11
    68:12 75:24 76:2
    85:3 87:9,11
    101:7
**floridly** 85:23
**flow** 38:16
**flowers** 48:18,20
**follow** 32:6 36:21
    38:23 59:4 61:13
**followers** 8:24

**following** 1:14 90:4
    90:7
**footage** 17:24
**forbid** 44:20
**force** 5:6,7 13:23
    21:20
**forced** 8:7 13:15
    19:11
**foregoing** 107:11
**forensic** 45:5
**forestall** 20:19
**forever** 48:14
    104:6
**forget** 47:3 94:18
**forgiven** 96:24
**forgot** 88:17
**forgotten** 8:15 97:1
**forth** 21:9 88:23
**forward** 2:7,10,17
    4:1 12:5 15:2,3,8
    15:14 17:13 26:18
    40:21 41:22 52:17
    54:10 64:12 65:1
    66:3 67:8,16
    68:14 70:13,24
    71:4,8,13 76:4
    83:12 85:1 87:13
    88:1,13 90:15,20
    91:4 92:16 99:20
    99:21 102:5
    103:20
**forward-looking**
    65:20 66:22
**foster** 58:17
**found** 2:22 57:16
    64:1 90:13
**founded** 4:22 42:19
**four** 56:14 88:3
    100:2
**fourth** 76:23
**fragile** 72:13
**fragmented** 77:18
**fragments** 47:6
**frame** 42:15
**frankly** 31:18
**free** 104:13
**Freedom** 5:11
**frequent** 43:2

**Freud** 70:22 71:7
    77:5
**Freud's** 70:24
**friend** 6:22 97:3
**friends** 6:23
**friendship** 15:24
**frightened** 48:24
**front** 98:16
**full** 34:7,19 101:13
**full-page** 29:18
**full-time** 69:18
**function** 99:13
**functional** 44:15
**funded** 100:18
**funding** 19:7
**funny** 43:5
**further** 3:12 17:3
    28:13 63:13 68:8
    86:4 94:4
**future** 23:8 67:13

——————

**G**

**G** 1:16 107:9,20
**gain** 7:8 18:15 66:6
**game** 74:6
**garbage** 102:24
**gavel** 3:18
**gender** 100:1
**Gene** 104:4
**general** 8:23 9:9,19
    25:16 52:8 57:4
    66:14,18 98:16
    102:1 104:16
**generally** 39:9 74:1
    74:5
**generated** 73:23
**generation** 50:12
    50:12 73:23
**gentleman** 23:6
**genuinely** 97:24
**geographic** 20:1
**Georgetown** 33:9
**geriatric** 69:5
**getting** 17:20 74:10
**girls** 39:2 82:21
    83:3
**give** 31:4,8 33:17
    33:24 36:21 37:10
    45:4 51:13 53:3

**61**:3 68:23 93:24
    97:13,20 101:9
**given** 19:13,15
    28:17 29:18 76:11
    90:10 94:12
**gives** 40:8 65:16
    69:6 95:4
**giving** 14:18 47:10
**glad** 50:19
**glee** 96:22
**go** 2:5,7 7:5 24:14
    26:16 32:10 37:1
    41:24 44:9 47:22
    50:18 65:5 70:11
    74:6 79:3,4 82:4
    92:16,22 102:21
**God** 12:15,16 44:19
    90:17,24
**goes** 46:14,16 50:11
    55:18 70:22 77:16
    90:7
**going** 3:3 11:21
    18:20 26:6 27:11
    30:5 31:15 37:9
    38:23 40:21,22
    44:6 48:24 49:1
    50:12 51:24 52:19
    63:20 64:12 66:21
    74:2 79:5 82:10
    82:16 83:3 91:5
    92:10 98:6 101:15
    102:21
**good** 15:15 18:24
    45:1,19,24 46:18
    47:4 48:21 49:10
    49:13 51:18 52:1
    71:12 73:12 74:17
    83:20 91:24
**goodness** 89:22
**gotten** 97:5,11
**governmental** 22:2
**Governor** 28:10
**grand** 21:15 37:15
**graphic** 24:12
**gratification** 39:1,6
**gratitude** 33:21
**grave** 2:7
**gravitate** 44:24

**great** 10:13 11:17
    95:7
**greater** 13:19,22
**greatly** 23:14 47:7
**greed** 23:9
**greedy** 14:4,4
**grief** 12:6
**grievance** 95:3
**grievously** 8:22
**grind** 23:18 92:1
**grips** 25:16
**groom** 31:12
**gross** 60:15,16,18
    60:23 61:5,14
    63:24 64:1,4,14
    64:19 66:6 67:9
**grossly** 65:9
**group** 58:18 75:10
    90:18
**groups** 90:16
**growing** 83:1
**guarantee** 29:24
**guess** 2:5 40:4
    60:24 66:23 82:18
    88:21 95:4,7 97:7
**guest** 102:1
**guests** 4:18 28:12
**guilt** 12:18 44:14
    45:23 66:1 98:13
**guilty** 74:11
**Guislers** 104:5
**Gun** 49:2
**guts** 98:16
**gutted** 83:14
**guy** 40:11

——————

**H**

**half** 29:24 40:7
    44:5
**hallway** 11:5,6
**Hamilton** 2:8,19
    3:1,14 16:4 17:1
    17:13 20:20 26:3
    26:12 41:15 83:11
    87:10,12,16,17,19
    87:20,23 89:7
    90:1,12 91:9,15
    91:18 92:5,15
    93:6,12

hand 9:23 40:18
    48:18 77:17
    107:15
handled 92:24
hands 17:17 27:6
hanging 18:1
happen 17:4 44:18
    44:18 48:24 49:4
    72:9 81:8,12,12
    82:20 99:13
happened 2:23 3:5
    11:3,18 15:21
    16:8,9 31:8,15
    37:22 47:21 53:1
    72:9 77:20 80:6
    81:1 82:6 85:5
    94:13 103:1
happening 9:23
    11:8 12:17 22:5
    46:14 77:15 81:10
happens 19:5 34:9
    44:11 45:12 46:12
    46:13,17 47:8
    48:2 51:22 92:3
happy 5:4,8
harassment 56:8
hard 3:18 16:18
    28:9 45:1,3 88:12
harm 9:24 18:21
harmed 8:22
harmful 20:11
haunt 20:4
head 48:4 77:23
heads 78:12,14
    80:23
heal 18:21
healing 6:20
health 69:16
    100:18
healthier 44:4
hear 27:5 28:11
    36:9 45:13 46:7,8
    82:17 96:5 99:22
heard 12:16 30:22
    31:18 34:21 35:1
    42:11 43:22,22
    44:4,13 46:11
    47:15 49:5 52:2

76:10 82:15 83:11
    83:16 88:3 89:1,4
    96:8 98:12,12,14
    100:5,5,10 101:6
    102:3,6,10,23
    103:10 104:9
hearing 1:1,14
    30:17,20 72:18
    90:23 93:19
hears 30:11 37:6
heart 43:1 49:19
    96:22
heart-wrenching
    15:11
heavily 92:22
Hebrides 33:7
heightened 64:13
    64:13
held 1:15 67:13,24
hell 77:16
help 7:17 11:17
    12:2 18:21 22:15
    30:24 31:20 52:9
    73:9 83:23 90:2
    101:15 103:12
helpful 81:24
helping 6:19 22:16
helpless 49:8,10
helps 98:20
Henry 105:16,17
Hepatitis 46:5
hereunto 107:14
hesitate 84:11
hid 21:5
hidden 10:6
hide 10:3
hiding 33:6
hierarchy 37:8
high 59:5 100:6
higher 60:16
highest 39:19
highly 39:8,8,13
    44:15,15 70:17
hire 59:23
hired 59:18
history 8:5 43:9
hit 39:2 101:7
hits 14:12

hokey 49:18
hold 29:7 48:18
home 49:2,13
honest 31:17
honestly 92:2
honesty 22:17
hope 23:2 36:7 83:4
    93:9 97:10 98:20
    99:11 100:16
    103:15 104:15
hopefully 36:3
    41:13
Hopkins 72:1
horrendous 29:17
    90:16
horrible 46:5
Hospital 42:20
hour 43:20 102:22
hourly 14:16
hours 14:16 44:6
House 1:15 93:24
huge 43:8
human 20:10
humility 5:14
hundred 6:21 7:12
    75:9
hundreds 6:15 7:21
    8:2 14:9 49:7
    88:9 100:10
hurt 8:19 9:24
    34:11 35:13 99:9
    99:14
husband 25:18

**I**
idea 29:3 70:11,12
    78:2 80:22 88:1
ideas 77:22 78:12
    78:14
ideation 85:24
identical 65:21,24
identified 52:16
identifies 2:20
identify 52:16
identity 21:6 30:21
ignored 100:24
Illness 69:24
illuminated 23:16
image 8:11

imagine 2:2,4
immaturity 88:12
immunity 57:23
    58:2,5,10 64:17
    64:24 65:3,6,14
    67:4
impact 64:23 90:10
impacted 12:11
    65:15
impassionately
    9:22
impetus 23:3
implant 72:10
implanted 86:13
implication 84:23
imply 33:19 84:14
    85:5
import 90:9
important 4:18 7:6
    8:18 10:14 33:3
    33:10 47:1 62:3
    81:22 91:20,23
    102:10
imposed 66:14
impression 33:14
    33:22,24
improper 62:22,23
    63:1,6
inability 12:7 46:24
    76:22 88:11
inadequately
    100:18
inaudible 23:20
    68:1 91:16
incapable 15:2
incarcerated 44:13
    45:14
incentive 2:17
incest 11:23 39:15
    40:2 50:9 56:11
    73:22 90:18
incestuous 25:1,4
    25:17 38:12 39:16
incidence 25:16
include 55:24
included 56:16
including 18:9
inclusive 107:11

incontrovertible
    8:21
increased 16:11
Indecent 56:8,10
independent 62:22
indicate 84:3
indicated 82:3
individual 44:15
    60:2 90:3 96:3,17
individuals 90:16
    94:20 100:11
    102:2
inept 77:22
inevitably 39:24
information 90:21
infrequent 85:11
    86:24
ingredient 72:16
initially 35:19
injury 57:6 59:12
injustices 9:19,22
    9:24
Inner 33:7
innocent 21:8
    74:11
instance 61:8
instances 13:5,11
    15:17,22 16:11
    25:1,17 31:13
    47:18 84:17,18
instill 80:16
institution 13:6
    17:5 21:5,11,11
    21:12 23:5 25:12
    64:15
institutional 21:6
    25:3 34:1 37:19
    64:4,7
institutions 5:21,21
    5:22 9:4,9,12,16
    9:19,20 10:3
    11:24 12:1,22,22
    13:18,19 19:3,23
    21:5,19 22:14
    25:15 29:13 57:18
instruction 61:14
instructions 61:9
insulting 14:6,19

insurance 59:19,22
82:24
intend 95:11
102:12
intended 32:19,21
intense 13:13
intent 62:13 63:2
63:11 73:18 74:12
74:19 91:11 96:13
intentional 38:4
intentionally 8:11
intentions 85:18
interest 92:19
interested 24:12
interesting 76:18
interests 10:2
92:19,21
intern 49:12
internal 10:4
interrogation
78:16
intertwine 70:10
intervene 13:2
interview 81:19
interviews 17:19
intimacy 29:4
intimately 28:22
43:7
invested 70:2
investigations
21:16 37:15,16
investment 59:4
involve 39:17
involved 6:17,19
13:21 18:6,8,19
24:24 25:1,21
29:10 39:7 40:19
90:18
involvement 5:18
14:9
in-the-trenches
43:2
Iraq 5:11
Iraqi 5:10
Ireland 7:22 17:21
Irish 33:4,8
irreparably 19:17
irrespective 25:6

Israel 7:24
issue 2:12 6:18 8:5
23:14 25:12 27:6
28:4 30:17 32:12
35:19 37:1,2,6,14
58:5 67:3 70:23
73:4 77:1,11 78:8
79:12,16 80:5
88:14 89:16 90:1
95:24 101:22
issues 32:24 36:12
45:2 67:5 93:22
98:1 99:4 102:8

**J**

Janice 68:11,16,16
69:2,3
January 107:22
jeer 28:17
Jeff 54:6,12,12,21
54:23 55:4,8,11
55:16,23 56:4,7
56:22 57:2,11,22
58:1,11,14,22
59:9 60:7,18 61:5
62:19,24 63:7
64:3,8,20 65:8
66:3,8,12 67:16
67:19
Jefferson 69:10
Jeffrey 54:9
job 17:10 49:1
95:23 101:18
John 104:5
Johns 71:24
join 95:10
joined 53:18
Journal 29:21
journals 8:3 39:11
journey 8:7
judge 16:5 61:9,24
72:19
Judiciary 1:15
jump 18:14
June 29:20
jury 21:15 37:15
61:8,9,11,14
72:24 80:11 83:18
justice 6:20 96:6

104:3

**K**

keen 89:14
keep 50:10
keeps 51:23
kept 40:20 81:13
key 88:15
kids 40:9 46:12
49:3 95:14
kind 24:11 45:3,19
46:15 47:5 48:8
49:18 73:7
kinds 49:4 83:24
100:19
King 1:22
Kingdom 7:23
knew 11:7 37:20
know 2:1,3,11,20
11:1,2,8,9 14:13
18:10,17 25:9
27:5,7,7,13 31:13
32:2,5,10,24 33:4
33:5,23 35:22
36:11 38:13,20
39:15 40:4,22
41:12 42:11 43:20
45:21 48:2,5
49:12 50:11 55:12
65:22,23 67:12,20
67:24,24 68:22
73:10 74:7 75:1,3
75:6,10,13 77:12
79:15,17 81:6,12
82:2,3,13,16,22
83:16 84:1 85:11
87:1 89:2 93:6
97:12,15,21,22
100:13 101:15,22
102:16
knowing 79:4
knowledge 55:11
known 6:14 13:8
14:9,10 28:22,22
31:9,10 39:19
40:24 61:17
knows 6:13 40:12

**L**

lack 29:1 92:17
lady 11:11 48:21,22
Lafayette 6:5
laid 48:6
land-rich 16:23
Langes 104:4
language 11:2
74:18
largely 83:10
lastly 36:7
late 15:12 18:3
43:20 102:22
law 5:17 19:22 24:5
24:11 25:6 30:11
30:13 33:7,8
36:10,12 45:6
56:18 58:24 59:14
64:9 66:20 71:14
72:14 73:12,13
93:2
lawmakers 16:5
29:12
Laws 69:14
lawsuit 57:5
lawyer 6:1,1,2
10:19 24:7,8,9,10
36:1,10 74:13
lawyers 35:23
36:13
layer 66:15
layman 61:4
lays 66:17
lead 70:1 103:6
leaders 23:5 37:19
37:19
leadership 19:20
20:7 21:7 34:1
102:11
leading 79:7
learn 51:22
learned 10:13,20
20:8
leave 33:13,18,22
41:13 100:17
leaves 99:12
leaving 84:23
lectern 103:23
left 69:22

legacy 21:15
legal 7:2 10:8 15:23
59:13 61:10 63:22
88:23 89:3,10
90:5 92:4
legion 25:23
legislation 9:5
13:21 16:2,3
22:15 25:11 27:11
27:14 28:6 29:7
52:9,14 67:15
74:8 82:19
legislative 10:16
12:20 14:2 21:17
23:1 29:10 69:13
Legislators 13:14
lengthy 94:21
letter 26:4,10
let's 58:18 59:22
level 66:6 94:1
liability 58:10
61:15 64:4,7
82:23
liable 66:2 93:11,13
licensed 5:18
Lieutenant 28:10
life 2:18 8:10 9:13
11:18 15:22 43:24
46:20 70:12 77:16
94:17 101:10
lifespan 11:21
lifetime 12:19
22:14 100:11
light 95:10 98:14
likelihood 100:6
limit 58:9
limitation 58:17
limitations 1:7 57:3
57:5 58:4 67:1,12
70:9,12 71:11
72:15 74:22 75:4
82:4 94:10 95:5
104:12
line 37:21 55:1
56:23 57:17 59:8
60:15 62:9 63:21
90:6
Lines 55:17 62:6

**list** 53:14,17,22
  55:23
**listened** 15:10
**listening** 2:2,2 80:4
**litigation** 18:20
**litigators** 89:8,12
  89:13,13
**little** 34:18 38:18
  68:23 78:22,23
  88:22 94:15 101:7
**live** 45:1,4 51:22
  88:6 98:3
**lives** 8:12 10:11
  15:13 19:17 22:23
  44:12 73:24 74:3
  104:6
**living** 42:15 74:7
**loathe** 25:21
**location** 103:3
**lonely** 22:23
**long** 11:4 50:10
  54:21 57:4 68:20
  103:19
**longer** 18:7 20:13
  23:8
**long-term** 42:12
**look** 3:2 10:16
  17:19 19:14 26:13
  62:1 74:21 75:11
  76:19 84:1,1
  88:22 91:3 100:24
  101:1
**looked** 14:21 59:16
  73:4
**looking** 40:5 64:18
  65:1 66:3,10 67:8
  67:16
**looks** 16:2
**look-back** 26:5,7,7
  57:10,12,15 64:5
  64:12 66:4,22
  83:10
**loose** 17:16,21 23:4
**Los** 16:22 89:21
**lose** 18:3 62:18
  96:15
**loses** 96:12
**lost** 34:18 74:5

**lot** 45:7,8 47:15
  51:14,18 70:12
  71:16 79:21 82:14
  83:4 91:5 97:6
  99:1
**lots** 46:7
**loudly** 9:22
**Louisiana** 6:5
**love** 22:3 48:17
  49:13
**loveliest** 48:21
**loving** 29:4
**lower** 74:15

### M
**Madam** 101:16
**magic** 55:6
**main** 25:17
**major** 94:16
**majority** 14:24
  26:18 39:4 70:14
  75:1 97:4
**making** 35:14 84:3
**maladaptive** 46:21
**malevolent** 19:19
**malice** 92:17
**malicious** 62:13,14
  63:2,10 73:18
  74:12,19 91:11
  93:20 96:13
**maliciously** 92:13
  93:9
**maliciousness**
  62:17
**malpractice** 75:8,9
**man** 6:14 17:23
  18:1 24:13 38:12
  38:24 39:23 48:17
  59:4 96:2 97:10
**manner** 28:11
  79:23
**mantra** 101:7
**Marci** 2:8,19 3:1
  20:20 87:16,16,23
  89:7 90:12 91:9
  91:15,18 92:5,15
  93:6,12
**marginalized** 8:19
**marked** 50:4

**married** 33:1 83:4
**Marshall** 105:19
  105:20
**massive** 10:24
  14:12
**Master's** 5:14 25:6
**material** 71:5 73:7
  73:8
**matter** 28:3 72:3
  85:8 89:15 107:13
**matters** 76:21
**McBRIDE** 2:1,14
  2:23 3:2,7 102:14
  102:15 103:16
  105:22,23
**McDowell** 32:14,15
  34:16 35:1,5,9,16
  36:6,18 84:9,10
  85:13,20 86:3
  98:22,23 100:22
  100:23 101:4
  106:1,2
**mean** 2:4 26:12
  32:11 33:13,19
  34:13 38:14 40:5
  40:12 45:3 57:3
  58:7,23 59:9,10
  59:15 60:7 61:5
  62:23,24 63:3,24
  64:16,24 65:6,12
  66:18,23,24 91:16
  92:5 99:18
**meaning** 21:21
  59:11 63:8
**meaningless** 83:10
**means** 39:24 57:19
  100:3
**meant** 26:11 35:6
  38:21
**measures** 12:24
  13:1,11 52:22
  60:4
**mechanism** 2:16
**mechanisms** 44:17
  51:20 97:9
**media** 6:6 13:13
**medical** 42:22 69:8
  69:10,10,14,17

**medicate** 45:15
**medicine** 70:20
**medieval** 24:11
**med-surg** 43:3
**meet** 48:23 67:5
  74:14
**member** 11:13
  50:11 96:17 97:2
**members** 4:13 5:20
  11:24 21:7,10
  22:3 73:22
**memories** 5:8 71:1
  73:1 79:18 80:16
  85:9 88:4,6,10
  89:2
**memory** 47:9 48:6
  48:7 62:15 69:1,6
  70:9,15,21 71:2,4
  71:18,20,21,23
  72:3,4,10,19,19
  72:20 73:2,20
  77:2,10,11,12,16
  78:1,2 79:12
  80:20 81:14 82:2
  83:5 84:15,17,18
  84:24 85:10 86:9
  86:9,13,15,22,22
  86:24 88:2,5,9,14
  89:9 97:13,13
**men** 7:9,10 11:15
  11:15 15:11 19:16
  22:22 29:2 33:23
  37:20 39:5,9 44:2
  83:2
**mental** 69:24
  100:18
**mention** 48:1
**mentioned** 17:8
  20:20 26:12 48:15
  50:23
**message** 101:14
**met** 15:5,10 22:21
  33:11 65:14,17
**Mexico** 7:23
**mic** 56:6
**midst** 7:19 8:13
  10:9,12 60:2
**mind** 18:19 40:17

**medicate** 45:15
43:6 46:14,15,18
  47:1,5 80:5 81:1
  82:15,22 96:19
**minister** 6:21
**ministers** 34:13
**ministries** 19:1
**ministry** 5:4 19:11
**minor** 55:2,4
**minority** 39:3
**minutes** 23:7
**miscalculation**
  87:24
**misdemeanor**
  55:21 56:1,8,9,10
  56:11,12
**misfortune** 18:16
**misled** 85:15
**misperception**
  85:19
**missed** 63:19
**missing** 71:14
  72:16,16,21
**mission** 21:21,21
  21:24
**mistake** 68:19 99:9
**mistakes** 99:13
**mix** 34:8 90:15
**mixed** 82:5
**model** 90:13
**molestation** 96:2
**molested** 50:22
  51:2,9
**molester** 51:12
**molesting** 81:5
**moment** 46:19
**monetary** 18:15
**money** 9:18 14:5
  16:21,21 23:21
  36:5 46:3
**monitor** 6:3
**months** 90:24
**mother** 11:9,19
**mothers** 28:23
**motive** 62:23,23
  63:1,6
**mount** 14:16,17
**move** 91:4
**movie** 17:17,24

**moving** 2:9 27:4
  37:1,7
**multiple** 39:9
**murder** 94:15,16
  94:17

**N**

**name** 4:2,3,19
  41:22 54:11 68:14
  68:16 69:3 74:6
  74:18 76:5 87:14
  87:16 91:24
**NAMI** 70:5
**nation** 103:5
**National** 69:23
**nationally** 93:2
**natural** 50:10
**nature** 10:14 51:16
  59:1,12
**Navy** 49:1
**near** 37:7 45:3
**necessarily** 79:1
**necessary** 12:20
**neck** 48:4
**need** 11:24 12:1
  22:4,15 33:17
  45:19 95:13 96:20
  99:15 100:19
  101:15,16
**needed** 12:21,23
  90:22
**needs** 21:12 47:23
  96:8
**neglect** 19:19,19
**negligence** 31:5
  60:15,16,16,19,21
  60:23 61:1,11,15
  63:24 64:1,4,10
  64:14 66:1,6 67:9
**negligent** 64:19,19
  65:10 67:10,23
**neighbor** 6:13
**neighborhood**
  38:14 74:5
**neighbors** 17:22
**neither** 71:21
**network** 21:23
**neurology** 48:5
**neuropsychiatrist**

42:18
**neuropsychiatry**
  48:3
**neuropsychologist**
  42:2
**neutral** 35:18
**never** 2:7 15:14
  31:8 34:11 44:9
  77:19 78:12 88:15
  97:1,5 98:3
  101:22
**new** 7:23 73:23
  107:3
**news** 29:21 48:19
**nickel** 78:15
**niece** 11:21
**nightmare** 10:21
  12:8 23:2
**nimble** 49:15
**non** 31:17 33:3
**normal** 20:9 51:5
  64:9 72:6,7,10,12
**normally** 55:21
**Notary** 107:10
**notes** 107:12
**nowadays** 70:19
**number** 4:24 5:2,9
  7:1 9:12,15 14:11
  15:6 17:15 23:16
  25:3 29:13 39:19
  39:21,23 40:13,14
  40:20 45:20 55:6
  59:3 75:6,11 85:4
  85:18 89:5 94:22
  100:8 104:9,21
  106:21,22,23
**numbers** 39:10,12
  39:14,14 40:5,11
  40:17 99:22,23,23
  100:9,12,19,24
**nurse** 48:22
**nurture** 51:17

**O**

**objected** 17:9
**objection** 4:1 14:6
  41:22 54:10 68:13
  76:3 87:13
**objections** 10:17

14:1 17:8 20:24
**obligation** 37:5
**obviously** 44:11,16
  67:20 68:1 74:13
  103:11
**occasionally** 39:22
  45:4
**occur** 78:1
**occurrence** 43:3
**October** 107:15
**odds** 51:14
**offend** 49:8
**offender** 29:14
**offenders** 40:24
  52:5
**offending** 25:22
**offense** 55:19
**offenses** 55:24
  56:20 58:6
**offer** 5:12 23:1,3
**offered** 15:19
**office** 59:24
**officers** 78:23
**offices** 89:11
**official** 65:11,12
**oftentimes** 9:21
  12:15 25:20 39:12
  47:6 52:7
**oh** 35:11 50:7 69:22
**okay** 26:19 35:5,9
  35:16 42:14 50:10
  50:13 51:8 52:23
  52:23 56:23 57:8
  57:17 58:9 60:14
  62:21 79:11 85:13
  91:7
**old** 15:18 16:7,8
  17:9 50:24 51:4
  59:22 97:2,11
**older** 22:22
**oldest** 15:7
**Oliver** 17:19
**once** 2:19 37:10
  75:1
**ones** 22:22 44:4
  49:9,9 88:18
**open** 16:4 49:20
  88:19 103:14

**opening** 17:12
  18:11
**open-ended** 77:24
  79:6
**Operation** 5:10
**opinion** 3:4 23:14
  25:5,10,13 26:6
  45:5 58:1 64:24
  89:3 94:10
**opinions** 99:1
**opportunity** 6:24
  22:19 23:1 33:17
  36:21 37:4,10
  83:6 94:23 96:7
  103:8 104:3
**opposed** 99:7
**opposition** 29:7,9
  101:23
**oppositions** 20:24
**Orange** 57:14
**ordained** 4:21
**order** 4:22 10:7
  50:16
**ordinary** 59:10
  60:20,22 63:7
**organization** 16:17
  19:5
**organizations**
  53:18 57:18 102:2
**outburst** 28:13
**outfit** 29:21
**outside** 23:20
  103:12
**overcome** 97:9
**overlooked** 98:1
**overshadowed** 9:17
**oversimplified**
  47:11
**overwhelming**
  99:10 101:24
**O'Grady** 17:19

**P**

**page** 29:23
**pages** 107:11
**paid** 58:20 62:18
**pain** 6:16 16:10
  22:24 34:10 43:5
  43:5 104:12

**painful** 7:7 8:6,8
  46:15 47:2 102:6
  103:19,20
**painted** 64:21
**paranoid** 85:23
**pardon** 72:23
**parent** 34:5,9
**parenthood** 29:3
**parents** 34:5,7
**parish** 5:1 18:24
  19:11
**parks** 18:1
**Parrish** 1:16 107:9
  107:20
**part** 2:18 8:10
  33:10,10 40:4
  81:13 95:4 97:18
**particular** 29:8
  42:12 89:20 90:13
  99:8 102:21
**particularly** 14:19
  45:7 99:2
**parts** 47:1 99:24
**party** 25:22
**pass** 3:5 27:11,14
  52:9 102:19 103:8
**passed** 70:16
  106:24
**passes** 66:20
  103:15
**passing** 52:15
**pastoral** 6:21
**patently** 18:6
**paths** 99:7
**patience** 41:17 42:8
  62:4 98:11
**patient** 70:4 73:9
**patients** 70:3,7,24
  73:7
**pay** 25:9
**payable** 23:17
**paying** 28:6 104:10
**pedophile** 18:2
  38:10,24 39:8
**pedophiles** 39:4
**pedophilic** 39:16
**pelvic** 43:5
**penitent** 32:2,5

**people** 2:3,6,9,17
  8:17,17,22 10:18
  18:14 27:24 29:15
  32:10 33:12,16
  35:12 37:17 40:14
  44:12 45:12,17,18
  47:7,13,14 48:13
  49:4 52:5 71:20
  71:23 73:18,21
  77:12,14 78:13
  80:11,17,21 83:11
  83:24 85:4,6
  86:17 88:11 91:14
  91:21 99:10,14
  102:1,5
**people's** 78:12,14
  99:1
**percent** 19:6 75:9
  97:18 100:8
**percentage** 19:9
  91:14
**performance** 65:10
**performing** 65:12
**period** 7:5 26:5
  56:24 57:10,12
  90:6
**permanent** 44:14
**perpetrating** 19:18
**perpetrator** 2:20
  6:8,9 51:12 58:19
**perpetrators** 16:11
  17:15 19:22 23:4
  39:4 40:9,23 49:6
  49:7 52:3,16
**persecution** 21:2
**person** 23:23 30:14
  30:18,23 31:13,20
  43:13 44:10 45:1
  49:12 51:15,19
  60:5,5 62:10,15
  65:18 74:15 79:7
  85:10,14 92:1,3
  93:4 96:7,12,14
  96:24 97:1
**personal** 3:21
  11:12 25:14 41:18
  53:15 54:6 59:11
  75:24 87:9

**persons** 10:15
**person's** 92:2
**perspective** 90:5
  92:24 93:2
**pervasive** 27:6
**Peter** 63:15
**Peterson** 3:8,9,14
  3:15,18,19 4:6,7
  4:12 24:1,9 29:19
  41:5,6,11 42:5,6
  42:10,16 43:15,18
  49:23,24 50:6
  53:8,9,12,13,22
  53:23,24 54:2,5
  54:15,16 68:4,5
  68:19,20 75:22,23
  76:8,9,13 78:4,5,6
  78:11,20 79:8,11
  79:15,24 82:12
  86:3,4 87:3,4,7,8
  87:19,20 93:15,16
  94:6 95:11,16,17
  95:21,22 101:18
  102:11 103:17,18
  104:19 106:4,5
**philosophy** 5:15
**phone** 96:2
**phrase** 35:21
**phraseology** 97:8
**phrasing** 63:24
**physical** 10:22
  21:24 46:5
**pick** 45:1 49:9
**picture** 34:7 103:24
**pilot** 49:2
**place** 12:15 13:12
  13:15 19:24 20:1
  37:2,8,23 74:23
**placed** 8:11 12:13
  34:20
**places** 5:3 13:20
**plaintiff** 14:4 65:18
  67:5
**plaintiffs** 14:5,8
**plant** 78:12,13
**planted** 80:22
**plants** 21:24
**playgrounds** 18:1

**please** 4:1,1,12
  28:16 41:22,22
  42:10,16 50:4
  53:22 54:10,11
  68:14,14 76:4,5
  76:14 87:13,14,15
  104:20
**plenty** 16:21
**ploy** 14:4
**poignant** 34:10
**point** 14:23,23
  34:19 36:8 47:2
  64:11 66:13 91:8
  91:9 96:1 98:19
  100:16
**points** 43:23 90:2
**police** 25:21 71:15
  71:15 78:8,12,13
  78:17,23
**policies** 13:12 37:9
**policy** 19:20 57:2,7
  66:21 73:4,6
  92:18
**political** 5:16 9:20
  12:1
**poor** 93:8
**population** 72:10
  72:12,13
**portrayed** 97:17
**position** 6:2 26:21
  44:16 90:2
**positions** 8:14
**possibility** 92:9
  94:1
**possible** 14:5 77:21
  79:3,5 81:18
  86:16
**possibly** 31:8 39:20
  50:23 60:1
**posted** 53:19
**post-traumatic**
  46:22 48:10 76:23
**potential** 18:17
  27:15,17,18
**potentially** 10:5
  27:12 64:9
**pouring** 48:7
**power** 8:11,14,16

  9:18 13:19,22
  104:2
**powerless** 9:17
**practice** 69:18
**pray** 97:10
**precisely** 37:18
**predators** 13:2,3
**prejudice** 21:13
**premorbid** 44:17
**prepared** 75:5
**prepubescent** 39:2
**present** 23:8 50:4
  60:1
**presented** 89:6
**presently** 16:22
**president** 3:9,20,21
  4:8,18 23:12 24:1
  27:3,21 36:19
  38:8 41:7,11 42:7
  42:21,22 53:9,13
  54:5,16,20 63:18
  68:5,23 69:11
  75:23 78:4,21
  80:4 84:11 86:7
  87:8 89:24 93:16
  94:8 95:17 98:9
  98:24 100:20
  101:2,5,21 102:15
  103:18 104:15,17
  106:20
**pressure** 13:13
**prestigious** 44:16
  47:16
**pretty** 26:21 72:1,7
  80:7
**prevailed** 71:22
**prevalence** 45:16
**prevalent** 43:17
  44:11 45:10 53:2
**prevent** 16:18 21:6
**prevention** 52:19
  52:20
**previous** 98:24
**prey** 49:10
**price** 104:11
**priest** 4:20,23 5:1
  11:5 12:12 17:20
  30:11,17,20 31:14

  32:9 33:14,22
  37:5 38:15 39:20
  48:19
**priests** 7:1 24:19
  31:11 32:23 33:11
  33:23 34:13 38:2
**primarily** 5:19
  6:18 24:23
**primary** 52:19
**principle** 73:11
**prison** 6:10,10,11
  17:21 44:9
**prisons** 44:6
**private** 5:22 9:4,13
  13:18 19:3 21:19
  25:14 57:19 66:11
  67:10 69:18
**privilege** 3:22,23
  32:3,5 41:18,20
  53:15 54:6,8
  68:10,12 75:24
  76:2 87:9,11
**privileged** 31:21
  38:1
**pro** 14:12,15
**proactive** 12:24
  13:1
**probably** 16:16
  18:7,7,13 24:2
  27:8,8 29:20 33:6
  38:13 47:15 49:7
  82:10 96:10 99:5
**probe** 52:6
**problem** 20:3 22:7
  22:8,8,9 27:7,9,13
  31:17 34:4 36:2
  45:10 53:1 58:17
  88:22 97:16,18,19
  97:19,21,22 98:3
**problems** 10:4,5
  28:24 73:14,16
  89:19
**procedures** 28:16
**process** 18:20
  48:12,12 99:11
**processes** 18:20
  20:20
**prodding** 81:13

profession 7:10
70:2 75:14
professional 5:12
8:3 39:11 49:19
72:22 107:9
professor 3:14 5:2
16:4 17:1,13 26:3
26:12 41:14 83:11
87:9,12,18,20
90:1
profiles 45:11
profiling 45:8
profound 10:22
prognosis 51:16
progressive 49:14
proof 67:6
proper 47:24 81:20
96:14
Property 29:22
Proponents 71:19
proposed 9:5 10:17
prosecution 93:20
prostitute 46:2
protect 12:2 52:17
59:20 70:6 92:1
104:15
protected 17:5
protecting 16:20
16:24 17:2,3
protection 13:7,11
16:23 20:17,19
65:17
protections 10:7,9
38:2
protective 13:11
protects 13:3 47:1
proud 5:4 49:14,17
70:1 101:8,11,17
provable 95:9
prove 21:18 65:18
72:5 74:12,19
94:12
proven 62:17
provide 2:16 22:16
61:14 93:1 99:15
provided 15:24
provides 23:15
93:7

provision 57:14,15
64:5,12 65:20
66:22,23 91:11
92:6 93:10 96:11
provisions 1:9
23:22 59:15 91:23
prudent 59:4 60:4
psyche 44:23
psychiatric 42:19
46:23 48:22 69:11
72:22 89:5,11
psychiatrist 45:19
72:17 73:5 80:16
81:11,19 88:24
psychiatrists 84:12
89:5
psychiatry 69:4,5
69:16 70:18
psychological
10:23
psychologically
88:16 90:22
psychologist 38:20
38:23
psychologists 73:6
psychosomatic
79:22
psychotic 85:23
puberty 39:3
public 9:1,4,12
13:19 57:18,21
66:10 69:14 92:18
107:10
publication 77:3
publicly 21:9
published 8:2
pull 37:21 41:24
purposely 96:17
put 13:12 18:17
31:2 45:11 56:2
61:4 96:4 99:24
100:7
puts 77:22

_____
        Q
_____
qualification 64:3
qualified 47:18
65:2
quarter 45:18

question 24:2 26:2
26:3 29:6 30:2,10
30:16 47:11 50:9
61:19 62:6 63:21
75:8 78:19 79:4
80:21 89:6 91:10
95:5
questioning 89:1
questions 3:10,13
10:18 24:16 26:20
36:22 41:7,14
47:19 50:1,16,21
53:16 54:18 55:1
63:13,15 68:6,8
75:18,20 77:23
80:1 86:4 94:2,5
95:18
quiet 50:10
Quills 104:4
quit 49:1
quite 26:9,10 30:16
31:7,18 36:12
98:18 102:20

_____
        R
_____
R 107:7
rabbis 34:13 38:3
raise 43:8
raised 93:23
rampantly 17:4
rape 11:23 56:14
83:1,7
raped 11:5,14
rare 43:17 92:11
rarely 39:1
rash 43:5
reach 12:24 66:5
70:14
reaching 11:14
read 29:19 39:11
62:9 80:9
reading 62:24
81:17
ready 47:5 83:12
83:13
reaffirm 17:2
real 43:8 96:11
reality 40:18
realize 8:20 100:20

realizes 27:20
really 8:20 22:16
26:20 30:7 36:11
43:1 52:2,6 62:16
66:15 72:2 73:1
73:10 77:20 78:2
79:19 84:18 93:22
96:5 97:5,7 98:4
reams 76:24
rearing 33:2
rearrested 6:11
reason 13:12 37:17
40:4 43:12 44:22
47:22 57:8 66:1
88:18 92:6 94:9
94:11
reasonable 60:4
reasonably 77:14
reasons 29:1 34:1
45:20 70:8 82:12
85:22
reassigned 103:2
rebirth 22:17
recall 76:22
recap 43:22
receive 39:6
received 2:9 6:6
33:10 106:23
receives 39:1
recklessness 61:1,2
61:16
recoil 45:3
recommended 26:4
reconstruct 94:20
record 4:2 29:17
41:23 54:1,4,11
55:3 56:2 61:23
61:24 68:15 76:5
87:14 107:11
Recorded 1:1
records 16:14,19
record-keeping
16:16
recourse 93:10
96:14,20,23 97:20
recover 23:22
62:10 77:12,13
91:24

recovered 71:20
72:24 77:11,11,16
recovery 62:14
red 43:8,9
redress 94:24 95:3
reevaluate 21:20
referable 79:23
referring 55:24
reflected 95:1,7
reflecting 7:15
reform 12:20 26:4
reforms 12:23
21:17
refrain 28:13
refreshing 36:8,12
refuse 37:9
Regan 11:21
regard 29:13 32:3
32:7 40:1 55:15
59:16 61:20 76:21
77:5,10
regarding 1:9
64:23 93:1
Regardless 86:12
Registered 107:9
regret 22:24
regretfully 8:13
regulations 24:13
reinforce 28:15
rejecting 12:17
relate 32:24
related 1:9 37:13
43:7 46:6
relates 30:10
relating 1:8 102:8
relation 7:5
relationship 12:11
38:12 44:22 48:21
80:6
relationships 24:20
24:21 39:16 44:24
46:4 79:20
relative 67:8
100:15
relatively 85:10
86:24
release 6:11
relieve 82:15

**religious** 7:17 8:22
9:3,8 14:14 29:16
38:3
**remain** 10:1 13:15
22:13 37:5
**remained** 69:18
**remains** 12:18 13:8
14:7
**remarkable** 95:23
101:18
**remedies** 93:18,21
**remedy** 56:21
58:20 93:21
**remember** 24:18
30:7 43:10 46:24
50:22 51:2,4,6
52:6 79:19 81:17
96:9
**remind** 22:15 44:3
**removing** 1:7 67:12
70:11 71:11 72:14
**render** 83:10
**repair** 23:23
**reparations** 74:16
**repeat** 38:17 101:8
**repeatedly** 102:10
**repeating** 86:19
**repercussion** 82:23
**report** 72:4
**reported** 32:9
**reporter** 23:21
68:2 91:17 107:10
**reporting** 32:3
**reports** 21:16
**reprehensible**
50:20
**represent** 4:2 41:23
42:24 60:3 68:15
89:13 98:17
**representations**
89:14
**representative**
59:19 69:13
**represented** 14:14
14:20 15:18 42:23
**representing** 14:8
68:17
**repressed** 71:1

77:2 80:16,20
83:5 84:15,17,18
84:24 86:8,22
88:2,4,9,14 89:2,8
**repressing** 97:12
**repression** 47:9
69:1 79:18
**reputation** 23:23
25:22 91:24 92:2
96:12
**request** 3:21 28:1
41:18 53:14 54:6
75:24 87:4,9
**requested** 3:24
41:21 54:9 68:13
76:3 87:12
**required** 106:23
**requirement** 64:14
**requirements**
66:17
**research** 4:14
73:24 77:4
**residence** 11:7
**residency** 69:9
**residents** 40:6
**resistance** 91:5
**resolve** 95:13
**respect** 14:2 27:23
27:24 28:2,7,16
28:18 76:16 89:3
**respectful** 28:8
**respectfully** 28:1
**respond** 24:3 53:16
76:14,16 87:21
**responsibility** 28:5
66:7 96:6
**responsibly** 13:23
**restate** 4:1 41:22
54:11 68:14 76:5
87:14
**result** 6:16 44:12
**resulted** 18:11
**reveal** 11:2 12:4
**revealed** 6:7
**revelations** 9:12,14
17:3
**reversed** 71:3
**review** 57:16

**reviewed** 89:4
**re-hardwired** 48:9
**re-hardwiring**
48:11
**re-victimizing** 14:6
**ridiculous** 21:3
26:16
**right** 3:5 18:19
25:19 26:14 40:3
40:10 46:15 47:19
47:23 48:12 49:20
50:16 72:8 80:23
92:8,14 93:12
**righted** 47:23
48:13
**rightfully** 74:2
**rights** 38:2 102:18
102:20
**rigorous** 18:18
**ripple** 46:1
**risk** 61:17
**risky** 46:6
**road** 2:22
**Rob** 104:4
**role** 84:4
**roll** 104:17,21
106:20
**Roman** 4:20 8:5
29:11
**room** 27:8
**roughly** 90:15
**rounds** 43:3
**RPR** 1:16
**ruined** 19:17 23:9
80:12
**rule** 28:11 57:24
59:4 60:12
**rules** 28:3,13
**run** 10:19 33:13
82:22
**runner-up** 17:18
**running** 23:4

**— S —**
**safe** 60:5
**sales** 59:18
**San** 16:22
**sane** 20:9
**satisfied** 96:19

**saw** 29:20
**saying** 2:16 68:20
74:9,21 76:18
81:8 84:2 86:18
**says** 39:23 62:10,21
63:22 90:6 92:12
99:21
**scales** 96:6
**scandalous** 7:16
8:7
**scare** 82:19
**scared** 82:10
**scarred** 48:13
**school** 19:11 69:8
77:9 103:1,2
**schools** 52:22
**science** 5:16
**Scotts** 33:4,7
**Scouts** 82:21
**screening** 18:18
**seal** 107:15
**second** 56:9,13
103:7
**secondary** 52:19
**Secondly** 77:5
**Secretary** 104:20
**secrets** 17:1,3
20:22 51:23
**section** 24:19 25:7
55:10 64:18 65:15
65:16 93:18
**sections** 8:4 57:9
**see** 17:16 26:10
38:15 43:16 45:19
47:5 89:8
**seeing** 3:12,24
41:21 54:9 68:8
68:13 75:20 76:3
87:12 94:4 101:24
**seek** 23:23 30:23,24
31:20 94:24
**seen** 17:14 54:21
88:23 89:3,4
101:13
**self** 35:14 45:15
**selfishness** 23:9
**self-medicate** 45:21
**sell** 59:22

**Senate** 1:2,6 4:9,13
13:20 42:8 54:12
96:9 104:21
106:21,22,24
**Senator** 2:1,14,23
3:2,7,7,8,9,12,14
3:15,17,18,19,23
4:5,6,7,12 23:10
23:11,12 24:1,8,9
24:14 25:5,10,19
26:2,14,19 27:1,1
27:2,3,21,22,22
27:23 28:14,14
29:19 30:9,9,10
31:1,1,2,22 32:13
32:13,13,15 34:16
35:1,5,9,16 36:6
36:17,17,18,19,22
38:6,6,7 40:3,11
41:2,4,4,5,6,9,11
41:20 42:4,5,6,10
42:16 43:14,18
49:22,23,24 50:2
50:2,3,5,6,8,15
51:3,8 52:8 53:4,7
53:7,8,9,11,12,13
53:16,16,21,21,23
53:24 54:2,3,5,8
54:14,15,16,17,17
54:19,19,20,24
55:6,9,12,14,17
55:23 56:2,5,19
56:22,23 57:3,8
57:11,17,23 58:9
58:12,16,23 59:2
59:18 60:14 61:3
61:22 62:20,21
63:5,8,12,14,14
63:15,16,17,18
64:6,8,16 65:5,21
66:5,8,9 67:7,18
67:20 68:3,3,4,5,8
68:9,10,12,18,19
68:19,20,21,22
75:7,16,17,18,20
75:21,23 76:2,7,8
76:9,13 78:4,5,5,6
78:11,20 79:8,11

79:15,24 80:2,2,3
80:14,24 81:4
82:1,9,12 83:15
84:6,8,8,9,10
85:13,20 86:2,2,3
86:4,6,6,7,12,18
86:21 87:2,2,3,4,6
87:7,8,11,18,19
87:20 88:20,20,21
89:23,23,24 91:7
91:10,16,19 92:14
92:23 93:8,14,14
93:15,16,23 94:4
94:6,7,8 95:10,15
95:15,16,17,19,19
95:20,21,22,22
98:7,7,8,9,21,21
98:22,23 99:2,21
100:22,22,23
101:3,3,4,5,17,18
101:19,19,20,21
102:4,11,13,13,14
102:15 103:16,16
103:17,18 104:18
104:18,22,23,24
105:1,2,3,4,6,7,9
105:10,11,13,14
105:16,17,19,20
105:22,23 106:1,2
106:4,5,7,8,10,11
106:12,14,15,17
106:18,19,22
**Senators** 4:18
  49:20
**send** 20:2 37:21
  101:14
**senior** 15:7
**sense** 70:10 71:12
  72:15 75:12
**sensitive** 49:9
**sentence** 59:8
**sentenced** 6:9
**sentiment** 28:15
**separate** 58:6
**sequelae** 46:11
**series** 21:23
**serious** 20:9
**seriously** 28:6

**serve** 7:17 69:12,14
  69:15,23 78:24
**served** 4:24 5:5,9
  6:10 9:11 69:17
**service** 42:19
**services** 100:18
**serving** 6:2 69:19
**session** 99:5
**set** 9:11 61:20 72:7
  107:14
**setting** 37:8 60:11
  61:8
**settlements** 19:12
**seven** 55:17
**severe** 18:23
**sex** 20:11 90:17,18
  102:8
**sexual** 1:8 4:15
  5:19,19,20 6:18
  6:18 10:14,15,21
  12:9,10 13:2,3
  19:13,16 20:9
  25:17 31:4,11
  32:4 39:1,6 42:13
  52:5 53:1 56:7,11
  56:12,15,17 70:13
**sexually** 6:12 10:20
  11:1 30:19 37:20
  39:7 40:8
**shame** 12:7,18
  44:13 45:23 98:12
**shameful** 8:8 11:9
**share** 11:13
**shared** 43:15
**shed** 83:20
**shielding** 49:5
**shock** 17:17
**shocking** 8:7,20
  40:15
**short** 11:21
**shortly** 6:10
**shoulder** 15:20
**show** 28:2 72:11
**showed** 102:2
**showing** 72:6
**shuffled** 41:1
**sick** 23:7
**side** 71:22

**sides** 73:3 80:5
**sign** 34:20
**significant** 6:6
  94:23
**significantly** 39:14
**silence** 51:22
**silent** 10:1 37:5
**similar** 27:11 37:16
  59:16 67:24 82:5
**simple** 60:15,21,21
  61:10
**simply** 6:2 22:1
  33:14 37:23
**Simpson** 27:2,3
  30:9,10 31:1,2,22
  32:13 53:16 54:17
  68:9,10,21,22
  75:7,17,18 86:6,7
  86:12,18,21 87:2
  88:20,21 106:7,8
**Simpson's** 36:22
**singled** 29:12
**single-handedly**
  44:7
**singular** 37:6
**sir** 26:24 30:2
  31:17 34:24 37:12
  54:23 55:4,8,16
  56:4,7,19 57:22
  58:1,11,14 59:9
  60:18 61:7,18
  62:24 64:3,20
  65:8 66:3,12
  67:19
**sister** 11:20 97:15
**sit** 75:13
**sitting** 2:2
**situation** 25:24
  38:15 63:8 93:4
  98:4
**situations** 9:20
  25:1
**six** 2:21 18:12 26:5
  26:13 90:24 97:2
  100:1,2
**six-month** 57:15
**slander** 93:11,21
**Slap** 20:2

**slightly** 100:21
**small** 23:1,15,21
  39:3,23 40:6
  49:15 91:13 92:10
**soccer** 74:6
**social** 12:1
**socially** 10:4
**societal** 22:9
**societies** 22:10
  72:22
**society** 9:9,16
  22:10 25:15 27:7
  29:12,22 42:23
  69:12,14 97:22
**sociopathic** 18:14
**Sokola** 101:20,21
  102:13 106:10
**sole** 62:7
**solely** 23:20
**solid** 44:22
**solution** 20:1
**somebody** 28:11
  43:4,10 44:16,18
  45:2 47:20 58:18
  60:1 70:1,1,2,3
  71:8,12,17 72:8
  75:7 77:22,24
  85:9,14,22 99:9
**somebody's** 77:23
**someone's** 101:10
**someplace** 43:5
**son** 6:12
**Sorenson** 106:11
  106:12
**sorry** 34:24 50:7
  74:2 78:21 95:1
**sort** 31:2 38:9,13
  38:14 40:5,12
  44:7 46:14 47:3
  47:10 48:4 52:24
  83:13 99:24
**sorted** 86:1
**sorts** 43:7 46:4
**soul** 44:1 93:8
  98:17
**sound** 5:13 49:18
**sounds** 81:15,18
**source** 85:16

**sovereign** 57:23
  58:2,5,10 64:17
  64:24 65:2,3,6,14
  67:3
**Soviet** 5:15
**speak** 9:19 10:18
  10:24 11:12 14:1
  22:20 40:1 56:5
  69:21 70:5 104:14
**speaker** 41:12
**speakers** 47:16
  98:24
**speaking** 17:7 19:3
  49:19 69:20 73:15
**speaks** 76:17
**special** 69:6
**specialized** 24:11
**specializes** 36:10
**specific** 56:20
**specter** 9:18
**spectrum** 19:15
**speed** 40:2
**spent** 44:5
**spins** 30:1
**spiraling** 11:19
**spirit** 44:1
**spiritual** 10:23
**spite** 99:8
**spoke** 11:4
**spoken** 7:14 66:18
  99:10
**sponsor** 62:4 95:11
**sponsors** 50:19
  91:20
**spouse** 25:18
**spread** 22:6
**spreading** 102:24
**spring** 85:15
**squarely** 73:3
**squelched** 48:8
**stability** 8:12 21:22
**staff** 6:1,1 42:21
  53:17,22 69:10
**stand** 28:9 98:16
  101:16
**standard** 59:7
  60:17,20,22 61:6
  61:18 64:2,10,13

64:19,19 67:9,10
67:13,24 74:8,10
74:14,14
**standards** 66:10,13
**start** 45:11 47:7
74:24
**started** 87:24 90:17
90:23 102:18
103:5
**starting** 74:23
**starts** 52:21 75:4
**state** 4:9 5:8 9:5,7
13:4,20 18:10
19:8 21:18 27:11
29:9 32:5 40:6
42:8,22 49:13,18
57:19,20 58:9
64:17 65:2,17,20
65:23 66:2,6,14
67:8 89:19 95:14
100:18 102:11,19
103:5,7 107:1
**stated** 92:10
**statement** 29:23
38:22 64:21
**statements** 87:21
**states** 5:5 7:22 9:7
16:24 19:10 20:17
21:18 27:14 32:1
32:1,2 82:18 90:5
92:24 93:3 103:6
**statistics** 39:15
52:1 100:5
**statute** 1:7 23:20
57:3,5 58:4 66:16
67:1,12 70:9,11
71:11 72:15 74:22
75:3 82:4 94:10
95:5 104:12
**statutory** 59:15
83:1,7
**stay** 49:2
**steam** 18:3
**stenographic**
107:12
**step** 36:3 84:12
102:10
**sterile** 16:8

**stewardship** 49:17
**Stills** 104:5
**Still's** 53:16
**stop** 52:9
**stopped** 20:21
**stopping** 52:21
102:7
**stories** 15:11 25:22
83:17 94:23 104:9
**story** 72:18
**straddle** 73:10
**straight** 14:21
**strange** 77:15
**street** 1:22 17:23
**stress** 46:23 48:10
76:23
**striking** 102:21
**strong** 44:17 78:16
**strongest** 29:8
103:7
**strongly** 72:3
**structures** 8:16
**struggle** 95:2
**studies** 5:16 76:18
77:1
**study** 81:17
**stunning** 40:13
**subject** 4:15 32:22
64:17 67:9,10
70:18
**submit** 44:18
**subsection** 63:1,9
63:23 64:1,5,7,10
64:22,22 65:1
**subsequent** 77:3
**subsequently** 42:20
**subspecialty** 69:4
**substance** 45:16
**sue** 31:16 60:12
65:2 93:20,20
**sued** 31:5
**suffered** 6:16
**suffering** 22:24
**sufficient** 90:8,8
**suggest** 28:12
47:20 78:16
**suggested** 81:20
84:16,20 85:9

**suggestible** 77:24
80:22
**suggesting** 84:21
**suggestion** 86:14
**suicide** 6:15 44:14
104:8
**suing** 65:18
**suit** 58:21 66:17
81:22
**suits** 1:8,9 21:15
66:20
**summed** 9:15
**support** 6:20 7:2
15:3,20,21,24
53:18 73:14 77:1
96:4 98:6 101:24
101:24 102:3,12
**supported** 15:10
**supporter** 6:21
**supportive** 7:15
67:21 68:1
**supposed** 3:17 30:8
**suppressed** 62:15
79:11
**sure** 2:21 26:10
32:1 33:13,18
38:19 47:14 59:24
61:5,23 75:9
84:14 88:13 90:9
96:7 103:15
**surface** 70:6
**surprised** 82:17
**survivors** 4:19
103:9,15
**Susan** 104:4
**suspect** 61:24
**suspend** 37:22
**sustenance** 22:1
**sympathetic** 34:14
**syndrome** 43:4
71:21,23 73:2,20
**system** 16:16 35:17
88:24
**systematic** 37:7
**systematically** 37:1

———————
**T**
———————
**T** 107:7,7
**tackling** 82:19

**tag** 17:15
**take** 12:24 13:1,15
14:15 28:5 35:12
58:3,7 60:8,10
74:18 77:9 99:23
100:9,19
**taken** 14:11,12
20:3 52:22 65:9
65:10 107:12
**takes** 12:14
**talk** 2:18 3:3 27:12
38:18 43:4 44:3
55:19 97:5,6
**talked** 24:16 44:9
49:6 52:4 99:2
103:23
**talking** 24:12 25:7
51:3 89:18
**talks** 55:18 57:17
**tall** 101:16
**Tape** 1:1
**target** 49:8
**tarred** 73:19,21
**Tavani** 41:19,21
42:1,1,4,7,9,14,17
49:22 50:1,14
51:1,5,13 52:14
53:6,12 76:1,3,6,6
76:7,9,12,15 78:6
78:10,13 79:2,8
79:10,13,17 80:13
80:19 81:3,15
82:7 83:8,22 84:7
84:11 85:2,17,21
86:11,16,20,23
87:7
**tears** 83:20
**tell** 2:12 4:12 15:16
43:15 44:8 45:14
52:4 61:11 70:17
82:11 88:11 92:2
98:13 101:13
103:21
**telling** 21:13 42:15
45:22 83:16
**ten** 2:21 6:10 39:24
44:6 91:22 100:8
**tend** 10:3 44:23

**tends** 94:18
**term** 102:23
**terms** 34:21 52:14
52:19 63:3
**terrible** 7:19 9:2
11:7 15:12 46:6
81:16
**testified** 48:16
80:15 90:3 93:19
**testify** 23:19 42:3
88:3
**testifying** 28:1
**testimonies** 100:6
**testimony** 14:19
23:14 27:5 28:10
28:17,21 32:16,18
36:20 42:11 73:17
76:10 81:8,9
82:14,15 84:16
90:11 91:12 95:24
96:5,19 97:3
98:14 99:18,23
102:20
**testing** 83:24 84:3
**thank** 3:6,7,13,19
4:5,7,9,11,17
22:19 23:9,10,12
23:13 24:15 26:23
27:1,3 28:14,18
32:15,16 34:16,16
36:6,8,15,16,17
36:19,20 37:12
38:7 41:2,3,4,6,10
42:4,6,8 49:21,22
50:3,9 53:6,6,7,12
53:21,23 54:14,20
56:19 59:2,2
61:22 63:12,14,17
68:3,18,22 69:2
75:15,16,21 76:7
78:3 80:3 84:6,8
84:10 85:20 86:2
86:7 87:2,7,18
89:24 93:14 94:5
95:15 96:9 98:7,9
98:21,23 101:1,3
101:5,18,19,21
102:11,13,15

103:16 104:18
**theology** 5:15
**theory** 82:9
**therapist** 5:18
38:21 47:19 77:22
**therapists** 6:24
11:17 78:21
**therapy** 71:5
**thing** 13:17 38:14
47:4,9,10,24 48:1
49:20 50:18 52:7
52:24 58:23 74:20
77:10 80:15,20
89:11 99:16
100:16
**things** 5:15 7:4
32:17 34:17 44:7
46:7,10 47:6
48:20 49:4,15
51:14,18 61:24
70:10 77:15 78:7
79:6,22 81:10,21
82:22 88:3 99:17
**think** 12:7 20:23
25:15 26:15,16
32:18,19,21 33:3
33:17,18 34:22
35:7,17 37:3
38:13 47:2 51:13
52:1,15,20,22,24
57:14 59:15 60:14
62:3 67:21 71:10
71:19,20 73:11,14
74:12,13,20 75:9
75:10,12,14 80:7
82:3,7,20,21,24
83:9,18 84:4,12
84:16,19 85:3
86:8 90:23 91:22
95:6,22 98:5,24
99:1,14 100:16
102:18 103:4,18
103:23
**thinking** 11:20
102:16
**third** 56:12
**Thomas** 4:3,3,11
4:17,20 24:6,10

24:22 25:8,13,20
26:9,15,23 27:16
28:19 30:15 31:7
31:24 33:20 34:24
35:4,6,11,20
36:16 37:12 38:19
40:10,15 41:3
**thoroughly** 36:23
**thought** 12:16
32:19 35:1 40:19
46:9 62:16 71:2,3
81:10
**thousand** 40:9
90:15
**thousands** 11:22
18:13 22:21 37:17
49:7 52:17
**three** 44:5 50:16
55:1 56:24 90:19
**three-year-old** 6:12
**threshold** 67:3
**ticking** 75:4
**time** 5:23 6:17 7:13
14:18 25:7,11
31:10 34:19 36:4
38:13 41:17 43:20
54:21 68:21 70:22
74:23 75:15 78:14
78:15 97:14
101:13 102:8,8
**times** 7:12 12:16
80:10 81:11
**timing** 66:17
**tiny** 19:8 88:14,14
**tired** 23:7
**Title** 1:6
**today** 4:10,19
22:20 28:1,7,12
32:17 36:20 42:3
43:19,22 44:3,13
46:8 54:22 69:7
69:20 82:14 83:19
88:3 89:6 96:18
96:19 97:17 98:11
98:11,15 100:6,15
101:8,11,17
102:16,20,23
103:4,8,10 104:8

**told** 7:12 48:19
61:15 80:9 82:12
88:5
**Tom** 3:22,24
**tomorrow** 99:6
**tonight** 41:12
**Tony** 99:20
**Top** 49:2
**tormenters** 104:3
**tort** 26:4 59:1,11
64:9 66:15
**tortuous** 88:4
**torture** 88:10
**total** 12:13 31:21
**touching** 52:23,24
**toxic** 13:2
**toxicity** 12:11
**track** 17:15 29:17
**Tradition** 29:22
**tragedy** 7:19 22:24
**tragic** 2:18 6:4 7:16
10:22
**training** 69:4
**transcribed** 1:16
**transcript** 107:12
**transfer** 19:24
37:23
**trapped** 22:23
**trash** 102:24
**trauma** 6:16 16:10
22:14,23 47:1
48:6 76:22
**treat** 73:7
**treated** 71:2
**treatment** 37:21
51:15
**treatments** 48:9
**tree** 60:24
**tremendous** 45:16
**trepidation** 99:3
**trepidations** 95:12
**trial** 20:19 48:17
**tried** 18:14 32:6
**triggers** 77:13
**trimmed** 21:24
**troops** 82:21
**troublesome** 94:15
**true** 29:24 39:4

40:15 50:14 70:22
71:6,9,19,19,21
72:5 73:9 81:7
**truly** 39:16
**trust** 7:8 12:14
44:21 95:8
**truth** 21:13 71:2
72:20,20 73:8
80:14
**truths** 30:1
**try** 38:8 43:19,21
47:13,14 48:12
73:8,8 81:22 85:5
**trying** 34:12 35:22
38:15 43:9 44:6
61:18 67:5 72:18
93:22
**turn** 30:24 43:13
80:11
**turned** 79:22
**turning** 30:14
**twice** 79:14
**two** 11:15,15 18:10
35:18 51:6,7,9
56:24 57:6,9 58:5
63:3 66:19 70:8
70:10 73:14,16
75:10 80:4 88:2
89:5 90:1,6,7,9,23
91:1,6,6 96:3
97:23 99:6 106:21
**two-year** 90:4
**type** 59:1 82:19
92:6 93:4
**types** 4:24
**typically** 59:3

———————
**U**
**Uh-huh** 78:10
80:13
**ultimately** 59:12
66:6
**unclassified** 56:8
**undermined** 89:21
**underside** 9:2
**understand** 20:8
20:10,12,13 26:11
26:11 30:15 34:12
36:23 38:15 63:20

65:7 67:7 77:7
83:9 90:21 91:4
98:4
**understanding**
7:14 15:4 33:12
34:3,6,14 38:9
48:22 58:22 68:24
**understood** 80:17
88:13
**undone** 100:17
**unexplained** 43:4
**unfortunate** 2:6
18:15 45:20
**unfortunately**
51:21 59:21
**unidentified** 52:2
**United** 5:5 7:22,23
16:24 19:10 20:16
90:5 103:6
**university** 5:2 33:9
41:13 72:1
**unjustly** 91:12 93:9
**Unlawful** 56:11,12
**unprepared** 88:16
**unscrupulous**
18:13 36:1,2 85:4
85:14
**untrue** 18:6
**untruths** 30:1
**unusual** 77:19 83:2
**unwilling** 15:1,2
**upbringing** 51:18
51:19
**upside** 21:14
**urge** 30:23 31:19
**urged** 9:6
**use** 11:2 35:12
58:18 83:5 97:7
**usually** 36:9 73:22
**utterly** 21:3

———————
**V**
**vacation** 46:14
**vain** 9:21
**valid** 79:5
**validity** 84:2 89:21
**value** 71:1
**variety** 85:22 88:7
**vast** 14:24 39:14

40:20
**Vatican** 5:24
**Vaughn** 106:17
**vein** 66:24
**Venables** 80:2,3,14
  80:24 81:4 82:1,9
  83:15 84:6,9
  93:23 106:18,19
**verdict** 62:7
**version** 76:24
**versus** 64:19 93:1
**vetted** 96:8
**victim** 2:4,19 12:12
  31:6 43:13 46:18
  88:5,8 92:12 96:1
  97:18 102:3
**victims** 2:21 4:19
  6:19 7:5 8:1
  11:22,23,23 12:3
  12:9,12 13:1 15:1
  15:5,18 16:3
  17:12 18:2 19:13
  19:15 22:21 26:17
  28:23 29:2 31:13
  34:8 35:13 38:11
  38:17 39:10,10,18
  39:19,22 40:21
  42:12 48:2 49:8
  70:13 88:1,3
  90:19,24 92:8
  94:22 95:6 98:18
  99:11,15,20 100:4
  102:4,18,19 103:4
  103:9,14,20 104:7
**videotape** 78:15
**view** 36:8 91:8,9
  96:1
**violated** 6:14 12:13
  12:15
**violation** 10:15,22
  13:9
**Virginia** 4:9
**visitors** 28:16
**vivid** 72:3 89:21
**vociferous** 29:9
**voice** 102:3 104:2
**vote** 82:10 95:11
  101:9

**votes** 106:23
**vulnerable** 8:13,18
  9:15 10:12 17:6
  21:8 22:12

___

**W**

**wagon** 18:14
**wagons** 10:1
**wait** 26:17,18
**waiting** 52:10
**waived** 32:3 65:3
  65:15
**waiver** 67:1
**waiving** 65:6
**walk** 100:17 104:13
**wallowing** 22:13
**want** 2:12 3:4
  17:16 18:19 24:14
  25:24 28:11,21
  32:16,18 33:2,21
  35:13 36:8 43:22
  43:23 48:20,23
  53:24 62:1 70:11
  84:11,13 97:6
  98:2,2,10
**wanted** 33:16,24
  34:17 35:21 36:20
  37:10 38:8 46:9
  48:1 61:23 63:21
  77:17 88:13 89:17
  93:24
**wants** 74:7
**Washington** 5:24
**wasn't** 79:19 81:7
  85:22 97:2 102:23
**wasting** 36:4,5
**Watch** 17:24
**watchdog** 49:2
**watched** 78:15
**way** 7:15 26:7,16
  47:19 48:7 49:6
  61:7,7 66:24
  73:15 74:9 80:21
  81:20 91:3 99:19
**ways** 79:6,7
**weak** 49:9 78:22,23
**web** 102:1
**website** 53:20
**weed** 35:23

**weeded** 47:17
**week** 44:6 48:16
  93:19
**weeks** 11:16
**weighing** 99:3,3,6
**welcome** 4:8 42:7,9
  54:22 84:7
**welfare** 19:23
**went** 71:6
**weren't** 77:12
**we'll** 20:2 99:5,7
**we're** 3:15 23:7,7
  26:6 27:11 33:5
  49:14,15 50:17
  52:13 59:7 67:11
  82:17 89:9,10,11
  99:4 100:12,15
  101:24 103:7
**whatsoever** 30:6
**WHEREOF**
  107:14
**Whitwell** 48:15
**wife** 25:18 48:17
**WILCOX** 1:21
**willfully** 96:17
**Wilmington** 1:22
  107:16
**win** 84:13
**wind** 44:13
**window** 17:12
  18:11 88:19 89:16
  89:19,22 91:1
**wish** 78:14
**witness** 3:10,13
  7:21 14:10 41:8,9
  41:16 45:5 50:6
  53:10,11 63:15
  68:7,9 75:19,21
  86:5 87:4,6 94:3,5
  94:17 103:13
  107:14
**witnessed** 40:18
**witnesses** 28:7,7
  53:14 83:16 94:13
  95:24 98:15
**woefully** 100:17
**woman** 11:4 15:8
  39:1 42:21,22

44:10
**women** 7:9 15:11
  19:16 22:22 39:5
  44:2 45:14 48:19
  77:7
**women's** 44:8
**wonder** 70:1
**wondering** 82:2
**word** 58:18 77:7,9
**words** 32:4 52:20
  59:8
**work** 7:1 19:4 20:1
  48:11 53:5 70:4
  71:16 72:6,11
  74:5
**worked** 5:2 6:20
  20:3
**workers** 60:12
**working** 5:24
**works** 18:24
**world** 5:3
**worries** 27:10
**worst** 50:18
**wouldn't** 77:9
**wrap** 17:7 40:17
**wrap-up** 43:19
**wrist** 20:2
**written** 69:22
  73:16 74:9 76:24
**wrong** 12:18 50:17
  62:17 80:21 82:5
**wrongdoing** 21:9
**wrongly** 99:14
**www.wilfet.com**
  1:24

___

**Y**

**yeah** 3:1 14:22 25:8
  35:11 47:14 76:15
**year** 43:16 51:4
  57:1 90:8,14,20
  93:23
**years** 4:21,23 5:6
  6:9,10 7:1,6 10:16
  13:10 14:10 15:5
  16:9,9 17:20 22:6
  26:13,17,18 28:22
  31:9 39:21 40:18
  42:19 44:5 50:23

56:24,24 57:6,9
  66:19 69:17,19
  70:16 71:4,8,13
  71:13,18 75:6,10
  80:6,8 83:13 90:6
  90:8,9,23 91:1,6,6
  94:13,13 97:2,11
  102:7
**yield** 54:17
**young** 6:13 11:4,11
  15:18 17:24 39:7
  39:17,18 52:10
  96:2
**younger** 12:3 46:13

___

**Z**

**Zealand** 7:23

___

**$**

**$300,000** 58:10,21

___

**1**

**1** 107:11
**10** 1:6
**10,000** 40:14
**107** 107:11
**12** 12:4 17:20 26:13
  57:17 59:3,8
**12-year** 26:5
**13** 11:5,15
**13th** 4:22
**13-year-old** 83:3
**1330** 1:22
**14** 63:21 74:24
**1412** 24:13
**144th** 104:16
**15** 44:6 60:15
**15,000** 100:9
**150** 39:22
**150,000** 100:3
**16** 55:7 62:9 97:11
**16th** 29:20
**17** 62:6,10 97:11
  102:7
**170-RPR** 107:21
**18** 40:7 55:4,5,5,6
  55:10,12,13 75:3
**19** 11:14 62:6
  102:17 106:21

**1970** 4:21
**1980s** 102:17
**19801** 1:22
**1983** 5:23
**1984** 6:6 20:6
**1993** 76:24 102:19
**1998** 69:15

**2**

**2,000** 43:16
**20** 2:21 5:6 6:9
   14:10 15:5 22:6
   28:22 42:18 94:12
**20-year-old** 83:2
**2002** 9:1 13:10
**2003** 5:11
**2006** 29:20
**2007** 1:15 107:15
**2009** 107:22
**22** 31:3
**23** 7:5
**24** 40:18
**24/7** 49:3
**25** 10:16
**29** 1:6 104:21
   106:21,22

**3**

**3rd** 107:15
**30** 26:17,18 83:13
   94:13
**302** 1:23
**31** 107:22

**4**

**4** 1:15 46:23 76:19
   76:23 77:3
**40** 12:5
**450** 93:24 96:9

**5**

**500** 39:20
**550** 39:20

**6**

**60s** 15:12
**655-0477** 1:23

**7**

**70** 97:18
**70s** 2:10 15:11,12
**75** 18:2 38:10 39:10
   39:22

**8**

**80** 18:2 19:6 38:10
   39:10 40:9 97:18
**80s** 2:10 18:3
**80,000** 40:8
**800,000** 40:6
**89** 15:8

**9**

**90s** 103:1
**92** 19:6
**92-year-old** 15:8



In The Matter Of:

# House Judiciary Committee of Delaware

---

Audiotaped Hearing - Act to amend Title 10 of the Delaware Code

Senate Bill 29

May 29, 2007

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Tape Recorded Hearing

Before the House Judiciary Committee of Delaware

IN RE:  SENATE BILL 29:  An Act to amend Title 10 of the
Delaware Code by removing the statute of limitations for
civil suits relating to child sexual abuse and adding
related provisions regarding such suits.

The following is an audiotaped hearing before
the House Judiciary Committee held on May 29, 2007,
transcribed by Elaine G. Parrish, RPR, CRR.

WILCOX & FETZER

1330 King Street - Wilmington, Delaware  19801

(302) 655-0477

www.wilfet.com

8220dda6-de90-4f5f-8500-b27425213391

Page 2

1     REPRESENTATIVE VALIHURA: Good afternoon,
2 everyone. We're going to call the Judiciary Committee
3 to order. I want to thank everyone for coming out on
4 this beautiful day here in Delaware, especially after
5 the wonderful holiday weekend, and apparently, as I have
6 heard, our beach communities did very well over the
7 weekend, so thank the economy for that.
8     I am going to start the meeting off by
9 introducing the members of the committee. I'll have
10 them introduce themselves and I'll start over here to my
11 left.
12     REPRESENTATIVE MARSHALL: Melanie Marshall,
13 5th District.
14     REPRESENTATIVE HUDSON: State
15 Representative Deborah Hudson.
16     REPRESENTATIVE MITCHELL: State
17 Representative Larry Mitchell from the 13th.
18     REPRESENTATIVE JOHNSON: State
19 Representative James Johnson from the 16th.
20     REPRESENTATIVE LAVELLE: Representative
21 Greg Lavelle.
22     REPRESENTATIVE STONE: State Representative
23 Donna Stone.
24     REPRESENTATIVE VALIHURA: And I am Bob

Page 3

1 Valihura, State Representative, Chair of this committee.
2 Nancy Wagner, also a member of the committee, is -- was
3 here. She wanted you to make sure that you all know
4 that she is paying attention. However, unfortunately
5 for her, her schedule requires her to be down in the
6 Joint Finance Committee meeting which is going on at the
7 same time, so she can not be here with us this
8 afternoon.
9     I do want folks to understand before we get
10 started with the presentation that this particular Bill
11 is taking up a lot of our time in terms of what I would
12 call discussions among members of the General Assembly.
13 It is -- it is being discussed in personal time. It is
14 being discussed during business time, and it is being
15 really vetted among all of our colleagues. It has taken
16 on a life of its own I might say. But it is one of the
17 most important Bills that we will see this year and I
18 think taking the time that we are today to continue on
19 with the discussion is very helpful for all of us on the
20 committee, as well as ultimately for the members who
21 aren't on this committee.
22     At this time I want to open it up for
23 members of the committee if anyone has any comments they
24 might want to make before we start with the

Page 4

1 presentations.
2     Representative Hudson, any questions or
3 comments at this time? No. Okay. I have a request of
4 a good friend who wanted to go first, and so I will
5 invite her up to the podium. Pat Michael.
6     MS. PAT MICHAEL: Thank you very much. I
7 appreciate it. I do have to go also down to the Joint
8 Finance Committee that's why I asked to go first.
9     My name is Pat Michael and I am the
10 Director of the Developmental Disabilities Council and I
11 thank you for the opportunity to address here today. I
12 am here in support of Bill Number 29 as a Roman
13 Catholic, as a survivor of childhood sexual assault and
14 as the Director of the Development Disabilities Council.
15 Those of you who have heard me speak a few years ago in
16 support of House Bill 65 and 66 realize that people with
17 disabilities are four times more likely to be victims of
18 crimes than the general population and more so for
19 sexual crimes.
20     Recently a child in special education with
21 a disability was sexually victimized by a staff person
22 at his school in Delaware. This is a person whose duty
23 it is to be responsible for this child and to protect
24 this child and all children in the care of the school.

Page 5

1 This is a common demonstration for what happens to
2 people with disabilities throughout their lives. Often
3 they are victimized repeatedly over time because they're
4 vulnerable, they often cannot tell when the crimes
5 occurs because of their disability, and they are often
6 not believed when they do tell.
7     We must hold perpetrators accountable, both
8 criminally and civilly, no matter when these crimes
9 occur. People must be afforded the opportunity to find
10 justice when they're able to speak about crimes. You
11 all know me and my abilities to speak for others.
12     I was in my 30s before I was able to talk
13 about what happened to me when I was 12. Think about
14 someone who is much less capable than I to speak for him
15 or herself. How can we put a limit on that time?
16 Please vote yes for Senate Bill Number 29 today so that
17 we can all find justice.
18     REPRESENTATIVE VALIHURA: Thank you, Pat.
19 At this time I'd ask Dr. Tom Connelly to come forward,
20 please. Dr. Connelly, welcome.
21     DR. TOM CONNELLY: Thank you,
22 Representative Valihura. I am here today to speak for
23 the most valuable treasure that we have in the State of
24 Delaware. The treasure is more precious than money or

2 (Pages 2 to 5)

Page 6

1   land or any measure of institutional wealth. This
2   priceless treasure is our children. They don't have a
3   vote, nor do they make decisions that affect their
4   lives. They depend on us to protect them. We adults
5   have failed our children.
6         Thousands of lives have been destroyed
7   because of a tragically flawed law that is still on the
8   books as we sit here in this chamber. This antiquated
9   law only allows a child two years to come forward and
10  report sexual assault by an adult. This legal loophole
11  has allowed child sexual predators to get away with
12  their unspeakable crimes.
13        Three weeks ago we heard heart-wrenching
14  testimony from victims whose lives have been forever
15  altered by these crimes. Nelson Lamb testified about
16  four Cub Scouts, including his son, Barry, who were
17  abused by their parish priest, Father Edward Dudzinski.
18  He told us that two of the boys committed suicide, one
19  died of a drug overdose, and Barry, Barry is still
20  dealing with substance abuse and psychological problems
21  because of the abuse by Dudzinski. Nelson Lamb has had
22  enough.
23        Jean Lange talked about being sexually
24  abused by her father from the age of seven until she was

Page 7

1   15. She told us how his acts divided and destroyed her
2   family. Jean Lange has had enough.
3         Rob Quill described that summer day when he
4   was in the seventh grade, that he along with four other
5   boys were taken to an overnight to the beach by their
6   parish priest, Father Francis DeLuca, a night when his
7   childhood innocence was destroyed by this vicious
8   predator. He described how he has suffered since that
9   day and he has to give up his career as a lawyer in
10  Federal Court of Appeals because of the horrible
11  nightmare of child abuse that has never gone away. The
12  memory only intensified as he got older and now he's on
13  disability with post-traumatic stress disorder.
14        In the meantime, in the meantime, DeLuca
15  has had a 50-year career of molesting children until he
16  was finally caught by police in Syracuse, New York,
17  where he admitted his guilt. He was 78 years old at
18  that time of his arrest and living on a full pension
19  from the Diocese of Wilmington.
20        Rob Quill has had enough.
21        Christine Geisler told of horrific abuse
22  she suffered as a small child at the hands of a
23  neighbor. Sadly, so many of her friends have also been
24  sexually abused that the number could field a softball

Page 8

1   team. Christine Geisler has had enough.
2         One of the largest coalitions to support a
3   Bill in recent history, including law enforcement
4   officers, members of the medical community, churches,
5   the president of the Rabbinical Society of Delaware, 36
6   of Delaware's leading nonprofit groups, business
7   leaders, three former governors, the AFL-CIO, Common
8   Cause, former FBI Director Judge Louie Freeh and many
9   others all signed to support this Bill as written
10  without amendments. This large and diverse coalition to
11  give Delaware's child sex abuse victims a voice has had
12  enough.
13        The members of the Delaware Senate had a
14  long and emotional debate and Senator John Still did his
15  due diligence in making sure that in his mind this is a
16  fair Bill. And then courageously told the day as a six
17  year old when he was sexually molested by a neighbor.
18  His words of forgiven but never forgotten, will always
19  resonate in my mind. Senator John Still and the members
20  of the Senate have had enough.
21        The two powerful institutions that oppose
22  this Bill are the Catholic Church and the insurance
23  industry. The church, my church, wants to hide their
24  secrets. Just as in Boston under the infamous Cardinal

Page 9

1   Law who covered up for and transferred predator priests
2   from parish to parish to parish while they
3   continued to abuse hundreds of children. The church
4   leaders in Delaware over many years have done exactly
5   the same thing.
6         You heard testimony three weeks ago by
7   Catholic priests who expressed concern that if this
8   civil law is enacted the Diocese might have to close
9   schools and churches. To date the thousands of claims
10  having been settled throughout the United States not one
11  church, school or hospital has been closed, not one.
12  Not because of civil windows, not because of sex abuse
13  settlements.
14        The reason this did not happen was the
15  church is heavily insured and holds vast amounts of
16  commercial real estate and the average settlement
17  awarded to a victim is only a hundred thousand dollars.
18  Everybody talks about 41 million dollars. That was just
19  the jury's sense of outrage at what happened to
20  Commander Whitwell. When they negotiate back and forth
21  between the lawyers the average settlement is $100,000.
22        Remember, the majority of priests are not
23  child sex predators. These evil priests only represent
24  seven percent of the total of all predators. The irony

3 (Pages 6 to 9)

8220dda6-de90-4f5f-8500-b27425213391

Page 10

1  is that the net effect of the church trying to stop and
2  weaken bills like Senate Bill 29 is to allow the other
3  predators to continue in their crimes with impunity.
4          The second powerful group that is working
5  hard with their teams of lobbyists to defeat this Bill
6  is the insurance industry. The insurance companies
7  collected premiums for liability insurance for decades
8  and now they would like to be excluded from a Child
9  Victims Act. Their argument is that when they wrote
10 liability insurance many years ago it was based on the
11 two-year statute of limitations. They think it is
12 unfair to change the rules of the game. I don't know
13 the answer to the fairness question. However, it is not
14 within the scope of this Bill. This issue must be
15 negotiated and settled between the insured institutions
16 and the insurance companies.
17         The third group you'll hear from today are
18 also victims in a certain sense. They are here because
19 of the scare tactics of the lobbyists for the church and
20 the insurance industry. These groups have nothing to
21 fear from this Bill. Senate Bill 29 provides that all
22 institutions that have been guilty of gross negligence
23 in their duty to protecting the children under their
24 care can be sued. Gross negligence is a very high legal

Page 11

1  standard to prove. In California the Bill is only
2  simple negligence.
3          Under gross negligence if it can be proved
4  that a nonprofit is guilty of placing known sex
5  predators in charge of children, if they knowingly
6  covered up child sex abuse by these predators, then and
7  only then can they be sued under the civil window. I
8  seriously doubt that any of the nonprofits in Delaware
9  are guilty of these crimes. However, if they are, they
10 deserve to be sued and put out of business.
11         Also, the Attorney General's office has
12 recently ruled that all institutions, including the
13 State of Delaware, are included under the one time,
14 two-year window. No one institution is excluded if they
15 have been guilty of gross negligence.
16         Finally, to the members of the 144th
17 General Assembly, this is your chance to help children.
18 This is your chance to give the victims of childhood sex
19 abuse their civil rights. This Bill is fair and simple
20 and should be passed as written. The 150,000
21 Delawareans whose lives have been ruined by these
22 reprehensible criminals have had enough. I would hope
23 the members of Delaware's House of Representatives also
24 have had enough.

Page 12

1          Pass this act so we can identify through
2  the civil window these unindicted criminals. Don't let
3  another year go by without bringing them to justice.
4  The place and time is here and now. We must send a
5  message. The message is that the State of Delaware will
6  no longer tolerate these horrible crimes. The message
7  is that we demand justice. The message is that we will
8  not prioritize the reputation of the church. We will
9  not prioritize the money of insurance companies over the
10 safety and welfare of Delaware's innocent children.
11 Thank you, Mr. Chairman.
12         REPRESENTATIVE VALIHURA: Thank you.
13 Members of the committee have any input? Seeing none,
14 thank you very much.
15         Let me just remind everyone of what I think
16 are the ground rules for today and that is that those
17 folks who signed up today will be limited to three
18 minutes. Those folks who were on the list that we
19 didn't get to last time will have a little bit more
20 freedom that we just have saw on our first committee
21 hearing, as well as -- Orso organization is five
22 minutes, that's correct.
23         At this point Sister Maureen Paul Turlish.
24         SISTER MAUREEN TURLISH:  Representative

Page 13

1  Hudson, members of the House Judiciary Committee, I am
2  Sister Maureen Paul Turlish, formerly a fine arts
3  teacher at St. Elizabeth's High School in Wilmington,
4  Delaware. I have been a sister of Notre Dame de Namur
5  for almost 50 years, and I have been a member of the
6  Diocese of Wilmington since 1983. In addition to the
7  Diocese of Wilmington I have taught and chaired
8  departments at Archbishop Wood and Lansdale Catholic
9  High Schools in the Archdiocese of Philadelphia. I have
10 also taught in the Archdiocese of Washington, D.C. and
11 Baltimore, Maryland.
12         I am here today representing neither the
13 Diocese of Wilmington nor my religious community. I am
14 not here today as a paid lobbyist but as an individual
15 resident of Delaware speaking for herself and a victims
16 advocate and a member of the coalition Child Victims
17 Voice who supports the full passage of Senate Bill 29
18 without amendments. We have all become aware in the
19 last five years, particularly in the light of the
20 Philadelphia Grand Jury report of the ineffectiveness of
21 most state's laws protecting our children. It is no
22 different in Delaware. But I am here today to say that
23 we can make a difference by the passage of Senate Bill
24 29 and even set an example for other states.

4 (Pages 10 to 13)

8220dda6-de90-4f5f-8500-b27425213391

Page 14

1    Senate Bill 29 covers everyone and
2  discriminates against no one. It is definitely not
3  anti-Catholic and it is not Catholic bashing. It holds
4  everyone's feet to the fire, as well it should. Having
5  said that, however, what the ongoing sexual abuse
6  scandal in the Catholic Church has pointed out to us is
7  the absolute necessity of upgrading our laws so that our
8  children will be adequately protected. If the Bishops,
9  for example, had followed even minimally the
10  requirements of the laws in place at the times these
11  crimes against children were perpetrated they would not
12  have had to take extraordinary precautions later to
13  insure that sexual misconduct did not reoccur. The
14  remedy should have been to rid the body of Christ, the
15  church, of this cancer. To the shame of all Catholics
16  this was not done because that was not the policy or the
17  practice in place at the time.
18    Clearly, no institution can be trusted to
19  police itself. Sadly, we have become aware of this in
20  regard to other large religious denominations, including
21  the Baptists, Episcopalian, Jewish, Latter Day Saints,
22  along with secular institutions and smaller groups, both
23  religious and secular. But the responsibility to
24  protect the common good belongs to the State. The

Page 15

1  primary mission of churches, no matter the denomination,
2  is to take care of the spiritual well being of its
3  people and to protect them from harm. Leadership fails
4  when it abandons its children in a misguided attempt to
5  prevent scandal.
6    You will hear that it is not fair to bring
7  up abuses that happened ten, 20, 30 or even 40 or more
8  years ago. But is it fair that individuals who have
9  suffered over so many years will even now receive no
10  justice? In our country there should be provisions in
11  the law for justice, especially when egregious crimes
12  have been committed against the young, when the law
13  itself has been circumvented by enablers who have
14  conspired to hide crimes of such magnitude and
15  depravity.
16    In advocating for changes in the civil
17  statute of limitations Bishop Thomas Gumbleton of
18  Detroit endorsed legislation in Ohio that would open a
19  window for sexual abuse victims to file lawsuits even if
20  the abuse took place decades ago. So let us be fair to
21  them, the victims. The full passage of Senate Bill 29
22  without amendment will accomplish this. I do not
23  believe that removing the time limits on lawsuits will
24  put an extraordinary burden on any institution.

Page 16

1    You will hear that it is about money. It
2  cannot be about money when in major cities across the
3  country hundreds of thousands of dollars are spent each
4  year to retain law firms and public relation firms, to
5  prevent records from becoming public, and to lobby to
6  put a kinder, gentler face on hardball legal
7  maneuvering. It cannot be about money when additional
8  lobbyists are hired at hundreds of dollars an hour to
9  oppose necessary legislation. Even if it were about the
10  money, is there a price one can put on the violation of
11  a child's soul and body?
12    It is about the records, like those records
13  made public in Boston and the records now being forcibly
14  made public in California because they have successfully
15  passed window legislation. In California victims of
16  childhood sexual abuse by parents, doctors, teachers and
17  coaches, in addition to church ministers, are finally
18  having their day of justice in a court of law. The full
19  passage of Senate Bill 29 without amendment will
20  accomplish this.
21    It is about the records when institutions
22  declare bankruptcy on the eve of trial dates as has been
23  the case with the four Diocese declaring Chapter 11, not
24  Chapter 7, bankruptcy. The Diocese of Portland,

Page 17

1  Spokane, Tucson and Davenport never said they were
2  running out of money. No, in these cases the reasons
3  for declaring Chapter 11 bankruptcy was more to avoid
4  opening church files on the eve of going to trial than
5  anything else. Moreover, in settling legislation -- in
6  settling litigation Bishops have been very careful to
7  state clearly that no churches, parishes, schools or
8  programs were shuttered, suppressed, closed or cut back
9  because of settlements with victims of childhood sexual
10  abuse.
11    One of the most important sections of
12  Senate Bill 29 is the window legislation for bringing
13  forward suits involving victims who were abused many
14  years ago. It will force all institutions, religious
15  and secular, to make public the paper trail, the records
16  of predators who were known, protected and enabled in
17  their crimes against children, their crimes against
18  humanity because, make no mistake about it, such acts,
19  such crimes are in violation of every human rights
20  convention and document I have ever read.
21    In the past five years I have talked with
22  scores of individuals who were sexually abused as
23  children and it is heart wrenching. In fact, in this
24  very building last year I heard one of my former ninth

5 (Pages 14 to 17)

8220dda6-de90-4f5f-8500-b27425213391

Page 18

1  grade students speak about the abuse she suffered for
2  years at the hands of her father.  I did not know in
3  2002 when the church's sexual abuse problems exploded in
4  the Archdiocese of Boston that this same student had
5  been abused not just in the ninth grade but throughout
6  her high school career, again by her father.  Neither
7  did I know that I knew any sexually abusive priests.  I
8  know now that I did.  The priest brother of a friend,
9  Sister friend of mine, was not only an abuser but was
10 part of a pedophile ring of abusers in another state.
11 One of the priests in that ring, only because he moved
12 out of state, was prosecuted under tolling laws, found
13 guilty and sentenced to 20 years in prison.
14        Yes, abuse starts in the home with the
15 family, but it doesn't stop there.  No country,
16 government, corporation, organization, no school and no
17 church is immune.  The reality of past sexual
18 exploitation has to be recognized, accepted and dealt
19 with.  It is no less real, no less degrading, and no
20 less harmful in long-term effect than the present
21 trafficking in women and children and the international
22 sex trade as discussed by Archbishop Celestino Migliore,
23 Apostolic Nuncio of the Holy State, Permanent Observer
24 Mission to the United Nations, in a March 2nd, 2007

Page 19

1  address to the UN Economic and Social Council's 51st
2  session on the status of women.
3        It is unconscionable that in the United
4  States and in countries around the world the church is
5  aggressively fighting against abuse victims and going to
6  court in a misguided attempt to protect the church's
7  reputation and avoid scandal rather than being proactive
8  in its concern for the victims.  This is a right to life
9  issue.  Justice, like charity, also begins at home, but
10 it doesn't end there either.  The institutional church
11 has a grave moral responsibility regarding the welfare
12 of all God's children and it must take responsibility
13 regardless of when the abuse took place.
14        The Roman Catholic Church was one of the
15 early signatories to the United Nations convention on
16 the rights of the child in 1990.  However, as noted in a
17 shadow report on implementation authorized by the United
18 Nations in 2002, the Holy See has not submitted periodic
19 compliance reports beyond its initial report in 1994
20 making it accountable to the world community for the
21 implementation of the convention.  And, as far as I can
22 determine from NGOs, follow-up reporting in 1997 has not
23 yet been submitted ten years after being required.
24 Indeed, no periodic reports have been submitted up to

Page 20

1  the present time.  This is troubling at a time when
2  peoples of goodwill are deeply concerned about
3  protecting children, as well as women, immigrants,
4  trafficked people and indigenous peoples.
5        The Diocese of Wilmington like most, but
6  not all in the United States, has followed the mandates
7  of the United States Conference of Catholic Bishops in
8  establishing Diocesan programs which include criminal
9  background checks on all church ministers, teachers,
10 volunteers and individuals.  Training workshops and
11 courses for all, including student programs, have been
12 part of the Diocesan programs for many years.  In the
13 Diocese of Wilmington and across the United States there
14 are now abuse coordinators and review boards, and this
15 is very commendable, but it needs to be remembered that
16 this was done only as a result of the church's mandate
17 in 2002 and it will be some time before the
18 effectiveness of these programs can be known.
19        Baltimore's Cardinal Keeler described
20 childhood sexual abuse as murder of the soul and it
21 truly is.  The sins, the crimes of the past, cry out for
22 justice, and it is incumbent on you, our legislators,
23 that justice is rendered.  The full passage of Senate
24 Bill 29 without amendment will accomplish this.  Thank

Page 21

1  you and God bless you.
2        REPRESENTATIVE VALIHURA:  Thank you,
3  Sister.  Any questions for Sister?  Thank you so much
4  for your testimony.  It's very helpful.  Thanks.  I want
5  to recognize John Kowalko, State Representative who has
6  joined us today.  Thank you very much for being here,
7  John.  And Senator McBride was here earlier and
8  obviously quite interested in the outcome of this
9  legislation.
10        At this time, George Krupanski.  And after
11 George it will be Tony Flynn.
12        MR. GEORGE KRUPANSKI:  Mr. Chairman,
13 members of the House Judiciary Committee, thank you for
14 the opportunity to speak with you today.  My name is
15 George Krupanski.  I serve as president and CEO of the
16 Boys and Girls Clubs of Delaware, representing tens of
17 thousands of Delaware's youth.
18        At the outset let me say that I support the
19 goal of Senate Bill 29.  As someone who has dedicated
20 his life to advancing opportunities for our youth,
21 inspiring their dreams and steering them from a life of
22 crime and drugs, a life as productive and successful
23 members of our community, I am repulsed by the notion of
24 an adult sexually abusing a minor, absolutely repulsed,

6 (Pages 18 to 21)

8220dda6-de90-4f5f-8500-b27425213391

Page 22

1  and believe that offenders should be held accountable.
2       My concern focuses on the agencies.  I urge
3  you to consider that the legislation as written might
4  devastate nonprofits in our State.  We simply do not
5  have records of our coaches and volunteers going back
6  30, 40 and 50 years ago, in our case back to 1931.  If
7  someone came forward tomorrow claiming they were
8  sexually assaulted by a club coach 30 years ago I'd have
9  no way, no way of digging out those records, no
10 insurance coverage to pay, no way of disproving gross
11 negligence or recklessness or any other legal
12 terminology put into that legislation.  As written the
13 legislation could honestly bankrupt us and maybe other
14 smaller nonprofits in the State.
15      I am asking for a bit of reasonableness.
16 There should be amendments to the Bill that limit its
17 retroactivity as it relates to the agency or past
18 incidents and require actual knowledge on the part of
19 the nonprofit.  I urge you to consider such, such that
20 makes it clear.  Our legal counsel believes it is not.
21 Please do not jeopardize the tremendous work we do on
22 behalf of the youth in our State.
23      I'm not a lawyer but I am on the front
24 lines of trying to keep our kids out of trouble and in

Page 23

1  mentoring relationships with counselors and coaches who
2  are good people that would never cross that line.
3  Please are consider carefully the impact of the
4  legislation and the impact it could have in the name of
5  protecting our kids.  I welcome the opportunity to work
6  with you to make this legislation work as intended to
7  truly help those who have been victimized by adults they
8  trusted.  Thank you.
9       REPRESENTATIVE VALIHURA:  Thank you,
10 Mr. Krupanski.  I am going to take chairman's
11 prerogative and ask the first question and then I'll
12 turn it over to my colleagues.  Mr. Krupanski, do you --
13 does the Boys and Girls Club receive money from the
14 Joint Finance Committee?
15      MR. GEORGE KRUPANSKI:  Yes.
16      REPRESENTATIVE VALIHURA:  And how much is
17 that, sir?  Just in ballpark, I don't need an exact.
18      MR. GEORGE KRUPANSKI:  Probably about
19 20,000.
20      REPRESENTATIVE VALIHURA:  $20,000.  Okay.
21 Thank you.  Senator.
22      SENATOR PETERSON:  You said that you think
23 the Bill should have an amendment that would show that
24 the organization had actual knowledge of the abuse.  Do

Page 24

1  you know what the definition of gross negligence is?
2       MR. GEORGE KRUPANSKI:  I only know what our
3  attorneys told us.
4       SENATOR PETERSON:  And what did your
5  attorneys tell you?
6       MR. GEORGE KRUPANSKI:  They told us that
7  this might make agencies like ours liable.
8       SENATOR PETERSON:  Okay.  The definition of
9  gross negligence is the intentional failure, intentional
10 failure, to perform a manifest duty in reckless
11 disregard of the consequences as affecting the life or
12 property of another.  Given that definition, does that
13 take care of your concern about actual knowledge?
14      MR. GEORGE KRUPANSKI:  I'm not sure I know
15 the answer to that.  I'm not trying to dodge a question.
16 Let me be clear.  Agencies that were aware of this type
17 of incident, swept it under the rug or purposely looked
18 the other way, ought to be shut down.  People that were
19 involved in this type of crime need to be locked up and
20 the key thrown away.  Our attorney says that when we try
21 to flip back to our records those records won't be
22 there.  We don't go back 40 or 50 years.
23      SENATOR PETERSON:  That brings me to my
24 second point.  Do you realize that in a tort claim the

Page 25

1  burden of proof is on the accuser to prove that it
2  happened, and not on the accused to prove that it
3  didn't?
4       MR. GEORGE KRUPANSKI:  Yes, I realize that.
5       SENATOR PETERSON:  So if your records are
6  gone, wouldn't that make it a whole lot harder for the
7  accuser to get records that no longer exist?
8       MR. GEORGE KRUPANSKI:  Logically it would.
9  And, as I understand, again, from our attorneys - which
10 I understand attorney's role, the very nature of their
11 role is to take different points of view - has advised
12 us that this could make us liable.
13      SENATOR PETERSON:  Well, you just said that
14 it should make you liable if you knew it was going on
15 and didn't do anything about it.
16      MR. GEORGE KRUPANSKI:  Absolutely.
17      SENATOR PETERSON:  So you agree you should
18 be liable in that case?
19      MR. GEORGE KRUPANSKI:  If someone knew that
20 it was going on and the agency was aware, absolutely
21 liable.
22      SENATOR PETERSON:  Okay.
23      MR. GEORGE KRUPANSKI:  Shut them up and
24 close them down.

7 (Pages 22 to 25)

8220dda6-de90-4f5f-8500-b27425213391

Page 26

1    SENATOR PETERSON: Okay. Thank you.
2    REPRESENTATIVE VALIHURA: Representative
3 Hudson.
4    REPRESENTATIVE HUDSON: Thank you. In your
5 testimony I think you said something about having
6 insurance. I think you said you do not?
7    MR. GEORGE KRUPANSKI: We would not have
8 insurance for sexual abuse going back 30, 40, 50 years
9 ago. At that point in time insurance companies did not
10 cover that.
11    REPRESENTATIVE HUDSON: But you have it
12 now?
13    MR. GEORGE KRUPANSKI: Yes.
14    REPRESENTATIVE HUDSON: And how long have
15 you had it?
16    MR. GEORGE KRUPANSKI: About the last 20
17 years.
18    REPRESENTATIVE HUDSON: Well, that's pretty
19 good. I think you're covered for a 20-year period.
20 That's excellent. Were you an original sponsor in the
21 Child Victims Act, organization --
22    MR. GEORGE KRUPANSKI: We supported it.
23    REPRESENTATIVE HUDSON: And you withdrew
24 because?

Page 27

1    MR. GEORGE KRUPANSKI: Because of the
2 advise of our attorneys saying be careful of what this
3 could open us up to.
4    REPRESENTATIVE HUDSON: Right. Well, I
5 always think that it is important to read legislation,
6 but I hope that you can understand what we're saying?
7    MR. GEORGE KRUPANSKI: Absolutely.
8    REPRESENTATIVE HUDSON: You would
9 reconsider support for this. Thank very much for
10 coming.
11    REPRESENTATIVE VALIHURA: And
12 Mr. Krupanski, you would support the legislation
13 obviously if it excluded nonprofits in the look-back
14 period, is that correct?
15    MR. GEORGE KRUPANSKI: Actually, I think
16 we'd support it if there was some firm look-back period,
17 30, 40, 50 years even, but 75 years in our case that
18 makes it difficult.
19    REPRESENTATIVE VALIHURA: And your attorney
20 is adamant about the liability that you may be exposed
21 to under this -- first of all, your attorney read the
22 legislation?
23    MR. GEORGE KRUPANSKI: Yes.
24    REPRESENTATIVE VALIHURA: Yes. And it is

Page 28

1 his or her opinion that you are exposed if something
2 comes up in your past and you don't have any records on
3 that?
4    MR. GEORGE KRUPANSKI: They believe that
5 the way the legislation is written - I can't remember
6 the actual words - but provides enough questionable
7 interpretation and just simply needs to be clearer.
8    REPRESENTATIVE VALIHURA: Thank you very
9 much. I am going to try -- well, Senator.
10    SENATOR PETERSON: Mr. Krupanski, is your
11 attorney here today so that they might explain what the
12 ambiguity is here?
13    MR. GEORGE KRUPANSKI: No, they're not.
14 They were here last month - or last week and (inaudible
15 to reporter).
16    REPRESENTATIVE VALIHURA: Representative
17 Marshall.
18    REPRESENTATIVE MARSHALL: This is a
19 question I'm not sure for you, Mr. Krupanski, or perhaps
20 for the many attorneys that might be in the audience and
21 it focuses on the actual definition of gross negligence,
22 and Senator Peterson and I have had many conversations
23 about this, I have talked with other attorneys about
24 this, and part of where I'm getting hung up on is I hear

Page 29

1 what you're saying about that you think there should be
2 liability in the event that there was actual knowledge,
3 like let's say the former president was told, you know,
4 the coaches -- coach X, Y and Z is abusing, saw it
5 happen with their own eyes, whatever it might be, that
6 they had actual knowledge and they just let it go.
7 Okay, you're saying culpability, liability in that
8 instance.
9    Gross negligence, and this is the part
10 that, again, I'm trying to focus in on, I guess is your
11 concern then that the level right underneath of that
12 would be, for example, if there were rumors out there
13 that a coach was maybe inappropriately touching some of
14 the children and that made its way up to the president
15 and then the president did nothing about it. So
16 technically the president didn't have any actual
17 knowledge that there was abuse going on, there was just
18 maybe some rumors going on out there, and of course
19 since it happened 50 or 70 years ago the president is
20 probably not even around to testify, is that the type of
21 incident that you're concerned about might -- might
22 happen that the law -- that would generate the lawsuit?
23    MR. GEORGE KRUPANSKI: Yeah, I'm not an
24 attorney, so I can't really describe the intent of what

8 (Pages 26 to 29)

8220dda6-de90-4f5f-8500-b27425213391

Page 30

1 gross negligence is. But in our case where we would
2 have no records of volunteers or coaches going back more
3 than 30 years ago, or situations where individuals have
4 come and gone -- our Board has completely turned over.
5 Our staff has completely turned over. I have got
6 nowhere to go to try to gather that information. And to
7 be very clear, I will be very adamant and work very hard
8 to find that information and dig that information up.
9 It's not a matter of saying oh, we just don't have it
10 because I'm going to take this very, very seriously, and
11 if there is just a thread out there that can help prove
12 that we were negligent if that were the case or not
13 negligent I am going to find it. But if it doesn't
14 exist it's going to be very, very difficult to do.
15        REPRESENTATIVE MARSHALL: Okay. That
16 definitely helps me. I'll just try to just restate once
17 more, not for you but, again, for perhaps just the
18 audience of attorneys who might be here who might be
19 able to help clarify. Again, my understanding of gross
20 negligence is not as high as actual knowledge. So that
21 an organization such as yourself, if this law passes and
22 gross negligence were the standard, you would be able to
23 be found culpable, liable, if your president maybe heard
24 a rumor of something going on, did not have actual

Page 31

1 knowledge, but then kind of like an ostrich sticks its
2 head in the sand, just kind of stuck his head in the
3 sand and said well, I know this rumor is out there but I
4 am going to stick my head in the sand and not ask any
5 questions so that I don't find out anything more about
6 it; if that's what gross negligence is then I would just
7 like that clarification if anyone can give that so that
8 I have a full understanding of what instances we might
9 be holding an institution such as yours liable for.
10 Thank you.
11        REPRESENTATIVE VALIHURA: Yes, Senator.
12        SENATOR PETERSON: I just have one more
13 question. You said in the last 20 years you have had
14 insurance cover these kinds of cases. Prior to that did
15 you have general liability coverage?
16        MR. GEORGE KRUPANSKI: Yes.
17        SENATOR PETERSON: And has somebody told
18 you that that would not cover?
19        MR. GEORGE KRUPANSKI: I had -- not in this
20 particular case as it relates to Delaware. But prior to
21 then I have been working in Boys and Girls Club work for
22 34 years, had an opportunity to work in the regional
23 office of Boys and Girls Club of America national office
24 and with Boys and Girls Clubs around the country, I do

Page 32

1 know that there were clubs way back when, 25, 30, 40
2 years ago that when an incident came up their insurance
3 companies did not cover them even though they had
4 liability insurance.
5        SENATOR PETERSON: Is that because
6 liability policies say if you commit a criminal act
7 you're not covered?
8        MR. GEORGE KRUPANSKI: I don't know why.
9        SENATOR PETERSON: Thank you.
10        REPRESENTATIVE VALIHURA: I just want to
11 follow up the point made by Representative Marshall.
12 Another aspect of that, just so we're clear, is that
13 when is that gross negligence standard applied because
14 gross negligence in 2007 is quite different from gross
15 negligence in 1950, and what knowledge and what people
16 expected are different, and there is nothing you can do
17 to change that because we move forward as a society. So
18 it is a moving target so to speak.
19        Any other questions of Mr. Krupanski? If
20 not, thank you very much. I appreciate your testimony
21 today.
22        Tony Flynn, and following Tony will be Rita
23 Moracco.
24        MR. TONY FLYNN: Thank you, Mr. Chairman.

Page 33

1 My name is Tony Flynn. I am the Diocesan attorney. My
2 fourth appearance before a committee of the General
3 Assembly to discuss the statute of limitations
4 applicable to child sexual abuse. I have to candidly
5 say I have been struggling to make the position of the
6 Diocese heard and understood.
7        Let me first address the question that's
8 been raised by some as to whether the Diocese should say
9 anything about this issue. The church in Delaware, the
10 Diocese of Wilmington, the Catholic Church, will bear
11 the greatest impact of this legislation. Unfortunately
12 the church in this Diocese has a lot of experience in
13 dealing with abusers, their victims, and legal claims
14 relating to child sexual abuse, which is, of course, the
15 focus of Senate Bill 29, the access to the judicial
16 system for those claims. As an institution with the
17 largest exposure from this legislation, as a charitable
18 organization with an obligation to its faithful for
19 stewardship, as a charitable organization with a very
20 broad range of social services, religious and
21 educational ministries to support, and as the private
22 institution with the greatest obligation to victims of
23 child sexual abuse the church in this Diocese has an
24 obligation to speak and to explain itself on this issue.

9 (Pages 30 to 33)

8220dda6-de90-4f5f-8500-b27425213391

Page 34

1    The Diocese supports changing but not
2  eliminating the --
3    (Whereupon Tape 1 Side 1 ended. The
4  following is Tape 1, Side 2:)
5    MR. TONY FLYNN: -- respectively. The
6  Diocese supports enactment of a limitations period which
7  does not begin to run until a victim becomes an adult
8  and runs for long enough to account for the fact that
9  victims of child sexual abuse typically require a long,
10  long time, many years into their adulthood to come to
11  grips with their abuse. House substitute number 1 for
12  House Bill 450 which on this point passed both the House
13  and the Senate last year in the same form embodied this
14  concept, a limitations period of age and majority for 25
15  years. Now the rationale for such a limitation period
16  has been stated several times. The purpose of the
17  statutes, among other things, statute of limitations,
18  among other things, means to encourage victims to come
19  forward sooner rather than later, to enable legal claims
20  to be investigated and decided fairly while facts are
21  fresh, memories vivid and evidence available, and to
22  enable institutions to manage risk. Institutions, their
23  insurers, auditors and lenders all rely on the operation
24  of statutes of limitation in risk management insurance

Page 35

1  and financial decisions.
2    No limitations period, the complete
3  abolishment of the statute of limitations, undermines
4  all these purposes.
5    The Diocese does not support, therefore,
6  eliminating a limitations period going forward or going
7  backward and that is what Senate Bill 29 does.
8    Now, I have previously discussed, and
9  others have, the problems with retroactively reviving
10  barred claims and I will not do so again. But if civil
11  litigation is seen -- about past abuse is seen as the
12  best, or, indeed, the premise of Senate Bill 29 the only
13  way to help victims then the due process -- I submit
14  that the due process concerns about the legislation can
15  be addressed. For example, limiting the backward reach
16  of the look-back period would help address concerns
17  about loss of evidence, unavailability of witnesses and
18  so forth.
19    We have proposed limiting, not eliminating,
20  but limiting the look-back period to 20 to 22 years,
21  back to 1987. This would be consistent with Delaware's
22  criminal law which allows a sex offense dating back that
23  far still to be prosecuted. This would also be
24  consistent with Delaware's prior look-back legislation

Page 36

1  enacted in 1983 in conjunction with the delayed
2  manifestation of personal injuries as a result of
3  exposure to Agent Orange during the Vietnam War. Under
4  that statute if personal injury claims then were barred
5  in 1983 by Delaware's two-year statute then there was a
6  six-month look-back period during which Agent Orange
7  victims could file suit.
8    Unlike Senate Bill 29, however, this Agent
9  Orange look-back legislation did not permit lawsuits to
10  be filed regardless of when the injury occurred. During
11  the Agent Orange window injured soldiers could sue only
12  if they were exposed to the disfoliate between specified
13  dates, January 1, 1962 and May 7, 1975. As a result,
14  the Agent Orange look-back was limited to exposures that
15  were as recent to eight years before the legislation was
16  enacted and not older than 21 years. Thus the Agent
17  Orange legislation, unlike Senate Bill 29, guaranteed
18  that revived claims would be recent enough that
19  witnesses and other relevant evidence still would be
20  available. Now --
21    REPRESENTATIVE VALIHURA: Mr. Flynn, isn't
22  it true that the reason why it was limited to that
23  period was that was our involvement in Vietnam during
24  that time? Rather than a particular time period that

Page 37

1  was thought to be reasonable?
2    MR. TONY FLYNN: Well, I would submit that
3  if the time period had been longer, if we were talking
4  about exposure during World War II, for example, or
5  other periods of time, the General Assembly might have
6  thought differently about completely eliminating or
7  having a look-back position that was 50 years or, but,
8  yes, certainly, that's the period of time when we were
9  there.
10    REPRESENTATIVE VALIHURA: Thank you.
11    MR. TONY FLYNN: Now this position of
12  limiting the look-back period has been viewed by some as
13  gutting the Bill. Now, prospectively an age of majority
14  plus 25 years limitations period would still be the
15  second longest statute of limitation among those states
16  who have taken such a fixed period of years approach to
17  child sex abuse claims. This approach would mean that
18  lawsuits still could be brought at least 28 years, and
19  perhaps as long as 40 years or more after the abuse
20  occurred. I submit that such an amendment hardly guts
21  the Bill. Retroactively, reviving barred claims from
22  more than 20 years ago would still be an extraordinary
23  thing. Only one other state has done something like
24  that.

10  (Pages 34 to 37)

8220dda6-de90-4f5f-8500-b27425213391

Page 38

1    Now, I want to pick up on something
2 actually that Sister Maureen said, she pointed out that
3 the church -- correctly pointed out that the church has
4 a grave moral responsibility to victims of its priests.
5 That was absolutely true. So one may fairly ask if
6 we're proposing limiting the look-back period to 1987,
7 what about the victims before 1987. Just as Delaware's
8 current statute of limitations is no bar to any victim
9 coming to the Diocese of Wilmington for assistance, so,
10 too, will the Diocese, if asked, compensate victims
11 regardless of when they were abused by a priest prior to
12 1987 or whenever. The Diocese currently and for a long
13 time has paid for support, medical treatment, counseling
14 and other assistance to victims, and we have also paid
15 lump-sum settlements to victims who wanted compensation
16 in that manner.
17    So if the look-back period is amended to
18 address the due process concerns about an unlimited
19 period of looking backward, the victims still will be
20 able to look to the Diocese for help.
21    Now, I got to point out that the pendency
22 of House Bill 450 and Senate Bill 29 has kind of brought
23 that process to a halt understandably, but the Diocese
24 is still willing, interested and anxious to be able to

Page 39

1 reach out to the victims however it can.
2    REPRESENTATIVE VALIHURA: Mr. Flynn, I'm
3 not sure why it would be brought to a halt. You can
4 settle claims at any time, and, you know, get releases.
5 Why would you stop trying to settle them now if someone
6 brings them to your attention?
7    MR. TONY FLYNN: We're not trying, but it
8 takes two parties to reach a settlement and on I think
9 sound advice from their counsel victims aren't coming to
10 us because they're waiting to see what happens with your
11 Bill.
12    REPRESENTATIVE VALIHURA: Okay. So it's
13 not your --
14    MR. TONY FLYNN: Oh, no.
15    REPRESENTATIVE VALIHURA: You haven't
16 stopped offering this to folks?
17    MR. TONY FLYNN: No. And this --
18    REPRESENTATIVE VALIHURA: Representative
19 Hudson has a question.
20    REPRESENTATIVE HUDSON: I don't want to
21 miss this thought. How many times have you come to
22 agreement with a victim and given them a lump sum?
23    MR. TONY FLYNN: I couldn't tell you an
24 exact number. But I am going to say 15 settlements,

Page 40

1 five since I have been doing it. I mean every claim
2 that has come to us during my tenure we have been able
3 to settle, and I don't blame -- I think the lawyers are
4 giving their clients good advice in this regard, by the
5 way, but that's the practical -- one practical
6 implication of the pendency of the Bill.
7    REPRESENTATIVE VALIHURA: Mr. Flynn, one of
8 the overriding themes that I have noticed in the public
9 discourse on this Bill has been the outing - I'll use
10 that word - of these folks who have engaged in this
11 behavior and bringing them to, quote, justice, in a way.
12 The -- either the voluntariness of these settlements
13 that you have engaged in, and they would be voluntary
14 before 1987, doesn't bring that to the fore and allow
15 the public to understand who or what and how long this
16 behavior engaged in -- was engaged in. How do you
17 address that aspect of the thoughts that these folks are
18 bringing to us?
19    MR. TONY FLYNN: As I previously have
20 testified, if disclosure of information is a fundamental
21 purpose of this Bill, which it is, I would suggest,
22 again, that the tort system is not the most efficient or
23 even an efficient way to get information out to the
24 public but there are other ways to do it. There are

Page 41

1 other ways in the form of mandatory reporting laws, for
2 example, where this information could be made public,
3 and Pennsylvania recently enacted a series of laws in
4 that regard. So there are other ways, I think better
5 ways I would submit, than a torts disposition --
6    REPRESENTATIVE VALIHURA: But I haven't
7 seen anyone propose that kind of publicly available
8 information. Your client has not done that. You know,
9 the press is here today, and thank you very much for
10 being here and covering this, but I think what I'm
11 hearing from folks, and I would ask anyone to disagree
12 with me on the panel here, is that there are -- that
13 people want to bring this out in the open. They want
14 daylight on these things. They want people to
15 understand what's been going on, who's been doing this,
16 and get that, you know, daylight on this. And the
17 voluntary settlements don't do that. And I guess part
18 of the reasons for having a unlimited look-back period
19 is to allow for that openness for all these claims. And
20 not so much -- I mean obviously a day in court is a good
21 thing for folks who want compensation for it, but it's
22 also, as you know as a trial lawyer, sir, press covers
23 that kind of thing, it's open forum, and allows for a
24 full explication of what went on.

11 (Pages 38 to 41)

8220dda6-de90-4f5f-8500-b27425213391

Page 42

1    I mean, I haven't seen anyone propose
2  anything that gives something more to the public than
3  what either we have this Bill or you suggesting we have
4  these private settlements.
5    MR. TONY FLYNN: No, I have suggested
6  before, I have suggested before that changes to
7  mandatory reporting laws, for example, are other ways to
8  more directly get information out. You're right, in a
9  one-on-one consensual negotiated settlement there is no
10  avenue for release of information. But I am only saying
11  that the tort system I think is an ill-suited way to do
12  it and there are other ways to do it, more direct ways.
13    REPRESENTATIVE VALIHURA: Thank you. Yes,
14  Representative Marshall.
15    REPRESENTATIVE MARSHALL: Mr. Flynn, I
16  didn't realize that the Diocese did engage in
17  settlements for cases that were from so long ago that
18  they could no longer be brought today. Could you help
19  me understand how that differs from if we were to have a
20  situation where these people now would formally be able
21  to go to court. I mean I know the settlement process,
22  95 percent of all cases generally settle anyways, how is
23  this going to change the church's practices as it
24  relates to settlements anyway?

Page 43

1    MR. TONY FLYNN: It won't change the
2  church's practices, but with a 41 million dollar verdict
3  out here there is going to be no settlement of these
4  cases. There will be the expectation in every case of
5  not merely a seven-figure but an eight-figure recovery,
6  and the atmosphere for settling a case now is I think
7  just impractical.
8    REPRESENTATIVE MARSHALL: But you don't
9  think that the attorney that's -- and I don't mean this
10  as -- I'm saying this more rhetorically than anything,
11  if the person -- if the victim has a strong case then,
12  you know, they're going to go to court, and if you're
13  not going to settle for what they're asking for then
14  they go to court. But if they don't have a strong case
15  then their attorney will suggest to them that they
16  settle, and I'm just trying to, you know, ferret out
17  what exactly is going to happen as a result of, you
18  know, it sounds like you're paying settlements out
19  currently and I just am not sure how things are going to
20  change much if this Bill were to pass. If you're paying
21  out settlements currently and the Bill passes, the same
22  victims are out there, they would have either gone to
23  you before this Bill and asked for a settlement or now
24  that they have this Bill they have the opportunity to

Page 44

1  air what happened to them and receive a court-ordered
2  settlement or a court-ordered award. I just am
3  struggling with seeing the big difference.
4    MR. TONY FLYNN: Well, I hope the dynamic
5  you suggest is present once the Bill passes. I have
6  grave doubts about it, however. But we'll certainly
7  try. I mean if the Bill passes in its current form
8  we're not going to do anything differently than we have
9  done before. We'll still certainly try to settle cases
10  even outside of the litigation context. But I think
11  we're going to have -- it's going to be very difficult
12  to do so. Simply as a practical matter of the
13  expectations and the good counsel that lawyers are give
14  to give their clients.
15    REPRESENTATIVE MARSHALL: I mean it might
16  be expectation but it may also be the actual value of
17  the injury, because presumably the court system and the
18  jury system, the judges and the appeals and all, when
19  all is said and done and a final award is determined,
20  that presumably in the marketplace is the value of
21  injury that occurred to that person and if that is
22  significantly higher than the amount that you would have
23  settled for, for example in the current situation where
24  people don't have access to lawsuits, what that suggests

Page 45

1  to me is that maybe the amount that people are being
2  settled for right now is an undervalue of what sort of
3  if you were to even put a marketplace value on what
4  their injury would be. That's maybe what it suggests to
5  me.
6    MR. TONY FLYNN: Well, that's
7  unquestionably true. I mean, we're able to settle cases
8  now, we have a process for doing so. And the
9  settlements do not attempt to give a victim what a jury
10  is going to give them. It's attempted to make them
11  whole from a financial point of view, and though the
12  dynamic will change fundamentally when the Bill passes.
13  But we'll still try.
14    REPRESENTATIVE MARSHALL: Thank you.
15    REPRESENTATIVE VALIHURA: I think we're
16  going to go on with your presentation, please.
17    MR. TONY FLYNN: Well, just on the first
18  thing I am going to address here. The Diocese is not
19  looking for a pass on its obligations to victims of
20  sexual abuse at the hands of its priests. We're looking
21  for some recognition of the legal and practical problems
22  with simply abolishing the statute of limitations. It
23  seems to us that the concerns and needs of victim
24  claimants, of prospective institutional defendants and

12 (Pages 42 to 45)

8220dda6-de90-4f5f-8500-b27425213391

Page 46

1  of our judicial system all can be addressed if there is
2  some reasonable balancing of these concerns and needs in
3  the form of some reasonable limitations period going
4  forward and backward.
5      Now, I want to address the question of
6  impact of this legislation on ministry and particularly
7  in this Diocese, but before -- because it's been raised
8  at the last hearing, it was raised earlier this
9  afternoon, but I want to preface my remarks by saying
10  that Diocese of Wilmington has an obligation to those
11  victimized by clergy.  It has an obligation to help them
12  heal, including by compensating them.  And if
13  compensating them appropriately means a significant
14  financial burden on the Diocese, then so be it.
15      The question of impacts on settlement that
16  I am going to address here and trying to explain what
17  that might be, I am not arguing that simply because of
18  that impact the Bill should be eliminated -- should be
19  amended so as to eliminate any impact.  That's not what
20  I'm saying.
21      Let me talk about one of the bankruptcy
22  cases and one of the large settlement cases and the
23  impact on ministry in those Dioceses.  Spokane,
24  Washington has been one of the ones mentioned earlier as

Page 47

1  a Diocese that went into bankruptcy.  And the statement
2  was made earlier on the Senate side that as a result of
3  the settlement and the bankruptcies there has been no
4  closing of schools, no closing of churches, and no
5  impact on ministry.  Now, so far as I can determine
6  there have been no schools or churches closed, but the
7  impact on ministry is undisputable.  In Spokane, for
8  example, at the time of the filing of their case they
9  had 56 plaintiffs with cases pending and 19 trials, four
10  to six weeks each that were scheduled and about to
11  commence.  As -- during the bankruptcy proceedings and
12  in anticipation of the settlement the direct employment
13  of the Diocese was cut in half, the formation of a new
14  diaconate class was delayed, and during the course of
15  the bankruptcy proceeding the number of claimants went
16  from 56 to about 200, of which about 176 have been
17  determined to be viable, and this is by an independent
18  process in accordance with that bankruptcy proceeding.
19      The plan provides for a 48 million dollar
20  pot of money to be used to pay these claims according to
21  a specified procedure.  About 20 million of that came
22  from insurance.  11 million of it came from the Diocese
23  and that 11 million was raised by the Diocese literally
24  just selling everything that it owned.  Six and a half

Page 48

1  million came from affiliated Catholic organizations and
2  ten million has to be raised by the parishes to come up
3  with this pot of money to be used for settling the
4  claim.
5      The average amount of the settlement is --
6  would be about $270,000, but the range of settlements or
7  payments will be as low as $15,000 to as high as 1.5
8  million, depending on the determination of the
9  arbitrator, but the average will be 270.  There will
10  also be a future claimant's Representative operating for
11  the next 23 years to deal with claims that come up post
12  bankruptcy.
13      Now to fund this, as I mentioned, every
14  asset of the Diocese had to be sold.  The parish
15  services office at the Diocesan level was eliminated.
16  That supported youth ministry and religious education in
17  the parishes.  A support role for parish administrators,
18  the Diocesan-wide Catholic conference was eliminated.
19  The Diocesan subsidy to Hispanic ministry in the Diocese
20  was eliminated, and Catholic Charities which was housed
21  in one of the buildings that was sold has to find new
22  quarters.
23      Now, this is the Diocese of Spokane which
24  is a smaller Diocese than the Diocese of Wilmington and

Page 49

1  had a lot of claims, 200 plus claims, including three --
2  I'm sorry, about 100 that were attributable to just
3  three abusers.  But the impact in that Diocese at least
4  was undeniable.
5      Now, I could talk about the other
6  bankruptcies but I am going to move instead to one of
7  the large settlements, the Diocese of Orange, California
8  which settled for $100 million with 87 victims, about
9  half to come from the Diocese and half to come from
10  insurance.  The Diocesan share was funded entirely by a
11  borrowing with the Diocesan assets pledged as
12  collateral, and the impact there has been one on
13  ministry, reduction of staff in the pastoral center, end
14  of ministry resourcing for parishes at the Diocesan
15  level, reduced Diocesan subsidies to inner city schools
16  resulting in the merger of two schools.
17      Now, is that going to happen here?  It's
18  impossible to predict.  I don't know how many cases
19  we're going to have.  It was at an earlier hearing
20  suggested that we're not going to get too many.  I don't
21  think that's the case.  I think we're going to get quite
22  a few.  And of course what we can resolve them for.  But
23  as I have previously expressed, given the very limited
24  track record in this jurisdiction on these claims with

13 (Pages 46 to 49)

8220dda6-de90-4f5f-8500-b27425213391

Page 50

1  just a gargantuan verdict it's going to be very
2  difficult to settle these claims.
3         REPRESENTATIVE VALIHURA:  Mr. Flynn, one of
4  the things that we hear down here from time to time in
5  the medical malpractice area in which one of the members
6  of your firm has been vigorous in support of is a
7  limitation on the amount of damages, 250,000 dollar
8  liability, and I note that in all the dialogue and over
9  the last three years that we have been discussing this,
10 that has never come up in any sort of discussion and I
11 find that kind of strange given the dialogue down here
12 on this limitation.  Has that ever been discussed?  Has
13 that ever been brought forward?  Is there anything like
14 that out there?
15        MR. TONY FLYNN:  A limitation on recovery?
16        REPRESENTATIVE VALIHURA:  Yes.
17        MR. TONY FLYNN:  Well, there was actually
18 an amendment introduced to House Bill 450 last year that
19 would have provided a cap $225,000 on recovery, yes.
20 Not proposed by us but --
21        REPRESENTATIVE VALIHURA:  Well, have you
22 surfaced that?  Have you been out there discussing that?
23 I mean, you seem to be trying to take a complete
24 limitation on it and it strikes me as that you could

Page 51

1  sort of get it both ways here if you sort of limit what
2  the liability might be versus especially since we now
3  just talked about these huge verdicts where you're
4  creating havoc and, you know, I'm all in favor of
5  punitive damages, I would never vote to get rid of that
6  because I think at some point, you know, you need that
7  kind of hammer, but punitive damages and the successive
8  for the same behavior by the same individual seems to be
9  -- it gets to a different level in my mind, and punitive
10 damages going out to one individual as opposed to being
11 shared by other people who were hurt are troubling.  But
12 I just -- there seems to be no dialogue on that and I'm
13 curious as to why the church hasn't, you know, surfaced
14 that kind of discussion.
15        MR. TONY FLYNN:  Well, I have engaged in no
16 discussion about proposing such a cap and I got to tell
17 you that I'd be very reluctant from the church's point
18 of view to be proposing a cap on damages for the victim.
19 It seems to me that what we're proposing is open access
20 to the court system back to a certain date and before
21 that we will continue to try to deal with victims on a
22 settlement basis.
23        REPRESENTATIVE VALIHURA:  I understand
24 that.  I'm not proposing a cap on future.  I'm not even

Page 52

1  proposing anything.  I'm throwing this out as I
2  mentioned in the last hearing and there are two lawyers
3  on this committee and we tend to throw things out in
4  legal concepts and this one just, you know, strikes me
5  as one that, you know, if you're going to change this
6  look-back period why don't you say okay, for claims
7  further back we're going to put a limitation of
8  liability because we can't, you know, know what they are
9  but we're going to still have your opportunity to have
10 your day in court.
11        MR. TONY FLYNN:  That would certainly be
12 one way to help moderate the impact of it and I am going
13 to talk about insurance, so maybe that's something that
14 would explain what the limitation is from our
15 perspective of what there is available for that.  So I
16 am certainly open to discussing that as a possible way
17 to address the concerns but I'm not here to propose such
18 a cap.
19        REPRESENTATIVE VALIHURA:  Thank you.
20        MR. TONY FLYNN:  Now, the Diocese of
21 Wilmington provides annually a little over five million
22 dollars in outlays to subsidize ministry.  It has
23 previously been mentioned correctly that Catholic Social
24 Services -- I'm sorry, Catholic Charity, formerly

Page 53

1  Catholic Social Services, it's a primary arm of the
2  Diocese to provides things like adoption services, AIDS
3  ministry, counseling, substance abuse assistance and
4  that sort of thing and that that agency gets about 70
5  percent, 73 percent in the current year of its funding
6  from government sources, but it gets about a million and
7  two from the Diocese of Wilmington, that's one direct
8  subsidy of social services at least that at the Diocese
9  level is provided.  In addition, the Diocese provides
10 subsidies for parish ministries of about 1.2 million
11 dollars, most of which is in the form of support for
12 parish schools.  24 parishes get these subsidies,
13 including seven in the City of Wilmington.
14        Beyond that the Diocese provides employee
15 benefits supports for all qualifying parish school and
16 other corporation employees of about 1.3 million
17 dollars.  All, at least potentially, would be impacted
18 if money is diverted for settling with victims.  And I
19 want to express again that the Diocese does already, and
20 is willing and anxious to do so in the future, divert
21 such money for those purposes.
22        Well, how can we manage this in this
23 Diocese?  And it has been suggested that the Diocese or
24 the church is heavily insured.  Let me just say that for

14 (Pages 50 to 53)

8220dda6-de90-4f5f-8500-b27425213391

Page 54

1 the Diocese we only have policies dating back to 1978.
2 There is evidence of coverage further back, and of
3 course further back is where the vast majority of our
4 victims are. The limit of the coverage that we do have
5 is a half a million dollars per occurrence with some
6 excess coverage in certain years of a million and up to
7 two million in certain years. If we go back further, if
8 we do find these policies that we have some evidence of,
9 you're talking about very low levels of -- or limits of
10 coverage. Typically 50,000 to 100 -- $50,000 per
11 occurrence, $100,000 in aggregate, going up in some
12 degree in the 1970s. But even if paid in 1960's or
13 1970's dollars that's not going to go very far towards
14 settlement.
15        So then it's suggested that between this
16 insurance availability and the sale of excess property
17 there will be no problem. They can raise sufficient
18 money. And it's certainly true the Diocese holds
19 property for future use, for future parishes and
20 schools. The Diocese has held property for a long time
21 that it then provides to a parish, either to create a
22 new parish. For example in Glasgo within the last ten
23 years a mission church down in Sussex County, schools --
24 a school in New Castle County and other uses of a

Page 55

1 similar nature. And, yes, this property could be sold
2 for other purposes, including settlements with victims.
3        But the money does go for other purposes.
4 The -- for example, Sienna Hall in Wilmington was
5 recently sold, a million dollars of the proceeds of that
6 sale are going to subsidize tuition for lower income
7 students to attend parochial schools.
8        Now, I want to say that it may well be
9 appropriate that this property needs to be sold for the
10 purpose we're talking about today, but if the Diocese
11 simply sells all its property that it owns where is the
12 future of the ministry of the church? Where will the
13 future Christ of Teacher School be built or the Most
14 Blessed Sacrament School be built? Where will the
15 future parishes come from? And, in any event, I mean
16 how many eight-figure settlements are we going to be
17 able to subsidize or pay for through the sale of
18 property? I don't know.
19        Again, I want to repeat, the church owes
20 its victims and has an obligation to dedicate sufficient
21 resources to compensate them appropriately, but it seems
22 to me undeniable - and I think the experience elsewhere
23 demonstrates this - that legislation -- this legislation
24 or settlement will affect the ability of the Diocese to

Page 56

1 continue to provide services at their current level.
2 Now, you may --
3        REPRESENTATIVE VALIHURA: Mr. Flynn, you
4 made a statement earlier on in your presentation and
5 then you just made one moments ago about the vast
6 majority of your claims are before 1987. You opened the
7 door and I am going to ask you how many claims do you
8 have after -- prior to 1987 that you're aware of right
9 now?
10        MR. TONY FLYNN: I want to be clear about
11 claims versus --
12        REPRESENTATIVE VALIHURA: Well, I mean you
13 used the terminology. Whatever you were intended by
14 your comment.
15        MR. TONY FLYNN: What I said was that prior
16 to 1978 I think it was.
17        REPRESENTATIVE VALIHURA: I'm sorry. You
18 did say 1978.
19        MR. TONY FLYNN: Is where most of our
20 victims are, and I do have this information in precise
21 form, but let me say generally speaking that I want to
22 say we're aware of reports about 40 some number like
23 that.
24        REPRESENTATIVE VALIHURA: I'm sorry, 40?

Page 57

1        MR. TONY FLYNN: 4-0, but I can give you a
2 more precise numbers if that --
3        REPRESENTATIVE VALIHURA: That's really
4 what I was looking for, a ballpark.
5        MR. TONY FLYNN: And your next question
6 might have been, well, what's post 1978.
7        REPRESENTATIVE VALIHURA: Very good.
8 That's . . .
9        MR. TONY FLYNN: And fewer, but I am going
10 to say 15 or some number like that. One of the things
11 learned from the experience elsewhere, however, in
12 California in particular where they have the window, is
13 that you don't know, you just don't know until the law
14 is passed, until the window is open, until in a
15 bankruptcy you have a bar date. Spokane got double the
16 number of victims that it thought were out there.
17 That's what I'm expecting. I'm expecting that we're
18 going to have more than we know about and they will be
19 across the spectrum but certainly more heavily weighted
20 I believe to the 70s or even 1960s.
21        REPRESENTATIVE VALIHURA: Let me ask this
22 because I really hadn't thought about it, but most of
23 the folks here in Delaware know what's going on, and we
24 have a very transient population now, I think everyone

15 (Pages 54 to 57)

8220dda6-de90-4f5f-8500-b27425213391

Page 58

1  in this room would agree. This legislation would open
2  it up for anybody who was victimized in Delaware by, for
3  example, the church, and I'm not picking on you I just
4  happen to have you in front of us, and so if that person
5  was living in Idaho now, he or she could come back here
6  and file that claim under this legislation, is that
7  correct?
8       MR. TONY FLYNN: Yes.
9       REPRESENTATIVE VALIHURA: Okay. And you
10  wouldn't necessarily know about that person today
11  because they probably haven't contacted you and probably
12  don't even know what's going on.
13       MR. TONY FLYNN: We certainly have heard
14  from some victims that are not currently in Delaware,
15  but I'm quite sure there are victims we have not heard
16  from. I'm absolutely certain of that.
17       REPRESENTATIVE VALIHURA: Thank you.
18       MR. TONY FLYNN: Let me just conclude by
19  saying that you -- the General Assembly may conclude
20  that regardless of the potential impact of the
21  legislation it should be enacted without any amendment
22  balancing the needs and concerns of all the parties
23  affected by the Bill. But do so, please, with your eyes
24  open to the consequences of the legislation. This will

Page 59

1  not be and cannot be a cost-free exercise entirely paid
2  for by insurance or the sale of surplus property. I
3  mean, you simply cannot take tens or scores of millions
4  of dollars out of any charitable institution and have no
5  effect on the mission of that institution.
6       I want to mention as I conclude that there
7  were two other witnesses who were present on May 10th
8  who were with me to testify, Sister Suzanne Donovan who
9  is the HR for the Diocese and the co-chair of our Safe
10  Environments Program and Doug Salter, a retired State
11  Policeman who is the other co-chair of the Safe
12  Environments Program, neither of whom were able to be
13  here today or to talk about our program.
14       REPRESENTATIVE VALIHURA: What -- and could
15  you just summarize what they were prepared to say,
16  Mr. Flynn?
17       MR. TONY FLYNN: Yeah, well --
18       REPRESENTATIVE VALIHURA: I assume you knew
19  what they were going to testify to.
20       MR. TONY FLYNN: Doug Salter was going to
21  testify about his experience as a state trooper in
22  dealing particularly with child abuse claims and the
23  difficulty of the cases from an evidentiary perspective
24  including on the older the case is. He was then also

Page 60

1  going to be an intro into our Safe Environments Program.
2  Now, we are by no means the only institutions to do what
3  is being done, but Sister Maureen, again, testified
4  earlier about the program that we have. That is -- that
5  is the way to prevent abuse. And of course this
6  legislation I think overridingly really is to prevent
7  abuse and there are several ways to do that, but the one
8  way certainly to do it is to train people, to do
9  background checks, to educate children and parents,
10  teachers and volunteers, to screen people, and all those
11  things are being done within the Diocese, and that is
12  what Doug was going to talk about and Sister Suzanne
13  also was going to talk about, and I'm not going to get
14  into the details of what they would have said.
15       REPRESENTATIVE VALIHURA: Representative
16  Hudson.
17       REPRESENTATIVE HUDSON: Since they're not
18  there maybe you can tell us when those programs began?
19       MR. TONY FLYNN: I can't. Following the
20  adoption in I want to say 1994 by the National
21  Conference of Catholic Bishops of a five point program
22  for dealing with sexual abuse, the Diocese of Wilmington
23  adopted a sexual abuse policy established - it wasn't
24  called a review Board, I forget what it was called at

Page 61

1  that time - and then following the adoption of the
2  charter in 2002 which had much more detail with respect
3  to what these programs should require the Diocese
4  initiated what is called For the Sake of God's Children
5  Program, which includes a criminal background check, the
6  establishment of the review panel, ethical standards
7  which document volunteer compliance with both training
8  and acknowledgment of their obligations with respect to
9  safe environments, and so that's when it was.
10       REPRESENTATIVE HUDSON: But it didn't
11  affect sending the one priest to Syracuse and it didn't
12  really affect you taking enablers out of schools. So it
13  is a policy on paper that isn't -- doesn't seem to be
14  valid to many of the people in this room.
15       MR. TONY FLYNN: Well, I'm not sure about
16  the latter that you referred to, taking enablers out of
17  school, but with respect to Father DeLuca who did move
18  to Syracuse following his removal from ministry in 1993,
19  that did occur, and following 2002 when a review of all
20  the files was done there were an additional three
21  pastors removed from ministry at that time.
22       REPRESENTATIVE HUDSON: So that wasn't part
23  of your policy?
24       MR. TONY FLYNN: It was. Father DeLuca was

16 (Pages 58 to 61)

8220dda6-de90-4f5f-8500-b27425213391

A169

Page 62

1  removed from ministry in 1993 based on an allegation of
2  sexual abuse prior to the adoption of the policy in that
3  regard, and he wasn't the first.
4         REPRESENTATIVE VALIHURA:  Senator.
5         SENATOR PETERSON:  Was that the first
6  allegations that was brought to the fore about Francis
7  DeLuca, the one that put him in retirement?
8         MR. TONY FLYNN:  Actually it was in this
9  sense.  What happened was that another victim reported
10 to the Diocese that a friend of theirs had been abused
11 by Father DeLuca and that that allegation had been
12 brought forward in 1966, some date then.  So it was the
13 same allegation but it was renewed or made known in
14 1993.
15        SENATOR PETERSON:  Because I can tell you
16 that I was a student at St. Elizabeth's High School in
17 the 1960s when Father Francis DeLuca was there and it
18 was pretty common knowledge that he was abusing young
19 boys.  In fact, that's why he was moved from St.
20 Elizabeth's over to Holy Spirit.  Having been moved to
21 Holy Spirit I wonder how many of those victims I haven't
22 heard from because I have heard from at least six of the
23 victims at this point.
24        I have a couple questions.  Do you want to

Page 63

1  hear some more?
2         MR. TONY FLYNN:  Absolutely.
3         SENATOR PETERSON:  A couple of things.  The
4  criminal statute of limitations you said goes back to
5  '87 and this law should do the same.  Are you aware of
6  the fact that House Bill 66 that both Houses unanimously
7  passed and approved statute of limitations retroactively
8  and the Supreme Court said you can't do that in
9  criminal?
10        MR. TONY FLYNN:  I am.
11        SENATOR PETERSON:  So why did you pick that
12 date?
13        MR. TONY FLYNN:  Well, because one reason
14 why -- what the Supreme Court did in the Stagner case
15 which invalidated that portion of Senate Bill 66 was
16 from a due process concern.  You can't go back and
17 retroactively revive criminal complaints.  But the
18 result was left in place what our statute was at the
19 time in 1992 when it had been previously changed which
20 is how do you get back to 1987?  And my only point is if
21 we can -- if we can, consistent with due process
22 requirements, criminally prosecute someone back that far
23 it seems to me that would be an appropriate day that you
24 can also sue someone back that far.

Page 64

1         SENATOR PETERSON:  Yeah, but my point was
2  you're aware of the fact that this legislature
3  unanimously passed a Bill attempting to go back as far
4  as we could?
5         MR. TONY FLYNN:  I am, but that it couldn't
6  be done because of due process.
7         SENATOR PETERSON:  Because that goes back
8  to(inaudible to reporter) consideration.  But the same
9  is not true in criminal -- I mean in civil cases?
10        MR. TONY FLYNN:  It is.  It is.  It's
11 simply a different analysis.  This legislation, as I
12 have previously said at the first hearing, and as the
13 State solicitor said at the Senate hearing, under
14 Delaware's Constitution, unlike those of Maryland, for
15 example, or Missouri or Illinois, that you can
16 retroactively revive barred claims but that leaves then
17 the analysis to a case-by-case scrutiny as to whether in
18 a given case you go too far back, if you go back 50
19 years and there is no witness and no evidence, then as
20 applied in that particular case the statute may be
21 (inaudible to reporter).
22        SENATOR PETERSON:  So for the two-year
23 look-back period people might have to argue the due
24 process arguments for that two-year period?

Page 65

1         MR. TONY FLYNN:  Yeah.
2         SENATOR PETERSON:  Beyond that, those
3  arguments go away for future cases?
4         MR. TONY FLYNN:  Yeah, for future cases,
5  that's correct.
6         SENATOR PETERSON:  All right.  You said
7  that you think the look-back period is 21 years or 20
8  years, going back to 1987.  But conceivably going
9  forward cases could be 43 years old before they're ever
10 brought?
11        MR. TONY FLYNN:  Right.
12        SENATOR PETERSON:  Because you're looking
13 at age 43, that's what you're looking at, and in the one
14 case of Father Oliver O'Grady, by his own admission his
15 youngest victim was a nine-month old girl that he raped,
16 so conceivably 43 years out.  So what I'm trying to
17 figure out if it's not a good idea to go more than 21
18 years back why 43 years from now would you allow people
19 to go 43 years back?
20        MR. TONY FLYNN:  Because you have a lot
21 more flexibility going forward because everyone is on
22 notice as to what the requirements are and it's now
23 absolute practice.  I mean recordkeeping is going to be
24 pristine.  Training programs in place to prevent.  So

17 (Pages 62 to 65)

8220dda6-de90-4f5f-8500-b27425213391

Page 66

1  going forward it seems to me there is a lot more
2  latitude in having a longer statute of limitations.
3        SENATOR PETERSON: So you don't think that
4  going back that people have thought this was important
5  enough to keep records about their employees molesting
6  kids? I mean what part of the brain was shut down where
7  somebody would say this isn't important, I'll just throw
8  this note in the trash?
9        MR. TONY FLYNN: I think it's not a
10  question of whether it was important or not. But two
11  problems: One is back then simply documenting what had
12  occurred, there just wasn't as a general proposition the
13  practice in place to do so. And, secondly, you lose
14  records over time. You go back 30 or 40 years and you
15  just don't -- you're not going to have the same records
16  as you do now.
17        SENATOR PETERSON: Does the church dispose
18  of its records?
19        MR. TONY FLYNN: I can't answer that as a
20  general proposition. I can only say --
21        REPRESENTATIVE VALIHURA: I guess the
22  question is do they have a record retention policy?
23        SENATOR PETERSON: Or do they have --
24        REPRESENTATIVE VALIHURA: I'm sure with a

Page 67

1  fine lawyer like yourself you have discussed a record
2  retention policy with the church.
3        MR. TONY FLYNN: Let me assure you that on
4  my watch, no records have been disposed of or destroyed
5  on my watch.
6        SENATOR PETERSON: And how long is your
7  watch?
8        MR. TONY FLYNN: Only since 2000 -- it was
9  Easter week of 2002.
10        SENATOR PETERSON: Father Tom Doyle
11  testified before the Senate and told us that by canon
12  law the church's records cannot be destroyed, that there
13  are, in fact, secret archives but that those records
14  exist somewhere. Do you disagree? Father Tom Doyle
15  will be back to address that before the House again.
16        MR. TONY FLYNN: Yeah. Actually what he
17  said was the church is the best record keeper of any
18  organization in the world or something to that effect.
19  He didn't cite specific canon law provisions, but yes,
20  there are records maintained, but the question is what
21  is in the records in the first place to be maintained,
22  and that's what I'm telling you, that you go back that
23  far you're just not going to find much.
24        SENATOR PETERSON: So your point is that

Page 68

1  people will keep good records from now on because they
2  could be liable?
3        MR. TONY FLYNN: Yes.
4        SENATOR PETERSON: So it's not about the
5  kids, it's about the money?
6        MR. TONY FLYNN: Absolutely incorrect. I
7  completely disagree with that. The purpose -- our job,
8  and Mr. Krupanski testified to that, is to prevent abuse
9  going forward. And simply because we're keeping good
10  records about that and training people does not mean
11  that we are not about taking care of kids going forward,
12  protecting kids going forward.
13        SENATOR PETERSON: Well, if that's the case
14  why --
15        MR. TONY FLYNN: And this law, the Bill is
16  designed to set up legal liability. That's what the
17  Bill is about.
18        SENATOR PETERSON: I understand what the
19  Bill is about.
20        MR. TONY FLYNN: Uh-huh. I know.
21        SENATOR PETERSON: My point was you didn't
22  think it was important to keep records when it was kids
23  being molested, but now you're going to keep records
24  because you could be on the hook for the kids being

Page 69

1  molested. So the only difference is now there might be
2  some money involved where before there wasn't --
3        MR. TONY FLYNN: I completely reject that
4  sort of a question, Senator.
5        SENATOR PETERSON: Tell me why.
6        MR. TONY FLYNN: Because the purpose for
7  keeping good records, which doesn't begin with the
8  enactment of this legislation - the Diocese has been
9  keeping good records, again, at least as far as I know
10  back to 2003 and I would say back to 1995 - in any event
11  have nothing to do with the legal liability of the
12  church.
13        SENATOR PETERSON: Let's move on from that.
14        REPRESENTATIVE VALIHURA: Well, Senator,
15  can I just, I don't want to interrupt you but there is
16  another member of the committee would like to ask some
17  questions and then we'll get back to you, how is that?
18        SENATOR PETERSON: Okay.
19        REPRESENTATIVE VALIHURA: Representative
20  Lavelle. Oh, no, no. I thought you were just looking
21  at me and making a point.
22        REPRESENTATIVE LAVELLE: Thank you.
23  Mr. Flynn, do you know what the current State policy is
24  on volunteers in our schools and other places? Do they

18 (Pages 66 to 69)

8220dda6-de90-4f5f-8500-b27425213391

A171

Page 70

1  require criminal background checks before when someone
2  is allowed to set into a school and become a PTA
3  volunteer or go on a field trip or anything like that?
4       MR. TONY FLYNN:  I have to say I'm not
5  aware.  How is that?
6       REPRESENTATIVE LAVELLE:  Okay.  Do you know
7  what State programs are in place if a victim of child --
8  if an alleged, if an allegation was made against a State
9  employee, what policies the State of Delaware may have
10 in place to provide counseling or welcome them in, try
11 to find them help?
12      MR. TONY FLYNN:  I am not.
13      REPRESENTATIVE LAVELLE:  I'm not either.
14 I'm a parent of a child who goes to public school and a
15 private school, a parochial school.  For the parochial
16 school I can't go on a field trip because I haven't had
17 a criminal background check yet.  For the public school,
18 as far as I know, I can go on a field trip tomorrow.
19 There is no policy to document, to make reasonable steps
20 to protect our children.  And my point for bringing this
21 up, as everyone knows in this room, goes around back to
22 amendment number two and we should make sure that all
23 those things are done the same.
24      Senator, with respect to the records - and

Page 71

1  I'm not here to defend the church, I think what the
2  church has done in all these cases is reprehensible.
3  When Cardinal Law got a promotion to Rome I was
4  disgusted, and that's the most polite word I can use in
5  this hall about that activity.  But everyone should be
6  treated the same here in terms of protecting our
7  children.  And my point in bringing it up was I believe
8  in the Diandra Simms case, a lawsuit against a
9  Christiana School District employee for sexually abusing
10 a special needs child, those records were lost.  This
11 wasn't 1965 records or '87 records.  These were records
12 from ten years ago.  Somehow they were lost.
13      So as we go through this, let's -- I do not
14 want this committee, I do not want this body, I do not
15 want this legislative building to lose track of making
16 sure that everyone is on the same playing field.  It
17 does happen, it has happened and it will happen again.
18 And the State perhaps needs to, or our school districts
19 perhaps needs to look, as has come out in this debate
20 today, at their policies and procedures for people who
21 walk in those buildings today, and what's being done to
22 make reasonable steps, costly steps, because as a
23 parent, I believe - and my wife went through this - she
24 had to pay the 20 bucks, 50 bucks or whatever it was to

Page 72

1  become a volunteer, an active volunteer in the sense
2  that she could go to the zoo or whatever and walk around
3  with the kids.  So --
4       (Whereupon Tape 1, side 2 concluded.  The
5  following is Tape 2, Side 1:)
6       REPRESENTATIVE LAVELLE:  -- been deficient
7  too many times.  I would suggest to you the State has
8  also been deficient on a number of occasions and that we
9  should all work towards a solution that protects all the
10 children and put those policies and procedures in place
11 that need to be put in place.
12      REPRESENTATIVE VALIHURA:  Thank you.
13 Representative Hudson.
14      REPRESENTATIVE HUDSON:  Thank you.  Do you
15 support this Bill?  Does your client, you're here as a
16 lawyer representing the Catholic Diocese?
17      MR. TONY FLYNN:  Right, as amended.
18      REPRESENTATIVE HUDSON:  Do you support --
19      MR. TONY FLYNN:  Yes, we would.
20      REPRESENTATIVE HUDSON:  As amended.  All
21 right.  Did you write the amendment?
22      MR. TONY FLYNN:  Which amendment is that?
23      REPRESENTATIVE HUDSON:  The first one --
24      MR. TONY FLYNN:  I wrote three amendments:

Page 73

1  One dealing with the look-back provision, one dealing
2  with the prospective limitation, and one on actual
3  knowledge.
4       REPRESENTATIVE HUDSON:  Well, we have one
5  file that I believe is going to be stricken.  House
6  Amendment 1, did you write that one?
7       MR. TONY FLYNN:  I did not.
8       REPRESENTATIVE HUDSON:  Did you write House
9  Amendment Number 2 that is currently a part of the Bill?
10      MR. TONY FLYNN:  No, but it is based on
11 something I did write.  Last year -- this was my issue
12 last year, one of my issues last year, was the public
13 immunity question, and in that context I did write an
14 amendment to the House Bill 450, and that language found
15 its way in to the substitute Bill and when I saw House
16 Amendment 1 to me it did not accomplish what House
17 substitute 1 was intended to accomplish last year and I
18 informed Representative Lavelle of that, and the
19 language which I drafted last year was incorporated into
20 House Amendment Number 2.
21      REPRESENTATIVE HUDSON:  Well, when you
22 first --
23      REPRESENTATIVE VALIHURA:  Well, can I just
24 -- I mean we have had a lot of discussion about House

19 (Pages 70 to 73)

8220dda6-de90-4f5f-8500-b27425213391

Page 74

1  Amendment 1 and House Amendment 2 and it's -- I think
2  it's -- it's unfortunate but Representative Lavelle did
3  not do the final approval on House Amendment Number 1,
4  never intended to file House Amendment Number 1, it got
5  filed, he struck it as soon -- well, he will strike it,
6  I assume he will strike it. It is unfortunate, but it
7  is -- it was Representative Lavelle's intention, I don't
8  want to put words in your mouth but I mean, I just, I
9  have heard a lot about this and I just I want it clear
10 for the folks out there that House Amendment Number 2
11 was the intended vehicle by which Representative Lavelle
12 was going to bring forward the issue.
13       REPRESENTATIVE HUDSON: That's good
14 clarification but that wasn't where I was going.
15       REPRESENTATIVE VALIHURA: I understand
16 that, but I wanted it out there because it needed to be
17 said.
18       REPRESENTATIVE HUDSON: Thank you. In the
19 very beginning when you stood up here you said that the
20 Catholic Church perhaps has a lot to lose in this field
21 or has a lot of experience. So I find it interesting
22 that you would be the one, the Catholic Diocese would be
23 the one trying to amend the Bill, and that you would be
24 writing it, and I know our house attorney had to contact

Page 75

1  one of your attorneys to make sure that House Amendment
2  Number 2 was written better than Number 1. So we are
3  checking in with the Diocese on amendments and I find
4  that a little bit awkward, although in many cases that
5  happens all the time. But it just is awkward. Just
6  like to me it's awkward that you would arbitrarily pick
7  1987 as where you wouldn't want any cases filed beyond
8  that and yet you say you have perhaps 40 cases going
9  back to 1978. So it looks, again, like perhaps you're
10 trying to protect something and I just find that
11 scrambling this Bill is not in the best interests of
12 victims and rather - although you're standing here in
13 front of everyone openly talking about it and I respect
14 your job as a lawyer - but it's awkward and it gives me
15 pause as one who is trying to figure out what's the best
16 part of this Bill.
17       Let me change the subject a little bit and
18 go back to when the Catholic Diocese closed some schools
19 earlier this year. Why was that?
20       MR. TONY FLYNN: You're outside of my
21 territory of knowledge. I can't say. I don't know.
22       REPRESENTATIVE HUDSON: But it wasn't an
23 abuse case that --
24       MR. TONY FLYNN: Oh, no.

Page 76

1        REPRESENTATIVE HUDSON: -- a lawsuit or
2  anything?
3        MR. TONY FLYNN: No.
4        REPRESENTATIVE HUDSON: It was just perhaps
5  that students were going to public school, or it wasn't
6  a priority or there wasn't -- it was just a run of the
7  mill --
8        REPRESENTATIVE VALIHURA: I believe it's
9  population shift more than anything else.
10       REPRESENTATIVE HUDSON: A run of the mill
11 decision that you closed schools in Wilmington?
12       MR. TONY FLYNN: Well, I can't answer that.
13 I can tell you it didn't have anything to do with the
14 settlement.
15       REPRESENTATIVE HUDSON: Right. I think
16 that's what I wanted -- that's for the moment, thank
17 you.
18       REPRESENTATIVE VALIHURA: Representative
19 Kowalko first.
20       REPRESENTATIVE KOWALKO: Thank you.
21       REPRESENTATIVE VALIHURA: John, can you
22 pull the speaker down?
23       REPRESENTATIVE KOWALKO: Two points here,
24 the Spokane bankruptcy, if it caused a doubling of

Page 77

1  victim claims and the victim claims were legitimate,
2  that seems to be a good consequence of this type of
3  legislation. And if this type of legislation as written
4  is passed in Delaware and it precipitates a legitimate
5  increase in claims and proved an increased number of
6  grossly negligent actions by the Diocese that is the
7  point of the Bill. And no matter what good an entity
8  does in its future charitable endeavors, and I know the
9  Catholic Church, I'm a Catholic, does a lot of good
10 work, is certainly no excuse and the Diocese must be
11 held accountable for its prior actions which enable such
12 crimes; would you agree with me?
13       MR. TONY FLYNN: I agree. I agree that the
14 Diocese has to atone and including in this way. My
15 urging is that there be some balance in your approach to
16 do it. Because we're talking about here is this is the
17 Judiciary Committee, we're talking about access to the
18 judicial process in Delaware and the appropriate way to
19 do that.
20       REPRESENTATIVE KOWALKO: And along those
21 lines I would address this to Representative Lavelle. I
22 agree with you, Representative Lavelle, that the
23 protection is to insure background checks that are
24 legitimate and then all encompass -- legitimate

20  (Pages 74 to 77)

8220dda6-de90-4f5f-8500-b27425213391

A173

Page 78

1   background checks, and then all encompassing background
2   checks for all entities. But that's easily a matter for
3   another separate piece of legislation. The focus of
4   this Bill, Senate Bill 29, would seem to insure that the
5   rights of victims who come forward and guarantee that
6   entities that allows these abuses to continue are
7   stopped from permitting that.
8           So I think what we have here are two
9   separate intentions of legislation and I think that the
10  amendment is sort of -- disserves the actual intention
11  of this Bill.
12          REPRESENTATIVE VALIHURA: Senator, I am
13  going to let Representative Lavelle respond since he was
14  directly --
15          REPRESENTATIVE LAVELLE: Thank you,
16  Representative Valihura. Representative Kowalko, did
17  you read the amendments in Amendment Number 2?
18          REPRESENTATIVE KOWALKO: I did.
19          REPRESENTATIVE LAVELLE: Does it say
20  anything about criminal background checks?
21          REPRESENTATIVE KOWALKO: No, but your --
22          REPRESENTATIVE LAVELLE: Does it say
23  anything about policies and procedures?
24          REPRESENTATIVE KOWALKO: No, but you're --

Page 79

1           REPRESENTATIVE LAVELLE: No, but my only
2   point is that was brought up about what the Diocese
3   does, and my point, it's not legislation, it's not an
4   amendment, it's to say that the State of Delaware,
5   perhaps, should be doing these things, just a moment,
6   sir, and I appreciate your question and your concern and
7   I do not believe this is an issue for another day. An
8   issue for another day to say who you would be abused --
9   who abused you grants you access to the courts. Do you
10  think a child who is -- a child in the Colonial School
11  District I believe it was less than three weeks ago who
12  was sexually molested, a special needs child who was
13  sexually molested by a 60-year-old white man - and we
14  know child molesters who are 60-year-old white men are
15  serial molesters, this gentleman, I suspect, did not
16  start doing this three weeks ago - do you believe that
17  that child's access to the courts should be limited?
18          REPRESENTATIVE KOWALKO: No, and I don't
19  believe under the grossly negligent provision of the
20  Bill, Senate Bill 29 excludes --
21          REPRESENTATIVE LAVELLE: Well, that's the
22  policy discussion --
23          REPRESENTATIVE KOWALKO: -- excludes the
24  State from their responsibility. I believe that is part

Page 80

1   of it and I think that was testified to at the last
2   hearing, that, in fact, the grossly negligent provision
3   of Senate Bill 29 as written will allow the State to be
4   accused and held responsible in Christina District or
5   any other district held responsible.
6           REPRESENTATIVE LAVELLE: That's fine,
7   Representative, and we can disagree on that point.
8   There is no disagreement on the intent of the sponsor to
9   allow someone who was abused five years ago access to
10  the courts, the State, it's not the intent of the
11  sponsor to waive its limited immunity. I don't think
12  that's correct either. There is no question about that.
13          REPRESENTATIVE KOWALKO: No. I agree with
14  you on that.
15          REPRESENTATIVE LAVELLE: There is a debate
16  on the other one and I think you clarified the debate
17  through the --
18          REPRESENTATIVE KOWALKO: I agree with you,
19  but the way you were portraying your amendment as
20  somehow being effective to give proper circumspect to
21  records of (inaudible to reporter). I don't think
22  that's a fair portrayal of that amendment.
23          REPRESENTATIVE LAVELLE: Okay. One other
24  comment, Representative Valihura, if I may?

Page 81

1           REPRESENTATIVE VALIHURA: Yes.
2           REPRESENTATIVE LAVELLE: I know in many
3   circles I have been made to be the bad guy in this
4   particular Bill. All I'm looking for is equity and I'll
5   out myself today. Why is it so important to me? You
6   don't think I appreciate you all coming here and
7   standing up for your children in many cases, for
8   relatives and friends in other cases, on the principle
9   in some cases. I stand beside you on all those issues.
10          I have a son who is six years old and who
11  doesn't speak. He is representative of the children
12  that are in the care of the State, the most vulnerable
13  children who are in the care of the State on any day.
14  I'm here standing up for him and I would ask you all to
15  stand up with him as well. I suspect he's never been
16  sexually abused. I hope it's not the case. But I can
17  tell you he can't tell me that. He doesn't come home
18  and tell me what happened at school, dad. He doesn't do
19  that, and I'll give you an example and it's just
20  symbolic of what the amendment tries to do, and I'm
21  sorry we got off on the amendment, Representative
22  Valihura.
23          Months ago there was an incident on the bus
24  that Matthew rides every day and the incident was with

21 (Pages 78 to 81)

A174

8220dda6-de90-4f5f-8500-b27425213391

Page 82

1  another special needs child, having some behavior, some
2  things going on, the bus was continually late. The
3  drivers related us back something had gone on. We
4  called the district. We said hey, we hear something is
5  going on on the bus. What's going on? Oh, I'm sorry,
6  Mr. and Mrs. Lavelle, we can't discuss that with you.
7  So I'm to take comfort from that? I sure hope they
8  would do the right thing. I don't know if they will. I
9  don't know if they did 20 years ago and I don't know if
10  they'll do it 20 years from now.
11         And as a body, not as you good people out
12  there, as a body, we are kidding ourselves if we think
13  that the issue of State responsibility and the proper
14  responsibility that should be laid on the church and
15  other institutions that have done this egregious acts
16  can be separated and we'll deal with it next time. It's
17  just not the case.
18         REPRESENTATIVE KOWALKO: With all due
19  respect I think you missed my point. I did not say that
20  the State's responsibility in any way should be
21  separated from the responsibility of private or
22  nonprofit enterprises or entities that are addressed in
23  Senate Bill 29. What I am saying is that the issue of
24  insuring that it's the State's responsibility or any

Page 83

1  enterprise that deals with the public's responsibility
2  to insure that they have proper background checks is a
3  separate issue that should be addressed and should be
4  addressed readily by us.
5         REPRESENTATIVE VALIHURA: Thank you.
6  Senator Peterson.
7         SENATOR PETERSON: Thank you, Mr. Chairman,
8  I will be brief. I want to go back to the Spokane,
9  Washington case because, Mr. Flynn, as I recall, you
10  said that the Diocese had to sell everything they owned.
11         MR. TONY FLYNN: Yes.
12         SENATOR PETERSON: Correct? Like the Agent
13  Orange example you gave, that's not exactly true. Well,
14  let's say it's disingenuous. The reason they sold --
15  had to sell everything they owned you was because when
16  they filed for Chapter 11 bankruptcy on the eve of trial
17  which has been done in five Dioceses, that's been one of
18  their tactics is on the eve of trial file for Chapter 11
19  bankruptcy, not Chapter 7 that says we don't have the
20  money, but Chapter 11 that says let's put everything on
21  hold while we try to shuffle things around. They used
22  an argument before the Bankruptcy Court. They were
23  trying to reduce the size of the estate, so to speak, so
24  as to avoid having to pay the victims as much as they

Page 84

1  were asking. So they were basically trying to say oh,
2  no, those parishes don't belong to us. Those parishes
3  are all individual entities unto themselves. They were
4  really just trying to protect assets.
5         The Bankruptcy Court judge came back and
6  said oh, no, they're not, they're all in your name,
7  Spokane, Archdiocese of Spokane, they're all in your
8  name and therefore they are your assets. So in
9  considering what you can or can't afford we're going to
10  include those parishes. So, in turn, the Diocese of
11  Spokane decided to turn around and sell the parishes to
12  the people of the parishes. They're making them buy
13  their own parishes from the Diocese to pay the ten
14  million dollars that the church has to come up with.
15         So when you say they had to sell everything
16  they owned, what they did was say we're going to sell
17  you your own parish and in return we'll give you the
18  title to your own parish and then from now on they can't
19  say that these are our assets. They'll be your assets
20  instead. So you made it sound like they had to, you
21  know, have bake sales and sell the chalices and
22  vestments. That is not the case at all.
23         MR. TONY FLYNN: I think that's completely
24  incorrect, Senator. First of all, the filing - and it

Page 85

1  was brought up before Chapter 7 versus Chapter 11.
2  Chapter 7 is liquidation as opposed to reorganization.
3  It is absolutely the rule in business bankruptcies that
4  Chapter 11 is filed. Sometimes cases convert from
5  Chapter 11 to Chapter 7 when it appears that there is
6  not enough assets to pay the claims and keep the
7  business as a going concern.
8         In Spokane -- I mean it's been said several
9  times that the purpose of filing these bankruptcies has
10  been to keep information from coming out. Well, in the
11  bankruptcy proceeding, for example, Portland is
12  releasing its files in connection with that, but put
13  that aside. In Spokane, we know now what has happened
14  in Spokane. We know what assets were available. We
15  know how many victims there are and we know what's to be
16  paid. They were facing 50 some trials going forward and
17  if a victim won in the first trial, got ten million
18  dollars, as we now know it would have sucked up 20
19  percent of all the assets that would be available for
20  all the victims. How in the world can that Diocese then
21  adequately compensate all its victims if the first
22  victim gets the eight million dollars or eight-figure
23  recovery?
24         And it's the same thing in the other

22  (Pages 82 to 85)

8220dda6-de90-4f5f-8500-b27425213391

Page 86

1 Dioceses. In Portland, for example, they were facing a
2 trial with a jury aboard of 130 million dollars. Well,
3 if they even got half that amount of money what's going
4 to be left for the remaining victims in that case?
5 That's why the Diocese -- why you file bankruptcy, to
6 make sure that you got as many assets as possible
7 available for the most number of victims.
8      In terms of what Spokane did, I'm not aware
9 of any transfers of property to avoid creditors. If
10 there was such a thing that would certainly be subject
11 to litigation in the Bankruptcy Court, as would the
12 solvency of the debtor. If the claimants thought there
13 were plenty of assets here to cover all these claims,
14 they could have asked that the bankruptcy case be
15 dismissed on failure -- lack of jurisdiction because the
16 debtor was not insolvent. That has not happened in any
17 of these bankruptcies so far. None of the claimant's
18 attorneys have argued that there are not enough assets
19 or that -- that's just plenty of assets to cover all
20 these claims.
21      And what happened in Spokane on the parish
22 ownership issue is that, as is commonly the case I'm
23 surprised to learn, not in this Diocese, the assets of
24 the parishes are titled in the name of the Bishop.

Page 87

1 That's very commonly done around the country. So there
2 was an issue, is the parish property assets of the
3 bankruptcy estate or not. The trial judge didn't rule
4 that they would be. That was reversed on appeal by the
5 district judge and it was never resolved finally because
6 there was a settlement reached in the bankruptcy
7 proceeding.
8      SENATOR PETERSON: So what part of what I
9 said do you disagree with?
10      MR. TONY FLYNN: There were no transfers --
11 the Diocese did not sell back to the parishes, post
12 bankruptcy as part of the plan all the parishes will be
13 separately incorporated and will have deeds to their own
14 assets.
15      SENATOR PETERSON: I think that's what I
16 said.
17      MR. TONY FLYNN: You said -- you suggested
18 that the Diocese was holding up the parishes by selling
19 them back their parishes in exchange to raise money for
20 the bankruptcy settlement. That is not the case.
21 Indeed, indeed, the parishes are going to have to raise
22 ten million dollars. It's been allocated among the
23 parishes in accordance with their respective shares of
24 the annual appeal and they're going to have to raise

Page 88

1 that money. And, by the way, the money they have to
2 raise equals a total amount of the annual appeal every
3 year in that Diocese.
4      SENATOR PETERSON: And in return for the
5 ten million dollar assessment, which is based on the
6 wealth of each parish, based on their collections --
7      MR. TONY FLYNN: Yeah.
8      SENATOR PETERSON: -- then the title to
9 those buildings will be turned over to the parishes.
10      MR. TONY FLYNN: It's not in return. It's
11 part of the plan, apart from that, that the parishes --
12      SENATOR PETERSON: So in return for ten
13 million dollars the Diocese is now going to deed those
14 properties over to the parishes.
15      MR. TONY FLYNN: Not in return for the ten
16 -- the ten million dollars doesn't go to the Diocese in
17 any event.
18      SENATOR PETERSON: But those things are
19 going to happen at the same time.
20      MR. TONY FLYNN: No, they're not going to
21 happen at the same time. The parishes have to come up
22 with the ten million dollars by December 31st. If they
23 don't do that, the parishes will all be required, by the
24 Bankruptcy Court now, to sign a note pledging to pay

Page 89

1 this money over time to adequately fund the 47 million
2 dollar settlement fund.
3      SENATOR PETERSON: And then the parishes
4 get their parish?
5      MR. TONY FLYNN: They will get it
6 regardless of their contribution.
7      SENATOR PETERSON: Judge -- I mean,
8 Professor Marci Hamilton will be here to address this
9 issue. She's done a lot of research on Spokane and the
10 other four Dioceses that have all claimed Chapter 11
11 bankruptcy on the eve of trial and she can testify at
12 great length on what happened in Spokane and other
13 places, including Colorado -- I'm sorry, including
14 Portland where the Archdiocese hired a PR firm to -- to
15 claim poverty, to talk about -- to convince the faithful
16 that programs would have to close and parishes and so
17 forth and so on, and spent -- one archdiocese spent 17
18 million dollars just on marketing that notion and on
19 attorneys fees. So we have Archdioceses that spend 17
20 million dollars on PR and lawyers fees to avoid paying
21 out any claims to any of the victims.
22      So I just, you know when you said that
23 Spokane had to sell everything that they owned, what did
24 they sell then and to whom did they sell it?

23 (Pages 86 to 89)

8220dda6-de90-4f5f-8500-b27425213391

Page 90

1    MR. TONY FLYNN: They sold the parish
2 headquarters. They sold whatever real property they
3 owned. They sold the Bishop's house. They sold
4 whatever assets were titled in the name of the Diocese.
5    SENATOR PETERSON: But all the parishes
6 were titled in the name of the Diocese.
7    MR. TONY FLYNN: They were titled in the
8 name of the Bishop, later ruled by the court not to be
9 the property of the Diocese for bankruptcy purposes.
10    REPRESENTATIVE LAVELLE: Let me correct
11 you, Senator. On the Portland payments, however, indeed
12 17 million dollars was paid in the bankruptcy to all
13 court-approved professionals. The 17 million dollars
14 was not paid to a public relations firm. The only
15 public relations firm paid through the 17 million was
16 the claimant's counsel's public relations firm. The 17
17 million dollars included payment for the defense of the
18 underlying cases, payment for the insurance litigation,
19 because Portland had to litigate with its insurers over
20 coverage, payments to the claimant's counsel. I mean,
21 one of the real problems with bankruptcy is it's ungodly
22 expensive. You got to pay everybody's lawyers and
23 consultants in the bankruptcy proceeding and that's what
24 the 17 million. It went to everybody, not just counsel

Page 91

1 for the Archdiocese.
2    And the only PR expense that was incurred
3 through the bankruptcy proceeding anyway was the
4 required two nationwide notices at the cost of $250,000
5 apiece to find these victims in Idaho or wherever who
6 would have claims in that bankruptcy proceeding.
7    SENATOR PETERSON: Well, with all due
8 respect I will disagree with you.
9    REPRESENTATIVE LAVELLE: Very well.
10    SENATOR PETERSON: I don't want to sit here
11 and read Professor Hamilton's work because she'll be
12 here to testify herself, but a lot of the information
13 that you just gave us was pretty self-serving and I have
14 not looked at in the legal context as Professor Hamilton
15 has done -- has found.
16    REPRESENTATIVE LAVELLE: What I'm telling
17 you is in the filings of the Bankruptcy Court.
18    SENATOR PETERSON: Just one line from
19 professor Hamilton. This is talking about Portland.
20 The Archdiocese while placed in the position to settle
21 with these victims from the very beginning making the
22 over 17 million dollars it spent on professional fees
23 seem hardly justified and the bankruptcy filing nothing
24 more than a delaying tactic. This settlement also laid

Page 92

1 to rest once again the hierarchy's oft repeated argument
2 that victims have driven Dioceses to litigation the
3 church cannot afford without undermining its provision
4 of essential service and religious practices. As I
5 said, Professor Hamilton is a whole lot more articulate
6 on the issue of bankruptcy than I am. But I just didn't
7 want to -- you know, I don't think three buildings is
8 everything the Diocese owned but we can let it rest
9 there.
10    REPRESENTATIVE VALIHURA: Thank you. Any
11 other questions? Thank you, Mr. Flynn. We really
12 appreciate you being here today.
13    MR. TONY FLYNN: Thank you, Mr. Chairman.
14    REPRESENTATIVE VALIHURA: Rita Moracco.
15 Mark Reardon is next and is Claire Dubius in the room
16 today? Claire is not here. That will be the -- is Ed
17 Burke in the room today? Mr. Burke, you will be the
18 last of the which I'll call the free after Mr. Reardon,
19 free reign, and after that I will ask my colleagues
20 whether they want to take a five-minute recess and after
21 that we have seven folks who have signed up that will be
22 time limited.
23    Ms. Moracco.
24    MS. RITA MORACCO: Good afternoon,

Page 93

1 Honorable judiciary members and Chairman, Representative
2 Valihura. My name is Rita Moracco and I speak to you as
3 a citizen of Delaware. I'd like to give special thanks
4 to Senator Peterson for bringing this Senate Bill
5 forward and having the tenacity to -- to push it through
6 the Senate and to bring it to the House hopefully. I
7 ask that you vote to move Senate Bill Number 29 to the
8 full House for a vote and passage into law. Survivors
9 of childhood abuse are left with injuries to their
10 psyche that may vary in degree but few are able to live
11 full and happy lives.
12    I use an analogy that perhaps people can
13 understand. Some -- some of these individuals
14 experience the same degree of debilitation that those
15 with spinal cord injuries experience. While others can
16 be compared to that of an amputee. They have adapted
17 their lives to accommodate a severed limb but the limb
18 will never grow back.
19    This issue has never been about money or
20 vengeance. It's about accountability, accountability
21 for the perpetrator; and validation, validation for the
22 injury sustained by the victim.
23    This Bill can reduce the number of victims
24 in the future. Thank you for extending the public

24 (Pages 90 to 93)

8220dda6-de90-4f5f-8500-b27425213391

Page 94

1  hearing through today. Please conclude that the Bill
2  must be moved to the full House for passage. Senate
3  Bill 29 does not take away the control of organizations,
4  to hold their employees accountable. It only holds
5  organizations accountable when they protect
6  perpetrators.
7        My profession is as an executive director
8  of a nonprofit. If I hear rumors of any abuse toward
9  any individual, child or not, I am duty bound to report
10 this to my Board of Directors. If they, in turn, choose
11 to ignore my report and not investigate it, it is my
12 opinion that they should be held accountable. The
13 impact of the accountability should be sufficient to
14 give great pause to repeating such protection of
15 offenders.
16       The Roman Catholic Church and others are
17 not being punished for having priests that were
18 criminals. They are being held accountable for
19 knowingly harboring sexual offending criminals. Thank
20 you very much.
21       REPRESENTATIVE VALIHURA: Thank you,
22 Mrs. Moracco. Could -- Miss Moracco, thank you. You're
23 an executive director of a nonprofit?
24       MS. RITA MORACCO: Yes.

Page 95

1        REPRESENTATIVE VALIHURA: And your
2  organization does deal with children, does it not,
3  somewhat?
4        MS. RITA MORACCO: We deal with parents of
5  children. We often -- it is rare that we have direct
6  contact with children to be very honest.
7        REPRESENTATIVE VALIHURA: Have you
8  discussed your liability under this proposed legislation
9  with your legal counsel?
10       MS. RITA MORACCO: Um.
11       REPRESENTATIVE VALIHURA: Not your personal
12 but your organization's liability.
13       MS. RITA MORACCO: Has the Board discussed
14 it with their legal counsel? Not that I'm aware of, no.
15       REPRESENTATIVE VALIHURA: So you're not
16 here on behalf of your organization? You're here as --
17       MS. RITA MORACCO: No, I am not here on
18 behalf of my organization. I'm here as a citizen of
19 Delaware that knows that many, many children's lives
20 have been destroyed and that this is one way that we can
21 put at least a bump in the road for perpetrators that
22 they will have some pause, that they will never, ever be
23 able to skip out on their accountability, that someone
24 will always be looking over their shoulders.

Page 96

1        REPRESENTATIVE VALIHURA: Thank you, Rita.
2  Any other questions? No. Yes, ma'am. Done. Super.
3  Thank you.
4        MS. RITA MORACCO: Thank you.
5        REPRESENTATIVE VALIHURA: My constituent,
6  Mark Reardon. No, they're not abandoning you. I think
7  that break I was proposing needed to come a little
8  earlier than I was going to make it.
9        MR. MARK REARDON: I am acutely aware that
10 I am all that stands between us and the five-minute
11 break so I can appreciate.
12       REPRESENTATIVE VALIHURA: Actually
13 Mr. Burke is.
14       MR. MARK REARDON: Mr. Chairman, members of
15 the committee, my name is Mark Reardon. I am a Delaware
16 attorney. I'm a former House attorney. I'm in private
17 practice in Wilmington. It has been my privilege over
18 the past 20 years or so to have either served on the
19 Board or serve as counsel of a variety of nonprofit
20 agencies: The Ministry of Caring, St. Francis Hospital,
21 Salesianum School, Archmere Academy, Nativity
22 Preparatory, Naamans Little League and others.
23       In my practice I have been defending
24 institutions who have rarely, thankfully, but painfully

Page 97

1  been accused of a volunteer or an employee who molested
2  a child. I am speaking not on behalf of any of these
3  institutions specifically, but, rather, from the vantage
4  point I have gathered from my years on the front line.
5  I support the legislative initiative to lengthen the
6  statute of limitations for civil claims for sex abuse,
7  but not to the extent proposed by Senate Bill 29. The
8  timeframe is too open-ended. And this Bill, this Bill
9  has the real potential to unfairly punish innocent
10 organizations.
11       I'd like to spend just a minute speaking
12 from the perspective of the organizations who are
13 wrongly accused. As drafted, this Bill goes too far,
14 and when I say too far I am specifically saying the Bill
15 should, one, not leave the statute of limitations open
16 for an indefinite duration of time; two, should not be
17 infinitely retroactive; and, three, should be directed
18 only towards the abuser.
19       I will address two of the primary reasons
20 why Senate Bill 29 should be amended from the
21 perspective of the falsely accused institution. First,
22 the sting of the word child molester. Let's make no
23 mistake. For the actual violator, for the perpetrator,
24 for the abuser, we all seem to agree, the full force of

25 (Pages 94 to 97)

8220dda6-de90-4f5f-8500-b27425213391

Page 98

1  the law should come bearing down upon them.  They
2  deserve to be brandished as a molester.  As someone
3  before me said, lock them up and throw away the key.
4  They deserve their due punishment under the law and then
5  some.
6        However, for those implicated by mistake or
7  by false accusation, for wrongly accused institutions or
8  people, the sting of the word child molestation is
9  simply devastating.  The word child molester is heinous
10  and it's life changing.  Just as the act of abuse is
11  heinous and life changing for the innocent victim, so,
12  too, is the moniker child molester heinous and life
13  changing for the innocent accused.
14        How does an innocent person defend himself
15  when the civil suit alleging abuse is filed?  How does
16  one prove that something did not happen five years, ten
17  years, 20 years ago?  How does an innocent organization
18  undo the taint, remove the smear of being accused of
19  harboring a molester?  Recall that when criminal charges
20  are brought there is an orderly time-tested process.  A
21  process that screens these cases:  Probable cause before
22  arrest, the Attorney General -- Attorney General's
23  Office felony screening unit before a grand jury review
24  and then grand jury review before indictment and trial.

Page 99

1        However, in the civil arena, that most
2  directly exclusively impacted by Senate Bill 29, there
3  is no comparable filtering system.  There is literally
4  no gate between the courthouse and the accuser.  Any
5  man, woman or child in Delaware, with or without --
6        REPRESENTATIVE VALIHURA:  Counsel, I mean,
7  I'll have to call you counsel now because you're acting
8  like one, Rule 11 is that gatekeeper and they have to
9  meet Rule 11 and, you know, that's a significant hurdle
10  in litigation, and you know it and I know it and the
11  Supreme Court of Delaware really knows it.
12        MR. MARK REARDON:  Mr. Chairman, you and I
13  can count on one hand the number of Rule 11 sanctions
14  that have been imposed by the Delaware Court.  The fact
15  of the matter is that Rule 11 is not a screening
16  mechanism.  It is a sanction imposed by the court for
17  frivolous litigation after the horse has left the gate.
18  The reality is there are brothers and --
19        REPRESENTATIVE VALIHURA:  But it does serve
20  as a screening.  I mean I won't even think about
21  bringing, unless I think about Rule 11 and whether I
22  have enough facts to insure that I'm not going to get
23  slammed by the court when I --
24        MR. MARK REARDON:  I couldn't agree with

Page 100

1  you more, and I'm aware of the very high ethical
2  standards of our brothers and sisters in the Delaware
3  bar and I'm casting no aspersions on them.  I am
4  recognizing the phenomenon of distorted memory over
5  time.
6        Let me give you an example pending from the
7  Delaware courthouse today.  In a civil case pending in
8  Delaware today, where the sex abuse relates back to the
9  70s and 80s, the plaintiff alleged that a Catholic
10  priest in a supervisory role harbored a pedophile.  For
11  the first two years of that lawsuit the plaintiff as
12  alleged -- the plaintiff alleged, in fact he swore, that
13  the specific priest, the harboring -- the harboring
14  priest, was a priest of a certain name.  Now, when
15  unmistakable evidence is brought forth in the discovery
16  process that it couldn't have been that priest of that
17  specific name, the plaintiff and his very well-intended
18  attorney amended their pleadings to recognize that it
19  was a similar-sounding completely different priest.
20        Relate back to my comment about the sting
21  of the word child molestation.  This was a well-intended
22  plaintiff who sat in the law office of an attorney on
23  the eve of statute of limitations.  Did they do their
24  due diligence?  Yes.  Did that lawyer meet his very high

Page 101

1  Rule 11 standard?  Yes.  But for similar sounding names
2  these are two entirely different men, one of whom's
3  reputation for two years was shaded by a very dark cloud
4  called child molestation.
5        That's the kind of issue I'm referring to.
6  Not as to the case being entirely frivolous or not to a
7  lawyer buying hook, line and sinker a tale of
8  fabrication.  I am talking about the innocent memory
9  mistake and the propensity for that to occur when we go
10  back ten, 20, 30 years.
11        I'm defending a case now where the
12  allegations relate back 50 years.  The alleged period of
13  abuse was 1956 and '57.  The supervising priest is gone.
14  The then Bishop is gone.  The Vicar General is gone.
15  There was no parish council.  There are no parish
16  records.  That case is in our Superior Court today.  It
17  is wrought with memory potholes.  That's the kind of
18  case I'm citing as an example.  Not as to Rule 11 as a
19  screening mechanism, but for the danger of using
20  ancient, ancient facts to bring a lawsuit in 2007 or
21  2008.
22        Let me cite another example.
23        REPRESENTATIVE VALIHURA:  Why -- tell me
24  how is it that suit is being brought without this Bill?

26 (Pages 98 to 101)

8220dda6-de90-4f5f-8500-b27425213391

Page 102

1    MR. MARK REARDON: That is precisely the
2  question we have in front of the Superior Court. Let me
3  just --
4    REPRESENTATIVE VALIHURA: Because what are
5  we here for if you can bring that claim today what are
6  we dealing with?
7    MR. MARK REARDON: The Delaware statute of
8  limitations, as everyone in this room is aware, is two
9  years unless an injury is inherently unknowable. Now,
10  inherently unknowable as it has been developed in the
11  Delaware case law relates to oh, the common things,
12  well, thankfully not too common, but by way of example,
13  the surgeon that inadvertently leaves a sponge in the
14  belly of a patient and the patient doesn't know until an
15  infection flares up five years after the fact. That
16  constitutes inherent unknowability. The acquiring
17  company that buys a subsidiary and doesn't realize an
18  accounting firm's negligence until years after the fact.
19  Inherent unknowability.
20    The short answer to your question, Mr.
21  Chairman, is this phrase repressed memory. The
22  plaintiff's bar in Delaware, and now there are two cases
23  pending and several more underway, are attempting to
24  skirt the two-year statute of limitation by saying these

Page 103

1  -- the traumatic amnesia imposed on my client, the
2  plaintiff, was so significant that when he was 15 or 16
3  or 17 he couldn't appreciate the wrongfulness of what
4  was happening, in fact he's blocked it out for the past
5  19 years. It's only now with the headlines and the
6  stories and the legislation and the attention that sex
7  abuse is getting that these memories are beginning to
8  resurface.
9    It is a wildly debated phenomenon in the
10  medical clinical community and I am certainly ill
11  equipped to take on that discussion today. I can only
12  say that all quarters of the medical community are
13  looking with careful eyes at this phenomenon, this
14  clinical phenomenon recognized as either traumatic
15  amnesia or false memory. The Superior Court in Delaware
16  has up to today simply taken the point, we don't know if
17  there was traumatic amnesia or repressed memory in this
18  case, and we don't even know if repressed memory is
19  valid enough to make the legal decision that that
20  constitutes a new element of inherent unknowability
21  under Delaware's statute of limitations law, but we do
22  know that additional discovery and exchange of expert
23  witness reports and depositions are going to be required
24  for a full and fair discernment of whether Delaware case

Page 104

1  law will be advancing to the point of adding repressed
2  memory.
3    So, long answer to your short question, why
4  is that 50-year-old case in the courthouse? It's
5  because by the language of that complaint, that
6  complaint said I would have brought suit if I knew I had
7  been harmed but these harms were so traumatic that as a
8  child that I didn't appreciate the danger that I was
9  subjected to until now that I'm 60 some years old.
10    REPRESENTATIVE VALIHURA: Thank you.
11    MR. MARK REARDON: Let me cite another
12  example or two as to institutions wrongly or potentially
13  wrongly accused and why Senate Bill 29 should have at
14  least some retroactive backstop and some prospective
15  limitation in its reach in terms of the statute of
16  limitations. In Delaware today is a 40-year-old man who
17  alleges - just recently brought this to our attention -
18  earlier this year he recalled that he was victimized by
19  a sexual abuser 30 years ago. His abuser was a minister
20  in training from an out-of-state seminary who would
21  spend weekends at this Delaware-based church. This
22  visiting seminarian ran the Sunday evening teen group
23  that met in the church basement Sunday nights during the
24  school year.

Page 105

1    Now this victim who I said is 40 can only
2  recall today that his abuser had dark hair and a slender
3  build. The victim does not remember the man's name. He
4  remembers the name of the church. It's a small church
5  in the Newark area and it's unaffiliated with any major
6  denomination or Diocese. The victim doesn't remember
7  the date or even the month, only that it must have
8  occurred during the school year since that's when his
9  youth group would meet on Sunday evenings. The church's
10  records do not go back 30 years. They can't even begin
11  to identify the names of the young seminarians who on a
12  rotating regional tour of duty visited that church over
13  the decades. What the church does know is that at no
14  time in the past 30 years has a claim of abuse ever been
15  made against anyone associated with that church until
16  now.
17    However, under Senate Bill 29 as introduced
18  this victim can directly sue the church, and trust me,
19  when that lawsuit is filed it will be public record and
20  the lawsuit will no doubt assert against this church
21  claims of gross misconduct, negligent hiring, negligent
22  supervision and breach of fiduciary duty, that legal
23  duty owed to any overseeing institution to the
24  individuals in its charge. Why? All because this

27 (Pages 102 to 105)

8220dda6-de90-4f5f-8500-b27425213391

A180

Page 106

1  church is alleged to have had an intern on weekends, a
2  visiting student minister, who is alleged to have
3  committed a sexual assault 30 years ago.  How does that
4  institution today defend itself against this claim, 30
5  years after the fact, without any information as to the
6  date, the time, the place, the circumstance or whether
7  there were even witnesses.
8          In this case also unintentionally impacted
9  by Senate Bill 29, besides the institutional church that
10 I'm referring in this example, are other law-abiding
11 ministers in this community who might unfortunately
12 today be in their 50s, be male, and once have had
13 slender build and dark hair.  These men will be painted
14 with too broad a brush.  People in his congregation will
15 wonder, will worry, was it him?  Maybe it was him.
16 Maybe it was him.  Ministers will needlessly worry, do
17 they think it's me?
18         Another brief third example, this
19 highlights the fact that not all lawsuits are filed for
20 seeking justice.  Not all lawsuits clear that very high
21 standards that our brothers and the sisters of the bar
22 are bound by Rule 11:  Revenge.  These are not the kind
23 of lawsuits brought by the people in this room.  I know
24 these families.  They have watched me grow up.  I know

Page 107

1  their children.  I know these victims.  I have lived in
2  the community for my entire life of the families that
3  are before you.  I'm talking about a different kind of
4  case.
5          And let me tell you one that you will read
6  about.  A caller to my office this past winter expressed
7  his first-hand knowledge, in fact his first-hand fear
8  that as a former employee of the Ferris School - the
9  caller by the way is currently a police officer in
10 Delaware - but in his younger days as an employee at
11 Ferris school a former detainee who is now 33 years old
12 has called to say I'm going to sue you and I'm going to
13 say you molested me.  Why is that?  Purely for the
14 revenge of being the front line of the law in juvenile
15 proceedings 18 years ago.  The alleged accuser has
16 absolutely nothing to lose except the most heinous,
17 shadowy way of seeking revenge, to take a husband, a
18 father, a city police officer and say you molested me
19 when I was at Ferris 18 years ago.
20         This proposed window, for all the good that
21 it will do in allowing retroactive claims to come
22 forward, leaves open spite lawsuits.  Teachers, coaches,
23 camp counselors, fathers or mothers of estranged
24 children are all vulnerable under Senate Bill 29.

Page 108

1          REPRESENTATIVE VALIHURA:  Counsel,
2  Mr. Reardon, I should say, those spite lawsuits could
3  happen today.  I mean someone -- no one is going to sit
4  here and say there is no sexual abuse going on in our
5  prisons or in our schools.  I mean, that is exactly
6  Mr. Lavelle's point.  And is there any evidence that
7  these spite lawsuits would be greater than is already
8  occurring in the general litigation system today?
9          MR. MARK REARDON:  No, they are not, and I
10 don't speak to you from any sociological data study.  I
11 don't speak to you from anything other than the
12 telephone that I pick up every day.  This particular
13 caller, this particular alleged abuser in speaking with
14 his former charge at the Ferris School, said simply, you
15 know, when the floodgates open I am going to be standing
16 in line.  I am going to be standing in line.  For one,
17 it's no longer a shame to say I was an abuse victim and
18 I am going to get in line and this is my way to bring
19 you down, brother.  That's as it was reported to me.
20         Listen, there is data on false claims.
21 There is a lot of data on false claims.  I can cite to
22 you just a few examples but there is going to be time
23 for this to be reviewed in more detail.  In Charlestown,
24 South Carolina, in 2003 the Diocese of Charlestown

Page 109

1  reported that it had received 48 allegations of abuse
2  involving 24 different --
3          (Whereupon Tape 2, Side 1 ended.  The
4  following is Tape 2, Side 2.
5          MR. MARK REARDON:  I'm sorry.  25 were
6  determined to be without merit and only 23 proceeded to
7  the class action settlement trust.
8          Other jurisdictions of note.  In Covington,
9  Kentucky, in 2003 and 2004 class action lawsuits were
10 filed against a Diocese there.  So far 263 of those
11 claims have been submitted to special masters, of which
12 241 have been completed and adjudicated and of those 241
13 124 of those claims have been rejected as without merit.
14 124 of the 241 by the special master of the settlement
15 trust in a class action have said there is not the
16 indicia of credibility, there is not the independent
17 corroboration of evidence to justify you getting in the
18 settlement line.
19         REPRESENTATIVE VALIHURA:  I think we have
20 two questions.  One from Senator Peterson and one from
21 Representative Hudson on these topics.
22         MR. MARK REARDON:  Yes, Representative.
23         REPRESENTATIVE HUDSON:  Well, I think it's
24 great that the claims were proven that they weren't

28 (Pages 106 to 109)

8220dda6-de90-4f5f-8500-b27425213391

A181

Page 110

1  worthy. That's what the system is for and I hope there
2  aren't attorneys in Delaware who will try to do that,
3  put their reputation on the line and try to take a lousy
4  case to the Honorable Superior Court of Delaware.
5       MR. MARK REARDON: You're saying you do
6  hope there are or there are not?
7       REPRESENTATIVE HUDSON: No, I -- well, I
8  think the system will prove that only a good case will
9  go through. Who knows what will happen? I mean you're
10  a good attorney. You're not going to represent one of
11  those losers who is trying to do a revenge, but maybe
12  somebody will, but when it gets to the court then the
13  court will sort it out, I'm sure, and that's the system
14  we have in place with this Bill, I believe.
15       MR. MARK REARDON: It is true, but how do
16  you unring the bell? How do you unring the bell when
17  you are named as a defendant in a lawsuit that a year
18  after the fact is proven without merit? The front page
19  maybe of the B section of the News Journal document will be:
20  Abuse case filed against fill in the blank, abuse case
21  filed, fill in the blank, the Reardon, the Reardon Day
22  Care Center. After discovery, after document
23  production, after Interrogatories and depositions and
24  after briefing and the court says this is a frivolous

Page 111

1  matter, there will not be a headline of comparable place
2  or size that said Reardon Day Care Center exonerated.
3  How do you remove the sting, the taint, the dark heavy
4  cloud that follows the innocently accused? That's the
5  perspective I'm standing here. I'm urging --
6       REPRESENTATIVE HUDSON: Well, that happens
7  with other cases in Delaware, today, even, you know,
8  even a neighborhood barking dog case or --
9       MR. MARK REARDON: Representative, with all
10  due respect, having been accused of owning a back -- a
11  backyard chain link fenced-in barking dog doesn't carry
12  the same to-your-obituary-page stigma of being accused
13  of being a child molester, with all due respect. And
14  your example is a good one to say that frivolous cases
15  are screened out.
16       REPRESENTATIVE HUDSON: Yes.
17       MR. MARK REARDON: I'm simply saying that
18  in Delaware other than the words serial murder there is
19  not a more disastrous moniker that you can tag to an
20  individual or institution than the word child abuser,
21  and I say to -- to the actual abusers, you're right, you
22  deserve that moniker, and I wish there was a stronger
23  word in our vocabulary. Words, I don't have the words
24  to use an adjective in front of the word child molester.

Page 112

1       REPRESENTATIVE HUDSON: But, further, that
2  has nothing to do with the timeline either. You're just
3  trying to create an air of there is something horrible
4  that is going to happen with this Bill. These tragedies
5  are going to occur. That has nothing to do with the
6  merits of the Bill in the timeline to your back -- or
7  going forward.
8       MR. MARK REARDON: I don't have the stature
9  or the presence or the vocabulary to create an air of
10  any kind. I'll tell you, Representative --
11       REPRESENTATIVE HUDSON: You were making me
12  gasp so you did a good job. I was very worried and but
13  then I realized, no, we have the Delaware court system.
14  It won't go through. I settled myself down --
15       MR. MARK REARDON: I respect your comment
16  that this will all be ferreted out in the court system.
17  My only pitch is that in your working of this Bill, in
18  your deliberations over this Bill, and in your vote of
19  this Bill, please stop and consider whether it is a
20  balanced approach towards the very long overdue, long
21  ignored rights of abuse victims, and the institutions
22  that are being accused of harboring the molesters. That
23  is my only presence today is to ask you to take that
24  stop-and-think moment and say in justifying this very,

Page 113

1  very worthy goal of extending retroactively and
2  prospectively the statute of limitations so these
3  families here today and others like them can have their
4  day in court. Am I going too far?
5       REPRESENTATIVE HUDSON: No, you're fine.
6  Let me ask another question.
7       MR. MARK REARDON: Sure.
8       REPRESENTATIVE HUDSON: Am I allowed?
9       REPRESENTATIVE VALIHURA: Sure.
10       REPRESENTATIVE HUDSON: You mentioned you
11  were involved in a case, one of these cases now?
12       MR. MARK REARDON: Several.
13       REPRESENTATIVE HUDSON: Several. And who
14  are -- which side are you representing?
15       MR. MARK REARDON: I have the institutional
16  defendants, no alleged abusers or criminals, if you
17  will.
18       REPRESENTATIVE HUDSON: Okay. But yet
19  you're here to tell us how to rewrite the Bill. I mean
20  I just -- it feels very awkward and again --
21       MR. MARK REARDON: In what sense?
22       REPRESENTATIVE HUDSON: In the sense that
23  you're involved in a case and we're trying to make a
24  fair law and you're here to say do this, do that,

29 (Pages 110 to 113)

8220dda6-de90-4f5f-8500-b27425213391

A182

Page 114

1  whatever, and you're perhaps representing you say
2  perhaps an organization or?
3          MR. MARK REARDON:  Plural, organizations.
4          REPRESENTATIVE HUDSON:  Okay, and I think I
5  might have read about that in the paper.
6          MR. MARK REARDON:  There are several, but
7  only one with -- you're referring to the Eden versus
8  Salesianum case, that is the only case pending against
9  Salesianum.
10         REPRESENTATIVE HUDSON:  And that is where
11 the priest was sent to South Africa?
12         MR. MARK REARDON:  No.
13         REPRESENTATIVE HUDSON:  Sorry.  I got my
14 cases -- but that was you, too, isn't it?
15         MR. MARK REARDON:  The priest involved is
16 not my client, but the school that he used to be
17 principal of is my client and the religious order of
18 which he is a member is my client, yes.
19         REPRESENTATIVE HUDSON:  Okay.
20         MR. MARK REARDON:  No, he was not sent to
21 South Africa.  He's got world-wide internal ministry and
22 his travels have taken him.
23         REPRESENTATIVE HUDSON:  And actually back
24 to my discussion on the -- what's the term that the

Page 115

1  church uses, the Safe Environment Program?
2          MR. MARK REARDON:  Yes.
3          REPRESENTATIVE HUDSON:  He didn't fall
4  under a person that needed to not go to --
5          MR. MARK REARDON:  That's correct.
6          REPRESENTATIVE HUDSON:  -- continue in his
7  ministry under the Safe Environment Program?
8          MR. MARK REARDON:  Yes.  You're correct,
9  Representative.  That's right.  Thank you for picking
10 that up.  The Safe Environment Program is for those who
11 are admitted, corroborated or substantiated abusers.
12 This man, 40 plus years a priest, has one allegation
13 from one accuser dating back to 1985.  He has been
14 relieved of his public ministry.  He can not do anything
15 in the way of rendering the sacraments in a public way.
16 What he is doing, because it's not a criminal charge
17 pending, it is only a civil claim in the context of the
18 Delaware court system that says we're alleging that you
19 worked for an organization that negligently permitted
20 you to have contact with this young man.  As a result of
21 that accusation alone, the oblates, beholden to the
22 Diocese and the bishop, removed him, North
23 Carolina, removed him instantly, instantly, from public
24 ministry.  The claim was brought to the Delaware

Page 116

1  Attorney General's Office on April 11th, 2002.  On April
2  13th, 2002 that priest was removed from public ministry.
3  He has been in internal ministry, writing grant
4  foundation -- foundation grants, organizing the
5  distribution of mission funds to the oblate missions
6  around the world.  He is not in public ministry and any
7  suggestion to the contrary is --
8          REPRESENTATIVE HUDSON:  And not in youth
9  ministry?
10         MR. MARK REARDON:  Certainly not in youth
11 ministry.  This is all very much in the public record.
12 The folks who had their own self interests in getting
13 this whole South Africa thing out there ignored
14 completely sworn Interrogatory Answers in our Superior
15 Court.  Was it in their political self interest to do
16 that?  Sure.  And do I say there is a pretty sharp piece
17 of spinning advocacy?  Sure.  But did it ignore certain
18 record facts on the court's docket at the moment that he
19 said these South African travel -- absolutely.
20         REPRESENTATIVE HUDSON:  I'm sorry.  I
21 didn't mean to get you off --
22         MR. MARK REARDON:  That's all right.
23         REPRESENTATIVE HUDSON:  -- on that issue.
24 Let me ask you, do you agree with Tony Flynn about the

Page 117

1  year 1987 being an appropriate stop date?  Is that
2  something that's on your mind as well?
3          MR. MARK REARDON:  I haven't dwelled on it,
4  but it certainly seems logical to me that if in the due
5  process analysis in the criminal vein we have said that
6  due process is appropriate to reach back to what was it,
7  July of 1987?  Is that the date?
8          REPRESENTATIVE HUDSON:  1987.
9          MR. MARK REARDON:  I don't know why we
10 would have a different definition of due process in the
11 civil arena than in the criminal arena.  So to that
12 extent I can say yes, wherever the Legislature believes
13 it can go back criminally certainly make sense to
14 me civilly.
15         REPRESENTATIVE HUDSON:  But you know that
16 it might not meet all the needs of all the victims
17 picking an arbitrary date like that, so therefore it is
18 unequal and unfair to all concerned?
19         MR. MARK REARDON:  Well, statutes of
20 limitations are harsh.  The United States --
21         REPRESENTATIVE HUDSON:  That's what we're
22 trying to get rid of.
23         MR. MARK REARDON:  The United States and
24 the Delaware Supreme Court have recognized that statutes

30 (Pages 114 to 117)

8220dda6-de90-4f5f-8500-b27425213391

Page 118

1  of limitation are harsh, and those same courts have said
2  in the pursuit of justice, if it means the occasional
3  denial of rendering of aid to a worthy victim that we
4  have maintained our sense of due process, then that's a
5  tradeoff that the court systems have upheld in
6  recognizing statutes of limitations. I don't know why
7  the analysis would be different here, Representative.
8        REPRESENTATIVE HUDSON: Thank you.
9        MR. MARK REARDON: I am delaying the
10 long-awaited five-minute break, but let me just conclude
11 with a second reason -- I'm sorry, Senator - a second
12 primary reason why this Bill ought to be amended. As
13 drafted Senate Bill 29 completely eliminates the statute
14 of limitations. For these kinds of cases that should be
15 particularly troubling to those of you charged with
16 monitoring the fairness of our justice system. By the
17 nature of these abuse allegations typically there are no
18 witnesses, there are no records, there is no physical
19 evidence. Compare that to another kind of a civil
20 lawsuit, a car crash or a breach of contract or a
21 medical malpractice claim where there is contemporaneous
22 records, where there is photographs, there is police
23 reports and eyewitnesses; here nothing but memories,
24 emotion, perhaps faded memories, distorted over time.

Page 119

1  In writing about the timing of filing civil lawsuits,
2  and specifically in writing about the statute of
3  limitations, the United States Supreme Court wrote
4  statutes of limitations protect parties from the
5  prosecution of stale claims - not bad claims or
6  meritless claims, but stale claims - when by the loss of
7  evidence from the death of some witnesses and the
8  imperfect recollection of others, or because of the
9  destruction of documents it might be impossible to
10 establish the truth and defend one's innocence.
11       In conclusion -- I'm sorry, Senator, did
12 you have a question?
13       SENATOR PETERSON: Yes. Go ahead.
14       MR. MARK REARDON: In conclusion, for
15 Senate Bill 29 to be fair it must balance the
16 long-neglected rights of the innocent victims and the
17 rights of those who may have to defend their innocence
18 of these allegations of child abuse. Speaking from the
19 vantage point of the wrongly-accused institutions, I
20 urge you to act on Senate Bill 29 to pass it and to add
21 some modicum of protection for the institutions which
22 stand to be wrongly stung by the heinous phrase child
23 molester. Please vote to pass but amend Senate Bill 29.
24       Senator Peterson.

Page 120

1        REPRESENTATIVE VALIHURA: Yes, Senator.
2        SENATOR PETERSON: Just a couple comments,
3  Mr. Reardon. You note the Supreme Court talking about
4  records being lost and witnesses, no witnesses, no
5  records, no chance of prevailing. I mean the burden is
6  on the accuser. So if the witnesses are gone, the
7  records are gone, not much of a chance of that accuser
8  prevailing.
9        MR. MARK REARDON: Respectfully disagree.
10       SENATOR PETERSON: Well, Dr. Hamilton -- or
11 Professor Hamilton can address that because she's been
12 involved in a couple thousand of these. So I'll leave
13 that for her. But I think it's different in this case
14 because the average age of the victim is nine, average
15 age of which a child is abused is nine. You know, more
16 than half of all rapes in this country the victims are
17 under 12 years old. 20 percent of those are raped by
18 their own fathers. There are circumstances here that
19 are real different from the car accident where, you
20 know, there was a witness in the next car. These are
21 real different cases and I believe they require a real
22 different statute of limitations.
23       MR. MARK REARDON: I agree.
24       SENATOR PETERSON: These kids go through

Page 121

1  life thinking somehow it was their fault or they were
2  threatened that if they told anybody that mommy or daddy
3  would be killed or, I mean, there is just some real
4  drastic, dramatic circumstances.
5        MR. MARK REARDON: Completely agree.
6        SENATOR PETERSON: I'll tell you something
7  else, Mr. Reardon, if we were talking about the flu in
8  this case and one in five kids in Delaware had it, we'd
9  be telling parents not to let the kids out of the house.
10 I mean it would be declared an epidemic. But this is
11 child sexual abuse. A lot of these people are older
12 now. They never had an opportunity to come forward.
13 They never had an opportunity for justice. They never
14 had any of that, and to seek to deny that, you know, I
15 look at a Rob Quill who is now 52 years old who was
16 molested by Francis DeLuca who was then moved to Holy
17 Spirit where he molested, who was then moved to St.
18 Matthews where he molested, the Diocese of Wilmington
19 not only allowed it, they actually enabled him. Every
20 parish was a new batch of victims.
21       So whether you're 43 years old or 52, your
22 life is still ruined and not having the statute of
23 limitations goes to the Rob Quills and the other people
24 in this room, some of whom have not spoken yet. And

31 (Pages 118 to 121)

8220dda6-de90-4f5f-8500-b27425213391

Page 122

1  that's the reason.  To say put some magical age 43 and
2  it cuts off, or last year Tony Flynn wanted age 30, it
3  was age of majority plus 12 years.  I mean I don't know
4  where the magic numbers come from, 30 or 43.  I'm saying
5  if you were injured and you can prove your case, you can
6  prove it was gross negligence, you ought to have your
7  day in court.  You ought to be able to face the person
8  who killed your soul, who ruined your life, who drove
9  you to the brink of suicide and in some cases to
10 suicide.  You know, this is -- I mean this is -- to me
11 this is just an incredibly serious issue.
12       The false claim issue, there are a lot of
13 things that people get called in the newspaper with
14 their pictures, one of which is rapist.  I mean I think
15 being called a child abuser or molester is right up
16 there with rapist but those names and pictures go out
17 there.  People accused of murder, those names go out.
18 People accused of stealing from -- of embezzling from
19 their employer, their names and pictures go out there.
20 And I can tell you that Father Tom Doyle who testified
21 in the Senate he's been -- he's travelled around the
22 world actually, but here in the United States he's been
23 involved in over 2,000 of these cases personally.  And
24 he was asked in the Senate how many false claims were

Page 123

1  there that you're aware of?  Two.  Two out of 2,000.  I
2  don't think you kill the Bill because there might be
3  two.  You know, I just don't.
4       The issue of picking 1987 as the
5  retroactive date, we didn't pick 1987 as the retroactive
6  date.  House Bill 66 attempted to remove the statute of
7  limitations going backwards, but two days after the
8  Governor signed the Bill the Supreme Court handed down a
9  decision in the California case that said you can't
10 impose it indefinitely retroactively, but we as a body
11 approved it unanimously, the Senate and the House
12 approved unanimously to try to lift the statute going
13 backwards.  We lifted it going forwards forever.  I
14 don't remember you being here to oppose that.  I
15 remember you saying gee, it's not fair that 30 years
16 after the fact somebody can be accused of a molestation.
17 You know, I didn't tell see you then to oppose.  But
18 when it comes to -- I know you represent the oblates in
19 the Eric Eden case.  It seems a little self-serving.  I
20 agree with Representative Hudson.
21       MR. MARK REARDON:  How is that, Senator?
22       SENATOR PETERSON:  Seems a little bit
23 self-serving that you would be here saying oh, no, you
24 chop it off at this end, chop it off at that end because

Page 124

1  my client would stand to gain from those kind of
2  amendments to the Bill.
3       Finally, you know, some people have asked,
4  you know, amend section A, and then amend section B, cut
5  off the retroactivity going backwards.  The trial
6  lawyers want C amended and the insurance people, you
7  know, want B amended.  By the time we get done amending
8  it we'll be left with a title and a number.  Everybody
9  says I'm in favor of the Bill but take A out of there or
10 take B out of there or take C out of there.  There won't
11 be anything left, and you're all here because you all
12 have clients and you all stand to lose.  But you know
13 who lost the most in all this?  The little kids.  The
14 little kids who were molested and the adults who allowed
15 it to happen.  They need to pay.  And I say that as a
16 Catholic.  They need to pay.
17       REPRESENTATIVE VALIHURA:  Do you want to
18 take a break?
19       SENATOR PETERSON:  Rob Quill is
20 unemployable because of what the Diocese of Wilmington
21 allowed to happen to him.  He's unemployable and you
22 would have it that he would be entitled to not one red
23 cent.  He can't work any more.  He's been declared
24 totally disabled, and you would have him what, live on

Page 125

1  welfare?  It's not his fault what happened to him.
2       MR. MARK REARDON:  Senator, I respectfully
3  disagree with your characterization of my assessment of
4  the Quill case.  I have not abused anyone.  You have not
5  abused anyone.  And I'd like to talk to you about the
6  policy issue at stake here.  And that is, how do we find
7  the appropriate way of seeking and providing justice for
8  the harms, the wrongs, the tragedies of years gone by?
9       SENATOR PETERSON:  We did that through
10 gross negligence which is defined in section B.  Gross
11 negligence was that sorting-out process.
12       MR. MARK REARDON:  Gross negligence is a
13 jury issue.  It will not be screened at the pre-trial
14 stage of the case.  It will not be decided by a motion
15 to dismiss.  It will not be decided by motion for
16 summary judgment.  For the Boys Club and Girls Club or a
17 YMCA, for a Little League to have to defend themselves
18 through three years of litigation, unless they can find
19 a pro bono lawyer like me to do it for year after year
20 at no charge there will be no Little League or Boys
21 Club.  The defense of ones innocence will cost tens, if
22 not hundreds, of thousands of dollars.  It will only be
23 a jury issue.
24       Senator, the issue of gross negligence

32 (Pages 122 to 125)

8220dda6-de90-4f5f-8500-b27425213391

Page 126

1  comes up in the Delaware courts rarely. It has been
2  defined in different ways, but here is the one constant:
3  It's determined to be an issue of fact. So it needs to
4  proceed to a jury of six people in the Federal Court or
5  12 people in the State Court and only after that
6  excruciating and expensive and anxiety-inflicting
7  process called litigation does the Boys Club or Naamans
8  Little League or a Girl Scout troop get to stand up on
9  the courthouse steps and say I told you we didn't harbor
10  someone we knew was wrong. I told you that we didn't --
11  we did everything that institutions were doing in 1973.
12      REPRESENTATIVE VALIHURA: Representative
13  Lavelle has a statement.
14      REPRESENTATIVE LAVELLE: Representative
15  Kowalko can go.
16      REPRESENTATIVE VALIHURA: I'm sorry?
17      REPRESENTATIVE LAVELLE: Representative
18  Kowalko was before me. I saw him waving.
19      REPRESENTATIVE VALIHURA: I'm sorry. I
20  didn't see him. I apologize.
21      REPRESENTATIVE KOWALKO: Yeah. I
22  appreciate your concerns about falsely accused, being
23  branded as child molesters, but the example -- one of
24  the examples you gave quite frankly confuses me. You

Page 127

1  had talked about a prison guard I believe, that an
2  incarcerated victim was 18 years ago and threatened to
3  bring charges against that, so that would be within a
4  parameter of even any amended Bill, the 18 years. But
5  that could happen five years ago, somebody could do that
6  two years ago and make that accusation.
7      MR. MARK REARDON: True.
8      REPRESENTATIVE KOWALKO: And this Bill
9  would not prolong that agony of being accused as a child
10  molester. That's not the intention of this Bill. And I
11  certainly don't see that this enhances that possibility
12  of someone being branded unfairly as a child abuser.
13      MR. MARK REARDON: Well, it does -- it does
14  widen the timeframe in which these cases can be brought.
15  If that same claim were brought this year, 2007, that
16  claim is presumably going to be barred by the two-year
17  statute of limitations unless the plaintiff, the
18  putative plaintiff can say memory suppression, some end
19  run around the two years, inherent unknowability. If
20  this statute -- if the statute of limitations is
21  extended retroactively by Senate Bill 29 that case can
22  come forward, and more to the point, the phone caller
23  says to me, fearful that he will be a named defendant,
24  this guy says he's just going to get in line, that he

Page 128

1  won't stand out as being anything unusual when the other
2  people start filing lawsuits.
3      So is it anecdotal? Yeah. Is it
4  illustrative of the concern that I have that it is more
5  difficult to defend ones innocence going into ancient
6  history? Absolutely yes.
7      REPRESENTATIVE KOWALKO: Well, I don't
8  think the example that you gave is applicable to this
9  Bill, and, quite frankly, the fact that this Bill will
10  extend the timeframe for victims of a crime that are so
11  psychologically damaged, so psychologically impaired at
12  such a young age that it is in fairness that this Bill
13  should be in place as it is unamended. In fairness to
14  the victims. We're talking fairness to the victims
15  here. We're not talking fairness to the institutions.
16  We're not talking fairness or unfairness. That will be
17  determined by the courts and that's as it should be.
18      MR. MARK REARDON: I couldn't agree with
19  you more and you hit the nail on the head when you said
20  these victims need to get justice for their crimes.
21  These aren't crimes we're trying to solve with Senate
22  Bill 29. These are civil lawsuits. I also agree with
23  you 100 percent when you say that these victims deserve
24  to confront their abuser. I agree with you, but not the

Page 129

1  institution, the Little League or the Boy Scout troop or
2  the YMCA day care camp that in 1973 wasn't doing the
3  kind of background checks that are routinely done now.
4  Representative Valihura pointed -- or Representative
5  Lavelle pointed out the classic example of his wife
6  needing a background check before she could chaperone a
7  school child on a class trip. That is the kind of
8  behavior that institutions thankfully have had to bring
9  themselves into the 21st century. It's happened over
10  the last five or ten years.
11      You can not volunteer as an umpire at a
12  Little League without signing -- without a two-page
13  background check. You can not be a Boy Scout leader
14  without a thorough background check. You can't
15  volunteer at a YMCA camp for children without a thorough
16  background check. That is a good thing. That is a good
17  thing. Listen, there is a lot of things in our culture.
18  We can not defend the way things were done in the 50s,
19  the way things were done in the 40s. We can't defend
20  the way volunteers came and went from child youth
21  service organizations in the 50s, 60s, 70s and 80s, but
22  we can correct what -- we can correct the mistakes, the
23  shortfalls and protocols in the past and move forward
24  and thank God that has happened.

33 (Pages 126 to 129)

8220dda6-de90-4f5f-8500-b27425213391

Page 130

1    REPRESENTATIVE KOWALKO: Well, we can
2    correct the shortfalls of making sure that our children
3    are protected in the future, but we certainly can't
4    excuse the shortfalls of the Diocese in not only
5    covering up but enabling these crimes to be perpetuated
6    -- perpetrated, I'm sorry.
7         REPRESENTATIVE VALIHURA: Thank you.
8    Representative Lavelle.
9         REPRESENTATIVE LAVELLE: Not with the
10   witness. Thank you.
11        REPRESENTATIVE VALIHURA: Okay. Do you
12   want a statement?
13        REPRESENTATIVE LAVELLE: After the witness
14   is excused.
15        REPRESENTATIVE VALIHURA: Okay. Thank you.
16   Any other questions? If not, thank you very much,
17   appreciate Mr. Reardon. We -- I sense some angst among
18   my colleagues, so we're going to take a five-minute
19   break now, but we're going to let Representative Lavelle
20   make a comment before we go on to that five-minute break
21   and I apologize to Mr. Burke who will start when we come
22   back.
23        REPRESENTATIVE LAVELLE: Thank you,
24   Representative. My apologies to everyone. I am going

Page 131

1    to have to excuse myself. I am happy - and I know I
2    can't vote in absentia - but to vote to release the Bill
3    to the floor, important issue, should be discussed and I
4    will pursue House Amendment Number 2, and some of the
5    comments, and not to belabor this, but, again, I think
6    it's important on this discussion on this proposed
7    amendment to go back to 1987, Representative Hudson I
8    believe you indicated it would be unequal and unfair to
9    allow that, I would respectfully suggest that it would
10   be unequal and unfair to allow the State to hide behind
11   sovereign and limited immunity. Representative Kowalko
12   used words of fairness and things along that line, and
13   that to be fair, to be equal, to be responsible and
14   accountable is why I will pursue and happy, pleased to
15   get the Bill to the floor to have this debate take place
16   with all of our colleagues.
17        Again I'm happy to release it. I know I
18   can't do that, Representative, but just so people know
19   I'm not ducking out. I wouldn't release it, but I'm
20   happy to do that. Thank you for giving me the
21   opportunity to make a comment.
22        REPRESENTATIVE VALIHURA: Thank you. We
23   will take a -- it is now five minutes to four. We're
24   going to be back here at 4 o'clock.

Page 132

1    (Recess taken.)
2         REPRESENTATIVE VALIHURA: All right. Thank
3    you very much everyone. I hope that was as helpful to
4    you as it was for the members of the committee. If we
5    could have Ed Burke to the podium, and I'd also want
6    to take the time to recognize my colleague, Pam Maier,
7    who is here. Pam, thank you very much for attending.
8    She is passing notes. She is letting us know of her
9    interest in this and I appreciate her taking the time to
10   be here today.
11        Mr. Burke.
12        MR. ED BURKE: Mr. Chairperson, thank you
13   very much. Members of the committee, I thank you as
14   well. How about that, is that better? I come and speak
15   to you as a survivor representing the Voice of the
16   Faithful unofficially. Also with permission from
17   Survivors Network of Those Abused By Priests. I come as
18   that survivor from a member of a family of six, of those
19   six five of us were all abused and we also have next
20   generation -- well, I'll give you the breakdown. I have
21   a sister who was abused. I have two brothers and myself
22   that are living who were abused. My brother who is
23   deceased, I would be willing to lay down my life that he
24   was abused as well. I have three nephews that we know

Page 133

1    of -- four nephews that we know of and four nieces that
2    I know of that were all abused. We have a suicide in
3    our family, and I dare -- well, he's not here, but I
4    guarantee you that her brothers' and sisters' memories
5    are not too hard to recall that that suicide took place.
6         Repressed memories I'll stand here any day
7    and argue that they are not invalid. It was many years
8    after I was abused before I was able to bring it
9    forward. It came forward after my parents died and then
10   it really came forward when I had to go seek counseling.
11   I'm -- I was putting my wife through hell and so I had
12   to get help and when I did it came out that I was
13   abused.
14        I'd just like to say before I get off that
15   I'd like to say a word about recordkeeping. Where my
16   abuse happened was actually in the Davenport Diocese. I
17   assure you the Roman Catholic Church as Father Doyle has
18   said has one of the best recordkeeping systems in the
19   world. When it came out that a priest by the name of
20   Janssen had been abusing from before he was ordained all
21   the way up through the seminary time and then through I
22   think it was like 48 years of priesthood, my family was
23   the type we had a lot of priests in our home. We had
24   Bishops in our home and we just were taught that they

34 (Pages 130 to 133)

8220dda6-de90-4f5f-8500-b27425213391

Page 134

1  were - in fact, the church used the word alter Christus,
2  other Christ.  They could do no wrong.  So when this
3  came out about Janssen and it got to - in Iowa they have
4  a little different thing on statute of limitations, so
5  some of these trials got to court - when it came out
6  about Janssen, here a great man, and I really think he
7  was a great man, Bishop Dingman from Iowa, when he was
8  the Chancellor in Davenport Diocese before he was made
9  the Bishop in Des Moines Diocese, came out in the
10  hearings of recordkeeping of 40 plus years where Ralph
11  Hayes, then Bishop, had Dingman put his hand on the
12  Bible and swear that he would never mention the abuse
13  that Janssen was doing to youth in any public setting or
14  any other parish, that's on record, if you want to go
15  look it up in the Davenport Scott County Courthouse in
16  Davenport.  You can find it.  They do have good records.
17          You know, Shakespeare I think it was - and
18  I'm not a great literarian here at all - but I think he
19  said somewhere "Me think thou doth protest too much."
20  Well, if you look where this comes up, the statute of
21  limitations, I believe it's 18 different states, who is
22  the number one people protesting?  It's the Roman
23  Catholic Church.  Because they do have the records.
24  They're not as scared about the money as they are that

Page 135

1  these records will come out.  And they suffer from a
2  sickness and almost an evil of clericalism.  They will
3  go to no -- the limits are so far out there to protect
4  the ordained and they will go and go and go to protect
5  people from that.
6          The other thing that really, really was
7  hard for me was after I moved out east and my children
8  were going to Holy Angel School in Newark, Delaware, and
9  if any of you read the DA's report from Philadelphia,
10  here I was abused, had really repressed it, if you had
11  asked me was I abused I would say no and I would be
12  telling you what I thought was the truth, right?  Then
13  when I see the Philadelphia DA's report I had four
14  children at Holy Angel School at Newark, Delaware, when
15  they put McGovern in there who is a known predator,
16  transferred him down from Philadelphia to put him
17  temporarily teaching and acting in parishes in the
18  Diocese of Wilmington.  And then one night he's there,
19  one night he's there and the next morning he's gone.  I
20  get a little suspicious about that.  My children say no
21  problem.  I hope to God they're telling me the truth.
22          I'd like to put a quick flashback with
23  you.  When all this started in 2002 the Dialogue, which
24  is the Wilmington Diocese newspaper, had a series called

Page 136

1  the VIP, stood for very important parishioners, right?
2  Well, hallelujah, guess what, you're looking at a VIP in
3  the Wilmington Diocese.  Whoopee, right?  So my picture
4  and the great story of what my wife and I had done in
5  St. John's Holy Angels Parish was told in there.  It
6  just so happened at the same time well, they called and
7  I went in and, you know, took the picture.  So I was
8  known as very important parishioner and it listed some
9  of the things that we did.  My wife and I, I have been a
10  eucharistic minister for about 15 years.  My wife had
11  taught CCD.  Well, that's what it was called then.  I
12  had started a greeters committee in the parish.  We took
13  over an organization that had three members in it.  We
14  filled it to 50 active members.  We did that for 18
15  years and all this was told in the dialogue that we had
16  done, you know, some fairly good work.
17          Now, fast forward to 2007, right?  About
18  two months ago I got a phone call from a man, I don't
19  know how my name is out there but it is, and I am kind
20  of glad it is and people call me who say they are
21  abused.  And I talk to them and I counsel them the best
22  I can.  And so a few months ago I got this phone call
23  and this man said after we talked awhile he said I got
24  to tell you something.  I said what's that?  And he said

Page 137

1  I think I did you a disservice.  I said well, how did
2  you do that?  So he said I couldn't get ahold of you so
3  I thought surely the Diocese has your phone number,
4  right?  So he called the Wilmington Diocese to get my
5  phone number and he was sent ahead to one of the right
6  or left arm of the Bishop.  Well, I know which one it
7  was but I'm not going to tell you.  And as they talked
8  and he tells him that he wants to call me, and so he
9  says why and they go through the whole bit.  And then he
10  said I don't know if you know it or not but you are
11  considered an enemy of the church.  And so I said well,
12  how did they say that?  And he said well, they know that
13  you were one of the ones that started the Voice of the
14  Faithful and therefore you're an enemy of the church.
15          And so in five short years I went from a
16  very important parishioner to I now stand before you as
17  the public enemy of the church of Wilmington, Delaware.
18  I'm kind of proud of that.  In fact, I'm a little more
19  proud of that than I am of being a VIP.
20          I think the people that talked earlier
21  today really showed you this is a societal problem.  And
22  I think there is so much to be gained.  You know, when
23  they talk about people coming out and false memories and
24  everything, I go back to what Senator Karen said that if

35 (Pages 134 to 137)

8220dda6-de90-4f5f-8500-b27425213391

A188

Page 138

1  the person has to prove it.
2        The other thing that I noticed is the
3  Representative asked the question and I think either
4  Mr. Flynn or Mr. Reardon said the great numbers of them
5  come forward. You know why a lot of them come out of
6  the woodwork? Because when they do a bankruptcy, I'll
7  tell you this from experience, I don't have to have say
8  I'm Ed Burke. I can do it as a John Doe. That's why
9  they come forward. See, when I got the letter from
10 Davenport, Iowa that said they claimed bankruptcy then
11 there is a bankruptcy committee formed, and some names
12 appear in every bankruptcy throughout the country. They
13 never see the light of court. The bankruptcy committee
14 throws them out right away. They had one guy his name
15 appears every bankruptcy throughout the Diocese -- or
16 throughout the United States that the Catholic Diocese
17 have.
18       But there are a lot of people who just
19 don't have, you know, I don't know, it's not fun to come
20 up here and I understand why they don't want to, but
21 they don't want to identify themselves. But were they
22 abused? Yeah, they were abused. I got a brother that
23 way. He'll never -- he'll never publicly admit it, you
24 know. So that's why the numbers grew so much in the

Page 139

1  case that you referred to. They came out as John Does.
2  Some of them didn't identify their name.
3        When I went public, my brothers and I went
4  public in a letter in Davenport, Iowa, a number of years
5  ago -- well, not that many years ago, '03. We went out
6  and met with the Bishop out there. Very interesting to
7  me, the very things that we suggested to Bishop
8  Franklin, he said if you want justice -- because he said
9  what do you want? We said the only thing we want is
10 justice. We don't want it for ourselves. We agreed
11 that we would never -- not never, we agreed that at that
12 time we would not sue the Diocese out there. And he
13 says, well, how do I get it? We said for one thing you
14 know because of your records where every pedophile
15 priest served. Go to those parishes, say you're sorry.
16 Blah, blah, blah. We spelled out about five steps for
17 them. And that was one was to visit the parishes. You
18 know how many parishes he visited? One, because a
19 parish council was going to write a letter to the press
20 and he came to try and suppress that letter. It's the
21 only parish he ever visited. He since retired.
22       When Spokane, if you look, and I'm positive
23 of this, when Spokane agreed with that bankruptcy
24 settlement or whatever it was he said today, 48 million

Page 140

1  or to be divided or 100 million to be divided among 48,
2  whatever it is, also in there is a list of 15 things
3  that Bishop Skylstad had to agree to or they wouldn't
4  have settled it, and you know what the number one was
5  thing, go to the parishes where the guys abused kids and
6  say you're sorry to that parish and to those people and
7  identify the priest. They don't want to identify. They
8  absolutely do not want to identify. It's really not the
9  money. It's the names. They don't want to look like
10 what they have done is real and it is real.
11       So I thank you for your time. If I have
12 any time left over I'd be happy to give it to Paula
13 Weldon or to Richard Reissmann. Thank you very much.
14       REPRESENTATIVE VALIHURA: Thank you very
15 much. I appreciate it. At this point we're going into
16 the time limited period. I will give the names of those
17 who are on our list in this -- in the order in which
18 we'll ask them up. Steve Abrams, Father Richard
19 Reissmann, Jack Keating, Shawn Dougherty, Paula Weldon
20 and Dr. James Walsh.
21       Steve Abrams. I understand you're
22 representing an organization?
23       MR. STEVE ABRAMS: I'm representing the
24 coalition --

Page 141

1        REPRESENTATIVE VALIHURA: Okay. Could you
2  pull down the microphone closer to your --
3        MR. STEVE ABRAMS: Okay. I am representing
4  the Coalition to Pass Senate Bill SB 29.
5        REPRESENTATIVE VALIHURA: So you'll have
6  five minutes.
7        MR. STEVE ABRAMS: Okay. Thank you. Mr.
8  Chairman, representatives and Senator, my name is Steven
9  Abrams. I'm 43 years old. I live in Los Angeles and I
10 work as a researcher in network television. I am
11 appearing on behalf of the Coalition to Pass Senate Bill
12 SB 29. I have come here to Delaware to testify in
13 support of the legislation. I believe my experience in
14 California is an example of the success that this Bill
15 will have here in Delaware.
16       I was -- I was abused by a child
17 psychiatrist my parents sent me to when I was 12 years
18 old. I have a picture of myself here. The doctor who
19 abused me is Dr. William Ayres. He is a past president
20 of the American Academy of Child and Adolescent
21 Psychiatry. He was extremely well regarded in the
22 psychiatry world for decades and was even the host of a
23 sex education television series called "The Time of Your
24 Life" which was broadcast on PBS in the late 1960s.

36 (Pages 138 to 141)

8220dda6-de90-4f5f-8500-b27425213391

Page 142

1    However, we now know that for decades Dr.
2  Ayres molested dozens and dozens of boys.  Under the
3  guise of giving physical exams Dr. Ayres contrived to
4  touch and fondle the genitals of boys.  He applied
5  lotion to my penis to treat itching during several
6  visits to his office.  I was shocked.  I couldn't
7  believe he was touching me in this way.  I felt ashamed
8  and guilty that I had trusted what Ayres was doing was
9  medically warranted.  After all we're taught that
10  doctors, like policemen, priests, teachers, et cetera,
11  are there to help you.  It took years before I became
12  mature enough to realize that there was no way that this
13  could be a legitimate physical exam or medical
14  procedure.
15    I was ashamed of what happened and I just
16  tried to forget about it and move on.  However, I took
17  away from the experience with Ayres a deep mistrust of
18  professionals in the so-called healing fields.  I didn't
19  realize until years later that what Ayres did to me had
20  a devastating impact on every decision I made and every
21  relationship I had.  It was hurting me in ways
22  indescribable.  The best way to describe it is to say
23  that everything in my life has been haunted by Ayres.
24  It took until I was 27 to tell anyone about what

Page 143

1  happened.  Ten years later in 2002 I mustered enough
2  courage and told a friend about my abuse.  She had told
3  me that she had been abused as a youngster also and she
4  decided to do some research on this Dr. Ayres and found
5  out that he was still in practice.  She contacted the
6  San Mateo Police Department and learned that they had
7  received several complaints about Dr. Ayres but since
8  Ayres evaluated delinquent boys for the San Mateo County
9  court system the police did not mount an investigation.
10  Most of those making the accusations were incarcerated,
11  you know, former delinquent kids, uncooperative and were
12  not considered trustworthy witnesses.
13    I have since learned that predators pick
14  their victims carefully, often choosing children who are
15  already vulnerable and with few resources.  They're
16  careful to choose the kids least likely to tell and even
17  less likely to be believed.
18    With my friend's support I decided to
19  report my abuse to the police.  They took the case and
20  opened an investigation.  I found it extremely painful
21  to disclose what happened to me, yet at the same time I
22  was reassured that they believed me and thought I was
23  credible.  The police tried to put together a criminal
24  case with the information they had received from me and

Page 144

1  other victims.  Eventually in 2003 the police said they
2  wouldn't be able to prosecute Ayres as a result of the
3  Supreme Court which reversed California's extension of
4  the statute of limitations for criminal prosecution of
5  child sex abuse cases.  I was disappointed.
6    (Whereupon Tape 2, Side 2 ended.  The
7  following is Tape 3, Side 1:)
8    MR. STEVE ABRAMS:  -- to face up to what he
9  had done to me and so many other boys.  Then I learned
10  that California had a one-year window for victims to
11  bring civil cases.  I weighed the pros and cons of
12  trying to bring a case against Ayres in the civil courts
13  and decided it would be good to do so, even if it would
14  be painful and embarrassing for me to bring charges it
15  might protect some other children from him.  He was
16  still practicing psychiatry at that time.  I hoped that
17  filing the civil case would help to hold him accountable
18  for his actions in a way to make his name public and
19  warn other kids about what he was doing.
20    After I filed my civil cases reporters told
21  about it in several California newspapers.  It was in
22  the news that Dr. Ayres was being sued.  I couldn't
23  believe it at first but it was true, as a result of the
24  press reports Ayres was forced to step down from his

Page 145

1  practice.  I was happy to think he couldn't abuse any
2  more kids, at least for the time being, but then my
3  worst fears were realized:  Ayres had been abusing other
4  boys, lots of other boys until very recently.  Other
5  victims of Ayres had heard the press reports about me
6  and came forward with their own stories of abuse by him.
7    It was great to learn that I wasn't alone,
8  but at the same time I felt very sad that so many others
9  had been abused.  The new victims coming forward were
10  sent to the police who reopened their investigation of
11  Dr. Ayres.  The police had enough information and
12  victims to get a search warrant and seize Dr. Ayres's
13  records.  The detectives and investigators got the
14  medical records and began contacting former patients.
15  Before long they found several who were young enough and
16  had been abused recently enough so that the criminal
17  statute would apply.
18    Just eight weeks ago on April 5th, 2007 Dr.
19  Ayres was arrested.  It still amazes me that this
20  happened.  Because I filed my lawsuit using the window,
21  the civil window in California Dr. Ayres is now facing
22  21 counts of lewd and lascivious acts against children
23  younger than 14.  Ayres is very wealthy and he had no
24  problem of posting his bail of $750,000.  He was freed

37 (Pages 142 to 145)

Page 146

1  after a weekend in the San Mateo County Jail.  To date
2  approximately 40 accusers have come forward saying Ayres
3  molested them.
4        None of this would have happened were it
5  not for the window allowing civil statutes in
6  California.  This is only possible because California
7  lawmakers did what we are asking you to do here in
8  Delaware.  They recognized that child victims of sexual
9  abuse can't come forward until well into adulthood and
10 they needed a break.  They needed a civil window in
11 California to allow victims to sue their perpetrators.
12 My case is one of many.  In California we learned that
13 when a perpetrator's name is made public other victims
14 feel safe enough to come forward.  Because of the
15 statute of limitations reform and the civil window in
16 California one dangerous man I know is facing criminal
17 charges and children are safer.
18       As adults today we'll never get our
19 innocence back and we know we will never get back the
20 years lost in silence, shame and secrecy, but it is very
21 healing to know that we have protected kids from harm.
22 I am so grateful to know that Dr. Ayres isn't able to
23 keep abusing kids as a psychiatrist in San Mateo,
24 California.

Page 147

1        I came here to Delaware to tell you my
2  story in the hopes that you will pass the same kind of
3  legislation here as I was able to use in California so
4  predators can be exposed and kids can be healed.  Thank
5  you for considering my testimony and please let me know
6  if you have any questions.  I would be glad to answer
7  them for you.
8        REPRESENTATIVE VALIHURA:  Thank you.  Very
9  riveting testimony and I understand how difficult it is
10 for you to come here and to do that and to tell us about
11 a personal situation in your life.  You're to be
12 commended for all your actions.  I can tell that it was
13 difficult for you to make that decision to come forward
14 and clearly your actions have benefited the citizens of
15 California and countless other children who were about
16 to be preyed upon by this individual.
17       Members of the committee have any
18 questions?  If not -- yes.  Representative Hudson.
19       REPRESENTATIVE HUDSON:  Just a question.
20 You really then only knew about the rule change in
21 California by hearing it in the -- or hearing it from
22 friends or reading it in the newspaper?  You weren't
23 involved in the legislation?  You weren't part of it at
24 all?

Page 148

1        MR. STEVE ABRAMS:  Not at all.  No.  No.
2  No.  No.
3        REPRESENTATIVE HUDSON:  You were just --
4        MR. STEVE ABRAMS:  No.  No.  I just I
5  benefited from the -- after the criminal case against
6  this doctor had to be abandoned because the Supreme
7  Court had, you know, mooted California's extension of
8  criminal statute I was able to go ahead and take him to
9  civil court and expose him and it has now led to
10 criminal charges against him.
11       REPRESENTATIVE HUDSON:  And we talked today
12 about evidence and diaries and that sort of thing.
13 Obviously you were able to work through your side to
14 prove your case.
15       MR. STEVE ABRAMS:  Well, the fact that --
16 the fact that dozens of other former patients of this
17 guy came forward with very similar stories provides
18 corroboration.  Also, the fact that he had first denied
19 having seen me as a patient and then during his
20 deposition he admitted to - although he contradicted
21 himself a couple times - to giving physical exams to
22 patients.  When the police seized his records they found
23 there was no -- no notations of giving physical exams
24 and there is also -- there are no colleagues of this guy

Page 149

1  that say it is permissible for a child psychiatrist to
2  be doing full body physical exams on children sent to
3  him for counseling.  That's something that a
4  pediatrician would do.  A psychiatrist has no reason to
5  be taking down a child's pants, and this is something
6  that this Dr. Ayres only did to boys.  No female patient
7  of his has ever reported to being subjected to physical
8  exams.
9        REPRESENTATIVE HUDSON:  And you didn't tell
10 your parents?
11       MR. STEVE ABRAMS:  No, of course not.  No,
12 I mean, I was just ashamed of it.  In my mind when I was
13 12 years old I thought this must be like normal, this
14 must be what's proper because he's a doctor, you know,
15 but I mean as I grew older I realized I had been abused.
16 You know, you try to make things normal to yourself so
17 you can live with yourself and I certainly wasn't going
18 to tell my parents about it.  I felt guilty at the time
19 because I felt like I had allowed it.  For me to even
20 consider it to have been wrong would mean that I had
21 allowed it and I would feel guilty about it.  So it took
22 awhile for me to realize what was really going on and as
23 it did it just kind of soured in my mind, and I realized
24 I had been abused by this guy, but until I went and

38 (Pages 146 to 149)

8220dda6-de90-4f5f-8500-b27425213391

1  reported to the police and found that he had done, you
2  know, he had done this same thing to other kids I didn't
3  realize that, yeah, he's a serial abuser.  This is how
4  these people operate.
5      REPRESENTATIVE HUDSON:  So you were able
6  because of your case to see to it that he had a civil
7  charge as well as a criminal charge?
8      MR. STEVE ABRAMS:  Right.  Yeah.
9      REPRESENTATIVE HUDSON:  So really you are
10  an excellent case for this Bill because it exposed him?
11      MR. STEVE ABRAMS:  Yes.
12      REPRESENTATIVE HUDSON:  Many people felt
13  better because they were able to come out and join you.
14      MR. STEVE ABRAMS:  That's right.  He would
15  have gotten away scott free probably if I hadn't been
16  able to take him to civil court.
17      REPRESENTATIVE HUDSON:  Did you start your
18  case at the beginning of the -- right away when the
19  one-year cycle was opened?
20      MR. STEVE ABRAMS:  Yeah, I did start it
21  right away.
22      REPRESENTATIVE HUDSON:  And you used a
23  California attorney?
24      MR. STEVE ABRAMS:  Yes.

1      REPRESENTATIVE HUDSON:  Thank you.
2      REPRESENTATIVE VALIHURA:  Did you sue any
3  other entity or just the doctor?
4      MR. STEVE ABRAMS:  No, it was -- it
5  happened, the abuse happened in 1976 and '77.  This
6  doctor, like he did try to sue his own medical practice
7  at the time.  He had partners and he was suing them and
8  their insurance company trying to recover the settlement
9  that he paid to me before trial, but, you know, that
10  didn't work out for him, but, yeah, I was just suing Dr.
11  Ayres.
12      REPRESENTATIVE VALIHURA:  And you wanted to
13  expose him, is that right?
14      MR. STEVE ABRAMS:  Yes.
15      REPRESENTATIVE VALIHURA:  Thank you.
16  Senator Peterson.
17      SENATOR PETERSON:  Just a quick question.
18  Over what period of time did he practice psychiatry?
19      MR. STEVE ABRAMS:  He had been a practicing
20  psychiatrist since the early 60s and he moved to
21  California about 1964, '65, and he had been practicing
22  there until the 90s, until like the mid 90s.  He was the
23  president of the Association of Child Psychiatry and he,
24  you know, was pretty respected in his field, and the

1  worst thing for me was he was evaluating delinquent kids
2  for the court system in San Mateo, you know.  They sent
3  him kids.
4      SENATOR PETERSON:  So about 40 years?
5      MR. STEVE ABRAMS:  About 40 years.
6      SENATOR PETERSON:  Thank you.
7      REPRESENTATIVE VALIHURA:  Any questions?
8  If not thank you so much for being here today.  We
9  appreciate your testimony and please have a safe trip
10  back to California.
11      MR. STEVE ABRAMS:  Thank you.
12      REPRESENTATIVE VALIHURA:  Thank you.
13  Father Richard Reissmann.
14      Good afternoon, Father.
15      FATHER RICHARD REISSMANN:  Good afternoon.
16  My name is Father Richard Reissmann, a priest of the
17  Diocese of Wilmington for the past 44 years.  I
18  represent no one but myself and my conscience and I am
19  speaking on behalf of Senate Bill 29.  I must confess
20  also that I am a church lawyer, a canon lawyer.  I
21  received my degree from the Catholic University of
22  America.  I always had some concern about some of our
23  legal principles, but after listening here to some legal
24  concerns I must confess I might not trust the judicial

1  system in this country.  Some of the things raised were
2  remarkable.
3      And I would like to say that the present
4  law with the two-year statute of limitations for sexual
5  abuse crimes is, in fact, an unjust law.  Does anyone
6  here truly believe that small children can have some
7  redress within this framed time?  These children are
8  manipulated, emotionally fractured and often threatened
9  by the predators.  Predators can feel secure because
10  they can control their victims.  Is it possible that
11  even these children can understand what is going on?
12  Does anyone believe that a seven, eight, nine year old
13  or even a young teenager would speak out within two
14  years against a parent, relative, friend, clergy person
15  or one who has responsibility for them?  You know that
16  if they did we would be demanding of them that they have
17  more courage than most adults possess.
18      What do we live by but the laissez-faire
19  attitude such as don't rock the boat, or what will the
20  neighbors think, or nobody will believe you, or you'll
21  be a curiosity to others.  There is not much to be
22  gained for exposing an abuser because unfortunately the
23  abused, the abused will only be abused again.
24      It is said that nearly 25 percent of young

39 (Pages 150 to 153)

8220dda6-de90-4f5f-8500-b27425213391

Page 154

1   children have been sexually abused. We must give the
2   courageous ones the opportunity to make their case and
3   Senate Bill 29 does just that. It looks to the past and
4   to the future. As a result, more abusers will come to
5   light. We will be able to better protect society and
6   institutions will be accountable for any gross
7   negligence applying to sexual abuse.
8        If we as a society place money, power, or
9   privilege as superseding justice then we are a society
10  that has become tepid, weak and immoral. I beg you to
11  vote for the passage of SB 29 without any amendments.
12  Thank you very much.
13       REPRESENTATIVE VALIHURA: Thank you,
14  Father. Questions? Mr. Keating.
15       MR. JACK KEATING: My name is Jack Keating
16  and I'm a resident of New Castle County, Delaware. It
17  is said as human beings --
18       REPRESENTATIVE VALIHURA: Mr. Keating,
19  could you move the microphone a little closer to you?
20  Thank you.
21       MR. JACK KEATING: It is said as human
22  beings our secrets die in the light of exposure. As a
23  victim of childhood sexual abuse from the age of five to
24  the age of 14 casting light on an extremely painful,

Page 155

1   embarrassing past is a mental hurdle to overcome that
2   most sexual abuse victims will never overcome. For most
3   victims their abusers is well known to them, family
4   incest, or close friend to the family, or in a circle of
5   friends with them. After finding my abuser dead when I
6   was at the age of 41 almost destroyed by alcoholism and
7   not capable of existing comfortably in any respect I
8   stepped forward about my past.
9        Standing here today with you our State
10  leaders and organizations that oppose this Bill as
11  written, the Catholic Church, representatives of, and
12  the press takes great strength. To come forward as a
13  victim of childhood sexual abuse takes courage. A
14  courage I never knew I could have. Most people believe
15  that the meaning of courage is walking through our fears
16  and accepting the outcome no matter what. I know that
17  the meaning of courage is the willingness to walk
18  through our fears no matter what the outcome.
19       For those here today opposing the Bill as
20  written, are victims of fear -- I'm sorry, are victims
21  of the fear factor, or, they are here to promote the
22  fear factor in this legislative body. No matter why we
23  are here today, failing to adopt this Bill as written is
24  a failure to be a responsible citizen in our society.

Page 156

1        As an adult victim of childhood sexual
2   abuse I can tell you that for the past 12 years I
3   revisited my fears over and over again. I am proud to
4   stand before you today that after much medical
5   treatment, 12-step recovery and putting a painful past
6   -- a painful past behind me, it is possible to be done.
7   With passage of Senate Bill 29 I can succeed in being a
8   sexual abuse victim no more. Let us help other victims
9   to achieve what I have.
10       I never thought 12 years ago that when I
11  met my psychiatrist for the first time and he asked me
12  what I wanted of him and I told him I just want to be
13  comfortable in my own skin, that I would be repeating
14  that statement today in the Delaware House hearings on
15  sexual abuse. But after extensive effort, much
16  patience, and financial burden that I just literally
17  thought I wouldn't be able to get through, I am
18  comfortable in my own skin. And as a matter of fact,
19  I'm the happiest I have been in my whole life.
20       Please, our Delaware leaders, walk through
21  the fear factor promoted in these hearings and do the
22  courageous thing, vote yes on Senate Bill 29 without any
23  amendments. Please, again, you have questioned church,
24  business and organization on their statements made, be

Page 157

1   courageous now and ask me questions about my past.
2   Thank you.
3        REPRESENTATIVE VALIHURA: Thank you.
4   Members of the committee, do you have any questions?
5   Representative Hudson.
6        REPRESENTATIVE HUDSON: I just wanted to
7   thank you because I -- seemed to me like you were having
8   a hard time and I appreciate your comments. Thank you.
9        MR. JACK KEATING: Thank you.
10       REPRESENTATIVE VALIHURA: I, too, want to
11  thank you for your very poignant comments and I
12  understand how difficult it is to get up here. You
13  know, I for the life of me could never do what you have
14  done today and, you know, you're to be commended to come
15  forward and tell us your story and we do very much
16  appreciate it. It's very helpful to the committee.
17  Thank you.
18       Shawn Dougherty? Okay. Paula Weldon.
19       MS. PAULA WELDON: Good afternoon,
20  everybody, Mr. Chairman, members of the committee,
21  Senator Peterson. I'm Dr. Paula Weldon and I am
22  supporting this legislation, both as a specialist in
23  organizational behavior and as the former vice-president
24  of human resources for the YMCA of Delaware. Delaware

40 (Pages 154 to 157)

8220dda6-de90-4f5f-8500-b27425213391

Page 158

1  is one of the State's largest youth-serving
2  organizations. It's a charitable organization. It is
3  my view and the view of the organization that I served
4  and continue to serve, that child safety should be the
5  number one priority of all youth-serving entities.
6  Protecting children from sexual abuse is a critical
7  accountability of all of those, all of us who operate
8  within the public trust and this means YMCAs.
9  Mr. Reardon, I thank you for speaking to the YMCA.
10 Mr. Reardon does not represent the YMCA. I just wanted
11 to clarify that. Boys and Girls Clubs, you heard
12 Mr. Krupanski, day care centers, scout troops, schools,
13 churches, just to name a few.
14       I am going to skip over the hundred-year
15 history of the YMCA and its care for children and kind
16 of jump right to the point. Agencies that serve
17 children must hold themselves to high standards of
18 accountability, especially regarding the chance for
19 child predation, and nonprofit institutions most of all.
20 Because most, if not all of those institutions, are
21 accepting charitable donations from you folks to support
22 our work from the public of Delaware and many of us are
23 also receiving state and federal funding. We're making
24 our case and doing our good work on your dollars. I

Page 159

1  think that holds us to an extremely high standard.
2        Organizations should not shrink from
3  accountability for their employees' behavior. However,
4  let me put on another house as a specialist in
5  organizational behavior, and just mention that if you
6  look at the history of how corporations change and when
7  they change and under what circumstances they change,
8  the incentive, the catalyst that promotes the change is
9  usually financial pressure of some kind.
10       The civil courts have established a
11 standard for organizational accountability which is
12 demonstrated in cases which I'm sure many of you are
13 familiar with involving sexual harassment, an area that
14 I dealt a lot with in my profession. And the standard
15 was did the organization know or should it have known
16 what was taking place under the aegis of its corporate
17 umbrella. That's the standard. SB 29 actually has a
18 much more conservative standard because its standard for
19 organizational accountability is gross negligence,
20 which, as Senator Peterson spoke to, means that there is
21 a knowing and complicit part on the organization if
22 there is child predation going on and it's almost being
23 - I use the words casually facilitated by the
24 organization.

Page 160

1        I contend that those organizations that
2  have assertively made child protection part of their
3  youth-serving culture do not need to fear this
4  legislation. But an organization that in its past has
5  been indifferent to or complicit in allowing sexual
6  abuse by its employees may well have a problem with this
7  Bill, but ultimately has to be held accountable.
8        I would like to also recall what Chairman
9  Valihura mentioned. I think this is a very important
10 point. For cases that go back some number of years, if,
11 again, looking at the body of civil law and when we look
12 at old cases, first of all, the courts are going to view
13 what occurred within the organization relative to the
14 standard of care at the time. Today high level of
15 responsibility around criminal background checks, a
16 whole different level of even an employment application
17 than you would have found 50 years ago. You might not
18 even have had employment applications. So the court
19 applying the 2007 standard to a common body of corporate
20 practice in 1967 wouldn't be appropriate. Same thing
21 happens as you can see in sexual harassment matters.
22       I think there is the possibility or the
23 reality of organizational bankruptcy, but in all candor,
24 having worked in a nonprofit for many years, I think we

Page 161

1  are more at risk of moral and ethical bankruptcy if
2  we're not supporting this fully and unamended.
3        As for the arguments - and I am going to
4  mention a couple of them - which have been perpetrated
5  primarily by lobbyists for the Roman Catholic Church
6  about the difficulties of the discovery process for
7  claims of past abuse, I think these are blatantly
8  misleading. And perhaps Mr. Flynn and I can step out in
9  the hall and argue that, but I'd like to present my side
10 on that particular question. Last year Mr. Flynn,
11 speaking for the Diocese of Wilmington stated, it's
12 impossible to investigate such claims. To do so is
13 denial of due process to the Defendants and the loss of
14 evidence will prevent the courts from fairly trying
15 these cases.
16       I ask, please, that you just be alert to
17 some of the fallacies that are in this argument. First,
18 we have discussed, I'll just reiterate, if a claim is
19 impossible to investigate or lacks sufficient evidence,
20 including that documentary evidence that I think worries
21 a lot of nonprofits, oh, my God, I don't have records
22 that go back 30 years. Well, that's probably true, and
23 if you're following standard record retention schedules
24 you aren't going to have records going back that far.

41 (Pages 158 to 161)

8220dda6-de90-4f5f-8500-b27425213391

Page 162

1  There is another word for that which is called lack of
2  evidence, because if you have simply an assertion and a
3  denial and there is no supporting evidence this case is
4  not going to get in to the inside of a courtroom as I'm
5  sure those of you who are legally trained, formally
6  legally trained know.
7          Merely investigating a claim of wrongdoing
8  does not - and I would certainly allow myself to be
9  corrected on this point - in and of itself deny due
10 process to any individual or organization. So merely
11 conducting an investigation I fail to see how under
12 American jurisprudence this would deny due process to
13 anybody.
14         And, further, it was claimed by Mr. Flynn
15 last year that the court - and certainly implied in a
16 variety of ways - that the courts would rule unfairly in
17 the absence of evidence and I wonder where this comes
18 from. The implication being that the court would
19 proceed to trial or to summary judgment in favor of a
20 plaintiff even in the absence of sufficient evidence to
21 rule in favor of the plaintiff. So we either have to
22 draw the conclusion that our court system in Delaware
23 and at the federal level is so lame that it can't make
24 competent judgements about the burden of evidence or

Page 163

1  that the notion that somehow this is going to clog up
2  the courts is absurd.
3          A point that I think is key to understand
4  in this, the actual number of torts which have reached
5  U.S. District Courts since its peak in 1985 has been
6  that the number of trials that have been terminated at
7  the District Court level has declined by nearly 80
8  percent, 79 percent. So tort claims are going down,
9  folks, not up. Even in -- and this is 2007 we're
10 talking about, so we have a little history on these
11 child abuse claims. And the Department of Justice
12 concluded, and I quote, that our 225-year-old legal
13 system has multiple procedural safeguards to treat
14 defendants fairly and insure their rights, especially as
15 to the amount and quality of evidence that must be
16 present for any case to proceed. Judges monitor filings
17 closely and readily dismiss cases that lack merit. In
18 some cases attorneys have been punished - mentioned here
19 earlier - for bringing suits that lacked merit into
20 court in an abuse of the legal process.
21         Last, last point. I agree that changing
22 the statute of limitations in this way with the two-year
23 look-back provision could change the financial and risk
24 management picture for organizations and of course

Page 164

1  nonprofits.
2          There are a couple of facts related to this
3  that I'd like to just share. Assume that the insurance
4  coverage at the time of the abuse, whenever that may
5  have been, was on a claims-made basis. The insurance
6  people in the room I know will know what that means.
7  But basically if that was the case any claim brought
8  forward today, if the insurance company is worried about
9  it that's just not going to be covered because the
10 claims-made basis is not going to countenance a claim
11 made today for something that happened 20 years ago.
12         If an insurance company's coverage or if an
13 organization has insurance coverage on an occurrence
14 basis, in other words, here is this wrongdoing, this
15 abuse that occurred 30 years ago and I have insurance
16 coverage today, or I was insured at that time on an
17 occurrence basis, then the insurance company has to
18 cover that claim or they're going to fight it out in
19 court probably as to whether the insurance company is
20 going to cover that claim.
21         But here is the way an insurance company
22 can help itself. Knowing that, and now going into
23 negotiations for this next year's premium, they're going
24 to look at the current statute of limitations once you

Page 165

1  all pass it - as I'm confident that you will, I
2  certainly hope so, I'm lighting candles like mad, so,
3  and we hope that's going to work - they're going to take
4  a look at these organizations, like Mr. Krupanski's
5  organization, like the YMCA, the other nonprofits that
6  Mr. Reardon represents, and they're going to adjust the
7  premium based on the track record and the corporate
8  practices that have been -- that have been taking place
9  over time for that organization.
10         So I can't speak for all the nonprofits in
11 Delaware, but for many of those that I'm aware of their
12 record of caring for kids has been pretty good and they
13 have met the standard for the times.
14         When the insurance company comes around to
15 rate that insurance they're going to look at what their
16 practices were before they set premium.
17         I think this is maybe the most important
18 thing. Those of us who have worked in these
19 youth-serving nonprofits realize that the vast majority
20 of abuse cases involve family members. Not a lot of the
21 institutions we have seen represented here. And after
22 all, if we work in one of these nonprofits we have an
23 affirmative duty to report any suspected case of abuse
24 to Child Protective Services. So we know about sort of

42 (Pages 162 to 165)

8220dda6-de90-4f5f-8500-b27425213391

Page 166

1  the magnitude of the problem out there.  This Bill is
2  all about keeping today's kids safe, finding redress,
3  appropriate redress for the now adult victims, and
4  especially exposing the predators who are very likely
5  still among us.
6         Abuse by clergy represents a tiny fraction
7  of abuse cases as you heard, and yet the Diocese of
8  Wilmington, unlike other Delaware religious institutions
9  I'd like to point out, would bar redress for all past
10  victims of child sexual abuse to protect its own narrow
11  interests.
12         I stand before you as a Delawarean, a YMCA
13  member, a charitable donor.  I tell you that I'm proud
14  of the many nonprofit organizations that put their name
15  on the Child Victim's Voice website and have
16  courageously set themselves right in the forefront, as I
17  believe they should in supporting this Bill.  And with
18  that, members of the committee, Senator, I'd be happy to
19  take any questions you have.
20         REPRESENTATIVE VALIHURA:  Thank you very
21  much.  You're not here on behalf of the YMCA, are you?
22         MS. PAULA WELDON:  No, I'm not.  I'm here
23  with the authorization of the president of the YMCA.
24         REPRESENTATIVE VALIHURA:  Personal

Page 167

1  authorization, not --
2         MS. PAULA WELDON:  It is the personal
3  authorization of the president.  The Board has not voted
4  on a position on this Bill.
5         REPRESENTATIVE VALIHURA:  Thank you.
6  Members of the committee, anyone?  Thank you very much.
7  Dr. James Walsh.
8         MR. JAMES WALSH:  Good afternoon.  My name
9  is Dr. Jim Walsh, and my credentials are that my
10  doctorate is in pastoral counseling.  I'm a board
11  certified counselor by the National Board.  I'm a
12  licensed professional counselor in Delaware.  Governor
13  Minner has appointed me a year and a half ago to the
14  License Board which has oversight of ethical practices
15  of counselors in the state.  I'm a professor at
16  Wilmington College in the masters and counseling program
17  where I do clinical supervision of our interns and make
18  sure that they practice ethically and practice in a
19  clinically sound manner.
20         I'm an expert witness in federal and state
21  courts.  I have probably testified or submitted reports
22  in over a hundred cases ranging from things as serious
23  as murder to as trivial as the 12-year-old who mooned
24  his principal a couple of years ago.  They wanted to

Page 168

1  list him on the sex registry.  Well, he shouldn't have
2  mooned her I guess.  But most importantly I think for
3  what I do, I'm a therapist.  I get to meet people as
4  wonderful as Mr. Keating in their worst hour.  I get to
5  sit with them when they finally are ready to talk about
6  their suffering.
7         Today we have heard a lot of suffering.  We
8  have heard from survivors of sexual abuse and their
9  advocates.  We have heard from institutions who are
10  concerned and I understand that concern about their well
11  being.  There is one group we haven't heard from,
12  though.  The perpetrators, and nor will you, of course.
13  There is no lobby for sexual abusers.  So I thought it
14  was important for this committee to understand the
15  mindset of the sexual abuser, and I have prepared a
16  document which is too long to read in this time limit
17  but I hope you'll take a look at, because perpetrators
18  of sexual abuse are not the stereotype we'd like to
19  believe.  They have been painted in very broad brush
20  strokes by some of the people who have testified here as
21  if they're sleazy-looking people who lurk under rocks.
22  They're not.  They look like fathers, brothers, uncles,
23  priests, rabbis, Little League coaches.  They look like
24  everyone else, male or female.

Page 169

1         Here is how they think.  First, they're not
2  impulsive.  These acts are planned very carefully.  Oh,
3  occasionally there is an impulse action, but, generally
4  speaking, sexual predators are not impulsive men and
5  women.  They carefully assess the vulnerability and
6  accessibility of their victims.  They watch.  They find
7  the child who is in a family that's chaotic, that's
8  vulnerable.  We heard Mr. Burke's testimony about how
9  many children in his family were victimized, and I don't
10  know much about Mr. Burke's family of origin, but there
11  was something there that predators picked out indicating
12  an accessibility and vulnerability.
13         Second, they establish a positive rapport.
14  They become a friend of the family, of the child.  They
15  talk their way in.  They're expert con men.  They know
16  how to lie and to lie with impunity.
17         Third, they test the victim.  It may be
18  through intimidation, persuasion, some guilt trips.
19  They say things like it's just a drink to a 14-year-old,
20  loosen up, have some fun, and if there is a protest they
21  say whoa, you're taking this out of context, I was just
22  kidding around.  They minimize what happened.
23         Fourth, when they have tested their victim
24  and they know they have someone who will comply, they

43  (Pages 166 to 169)

8220dda6-de90-4f5f-8500-b27425213391

Page 170

1  isolate the victim: First psychologically, they make
2  them the most important person in their life, and then
3  physically, they get them alone, someplace where there
4  is no help, and then of course they're ready to
5  victimize. And victimization takes many forms,
6  something as simple as just rubbing genitals against the
7  person to the point of climax, to as vicious as
8  sodomizing that person, orally raping, horrible actions.
9         And then the most insidious of the steps,
10 the sixth and seventh. First, they insure the secrecy
11 of the action. They choose a tricky way to do this
12 usually. They do it by normalizing what they have done.
13 They say this is okay. This isn't bad. This didn't
14 hurt you. Everything we have done is good fun, and then
15 the worst is when they are around the victim's family or
16 friends they act in a completely normal way while the
17 victim sits there numb, wondering what is actually
18 happening. They tell the victim if you tell you'll get
19 in trouble. You'll be wrong. So immediately not only
20 is the victim victimized by the sexual abuse itself but
21 the victim is overpowered and learns that he or she is a
22 powerless person.
23         And, finally, they revictimize, and the
24 revictimization in its most obvious form of course is in

Page 171

1  the continued sexual contact. But don't think that's
2  all. Because even into adulthood perpetrators of
3  childhood sexual abuse will continue to contact the
4  adult survivor and taunt, will call and say horrible
5  things on the phone, like remember the good times we
6  had, remember the fun, anonymously and then hang up.
7  Yes, I have sat with people who have been victimized.
8  It's awful.
9         In conclusion, I'd like to strongly caution
10 the institutions that have lobbied against this Bill.
11 It is a very slippery slope to take the side of the
12 perpetrator. The perpetrator is a con person. The
13 perpetrator is slick. They're good. And they will have
14 you believe that they are the victim. They will have
15 you believe that these people who come forward are out
16 to get them.
17        Institutions can be easily fooled, I
18 believe, just as the original child victim was fooled.
19 Children who were victimized become survivors when the
20 secret is broken and we are only as sick as the secrets
21 we keep. When the secret comes out into the open the
22 victim becomes a survivor and can begin to live.
23        I would urge the institutions that oppose
24 this Bill to consider carefully how hard you're working

Page 172

1  to keep secrets because when you do so you join the
2  perpetrator, and I do not say that you join the
3  perpetrator consciously or willingly, but you do,
4  unwittingly. And it is not until you break your own
5  secrecy that you will begin to heal and be a survivor as
6  well. Thank you.
7         REPRESENTATIVE VALIHURA: Thank you.
8  Representative Hudson.
9         REPRESENTATIVE HUDSON: We were chatting
10 some of us legislators during the break and we were
11 wondering how many people are abused in Delaware. Since
12 this is your field, can you give us not a statistic that
13 you see on the buttons here, but what is your really
14 feeling?
15        MR. JAMES WALSH: Unfortunately the
16 research is true. It's horrific. One out of five, one
17 out of four gets thrown around.
18        REPRESENTATIVE VALIHURA: Where does that
19 number come from?
20        REPRESENTATIVE HUDSON: Yeah.
21        MR. JAMES WALSH: The research statistics
22 come out of scientifically peer-reviewed journals, APA
23 styled journals that conduct very careful research.
24 Right now the most recent research I have seen is

Page 173

1  showing, it depends on the survey, one in four, one in
2  five females, one in six, one in seven males. It's
3  thought that male population report is probably
4  underreported because of societal shame issues around
5  sexual abuse. Boys who were sexually abused, as
6  horrible as it is for young ladies, there is an
7  additional shame layer for men. But the peer-reviewed
8  journals, APA American Psychology Association which are
9  the sine qua non for peer-reviewed journals consistently
10 report numbers around one in five, one in four --
11        REPRESENTATIVE VALIHURA: Can you get us a
12 copy of the most recent one and make sure that it gets
13 to Renee or Representative Hudson so that she can
14 distribute it to members of the community?
15        MR. JAMES WALSH: Very well.
16        REPRESENTATIVE HUDSON: And to just follow
17 up on that very quick, do you think it's getting worse?
18 Do you think it's a stable number?
19        MR. JAMES WALSH: I am pessimistic because
20 of how sexualized our society is. You can't turn on
21 television without seeing youngsters sexualize. 14, 15
22 years old acting and made up as adults. I remember
23 years ago how heartsick I became just looking at
24 photographs of JonBenet Ramsay, a seven, eight-year-old

44 (Pages 170 to 173)

8220dda6-de90-4f5f-8500-b27425213391

Page 174

1  girl made to look like a sexual object.
2        REPRESENTATIVE VALIHURA:  I think the worst
3  is the 20-year-old trying to look 15.
4        MR. JAMES WALSH:  Yes.
5        REPRESENTATIVE VALIHURA:  And that's really
6  where you give a -- the younger generation an improper
7  view of what it is to be their age.  I mean I find that
8  to be very difficult.
9        MR. JAMES WALSH:  And it's not just in the
10  states.  I have just returned from Japan and there is a
11  phenomenon in Tokyo called the Harajuku girls who dress
12  up Lolito style, which they're 14, 15-year-old girls and
13  stand in a particular neighborhood looking like a cross
14  between a 25-year-old Playboy model and a 12-year-old,
15  and as you walk past and you watch the men leering you
16  realize how sick this is.  And Harajuku girls are
17  institutionalized by singers such as Gwen Stefani who
18  has women dressed as Harajuku backing her up.  So I'm
19  sorry to say I'm pessimistic how much there is.
20        And one anecdote, for years I ran a support
21  group for women suffering from pathological gambling
22  which is an epidemic in this state amongst middle-aged
23  women especially because of the availability of slot
24  machines.

Page 175

1        REPRESENTATIVE VALIHURA:  No.  Hard to
2  believe.  Oh, shocking.  Shocking.
3        MR. JAMES WALSH:  One evening we had 11
4  women in the room in the support group and one began to
5  weep and in a fashion that Mr. Burke evoked for me when
6  the memories had come back to her when her perpetrator,
7  the man who had sexually assaulted her in childhood,
8  called and taunted her on the telephone, and she came
9  into our support group just falling apart.  And after
10  ten or 15 minutes of her talking about this, what do you
11  say?  How do you talk?  And so I just looked around the
12  room at the ten other women and said is there anyone --
13  anything anyone can say right now?  Is there anyone who
14  can speak to this themselves personally?  And out of the
15  ten remaining women eight hands went up.  And I can tell
16  you if you go into an addiction treatment center, and
17  Mr. Keating shared that he's in 12-step recovery, if you
18  go into an addiction treatment center and poll the
19  people in those centers as to what percentage were
20  sexually assaulted in childhood it will rival those
21  kinds of numbers.
22        And I can tell you right now, though the
23  example Mr. Reardon gave sounds horrific, if you go into
24  Gander Hill Prison right now or Sussex Correctional

Page 176

1  Institute or DCC you will find horrific percentages of
2  inmates who were sexually assaulted in childhood.  If
3  you go into BWCI, Baylor Women's Prison, it will be
4  nearly 100.
5        (Whereupon Tape 3, Side 1 ended.  The
6  following is Tape 3, Side 2:)
7        MR. JAMES WALSH:  -- comes out there and
8  they need their -- they need their day in court.
9        REPRESENTATIVE VALIHURA:  Representative
10  Stone?
11        REPRESENTATIVE STONE:  Thank you,
12  Mr. Chair.  Thank you so much for being here with us
13  today.  And thank you for not reading to us.  That was
14  great.
15        MR. JAMES WALSH:  You're welcome.
16        REPRESENTATIVE STONE:  And I appreciate
17  your testimony very, very much.  It was very interesting
18  to me to kind of have you take us into the mind of a
19  predator.  And you talked about, you know, just the
20  sadness in our society of youngsters and trying to look
21  like very sexual adults and the reverse and that's a
22  bigger topic than we're here addressing today.  But do
23  you think that today as a society, and I'm not just
24  going to single out families but also in sexual

Page 177

1  education of our young people, that this is an issue
2  that we are doing better communicating to young people
3  today?  A couple of the victims commented that they
4  wouldn't go home and tell their family for fear that it
5  would be perceived that they were at fault, that it was
6  their fault.  But I - at least my impression is today
7  we're much more aware of this type of abuse and we try
8  to communicate to our young people that people shouldn't
9  be touching you in your private place.  We teach
10  youngsters today about inappropriate touching and
11  inappropriate behavior.  Am I right or am I wrong?  I
12  hope I'm right, that we are doing a little better job
13  and that today children, at least our young people today
14  don't feel wrong to go home and tell mommy or tell daddy
15  or tell whoever is their guardian I think something
16  inappropriate happened to me today?
17        MR. JAMES WALSH:  I have to answer that
18  question of course more as a parent than as a
19  professional.
20        REPRESENTATIVE STONE:  Of course.
21        MR. JAMES WALSH:  Because there is not
22  research or literature to that.  And I think the answer
23  to that question -- I think I have mixed feelings about
24  that.  I think on the one hand that we are.

45 (Pages 174 to 177)

8220dda6-de90-4f5f-8500-b27425213391

A198

Page 178

1      REPRESENTATIVE STONE:  I hope so.
2      MR. JAMES WALSH:  I know that the codes of
3   ethics that we see across the board in my field, APA
4   Code, ACA Code which is mine, American Counseling
5   Association, the social workers, psychiatrists, et
6   cetera.
7      REPRESENTATIVE VALIHURA:  And the legal
8   profession, too.
9      MR. JAMES WALSH:  I'm sorry?
10     REPRESENTATIVE VALIHURA:  The legal
11  profession, too.
12     MR. JAMES WALSH:  And the legal profession.
13  So I think the codes are much more up to date and much
14  better, no question about that.  However, I will say
15  this, I asked my mom, who is 77 years old, a few months
16  ago, I said mom, if I had come home and said that
17  Monsignor Gilhooley who was our Pastor or Mr. Duncan who
18  was my Little League coach had sexually touched, had
19  done this, that or the other thing to me, what would you
20  have thought or said or done?  She said well, before or
21  after I killed him?  Yeah.
22     So on the one level I think as a society,
23  sure, there is more publicity, it's out in the open.
24  There is more talk about hey, you're not the

Page 179

1   perpetrator, even though the perpetrator has made you
2   feel like that.  But on the other hand people have
3   always known this was wrong.  And there is a tendency
4   sometimes when I hear institutions talk about this as if
5   well, we didn't really know back in 1962.  Well, you
6   know, we did.  We knew then.  And we know now.
7      So, yes, and no.  I think more publicity,
8   yes, I think that's good.  And I think children today
9   are probably in a more free environment to know this is
10  wrong.  But on the other hand look at the mixed message.
11  You turn on the TV and look at the sexualization.  So I
12  think it's a mixed bag.  I truly do.
13     REPRESENTATIVE STONE:  Thank you.  Thank
14  you for your information.
15     REPRESENTATIVE VALIHURA:  Any other
16  questions from members of the committee?  If not, thank
17  you very much, Dr. Walsh.
18     MR. JAMES WALSH:  You're welcome.
19     REPRESENTATIVE VALIHURA:  One of the issues
20  that didn't come out today which I was a little
21  disappointed my friends in the insurance -- oh, yes?
22  Yes.  Representative Hudson.
23     REPRESENTATIVE HUDSON:  Thank you.
24  Mr. Denn, the Insurance Commissioner was here for the

Page 180

1   whole three hours on May 10th and he couldn't be here
2   today, so he did two things, he wrote a very long letter
3   which I won't read, Mrs. Stone.  I will give you a copy.
4   You can read it at home.  But let me read you the last
5   paragraph.  I support Senate Bill 29.  I believe that
6   whatever political short-term challenges it poses for
7   these institutions with a history of failing to provide
8   supervised -- properly supervised adults with access to
9   children are outweighed by the importance of vindicating
10  the rights of adults who were subjected to horrific
11  abuse.  I would be happy to answer any additional
12  questions the committee has of them.
13     And he sincerely means this.  I was
14  speaking to him over the weekend.  He sent Mike Vild
15  today but I don't necessarily intend to have him speak.
16  The letter is very comprehensive and I would recommend
17  my colleagues speak to him directly about real specific
18  questions.  I have copies.
19     REPRESENTATIVE VALIHURA:  Can you make sure
20  that all the members get copied?  I am told that Matt
21  Doyle is in the room.  Is he here?  Mr. Doyle.
22     REPRESENTATIVE HUDSON:  Mr. Who?
23     REPRESENTATIVE VALIHURA:  Doyle.  Doyle.
24  Who works for Zutz Insurance or HRH I think it is now.

Page 181

1      MR. MATTHEW DOYLE:  We recently merged with
2   an international.  We're now part of the eighth largest
3   brokerage firm in the world.
4      REPRESENTATIVE VALIHURA:  You're going to
5   have to speak into the microphone.
6      MR. MATTHEW DOYLE:  I'm sorry.
7      REPRESENTATIVE VALIHURA:  We're going to
8   ask you to keep your remarks shorter.
9      MR. MATTHEW DOYLE:  Oh, it will be very
10  short, believe me.
11     REPRESENTATIVE VALIHURA:  Okay.
12     MR. MATTHEW DOYLE:  My name is Matthew
13  Doyle and I am a senior account executive at Zutz
14  Insurance, a division of the Hilb, Rogal & Hobbs.
15     REPRESENTATIVE VALIHURA:  You're still
16  going to have to get closer to the microphone.
17     MR. MATTHEW DOYLE:  My name is Matthew
18  Doyle and I am a senior account executive at Zutz
19  Insurance which is part of the HRH program, otherwise
20  known as Hilb, Rogal & Hobbs.  We're the eighth largest
21  brokerage firm in the world and I have been asked to
22  speak on behalf of I had two -- we were here at the last
23  hearings on May 10th, my two counterparts could not make
24  it due to their traveling schedules and so I am here

46 (Pages 178 to 181)

8220dda6-de90-4f5f-8500-b27425213391

Page 182

1  standing here solo to talk about the insurance industry
2  and coverages that relate to sexual abuse and
3  molestation, otherwise known as SAM.
4         Insurance industry what most people don't
5  understand is that the coverage is never included in a
6  policy. You have talked about the insurance picking up
7  the coverage. It is specifically excluded. It is a
8  deliberate act that is not covered by any insurance
9  policy and it is also a criminal act which is
10 specifically excluded by all insurance policies.
11 Everybody from what I have been listening through the
12 last two hearings seems to misinterpret that.
13        The coverage that gets placed on to an
14 insurance policy is -- has been added back on to the
15 policy at the discretion of the insurance carrier. And
16 when it -- years back when it was added on the coverage
17 was set up usually at policy limits. Now you have to
18 also understand that the insurance industry is set up on
19 a basic premise that all of us, whether it's commercial
20 insurance or your personal insurance, we all pay into
21 the pool and the claims of the few are paid by the
22 premiums of all of us. And that's how insurance
23 companies figure out your rates, how things are charged.
24 And sexual abuse and molestation coverage is no

Page 183

1  different.
2         Many years ago coverage could get added
3  back and it was added back on at policy limits. Now,
4  policy limits traditionally for any business is a
5  million dollars. We were taught that that is considered
6  corporate financial responsibility to the public.
7         An umbrella policy, for those of you who
8  are not familiar with it, gives you additional limits of
9  liability for third party lawsuits. And in years back
10 umbrella insurance companies would add sexual abuse and
11 molestation coverage as part of it. SAM was added back
12 on top of the million dollar primary limit to give you
13 five million or ten million, whatever your umbrella
14 limit was. As time has passed -- and that pricing that
15 was dictated was based on the statistics of claims, and
16 the rates were charged accordingly based on the claims,
17 as well as the policy limits that were under the --
18 underlying the first million dollars. If you only had a
19 half a million dollars there would be no coverage on the
20 umbrella because it would not sit on top of it.
21        As these cases have come about over the
22 years the industry has shrunk. Originally we could say,
23 just picking a number, there were a hundred insurers who
24 would write this coverage for schools or private

Page 184

1  institutions, for any social service organization. They
2  would add it at a small percentage of their primary
3  liability premium to add this coverage on to it and the
4  umbrella carrier would charge accordingly also, based on
5  a percentage of the primary insurance costs.
6         As time has rolled out and these claims
7  have come about the industry shrinks. What used to be a
8  hundred insurers in the near present all of a sudden
9  you're down to 50 insurers and no one writes umbrella
10 coverage over the primary limit. So now a social
11 service organization, the Y, or anybody, all the
12 nonprofit organizations that I insure in the State of
13 Delaware are having capped at a million dollar limit if
14 they can get that. As we have gone to the nearer
15 present the companies have now shrunk from 50 insurers
16 maybe to ten or 15 that would write this and now they're
17 only -- and they're reducing their limits to 500,000.
18 They won't give the million dollar limit. They're also
19 charging instead of the smaller percentage of the
20 premium, double the premium, three times the premium,
21 depending on what they feel is the exposure of that
22 entity.
23        Now we get to the nearest present. We're
24 down to maybe five insurers. They're not providing

Page 185

1  coverage at all or they're providing a bare minimum of
2  50,000 or 100,000 dollar limits and that cost that they
3  are charging for that small amount of coverage is almost
4  cost prohibitive to the day care centers, to the
5  schools, to social service organizations, and if you
6  don't cross your T's and dot your I's according to the
7  underwriting guidelines, like run a full report on every
8  individual or every volunteer and every employee, they
9  will not give you the coverage.
10        So they are now faced with not being able
11 to get a coverage, you're not -- and if you can get it
12 it's a minimal limit and at a cost -- and it's so cost
13 prohibitive the organization almost has to go either
14 bare or not exist if they want to be in society here.
15        For the future I don't know what -- what's
16 going to happen. If things keep going the way they are
17 going I can see that the standard insurers will
18 completely drop out of the market. That's your
19 Hartford, your Fireman's Fund, Travelers, St. Paul, all
20 your standard insurers, those who have rates and forms
21 filed with the State of Delaware. And what it will go
22 as to the surplus lines insurance company and they write
23 their own forms and they charge their own rates. And if
24 the industry feels that the costs are prohibitive for

47 (Pages 182 to 185)

8220dda6-de90-4f5f-8500-b27425213391

Page 186

1 them to have this coverage, wait until they see what the
2 surplus lines insurers charge and they will probably get
3 even less limits.
4       Because you also have to remember that
5 going back to what I first stated, the insurance
6 industry has the premiums of the many pay the claims of
7 the few. Delaware has 800,000 residents, approximately.
8 I'm from Pennsylvania so I'm just relaying that.
9       REPRESENTATIVE VALIHURA: We won't hold it
10 against you.
11       MR. MATTHEW DOYLE: Thank you. But what
12 happens is State rates there is not enough spread of
13 risk and the costs will escalate so high that no one
14 will be able to get it. And that's pretty much what
15 will happen. It's what I'm looking at at the future,
16 and for me to place coverages for the social service
17 organizations, I have one that they wouldn't -- the
18 insurers wouldn't even talk to because they didn't do
19 full background checks on every volunteer that worked
20 there, not to mention the Little Leagues and the girl's
21 softball leagues and soccer leagues, all these leagues
22 that I insure, the underwriting requirements that the
23 insurance companies are putting on these individual
24 organizations for our children to be out there to play

Page 187

1 and to do extracurricular activities is almost cost
2 prohibitive because of the costs that they are being
3 charged to do these checks so that they can even have
4 insurance.
5       REPRESENTATIVE VALIHURA: Thank you,
6 Mr. Doyle. The question I have is --
7       MR. MATTHEW DOYLE: Yes.
8       REPRESENTATIVE VALIHURA: -- is more of a
9 balancing thing. We're asked to make tough decisions
10 here and I have mentioned this at our last committee
11 hearing. And we're balancing policy issues. And one of
12 the things that I want to understand is that this is
13 going and opening up a two-year look-back period is
14 unprecedented in this State, and it will -- and once we
15 do it for this there will be other folks that will
16 approach us for opening up look-back periods for other
17 problems such as medical malpractice and folks who are
18 injured, killed, whose time has expired, whose claims
19 are as every much as important or as dramatic or
20 traumatic as we heard today and throughout these
21 hearings, and what I am concerned about as just a policy
22 matter is, is this going to have a cascading effect on
23 other insurance? Because once they see that we're
24 moving in a direction here doing something that's never

Page 188

1 been done before will the insurers tend to believe that
2 Delaware is going down a route that may cause problems
3 for them and, one, pull out, or, two, charge higher
4 rates which by the way goes on all constituents?
5       MR. MATTHEW DOYLE: Well, as I said, I
6 don't have a crystal ball but my personal feeling would
7 be that the insurance marketplace will constrict
8 severely if you start opening a window because their
9 rates over time were based on claims and statute of
10 limitations. You open up that window and the insurance
11 industry has not promulgated past rates to pick up these
12 additional timeframe. It's like -- on a claims-made
13 form --
14       REPRESENTATIVE VALIHURA: Matt Denn
15 disagrees with you but that's okay. I just want to
16 understand what you think. Is it a possibility? Is
17 that scenario correct?
18       MR. MATTHEW DOYLE: You are correct. It
19 will constrict.
20       REPRESENTATIVE VALIHURA: It could happen.
21 Okay. I am going to ask Mr. Vild to come up shortly but
22 I want to make sure the questions of Mr. Doyle get
23 answered first but I am going to ask him the same
24 question.

Page 189

1       MR. MATTHEW DOYLE: You also have to
2 remember that you can not buy coverage backwards. You
3 can only go forwards.
4       REPRESENTATIVE VALIHURA: Yes. I know that
5 very well.
6       MR. MATTHEW DOYLE: So what happens is
7 these -- the insurers -- and also with the current
8 statute of limitations, go back to the pollution when
9 the law was changed concerning pollution liability
10 exposure. Companies had had -- and we had very -- we
11 were very different than everyone else because we have a
12 warehouse full of past documents, as long as they
13 haven't gotten wet, but insurance carriers don't
14 maintain coverage. They -- seven years, they throw out
15 all their files. They're done. So when the pollution
16 opened up this coverage back forever to the guilty
17 party, companies had very tough times proving that they
18 had insurance during those windows, even though the
19 policy technically excluded that.
20       REPRESENTATIVE VALIHURA: Do you know who
21 made out? Delaware lawyers did. I just wanted to make
22 sure you understood that. We had coverage cases galore
23 in the State of Delaware. Representative Stone.
24       MR. MATTHEW DOYLE: Yes.

48 (Pages 186 to 189)

8220dda6-de90-4f5f-8500-b27425213391

A201

Page 190

1  REPRESENTATIVE STONE: Thank you, Mr. Doyle
2  for being here and for your testimony. Dr. Weldon made
3  a point at the end of her comments about insurance. Did
4  you hear them?
5  MR. MATTHEW DOYLE: Yes.
6  REPRESENTATIVE STONE: Would you comment on
7  those for me? If you don't remember them I'll just pass
8  this to you. The last --
9  MR. MATTHEW DOYLE: Yes. I'd like to
10  quickly refresh my, I mean I have been listening to so
11  many different. She addressed the two different forms
12  of coverage, claims made and currents. The rates that
13  are charged are the rates that are charged for that
14  period. I don't understand when she can adjust premium
15  loading and retentions to account for the past risk.
16  That's just reserving additional -- her additional
17  claims that have been reported. That's not collecting
18  any money or statistical analysis -- from the statistics
19  that existed at the time that that policy year was
20  written. So you have an insurance industry who will be
21  incurring more claims because of the openendedness of
22  this law and as a result the insurance companies were
23  saying we're losing too much money, we're pulling out of
24  the State.

Page 191

1  REPRESENTATIVE STONE: Wouldn't the other
2  option be to just increase everybody's premiums?
3  MR. MATTHEW DOYLE: They could increase the
4  premiums but they would have to increase them to a point
5  where they would be almost cost prohibitive.
6  REPRESENTATIVE STONE: So would that --
7  MR. MATTHEW DOYLE: And you would be
8  putting daycares and Little Leagues and girls soccer
9  leagues and boys soccer leagues and the lacrosse
10  leagues, all the children's activities outside of the
11  school would be shut down because they could not afford
12  to carry the insurance. I can tell you that. The
13  insurers will pull out, or they will charge so high that
14  no one can afford to have it and who is going to foot
15  that bill? Okay. If my son who is now in college
16  wanted to play lacrosse instead of paying the usual
17  hundred dollars it might be $500 for him to pay because
18  they would have to cover the medical as well as the
19  additional insurance costs for the league to carry.
20  REPRESENTATIVE STONE: It gets passed on.
21  MR. MATTHEW DOYLE: It gets passed on.
22  REPRESENTATIVE STONE: To the ultimate
23  consumer.
24  MR. MATTHEW DOYLE: To the ultimate

Page 192

1  consumer at all times, yes, it does.
2  REPRESENTATIVE VALIHURA: Representative
3  Hudson.
4  REPRESENTATIVE STONE: Thank you. Thanks.
5  REPRESENTATIVE HUDSON: Just a quick
6  question on the look-back period.
7  MR. MATTHEW DOYLE: Yes.
8  REPRESENTATIVE HUDSON: The person either
9  had insurance or they didn't, is that correct? They
10  were either covered or they weren't.
11  MR. MATTHEW DOYLE: You have to
12  understand --
13  REPRESENTATIVE HUDSON: Well, could you
14  answer?
15  MR. MATTHEW DOYLE: The policy does not
16  cover the act. It's a crime and it's a deliberate act
17  so it's automatically excluded. If an organization had
18  coverage it was added back in with a supplement, meaning
19  that it was -- if a standard policy has a one million
20  per occurrence and a two million aggregate, what that
21  means is that for any one lawsuit there is a one million
22  dollar limit and the most the insurance policy will pay
23  in a policy year is two million dollars. A sexual abuse
24  and molestation endorsement, SAM, might have a flat

Page 193

1  limit of one million dollars or $500,000 and the
2  umbrella policy would not most likely be riding over it.
3  So that that would be the only limit that's available.
4  And only if that endorsement was added back to a policy
5  is there coverage. There is no gray areas on a policy.
6  REPRESENTATIVE HUDSON: That's what I was
7  getting to.
8  REPRESENTATIVE STONE: Is it a fair analogy
9  of that the same thing that when you're buying a
10  homeowners policy your policy excludes things like furs
11  and jewelry and very expensive equipment?
12  MR. MATTHEW DOYLE: No.
13  REPRESENTATIVE STONE: And if you want to
14  insure those things you buy what's called a rider? I
15  mean I'm just trying to --
16  MR. MATTHEW DOYLE: Well, there is -- there
17  is -- you're talking property versus casualty.
18  REPRESENTATIVE STONE: That I understand.
19  MR. MATTHEW DOYLE: Okay. From a property
20  standpoint, all your furs, your jewelry, everything is
21  included as part of your quote-unquote contents, your
22  personal property, real property being the building, of
23  course, and your personal property meaning everything
24  you would take with you when you moved, easiest way to

49 (Pages 190 to 193)

A202

8220dda6-de90-4f5f-8500-b27425213391

Page 194

1  describe that. If you want to specifically insure
2  something, your -- my wife's diamond -- my wife's
3  engagement ring, I specifically schedule that so that it
4  is specifically insured for a value, because otherwise
5  you get your settlement in the event of a loss is here
6  is X amount of dollars. Well, it would cost me so much
7  more to replace it. Well, that's not the way the policy
8  is written because we have no exact figure for that
9  item.
10        REPRESENTATIVE STONE: And that's the way
11 you purchase this type of insurance that you're
12 referring to which is a supplemental type of insurance?
13        MR. MATTHEW DOYLE: Correct. It's an
14 add-on to give you coverage. The policy excludes it and
15 this adds the coverage back on and then the insurance
16 carrier, the underwriter determines based on your --
17 what you do and your exposure how much limit and if it's
18 a standard insurer versus a surplus lines insurer then
19 those rates are filed with the State as to what they can
20 charge, and they have to refile rates in order to change
21 that. So rather than go through that long process, what
22 they is they just pull the coverage and say we don't
23 offer this any more.
24        REPRESENTATIVE VALIHURA: Senator Peterson.

Page 195

1         SENATOR PETERSON: Yes, thank you, Mr.
2  Chairman. Are you for or against the Bill? I never
3  heard you say whether you like it or you don't like it.
4  Given that you have said you don't cover anything old
5  because it was a crime so the retroactivity is not an
6  issue.
7         MR. MATTHEW DOYLE: Correct.
8         SENATOR PETERSON: If you look forward you
9  have to charge a lot of money which means you're going
10 to make a lot of money. So are you for the Bill or
11 against it?
12        MR. MATTHEW DOYLE: I am for protecting all
13 children.
14        SENATOR PETERSON: Okay.
15        MR. MATTHEW DOYLE: Okay. And I have to
16 try and stay professional versus myself personally and
17 you don't want to hear my personal opinions on that in
18 this courtroom because I have certain personal --
19        REPRESENTATIVE VALIHURA: Well, let me --
20        MR. MATTHEW DOYLE: -- feelings toward.
21        REPRESENTATIVE VALIHURA: Let me stop you
22 right here. I mean I think you're here explaining the
23 insurance ramifications.
24        MR. MATTHEW DOYLE: Insurance, and I want

Page 196

1  to explain --
2         REPRESENTATIVE VALIHURA: And you didn't
3  come down here and testify because you were opposed to
4  the Bill or you're in favor of the Bill. You came down
5  here and said this is what we'll see out --
6         MR. MATTHEW DOYLE: This is the insurance
7  industry. This is how the insurance industry will
8  react.
9         SENATOR PETERSON: Thank you. I wasn't
10 sure what his role was here.
11        REPRESENTATIVE VALIHURA: I think that's
12 why he's here.
13        MR. MATTHEW DOYLE: Yes. I'm only here for
14 the insurance because I'm a nonresident.
15        SENATOR PETERSON: All right. Now, there
16 are now three states that have look-back periods,
17 California, Minnesota and South Dakota; did their
18 insurance -- did all the insurance companies pack up and
19 leave?
20        MR. MATTHEW DOYLE: I can't answer for
21 those states.
22        SENATOR PETERSON: But I thought I
23 understood you to say there would be no insurance in the
24 State of Delaware if the Bill passes?

Page 197

1         MR. MATTHEW DOYLE: What will happen, and I
2  said this, I can't predict the future, but the shrinkage
3  in my markets that I used to deal with was, picking a
4  number, 100 insurance carriers, as these cases have gone
5  through the -- since -- in the past several years, the
6  markets that I deal with, the insurance companies, has
7  shrunk down to I am down to maybe three, three to five
8  carriers that will write schools, social service
9  organizations, anything that has to deal with
10 children --
11        SENATOR PETERSON: Isn't the --
12        MR. MATTHEW DOYLE: -- that will provide
13 sexual abuse and molestation coverage.
14        SENATOR PETERSON: Doesn't the same problem
15 exist with Workers' Comp coverage, and, again, it goes
16 back to something -- and I handled Workers' Comp for
17 many years for the Department of Labor and the number of
18 companies that would cover just kept getting smaller and
19 smaller and when we asked why they said because Delaware
20 is just such a little itty-bitty market and many have to
21 pay for the claims of the few. Same arguments. So is
22 this unique to SAM or is this unique to Workers' Comp
23 and every other kind of insurance?
24        MR. MATTHEW DOYLE: No. This is

50 (Pages 194 to 197)

8220dda6-de90-4f5f-8500-b27425213391

Page 198

1 particularly unique to SAM.
2      SENATOR PETERSON: Aren't we down to about
3 three Workers' Comp insurers now in Delaware, only
4 three?
5      MR. MATTHEW DOYLE: No. Unh-unh, no.
6      SENATOR PETERSON: Last I heard we were.
7      MR. MATTHEW DOYLE: No. You were
8 misinformed.
9      SENATOR PETERSON: How many do we have?
10      MR. MATTHEW DOYLE: Probably about 35 or
11 40, not counting what goes through the -- what you can
12 get through the plan.
13      SENATOR PETERSON: All right.
14      MR. MATTHEW DOYLE: What you have run into
15 with Delaware, more than anything, again I'm from out --
16 I'm from Pennsylvania so it's a whole different arena,
17 is the fact that most insurance companies are domiciled
18 in Delaware, and as a result because of certain rules
19 and laws pertaining to participation and taxes they do
20 not write in the state.
21      SENATOR PETERSON: That was my question. I
22 didn't ask how many are domiciled here. I asked how
23 many are selling.
24      MR. MATTHEW DOYLE: Well, that's -- that's

Page 199

1 a big part of the answer to your question. That if
2 there is 3800 insurers in the United States you're --
3 because of domiciling you have cut yourself down to
4 maybe 500 or 750 of that 3800.
5      SENATOR PETERSON: My question was how many
6 companies are selling Workers' Comp to Delaware
7 companies?
8      MR. MATTHEW DOYLE: Oh. Many. I have 25
9 in my office alone that I can use.
10      SENATOR PETERSON: To sell to Delaware
11 companies?
12      MR. MATTHEW DOYLE: Yes.
13      SENATOR PETERSON: All right. Because they
14 made the same dire predictions during the debate on the
15 Workers' Comp Reform Act of 1997. They said exactly the
16 same thing, that if we passed that Bill then the number
17 of insurers was going to go away, people were going to
18 be thrown into the higher risk pool, and just the sky is
19 going to fall and all that, so we heard the same
20 arguments in '97 against Workers' Comp that you're
21 telling us today about this legislation. So it didn't
22 come true then, the dire predictions on Workers' Comp?
23      MR. MATTHEW DOYLE: Not that everybody left
24 the state but you're talking about a supplemental

Page 200

1 coverage that's an add-on that has catastrophic exposure
2 to it.
3      SENATOR PETERSON: All right. My last --
4 my last comment, really it's a comment to the chairman
5 about this slippery slope idea that if we open this
6 look-back period, you know, then the doors open for
7 medical malpractice and all that. I would suggest that
8 in California the Bill passed five years ago and I'm not
9 aware of any look-back period since then. I think the
10 difference here is that we're talking about little
11 children who didn't know what happened. If I was in a
12 car accident I know what happened. I know what happened
13 as soon as I come to in the emergency room. Little kids
14 at the age of five or seven or nine are not aware of
15 what happened and I think that's the difference.
16      REPRESENTATIVE VALIHURA: I was just making
17 it a discussion topic. It had nothing to do with my
18 position on anything other than as being a thorough
19 chairperson of this committee. I throw issues out for
20 discussion. Thank you. Representative Hudson.
21      REPRESENTATIVE HUDSON: Mr. Chair, may I go
22 back again? You said this gentleman was here, invited
23 here to speak on policy. Is that --
24      REPRESENTATIVE VALIHURA: No. No. I

Page 201

1 believe he's -- I mean, my understanding is he's not
2 here to testify for or against it. I mean, he's clearly
3 uncomfortable saying one thing or the other. He's not a
4 Delaware resident.
5      REPRESENTATIVE HUDSON: Right.
6      REPRESENTATIVE VALIHURA: And he's here to
7 talk about the insurance ramifications.
8      REPRESENTATIVE HUDSON: From Mr. Zutz's
9 company.
10      REPRESENTATIVE VALIHURA: From Mr. Zutz's,
11 and, by the way, it is my insurance company, too, so I
12 appreciate you being here.
13      REPRESENTATIVE HUDSON: Well, so that puts
14 you in a, not as a gentleman here to talk about State
15 policy, but you're here talking about your company, the
16 way your company works and what you see through the eyes
17 of your company?
18      MR. MATTHEW DOYLE: I do the marketing
19 for --
20      REPRESENTATIVE HUDSON: Yes, but I suggest
21 to my colleagues if we want to talk about policy and how
22 things are going, our insurance commissioner is probably
23 a better one.
24      REPRESENTATIVE VALIHURA: Indeed, I reserve

51 (Pages 198 to 201)

8220dda6-de90-4f5f-8500-b27425213391

Page 202

1  the right to call Mr. Vild to the stand but this is from
2  the business side. I mean clearly it's from the
3  business side.
4        REPRESENTATIVE HUDSON: I understand, but
5  I'm not sure that it was clear that this is -- that you
6  were here speaking on behalf of your business.
7        REPRESENTATIVE VALIHURA: Well, I mean, I
8  don't think it's just his business. I think it's the
9  industry. I mean, his business is recognized as the
10 leader in the State. I mean, we have had -- we have had
11 several before us in other forums that I have dealt with
12 and Zutz Insurance is regarded as, you know, the
13 Wilmington Trust of Delaware, let's put it that way.
14        REPRESENTATIVE HUDSON: Right. Which leads
15 me to say next then if you are such a large company you
16 don't just operate in Delaware. You know what's going
17 on in other states. You insure people in other states.
18        MR. MATTHEW DOYLE: Yes.
19        REPRESENTATIVE HUDSON: Somehow, someone in
20 your company must know the effects of the other states
21 that have had this type of legislative change and --
22        REPRESENTATIVE VALIHURA: Are you asking
23 for it? If you're asking for it, I'll ask for it, too.
24        REPRESENTATIVE HUDSON: I'm wondering why

Page 203

1  you aren't here to talk about that because that's really
2  pertinent. I mean you're talking about what ifs, but
3  can't we find out --
4        MR. MATTHEW DOYLE: I am here to speak
5  about what effect it will be on Delaware. I do not know
6  about California, because California to me is in another
7  world and Texas also. What happens in those two --
8  they're almost like foreign countries when you talk to
9  insurance carriers.
10        REPRESENTATIVE HUDSON: Is that right? I
11 just figured since you were such a large company, sixth
12 largest in the world.
13        MR. MATTHEW DOYLE: We are Zutz Insurance.
14 We just recently became part of the HRH family of
15 companies.
16        REPRESENTATIVE HUDSON: It just surprised
17 me that you weren't aware of more beyond your state or
18 Delaware. Thank you.
19        REPRESENTATIVE VALIHURA: Could we ask you
20 to provide us with that information? Could you have
21 someone in your office look at that for us?
22        MR. MATTHEW DOYLE: Surely.
23        REPRESENTATIVE VALIHURA: That would be
24 great. Any other questions? Seeing none, Mr. Doyle,

Page 204

1  thank you so much for being here with us this afternoon.
2        MR. MATTHEW DOYLE: You're welcome.
3        REPRESENTATIVE VALIHURA: Mr. Vild, please
4  join us at the podium. If you could just state your
5  name for the record, the tape is running.
6        MR. MICHAEL VILD: Michael Vild, Deputy
7  Insurance Commissioner.
8        REPRESENTATIVE VALIHURA: Thank you very
9  much for being here. You have been here all afternoon.
10 We really appreciate it. We appreciate Mr. Denn's
11 making sure that you're available for us here at this
12 committee hearing.
13        MR. MICHAEL VILD: It's my pleasure to be
14 here. I'll just say with respect to the last question
15 regarding the effects in other states that have had
16 these types of programs put in, we have reached out to
17 the Insurance Department in California but I don't yet
18 have an answer back from them with respect to the answer
19 to your specific question. As soon as that -- as soon
20 as we get that information we'll provide it to the
21 committee.
22        REPRESENTATIVE VALIHURA: That would be
23 great. We had a chance to read Mr. Denn's letter to the
24 committee and also I want to just ask the question I

Page 205

1  originally had posed, is there likelihood that if we
2  start going down this route of opening up older claims
3  that we may be viewed by the insurance companies in the
4  future as being -- having an exposure that they're not
5  particularly geared to accepting or understanding they
6  were and that may ultimately cascade into higher rates
7  in the future.
8        MR. MICHAEL VILD: I'm uncomfortable
9  answering a question where I'm asked to look into the
10 mind of an insurance company. But what I can say is
11 based on the experience that we have had on many issues
12 the immediate response that we get when we attempt any
13 regulatory reform or legislative proposal that the
14 industry is -- dislikes is the - I am going to use the
15 word threat but I'm not sure that's the right word - to
16 leave the state, and it is -- it's an issue that we are
17 particularly concerned about in a state the size of
18 Delaware and it does -- it does have an effect on how we
19 regulate the industry because maintaining a vibrant
20 market is the best way to control rates.
21        REPRESENTATIVE VALIHURA: Okay. Do they
22 also threaten that they have to raise their rates, too?
23        MR. MICHAEL VILD: Sure.
24        REPRESENTATIVE VALIHURA: Sure. And do

52 (Pages 202 to 205)

8220dda6-de90-4f5f-8500-b27425213391

A205

Page 206

1  some of them do so?
2      MR. MICHAEL VILD:  The -- I mean the way
3  rates are calculated Delaware's specific experience is
4  actually a very small piece in the whole rate setting
5  process.  They use nationwide, nationwide data of which
6  Delaware data is entitled to some weight but because of
7  the small size of the state from an actuarial
8  perspective the Delaware data does not get substantial
9  weight in rate setting.  It's done more on a --
10  actuarially speaking on a nationwide basis although the
11  Delaware data does have some impact on our rates.
12      REPRESENTATIVE VALIHURA:  And since we only
13  have one state that's done this it would be difficult to
14  understand what those rates might be?
15      MR. MICHAEL VILD:  Well, I think that's
16  right, but I think it's also fair to say that the one
17  state that did it is, you know, I think the fifth
18  largest economy in the world or something along those
19  lines.
20      REPRESENTATIVE VALIHURA:  Right.
21      MR. MICHAEL VILD:  So it's not as if, you
22  know, Maine it was the only state that we had to look
23  for for some experience.  California is a substantial
24  population and the effect there would -- would be

Page 207

1  telling.
2      REPRESENTATIVE VALIHURA:  Okay.  So we'll
3  wait for your response.
4      MR. MICHAEL VILD:  I hoped to have that
5  information today but I have not been able to gather it
6  yet.
7      REPRESENTATIVE VALIHURA:  Thank you.  Other
8  questions of Mr. Vild?  Seeing none, thank you very
9  much, Mr. Vild.  I appreciate you being here.
10      MR. MICHAEL VILD:  Thank you.
11      REPRESENTATIVE VALIHURA:  At this point we
12  have reached the end of our list of speakers.  The
13  members of the committee have -- actually we do have a
14  quorum, which is good.  We have already heard from one
15  of our members as to what his position is on the
16  legislation.  Before we go to the next point here, I am
17  going to ask the sponsor of the Bill before we take the
18  next step that whether if, in fact, we do release the
19  legislation today that you will not put it on Tuesday's
20  agenda when we come back?
21      SENATOR PETERSON:  I'm insulted that you
22  would say that because it has to go to JFC.
23      REPRESENTATIVE VALIHURA:  Oh, I'm not -- I
24  was not insulting you.

Page 208

1      SENATOR PETERSON:  It's an internal joke.
2      REPRESENTATIVE VALIHURA:  There is some
3  members of the chamber who would certainly do that and I
4  have now taken on making sure those kind of things get
5  the opportunity to -- everyone gets an understanding
6  that it is coming up.  So having made that
7  representation, is there a motion at this time?  Yes.
8  Representative Johnson.
9      REPRESENTATIVE JOHNSON:  I move to release.
10      REPRESENTATIVE VALIHURA:  We have a motion
11  to release -- you know what -- 29, Senate Bill 29, I
12  like that, sort of hit the bottom of my -- all the
13  papers piled up on top of that.  Senate Bill 29, a
14  motion and a second has been made.  The second was made
15  by Representative Mitchell, I'm saying that for the tape
16  recorder on the other side of the room there.  All those
17  in favor of releasing Senate Bill Number 29 say aye.
18  Aye.
19      (Whereupon various members responded aye.)
20      REPRESENTATIVE VALIHURA:  Anyone opposed?
21  Seeing no opposition and having the five requisite
22  members to release the Bill, the Bill will be released,
23  and I appreciate everyone's attendance today and
24  appreciate your courtesy and it's one of the longest

Page 209

1  committee meetings we have ever had and we do appreciate
2  it.  Thank you.  We stand adjourned.

53 (Pages 206 to 209)

8220dda6-de90-4f5f-8500-b27425213391

Page 210

```
 1    State of Delaware        }
 2                             }
 3    County of New Castle      }
 4
 5
 6
 7            C E R T I F I C A T E
 8
 9        I, Elaine G. Parrish, Registered Professional
10    Reporter and Notary Public, do hereby certify that the
11    foregoing record, pages 1 to 210 inclusive, is a
12    transcript of my stenographic notes taken from an
13    audiotape in the above-captioned matter.
14            IN WITNESS WHEREOF, I have hereunto set my
15    hand and seal this 16th day of September, 2007, at
16    Wilmington.
17
18
19
20        Elaine G. Parrish
21        Certification No. 170-RPR
22        (Expires January 31, 2009)
23
24
```

Wilcox & Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

8220dda6-de90-4f5f-8500-b27425213391



In The Matter Of:

# House Judiciary Committee of Delaware

---

## Audiotaped Hearing - Act to amend Title 10 of the Delaware Code

## Senate Bill 29

## May 29, 2007

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

**A**

**abandoned** 148:6
**abandoning** 96:6
**abandons** 15:4
**abilities** 5:11
**ability** 55:24
**able** 5:10,12 30:19
  30:22 38:20,24
  40:2 42:20 45:7
  55:17 59:12 93:10
  95:23 122:7 133:8
  144:2 146:22
  147:3 148:8,13
  150:5,13,16 154:5
  156:17 185:10
  186:14 207:5
**abolishing** 45:22
**abolishment** 35:3
**above-captioned**
  210:13
**Abrams** 140:18,21
  140:23 141:3,7,9
  144:8 148:1,4,15
  149:11 150:8,11
  150:14,20,24
  151:4,14,19 152:5
  152:11
**absence** 162:17,20
**absentia** 131:2
**absolute** 14:7 65:23
**absolutely** 21:24
  25:16,20 27:7
  38:5 58:16 63:2
  68:6 85:3 107:16
  116:19 128:6
  140:8
**absurd** 163:2
**abuse** 1:8 6:20,21
  7:11,21 8:11 9:3
  9:12 11:6,19 14:5
  15:19,20 16:16
  17:10 18:1,3,14
  19:5,13 20:14,20
  23:24 26:8 29:17
  33:4,14,23 34:9
  34:11 35:11 37:17
  37:19 45:20 53:3
  59:22 60:5,7,22

60:23 62:2 68:8
  75:23 93:9 94:8
  97:6 98:10,15
  100:8 101:13
  103:7 105:14
  108:4,17 109:1
  110:20,20 112:21
  118:17 119:18
  121:11 133:16
  134:12 143:2,19
  144:5 145:1,6
  146:9 151:5 153:5
  154:7,23 155:2,13
  156:2,8,15 158:6
  160:6 161:7
  163:11,20 164:4
  164:15 165:20,23
  166:6,7,10 168:8
  168:18 170:20
  171:3 173:5 177:7
  180:11 182:2,24
  183:10 192:23
  197:13
**abused** 6:17,24
  7:24 17:13,22
  18:5 38:11 62:10
  79:8,9 80:9 81:16
  120:15 125:4,5
  132:17,19,21,22
  132:24 133:2,8,13
  135:10,11 136:21
  138:22,22 140:5
  141:16,19 143:3
  145:9,16 149:15
  149:24 153:23,23
  153:23 154:1
  172:11 173:5
**abuser** 18:9 97:18
  97:24 104:19,19
  105:2 108:13
  111:20 122:15
  127:12 128:24
  150:3 153:22
  155:5 168:15
**abusers** 18:10
  33:13 49:3 111:21
  113:16 115:11
  154:4 155:3

168:13
**abuses** 15:7 78:6
**abusing** 21:24 29:4
  62:18 71:9 133:20
  145:3 146:23
**abusive** 18:7
**ACA** 178:4
**Academy** 96:21
  141:20
**accepted** 18:18
**accepting** 155:16
  158:21 205:5
**access** 33:15 44:24
  51:19 77:17 79:9
  79:17 80:9 180:8
**accessibility** 169:6
  169:12
**accident** 120:19
  200:12
**accommodate**
  93:17
**accomplish** 15:22
  16:20 20:24 73:16
  73:17
**account** 34:8
  181:13,18 190:15
**accountability**
  93:20,20 94:13
  95:23 158:7,18
  159:3,11,19
**accountable** 5:7
  19:20 22:1 77:11
  94:4,5,12,18
  131:14 144:17
  154:6 160:7
**accounting** 102:18
**accusation** 98:7
  115:21 127:6
**accusations** 143:10
**accused** 25:2 80:4
  97:1,13,21 98:7
  98:13,18 104:13
  111:4,10,12
  112:22 122:17,18
  123:16 126:22
  127:9
**accuser** 25:1,7 99:4
  107:15 115:13

120:6,7
**accusers** 146:2
**achieve** 156:9
**acknowledgment**
  61:8
**acquiring** 102:16
**act** 1:6 10:9 12:1
  26:21 32:6 98:10
  119:20 170:16
  182:8,9 192:16,16
  199:15
**acting** 99:7 135:17
  173:22
**action** 109:7,9,15
  169:3 170:11
**actions** 77:6,11
  144:18 147:12,14
  170:8
**active** 72:1 136:14
**activities** 187:1
  191:10
**activity** 71:5
**acts** 7:1 17:18
  82:15 145:22
  169:2
**actual** 22:18 23:24
  24:13 28:6,21
  29:2,6,16 30:20
  30:24 44:16 73:2
  78:10 97:23
  111:21 163:4
**actuarial** 206:7
**actuarially** 206:10
**acutely** 96:9
**adamant** 27:20
  30:7
**adapted** 93:16
**add** 119:20 183:10
  184:2,3
**added** 182:14,16
  183:2,3,11 192:18
  193:4
**addiction** 175:16
  175:18
**adding** 1:8 104:1
**addition** 13:6 16:17
  53:9
**additional** 16:7

61:20 103:22
  173:7 180:11
  183:8 188:12
  190:16,16 191:19
**address** 4:11 19:1
  33:7 35:16 38:18
  40:17 45:18 46:5
  46:16 52:17 67:15
  77:21 89:8 97:19
  120:11
**addressed** 35:15
  46:1 82:22 83:3,4
  190:11
**addressing** 176:22
**adds** 194:15
**add-on** 194:14
  200:1
**adequately** 14:8
  85:21 89:1
**adjective** 111:24
**adjourned** 209:2
**adjudicated** 109:12
**adjust** 165:6
  190:14
**administrators**
  48:17
**admission** 65:14
**admit** 138:23
**admitted** 7:17
  115:11 148:20
**Adolescent** 141:20
**adopt** 155:23
**adopted** 60:23
**adoption** 53:2
  60:20 61:1 62:2
**adult** 6:10 21:24
  34:7 156:1 166:3
  171:4
**adulthood** 34:10
  146:9 171:2
**adults** 6:4 23:7
  124:14 146:18
  153:17 173:22
  176:21 180:8,10
**advancing** 21:20
  104:1
**advice** 39:9 40:4
**advise** 27:2

advised 25:11
advocacy 116:17
advocate 13:16
advocates 168:9
advocating 15:16
aegis 159:16
affect 6:3 55:24
    61:11,12
affiliated 48:1
affirmative 165:23
afford 84:9 92:3
    191:11,14
afforded 5:9
AFL-CIO 8:7
Africa 114:11,21
    116:13
African 116:19
afternoon 2:1 3:8
    46:9 92:24 152:14
    152:15 157:19
    167:8 204:1,9
age 6:24 34:14
    37:13 65:13
    120:14,15 122:1,2
    122:3 128:12
    154:23,24 155:6
    174:7 200:14
agencies 22:2 24:7
    24:16 96:20
    158:16
agency 22:17 25:20
    53:4
agenda 207:20
Agent 36:3,6,8,11
    36:14,16 83:12
aggregate 54:11
    192:20
aggressively 19:5
ago 4:15 6:13 9:6
    10:10 15:8,20
    17:14 22:6,8 26:9
    29:19 30:3 32:2
    37:22 42:17 56:5
    71:12 79:11,16
    80:9 81:23 82:9
    98:17 104:19
    106:3 107:15,19
    127:2,5,6 136:18

136:22 139:5,5
    145:18 156:10
    160:17 164:11,15
    167:13,24 173:23
    178:16 183:2
    200:8
agony 127:9
agree 25:17 58:1
    77:12,13,13,22
    80:13,18 97:24
    99:24 116:24
    120:23 121:5
    123:20 128:18,22
    128:24 140:3
    163:21
agreed 139:10,11
    139:23
agreement 39:22
ahead 119:13 137:5
    148:8
ahold 137:2
aid 118:3
AIDS 53:2
air 44:1 112:3,9
alcoholism 155:6
alert 161:16
allegation 62:1,11
    62:13 70:8 115:12
allegations 62:6
    101:12 109:1
    118:17 119:18
alleged 70:8 100:9
    100:12,12 101:12
    106:1,2 107:15
    108:13 113:16
alleges 104:17
alleging 98:15
    115:18
allocated 87:22
allow 10:2 40:14
    41:19 65:18 80:3
    80:9 131:9,10
    146:11 162:8
allowed 6:11 70:2
    113:8 121:19
    124:14,21 149:19
    149:21
allowing 107:21

146:5 160:5
allows 6:9 35:22
    41:23 78:6
alter 134:1
altered 6:15
amazes 145:19
ambiguity 28:12
amend 1:6 74:23
    119:23 124:4,4
amended 38:17
    46:19 72:17,20
    97:20 100:18
    118:12 124:6,7
    127:4
amending 124:7
amendment 15:22
    16:19 20:24 23:23
    37:20 50:18 58:21
    70:22 72:21,22
    73:6,9,14,16,20
    74:1,1,3,4,10 75:1
    78:10,17 79:4
    80:19,22 81:20,21
    131:4,7
amendments 8:10
    13:18 22:16 72:24
    75:3 78:17 124:2
    154:11 156:23
America 31:23
    152:22
American 141:20
    162:12 173:8
    178:4
amnesia 103:1,15
    103:17
amount 44:22 45:1
    48:5 50:7 86:3
    88:2 163:15 185:3
    194:6
amounts 9:15
amputee 93:16
analogy 93:12
    193:8
analysis 64:11,17
    117:5 118:7
    190:18
ancient 101:20,20
    128:5

anecdotal 128:3
anecdote 174:20
Angel 135:8,14
Angeles 141:9
Angels 136:5
angst 130:17
annual 87:24 88:2
annually 52:21
anonymously
    171:6
answer 10:13 24:15
    66:19 76:12
    102:20 104:3
    147:6 177:17,22
    180:11 192:14
    196:20 199:1
    204:18,18
answered 188:23
answering 205:9
Answers 116:14
anticipation 47:12
antiquated 6:8
anti-Catholic 14:3
anxiety-inflicting
    126:6
anxious 38:24
    53:20
anybody 58:2
    121:2 162:13
    184:11
anyway 42:24 91:3
anyways 42:22
APA 172:22 173:8
    178:3
apart 88:11 175:9
apiece 91:5
apologies 130:24
apologize 126:20
    130:21
Apostolic 18:23
apparently 2:5
appeal 87:4,24 88:2
appeals 7:10 44:18
appear 138:12
appearance 33:2
appearing 141:11
appears 85:5
    138:15

applicable 33:4
    128:8
application 160:16
applications
    160:18
applied 32:13
    64:20 142:4
apply 145:17
applying 154:7
    160:19
appointed 167:13
appreciate 4:7
    32:20 79:6 81:6
    92:12 96:11 103:3
    104:8 126:22
    130:17 132:9
    140:15 152:9
    157:8,16 176:16
    201:12 204:10,10
    207:9 208:23,24
    209:1
approach 37:16,17
    77:15 112:20
    187:16
appropriate 55:9
    63:23 77:18 117:1
    117:6 125:7
    160:20 166:3
appropriately
    46:13 55:21
approval 74:3
approved 63:7
    123:11,12
approximately
    146:2 186:7
April 116:1,1
    145:18
arbitrarily 75:6
arbitrary 117:17
arbitrator 48:9
Archbishop 13:8
    18:22
archdiocese 13:9
    13:10 18:4 84:7
    89:14,17 91:1,20
Archdioceses 89:19
archives 67:13
Archmere 96:21

**area** 50:5 105:5
  159:13
**areas** 193:5
**arena** 99:1 117:11
  117:11 198:16
**argue** 64:23 133:7
  161:9
**argued** 86:18
**arguing** 46:17
**argument** 10:9
  83:22 92:1 161:17
**arguments** 64:24
  65:3 161:3 197:21
  199:20
**arm** 53:1 137:6
**arrest** 7:18 98:22
**arrested** 145:19
**articulate** 92:5
**arts** 13:2
**ashamed** 142:7,15
  149:12
**aside** 85:13
**asked** 4:8 38:10
  43:23 86:14
  122:24 124:3
  135:11 138:3
  156:11 178:15
  181:21 187:9
  197:19 198:22
  205:9
**asking** 22:15 43:13
  84:1 146:7 202:22
  202:23
**aspect** 32:12 40:17
**aspersions** 100:3
**assault** 4:13 6:10
  106:3
**assaulted** 22:8
  175:7,20 176:2
**Assembly** 3:12
  11:17 33:3 37:5
  58:19
**assert** 105:20
**assertion** 162:2
**assertively** 160:2
**assess** 169:5
**assessment** 88:5
  125:3

**asset** 48:14
**assets** 49:11 84:4,8
  84:19,19 85:6,14
  85:19 86:6,13,18
  86:19,23 87:2,14
  90:4
**assistance** 38:9,14
  53:3
**associated** 105:15
**Association** 151:23
  173:8 178:5
**assume** 59:18 74:6
  164:3
**assure** 67:3 133:17
**atmosphere** 43:6
**atone** 77:14
**attempt** 15:4 19:6
  45:9 205:12
**attempted** 45:10
  123:6
**attempting** 64:3
  102:23
**attend** 55:7
**attendance** 208:23
**attending** 132:7
**attention** 3:4 39:6
  103:6 104:17
**attitude** 153:19
**attorney** 11:11
  24:20 27:19,21
  28:11 29:24 33:1
  43:9,15 74:24
  96:16,16 98:22,22
  100:18,22 110:10
  116:1 150:23
**attorneys** 24:3,5
  25:9 27:2 28:20
  28:23 30:18 75:1
  86:18 89:19 110:2
  163:18
**attorney's** 25:10
**attributable** 49:2
**audience** 28:20
  30:18
**audiotape** 210:13
**audiotaped** 1:15
**auditors** 34:23
**authorization**

166:23 167:1,3
**authorized** 19:17
**automatically**
  192:17
**availability** 54:16
  174:23
**available** 34:21
  36:20 41:7 52:15
  85:14,19 86:7
  193:3 204:11
**avenue** 42:10
**average** 9:16,21
  48:5,9 120:14,14
**avoid** 17:3 19:7
  83:24 86:9 89:20
**award** 44:2,19
**awarded** 9:17
**aware** 13:18 14:19
  24:16 25:20 56:8
  56:22 63:5 64:2
  70:5 86:8 95:14
  96:9 100:1 102:8
  123:1 165:11
  177:7 200:9,14
  203:17
**awful** 171:8
**awhile** 136:23
  149:22
**awkward** 75:4,5,6
  75:14 113:20
**aye** 208:17,18,19
**Ayres** 141:19 142:2
  142:3,8,17,19,23
  143:4,7,8 144:2
  144:12,22,24
  145:3,5,11,19,21
  145:23 146:2,22
  149:6 151:11
**Ayres's** 145:12

**B**

**B** 110:19 124:4,7
  124:10 125:10
**back** 9:20 17:8 22:5
  22:6 24:21,22
  26:8 30:2 32:1
  35:21,22 51:20
  52:7 54:1,2,3,7
  58:5 63:4,16,20

63:22,24 64:3,7
  64:18,18 65:8,18
  65:19 66:4,11,14
  67:15,22 69:10,10
  69:17 70:21 75:9
  75:18 82:3 83:8
  84:5 87:11,19
  93:18 100:8,20
  101:10,12 105:10
  111:10 112:6
  114:23 115:13
  117:6,13 130:22
  131:7,24 137:24
  146:19,19 152:10
  160:10 161:22,24
  175:6 179:5
  182:14,16 183:3,3
  183:9,11 186:5
  189:8,16 192:18
  193:4 194:15
  197:16 200:22
  204:18 207:20
**background** 20:9
  60:9 61:5 70:1,17
  77:23 78:1,1,20
  83:2 129:3,6,13
  129:14,16 160:15
  186:19
**backing** 174:18
**backstop** 104:14
**backward** 35:7,15
  38:19 46:4
**backwards** 123:7
  123:13 124:5
  189:2
**backyard** 111:11
**bad** 81:3 119:5
  170:13
**bag** 179:12
**bail** 145:24
**bake** 84:21
**balance** 77:15
  119:15
**balanced** 112:20
**balancing** 46:2
  58:22 187:9,11
**ball** 188:6
**ballpark** 23:17

57:4
**Baltimore** 13:11
**Baltimore's** 20:19
**bankrupt** 22:13
**bankruptcies** 47:3
  49:6 85:3,9 86:17
**bankruptcy** 16:22
  16:24 17:3 46:21
  47:1,11,15,18
  48:12 57:15 76:24
  83:16,19,22 84:5
  85:11 86:5,11,14
  87:3,6,12,20
  88:24 89:11 90:9
  90:12,21,23 91:3
  91:6,17,23 92:6
  138:6,10,11,12,13
  138:15 139:23
  160:23 161:1
**Baptists** 14:21
**bar** 38:8 57:15
  100:3 102:22
  106:21 166:9
**bare** 185:1,14
**barking** 111:8,11
**barred** 35:10 36:4
  37:21 64:16
  127:16
**Barry** 6:16,19,19
**based** 10:10 62:1
  73:10 88:5,6
  165:7 183:15,16
  184:4 188:9
  194:16 205:11
**basement** 104:23
**bashing** 14:3
**basic** 182:19
**basically** 84:1
  164:7
**basis** 51:22 164:5
  164:10,14,17
  206:10
**batch** 121:20
**Baylor** 176:3
**beach** 2:6 7:5
**bear** 33:10
**bearing** 98:1
**beautiful** 2:4

**becoming** 16:5
**beg** 154:10
**began** 60:18 145:14
  175:14
**beginning** 74:19
  91:21 103:7
  150:18
**begins** 19:9
**behalf** 22:22 95:16
  95:18 97:2 141:11
  152:19 166:21
  181:22 202:6
**behavior** 40:11,16
  51:8 82:1 129:8
  157:23 159:3,5
  177:11
**beholden** 115:21
**beings** 154:17,22
**belabor** 131:5
**believe** 15:23 22:1
  28:4 57:20 71:7
  71:23 73:5 76:8
  79:7,11,16,19,24
  110:14 120:21
  127:1 131:8
  134:21 141:13
  142:7 144:23
  153:6,12,20
  155:14 166:17
  168:19 171:14,15
  171:18 175:2
  180:5 181:10
  188:1 201:1
**believed** 5:6 143:17
  143:22
**believes** 22:20
  117:12
**bell** 110:16,16
**belly** 102:14
**belong** 84:2
**belongs** 14:24
**benefited** 147:14
  148:5
**benefits** 53:15
**best** 35:12 67:17
  75:11,15 133:18
  136:21 142:22
  205:20

**better** 41:4 75:2
  132:14 150:13
  154:5 177:2,12
  178:14 201:23
**beyond** 19:19
  53:14 65:2 75:7
  203:17
**Bible** 134:12
**big** 44:3 199:1
**bigger** 176:22
**bill** 1:6 3:10 4:12
  4:16 5:16 8:3,9,16
  8:22 10:2,5,14,21
  10:21 11:1,19
  13:17,23 14:1
  15:21 16:19 17:12
  20:24 21:19 22:16
  23:23 33:15 34:12
  35:7,12 36:8,17
  37:13,21 38:22,22
  39:11 40:6,9,21
  42:3 43:20,21,23
  43:24 44:5,7
  45:12 46:18 50:18
  58:23 63:6,15
  64:3 68:15,17,19
  72:15 73:9,14,15
  74:23 75:11,16
  77:7 78:4,4,11
  79:20,20 80:3
  81:4 82:23 93:4,7
  93:23 94:1,3 97:7
  97:8,8,13,14,20
  99:2 101:24
  104:13 105:17
  106:9 107:24
  110:14 112:4,6,17
  112:18,19 113:19
  118:12,13 119:15
  119:20,23 123:2,6
  123:8 124:2,9
  127:4,8,10,21
  128:9,9,12,22
  131:2,15 141:4,11
  141:14 150:10
  152:19 154:3
  155:10,19,23
  156:7,22 160:7

**166**:1,17 167:4
  171:10,24 180:5
  191:15 195:2,10
  196:4,4,24 199:16
  200:8 207:17
  208:11,13,17,22
  208:22
**bills** 3:17 10:2
**Bishop** 15:17 86:24
  90:8 101:14 134:7
  134:9,11 137:6
  139:6,7 140:3
**Bishops** 14:8 17:6
  20:7 60:21 133:24
**Bishop's** 90:3
**bit** 12:19 22:15
  75:4,17 123:22
  137:9
**blah** 139:16,16,16
**blame** 40:3
**blank** 110:20,21
**blatantly** 161:7
**bless** 21:1
**Blessed** 55:14
**blocked** 103:4
**board** 30:4 60:24
  94:10 95:13 96:19
  167:3,10,11,14
  178:3
**boards** 20:14
**boat** 153:19
**Bob** 2:24
**body** 14:14 16:11
  71:14 82:11,12
  123:10 149:2
  155:22 160:11,19
**bono** 125:19
**books** 6:8
**borrowing** 49:11
**Boston** 8:24 16:13
  18:4
**bottom** 208:12
**bound** 94:9 106:22
**Boy** 129:1,13
**boys** 6:18 7:5 21:16
  23:13 31:21,23,24
  62:19 125:16,20
  126:7 142:2,4

**143**:8 144:9 145:4
  145:4 149:6
  158:11 173:5
  191:9
**brain** 66:6
**branded** 126:23
  127:12
**brandished** 98:2
**breach** 105:22
  118:20
**break** 96:7,11
  118:10 124:18
  130:19,20 146:10
  172:4,10
**breakdown** 132:20
**brief** 83:8 106:18
**briefing** 110:24
**bring** 15:6 40:14
  41:13 74:12 93:6
  101:20 102:5
  108:18 127:3
  129:8 133:8
  144:11,12,14
**bringing** 12:3
  17:12 40:11,18
  70:20 71:7 93:4
  99:21 163:19
**brings** 24:23 39:6
**brink** 122:9
**broad** 33:20 106:14
  168:19
**broadcast** 141:24
**broken** 171:20
**brokerage** 181:3
  181:21
**brother** 18:8
  108:19 132:22
  138:22
**brothers** 99:18
  100:2 106:21
  132:21 133:4
  139:3 168:22
**brought** 37:18
  38:22 39:3 42:18
  50:13 62:6,12
  65:10 79:2 85:1
  98:20 100:15
  101:24 104:6,17

**106**:23 115:24
  127:14,15 164:7
**brush** 106:14
  168:19
**bucks** 71:24,24
**build** 105:3 106:13
**building** 17:24
  71:15 193:22
**buildings** 48:21
  71:21 88:9 92:7
**built** 55:13,14
**bump** 95:21
**burden** 15:24 25:1
  46:14 120:5
  156:16 162:24
**Burke** 92:17,17
  96:13 130:21
  132:5,11,12 138:8
  175:5
**Burke's** 169:8,10
**bus** 81:23 82:2,5
**business** 3:14 8:6
  11:10 85:3,7
  156:24 183:4
  202:2,3,6,8,9
**buttons** 172:13
**buy** 84:12 189:2
  193:14
**buying** 101:7 193:9
**buys** 102:17
**BWCI** 176:3

**C**

**C** 124:6,10 210:7,7
**calculated** 206:3
**California** 11:1
  16:14,15 49:7
  57:12 123:9
  141:14 144:10,21
  145:21 146:6,6,11
  146:12,16,24
  147:3,15,21
  150:23 151:21
  152:10 196:17
  200:8 203:6,6
  204:17 206:23
**California's** 144:3
  148:7
**call** 2:2 3:12 92:18

99:7 136:18,20,22
137:8 171:4 202:1
**called** 60:24,24
61:4 82:4 101:4
107:12 122:13,15
126:7 135:24
136:6,11 137:4
141:23 162:1
174:11 175:8
193:14
**caller** 107:6,9
108:13 127:22
**camp** 107:23 129:2
129:15
**cancer** 14:15
**candidly** 33:4
**candles** 165:2
**candor** 160:23
**canon** 67:11,19
152:20
**cap** 50:19 51:16,18
51:24 52:18
**capable** 5:14 155:7
**capped** 184:13
**car** 118:20 120:19
120:20 200:12
**Cardinal** 8:24
20:19 71:3
**care** 4:24 10:24
15:2 24:13 68:11
81:12,13 110:22
111:2 129:2
158:12,15 160:14
185:4
**career** 7:9,15 18:6
**careful** 17:6 27:2
103:13 143:16
172:23
**carefully** 23:3
143:14 169:2,5
171:24
**caring** 96:20
165:12
**Carolina** 108:24
115:23
**carrier** 182:15
184:4 194:16
**carriers** 189:13

197:4,8 203:9
**carry** 111:11
191:12,19
**cascade** 205:6
**cascading** 187:22
**case** 16:23 22:6
25:18 27:17 30:1
30:12 31:20 43:4
43:6,11,14 47:8
49:21 59:24 63:14
64:18,20 65:14
68:13 71:8 75:23
81:16 82:17 83:9
84:22 86:4,14,22
87:20 100:7 101:6
101:11,16,18
102:11 103:18,24
104:4 106:8 107:4
110:4,8,20,20
111:8 113:11,23
114:8,8 121:13
121:8 122:5 123:9
123:19 125:4,14
127:21 139:1
143:19,24 144:12
144:17 146:12
148:5,14 150:6,10
150:18 154:2
158:24 162:3
163:16 164:7
165:23
**cases** 17:2 31:14
42:17,22 43:4
44:9 45:7 46:22
46:22 47:9 49:18
59:23 64:9 65:3,4
65:9 71:2 75:4,7,8
81:7,8,9 85:4
90:18 98:21
102:22 111:7,14
113:11 114:14
118:14 120:21
122:9,23 127:14
144:5,11,20
159:12 160:10,12
161:15 163:17,18
165:20 166:7
167:22 183:21

189:22 197:4
**case-by-case** 64:17
**casting** 100:3
154:24
**Castle** 54:24
154:16 210:3
**casually** 159:23
**casualty** 193:17
**catalyst** 159:8
**catastrophic** 200:1
**Catholic** 4:13 8:22
9:7 13:8 14:3,6
19:14 20:7 33:10
48:1,18,20 52:23
52:24 53:1 60:21
72:16 74:20,22
75:18 77:9,9
94:16 100:9
124:16 133:17
134:23 138:16
152:21 155:11
161:5
**Catholics** 14:15
**caught** 7:16
**cause** 8:8 98:21
188:2
**caused** 76:24
**caution** 171:9
**CCD** 136:11
**Celestino** 18:22
**cent** 124:23
**center** 49:13
110:22 111:2
175:16,18
**centers** 158:12
175:19 185:4
**century** 129:9
**CEO** 21:15
**certain** 10:18 51:20
54:6,7 58:16
100:14 116:17
195:18 198:18
**certainly** 37:8 44:6
44:9 52:11,16
54:18 57:19 58:13
60:8 77:10 86:10
103:10 116:10
117:4,13 127:11

130:3 149:17
162:8,15 165:2
208:3
**Certification**
210:21
**certified** 167:11
**certify** 210:10
**cetera** 142:10
178:6
**chain** 111:11
**Chair** 3:1 176:12
200:21
**chaired** 13:7
**chairman** 12:11
21:12 32:24 83:7
92:13 93:1 96:14
99:12 102:21
141:8 157:20
160:8 195:2 200:4
**chairman's** 23:10
**chairperson** 132:12
200:19
**chalices** 84:21
**challenges** 180:6
**chamber** 6:8 208:3
**chance** 11:17,18
120:5,7 158:18
204:23
**Chancellor** 134:8
**change** 10:12 32:17
42:23 43:1,20
45:12 52:5 75:17
147:20 159:6,7,7
159:8 163:23
194:20 202:21
**changed** 63:19
189:9
**changes** 15:16 42:6
**changing** 34:1
98:10,11,13
163:21
**chaotic** 169:7
**chaperone** 129:6
**Chapter** 16:23,24
17:3 83:16,18,19
83:20 85:1,1,2,4,5
85:5 89:10
**characterization**

125:3
**charge** 11:5 105:24
108:14 115:16
125:20 150:7,7
184:4 185:23
186:2 188:3
191:13 194:20
195:9
**charged** 118:15
182:23 183:16
187:3 190:13,13
**charges** 98:19
127:3 144:14
146:17 148:10
**charging** 184:19
185:3
**charitable** 33:17,19
59:4 77:8 158:2
158:21 166:13
**Charities** 48:20
**charity** 19:9 52:24
**Charlestown**
108:23,24
**charter** 61:2
**chatting** 172:9
**check** 61:5 70:17
129:6,13,14,16
**checking** 75:3
**checks** 20:9 60:9
70:1 77:23 78:1,2
78:20 83:2 129:3
160:15 186:19
187:3
**child** 1:8 4:20,23
4:24 6:9,11 7:11
7:22 8:11 9:23
10:8 11:6 13:16
19:16 26:21 33:4
33:14,23 34:9
37:17 59:22 70:7
70:14 71:10 79:10
79:10,12,14 82:1
94:9 97:2,22 98:8
98:9,12 99:5
100:21 101:4
104:8 111:13,20
111:24 119:18,22
120:15 121:11

122:15 126:23
127:9,12 129:7,20
141:16,20 144:5
146:8 149:1
151:23 158:4,19
159:22 160:2
163:11 165:24
166:10,15 169:7
169:14 171:18
**childhood** 4:13 7:7
11:18 16:16 17:9
20:20 93:9 154:23
155:13 156:1
171:3 175:7,20
176:2
**children** 4:24 6:2,5
7:15 9:3 10:23
11:5,17 12:10
13:21 14:8,11
15:4 17:17,23
18:21 19:12 20:3
29:14 60:9 61:4
70:20 71:7 72:10
81:7,11,13 95:2,5
95:6 107:1,24
129:15 130:2
135:7,14,20
143:14 144:15
145:22 146:17
147:15 149:2
153:6,7,11 154:1
158:6,15,17 169:9
171:19 177:13
179:8 180:9
186:24 195:13
197:10 200:11
**children's** 95:19
191:10
**child's** 16:11 79:17
149:5
**choose** 94:10
143:16 170:11
**choosing** 143:14
**chop** 123:24,24
**Christ** 14:14 55:13
134:2
**Christiana** 71:9
**Christina** 80:4

**Christine** 7:21 8:1
**Christus** 134:1
**church** 8:22,23,23
9:3,11,15 10:1,19
12:8 14:6,15
16:17 17:4 18:17
19:4,10,14 20:9
33:9,10,12,23
38:3,3 51:13
53:24 54:23 55:12
55:19 58:3 66:17
67:2,17 69:12
71:1,2 74:20 77:9
82:14 84:14 92:3
94:16 104:21,23
105:4,4,12,13,15
105:18,20 106:1,9
115:1 133:17
134:1,23 137:11
137:14,17 152:20
155:11 156:23
161:5
**churches** 8:4 9:9
15:1 17:7 47:4,6
158:13
**church's** 18:3 19:6
20:16 42:23 43:2
51:17 67:12 105:9
**circle** 155:4
**circles** 81:3
**circumspect** 80:20
**circumstance**
106:6
**circumstances**
120:18 121:4
159:7
**circumvented**
15:13
**cite** 67:19 101:22
104:11 108:21
**cities** 16:2
**citing** 101:18
**citizen** 93:3 95:18
155:24
**citizens** 147:14
**city** 49:15 53:13
107:18
**civil** 1:8 9:8,12 11:7

11:19 12:2 15:16
35:10 64:9 97:6
98:15 99:1 100:7
115:17 117:11
118:19 119:1
128:22 144:11,12
144:17,20 145:21
146:5,10,15 148:9
150:6,16 159:10
160:11
**civilly** 5:8 117:14
**claim** 24:24 40:1
48:4 58:6 89:15
102:5 105:14
106:4 115:17,24
118:21 122:12
127:15,16 161:18
162:7 164:7,10,18
164:20
**claimants** 45:24
47:15 86:12
**claimant's** 48:10
86:17 90:16,20
**claimed** 89:10
138:10 162:14
**claiming** 22:7
**claims** 9:9 33:13,16
34:19 35:10 36:4
36:18 37:17,21
39:4 41:19 47:20
48:11 49:1,1,24
50:2 52:6 56:6,7
56:11 59:22 64:16
77:1,1,5 85:6
86:13,20 89:21
91:6 97:6 105:21
107:21 108:20,21
109:11,13,24
119:5,5,6,6
122:24 161:7,12
163:8,11 182:21
183:15,16 184:6
186:6 187:18
188:9 190:12,17
190:21 197:21
205:2
**claims-made** 164:5
164:10 188:12

**Claire** 92:15,16
**clarification** 31:7
74:14
**clarified** 80:16
**clarify** 30:19
158:11
**class** 47:14 109:7,9
109:15 129:7
**classic** 129:5
**clear** 22:20 24:16
30:7 32:12 56:10
74:9 106:20 202:5
**clearer** 28:7
**clearly** 14:18 17:7
147:14 201:2
202:2
**clergy** 46:11
153:14 166:6
**clericalism** 135:2
**client** 41:8 72:15
103:1 114:16,17
114:18 124:1
**clients** 40:4 44:14
124:12
**climax** 170:7
**clinical** 103:10,14
167:17
**clinically** 167:19
**clog** 163:1
**close** 9:8 25:24
89:16 155:4
**closed** 9:11 17:8
47:6 75:18 76:11
**closely** 163:17
**closer** 141:2 154:19
181:16
**closing** 47:4,4
**cloud** 101:3 111:4
**club** 22:8 23:13
31:21,23 125:16
125:16,21 126:7
**clubs** 21:16 31:24
32:1 158:11
**coach** 22:8 29:4,13
178:18
**coaches** 16:17 22:5
23:1 29:4 30:2
107:22 168:23

**coalition** 8:10
13:16 140:24
141:4,11
**coalitions** 8:2
**Code** 1:7 178:4,4
**codes** 178:2,13
**collateral** 49:12
**colleague** 132:6
**colleagues** 3:15
23:12 92:19
130:18 131:16
148:24 180:17
201:21
**collected** 10:7
**collecting** 190:17
**collections** 88:6
**college** 167:16
191:15
**Colonial** 79:10
**Colorado** 89:13
**come** 5:19 6:9 30:4
34:10,18 39:21
40:2 48:2,11 49:9
49:9 50:10 55:15
58:5 71:19 78:5
81:17 84:14 88:21
96:7 98:1 107:21
121:12 122:4
127:22 130:21
132:14,17 135:1
138:5,5,9,19
141:12 146:2,9,14
147:10,13 150:13
154:4 155:12
157:14 171:15
172:19,22 175:6
178:16 179:20
183:21 184:7
188:21 196:3
199:22 200:13
207:20
**comes** 28:2 123:18
126:1 134:20
162:17 165:14
171:21 176:7
**comfort** 82:7
**comfortable**
156:13,18

**comfortably** 155:7
**coming** 2:3 27:10
  38:9 39:9 81:6
  85:10 137:23
  145:9 208:6
**Commander** 9:20
**commence** 47:11
**commendable**
  20:15
**commended**
  147:12 157:14
**comment** 56:14
  80:24 100:20
  112:15 130:20
  131:21 190:6
  200:4,4
**commented** 177:3
**comments** 3:23 4:3
  120:2 131:5 157:8
  157:11 190:3
**commercial** 9:16
  182:19
**commissioner**
  179:24 201:22
  204:7
**commit** 32:6
**committed** 6:18
  15:12 106:3
**committee** 1:2,16
  2:2,9 3:1,2,6,20
  3:21,23 4:8 12:13
  12:20 13:1 21:13
  23:14 33:2 52:3
  69:16 71:14 77:17
  96:15 132:4,13
  136:12 138:11,13
  147:17 157:4,16
  157:20 166:18
  167:6 168:14
  179:16 180:12
  187:10 200:19
  204:12,21,24
  207:13 209:1
**common** 5:1 8:7
  14:24 62:18
  102:11,12 160:19
**commonly** 86:22
  87:1

**communicate**
  177:8
**communicating**
  177:2
**communities** 2:6
**community** 8:4
  13:13 19:20 21:23
  103:10,12 106:11
  107:2 173:14
**Comp** 197:15,16,22
  198:3 199:6,15,20
  199:22
**companies** 10:6,16
  12:9 26:9 32:3
  182:23 183:10
  184:15 186:23
  189:10,17 190:22
  196:18 197:6,18
  198:17 199:6,7,11
  203:15 205:3
**company** 102:17
  151:8 164:8,17,19
  164:21 165:14
  185:22 201:9,11
  201:15,16,17
  202:15,20 203:11
  205:10
**company's** 164:12
**comparable** 99:3
  111:1
**Compare** 118:19
**compared** 93:16
**compensate** 38:10
  55:21 85:21
**compensating**
  46:12,13
**compensation**
  38:15 41:21
**competent** 162:24
**complaint** 104:5,6
**complaints** 63:17
  143:7
**complete** 35:2
  50:23
**completed** 109:12
**completely** 30:4,5
  37:6 68:7 69:3
  84:23 100:19

  116:14 118:13
  121:5 170:16
  185:18
**compliance** 19:19
  61:7
**complicit** 159:21
  160:5
**comply** 169:24
**comprehensive**
  180:16
**con** 169:15 171:12
**conceivably** 65:8
  65:16
**concept** 34:14
**concepts** 52:4
**concern** 9:7 19:8
  22:2 24:13 29:11
  63:16 79:6 85:7
  128:4 152:22
  168:10
**concerned** 20:2
  29:21 117:18
  168:10 187:21
  205:17
**concerning** 189:9
**concerns** 35:14,16
  38:18 45:23 46:2
  52:17 58:22
  126:22 152:24
**conclude** 58:18,19
  59:6 94:1 118:10
**concluded** 72:4
  163:12
**conclusion** 119:11
  119:14 162:22
  171:9
**conduct** 172:23
**conducting** 162:11
**conference** 20:7
  48:18 60:21
**confess** 152:19,24
**confident** 165:1
**confront** 128:24
**confuses** 126:24
**congregation**
  106:14
**conjunction** 36:1
**connection** 85:12

**Connelly** 5:19,20
  5:21
**cons** 144:11
**conscience** 152:18
**consciously** 172:3
**consensual** 42:9
**consequence** 77:2
**consequences**
  24:11 58:24
**conservative**
  159:18
**consider** 22:3,19
  23:3 112:19
  149:20 171:24
**consideration** 64:8
**considered** 137:11
  143:12 183:5
**considering** 84:9
  147:5
**consistent** 35:21,24
  63:21
**consistently** 173:9
**conspired** 15:14
**constant** 126:2
**constituent** 96:5
**constituents** 188:4
**constitutes** 102:16
  103:20
**Constitution** 64:14
**constrict** 188:7,19
**consultants** 90:23
**consumer** 191:23
  192:1
**contact** 74:24 95:6
  115:20 171:1,3
**contacted** 58:11
  143:5
**contacting** 145:14
**contemporaneous**
  118:21
**contend** 160:1
**contents** 193:21
**context** 44:10
  73:13 91:14
  115:17 169:21
**continually** 82:2
**continue** 3:18 10:3
  51:21 56:1 78:6

  115:6 158:4 171:3
**continued** 9:3
  171:1
**contract** 118:20
**contradicted**
  148:20
**contrary** 116:7
**contribution** 89:6
**contrived** 142:3
**control** 94:3 153:10
  205:20
**convention** 17:20
  19:15,21
**conversations**
  28:22
**convert** 85:4
**convince** 89:15
**coordinators** 20:14
**copied** 180:20
**copies** 180:18
**copy** 173:12 180:3
**cord** 93:15
**corporate** 159:16
  160:19 165:7
  183:6
**corporation** 18:16
  53:16
**corporations** 159:6
**correct** 12:22 27:14
  58:7 65:5 80:12
  83:12 90:10 115:5
  115:8 129:22,22
  130:2 188:17,18
  192:9 194:13
  195:7
**corrected** 162:9
**Correctional**
  175:24
**correctly** 38:3
  52:23
**corroborated**
  115:11
**corroboration**
  109:17 148:18
**cost** 91:4 125:21
  185:2,4,12,12
  187:1 191:5 194:6
**costly** 71:22

costs 184:5 185:24
    186:13 187:2
    191:19
cost-free 59:1
council 4:10,14
    101:15 139:19
Council's 19:1
counsel 22:20 39:9
    44:13 90:20,24
    95:9,14 96:19
    99:6,7 108:1
    136:21
counseling 38:13
    53:3 70:10 133:10
    149:3 167:10,16
    178:4
counselor 167:11
    167:12
counselors 23:1
    107:23 167:15
counsel's 90:16
count 99:13
countenance
    164:10
counterparts
    181:23
counting 198:11
countless 147:15
countries 19:4
    203:8
country 15:10 16:3
    18:15 31:24 87:1
    120:16 138:12
    153:1
counts 145:22
County 54:23,24
    134:15 143:8
    146:1 154:16
    210:3
couple 62:24 63:3
    120:2,12 148:21
    161:4 164:2
    167:24 177:3
courage 143:2
    153:17 155:13,14
    155:15,17
courageous 154:2
    156:22 157:1

courageously 8:16
    166:16
course 29:18 33:14
    47:14 49:22 54:3
    60:5 149:11
    163:24 168:12
    170:4,24 177:18
    177:20 193:23
courses 20:11
court 7:10 16:18
    19:6 41:20 42:21
    43:12,14 44:17
    51:20 52:10 63:8
    63:14 83:22 84:5
    86:11 88:24 90:8
    91:17 99:11,14,16
    99:23 101:16
    102:2 103:15
    110:4,12,13,24
    112:13,16 113:4
    115:18 116:15
    117:24 118:5
    119:3 120:3 122:7
    123:8 126:4,5
    134:5 138:13
    143:9 144:3 148:7
    148:9 150:16
    152:2 160:18
    162:15,18,22
    163:7,20 164:19
    176:8
courtesy 208:24
courthouse 99:4
    100:7 104:4 126:9
    134:15
courtroom 162:4
    195:18
courts 79:9,17
    80:10 118:1 126:1
    128:17 144:12
    159:10 160:12
    161:14 162:16
    163:2,5 167:21
court's 116:18
court-approved
    90:13
court-ordered 44:1
    44:2

cover 26:10 31:14
    31:18 32:3 86:13
    86:19 164:18,20
    191:18 192:16
    195:4 197:18
coverage 22:10
    31:15 54:2,4,6,10
    90:20 164:4,12,13
    164:16 182:5,7,13
    182:16,24 183:2
    183:11,19,24
    184:3,10 185:1,3
    185:9,11 186:1
    189:2,14,16,22
    190:12 192:18
    193:5 194:14,15
    194:22 197:13,15
    200:1
coverages 182:2
    186:16
covered 9:1 11:6
    26:19 32:7 164:9
    182:8 192:10
covering 41:10
    130:5
covers 14:1 41:22
Covington 109:8
co-chair 59:9,11
crash 118:20
create 54:21 112:3
    112:9
creating 51:4
credentials 167:9
credibility 109:16
credible 143:23
creditors 86:9
crime 21:22 24:19
    128:10 192:16
    195:5
crimes 4:18,19 5:4
    5:8,10 6:12,15
    10:3 11:9 12:6
    14:11 15:11,14
    17:17,17,19 20:21
    77:12 128:20,21
    130:5 153:5
criminal 20:8 32:6
    35:22 61:5 63:4,9

63:17 64:9 70:1
    70:17 78:20 98:19
    115:16 117:5,11
    143:23 144:4
    145:16 146:16
    148:5,8,10 150:7
    160:15 182:9
criminally 5:8
    63:22 117:13
criminals 11:22
    12:2 94:18,19
    113:16
critical 158:6
cross 23:2 174:13
    185:6
CRR 1:17
cry 20:21
crystal 188:6
Cub 6:16
culpability 29:7
culpable 30:23
culture 129:17
    160:3
curiosity 153:21
curious 51:13
current 38:8 44:7
    44:23 53:5 56:1
    69:23 164:24
    189:7
currently 38:12
    43:19,21 58:14
    73:9 107:9
currents 190:12
cut 17:8 47:13
    124:4 199:3
cuts 122:2
cycle 150:19

— D —

dad 81:18
daddy 121:2
    177:14
Dakota 196:17
damaged 128:11
damages 50:7 51:5
    51:7,10,18
Dame 13:4
danger 101:19
    104:8

dangerous 146:16
dare 133:3
dark 101:3 105:2
    106:13 111:3
data 108:10,20,21
    206:5,6,8,11
date 9:9 51:20
    57:15 62:12 63:12
    105:7 106:6 117:1
    117:7,17 123:5,6
    146:1 178:13
dates 16:22 36:13
dating 35:22 54:1
    115:13
Davenport 17:1
    133:16 134:8,15
    134:16 138:10
    139:4
day 2:4 7:3,9 8:16
    14:21 16:18 41:20
    52:10 63:23 79:7
    79:8 81:13,24
    108:12 110:21
    111:2 113:4 122:7
    129:2 133:6
    158:12 176:8
    185:4 210:15
daycares 191:8
daylight 41:14,16
days 107:10 123:7
DA's 135:9,13
DCC 176:1
de 13:4
dead 155:5
deal 48:11 51:21
    82:16 95:2,4
    197:3,6,9
dealing 6:20 33:13
    59:22 60:22 73:1
    73:1 102:6
deals 83:1
dealt 18:18 159:14
    202:11
death 119:7
debate 8:14 71:19
    80:15,16 131:15
    199:14
debated 103:9

**debilitation** 93:14
**Deborah** 2:15
**debtor** 86:12,16
**decades** 10:7 15:20
105:13 141:22
142:1
**deceased** 132:23
**December** 88:22
**decided** 34:20
84:11 125:14,15
143:4,18 144:13
**decision** 76:11
103:19 123:9
142:20 147:13
**decisions** 6:3 35:1
187:9
**declare** 16:22
**declared** 121:10
124:23
**declaring** 16:23
17:3
**declined** 163:7
**dedicate** 55:20
**dedicated** 21:19
**deed** 88:13
**deeds** 87:13
**deep** 142:17
**deeply** 20:2
**defeat** 10:5
**defend** 71:1 98:14
106:4 119:10,17
125:17 128:5
129:18,19
**defendant** 110:17
127:23
**defendants** 45:24
113:16 161:13
163:14
**defending** 96:23
101:11
**defense** 90:17
125:21
**deficient** 72:6,8
**defined** 125:10
126:2
**definitely** 14:2
30:16
**definition** 24:1,8,12

28:21 117:10
**degrading** 18:19
**degree** 54:12 93:10
93:14 152:21
**Delaware** 1:2,7,22
2:4 4:22 5:24 8:5
8:13 9:4 11:8,13
12:5 13:4,15,22
21:16 31:20 33:9
57:23 58:2,14
70:9 77:4,18 79:4
93:3 95:19 96:15
99:5,11,14 100:2
100:7,8 102:7,11
102:22 103:15,24
104:16 107:10
110:2,4 111:7,18
112:13 115:18,24
117:24 121:8
126:1 135:8,14
137:17 141:12,15
146:8 147:1
154:16 156:14,20
157:24,24 158:22
162:22 165:11
166:8 167:12
172:11 184:13
185:21 186:7
188:2 189:21,23
196:24 197:19
198:3,15,18 199:6
199:10 201:4
202:13,16 203:5
203:18 205:18
206:6,8,11 210:1
**Delawarean** 166:12
**Delawareans** 11:21
**Delaware's** 8:6,11
11:23 12:10 21:17
35:21,24 36:5
38:7 64:14 103:21
206:3
**Delaware-based**
104:21
**delayed** 36:1 47:14
**delaying** 91:24
118:9
**deliberate** 182:8

192:16
**deliberations**
112:18
**delinquent** 143:8
143:11 152:1
**DeLuca** 7:6,14
61:17,24 62:7,11
62:17 121:16
**demand** 12:7 86:2
**demanding** 153:16
**demonstrated**
159:12
**demonstrates**
55:23
**demonstration** 5:1
**denial** 118:3
161:13 162:3
**denied** 148:18
**Denn** 179:24
188:14
**Denn's** 204:10,23
**denomination** 15:1
105:6
**denominations**
14:20
**deny** 121:14 162:9
162:12
**Department** 143:6
163:11 197:17
204:17
**departments** 13:8
**depend** 6:4
**depending** 48:8
184:21
**depends** 173:1
**deposition** 148:20
**depositions** 103:23
110:23
**depravity** 15:15
**Deputy** 204:6
**Des** 134:9
**describe** 29:24
142:22 194:1
**described** 7:3,8
20:19
**deserve** 11:10 98:2
98:4 111:22
128:23

**designed** 68:16
**destroyed** 6:6 7:1,7
67:4,12 95:20
155:6
**destruction** 119:9
**detail** 61:2 108:23
**details** 60:14
**detainee** 107:11
**detectives** 145:13
**determination** 48:8
**determine** 19:22
47:5
**determined** 44:19
47:17 109:6 126:3
128:17
**determines** 194:16
**Detroit** 15:18
**devastate** 22:4
**devastating** 98:9
142:20
**developed** 102:10
**Development** 4:14
**Developmental**
4:10
**diaconate** 47:14
**dialogue** 50:8,11
51:12 135:23
136:15
**diamond** 194:2
**Diandra** 71:8
**diaries** 148:12
**dictated** 183:15
**die** 154:22
**died** 6:19 133:9
**difference** 13:23
44:3 69:1 200:10
200:15
**different** 13:22
25:11 32:14,16
51:9 64:11 100:19
101:2 107:3 109:2
117:10 118:7
120:13,19,21,22
126:2 134:4,21
160:16 183:1
189:11 190:11,11
198:16
**differently** 37:6

44:8
**differs** 42:19
**difficult** 27:18
30:14 44:11 50:2
128:5 147:9,13
157:12 174:8
206:13
**difficulties** 161:6
**difficulty** 59:23
**dig** 30:8
**digging** 22:9
**diligence** 8:15
100:24
**Dingman** 134:7,11
**Diocesan** 20:8,12
33:1 48:15,19
49:10,11,14,15
**Diocesan-wide**
48:18
**Diocese** 7:19 9:8
13:6,7,13 16:23
16:24 20:5,13
33:6,8,10,12,23
34:1,6 35:5 38:9
38:10,12,20,23
42:16 45:18 46:7
46:10,14 47:1,13
47:22,23 48:14,19
48:23,24,24 49:3
49:7,9 52:20 53:2
53:7,8,9,14,19,23
53:23 54:1,18,20
55:10,24 59:9
60:11,22 61:3
62:10 69:8 72:16
74:22 75:3,18
77:6,10,14 79:2
83:10 84:10,13
85:20 86:5,23
87:11,18 88:3,13
88:16 90:4,6,9
92:8 105:6 108:24
109:10 115:22
121:18 124:20
130:4 133:16
134:8,9 135:18,24
136:3 137:3,4
138:15,16 139:12

152:17 161:11 166:7
**Dioceses** 46:23 83:17 86:1 89:10 92:2
**dire** 199:14,22
**direct** 42:12 47:12 53:7 95:5
**directed** 97:17
**direction** 187:24
**directly** 42:8 78:14 99:2 105:18 180:17
**director** 4:10,14 8:8 94:7,23
**Directors** 94:10
**disabilities** 4:10,14 4:17 5:2
**disability** 4:21 5:5 7:13
**disabled** 124:24
**disagree** 41:11 67:14 68:7 80:7 87:9 91:8 120:9 125:3
**disagreement** 80:8
**disagrees** 188:15
**disappointed** 144:5 179:21
**disastrous** 111:19
**discernment** 103:24
**disclose** 143:21
**disclosure** 40:20
**discourse** 40:9
**discovery** 100:15 103:22 110:22 161:6
**discretion** 182:15
**discriminates** 14:2
**discuss** 33:3 82:6
**discussed** 3:13,14 18:22 35:8 50:12 67:1 95:8,13 131:3 161:18
**discussing** 50:9,22 52:16
**discussion** 3:19

50:10 51:14,16 73:24 79:22
103:11 114:24 131:6 200:17,20
**discussions** 3:12
**disfoliate** 36:12
**disgusted** 71:4
**disingenuous** 83:14
**dislikes** 205:14
**dismiss** 125:15 163:17
**dismissed** 86:15
**disorder** 7:13
**dispose** 66:17
**disposed** 67:4
**disposition** 41:5
**disproving** 22:10
**disregard** 24:11
**disserves** 78:10
**disservice** 137:1
**distorted** 100:4 118:24
**distribute** 173:14
**distribution** 116:5
**district** 2:13 71:9 79:11 80:4,5 82:4 87:5 163:5,7
**districts** 71:18
**diverse** 8:10
**divert** 53:20
**diverted** 53:18
**divided** 7:1 140:1,1
**division** 181:14
**docket** 116:18
**doctor** 141:18 148:6 149:14 151:3,6
**doctorate** 167:10
**doctors** 16:16 142:10
**document** 17:20 61:7 70:19 110:22 168:16
**documentary** 161:20
**documenting** 66:11
**documents** 119:9 189:12

**dodge** 24:15
**Doe** 138:8
**dog** 111:8,11
**doing** 40:1 41:15 45:8 79:5,16 115:16 126:11 129:2 134:13 142:8 144:19 149:2 158:24 177:2,12 187:24
**dollar** 43:2 47:19 50:7 88:5 89:2 183:12 184:13,18 185:2 192:22
**dollars** 9:17,18 16:3,8 52:22 53:11,17 54:5,13 55:5 59:4 84:14 85:18,22 86:2 87:22 88:13,16,22 89:18,20 90:12,13 90:17 91:22 125:22 158:24 183:5,18,19 191:17 192:23 193:1 194:6
**domiciled** 198:17 198:22
**domiciling** 199:3
**donations** 158:21
**Donna** 2:23
**donor** 166:13
**Donovan** 59:8
**door** 56:7
**doors** 200:6
**dot** 185:6
**doth** 134:19
**double** 57:15 184:20
**doubling** 76:24
**doubt** 11:8 105:20
**doubts** 44:6
**Doug** 59:10,20 60:12
**Dougherty** 140:19 157:18
**Doyle** 67:10,14 122:20 133:17

180:21,21,23,23 181:1,6,9,12,13 181:17,18 186:11 187:6,7 188:5,18 188:22 189:1,6,24 190:1,5,9 191:3,7 191:21,24 192:7 192:11,15 193:12 193:16,19 194:13 195:7,12,15,20,24 196:6,13,20 197:1 197:12,24 198:5,7 198:10,14,24 199:8,12,23 201:18 202:18 203:4,13,22,24 204:2
**dozens** 142:2,2 148:16
**Dr** 5:19,20,21 120:10 140:20 141:19 142:1,3 143:4,7 144:22 145:11,12,18,21 146:22 149:6 151:10 157:21 167:7,9 179:17 190:2
**drafted** 73:19 97:13 118:13
**dramatic** 121:4 187:19
**drastic** 121:4
**draw** 162:22
**dreams** 21:21
**dress** 174:11
**dressed** 174:18
**drink** 169:19
**driven** 92:2
**drivers** 82:3
**drop** 185:18
**drove** 122:8
**drug** 6:19
**drugs** 21:22
**Dubius** 92:15
**ducking** 131:19
**Dudzinski** 6:17,21
**due** 8:15 35:13,14

38:18 63:16,21 64:6,23 82:18 91:7 98:4 100:24 111:10,13 117:4,6 117:10 118:4 161:13 162:9,12 181:24
**Duncan** 178:17
**duration** 97:16
**duty** 4:22 10:23 24:10 94:9 105:12 105:22,23 165:23
**dwelled** 117:3
**dynamic** 44:4 45:12
**D.C** 13:10

---

**E**

**E** 210:7,7
**earlier** 21:7 46:8,24 47:2 49:19 56:4 60:4 75:19 96:8 104:18 137:20 163:19
**early** 19:15 151:20
**easiest** 193:24
**easily** 78:2 171:17
**east** 135:7
**Easter** 67:9
**Economic** 19:1
**economy** 2:7 206:18
**Ed** 92:16 132:5,12 138:8
**Eden** 114:7 123:19
**educate** 60:9
**education** 4:20 48:16 141:23 177:1
**educational** 33:21
**Edward** 6:17
**effect** 10:1 18:20 59:5 67:18 187:22 203:5 205:18 206:24
**effective** 80:20
**effectiveness** 20:18
**effects** 202:20 204:15

**efficient** 40:22,23
**effort** 156:15
**egregious** 15:11
  82:15
**eight** 36:15 85:22
  145:18 153:12
  175:15
**eighth** 181:2,20
**eight-figure** 43:5
  55:16 85:22
**eight-year-old**
  173:24
**either** 19:10 40:12
  42:3 43:22 54:21
  70:13 80:12 96:18
  103:14 112:2
  138:3 162:21
  185:13 192:8,10
**Elaine** 1:17 210:9
  210:20
**element** 103:20
**eliminate** 46:19
**eliminated** 46:18
  48:15,18,20
**eliminates** 118:13
**eliminating** 34:2
  35:6,19 37:6
**Elizabeth's** 13:3
  62:16,20
**embarrassing**
  144:14 155:1
**embezzling** 122:18
**embodied** 34:13
**emergency** 200:13
**emotion** 118:24
**emotional** 8:14
**emotionally** 153:8
**employee** 53:14
  70:9 71:9 97:1
  107:8,10 185:8
**employees** 53:16
  66:5 94:4 159:3
  160:6
**employer** 122:19
**employment** 47:12
  160:16,18
**enable** 34:19,22
  77:11

**enabled** 17:16
  121:19
**enablers** 15:13
  61:12,16
**enabling** 130:5
**enacted** 9:8 36:1,16
  41:3 58:21
**enactment** 34:6
  69:8
**encompass** 77:24
**encompassing** 78:1
**encourage** 34:18
**endeavors** 77:8
**ended** 34:3 109:3
  144:6 176:5
**endorsed** 15:18
**endorsement**
  192:24 193:4
**enemy** 137:11,14
  137:17
**enforcement** 8:3
**engage** 42:16
**engaged** 40:10,13
  40:16,16 51:15
**engagement** 194:3
**enhances** 127:11
**enterprise** 83:1
**enterprises** 82:22
**entire** 107:2
**entirely** 49:10 59:1
  101:2,6
**entities** 78:2,6
  82:22 84:3 158:5
**entitled** 124:22
  206:6
**entity** 77:7 151:3
  184:22
**environment** 115:1
  115:7,10 179:9
**environments**
  59:10,12 60:1
  61:9
**epidemic** 121:10
  174:22
**Episcopalian** 14:21
**equal** 131:13
**equals** 88:2
**equipment** 193:11

**equipped** 103:11
**equity** 81:4
**Eric** 123:19
**escalate** 186:13
**especially** 2:4
  15:11 51:2 158:18
  163:14 166:4
  174:23
**essential** 92:4
**establish** 119:10
  169:13
**established** 60:23
  159:10
**establishing** 20:8
**establishment** 61:6
**estate** 9:16 83:23
  87:3
**estranged** 107:23
**et** 142:10 178:5
**ethical** 61:6 100:1
  161:1 167:14
**ethically** 167:18
**ethics** 178:3
**eucharistic** 136:10
**evaluated** 143:8
**evaluating** 152:1
**eve** 16:22 17:4
  83:16,18 89:11
  100:23
**evening** 104:22
  175:3
**evenings** 105:9
**event** 29:2 55:15
  69:10 88:17 194:5
**Eventually** 144:1
**everybody** 9:18
  90:24 124:8
  157:20 182:11
  199:23
**everybody's** 90:22
  191:2
**everyone's** 14:4
  208:23
**evidence** 34:21
  35:17 36:19 54:2
  54:8 64:19 100:15
  108:6 109:17
  118:19 119:7

148:12 161:14,19
  161:20 162:2,3,17
  162:20,24 163:15
**evidentiary** 59:23
**evil** 9:23 135:2
**evoked** 175:5
**exact** 23:17 39:24
  194:8
**exactly** 9:4 43:17
  83:13 108:5
  199:15
**exam** 142:13
**example** 13:24 14:9
  29:12 35:15 37:4
  41:2 42:7 44:23
  47:8 54:22 55:4
  58:3 64:15 81:19
  83:13 85:11 86:1
  100:6 101:18,22
  102:12 104:12
  106:10,18 111:14
  126:23 128:8
  129:5 141:14
  175:23
**examples** 108:22
  126:24
**exams** 142:3
  148:21,23 149:2,8
**excellent** 26:20
  150:10
**excess** 54:6,16
**exchange** 87:19
  103:22
**excluded** 10:8
  11:14 27:13 182:7
  182:10 189:19
  192:17
**excludes** 79:20,23
  193:10 194:14
**exclusively** 99:2
**excruciating** 126:6
**excuse** 77:10 130:4
  131:1
**excused** 130:14
**executive** 94:7,23
  181:13,18
**exercise** 59:1
**exist** 25:7 30:14

67:14 185:14
  197:15
**existed** 190:19
**existing** 155:7
**exonerated** 111:2
**expectation** 43:4
  44:16
**expectations** 44:13
**expected** 32:16
**expecting** 57:17,17
**expense** 91:2
**expensive** 90:22
  126:6 193:11
**experience** 33:12
  55:22 57:11 59:21
  74:21 93:14,15
  138:7 141:13
  142:17 205:11
  206:3,23
**expert** 103:22
  167:20 169:15
**expired** 187:18
**Expires** 210:22
**explain** 28:11
  33:24 46:16 52:14
  196:1
**explaining** 195:22
**explication** 41:24
**exploded** 18:3
**exploitation** 18:18
**expose** 148:9
  151:13
**exposed** 27:20 28:1
  36:12 147:4
  150:10
**exposing** 153:22
  166:4
**exposure** 33:17
  36:3 37:4 154:22
  184:21 189:10
  194:17 200:1
  205:4
**exposures** 36:14
**express** 53:19
**expressed** 9:7
  49:23 107:6
**extend** 128:10
**extended** 127:21

**extending** 93:24
 113:1
**extension** 144:3
 148:7
**extensive** 156:15
**extent** 97:7 117:12
**extracurricular**
 187:1
**extraordinary**
 14:12 15:24 37:22
**extremely** 141:21
 143:20 154:24
 159:1
**eyes** 29:5 58:23
 103:13 201:16
**eyewitnesses**
 118:23

**F**

**F** 210:7
**fabrication** 101:8
**face** 16:6 122:7
 144:8
**faced** 185:10
**facilitated** 159:23
**facing** 85:16 86:1
 145:21 146:16
**fact** 17:23 34:8
 62:19 63:6 64:2
 67:13 80:2 99:14
 100:12 102:15,18
 103:4 106:5,19
 107:7 110:18
 123:16 126:3
 128:9 134:1
 137:18 148:15,16
 148:18 153:5
 156:18 198:17
 207:18
**factor** 155:21,22
 156:21
**facts** 34:20 99:22
 101:20 116:18
 164:2
**faded** 118:24
**fail** 162:11
**failed** 6:5
**failing** 155:23
 180:7

**fails** 15:3
**failure** 24:9,10
 86:15 155:24
**fair** 8:16 11:19 15:6
 15:8,20 80:22
 103:24 113:24
 119:15 123:15
 131:13 193:8
 206:16
**fairly** 34:20 38:5
 136:16 161:14
 163:14
**fairness** 10:13
 118:16 128:12,13
 128:14,15,16
 131:12
**faithful** 33:18
 89:15 132:16
 137:14
**fall** 115:3 199:19
**fallacies** 161:17
**falling** 175:9
**false** 98:7 103:15
 108:20,21 122:12
 122:24 137:23
**falsely** 97:21
 126:22
**familiar** 159:13
 183:8
**families** 106:24
 107:2 113:3
 176:24
**family** 7:2 18:15
 132:18 133:3,22
 155:3,4 165:20
 169:7,9,10,14
 170:15 177:4
 203:14
**far** 19:21 35:23
 47:5 54:13 63:22
 63:24 64:3,18
 67:23 69:9 70:18
 86:17 97:13,14
 109:10 113:4
 135:3 161:24
**fashion** 175:5
**fast** 136:17
**father** 6:17,24 7:6

18:2,6 61:17,24
 62:11,17 65:14
 67:10,14 107:18
 122:20 133:17
 140:18 152:13,14
 152:15,16 154:14
**fathers** 107:23
 120:18 168:22
**fault** 121:1 125:1
 177:5,6
**favor** 51:4 124:9
 162:19,21 196:4
 208:17
**FBI** 8:8
**fear** 10:21 107:7
 155:20,21,22
 156:21 160:3
 177:4
**fearful** 127:23
**fears** 145:3 155:15
 155:18 156:3
**federal** 7:10 126:4
 158:23 162:23
 167:20
**feel** 146:14 149:21
 153:9 177:14
 179:2 184:21
**feeling** 172:14
 188:6
**feelings** 177:23
 195:20
**feels** 113:20 185:24
**fees** 89:19,20 91:22
**feet** 14:4
**felony** 98:23
**felt** 142:7 145:8
 149:18,19 150:12
**female** 149:6
 168:24
**females** 173:2
**fenced-in** 111:11
**ferret** 43:16
**ferreted** 112:16
**Ferris** 107:8,11,19
 108:14
**FETZER** 1:21
**fewer** 57:9
**fiduciary** 105:22

**field** 7:24 70:3,16
 70:18 71:16 74:20
 151:24 172:12
 178:3
**fields** 142:18
**fifth** 206:17
**fight** 164:18
**fighting** 19:5
**figure** 65:17 75:15
 182:23 194:8
**figured** 203:11
**file** 15:19 36:7 58:6
 73:5 74:4 83:18
 86:5
**filed** 36:10 74:5
 75:7 83:16 85:4
 98:15 105:19
 106:19 109:10
 110:20,21 144:20
 145:20 185:21
 194:19
**files** 17:4 61:20
 85:12 189:15
**filing** 47:8 84:24
 85:9 91:23 119:1
 128:2 144:17
**filings** 91:17
 163:16
**fill** 110:20,21
**filled** 136:14
**filtering** 99:3
**final** 44:19 74:3
**finally** 7:16 11:16
 16:17 87:5 124:3
 168:5 170:23
**Finance** 3:6 4:8
 23:14
**financial** 35:1
 45:11 46:14
 156:16 159:9
 163:23 183:6
**find** 5:9,17 30:8,13
 31:5 48:21 50:11
 54:8 67:23 70:11
 74:21 75:3,10
 91:5 125:6,18
 134:16 169:6
 174:7 176:1 203:3

**finding** 155:5 166:2
**fine** 13:2 67:1 80:6
 113:5
**fire** 14:4
**Fireman's** 185:19
**firm** 27:16 50:6
 89:14 90:14,15,16
 181:3,21
**firms** 16:4,4
**firm's** 102:18
**first** 4:4,8 12:20
 23:11 27:21 33:7
 45:17 62:3,5
 64:12 67:21 72:23
 73:22 76:19 84:24
 85:17,21 97:21
 100:11 144:23
 148:18 156:11
 160:12 161:17
 169:1 170:1,10
 183:18 186:5
 188:23
**first-hand** 107:7,7
**five** 12:21 13:19
 17:21 40:1 52:21
 60:21 80:9 83:17
 98:16 102:15
 121:8 127:5
 129:10 131:23
 132:19 137:15
 139:16 141:6
 154:23 172:16
 173:2,10 183:13
 184:24 197:7
 200:8,14 208:21
**five-minute** 92:20
 96:10 118:10
 130:18,20
**fixed** 37:16
**flares** 102:15
**flashback** 135:22
**flat** 192:24
**flawed** 6:7
**flexibility** 65:21
**flip** 24:21
**floodgates** 108:15
**floor** 131:3,15
**flu** 121:7

**Flynn** 21:11 32:22
32:24 33:1 34:5
36:21 37:2,11
39:2,7,14,17,23
40:7,19 42:5,15
43:1 44:4 45:6,17
50:3,15,17 51:15
52:11,20 56:3,10
56:15,19 57:1,5,9
58:8,13,18 59:16
59:17,20 60:19
61:15,24 62:8
63:2,10,13 64:5
64:10 65:1,4,11
65:20 66:9,19
67:3,8,16 68:3,6
68:15,20 69:3,6
69:23 70:4,12
72:17,19,22,24
73:7,10 75:20,24
76:3,12 77:13
83:9,11 84:23
87:10,17 88:7,10
88:15,20 89:5
90:1,7 92:11,13
116:24 122:2
138:4 161:8,10
162:14
**focus** 29:10 33:15
78:3
**focuses** 22:2 28:21
**folks** 3:9 12:17,18
39:16 40:10,17
41:11,21 57:23
74:10 92:21
116:12 158:21
163:9 187:15,17
**follow** 32:11
173:16
**followed** 14:9 20:6
**following** 1:15
32:22 34:4 60:19
61:1,18,19 72:5
109:4 144:7
161:23 176:6
**follows** 111:4
**follow-up** 19:22
**fondle** 142:4

**fooled** 171:17,18
**foot** 191:14
**force** 17:14 97:24
**forced** 144:24
**forcibly** 16:13
**fore** 40:14 62:6
**forefront** 166:16
**foregoing** 210:11
**foreign** 203:8
**forever** 6:14
123:13 189:16
**forget** 60:24 142:16
**forgiven** 8:18
**forgotten** 8:18
**form** 34:13 41:1
44:7 46:3 53:11
56:21 170:24
188:13
**formally** 42:20
162:5
**formation** 47:13
**formed** 138:11
**former** 8:7,8 17:24
29:3 96:16 107:8
107:11 108:14
143:11 145:14
148:16 157:23
**formerly** 13:2
52:24
**forms** 170:5 185:20
185:23 190:11
**forth** 9:20 35:18
89:17 100:15
**forum** 41:23
**forums** 202:11
**forward** 5:19 6:9
17:13 22:7 32:17
34:19 35:6 46:4
50:13 62:12 65:9
65:21 66:1 68:9
68:11,12 74:12
78:5 85:16 93:5
107:22 112:7
121:12 127:22
129:23 133:9,9,10
136:17 138:5,9
145:6,9 146:2,9
146:14 147:13

148:17 155:8,12
157:15 164:8
171:15 195:8
**forwards** 123:13
189:3
**found** 18:12 30:23
73:14 91:15 143:4
143:20 145:15
148:22 150:1
160:17
**foundation** 116:4,4
**four** 4:17 6:16 7:4
16:23 47:9 89:10
131:23 133:1,1
135:13 172:17
173:1,10
**fourth** 33:2 169:23
**fraction** 166:6
**fractured** 153:8
**framed** 153:7
**Francis** 7:6 62:6,17
96:20 121:16
**Franklin** 139:8
**frankly** 126:24
128:9
**free** 92:18,19
150:15 179:9
**freed** 145:24
**freedom** 12:20
**Freeh** 8:8
**fresh** 34:21
**friend** 4:4 18:8,9
62:10 143:2
153:14 155:4
169:14
**friends** 7:23 81:8
147:22 155:5
170:16 179:21
**friend's** 143:18
**frivolous** 99:17
101:6 110:24
111:14
**front** 22:23 58:4
75:13 97:4 102:2
107:14 110:18
111:24
**full** 7:18 13:17
15:21 16:18 20:23

31:8 41:24 93:8
93:11 94:2 97:24
103:24 149:2
185:7 186:19
189:12
**fully** 161:2
**fun** 138:19 169:20
170:14 171:6
**fund** 48:13 89:1,2
185:19
**fundamental** 40:20
**fundamentally**
45:12
**funded** 49:10
**funding** 53:5
158:23
**funds** 116:5
**furs** 193:10,20
**further** 52:7 54:2,3
54:7 112:1 162:14
**future** 48:10 51:24
53:20 54:19,19
55:12,13,15 65:3
65:4 77:8 93:24
130:3 154:4
185:15 186:15
197:2 205:4,7

---

**G**

**G** 1:17 210:9,20
**gain** 124:1
**gained** 137:22
153:22
**galore** 189:22
**gambling** 174:21
**game** 10:12
**Gander** 175:24
**gargantuan** 50:1
**gasp** 112:12
**gate** 99:4,17
**gatekeeper** 99:8
**gather** 30:6 207:5
**gathered** 97:4
**geared** 205:5
**gee** 123:15
**Geisler** 7:21 8:1
**general** 3:12 4:18
11:17 31:15 33:2
37:5 58:19 66:12

66:20 98:22
101:14 108:8
**generally** 42:22
56:21 169:3
**General's** 11:11
98:22 116:1
**generate** 29:22
**generation** 132:20
174:6
**genitals** 142:4
170:6
**gentleman** 79:15
200:22 201:14
**gentler** 16:6
**George** 21:10,11,12
21:15 23:15,18
24:2,6,14 25:4,8
25:16,19,23 26:7
26:13,16,22 27:1
27:7,15,23 28:4
28:13 29:23 31:16
31:19 32:8
**getting** 28:24 103:7
109:17 116:12
173:17 193:7
197:18
**Gilhooley** 178:17
**girl** 65:15 126:8
174:1
**girls** 21:16 23:13
31:21,23,24
125:16 158:11
174:11,12,16
191:8
**girl's** 186:20
**give** 7:9 8:11 11:18
31:7 44:13,14
45:9,10 57:1
80:20 81:19 84:17
93:3 94:14 100:6
132:20 140:12,16
154:1 172:12
174:6 180:3
183:12 184:18
185:9 194:14
**given** 24:12 39:22
49:23 50:11 64:18
195:4

gives 42:2 75:14
183:8
giving 40:4 131:20
142:3 148:21,23
glad 136:20 147:6
Glasgo 54:22
go 4:4,7,8 12:3
24:22 29:6 30:6
42:21 43:12,14
45:16 54:7,13
55:3 63:16 64:3
64:18,18 65:3,17
65:19 66:14 67:22
70:3,16,18 71:13
72:7 75:18 83:8
88:16 101:9
105:10 110:9
112:14 115:4
117:13 119:13
120:24 122:16,17
122:19 126:15
130:20 131:7
133:10 134:14
135:3,4,4,4 137:9
137:24 139:15
140:5 148:8
160:10 161:22
175:16,18,23
176:3 177:4,14
185:13,21 189:3,8
194:21 199:17
200:21 207:16,22
goal 21:19 113:1
God 21:1 129:24
135:21 161:21
God's 19:12 61:4
goes 63:4 64:7
70:14,21 97:13
121:23 188:4
197:15 198:11
going 2:2,8 3:6
17:4 19:5 22:5
23:10 25:14,20
26:8 28:9 29:17
29:18 30:2,10,13
30:14,24 31:4
35:6,6 39:24
41:15 42:23 43:3

43:12,13,17,19
44:8,11,11 45:10
45:16,18 46:3,16
49:6,17,19,20,21
50:1 51:10 52:5,7
52:9,12 54:11,13
55:6,16 56:7 57:9
57:18,23 58:12
59:19,20 60:1,12
60:13,13 65:8,8
65:21,23 66:1,4
66:15 67:23 68:9
68:11,12,23 73:5
74:12,14 75:8
76:5 78:13 82:2,5
82:5 84:9,16 85:7
85:16 86:3 87:21
87:24 88:13,19,20
96:8 99:22 103:23
107:12,12 108:3,4
108:15,16,18,22
110:10 112:4,5,7
113:4 123:7,12,13
124:5 127:16,24
128:5 130:18,19
130:24 131:24
135:8 137:7
139:19 140:15
149:17,22 153:11
158:14 159:22
160:12 161:3,24
161:24 162:4
163:1,8 164:9,10
164:18,20,22,23
165:3,3,6,15
176:24 181:4,7,16
185:16,16,17
186:5 187:13,22
188:2,21,23
191:14 195:9
199:17,17,19
201:22 202:16
205:2,14 207:17
good 2:1 4:4 14:24
23:2 26:19 40:4
41:20 44:13 57:7
65:17 68:1,9 69:7
69:9 74:13 77:2,7

77:9 82:11 92:24
107:20 110:8,10
111:14 112:12
129:16,16 134:16
136:16 144:13
152:14,15 157:19
158:24 165:12
167:8 170:14
171:5,13 179:8
189:13
goodwill 20:2
gotten 150:15
189:13
government 18:16
53:6
Governor 123:8
167:12
governors 8:7
grade 7:4 18:1,5
grand 13:20 98:23
98:24
grant 116:3
grants 79:9 116:4
grateful 146:22
grave 19:11 38:4
44:6
gray 193:5
great 89:12 94:14
109:24 134:6,7,18
136:4 138:4 145:7
155:12 176:14
203:24 204:23
greater 108:7
greatest 33:11,22
greeters 136:12
Greg 2:21
grew 138:24 149:15
grips 34:11
gross 10:22,24 11:3
11:15 22:10 24:1
24:9 28:21 29:9
30:1,19,22 31:6
32:13,14,14
105:21 122:6
125:10,10,12,24
154:6 159:19
grossly 77:6 79:19
80:2

ground 12:16
group 10:4,17
104:22 105:9
168:11 174:21
175:4,9
groups 8:6 10:20
14:22
grow 93:18 106:24
guarantee 78:5
133:4
guaranteed 36:17
guard 127:1
guardian 177:15
guess 29:10 41:17
66:21 136:2 168:2
guidelines 185:7
guilt 7:17 169:18
guilty 10:22 11:4,9
11:15 18:13 142:8
149:18,21 189:16
guise 142:3
Gumbleton 15:17
guts 37:20
gutting 37:13
guy 81:3 127:24
138:14 148:17,24
149:24
guys 140:5
Gwen 174:17

_____

**H**
hair 105:2 106:13
half 47:13,24 49:9
49:9 54:5 86:3
120:16 167:13
183:19
hall 55:4 71:5
161:9
hallelujah 136:2
halt 38:23 39:3
Hamilton 89:8
91:14,19 92:5
120:10,11
Hamilton's 91:11
hammer 51:7
hand 99:13 134:11
177:24 179:2,10
210:15
handed 123:8

handled 197:16
hands 7:22 18:2
45:20 175:15
hang 171:6
happen 9:14 29:5
29:22 43:17 49:17
58:4 71:17,17
88:19,21 98:16
108:3 110:9 112:4
124:15,21 127:5
185:16 186:15
188:20 197:1
happened 5:13
9:19 15:7 25:2
29:19 44:1 62:9
71:17 81:18 85:13
86:16,21 89:12
125:1 129:9,24
133:16 136:9
142:15 143:1,21
145:20 146:4
151:5,5 164:11
169:22 177:16
200:11,12,12,15
happening 103:4
170:18
happens 5:1 39:10
75:5 111:6 160:21
186:12 189:6
203:7
happiest 156:19
happy 93:11 131:1
131:14,17,20
140:12 145:1
166:18 180:11
Harajuku 174:11
174:16,18
harassment 159:13
160:21
harbor 126:9
harbored 100:10
harboring 94:19
98:19 100:13,13
112:22
hard 10:5 30:7
133:5 135:7 157:8
171:24 175:1
hardball 16:6

**harder** 25:6
**harm** 15:3 146:21
**harmed** 104:7
**harmful** 18:20
**harms** 104:7 125:8
**harsh** 117:20 118:1
**Hartford** 185:19
**haunted** 142:23
**havoc** 51:4
**Hayes** 134:11
**head** 31:2,2,4
    128:19
**headline** 111:1
**headlines** 103:5
**headquarters** 90:2
**heal** 46:12 172:5
**healed** 147:4
**healing** 142:18
    146:21
**hear** 10:17 15:6
    16:1 28:24 50:4
    63:1 82:4 94:8
    179:4 190:4
    195:17
**heard** 2:6 4:15 6:13
    9:6 17:24 30:23
    33:6 58:13,15
    62:22,22 74:9
    145:5 158:11
    166:7 168:7,8,9
    168:11 169:8
    187:20 195:3
    198:6 199:19
    207:14
**hearing** 1:1,15
    12:21 41:11 46:8
    49:19 52:2 64:12
    64:13 80:2 94:1
    147:21,21 187:11
    204:12
**hearings** 134:10
    156:14,21 181:23
    182:12 187:21
**heart** 17:23
**heartsick** 173:23
**heart-wrenching**
    6:13
**heavily** 9:15 53:24

57:19
**heavy** 111:3
**heinous** 98:9,11,12
    107:16 119:22
**held** 1:16 22:1
    54:20 77:11 80:4
    80:5 94:12,18
    160:7
**hell** 133:11
**help** 11:17 23:7
    30:11,19 35:13,16
    38:20 42:18 46:11
    52:12 70:11
    133:12 142:11
    144:17 156:8
    164:22 170:4
**helpful** 3:19 21:4
    132:3 157:16
**helps** 30:16
**hereunto** 210:14
**hey** 82:4 178:24
**he'll** 138:23,23
**hide** 8:23 15:14
    131:10
**hierarchy's** 92:1
**high** 10:24 13:3,9
    18:6 30:20 48:7
    62:16 100:1,24
    106:20 158:17
    159:1 160:14
    186:13 191:13
**higher** 44:22 188:3
    199:18 205:6
**highlights** 106:19
**Hilb** 181:14,20
**Hill** 175:24
**hired** 16:8 89:14
**hiring** 105:21
**Hispanic** 48:19
**history** 8:3 128:6
    158:15 159:6
    163:10 180:7
**hit** 128:19 208:12
**Hobbs** 181:14,20
**hold** 5:7 83:21 94:4
    144:17 158:17
    186:9
**holding** 31:9 87:18

**holds** 9:15 14:3
    54:18 94:4 159:1
**holiday** 2:5
**Holy** 18:23 19:18
    62:20,21 121:16
    135:8,14 136:5
**home** 18:14 19:9
    81:17 133:23,24
    177:4,14 178:16
    180:4
**homeowners**
    193:10
**honest** 95:6
**honestly** 22:13
**Honorable** 93:1
    110:4
**hook** 68:24 101:7
**hope** 11:22 27:6
    44:4 81:16 82:7
    110:1,6 132:3
    135:21 165:2,3
    168:17 177:12
    178:1
**hoped** 144:16
    207:4
**hopefully** 93:6
**hopes** 147:2
**horrible** 7:10 12:6
    112:3 170:8 171:4
    173:6
**horrific** 7:21
    172:16 175:23
    176:1 180:10
**horse** 99:17
**hospital** 9:11 96:20
**host** 141:22
**hour** 16:8 168:4
**hours** 180:1
**house** 1:2,16 4:16
    11:23 13:1 21:13
    34:11,12,12 38:22
    50:18 63:6 67:15
    73:5,8,14,15,16
    73:20,24 74:1,3,4
    74:10,24 75:1
    90:3 93:6,8 94:2
    96:16 121:9 123:6
    123:11 131:4

156:14 159:4
**housed** 48:20
**Houses** 63:6
**HR** 59:9
**HRH** 180:24
    181:19 203:14
**Hudson** 2:14,15 4:2
    13:1 26:3,4,11,14
    26:18,23 27:4,8
    39:19,20 60:16,17
    61:10,22 72:13,14
    72:18,20,23 73:4
    73:8,21 74:13,18
    75:22 76:1,4,10
    76:15 109:21,23
    110:7 111:6,16
    112:1,11 113:5,8
    113:10,13,18,22
    114:4,10,13,19,23
    115:3,6 116:8,20
    116:23 117:8,15
    117:21 118:8
    123:20 131:7
    147:18,19 148:3
    148:11 149:9
    150:5,9,12,17,22
    151:1 157:5,6
    172:8,9,20 173:13
    173:16 179:22,23
    180:22 192:3,5,8
    192:13 193:6
    200:20,21 201:5,8
    201:13,20 202:4
    202:14,19,24
    203:10,16
**huge** 51:3
**human** 17:19
    154:17,21 157:24
**humanity** 17:18
**hundred** 9:17
    167:22 183:23
    184:8 191:17
**hundreds** 9:3 16:3
    16:8 125:22
**hundred-year**
    158:14
**hung** 28:24
**hurdle** 99:9 155:1

**hurt** 51:11 170:14
**hurting** 142:21
**husband** 107:17

_____

**I**
**Idaho** 58:5 91:5
**idea** 65:17 200:5
**identify** 12:1
    105:11 138:21
    139:2 140:7,7,8
**ifs** 203:2
**ignore** 94:11
    116:17
**ignored** 112:21
    116:13
**II** 37:4
**ill** 103:10
**Illinois** 64:15
**illustrative** 128:4
**ill-suited** 42:11
**immediate** 205:12
**immediately**
    170:19
**immigrants** 20:3
**immoral** 154:10
**immune** 18:17
**immunity** 73:13
    80:11 131:11
**impact** 23:3,4
    33:11 46:6,18,19
    46:23 47:5,7 49:3
    49:12 52:12 58:20
    94:13 142:20
    206:11
**impacted** 53:17
    99:2 106:8
**impacts** 46:15
**impaired** 128:11
**imperfect** 119:8
**implementation**
    19:17,21
**implicated** 98:6
**implication** 40:6
    162:18
**implied** 162:15
**importance** 180:9
**important** 3:17
    17:11 27:5 66:4,7
    66:10 68:22 81:5

131:3,6 136:1,8
137:16 160:9
165:17 168:14
170:2 187:19
**importantly** 168:2
**impose** 123:10
**imposed** 99:14,16
103:1
**impossible** 49:18
119:9 161:12,19
**impractical** 43:7
**impression** 177:6
**improper** 174:6
**impulse** 169:3
**impulsive** 169:2,4
**impunity** 10:3
169:16
**inadvertently**
102:13
**inappropriate**
177:10,11,16
**inappropriately**
29:13
**inaudible** 28:14
64:21 80:21
**incarcerated** 127:2
143:10
**incentive** 159:8
**incest** 155:4
**incident** 24:17
29:21 32:2 81:23
81:24
**incidents** 22:18
**include** 20:8 84:10
**included** 11:13
90:17 182:5
193:21
**includes** 61:5
**including** 6:16 8:3
11:12 14:20 20:11
46:12 49:1 53:13
55:2 59:24 77:14
89:13,13 161:20
**inclusive** 210:11
**income** 55:6
**incorporated** 73:19
87:13
**incorrect** 68:6

84:24
**increase** 77:5 191:2
191:3,4
**increased** 77:5
**incredibly** 122:11
**incumbent** 20:22
**incurred** 91:2
**incurring** 190:21
**indefinite** 97:16
**indefinitely** 123:10
**independent** 47:17
109:16
**indescribable**
142:22
**indicated** 131:8
**indicating** 169:11
**indicia** 109:16
**indictment** 98:24
**indifferent** 160:5
**indigenous** 20:4
**individual** 13:14
51:8,10 84:3 94:9
111:20 147:16
162:10 185:8
186:23
**individuals** 15:8
17:22 20:10 30:3
93:13 105:24
**industry** 8:23 10:6
10:20 182:1,4,18
183:22 184:7
185:24 186:6
188:11 190:20
196:7,7 202:9
205:14,19
**ineffectiveness**
13:20
**infamous** 8:24
**infection** 102:15
**infinitely** 97:17
**information** 30:6,8
30:8 40:20,23
41:2,8 42:8,10
56:20 85:10 91:12
106:5 143:24
145:11 179:14
203:20 204:20
207:5

**informed** 73:18
**inherent** 102:16,19
103:20 127:19
**inherently** 102:9
102:10
**initial** 19:19
**initiated** 61:4
**initiative** 97:5
**injured** 36:11
122:5 187:18
**injuries** 36:2 93:9
93:15
**injury** 36:4,10
44:17,21 45:4
93:22 102:9
**inmates** 176:2
**inner** 49:15
**innocence** 7:7
119:10,17 125:21
128:5 146:19
**innocent** 12:10
97:9 98:11,13,14
98:17 101:8
119:16
**innocently** 111:4
**input** 12:13
**inside** 162:4
**insidious** 170:9
**insolvent** 86:16
**inspiring** 21:21
**instance** 29:8
**instances** 31:8
**instantly** 115:23,23
**Institute** 176:1
**institution** 11:14
14:18 15:24 31:9
33:16,22 59:4,5
97:21 105:23
106:4 111:20
129:1
**institutional** 6:1
19:10 45:24 106:9
113:15
**institutionalized**
174:17
**institutions** 8:21
10:15,22 11:12
14:22 16:21 17:14

34:22,22 60:2
82:15 96:24 97:3
98:7 104:12
112:21 119:19,21
126:11 128:15
129:8 154:6
158:19,20 165:21
166:8 168:9
171:10,17,23
179:4 180:7 184:1
**insulted** 207:21
**insulting** 207:24
**insurance** 8:22
10:6,6,7,10,16,20
12:9 22:10 26:6,8
26:9 31:14 32:2,4
34:24 47:22 49:10
52:13 54:16 59:2
90:18 124:6 151:8
164:3,5,8,12,13
164:15,17,19,21
165:14,15 179:21
179:24 180:24
181:14,19 182:1,4
182:6,8,10,14,15
182:18,20,20,22
183:10 184:5
185:22 186:5,23
187:4,23 188:7,10
189:13,18 190:3
190:20,22 191:12
191:19 192:9,22
194:11,12,15
195:23,24 196:6,7
196:14,18,18,23
197:4,6,23 198:17
201:7,11,22
202:12 203:9,13
204:7,17 205:3,10
**insure** 14:13 77:23
78:4 83:2 99:22
163:14 170:10
184:12 186:22
193:14 194:1
202:17
**insured** 9:15 10:15
53:24 164:16
194:4

**insurer** 194:18,18
**insurers** 34:23
90:19 183:23
184:8,9,15,24
185:17,20 186:2
186:18 188:1
189:7 191:13
198:3 199:2,17
**insuring** 82:24
**intend** 180:15
**intended** 23:6
56:13 73:17 74:4
74:11
**intensified** 7:12
**intent** 29:24 80:8
80:10
**intention** 74:7
78:10 127:10
**intentional** 24:9,9
**intentions** 78:9
**interest** 116:15
132:9
**interested** 21:8
38:24
**interesting** 74:21
139:6 176:17
**interests** 75:11
116:12 166:11
**intern** 106:1
**internal** 114:21
116:3 208:1
**international** 18:21
181:2
**interns** 167:17
**interpretation** 28:7
**Interrogatories**
110:23
**Interrogatory**
116:14
**interrupt** 69:15
**intimidation**
169:18
**intro** 60:1
**introduce** 2:10
**introduced** 50:18
105:17
**introducing** 2:9
**invalid** 133:7

**invalidated** 63:15
**investigate** 94:11
  161:12,19
**investigated** 34:20
**investigating** 162:7
**investigation** 143:9
  143:20 145:10
  162:11
**investigators**
  145:13
**invite** 4:5
**invited** 200:22
**involve** 165:20
**involved** 24:19
  69:2 113:11,23
  114:15 120:12
  122:23 147:23
**involvement** 36:23
**involving** 17:13
  109:2 159:13
**Iowa** 134:3,7
  138:10 139:4
**irony** 9:24
**isolate** 170:1
**issue** 10:14 19:9
  33:9,24 73:11
  74:12 79:7,8
  82:13,23 83:3
  86:22 87:2 89:9
  92:6 93:19 101:5
  116:23 122:11,12
  123:4 125:6,13,23
  125:24 126:3
  131:3 177:1 195:6
  205:16
**issues** 73:12 81:9
  173:4 179:19
  187:11 200:19
  205:11
**itching** 142:5
**item** 194:9
**itty-bitty** 197:20
**I's** 185:6

**J**

**Jack** 140:19 154:15
  154:15,21 157:9
**Jail** 146:1
**James** 2:19 140:20

167:7,8 172:15,21
173:15,19 174:4,9
175:3 176:7,15
177:17,21 178:2,9
178:12 179:18
**Janssen** 133:20
  134:3,6,13
**January** 36:13
  210:22
**Japan** 174:10
**Jean** 6:23 7:2
**jeopardize** 22:21
**jewelry** 193:11,20
**Jewish** 14:21
**JFC** 207:22
**Jim** 167:9
**job** 68:7 75:14
  112:12 177:12
**John** 8:14,19 21:5
  21:7 76:21 138:8
  139:1
**Johnson** 2:18,19
  208:8,9
**John's** 136:5
**join** 150:13 172:1,2
  204:4
**joined** 21:6
**Joint** 3:6 4:7 23:14
**joke** 208:1
**JonBenet** 173:24
**Journal** 110:19
**journals** 172:22,23
  173:8,9
**judge** 8:8 84:5 87:3
  87:5 89:7
**judgements** 162:24
**judges** 44:18
  163:16
**judgment** 125:16
  162:19
**judicial** 33:15 46:1
  77:18 152:24
**judiciary** 1:2,16
  2:2 13:1 21:13
  77:17 93:1
**July** 117:7
**jump** 158:16
**jurisdiction** 49:24

86:15
**jurisdictions** 109:8
**jurisprudence**
  162:12
**jury** 13:20 44:18
  45:9 86:2 98:23
  98:24 125:13,23
  126:4
**jury's** 9:19
**justice** 5:10,17 12:3
  12:7 15:10,11
  16:18 19:9 20:22
  20:23 40:11
  106:20 118:2,16
  121:13 125:7
  128:20 139:8,10
  154:9 163:11
**justified** 91:23
**justify** 109:17
**justifying** 112:24
**juvenile** 107:14

**K**

**Karen** 137:24
**Keating** 140:19
  154:14,15,15,18
  154:21 157:9
  168:4 175:17
**Keeler** 20:19
**keep** 22:24 66:5
  68:1,22,23 85:6
  85:10 146:23
  171:21 172:1
  181:8 185:16
**keeper** 67:17
**keeping** 68:9 69:7,9
  166:2
**Kentucky** 109:9
**kept** 197:18
**key** 24:20 98:3
  163:3
**kidding** 82:12
  169:22
**kids** 22:24 23:5
  66:6 68:5,11,12
  68:22,24 72:3
  120:24 121:8,9
  124:13,14 140:5
  143:11,16 144:19

145:2 146:21,23
147:4 150:2 152:1
152:3 165:12
166:2 200:13
**kill** 123:2
**killed** 121:3 122:8
  178:21 187:18
**kind** 31:1,2 38:22
  41:7,23 50:11
  51:7,14 101:5,17
  106:22 107:3
  112:10 118:19
  124:1 129:3,7
  136:19 137:18
  147:2 149:23
  158:15 159:9
  176:18 197:23
  208:4
**kinder** 16:6
**kinds** 31:14 118:14
  175:21
**King** 1:22
**knew** 18:7 25:14,19
  59:18 104:6
  126:10 147:20
  155:14 179:6
**know** 3:3 5:11
  10:12 18:2,7,8
  24:1,2,14 29:3
  31:3 32:1,8 39:4
  41:8,16,22 42:21
  43:12,16,18 49:18
  51:4,6,13 52:4,5,8
  52:8 55:18 57:13
  57:13,18,23 58:10
  58:12 68:20 69:9
  69:23 70:6,18
  74:24 75:21 77:8
  79:14 81:2 82:8,9
  82:9 84:21 85:13
  85:14,15,15,18
  89:22 92:7 99:9
  99:10,10 102:14
  103:16,18,22
  105:13 106:23,24
  107:1 108:15
  111:7 117:9,15
  118:6 120:15,20

121:14 122:3,10
123:3,17,18 124:3
124:4,7,12 131:1
131:17,18 132:8
132:24 133:1,2
134:17 136:7,16
136:19 137:6,10
137:10,12,22
138:5,19,19,24
139:14,18 140:4
142:1 143:11
146:16,19,21,22
147:5 148:7
149:14,16 150:2
151:9,24 152:2
153:15 155:16
157:13,14 159:15
162:6 164:6,6
165:24 169:10,15
169:24 176:19
178:2 179:5,6,6,9
185:15 189:4,20
200:6,11,12,12
202:12,16,20
203:5 206:17,22
208:11
**knowing** 159:21
  164:22
**knowingly** 11:5
  94:19
**knowledge** 22:18
  23:24 24:13 29:2
  29:6,17 30:20
  31:1 32:15 62:18
  73:3 75:21 107:7
**known** 11:4 17:16
  20:18 62:13
  135:15 136:8
  155:3 159:15
  179:3 181:20
  182:3
**knows** 70:21 95:19
  99:11 110:9
**Kowalko** 21:5
  76:19,20,23 77:20
  78:16,18,21,24
  79:18,23 80:13,18
  82:18 126:15,18

126:21 127:8
128:7 130:1
131:11
**Krupanski** 21:10
21:12,15 23:10,12
23:15,18 24:2,6
24:14 25:4,8,16
25:19,23 26:7,13
26:16,22 27:1,7
27:12,15,23 28:4
28:10,13,19 29:23
31:16,19 32:8,19
68:8 158:12
**Krupanski's** 165:4

**L**

**Labor** 197:17
**lack** 86:15 162:1
163:17
**lacked** 163:19
**lacks** 161:19
**lacrosse** 191:9,16
**ladies** 173:6
**laid** 82:14 91:24
**laissez-faire** 153:18
**Lamb** 6:15,21
**lame** 162:23
**land** 6:1
**Lange** 6:23 7:2
**language** 73:14,19
104:5
**Lansdale** 13:8
**large** 8:10 14:20
46:22 49:7 202:15
203:11
**largest** 8:2 33:17
158:1 181:2,20
203:12 206:18
**Larry** 2:17
**lascivious** 145:22
**late** 82:2 141:24
**latitude** 66:2
**Lavelle** 2:20,21
69:20,22 70:6,13
72:6 73:18 74:2
74:11 77:21,22
78:13,15,19,22
79:1,21 80:6,15
80:23 81:2 82:6

90:10 91:9,16
126:13,14,17
129:5 130:8,9,13
130:19,23
**Lavelle's** 74:7
108:6
**law** 6:7,9 8:3 9:1,8
15:11,12 16:4,18
29:22 30:21 35:22
57:13 63:5 67:12
67:19 68:15 71:3
93:8 98:1,4
100:22 102:11
103:21 104:1
107:14 113:24
153:4,5 160:11
189:9 190:22
**lawmakers** 146:7
**laws** 13:21 14:7,10
18:12 41:1,3 42:7
198:19
**lawsuit** 29:22 71:8
76:1 100:11
101:20 105:19,20
110:17 118:20
145:20 192:21
**lawsuits** 15:19,23
36:9 37:18 44:24
106:19,20,23
107:22 108:2,7
109:9 119:1 128:2
128:22 183:9
**lawyer** 7:9 22:23
41:22 67:1 72:16
75:14 100:24
101:7 125:19
152:20,20
**lawyers** 9:21 40:3
44:13 52:2 89:20
90:22 124:6
189:21
**law-abiding** 106:10
**lay** 132:23
**layer** 173:7
**leader** 129:13
202:10
**leaders** 8:7 9:4
155:10 156:20

**Leadership** 15:3
**leading** 8:6
**leads** 202:14
**league** 96:22
125:17,20 126:8
129:1,12 168:23
178:18 191:19
**leagues** 186:20,21
186:21,21 191:8,9
191:9,10
**learn** 86:23 145:7
**learned** 57:11
143:6,13 144:9
146:12
**learns** 170:21
**leave** 97:15 120:12
196:19 205:16
**leaves** 64:16 102:13
107:22
**led** 148:9
**leering** 174:15
**left** 2:11 63:18 86:4
93:9 99:17 124:8
124:11 137:6
140:12 199:23
**legal** 6:10 10:24
16:6 22:11,20
33:13 34:19 45:21
52:4 68:16 69:11
91:14 95:9,14
103:19 105:22
152:23,23 163:12
163:20 178:7,10
178:12
**legally** 162:5,6
**legislation** 15:18
16:9,15 17:5,12
21:9 22:3,12,13
23:4,6 27:5,12,22
28:5 33:11,17
35:14,24 36:9,15
36:17 46:6 55:23
55:23 58:1,6,21
58:24 60:6 64:11
69:8 77:3,3 78:3,9
79:3 95:8 103:6
141:13 147:3,23
157:22 160:4

199:21 207:16,19
**legislative** 71:15
97:5 155:22
202:21 205:13
**legislators** 20:22
172:10
**legislature** 64:2
117:12
**legitimate** 77:1,4
77:24,24 142:13
**lenders** 34:23
**length** 89:12
**lengthen** 97:5
**letter** 138:9 139:4
139:19,20 180:2
180:16 204:23
**letting** 132:8
**let's** 29:3 69:13
71:13 83:14,20
97:22 202:13
**level** 29:11 48:15
49:15 51:9 53:9
56:1 160:14,16
162:23 163:7
178:22
**levels** 54:9
**lewd** 145:22
**liability** 10:7,10
27:20 29:2,7
31:15 32:4,6 50:8
51:2 52:8 68:16
69:11 95:8,12
183:9 184:3 189:9
**liable** 24:7 25:12,14
25:18,21 30:23
31:9 68:2
**License** 167:14
**licensed** 167:12
**lie** 169:16,16
**life** 3:16 19:8 21:20
21:21,22 24:11
98:10,11,12 107:2
121:1,22 122:8
132:23 141:24
142:23 147:11
156:19 157:13
170:2
**lift** 123:12

**lifted** 123:13
**light** 13:19 138:13
154:5,22,24
**lighting** 165:2
**likelihood** 205:1
**limb** 93:17,17
**limit** 5:15 22:16
51:1 54:4 168:16
183:12,14 184:10
184:13,18 185:12
192:22 193:1,3
194:17
**limitation** 34:15,24
37:15 50:7,12,15
50:24 52:7,14
73:2 102:24
104:15 118:1
**limitations** 1:7
10:11 15:17 33:3
34:6,14,17 35:2,3
35:6 37:14 38:8
45:22 46:3 63:4,7
66:2 97:6,15
100:23 102:8
103:21 104:16
113:2 117:20
118:6,14 119:3,4
120:22 121:23
123:7 127:17,20
134:4,21 144:4
146:15 153:4
163:22 164:24
188:10 189:8
**limited** 12:17 36:14
36:22 49:23 79:17
80:11 92:22
131:11 140:16
**limiting** 35:15,19
35:20 37:12 38:6
**limits** 15:23 54:9
135:3 182:17
183:3,4,8,17
184:17 185:2
186:3
**line** 23:2 91:18 97:4
101:7 107:14
108:16,16,18
109:18 110:3

127:24 131:12
**lines** 22:24 77:21
185:22 186:2
194:18 206:19
**link** 111:11
**liquidation** 85:2
**list** 12:18 140:2,17
168:1 207:12
**listed** 136:8
**Listen** 108:20
129:17
**listening** 152:23
182:11 190:10
**literally** 47:23 99:3
156:16
**literarian** 134:18
**literature** 177:22
**litigate** 90:19
**litigation** 17:6
35:11 44:10 86:11
90:18 92:2 99:10
99:17 108:8
125:18 126:7
**little** 12:19 52:21
75:4,17 96:7,22
123:19,22 124:13
124:14 125:17,20
126:8 129:1,12
134:4 135:20
137:18 154:19
163:10 168:23
177:12 178:18
179:20 186:20
191:8 197:20
200:10,13
**live** 93:10 124:24
141:9 149:17
153:18 171:22
**lived** 107:1
**lives** 5:2 6:4,6,14
11:21 93:11,17
95:19
**living** 7:18 58:5
132:22
**loading** 190:15
**lobbied** 171:10
**lobby** 16:5 168:13
**lobbyist** 13:14

**lobbyists** 10:5,19
16:8 161:5
**lock** 98:3
**locked** 24:19
**logical** 117:4
**Logically** 25:8
**Lolito** 174:12
**long** 8:14 26:14
34:8,9,10 37:19
38:12 40:15 42:17
54:20 67:6 104:3
112:20,20 145:15
168:16 180:2
189:12 194:21
**longer** 12:6 25:7
37:3 42:18 66:2
108:17
**longest** 37:15
208:24
**long-awaited**
118:10
**long-neglected**
119:16
**long-term** 18:20
**look** 38:20 71:19
121:15 134:15,20
139:22 140:9
159:6 160:11
164:24 165:4,15
168:17,22,23
174:1,3 176:20
179:10,11 195:8
203:21 205:9
206:22
**looked** 24:17 91:14
175:11
**looking** 38:19
45:19,20 57:4
65:12,13 69:20
81:4 95:24 103:13
136:2 160:11
173:23 174:13
186:15
**looks** 75:9 154:3
**look-back** 27:13,16
35:16,20,24 36:6
36:9,14 37:7,12
38:6,17 41:18

52:6 64:23 65:7
73:1 163:23
187:13,16 192:6
196:16 200:6,9
**loophole** 6:10
**loosen** 169:20
**Los** 141:9
**lose** 66:13 71:15
74:20 107:16
124:12
**losers** 110:11
**losing** 190:23
**loss** 35:17 119:6
161:13 194:5
**lost** 71:10,12 120:4
124:13 146:20
**lot** 3:11 25:6 33:12
49:1 65:20 66:1
73:24 74:9,20,21
77:9 89:9 91:12
92:5 108:21
121:11 122:12
129:17 133:23
138:5,18 159:14
161:21 165:20
168:7 195:9,10
**lotion** 142:5
**lots** 145:4
**Louie** 8:8
**lousy** 110:3
**low** 48:7 54:9
**lower** 55:6
**lump** 39:22
**lump-sum** 38:15
**lurk** 168:21

## M

**machines** 174:24
**mad** 165:2
**magic** 122:4
**magical** 122:1
**magnitude** 15:14
166:1
**Maier** 132:6
**Maine** 206:22
**maintain** 189:14
**maintained** 67:20
67:21 118:4
**maintaining**

205:19
**major** 16:2 105:5
**majority** 9:22
34:14 37:13 54:3
56:6 122:3 165:19
**making** 8:15 19:20
69:21 71:15 84:12
91:21 112:11
130:2 143:10
158:23 200:16
204:11 208:4
**male** 106:12 168:24
173:3
**males** 173:2
**malpractice** 50:5
118:21 187:17
200:7
**man** 79:13 99:5
104:16 115:12,20
134:6,7 136:18,23
146:16 175:7
**manage** 34:22
53:22
**management** 34:24
163:24
**mandate** 20:16
**mandates** 20:6
**mandatory** 41:1
42:7
**maneuvering** 16:7
**manifest** 24:10
**manifestation** 36:2
**manipulated** 153:8
**manner** 38:16
167:19
**man's** 105:3
**March** 18:24
**Marci** 89:8
**Mark** 92:15 96:6,9
96:14,15 99:12,24
102:1,7 104:11
108:9 109:5,22
110:5,15 111:9,17
112:8,15 113:7,12
113:15,21 114:3,6
114:12,15,20
115:2,5,8 116:10
116:22 117:3,9,19

117:23 118:9
119:14 120:9,23
121:5 123:21
125:2,12 127:7,13
128:18
**market** 185:18
197:20 205:20
**marketing** 89:18
201:18
**marketplace** 44:20
45:3 188:7
**markets** 197:3,6
**Marshall** 2:12,12
28:17,18 30:15
32:11 42:14,15
43:8 44:15 45:14
**Maryland** 13:11
64:14
**master** 109:14
**masters** 109:11
167:16
**Mateo** 143:6,8
146:1,23 152:2
**Matt** 180:20
188:14
**matter** 5:8 15:1
30:9 44:12 77:7
78:2 99:15 111:1
155:16,18,22
156:18 187:22
210:13
**matters** 160:21
**Matthew** 81:24
181:1,6,9,12,12
181:17,17 186:11
187:7 188:5,18
189:1,6,24 190:5
190:9 191:3,7,21
191:24 192:7,11
192:15 193:12,16
193:19 194:13
195:7,12,15,20,24
196:6,13,20 197:1
197:12,24 198:5,7
198:10,14,24
199:8,12,23
201:18 202:18
203:4,13,22 204:2

**Matthews** 121:18
**mature** 142:12
**Maureen** 12:23,24
  13:2 38:2 60:3
**ma'am** 96:2
**McBride** 21:7
**McGovern** 135:15
**mean** 37:17 40:1
  41:20 42:1,21
  43:9 44:7,15 45:7
  50:23 55:15 56:12
  59:3 64:9 65:23
  66:6 68:10 73:24
  74:8 85:8 89:7
  90:20 99:6,20
  108:3,5 110:9
  113:19 116:21
  120:5 121:3,10
  122:3,10,14
  149:12,15,20
  174:7 190:10
  193:15 195:22
  201:1,2 202:2,7,9
  202:10 203:2
  206:2
**meaning** 155:15,17
  192:18 193:23
**means** 34:18 46:13
  60:2 118:2 158:8
  159:20 164:6
  180:13 192:21
  195:9
**measure** 6:1
**mechanism** 99:16
  101:19
**medical** 8:4 38:13
  50:5 103:10,12
  118:21 142:13
  145:14 151:6
  156:4 187:17
  191:18 200:7
**medically** 142:9
**meet** 99:9 100:24
  105:9 117:16
  168:3
**meeting** 2:8 3:6
**meetings** 209:1
**Melanie** 2:12

**member** 3:2 13:5
  13:16 69:16
  114:18 132:18
  166:13
**members** 2:9 3:12
  3:20,23 8:4,13,19
  11:16,23 12:13
  13:1 21:13,23
  50:5 93:1 96:14
  132:4,13 136:13
  136:14 147:17
  157:4,20 165:20
  166:18 167:6
  173:14 179:16
  180:20 207:13,15
  208:3,19,22
**memories** 34:21
  103:7 118:23,24
  133:4,6 137:23
  175:6
**memory** 7:12 100:4
  101:8,17 102:21
  103:15,17,18
  104:2 127:18
**men** 79:14 101:2
  106:13 169:4,15
  173:7 174:15
**mental** 155:1
**mention** 59:6
  134:12 159:5
  161:4 186:20
**mentioned** 46:24
  48:13 52:2,23
  113:10 160:9
  163:18 187:10
**mentoring** 23:1
**merely** 43:5 162:7
  162:10
**merged** 181:1
**merger** 49:16
**merit** 109:6,13
  110:18 163:17,19
**meritless** 119:6
**merits** 112:6
**message** 12:5,5,6,7
  179:10
**met** 104:23 139:6
  156:11 165:13

**Michael** 4:5,6,9
  204:6,6,13 205:8
  205:23 206:2,15
  206:21 207:4,10
**microphone** 141:2
  154:19 181:5,16
**mid** 151:22
**middle-aged**
  174:22
**Migliore** 18:22
**Mike** 180:14
**mill** 76:7,10
**million** 9:18 43:2
  47:19,21,22,23
  48:1,2,8 49:8
  52:21 53:6,10,16
  54:5,6,7 55:5
  84:14 85:17,22
  86:2 87:22 88:5
  88:13,16,22 89:1
  89:18,20 90:12,13
  90:15,17,24 91:22
  139:24 140:1
  183:5,12,13,13,18
  183:19 184:13,18
  192:19,20,21,23
  193:1
**millions** 59:3
**mind** 8:15,19 51:9
  117:2 149:12,23
  176:18 205:10
**mindset** 168:15
**mine** 18:9 178:4
**minimal** 185:12
**minimally** 14:9
**minimize** 169:22
**minimum** 185:1
**minister** 104:19
  106:2 136:10
**ministers** 16:17
  20:9 106:11,16
**ministries** 33:21
  53:10
**ministry** 46:6,23
  47:5,7 48:16,19
  49:13,14 52:22
  53:3 55:12 61:18
  61:21 62:1 96:20

114:21 115:7,14
  115:24 116:2,3,6
  116:9,11
**Minner** 167:13
**Minnesota** 196:17
**minor** 21:24
**minute** 97:11
**minutes** 12:18,22
  131:23 141:6
  175:10
**misconduct** 14:13
  105:21
**misguided** 15:4
  19:6
**misinformed** 198:8
**misinterpret**
  182:12
**misleading** 161:8
**missed** 82:19
**mission** 15:1 18:24
  54:23 59:5 116:5
**missions** 116:5
**Missouri** 64:15
**mistake** 17:18
  97:23 98:6 101:9
**mistakes** 129:22
**mistrust** 142:17
**Mitchell** 2:16,17
  208:15
**mixed** 177:23
  179:10,12
**model** 174:14
**moderate** 52:12
**modicum** 119:21
**Moines** 134:9
**molestation** 98:8
  100:21 101:4
  123:16 182:3,24
  183:11 192:24
  197:13
**molested** 8:17
  68:23 69:1 79:12
  79:13 97:1 107:13
  107:18 121:16,17
  121:18 124:14
  142:2 146:3
**molester** 97:22
  98:2,9,12,19

111:13,24 119:23
  122:15 127:10
**molesters** 79:14,15
  112:22 126:23
**molesting** 7:15
  66:5
**mom** 178:15,16
**moment** 76:16 79:5
  112:24 116:18
**moments** 56:5
**mommy** 121:2
  177:14
**money** 5:24 12:9
  16:1,2,7,10 17:2
  23:13 47:20 48:3
  53:18,21 54:18
  55:3 68:5 69:2
  83:20 86:3 87:19
  88:1,1 89:1 93:19
  134:24 140:9
  154:8 190:18,23
  195:9,10
**moniker** 98:12
  111:19,22
**monitor** 163:16
**monitoring** 118:16
**Monsignor** 178:17
**month** 28:14 105:7
**months** 81:23
  136:18,22 178:15
**mooned** 167:23
  168:2
**mooted** 148:7
**Morocco** 32:23
  92:14,23,24 93:2
  94:22,22,24 95:4
  95:10,13,17 96:4
**moral** 19:11 38:4
  161:1
**morning** 135:19
**mothers** 107:23
**motion** 125:14,15
  208:7,10,14
**mount** 143:9
**mouth** 74:8
**move** 32:17 49:6
  61:17 69:13 93:7
  129:23 142:16

154:19 208:9
**moved** 18:11 62:19
　62:20 94:2 121:16
　121:17 135:7
　151:20 193:24
**moving** 32:18
　187:24
**multiple** 163:13
**murder** 20:20
　111:18 122:17
　167:23
**mustered** 143:1

**N**

**Naamans** 96:22
　126:7
**nail** 128:19
**name** 4:9 21:14
　23:4 33:1 84:6,8
　86:24 90:4,6,8
　93:2 96:15 100:14
　100:17 105:3,4
　133:19 136:19
　138:14 139:2
　141:8 144:18
　146:13 152:16
　154:15 158:13
　166:14 167:8
　181:12,17 204:5
**named** 110:17
　127:23
**names** 101:1
　105:11 122:16,17
　122:19 138:11
　140:9,16
**Namur** 13:4
**Nancy** 3:2
**narrow** 166:10
**national** 31:23
　60:20 167:11
**Nations** 18:24
　19:15,18
**nationwide** 91:4
　206:5,5,10
**Nativity** 96:21
**nature** 25:10 55:1
　118:17
**near** 184:8
**nearer** 184:14

**nearest** 184:23
**nearly** 153:24
　163:7 176:4
**necessarily** 58:10
　180:15
**necessary** 16:9
**necessity** 14:7
**need** 23:17 24:19
　51:6 72:11 124:15
　124:16 128:20
　160:3 176:8,8
**needed** 74:16 96:7
　115:4 146:10,10
**needing** 129:6
**needlessly** 106:16
**needs** 20:15 28:7
　45:23 46:2 55:9
　58:22 71:10,18,19
　79:12 82:1 117:16
　126:3
**negligence** 10:22
　10:24 11:2,3,15
　22:11 24:1,9
　28:21 29:9 30:1
　30:20,22 31:6
　32:13,14,15
　102:18 122:6
　125:10,11,12,24
　154:7 159:19
**negligent** 30:12,13
　77:6 79:19 80:2
　105:21,21
**negligently** 115:19
**negotiate** 9:20
**negotiated** 10:15
　42:9
**negotiations**
　164:23
**neighbor** 7:23 8:17
**neighborhood**
　111:8 174:13
**neighbors** 153:20
**neither** 13:12 18:6
　59:12
**Nelson** 6:15,21
**nephews** 132:24
　133:1
**net** 10:1

**network** 132:17
　141:10
**never** 7:11 8:18
　17:1 23:2 50:10
　51:5 74:4 81:15
　87:5 93:18,19
　95:22 121:12,13
　121:13 134:12
　138:13,23,23
　139:11,11 146:18
　146:19 155:2,14
　156:10 157:13
　182:5 187:24
　195:2
**new** 7:16 47:13
　48:21 54:22,24
　103:20 121:20
　145:9 154:16
　210:3
**Newark** 105:5
　135:8,14
**news** 110:19 144:22
**newspaper** 122:13
　135:24 147:22
**newspapers** 144:21
**NGOs** 19:22
**nieces** 133:1
**night** 7:6 135:18,19
**nightmare** 7:11
**nights** 104:23
**nine** 120:14,15
　153:12 200:14
**nine-month** 65:15
**ninth** 17:24 18:5
**non** 173:9
**nonprofit** 8:6 11:4
　22:19 82:22 94:8
　94:23 96:19
　158:19 160:24
　166:14 184:12
**nonprofits** 11:8
　22:4,14 27:13
　161:21 164:1
　165:5,10,19,22
**nonresident** 196:14
**normal** 149:13,16
　170:16
**normalizing**

170:12
**North** 115:22
**Notary** 210:10
**notations** 148:23
**note** 50:8 66:8
　88:24 109:8 120:3
**noted** 19:16
**notes** 132:8 210:12
**notice** 65:22
**noticed** 40:8 138:2
**notices** 91:4
**notion** 21:23 89:18
　163:1
**Notre** 13:4
**numb** 170:17
**number** 4:12 5:16
　7:24 34:11 39:24
　47:15 56:22 57:10
　57:16 70:22 72:8
　73:9,20 74:3,4,10
　75:2,2 77:5 78:17
　86:7 93:7,23
　99:13 124:8 131:4
　134:22 137:3,5
　139:4 140:4 158:5
　160:10 163:4,6
　172:19 173:18
　183:23 197:4,17
　199:16 208:17
**numbers** 57:2
　122:4 138:4,24
　173:10 175:21
**Nuncio** 18:23

**O**

**object** 174:1
**oblate** 116:5
**oblates** 115:21
　123:18
**obligation** 33:18,22
　33:24 46:10,11
　55:20
**obligations** 45:19
　61:8
**Observer** 18:23
**obvious** 170:24
**obviously** 21:8
　27:13 41:20
　148:13

**occasional** 118:2
**occasionally** 169:3
**occasions** 72:8
**occur** 5:9 61:19
　101:9 112:5
**occurred** 36:10
　37:20 44:21 66:12
　105:8 160:13
　164:15
**occurrence** 54:5,11
　164:13,17 192:20
**occurring** 108:8
**occurs** 5:5
**offenders** 22:1
　94:15
**offending** 94:19
**offense** 35:22
**offer** 194:23
**offering** 39:16
**office** 11:11 31:23
　31:23 48:15 98:23
　100:22 107:6
　116:1 142:6 199:9
　203:21
**officer** 107:9,18
**officers** 8:4
**oft** 92:1
**oh** 30:9 39:14 69:20
　75:24 82:5 84:1,6
　102:11 123:23
　161:21 169:2
　175:2 179:21
　181:9 199:8
　207:23
**Ohio** 15:18
**okay** 4:3 23:20 24:8
　25:22 26:1 29:7
　30:15 39:12 52:6
　58:9 69:18 70:6
　80:23 113:18
　114:4,19 130:11
　130:15 141:1,3,7
　157:18 170:13
　181:11 188:15,21
　191:15 193:19
　195:14,15 205:21
　207:2
**old** 7:17 8:17 65:9

65:15 81:10 104:9
107:11 120:17
121:15,21 141:9
141:18 149:13
153:12 160:12
173:22 178:15
195:4
**older** 7:12 36:16
59:24 121:11
149:15 205:2
**Oliver** 65:14
**once** 30:16 44:5
92:1 106:12
164:24 187:14,23
**ones** 46:24 125:21
128:5 137:13
154:2
**one's** 119:10
**one-on-one** 42:9
**one-year** 144:10
150:19
**ongoing** 14:5
**open** 3:22 15:18
27:3 41:13,23
51:19 52:16 57:14
58:1,24 97:15
107:22 108:15
171:21 178:23
188:10 200:5,6
**opened** 56:6 143:20
150:19 189:16
**openendedness**
190:21
**opening** 17:4
187:13,16 188:8
205:2
**openly** 75:13
**openness** 41:19
**open-ended** 97:8
**operate** 150:4
158:7 202:16
**operating** 48:10
**operation** 34:23
**opinion** 28:1 94:12
**opinions** 195:17
**opportunities**
21:20
**opportunity** 4:11

5:9 21:14 23:5
31:22 43:24 52:9
121:12,13 131:21
154:2 208:5
**oppose** 8:21 16:9
123:14,17 155:10
171:23
**opposed** 51:10 85:2
196:3 208:20
**opposing** 155:19
**opposition** 208:21
**option** 191:2
**orally** 170:8
**Orange** 36:3,6,9,11
36:14,17 49:7
83:13
**ordained** 133:20
135:4
**order** 2:3 114:17
140:17 194:20
**orderly** 98:20
**organization** 12:21
18:16 23:24 26:21
30:21 33:18,19
67:18 95:2,16,18
98:17 114:2
115:19 136:13
140:22 156:24
158:2,3 159:15,21
159:24 160:4,13
162:10 164:13
165:5,9 184:1,11
185:13 192:17
**organizational**
157:23 159:5,11
159:19 160:23
**organizations** 48:1
94:3,5 97:10,12
114:3 129:21
155:10 158:2
159:2 160:1
163:24 165:4
166:14 184:12
185:5 186:17,24
197:9
**organization's**
95:12
**organizing** 116:4

**origin** 169:10
**original** 26:20
171:18
**originally** 183:22
205:1
**Orso** 12:21
**ostrich** 31:1
**ought** 24:18 118:12
122:6,7
**outcome** 21:8
155:16,18
**outing** 40:9
**outlays** 52:22
**outrage** 9:19
**outset** 21:18
**outside** 44:10 75:20
191:10
**outweighed** 180:9
**out-of-state** 104:20
**overcome** 155:1,2
**overdose** 6:19
**overdue** 112:20
**overnight** 7:5
**overpowered**
170:21
**overriding** 40:8
**overridingly** 60:6
**overseeing** 105:23
**oversight** 167:14
**owed** 105:23
**owes** 55:19
**owned** 47:24 83:10
83:15 84:16 89:23
90:3 92:8
**ownership** 86:22
**owning** 111:10
**owns** 55:11
**o'clock** 131:24
**O'Grady** 65:14

**P**

**pack** 196:18
**page** 110:18
**pages** 210:11
**paid** 13:14 38:13
38:14 54:12 59:1
85:16 90:12,14,15
151:9 182:21
**painful** 143:20

144:14 154:24
156:5,6
**painfully** 96:24
**painted** 106:13
168:19
**Pam** 132:6,7
**panel** 41:12 61:6
**pants** 149:5
**paper** 17:15 61:13
114:5
**papers** 208:13
**paragraph** 180:5
**parameter** 127:4
**parent** 70:14 71:23
153:14 177:18
**parents** 16:16 60:9
95:4 121:9 133:9
141:17 149:10,18
**parish** 6:17 7:6 9:2
9:2,2,2 48:14,17
53:10,12,15 54:21
54:22 84:17,18
86:21 87:2 88:6
89:4 90:1 101:15
101:15 121:20
134:14 136:5,12
139:19,21 140:6
**parishes** 17:7 48:2
48:17 49:14 53:12
54:19 55:15 84:2
84:2,10,11,12,13
86:24 87:11,12,18
87:19,21,23 88:9
88:11,14,21,23
89:3,16 90:5
135:17 139:15,17
139:18 140:5
**parishioner** 136:8
137:16
**parishioners** 136:1
**parochial** 55:7
70:15,15
**Parrish** 1:17 210:9
210:20
**part** 18:10 20:12
22:18 28:24 29:9
41:17 61:22 66:6
73:9 75:16 79:24

87:8,12 88:11
147:23 159:21
160:2 181:2,19
183:11 193:21
199:1 203:14
**participation**
198:19
**particular** 3:10
31:20 36:24 57:12
64:20 81:4 108:12
108:13 161:10
174:13
**particularly** 13:19
46:6 59:22 118:15
198:1 205:5,17
**parties** 39:8 58:22
119:4
**partners** 151:7
**party** 183:9 189:17
**pass** 12:1 43:20
45:19 119:20,23
141:4,11 147:2
165:1 190:7
**passage** 13:17,23
15:21 16:19 20:23
93:8 94:2 154:11
156:7
**passed** 11:20 16:15
34:12 57:14 63:7
64:3 77:4 183:14
191:20,21 199:16
200:8
**passes** 30:21 43:21
44:5,7 45:12
196:24
**passing** 132:8
**Pastor** 178:17
**pastoral** 49:13
167:10
**pastors** 61:21
**Pat** 4:5,6,9 5:18
**pathological**
174:21
**patience** 156:16
**patient** 102:14,14
148:19 149:6
**patients** 145:14
148:16,22

**Paul** 12:23 13:2
  185:19
**Paula** 140:12,19
  157:18,19,21
  166:22 167:2
**pause** 75:15 94:14
  95:22
**pay** 22:10 47:20
  55:17 71:24 83:24
  84:13 85:6 88:24
  90:22 124:15,16
  182:20 186:6
  191:17 192:22
  197:21
**paying** 3:4 43:18
  43:20 89:20
  191:16
**payment** 90:17,18
**payments** 48:7
  90:11,20
**PBS** 141:24
**peak** 163:5
**pediatrician** 149:4
**pedophile** 19:10
  100:10 139:14
**peer-reviewed**
  172:22 173:7,9
**pendency** 38:21
  40:6
**pending** 47:9 100:6
  100:7 102:23
  114:8 115:17
**penis** 142:5
**Pennsylvania** 41:3
  186:8 198:16
**pension** 7:18
**people** 4:16 5:2,9
  15:3 20:4 23:2
  24:18 32:15 41:13
  41:14 42:20 44:24
  45:1 51:11 60:8
  60:10 61:14 64:23
  65:18 66:4 68:1
  68:10 71:20 82:11
  84:12 93:12 98:8
  106:14,23 121:11
  121:23 122:13,17
  122:18 124:3,6

126:4,5 128:2
  131:18 134:22
  135:5 136:20
  137:20,23 138:18
  140:6 150:4,12
  155:14 164:6
  168:3,20,21 171:7
  171:15 172:11
  175:19 177:1,2,8
  177:8,13 179:2
  182:4 199:17
  202:17
**peoples** 20:2,4
**perceived** 177:5
**percent** 9:24 42:22
  53:5,5 85:19
  120:17 128:23
  153:24 163:8,8
**percentage** 175:19
  184:2,5,19
**percentages** 176:1
**perform** 24:10
**period** 26:19 27:14
  27:16 34:6,14,15
  35:2,6,16,20 36:6
  36:23,24 37:3,8
  37:12,14,16 38:6
  38:17,19 41:18
  46:3 52:6 64:23
  64:24 65:7 101:12
  140:16 151:18
  187:13 190:14
  192:6 200:6,9
**periodic** 19:18,24
**periods** 37:5
  187:16 196:16
**Permanent** 18:23
**permissible** 149:1
**permission** 132:16
**permit** 36:9
**permitted** 115:19
**permitting** 78:7
**perpetrated** 14:11
  130:6 161:4
**perpetrator** 93:21
  97:23 171:12,12
  171:13 172:2,3
  175:6 179:1,1

**perpetrators** 5:7
  94:6 95:21 146:11
  168:12,17 171:2
**perpetrator's**
  146:13
**perpetuated** 130:5
**person** 4:21,22
  43:11 44:21 58:4
  58:10 98:14 115:4
  122:7 138:1
  153:14 170:2,7,8
  170:22 171:12
  192:8
**personal** 3:13 36:2
  36:4 95:11 147:11
  166:24 167:2
  182:20 188:6
  193:22,23 195:17
  195:18
**personally** 122:23
  175:14 195:16
**perspective** 52:15
  59:23 97:12,21
  111:5 206:8
**persuasion** 169:18
**pertaining** 198:19
**pertinent** 203:2
**pessimistic** 173:19
  174:19
**Peterson** 23:22
  24:4,8,23 25:5,13
  25:17,22 26:1
  28:10,22 31:12,17
  32:5,9 62:5,15
  63:3,11 64:1,7,22
  65:2,6,12 66:3,17
  66:23 67:6,10,24
  68:4,13,18,21
  69:5,13,18 83:6,7
  83:12 87:8,15
  88:4,8,12,18 89:3
  89:7 90:5 91:7,10
  91:18 93:4 109:20
  119:13,24 120:2
  120:10,24 121:6
  123:22 124:19
  125:9 151:16,17
  152:4,6 157:21

159:20 194:24
  195:1,8,14 196:9
  196:15,22 197:11
  197:14 198:2,6,9
  198:13,21 199:5
  199:10,13 200:3
  207:21 208:1
**phenomenon** 100:4
  103:9,13,14
  174:11
**Philadelphia** 13:9
  13:20 135:9,13,16
**phone** 127:22
  136:18,22 137:3,5
  171:5
**photographs**
  118:22 173:24
**phrase** 102:21
  119:22
**physical** 118:18
  142:3,13 148:21
  148:23 149:2,7
**physically** 170:3
**pick** 38:1 63:11
  75:6 108:12 123:5
  143:13 188:11
**picked** 169:11
**picking** 58:3 115:9
  117:17 123:4
  182:6 183:23
  197:3
**picture** 136:3,7
  141:18 163:24
**pictures** 122:14,16
  122:19
**piece** 78:3 116:16
  206:4
**piled** 208:13
**pitch** 112:17
**place** 12:4 14:10,17
  15:20 19:13 63:18
  65:24 66:13 67:21
  70:7,10 72:10,11
  106:6 110:14
  111:1 128:13
  131:15 133:5
  154:8 159:16
  165:8 177:9

186:16
**placed** 91:20
  182:13
**places** 69:24 89:13
**placing** 11:4
**plaintiff** 100:9,11
  100:12,17,22
  103:2 127:17,18
  162:20,21
**plaintiffs** 47:9
**plaintiff's** 102:22
**plan** 47:19 87:12
  88:11 198:12
**planned** 169:2
**play** 186:24 191:16
**Playboy** 174:14
**playing** 71:16
**pleadings** 100:18
**please** 5:16,20
  22:21 23:3 45:16
  58:23 94:1 112:19
  119:23 132:5
  147:5 152:9
  156:20,23 161:16
  204:3
**pleased** 131:14
**pleasure** 204:13
**pledged** 49:11
**pledging** 88:24
**plenty** 86:13,19
**Plural** 114:3
**plus** 37:14 49:1
  115:12 122:3
  134:10
**podium** 4:5 132:5
  204:4
**poignant** 157:11
**point** 12:23 24:24
  26:9 32:11 34:12
  38:21 45:11 51:6
  51:17 60:21 62:23
  63:20 64:1 67:24
  68:21 69:21 70:20
  71:7 77:7 79:2,3
  80:7 82:19 97:4
  103:16 104:1
  108:6 119:19
  127:22 140:15

158:16 160:10 162:9 163:3,21 166:9 170:7 190:3 191:4 207:11,16
**pointed** 14:6 38:2,3 129:4,5
**points** 25:11 76:23
**police** 7:16 14:19 107:9,18 118:22 143:6,9,19,23 144:1 145:10,11 148:22 150:1
**Policeman** 59:11
**policemen** 142:10
**policies** 32:6 54:1,8 70:9 71:20 72:10 78:23 182:10
**policy** 14:16 60:23 61:13,23 62:2 66:22 67:2 69:23 70:19 79:22 125:6 182:6,9,14,15,17 183:3,4,7,17 187:11,21 189:19 190:19 192:15,19 192:22,23 193:2,4 193:5,10,10 194:7 194:14 200:23 201:15,21
**polite** 71:4
**political** 116:15 180:6
**poll** 175:18
**pollution** 189:8,9 189:15
**pool** 182:21 199:18
**population** 4:18 57:24 76:9 173:3 206:24
**portion** 63:15
**Portland** 16:24 85:11 86:1 89:14 90:11,19 91:19
**portrayal** 80:22
**portraying** 80:19
**posed** 205:1
**poses** 180:6
**position** 33:5 37:7

37:11 91:20 167:4 200:18 207:15
**positive** 139:22 169:13
**possess** 153:17
**possibility** 127:11 160:22 188:16
**possible** 52:16 86:6 146:6 153:10 156:6
**post** 48:11 57:6 87:11
**posting** 145:24
**post-traumatic** 7:13
**pot** 47:20 48:3
**potential** 58:20 97:9
**potentially** 53:17 104:12
**potholes** 101:17
**poverty** 89:15
**power** 154:8
**powerful** 8:21 10:4
**powerless** 170:22
**PR** 89:14,20 91:2
**practical** 40:5,5 44:12 45:21
**practice** 14:17 65:23 66:13 96:17 96:23 143:5 145:1 151:6,18 160:20 167:18,18
**practices** 42:23 43:2 92:4 165:8 165:16 167:14
**practicing** 144:16 151:19,21
**precautions** 14:12
**precious** 5:24
**precipitates** 77:4
**precise** 56:20 57:2
**precisely** 102:1
**predation** 158:19 159:22
**predator** 7:8 9:1 135:15 176:19
**predators** 6:11

9:23,24 10:3 11:5 11:6 17:16 143:13 147:4 153:9,9 166:4 169:4,11
**predict** 49:18 197:2
**predictions** 199:14 199:22
**preface** 46:9
**premise** 35:12 182:19
**premium** 164:23 165:7,16 184:3,20 184:20,20 190:14
**premiums** 10:7 182:22 186:6 191:2,4
**Preparatory** 96:22
**prepared** 59:15 168:15
**prerogative** 23:11
**presence** 112:9,23
**present** 18:20 20:1 44:5 59:7 153:3 161:9 163:16 184:8,15,23
**presentation** 3:10 45:16 56:4
**presentations** 4:1
**president** 8:5 21:15 29:3,14,15,16,19 30:23 141:19 151:23 166:23 167:3
**press** 41:9,22 139:19 144:24 145:5 155:12
**pressure** 159:9
**presumably** 44:17 44:20 127:16
**pretty** 26:18 62:18 91:13 116:16 151:24 165:12 186:14
**prevailing** 120:5,8
**prevent** 15:5 16:5 60:5,6 65:24 68:8 161:14
**previously** 35:8

40:19 49:23 52:23 63:19 64:12
**preyed** 147:16
**pre-trial** 125:13
**price** 16:10
**priceless** 6:2
**pricing** 183:14
**priest** 6:17 7:6 18:8 38:11 61:11 100:10,13,14,14 100:16,19 101:13 114:11,15 115:12 115:22 116:2 133:19 139:15 140:7 152:16
**priesthood** 133:22
**priests** 9:1,7,22,23 18:7,11 38:4 45:20 94:17 132:17 133:23 142:10 168:23
**primarily** 161:5
**primary** 15:1 53:1 97:19 118:12 183:12 184:2,5,10
**principal** 114:17 167:24
**principle** 81:8
**principles** 152:23
**prior** 31:14,20 35:24 38:11 56:8 56:15 62:2 77:11
**prioritize** 12:8,9
**priority** 76:6 158:5
**prison** 18:13 127:1 175:24 176:3
**prisons** 108:5
**pristine** 65:24
**private** 33:21 42:4 70:15 82:21 96:16 177:9 183:24
**privilege** 96:17 154:9
**pro** 125:19
**proactive** 19:7
**Probable** 98:21
**probably** 23:18 29:20 58:11,11

150:15 161:22 164:19 167:21 173:3 179:9 186:2 198:10 201:22
**problem** 54:17 135:21 137:21 145:24 160:6 166:1 197:14
**problems** 6:20 18:3 35:9 45:21 66:11 90:21 187:17 188:2
**procedural** 163:13
**procedure** 47:21 142:14
**procedures** 71:20 72:10 78:23
**proceed** 126:4 162:19 163:16
**proceeded** 109:6
**proceeding** 47:15 47:18 85:11 87:7 90:23 91:3,6
**proceedings** 47:11 107:15
**proceeds** 55:5
**process** 35:13,14 38:18,23 42:21 45:8 47:18 63:16 63:21 64:6,24 77:18 98:20,21 100:16 117:5,6,10 118:4 125:11 126:7 161:6,13 162:10,12 163:20 194:21 206:5
**production** 110:23
**productive** 21:22
**profession** 94:7 159:14 178:8,11 178:12
**professional** 91:22 167:12 177:19 195:16 210:9
**professionals** 90:13 142:18
**professor** 89:8 91:11,14,19 92:5

120:11 167:15
**program** 59:10,12
  59:13 60:1,4,21
  61:5 115:1,7,10
  167:16 181:19
**programs** 17:8
  20:8,11,12,18
  60:18 61:3 65:24
  70:7 89:16 204:16
**prohibitive** 185:4
  185:13,24 187:2
  191:5
**prolong** 127:9
**promote** 155:21
**promoted** 156:21
**promotes** 159:8
**promotion** 71:3
**promulgated**
  188:11
**proof** 25:1
**propensity** 101:9
**proper** 80:20 82:13
  83:2 149:14
**properly** 180:8
**properties** 88:14
**property** 24:12
  54:16,19,20 55:1
  55:9,11,18 59:2
  86:9 87:2 90:2,9
  193:17,19,22,22
  193:23
**proposal** 205:13
**propose** 41:7 42:1
  52:17
**proposed** 35:19
  50:20 95:8 97:7
  107:20 131:6
**proposing** 38:6
  51:16,18,19,24
  52:1 96:7
**proposition** 66:12
  66:20
**pros** 144:11
**prosecute** 63:22
  144:2
**prosecuted** 18:12
  35:23
**prosecution** 119:5

144:4
**prospective** 45:24
  73:2 104:14
**prospectively**
  37:13 113:2
**protect** 4:23 6:4
  14:24 15:3 19:6
  70:20 75:10 84:4
  94:5 119:4 135:3
  135:4 144:15
  154:5 166:10
**protected** 14:8
  17:16 130:3
  146:21
**protecting** 10:23
  13:21 20:3 23:5
  68:12 71:6 158:6
  195:12
**protection** 77:23
  94:14 119:21
  160:2
**Protective** 165:24
**protects** 72:9
**protest** 134:19
  169:20
**protesting** 134:22
**protocols** 129:23
**proud** 137:18,19
  156:3 166:13
**prove** 11:1 25:1,2
  30:11 98:16 110:8
  122:5,6 138:1
  148:14
**proved** 11:3 77:5
**proven** 109:24
  110:18
**provide** 56:1 70:10
  180:7 197:12
  203:20 204:20
**provided** 50:19
  53:9
**provides** 10:21
  28:6 47:19 52:21
  53:2,9,14 54:21
  148:17
**providing** 125:7
  184:24 185:1
**proving** 189:17

**provision** 73:1
  79:19 80:2 92:3
  163:23
**provisions** 1:9
  15:10 67:19
**psyche** 93:10
**psychiatrist** 141:17
  146:23 149:1,4
  151:20 156:11
**psychiatrists** 178:5
**psychiatry** 141:21
  141:22 144:16
  151:18,23
**psychological** 6:20
**psychologically**
  128:11,11 170:1
**Psychology** 173:8
**PTA** 70:2
**public** 16:4,5,13,14
  17:15 40:8,15,24
  41:2 42:2 70:14
  70:17 73:12 76:5
  90:14,15,16 93:24
  105:19 115:14,15
  115:23 116:2,6,11
  134:13 137:17
  139:3,4 144:18
  146:13 158:8,22
  183:6 210:10
**publicity** 178:23
  179:7
**publicly** 41:7
  138:23
**public's** 83:1
**pull** 76:22 141:2
  188:3 191:13
  194:22
**pulling** 190:23
**punish** 97:9
**punished** 94:17
  163:18
**punishment** 98:4
**punitive** 51:5,7,9
**purchase** 194:11
**Purely** 107:13
**purpose** 34:16
  40:21 55:10 68:7
  69:6 85:9

**purposely** 24:17
**purposes** 35:4
  53:21 55:2,3 90:9
**pursue** 131:4,14
**pursuit** 118:2
**push** 93:5
**put** 5:15 11:10
  15:24 16:6,10
  22:12 45:3 52:7
  62:7 72:10,11
  74:8 83:20 85:12
  95:21 110:3 122:1
  134:11 135:15,16
  143:23 159:4
  166:14 202:13
  204:16 207:19
**putative** 127:18
**puts** 201:13
**putting** 133:11
  156:5 186:23
  191:8

**Q**
**qua** 173:9
**qualifying** 53:15
**quality** 163:15
**quarters** 48:22
  103:12
**question** 10:13
  23:11 24:15 28:19
  31:13 33:7 39:19
  46:5,15 57:5
  66:10,22 67:20
  69:4 73:13 79:6
  80:12 102:2,20
  104:3 113:6
  119:12 138:3
  147:19 151:17
  161:10 177:18,23
  178:14 187:6
  188:24 192:6
  198:21 199:1,5
  204:14,19,24
  205:9
**questionable** 28:6
**questioned** 156:23
**questions** 4:2 21:3
  31:5 32:19 62:24
  69:17 92:11 96:2

109:20 130:16
  147:6,18 152:7
  154:14 157:1,4
  166:19 179:16
  180:12,18 188:22
  203:24 207:8
**quick** 135:22
  151:17 173:17
  192:5
**quickly** 190:10
**Quill** 7:3,20 121:15
  124:19 125:4
**Quills** 121:23
**quite** 21:8 32:14
  49:21 58:15
  126:24 128:9
**quorum** 207:14
**quote** 40:11 163:12
**quote-unquote**
  193:21

**R**
**R** 210:7
**Rabbinical** 8:5
**rabbis** 168:23
**raise** 54:17 87:19
  87:21,24 88:2
  205:22
**raised** 33:8 46:7,8
  47:23 48:2 153:1
**Ralph** 134:10
**ramifications**
  195:23 201:7
**Ramsay** 173:24
**ran** 104:22 174:20
**range** 33:20 48:6
**ranging** 167:22
**raped** 65:15 120:17
**rapes** 120:16
**raping** 170:8
**rapist** 122:14,16
**rapport** 169:13
**rare** 95:5
**rarely** 96:24 126:1
**rate** 165:15 206:4,9
**rates** 182:23
  183:16 185:20,23
  186:12 188:4,9,11
  190:12,13 194:19

194:20 205:6,20
205:22 206:3,11
206:14
**rationale** 34:15
**reach** 35:15 39:1,8
104:15 117:6
**reached** 87:6 163:4
204:16 207:12
**react** 196:8
**read** 17:20 27:5,21
78:17 91:11 107:5
114:5 135:9
168:16 180:3,4,4
204:23
**readily** 83:4 163:17
**reading** 147:22
176:13
**ready** 168:5 170:4
**real** 9:16 18:19
90:2,21 97:9
120:19,21,21
121:3 140:10,10
180:17 193:22
**reality** 18:17 99:18
160:23
**realize** 4:16 24:24
25:4 42:16 102:17
142:12,19 149:22
150:3 165:19
174:16
**realized** 112:13
145:3 149:15,23
**really** 3:15 29:24
57:3,22 60:6
61:12 84:4 92:11
99:11 133:10
134:6 135:6,6,10
137:21 140:8
147:20 149:22
150:9 172:13
174:5 179:5 200:4
203:1 204:10
**Reardon** 92:15,18
96:6,9,14,15
99:12,24 102:1,7
104:11 108:2,9
109:5,22 110:5,15
110:21,21 111:2,9

111:17 112:8,15
113:7,12,15,21
114:3,6,12,15,20
115:2,5,8 116:10
116:22 117:3,9,19
117:23 118:9
119:14 120:3,9,23
121:5,7 123:21
125:2,12 127:7,13
128:18 130:17
138:4 158:9,10
165:6 175:23
**reason** 9:14 36:22
63:13 83:14
118:11,12 122:1
149:4
**reasonable** 37:1
46:2,3 70:19
71:22
**reasonableness**
22:15
**reasons** 17:2 41:18
97:19
**reassured** 143:22
**recall** 83:9 98:19
105:2 133:5 160:8
**recalled** 104:18
**receive** 15:9 23:13
44:1
**received** 109:1
143:7,24 152:21
**receiving** 158:23
**recess** 92:20 132:1
**reckless** 24:10
**recklessness** 22:11
**recognition** 45:21
**recognize** 21:5
100:18 132:6
**recognized** 18:18
103:14 117:24
146:8 202:9
**recognizing** 100:4
118:6
**recollection** 119:8
**recommend** 180:16
**reconsider** 27:9
**record** 49:24 66:22
67:1,17 105:19

116:11,18 134:14
161:23 165:7,12
204:5 210:11
**Recorded** 1:1
**recorder** 208:16
**recordkeeping**
65:23 133:15,18
134:10
**records** 16:5,12,12
16:13,21 17:15
22:5,9 24:21,21
25:5,7 28:2 30:2
66:5,14,15,18
67:4,12,13,20,21
68:1,10,22,23
69:7,9 70:24
71:10,11,11,11
80:21 101:16
105:10 118:18,22
120:4,5,7 134:16
134:23 135:1
139:14 145:13,14
148:22 161:21,24
**recover** 151:8
**recovery** 43:5
50:15,19 85:23
156:5 175:17
**red** 124:22
**redress** 153:7
166:2,3,9
**reduce** 83:23 93:23
**reduced** 49:7
**reducing** 184:17
**reduction** 49:13
**referred** 61:16
139:1
**referring** 101:5
106:10 114:7
194:12
**refile** 194:20
**reform** 146:15
199:15 205:13
**refresh** 190:10
**regard** 14:20 40:4
41:4 62:3
**regarded** 141:21
202:12
**regarding** 1:9

19:11 158:18
204:15
**regardless** 19:13
36:10 38:11 58:20
89:6
**regional** 31:22
105:12
**Registered** 210:9
**registry** 168:1
**regulate** 205:19
**regulatory** 205:13
**reign** 92:19
**Reissmann** 140:13
140:19 152:13,15
152:16
**reiterate** 161:18
**reject** 69:3
**rejected** 109:13
**relate** 100:20
101:12 182:2
**related** 1:9 82:3
164:2
**relates** 22:17 31:20
42:24 100:8
102:11
**relating** 1:8 33:14
**relation** 16:4
**relations** 90:14,15
90:16
**relationship** 142:21
**relationships** 23:1
**relative** 153:14
160:13
**relatives** 81:8
**relaying** 186:8
**release** 42:10 131:2
131:17,19 207:18
208:9,11,22
**released** 208:22
**releases** 39:4
**releasing** 85:12
208:17
**relevant** 36:19
**relieved** 115:14
**religious** 13:13
14:20,23 17:14
33:20 48:16 92:4
114:17 166:8

**reluctant** 51:17
**rely** 34:23
**remaining** 86:4
175:15
**remarkable** 153:2
**remarks** 46:9
181:8
**remedy** 14:14
**remember** 9:22
28:5 105:3,6
123:14,15 171:5,6
173:22 186:4
189:2 190:7
**remembered** 20:15
**remembers** 105:4
**remind** 12:15
**removal** 61:18
**remove** 98:18
111:3 123:6
**removed** 61:21
62:1 115:23 116:2
**removing** 1:7 15:23
**rendered** 20:23
**rendering** 115:15
118:3
**Renee** 173:13
**renewed** 62:13
**reoccur** 14:13
**reopened** 145:10
**reorganization**
85:2
**repeat** 55:19
**repeated** 92:1
**repeatedly** 5:3
**repeating** 94:14
156:13
**replace** 194:7
**report** 6:10 13:20
19:17,19 94:9,11
135:9,13 143:19
165:23 173:3,10
185:7
**reported** 62:9
108:19 109:1
149:7 150:1
190:17
**reporter** 28:15
64:8,21 80:21

210:10
**reporters** 144:20
**reporting** 19:22
   41:1 42:7
**reports** 19:19,24
   56:22 103:23
   118:23 144:24
   145:5 167:21
**reprehensible**
   11:22 71:2
**represent** 9:23
   110:10 123:18
   152:18 158:10
**representation**
   208:7
**representative** 2:1
   2:12,14,15,16,17
   2:18,19,20,20,22
   2:22,24 3:1 4:2
   5:18,22 12:12,24
   21:2,5 23:9,16,20
   26:2,2,4,11,14,18
   26:23 27:4,8,11
   27:19,24 28:8,16
   28:16,18 30:15
   31:11 32:10,11
   36:21 37:10 39:2
   39:12,15,18,18,20
   40:7 41:6 42:13
   42:14,15 43:8
   44:15 45:14,15
   48:10 50:3,16,21
   51:23 52:19 56:3
   56:12,17,24 57:3
   57:7,21 58:9,17
   59:14,18 60:15,15
   60:17 61:10,22
   62:4 66:21,24
   69:14,19,19,22
   70:6,13 72:6,12
   72:13,14,18,20,23
   73:4,8,18,21,23
   74:2,7,11,13,15
   74:18 75:22 76:1
   76:4,8,10,15,18
   76:18,20,21,23
   77:20,21,22 78:12
   78:13,15,16,16,18

78:19,21,22,24
79:1,18,21,23
80:6,7,13,15,18
80:23,24 81:1,2
81:11,21 82:18
83:5 90:10 91:9
91:16 92:10,14
93:1 94:21 95:1,7
95:11,15 96:1,5
96:12 99:6,19
101:23 102:4
104:10 108:1
109:19,21,22,23
110:7 111:6,9,16
112:1,10,11 113:5
113:8,9,10,13,18
113:22 114:4,10
114:13,19,23
115:3,6,9 116:8
116:20,23 117:8
117:15,21 118:7,8
120:1 123:20
124:17 126:12,12
126:14,14,16,17
126:17,19,21
127:8 128:7 129:4
129:4 130:1,7,8,9
130:11,13,15,19
130:23,24 131:7
131:11,18,22
132:2 138:3
140:14 141:1,5
147:8,18,19 148:3
148:11 149:9
150:5,9,12,17,22
151:1,2,12,15
152:7,12 154:13
154:18 157:3,5,6
157:10 166:20,24
167:5 172:7,8,9
172:18,20 173:11
173:13,16 174:2,5
175:1 176:9,9,11
176:16 177:20
178:1,7,10 179:13
179:15,19,22,23
180:19,22,23
181:4,7,11,15

186:9 187:5,8
188:14,20 189:4
189:20,23 190:1,6
191:1,6,20,22
192:2,2,4,5,8,13
193:6,8,13,18
194:10,24 195:19
195:21 196:2,11
200:16,20,21,24
201:5,6,8,10,13
201:20,24 202:4,7
202:14,19,22,24
203:10,16,19,23
204:3,8,22 205:21
205:24 206:12,20
207:2,7,11,23
208:2,8,9,10,15
208:20
**representatives**
   11:23 141:8
   155:11
**represented** 165:21
**representing** 13:12
   21:16 72:16
   113:14 114:1
   132:15 140:22,23
   141:3
**represents** 165:6
   166:6
**repressed** 102:21
   103:17,18 104:1
   133:6 135:10
**repulsed** 21:23,24
**reputation** 12:8
   19:7 101:3 110:3
**request** 4:3
**require** 22:18 34:9
   61:3 70:1 120:21
**required** 19:23
   88:23 91:4 103:23
**requirements**
   14:10 63:22 65:22
   186:22
**requires** 3:5
**requisite** 208:21
**research** 89:9
   143:4 172:16,21
   172:23,24 177:22

**researcher** 141:10
**reserve** 201:24
**reserving** 190:16
**resident** 13:15
   154:16 201:4
**residents** 186:7
**resolve** 49:22
**resolved** 87:5
**resonate** 8:19
**resources** 55:21
   143:15 157:24
**resourcing** 49:14
**respect** 61:2,8,17
   70:24 75:13 82:19
   91:8 111:10,13
   112:15 155:7
   204:14,18
**respected** 151:24
**respectfully** 120:9
   125:2 131:9
**respective** 87:23
**respectively** 34:5
**respond** 78:13
**responded** 208:19
**response** 205:12
   207:3
**responsibility**
   14:23 19:11,12
   38:4 79:24 82:13
   82:14,20,21,24
   83:1 153:15
   160:15 183:6
**responsible** 4:23
   80:4,5 131:13
   155:24
**rest** 92:1,8
**restate** 30:16
**result** 20:16 36:2
   36:13 43:17 47:2
   63:18 115:20
   144:2,23 154:4
   190:22 198:18
**resulting** 49:16
**resurface** 103:8
**retain** 16:4
**retention** 66:22
   67:2 161:23
**retentions** 190:15

**retired** 59:10
   139:21
**retirement** 62:7
**retroactive** 97:17
   104:14 107:21
   123:5,5
**retroactively** 35:9
   37:21 63:7,17
   64:16 113:1
   123:10 127:21
**retroactivity** 22:17
   124:5 195:5
**return** 84:17 88:4
   88:10,12,15
**returned** 174:10
**revenge** 106:22
   107:14,17 110:11
**reverse** 176:21
**reversed** 87:4
   144:3
**revictimization**
   170:24
**revictimize** 170:23
**review** 20:14 60:24
   61:6,19 98:23,24
**reviewed** 108:23
**revisited** 156:3
**revive** 63:17 64:16
**revived** 36:18
**reviving** 35:9 37:21
**rewrite** 113:19
**rhetorically** 43:10
**Richard** 140:13,18
   152:13,15,16
**rid** 14:14 51:5
   117:22
**rider** 193:14
**rides** 81:24
**riding** 193:2
**right** 19:8 27:4
   29:11 42:8 45:2
   56:8 65:6,11
   72:17,21 76:15
   82:8 111:21 115:9
   116:22 122:15
   132:2 135:12
   136:1,3,17 137:4
   137:5 138:14

150:8,14,18,21
151:13 158:16
166:16 172:24
175:13,22,24
177:11,12 195:22
196:15 198:13
199:13 200:3
201:5 202:1,14
203:10 205:15
206:16,20
**rights** 11:19 17:19
19:16 78:5 112:21
119:16,17 163:14
180:10
**ring** 18:10,11 194:3
**risk** 34:22,24 161:1
163:23 186:13
190:15 199:18
**Rita** 32:22 92:14,24
93:2 94:24 95:4
95:10,13,17 96:1
96:4
**rival** 175:20
**riveting** 147:9
**road** 95:21
**Rob** 7:3,20 121:15
121:23 124:19
**rock** 153:19
**rocks** 168:21
**Rogal** 181:14,20
**role** 25:10,11 48:17
100:10 196:10
**rolled** 184:6
**Roman** 4:12 19:14
94:16 133:17
134:22 161:5
**Rome** 71:3
**room** 58:1 61:14
70:21 92:15,17
102:8 106:23
121:24 164:6
175:4,12 180:21
200:13 208:16
**rotating** 105:12
**route** 188:2 205:2
**routinely** 129:3
**RPR** 1:17
**rubbing** 170:6

**rug** 24:17
**ruined** 11:21
121:22 122:8
**rule** 85:3 87:3 99:8
99:9,13,15,21
101:1,18 106:22
147:20 162:16,21
**ruled** 11:12 90:8
**rules** 10:12 12:16
198:18
**rumor** 30:24 31:3
**rumors** 29:12,18
94:8
**run** 34:7 76:6,10
127:19 185:7
198:14
**running** 17:2 204:5
**runs** 34:8

_____
**S**
**Sacrament** 55:14
**sacraments** 115:15
**sad** 145:8
**Sadly** 7:23 14:19
**sadness** 176:20
**safe** 59:9,11 60:1
61:9 115:1,7,10
146:14 152:9
166:2
**safeguards** 163:13
**safer** 146:17
**safety** 12:10 158:4
**Saints** 14:21
**Sake** 61:4
**sale** 54:16 55:6,17
59:2
**sales** 84:21
**Salesianum** 96:21
114:8,9
**Salter** 59:10,20
**SAM** 182:3 183:11
192:24 197:22
198:1
**San** 143:6,8 146:1
146:23 152:2
**sanction** 99:16
**sanctions** 99:13
**sand** 31:2,3,4
**sat** 100:22 171:7

**saw** 12:20 29:4
73:15 126:18
**saying** 27:2,6 29:1
29:7 30:9 42:10
43:10 46:9,20
58:19 82:23 97:14
102:24 110:5
111:17 122:4
123:15,23 146:2
190:23 201:3
208:15
**says** 24:20 83:19,20
110:24 115:18
124:9 127:23,24
137:9 139:13
**SB** 141:4,12 154:11
159:17
**scandal** 14:6 15:5
19:7
**scare** 10:19
**scared** 134:24
**scenario** 188:17
**schedule** 3:5 194:3
**scheduled** 47:10
**schedules** 161:23
181:24
**school** 4:22,24 9:11
13:3 18:6,16
53:15 54:24 55:13
55:14 61:17 62:16
70:2,14,15,15,16
70:17 71:9,18
76:5 79:10 81:18
96:21 104:24
105:8 107:8,11
108:14 114:16
129:7 135:8,14
191:11
**schools** 9:9 13:9
17:7 47:4,6 49:15
49:16 53:12 54:20
54:23 55:7 61:12
69:24 75:18 76:11
108:5 158:12
183:24 185:5
197:8
**scientifically**
172:22

**scope** 10:14
**scores** 17:22 59:3
**scott** 134:15 150:15
**scout** 126:8 129:1
129:13 158:12
**Scouts** 6:16
**scrambling** 75:11
**screen** 60:10
**screened** 111:15
125:13
**screening** 98:23
99:15,20 101:19
**screens** 98:21
**scrutiny** 64:17
**seal** 210:15
**search** 145:12
**second** 10:4 24:24
37:15 118:11,11
169:13 208:14,14
**secondly** 66:13
**secrecy** 146:20
170:10 172:5
**secret** 67:13 171:20
171:21
**secrets** 8:24 154:22
171:20 172:1
**section** 110:19
124:4,4 125:10
**sections** 17:11
**secular** 14:22,23
17:15
**secure** 153:9
**see** 3:17 19:18
39:10 123:17
126:20 127:11
135:13 138:9,13
150:6 160:21
162:11 172:13
178:3 185:17
186:1 187:23
196:5 201:16
**seeing** 12:13 44:3
173:21 203:24
207:8 208:21
**seek** 121:14 133:10
**seeking** 106:20
107:17 125:7
**seen** 35:11,11 41:7

42:1 148:19
165:21 172:24
**seize** 145:12
**seized** 148:22
**self** 116:12,15
**self-serving** 91:13
123:19,23
**sell** 83:10,15 84:11
84:15,16,21 87:11
89:23,24,24
199:10
**selling** 47:24 87:18
198:23 199:6
**sells** 55:11
**seminarian** 104:22
**seminarians**
105:11
**seminary** 104:20
133:21
**Senate** 1:6 5:16
8:13,20 10:2,21
13:17,23 14:1
15:21 16:19 17:12
20:23 21:19 33:15
34:13 35:7,12
36:8,17 38:22
47:2 63:15 64:13
67:11 78:4 79:20
80:3 82:23 93:4,6
93:7 94:2 97:7,20
99:2 104:13
105:17 106:9
107:24 118:13
119:15,20,23
122:21,24 123:11
127:21 128:21
141:4,11 152:19
154:3 156:7,21
180:5 208:11,13
208:17
**Senator** 8:14,19
21:7 23:21,22
24:4,8,23 25:5,13
25:17,22 26:1
28:9,10,22 31:11
31:12,17 32:5,9
62:4,5,15 63:3,11
64:1,7,22 65:2,6

65:12 66:3,17,23
67:6,10,24 68:4
68:13,18,21 69:4
69:5,13,14,18
70:24 78:12 83:6
83:7,12 84:24
87:8,15 88:4,8,12
88:18 89:3,7 90:5
90:11 91:7,10,18
93:4 109:20
118:11 119:11,13
119:24 120:1,2,10
120:24 121:6
123:21,22 124:19
125:2,9,24 137:24
141:8 151:16,17
152:4,6 157:21
159:20 166:18
194:24 195:1,8,14
196:9,15,22
197:11,14 198:2,6
198:9,13,21 199:5
199:10,13 200:3
207:21 208:1
**send** 12:4
**sending** 61:11
**senior** 181:13,18
**sense** 9:19 10:18
62:9 72:1 113:21
113:22 117:13
118:4 130:17
**sent** 114:11,20
137:5 141:17
145:10 149:2
152:2 180:14
**sentenced** 18:13
**separate** 78:3,9
83:3
**separated** 82:16,21
**separately** 87:13
**September** 210:15
**serial** 79:15 111:18
150:3
**series** 41:3 135:24
141:23
**serious** 122:11
167:22
**seriously** 11:8

30:10
**serve** 21:15 96:19
99:19 158:4,16
**served** 96:18
139:15 158:3
**service** 92:4 129:21
184:1,11 185:5
186:16 197:8
**services** 33:20
48:15 52:24 53:1
53:2,8 56:1
165:24
**session** 19:2
**set** 13:24 68:16
70:2 165:16
166:16 182:17,18
210:14
**setting** 134:13
206:4,9
**settle** 39:4,5 40:3
42:22 43:13,16
44:9 45:7 50:2
91:20
**settled** 9:10 10:15
44:23 45:2 49:8
112:14 140:4
**settlement** 9:16,21
39:8 42:9,21 43:3
43:23 44:2 46:15
46:22 47:3,12
48:5 51:22 54:14
55:24 76:14 87:6
87:20 89:2 91:24
109:7,14,18
139:24 151:8
194:5
**settlements** 9:13
17:9 38:15 39:24
40:12 41:17 42:4
42:17,24 43:18,21
45:9 48:6 49:7
55:2,16
**settling** 17:5,6 43:6
48:3 53:18
**seven** 6:24 9:24
53:13 92:21
153:12 173:2,24
189:14 200:14

**seventh** 7:4 170:10
**seven-figure** 43:5
**severed** 93:17
**severely** 188:8
**sex** 8:11 9:12,23
11:4,6,18 18:22
35:22 37:17 97:6
100:8 103:6
141:23 144:5
168:1
**sexual** 1:8 4:13,19
6:10,11 14:5,13
15:19 16:16 17:9
18:3,17 20:20
26:8 33:4,14,23
34:9 45:20 60:22
60:23 62:2 94:19
104:19 106:3
108:4 121:11
146:8 153:4 154:7
154:23 155:2,13
156:1,8,15 158:6
159:13 160:5,21
166:10 168:8,13
168:15,18 169:4
170:20 171:1,3
173:5 174:1
176:21,24 182:2
182:24 183:10
192:23 197:13
**sexualization**
179:11
**sexualize** 173:21
**sexualized** 173:20
**sexually** 4:21 6:23
7:24 8:17 17:22
18:7 21:24 22:8
71:9 79:12,13
81:16 154:1 173:5
175:7,20 176:2
178:18
**shaded** 101:3
**shadow** 19:17
**shadowy** 107:17
**Shakespeare**
134:17
**shame** 14:15
108:17 146:20

173:4,7
**share** 49:10 164:3
**shared** 51:11
175:17
**shares** 87:23
**sharp** 116:16
**Shawn** 140:19
157:18
**she'll** 91:11
**shift** 76:9
**shocked** 142:6
**shocking** 175:2,2
**short** 102:20 104:3
137:15 181:10
**shorter** 181:8
**shortfalls** 129:23
130:2,4
**shortly** 188:21
**short-term** 180:6
**shoulders** 95:24
**show** 23:23
**showed** 137:21
**showing** 173:1
**shrink** 159:2
**shrinkage** 197:2
**shrinks** 184:7
**shrunk** 183:22
184:15 197:7
**shuffle** 83:21
**shut** 24:18 25:23
66:6 191:11
**shuttered** 17:8
**sick** 171:20 174:16
**sickness** 135:2
**side** 34:3,4 47:2
72:4,5 109:3,4
113:14 144:6,7
148:13 161:9
171:11 176:5,6
202:2,3 208:16
**Sienna** 55:4
**sign** 88:24
**signatories** 19:15
**signed** 8:9 12:17
92:21 123:8
**significant** 46:13
99:9 103:2
**significantly** 44:22

**signing** 129:12
**silence** 146:20
**similar** 55:1 101:1
148:17
**similar-sounding**
100:19
**Simms** 71:8
**simple** 11:2,19
170:6
**simply** 22:4 28:7
44:12 45:22 46:17
55:11 59:3 64:11
66:11 68:9 98:9
103:16 108:14
111:17 162:2
**sincerely** 180:13
**sine** 173:9
**singers** 174:17
**single** 176:24
**sinker** 101:7
**sins** 20:21
**sir** 23:17 41:22
79:6
**sister** 12:23,24 13:2
13:4 18:9 21:3,3
38:2 59:8 60:3,12
132:21
**sisters** 100:2
106:21 133:4
**sit** 6:8 91:10 108:3
168:5 183:20
**sits** 170:17
**situation** 42:20
44:23 147:11
**situations** 30:3
**six** 8:16 47:10,24
62:22 81:10 126:4
132:18,19 173:2
**sixth** 170:10 203:11
**six-month** 36:6
**size** 83:23 111:2
205:17 206:7
**skin** 156:13,18
**skip** 95:23 158:14
**skirt** 102:24
**sky** 199:18
**Skylstad** 140:3
**slammed** 99:23

**sleazy-looking**
168:21
**slender** 105:2
106:13
**slick** 171:13
**slippery** 171:11
200:5
**slope** 171:11 200:5
**slot** 174:23
**small** 7:22 105:4
153:6 184:2 185:3
206:4,7
**smaller** 14:22
22:14 48:24
184:19 197:18,19
**smear** 98:18
**soccer** 186:21
191:8,9
**social** 19:1 33:20
52:23 53:1,8
178:5 184:1,10
185:5 186:16
197:8
**societal** 137:21
173:4
**society** 8:5 32:17
154:5,8,9 155:24
173:20 176:20,23
178:22 185:14
**sociological** 108:10
**sodomizing** 170:8
**softball** 7:24
186:21
**sold** 48:14,21 55:1
55:5,9 83:14 90:1
90:2,3,3
**soldiers** 36:11
**solicitor** 64:13
**solo** 182:1
**solution** 72:9
**solve** 128:21
**solvency** 86:12
**somebody** 31:17
66:7 110:12
123:16 127:5
**someplace** 170:3
**somewhat** 95:3
**son** 6:16 81:10

191:15
**soon** 74:5 200:13
204:19,19
**sooner** 34:19
**sorry** 49:2 52:24
56:17,24 81:21
82:5 89:13 109:5
114:13 116:20
118:11 119:11
126:16,19 130:6
139:15 140:6
155:20 174:19
178:9 181:6
**sort** 45:2 50:10
51:1,1 53:4 69:4
78:10 110:13
148:12 165:24
208:12
**sorting-out** 125:11
**soul** 16:11 20:20
122:8
**sound** 39:9 84:20
167:19
**sounding** 101:1
**sounds** 43:18
175:23
**sources** 53:6
**soured** 149:23
**South** 108:24
114:11,21 116:13
116:19 196:17
**sovereign** 131:11
**so-called** 142:18
**speak** 4:15 5:10,11
5:14,22 18:1
21:14 32:18 33:24
81:11 83:23 93:2
108:10,11 132:14
153:13 165:10
175:14 180:15,17
181:5,22 200:23
203:4
**speaker** 76:22
**speakers** 207:12
**speaking** 13:15
56:21 97:2,11
108:13 119:18
152:19 158:9

161:11 169:4
180:14 202:6
206:10
**special** 4:20 71:10
79:12 82:1 93:3
109:11,14
**specialist** 157:22
159:4
**specific** 67:19
100:13,17 180:17
204:19 206:3
**specifically** 97:3,14
119:2 182:7,10
194:1,3,4
**specified** 36:12
47:21
**spectrum** 57:19
**spelled** 139:16
**spend** 89:19 97:11
104:21
**spent** 16:3 89:17,17
91:22
**spinal** 93:15
**spinning** 116:17
**Spirit** 62:20,21
121:17
**spiritual** 15:2
**spite** 107:22 108:2
108:7
**Spokane** 17:1
46:23 47:7 48:23
57:15 76:24 83:8
84:7,7,11 85:8,13
85:14 86:8,21
89:9,12,23 139:22
139:23
**spoke** 159:20
**spoken** 121:24
**sponge** 102:13
**sponsor** 26:20 80:8
80:11 207:17
**spread** 186:12
**St** 13:3 62:16,19
96:20 121:17
136:5 185:19
**stable** 173:18
**staff** 4:21 30:5
49:13

**stage** 125:14
**Stagner** 63:14
**stake** 125:6
**stale** 119:5,6
**stand** 81:9,15
119:22 124:1,12
126:8 128:1 133:6
137:16 156:4
166:12 174:13
202:1 209:2
**standard** 11:1
30:22 32:13 101:1
159:1,11,14,17,18
159:18 160:14,19
161:23 165:13
185:17,20 192:19
194:18
**standards** 61:6
100:2 106:21
158:17
**standing** 75:12
81:7,14 108:15,16
111:5 155:9 182:1
**standpoint** 193:20
**stands** 96:10
**start** 2:8,10 3:24
79:16 128:2
130:21 150:17,20
188:8 205:2
**started** 3:10 135:23
136:12 137:13
**starts** 18:14
**state** 2:14,16,18,22
3:1 5:23 11:13
12:5 14:24 17:7
18:10,12,23 21:5
22:4,14,22 37:23
59:10,21 64:13
69:23 70:7,8,9
71:18 72:7 79:4
79:24 80:3,10
81:12,13 82:13
126:5 131:10
155:9 158:23
167:15,20 174:22
184:12 185:21
186:12 187:14
189:23 190:24

194:19 196:24
198:20 199:24
201:14 202:10
203:17 204:4
205:16,17 206:7
206:13,17,22
210:1
**stated** 34:16 161:11
186:5
**statement** 47:1
56:4 126:13
130:12 156:14
**statements** 156:24
**states** 9:10 13:24
19:4 20:6,7,13
37:15 117:20,23
119:3 122:22
134:21 138:16
174:10 196:16,21
199:2 202:17,17
202:20 204:15
**state's** 13:21 82:20
82:24 158:1
**statistic** 172:12
**statistical** 190:18
**statistics** 172:21
183:15 190:18
**stature** 112:8
**status** 19:2
**statute** 1:7 10:11
15:17 33:3 34:17
35:3 36:4,5 37:15
38:8 45:22 63:4,7
63:18 64:20 66:2
97:6,15 100:23
102:7,24 103:21
104:15 113:2
118:13 119:2
120:22 121:22
123:6,12 127:17
127:20,20 134:4
134:20 144:4
145:17 146:15
148:8 153:4
163:22 164:24
188:9 189:8
**statutes** 34:17,24
117:19,24 118:6

119:4 146:5
**stay** 195:16
**stealing** 122:18
**steering** 21:21
**Stefani** 174:17
**stenographic** 210:12
**step** 144:24 161:8 207:18
**stepped** 155:8
**steps** 70:19 71:22 71:22 126:9 139:16 170:9
**stereotype** 168:18
**Steve** 140:18,21,23 141:3,7 144:8 148:1,4,15 149:11 150:8,11,14,20,24 151:4,14,19 152:5 152:11
**Steven** 141:8
**stewardship** 33:19
**stick** 31:4
**sticks** 31:1
**stigma** 111:12
**sting** 97:22 98:8 100:20 111:3
**Stone** 2:22,23 176:10,11,16 177:20 178:1 179:13 180:3 189:23 190:1,6 191:1,6,20,22 192:4 193:8,13,18 194:10
**stood** 74:19 136:1
**stop** 10:1 18:15 39:5 112:19 117:1 195:21
**stopped** 39:16 78:7
**stop-and-think** 112:24
**stories** 103:6 145:6 148:17
**story** 136:4 147:2 157:15
**strange** 50:11
**Street** 1:22

**strength** 155:12
**stress** 7:13
**stricken** 73:5
**strike** 74:5,6
**strikes** 50:24 52:4
**strokes** 168:20
**strong** 43:11,14
**stronger** 111:22
**strongly** 171:9
**struck** 74:5
**struggling** 33:5 44:3
**stuck** 31:2
**student** 18:4 20:11 62:16 106:2
**students** 18:1 55:7 76:5
**study** 108:10
**stung** 119:22
**style** 174:12
**styled** 172:23
**subject** 75:17 86:10 149:7 180:10
**subjected** 104:9
**submit** 35:13 37:2 37:20 41:5
**submitted** 19:18,23 19:24 109:11 167:21
**subsidiary** 102:17
**subsidies** 49:15 53:10,12
**subsidize** 52:22 55:6,17
**subsidy** 48:19 53:8
**substance** 6:20 53:3
**substantial** 206:8 206:23
**substantiated** 115:11
**substitute** 34:11 73:15,17
**succeed** 156:7
**success** 141:14
**successful** 21:22
**successfully** 16:14
**successive** 51:7

**sucked** 85:18
**sudden** 184:8
**sue** 36:11 63:24 105:18 107:12 139:12 146:11 151:2,6
**sued** 10:24 11:7,10 144:22
**suffer** 135:1
**suffered** 7:8,22 15:9 18:1
**suffering** 168:6,7 174:21
**sufficient** 54:17 55:20 94:13 161:19 162:20
**suggest** 40:21 43:15 44:5 72:7 131:9 200:7 201:20
**suggested** 42:5,6 49:20 53:23 54:15 87:17 139:7
**suggesting** 42:3
**suggestion** 116:7
**suggests** 44:24 45:4
**suicide** 6:18 122:9 122:10 133:2,5
**suing** 151:7,10
**suit** 36:7 98:15 101:24 104:6
**suits** 1:8,9 17:13 163:19
**sum** 39:22
**summarize** 59:15
**summary** 125:16 162:19
**summer** 7:3
**Sunday** 104:22,23 105:9
**Super** 96:2
**Superior** 101:16 102:2 103:15 110:4 116:14
**superseding** 154:9
**supervised** 180:8,8
**supervising** 101:13
**supervision** 105:22

167:17
**supervisory** 100:10
**supplement** 192:18
**supplemental** 194:12 199:24
**support** 4:12,16 8:2 8:9 21:18 27:9,12 27:16 33:21 35:5 38:13 48:17 50:6 53:11 72:15,18 97:5 141:13 143:18 158:21 174:20 175:4,9 180:5
**supported** 26:22 48:16
**supporting** 157:22 161:2 162:3 166:17
**supports** 13:17 34:1,6 53:15
**suppress** 139:20
**suppressed** 17:8
**suppression** 127:18
**Supreme** 63:8,14 99:11 117:24 119:3 120:3 123:8 144:3 148:6
**sure** 3:3 8:15 24:14 28:19 39:3 43:19 58:15 61:15 66:24 70:22 71:16 75:1 82:7 86:6 110:13 113:7,9 116:16,17 130:2 159:12 162:5 167:18 173:12 178:23 180:19 188:22 189:22 196:10 202:5 204:11 205:15,23,24 208:4
**surely** 137:3 203:22
**surfaced** 50:22 51:13
**surgeon** 102:13
**surplus** 59:2

185:22 186:2 194:18
**surprised** 86:23 203:16
**survey** 173:1
**survivor** 4:13 132:15,18 171:4 171:22 172:5
**survivors** 93:8 132:17 168:8 171:19
**suspect** 79:15 81:15
**suspected** 165:23
**suspicious** 135:20
**Sussex** 54:23 175:24
**sustained** 93:22
**Suzanne** 59:8 60:12
**swear** 134:12
**swept** 24:17
**swore** 100:12
**sworn** 116:14
**symbolic** 81:20
**Syracuse** 7:16 61:11,18
**system** 33:16 40:22 42:11 44:17,18 46:1 51:20 99:3 108:8 110:1,8,13 112:13,16 115:18 118:16 143:9 152:2 153:1 162:22 163:13
**systems** 118:5 133:18

---

**T**

**T** 210:7,7
**tactic** 91:24
**tactics** 10:19 83:18
**tag** 111:19
**taint** 98:18 111:3
**take** 14:12 15:2 19:12 23:10 24:13 25:11 30:10 50:23 59:3 82:7 92:20 94:3 103:11 107:17 110:3

112:23 124:9,10
124:10,18 130:18
131:15,23 132:6
148:8 150:16
165:3 166:19
168:17 171:11
176:18 193:24
207:17
**taken** 3:15 7:5
37:16 103:16
114:22 132:1
208:4 210:12
**takes** 39:8 155:12
155:13 170:5
**tale** 101:7
**talk** 5:12 46:21
49:5 52:13 59:13
60:12,13 89:15
125:5 136:21
137:23 168:5
169:15 175:11
178:24 179:4
182:1 186:18
201:7,14,21 203:1
203:8
**talked** 6:23 17:21
28:23 51:3 127:1
136:23 137:7,20
148:11 176:19
182:6
**talking** 37:3 54:9
55:10 75:13 77:16
77:17 91:19 101:8
107:3 120:3 121:7
128:14,15,16
163:10 175:10
193:17 199:24
200:10 201:15
203:2
**talks** 9:18
**tape** 1:1 34:3,4
72:4,5 109:3,4
144:6,7 176:5,6
204:5 208:15
**target** 32:18
**taught** 13:7,10
133:24 136:11
142:9 183:5

**taunt** 171:4
**taunted** 175:8
**taxes** 198:19
**teach** 177:9
**teacher** 13:3 55:13
**teachers** 16:16 20:9
60:10 107:22
142:10
**teaching** 135:17
**team** 8:1
**teams** 10:5
**technically** 29:16
189:19
**teen** 104:22
**teenager** 153:13
**telephone** 108:12
175:8
**television** 141:10
141:23 173:21
**tell** 5:4,6 24:5
39:23 51:16 60:18
62:15 69:5 76:13
81:17,17,18
101:23 107:5
112:10 113:19
121:6 122:20
123:17 136:24
137:7 138:7
142:24 143:16
147:1,10,12 149:9
149:18 156:2
157:15 166:13
170:18,18 175:15
175:22 177:4,14
177:14,15 191:12
**telling** 67:22 91:16
121:9 135:12,21
199:21 207:1
**tells** 137:8
**temporarily** 135:17
**ten** 15:7 19:23 48:2
54:22 71:12 84:13
85:17 87:22 88:5
88:12,15,16,22
98:16 101:10
129:10 143:1
175:10,12,15
183:13 184:16

**tenacity** 93:5
**tend** 52:3 188:1
**tendency** 179:3
**tens** 21:16 59:3
125:21
**tenure** 40:2
**tepid** 154:10
**term** 114:24
**terminated** 163:6
**terminology** 22:12
56:13
**terms** 3:11 71:6
86:8 104:15
**territory** 75:21
**test** 169:17
**tested** 169:23
**testified** 6:15 40:20
60:3 67:11 68:8
80:1 122:20
167:21 168:20
**testify** 29:20 59:8
59:19,21 89:11
91:12 141:12
196:3 201:2
**testimony** 6:14 9:6
21:4 26:5 32:20
147:5,9 152:9
169:8 176:17
190:2
**Texas** 203:7
**thank** 2:3,7 4:6,11
5:18,21 12:11,12
12:14 20:24 21:2
21:3,6,13 23:8,9
23:21 26:1,4 27:9
28:8 31:10 32:9
32:20,24 37:10
41:9 42:13 45:14
52:19 58:17 69:22
72:12,14 74:18
76:16,20 78:15
83:5,7 92:10,11
92:13 93:24 94:19
94:21,22 96:1,3,4
104:10 115:9
118:8 129:24
130:7,10,15,16,23
131:20,22 132:2,7

132:12,13 140:11
140:13,14 141:7
147:4,8 151:1,15
152:6,8,11,12
154:12,13,20
157:2,3,7,8,9,11
157:17 158:9
166:20 167:5,6
172:6,7 176:11,12
176:13 179:13,13
179:16,23 186:11
187:5 190:1 192:4
195:1 196:9
200:20 203:18
204:1,8 207:7,8
207:10 209:2
**thankfully** 96:24
102:12 129:8
**thanks** 21:4 93:3
192:4
**theirs** 62:10
**themes** 40:8
**therapist** 168:3
**thing** 9:5 37:23
41:21,23 45:18
53:4 82:8 85:24
86:10 116:13
129:16,17 134:4
135:6 138:2 139:9
139:13 140:5
148:12 150:2
152:1 156:22
160:20 165:18
178:19 187:9
193:9 199:16
201:3
**things** 34:17,18
41:14 43:19 50:4
52:3 53:2 57:10
60:11 63:3 70:23
79:5 82:2 83:21
88:18 102:11
122:13 129:17,18
129:19 131:12
136:9 139:7 140:2
149:16 153:1
167:22 169:19
171:5 180:2

182:23 185:16
187:12 193:10,14
201:22 208:4
**think** 3:18 5:13
10:11 12:15 23:22
26:5,6,19 27:5,15
29:1 39:8 40:3
41:4,10 42:11
43:6,9 44:10
45:15 49:21,21
51:6 55:22 56:16
57:24 60:6 65:7
66:3,9 68:22 71:1
74:1 76:15 78:8,9
79:10 80:1,11,16
80:21 81:6 82:12
82:19 84:23 87:15
92:7 96:6 99:20
99:21 106:17
109:19,23 110:8
114:4 120:13
122:14 123:2
128:8 131:5
133:22 134:6,17
134:18,19 137:1
137:20,22 138:3
145:1 153:20
159:1 160:9,22,24
161:7,20 163:3
165:17 168:2
169:1 171:1
173:17,18 174:2
176:23 177:15,22
177:23,24 178:13
178:22 179:7,8,8
179:12 180:24
188:16 195:22
196:11 200:9,15
202:8,8 206:15,16
206:17
**thinking** 121:1
**third** 10:17 106:18
169:17 183:9
**Thomas** 15:17
**thorough** 129:14
129:15 200:18
**thou** 134:19
**thought** 37:1,6

39:21 57:16,22
66:4 69:20 86:12
135:12 137:3
143:22 149:13
156:10,17 168:13
173:3 178:20
196:22
**thoughts** 40:17
**thousand** 9:17
120:12
**thousands** 6:6 9:9
16:3 21:17 125:22
**thread** 30:11
**threat** 205:15
**threaten** 205:22
**threatened** 121:2
127:2 153:8
**three** 6:13 8:7 9:6
12:17 49:1,3 50:9
61:20 72:24 79:11
79:16 92:7 97:17
125:18 132:24
136:13 180:1
184:20 196:16
197:7,7 198:3,4
**throw** 52:3 66:7
98:3 189:14
200:19
**throwing** 52:1
**thrown** 24:20
172:17 199:18
**throws** 138:14
**time** 3:7,11,13,14
3:18,22 4:3 5:3,15
5:19 7:18 11:13
12:4,19 14:17
15:23 20:1,1,17
21:10 26:9 34:10
36:24,24 37:3,5,8
38:13 39:4 47:8
50:4,4 54:20 61:1
61:21 63:19 66:14
75:5 82:16 88:19
88:21 89:1 92:22
97:16 100:5
105:14 106:6
108:22 118:24
124:7 132:6,9

133:21 136:6
139:12 140:11,12
140:16 141:23
143:21 144:16
145:2,8 149:18
151:7,18 153:7
156:11 157:8
160:14 164:4,16
165:9 168:16
183:14 184:6
187:18 188:9
190:19 208:7
**timeframe** 97:8
127:14 128:10
188:12
**timeline** 112:2,6
**times** 4:17 14:10
34:16 39:21 72:7
85:9 148:21
165:13 171:5
184:20 189:17
192:1
**time-tested** 98:20
**timing** 119:1
**tiny** 166:6
**title** 1:6 84:18 88:8
124:8
**titled** 86:24 90:4,6
90:7
**today** 3:18 4:11
5:16,22 10:17
12:16,17 13:12,14
13:22 21:6,14
28:11 32:21 41:9
42:18 55:10 58:10
59:13 71:20,21
81:5 92:12,16,17
94:1 100:7,8
101:16 102:5
103:11,16 104:16
105:2 106:4,12
108:3,8 111:7
112:23 113:3
132:10 137:21
139:24 146:18
148:11 152:8
155:9,19,23 156:4
156:14 157:14

160:14 164:8,11
164:16 168:7
176:13,22,23
177:3,6,10,13,13
177:16 179:8,20
180:2,15 187:20
199:21 207:5,19
208:23
**today's** 166:2
**Tokyo** 174:11
**told** 6:18 7:1,21
8:16 24:3,6 29:3
31:17 67:11 121:2
126:9,10 136:5,15
143:2,2 144:20
156:12 180:20
**tolerate** 12:6
**tolling** 18:12
**Tom** 5:19,21 67:10
67:14 122:20
**tomorrow** 22:7
70:18
**Tony** 21:11 32:22
32:22,24 33:1
34:5 37:2,11 39:7
39:14,17,23 40:19
42:5 43:1 44:4
45:6,17 50:15,17
51:15 52:11,20
56:10,15,19 57:1
57:5,9 58:8,13,18
59:17,20 60:19
61:15,24 62:8
63:2,10,13 64:5
64:10 65:1,4,11
65:20 66:9,19
67:3,8,16 68:3,6
68:15,20 69:3,6
70:4,12 72:17,19
72:22,24 73:7,10
75:20,24 76:3,12
77:13 83:11 84:23
87:10,17 88:7,10
88:15,20 89:5
90:1,7 92:13
116:24 122:2
**top** 183:12,20
208:13

**topic** 176:22
200:17
**topics** 109:21
**tort** 24:24 40:22
42:11 163:8
**torts** 41:5 163:4
**total** 9:24 88:2
**totally** 124:24
**touch** 142:4
**touched** 178:18
**touching** 29:13
142:7 177:9,10
**tough** 187:9 189:17
**tour** 105:12
**to(inaudible** 64:8
**to-your-obituary...**
111:12
**track** 49:24 71:15
165:7
**trade** 18:22
**tradeoff** 118:5
**traditionally** 183:4
**trafficked** 20:4
**trafficking** 18:21
**tragedies** 112:4
125:8
**tragically** 6:7
**trail** 17:15
**train** 60:8
**trained** 162:5,6
**training** 20:10 61:7
65:24 68:10
104:20
**transcribed** 1:17
**transcript** 210:12
**transferred** 9:1
135:16
**transfers** 86:9
87:10
**transient** 57:24
**trash** 66:8
**traumatic** 103:1,14
103:17 104:7
187:20
**travel** 116:19
**Travelers** 185:19
**traveling** 181:24
**travelled** 122:21

**travels** 114:22
**treasure** 5:23,24
6:2
**treat** 142:5 163:13
**treated** 71:6
**treatment** 38:13
156:5 175:16,18
**tremendous** 22:21
**trial** 16:22 17:4
41:22 83:16,18
85:17 86:2 87:3
89:11 98:24 124:5
151:9 162:19
**trials** 47:9 85:16
134:5 163:6
**tricky** 170:11
**tried** 142:16 143:23
**tries** 81:20
**trip** 70:3,16,18
129:7 152:9
**trips** 169:18
**trivial** 167:23
**troop** 126:8 129:1
**trooper** 59:21
**troops** 158:12
**trouble** 22:24
170:19
**troubling** 20:1
51:11 118:15
**true** 36:22 38:5
45:7 54:18 64:9
83:13 110:15
127:7 144:23
161:22 172:16
199:22
**truly** 20:21 23:7
153:6 179:12
**trust** 105:18 109:7
109:15 152:24
158:8 202:13
**trusted** 14:18 23:8
142:8
**trustworthy** 143:12
**truth** 119:10
135:12,21
**try** 24:20 28:9 30:6
30:16 44:7,9
45:13 51:21 70:10

83:21 110:2,3
123:12 139:20
149:16 151:6
177:7 195:16
**trying** 10:1 22:24
24:15 29:10 39:5
39:7 43:16 46:16
50:23 65:16 74:23
75:10,15 83:23
84:1,4 110:11
112:3 113:23
117:22 128:21
144:12 151:8
161:14 174:3
176:20 193:15
**Tucson** 17:1
**Tuesday's** 207:19
**tuition** 55:6
**Turlish** 12:23,24
13:2
**turn** 23:12 84:10
84:11 94:10
173:20 179:11
**turned** 30:4,5 88:9
**TV** 179:11
**two** 6:9,18 8:21
39:8 49:16 52:2
53:7 54:7 59:7
66:10 70:22 76:23
78:8 91:4 97:16
97:19 100:11
101:2,3 102:8,22
104:12 109:20
123:1,1,3,7 127:6
127:19 132:21
136:18 153:13
180:2 181:22,23
182:12 188:3
190:11 192:20,23
203:7
**two-page** 129:12
**two-year** 10:11
11:14 36:5 64:22
64:24 102:24
127:16 153:4
163:22 187:13
**type** 24:16,19 29:20
77:2,3 133:23

177:7 194:11,12
202:21
**types** 204:16
**typically** 34:9
54:10 118:17
**T's** 185:6

— **U** —

**Uh-huh** 68:20
**ultimate** 191:22,24
**ultimately** 3:20
160:7 205:6
**Um** 95:10
**umbrella** 159:17
183:7,10,13,20
184:4,9 193:2
**umpire** 129:11
**UN** 19:1
**unaffiliated** 105:5
**unamended** 128:13
161:2
**unanimously** 63:6
64:3 123:11,12
**unavailability**
35:17
**uncles** 168:22
**uncomfortable**
201:3 205:8
**unconscionable**
19:3
**uncooperative**
143:11
**undeniable** 49:4
55:22
**underlying** 90:18
183:18
**undermines** 35:3
**undermining** 92:3
**underneath** 81:9
**underreported**
173:4
**understand** 3:9
25:9,10 27:6
40:15 41:15 42:19
51:23 68:18 74:15
93:13 138:20
140:21 147:9
153:11 157:12
163:3 168:10,14

182:5,18 187:12
188:16 190:14
192:12 193:18
202:4 206:14
**understandably**
38:23
**understanding**
30:19 31:8 201:1
205:5 208:5
**understood** 33:6
189:22 196:23
**undervalue** 45:2
**underway** 102:23
**underwriter**
194:16
**underwriting**
185:7 186:22
**undisputable** 47:7
**undo** 98:18
**unemployable**
124:20,21
**unequal** 117:18
131:8,10
**unfair** 10:12
117:18 131:8,10
**unfairly** 97:9
127:12 162:16
**unfairness** 128:16
**unfortunate** 74:2,6
**unfortunately** 3:4
33:11 106:11
153:22 172:15
**ungodly** 90:21
**Unh-unh** 198:5
**unindicted** 12:2
**unintentionally**
106:8
**unique** 197:22,22
198:1
**unit** 98:23
**United** 9:10 18:24
19:3,15,17 20:6,7
20:13 117:20,23
119:3 122:22
138:16 199:2
**University** 152:21
**unjust** 153:5
**unknowability**

102:16,19 103:20
127:19
**unknowable** 102:9
102:10
**unlimited** 38:18
41:18
**unmistakable**
100:15
**unofficially** 132:16
**unprecedented**
187:14
**unquestionably**
45:7
**unring** 110:16,16
**unspeakable** 6:12
**unusual** 128:1
**unwittingly** 172:4
**upgrading** 14:7
**upheld** 118:5
**urge** 22:2,19
119:20 171:23
**urging** 77:15 111:5
**use** 40:9 54:19 71:4
93:12 111:24
147:3 159:23
199:9 205:14
206:5
**uses** 54:24 115:1
**usual** 191:16
**usually** 159:9
170:12 182:17
**U.S** 163:5

— **V** —

**valid** 61:14 103:19
**validation** 93:21,21
**Valihura** 2:1,24 3:1
5:18,22 12:12
21:2 23:9,16,20
26:2 27:11,19,24
28:8,16 31:11
32:10 36:21 37:10
39:2,12,15,18
40:7 41:6 42:13
45:15 50:3,16,21
51:23 52:19 56:3
56:12,17,24 57:3
57:7,21 58:9,17
59:14,18 60:15

62:4 66:21,24
69:14,19 72:12
73:23 74:15 76:8
76:18,21 78:12,16
80:24 81:1,22
83:5 92:10,14
93:2 94:21 95:1,7
95:11,15 96:1,5
96:12 99:6,19
101:23 102:4
104:10 108:1
109:19 113:9
120:1 124:17
126:12,16,19
129:4 130:7,11,15
131:22 132:2
140:14 141:1,5
147:8 151:2,12,15
152:7,12 154:13
154:18 157:3,10
160:9 166:20,24
167:5 172:7,18
173:11 174:2,5
175:1 176:9 178:7
178:10 179:15,19
180:19,23 181:4,7
181:11,15 186:9
187:5,8 188:14,20
189:4,20 192:2
194:24 195:19,21
196:2,11 200:16
200:24 201:6,10
201:24 202:7,22
203:19,23 204:3,8
204:22 205:21,24
206:12,20 207:2,7
207:11,23 208:2
208:10,20
**valuable** 5:23
**value** 44:16,20 45:3
194:4
**vantage** 97:3
119:19
**variety** 96:19
162:16
**various** 208:19
**vary** 93:10
**vast** 9:15 54:3 56:5

165:19
**vehicle** 74:11
**vein** 117:5
**vengeance** 93:20
**verdict** 43:2 50:1
**verdicts** 51:3
**versus** 51:2 56:11
　85:1 114:7 193:17
　194:18 195:16
**vestments** 84:22
**vetted** 3:15
**viable** 47:17
**vibrant** 205:19
**Vicar** 101:14
**vice-president**
　157:23
**vicious** 7:7 170:7
**victim** 9:17 34:7
　38:8 39:22 43:11
　45:9,23 51:18
　62:9 65:15 70:7
　77:1,1 85:17,22
　93:22 98:11 105:1
　105:3,6,18 108:17
　118:3 120:14
　127:2 154:23
　155:13 156:1,8
　169:17,23 170:1
　170:17,18,20,21
　171:14,18,22
**victimization** 170:5
**victimize** 170:5
**victimized** 4:21 5:3
　23:7 46:11 58:2
　104:18 169:9
　170:20 171:7,19
**victims** 4:17 6:14
　8:11 10:9,18
　11:18 13:15,16
　15:19,21 16:15
　17:9,13 19:5,8
　26:21 33:13,22
　34:9,18 35:13
　36:7 38:4,7,10,14
　38:15,19 39:1,9
　43:22 45:19 49:8
　51:21 53:18 54:4
　55:2,20 56:20

57:16 58:14,15
62:21,23 75:12
78:5 83:24 85:15
85:20,21 86:4,7
89:21 91:5,21
92:2 93:23 107:1
112:21 117:16
119:16 120:16
121:20 128:10,14
128:14,20,23
143:14 144:1,10
145:5,9,12 146:8
146:11,13 153:10
155:2,3,20,20
156:8 166:3,10
169:6 177:3
**victim's** 166:15
170:15
**Vietnam** 36:3,23
**view** 25:11 45:11
51:18 158:3,3
160:12 174:7
**viewed** 37:12 205:3
**vigorous** 50:6
**Vild** 180:14 188:21
202:1 204:3,6,6
204:13 205:8,23
206:2,15,21 207:4
207:8,9,10
**vindicating** 180:9
**violation** 16:10
17:19
**violator** 97:23
**VIP** 136:1,2 137:19
**visit** 139:17
**visited** 105:12
139:18,21
**visiting** 104:22
106:2
**visits** 142:6
**vivid** 34:21
**vocabulary** 111:23
112:9
**voice** 8:11 13:17
132:15 137:13
166:15
**voluntariness**
40:12

**voluntary** 40:13
41:17
**volunteer** 61:7 70:3
72:1,1 97:1
129:11,15 185:8
186:19
**volunteers** 20:10
22:5 30:2 60:10
69:24 129:20
**vote** 5:16 6:3 51:5
93:7,8 112:18
119:23 131:2,2
154:11 156:22
**voted** 167:3
**vulnerability** 169:5
169:12
**vulnerable** 5:4
81:12 107:24
143:15 169:8

──────────

**W**

**Wagner** 3:2
**wait** 186:1 207:3
**waiting** 39:10
**waive** 80:11
**walk** 71:21 72:2
155:17 156:20
174:15
**walking** 155:15
**Walsh** 140:20
167:7,8,9 172:15
172:21 173:15,19
174:4,9 175:3
176:7,15 177:17
177:21 178:2,9,12
179:17,18
**want** 2:3 3:9,22,24
21:4 32:10 38:1
39:20 41:13,13,14
41:21 46:5,9
53:19 55:8,19
56:10,21 59:6
60:20 62:24 69:15
71:14,14,15 74:8
74:9 75:7 83:8
91:10 92:7,20
124:6,7,17 130:12
132:5 134:14
138:20,21 139:8,9

139:9,10 140:7,8
140:9 156:12
157:10 185:14
187:12 188:15,22
193:13 194:1
195:17,24 201:21
204:24
**wanted** 3:3 4:4
38:15 74:16 76:16
122:2 151:12
156:12 157:6
158:10 167:24
189:21 191:16
**wants** 8:23 137:8
**War** 36:3 37:4
**warehouse** 189:12
**warn** 144:19
**warrant** 145:12
**warranted** 142:9
**Washington** 13:10
46:24 83:9
**wasn't** 60:23 61:22
62:3 66:12 69:2
71:11 74:14 75:22
76:5,6 129:2
145:7 149:17
196:9
**watch** 67:4,5,7
169:6 174:15
**watched** 106:24
**waving** 126:18
**way** 22:9,9,10
24:18 28:5 29:14
32:1 35:13 40:5
40:11,23 42:11
52:12,16 60:5,8
73:15 77:14,18
80:19 82:20 88:1
95:20 102:12
107:9,17 108:18
115:15,15 125:7
129:18,19,20
133:21 138:23
142:7,12,22
144:18 163:22
164:21 169:15
170:11,16 185:16
188:4 193:24

194:7,10 201:11
201:16 202:13
205:20 206:2
**ways** 40:24 41:1,4,5
42:7,12,12 51:1
60:7 126:2 142:21
162:16
**weak** 154:10
**weaken** 10:2
**wealth** 6:1 88:6
**wealthy** 145:23
**website** 166:15
**week** 28:14 67:9
**weekend** 2:5,7
146:1 180:14
**weekends** 104:21
106:1
**weeks** 6:13 9:6
47:10 79:11,16
145:18
**weep** 175:5
**weighed** 144:11
**weight** 206:6,9
**weighted** 57:19
**welcome** 5:20 23:5
70:10 176:15
179:18 204:2
**Weldon** 140:13,19
157:18,19,21
166:22 167:2
190:2
**welfare** 12:10
19:11 125:1
**well-intended**
100:17,21
**went** 41:24 47:1,15
71:23 90:24
129:20 136:7
137:15 139:3,3,5
149:24 175:15
**weren't** 109:24
147:22,23 192:10
203:17
**wet** 189:13
**we'll** 44:6,9 45:13
69:17 82:16 84:17
124:8 140:18
146:18 196:5

204:20 207:2
**we're** 2:2 27:6
32:12 38:6 39:7
44:8,11 45:7,15
45:20 49:19,20,21
51:19 52:7,9
55:10 56:22 57:17
68:9 77:16,17
84:9,16 113:23
115:18 117:21
128:14,15,16,21
130:18,19 131:23
140:15 142:9
158:23 161:2
163:9 176:22
177:7 181:2,7,20
184:23 187:9,11
187:23 190:23,23
200:10
**WHEREOF**
210:14
**white** 79:13,14
**Whitwell** 9:20
**whoa** 169:21
**whom's** 101:2
**Whoopee** 136:3
**widen** 127:14
**wife** 71:23 129:5
133:11 136:4,9,10
**wife's** 194:2,2
**WILCOX** 1:21
**wildly** 103:9
**William** 141:19
**willing** 38:24 53:20
132:23
**willingly** 172:3
**willingness** 155:17
**Wilmington** 1:22
7:19 13:3,6,7,13
20:5,13 33:10
38:9 46:10 48:24
52:21 53:7,13
55:4 60:22 76:11
96:17 121:18
124:20 135:18,24
136:3 137:4,17
152:17 161:11
166:8 167:16

**window** 11:7,14
12:2 15:19 16:15
17:12 36:11 57:12
57:14 107:20
144:10 145:20,21
146:5,10,15 188:8
188:10
**windows** 9:12
189:18
**winter** 107:6
**wish** 111:22
**withdrew** 26:23
**witness** 64:19
103:23 120:20
130:10,13 167:20
210:14
**witnesses** 35:17
36:19 59:7 106:7
118:18 119:7
120:4,4,6 143:12
**woman** 99:5
**women** 18:21 19:2
20:3 169:5 174:18
174:21,23 175:4
175:12,15
**Women's** 176:3
**won** 85:17
**wonder** 62:21
106:15 162:17
**wonderful** 2:5
168:4
**wondering** 170:17
172:11 202:24
**Wood** 13:8
**woodwork** 138:6
**word** 40:10 71:4
97:22 98:8,9
100:21 111:20,23
111:24 133:15
134:1 162:1
205:15,15
**words** 8:18 28:6
74:8 111:18,23,23
131:12 159:23
164:14
**work** 22:21 23:5,6
30:7 31:21,22

72:9 77:10 91:11
124:23 136:16
141:10 148:13
151:10 158:22,24
165:3,22
**worked** 115:19
160:24 165:18
186:19
**workers** 178:5
197:15,16,22
198:3 199:6,15,20
199:22
**working** 10:4 31:21
112:17 115:22
171:24
**works** 180:24
201:16
**workshops** 20:10
**world** 19:4,20 37:4
67:18 85:20 116:6
122:22 133:19
141:22 181:3,21
203:7,12 206:18
**world-wide** 114:21
**worried** 112:12
164:8
**worries** 161:20
**worry** 106:15,16
**worse** 173:17
**worst** 145:3 152:1
168:4 170:15
174:2
**worthy** 110:1 113:1
118:3
**wouldn't** 25:6
58:10 75:7 131:19
140:3 144:2
156:17 160:20
177:4 186:17,18
191:1
**wrenching** 17:23
**write** 72:21 73:6,8
73:11,13 139:19
183:24 184:16
185:22 197:8
198:20
**writes** 184:9
**writing** 74:24

116:3 119:1,2
**written** 8:9 11:20
22:3,12 28:5 75:2
77:3 80:3 155:11
155:20,23 190:20
194:8
**wrong** 126:10
134:2 149:20
170:19 177:11,14
179:3,10
**wrongdoing** 162:7
164:14
**wrongfulness**
103:3
**wrongly** 97:13 98:7
104:12,13 119:22
**wrongly-accused**
119:19
**wrongs** 125:8
**wrote** 10:9 72:24
119:3 180:2
**wrought** 101:17
**www.wilfet.com**
1:24

——————
**X**
**X** 29:4 194:6

——————
**Y**
**Y** 29:4 184:11
**yeah** 29:23 59:17
64:1 65:1,4 67:16
88:7 126:21 128:3
138:22 150:3,8,20
151:10 172:20
178:21
**year** 3:17 8:17 12:3
16:4 17:24 34:13
50:18 53:5 73:11
73:12,12,17,19
75:19 88:3 104:18
104:24 105:8
110:17 117:1
122:2 125:19,19
127:15 153:12
161:10 162:15
167:13 190:19
192:23
**years** 4:15 6:9 7:17

9:4 10:10 13:5,19
15:8,9 17:14,21
18:2,13 19:23
20:12 22:6,8
24:22 26:8,17
27:17,17 29:19
30:3 31:13,22
32:2 34:10,15
35:20 36:15,16
37:7,14,16,18,19
37:22 48:11 50:9
54:6,7,23 64:19
65:7,8,9,16,18,18
65:19 66:14 71:12
80:9 81:10 82:9
82:10 96:18 97:4
98:16,17,17
100:11 101:3,10
101:12 102:9,15
102:18 103:5
104:9,19 105:10
105:14 106:3,5
107:11,15,19
115:12 120:17
121:15,21 122:3
123:15 125:8,18
127:2,4,5,6,19
129:10 133:7,22
134:10 136:10,15
137:15 139:4,5
141:9,17 142:11
142:19 143:1
146:20 149:13
152:4,5,17 153:14
156:2,10 160:10
160:17,24 161:22
164:11,15 167:24
173:22,23 174:20
178:15 182:16
183:2,9,22 189:14
197:5,17 200:8
**year's** 164:23
**YMCA** 125:17
129:2,15 157:24
158:9,10,15 165:5
166:12,21,23
**YMCAs** 158:8
**York** 7:16

**young** 15:12 62:18
105:11 115:20
128:12 145:15
153:13,24 173:6
177:1,2,8,13
**younger** 107:10
145:23 174:6
**youngest** 65:15
**youngster** 143:3
**youngsters** 173:21
176:20 177:10
**youth** 21:17,20
22:22 48:16 105:9
116:8,10 129:20
134:13
**youth-serving**
158:1,5 160:3
165:19

---

**Z**

**Z** 29:4
**zoo** 72:2
**Zutz** 180:24 181:13
181:18 202:12
203:13
**Zutz's** 201:8,10

---

**$**

**$100** 49:8
**$100,000** 9:21
54:11
**$15,000** 48:7
**$20,000** 23:20
**$225,000** 50:19
**$250,000** 91:4
**$270,000** 48:6
**$50,000** 54:10
**$500** 191:17
**$500,000** 193:1
**$750,000** 145:24

---

**0**

**03** 139:5

---

**1**

**1** 34:3,3,4,11 36:13
72:4,5 73:6,16,17
74:1,3,4 75:2
109:3 144:7 176:5

210:11
**1.2** 53:10
**1.3** 53:16
**1.5** 48:7
**10** 1:6
**10th** 59:7 180:1
181:23
**100** 49:2 54:10
128:23 140:1
176:4 197:4
**100,000** 185:2
**11** 16:23 17:3 47:22
47:23 83:16,18,20
85:1,4,5 89:10
99:8,9,13,15,21
101:1,18 106:22
175:3
**11th** 116:1
**12** 5:13 120:17
122:3 126:5
141:17 149:13
156:2,10
**12-step** 156:5
175:17
**12-year-old** 167:23
174:14
**124** 109:13,14
**13th** 2:17 116:2
**130** 86:2
**1330** 1:22
**14** 145:23 154:24
173:21 174:12
**14-year-old** 169:19
**144th** 11:16
**15** 7:1 39:24 57:10
103:2 136:10
140:2 173:21
174:3 175:10
184:16
**15-year-old** 174:12
**150,000** 11:20
**16** 103:2
**16th** 2:19 210:15
**17** 89:17,19 90:12
90:13,15,16,24
91:22 103:3
**170-RPR** 210:21
**176** 47:16

**18** 107:15,19 127:2
127:4 134:21
136:14
**19** 47:9 103:5
**1931** 22:6
**1950** 32:15
**1956** 101:13
**1960s** 57:20 62:17
141:24
**1960's** 54:12
**1962** 36:13 179:5
**1964** 151:21
**1965** 71:11
**1966** 62:12
**1967** 160:20
**1970s** 54:12
**1970's** 54:13
**1973** 126:11 129:2
**1975** 36:13
**1976** 151:5
**1978** 54:1 56:16,18
57:6 75:9
**19801** 1:22
**1983** 13:6 36:1,5
**1985** 115:13 163:5
**1987** 35:21 38:6,7
38:12 40:14 56:6
56:8 63:20 65:8
75:7 117:1,7,8
123:4,5 131:7
**1990** 19:16
**1992** 63:19
**1993** 61:18 62:1,14
**1994** 19:19 60:20
**1995** 69:10
**1997** 19:22 199:15

---

**2**

**2** 34:4 72:4,5 73:9
73:20 74:1,10
75:2 78:17 109:3
109:4,4 131:4
144:6,6 176:6
**2nd** 18:24
**2,000** 122:23 123:1
**20** 15:7 18:13 26:16
31:13 35:20 37:22
47:21 65:7 71:24
82:9,10 85:18

96:18 98:17
101:10 120:17
164:11
**20,000** 23:19
**20-year** 26:19
**20-year-old** 174:3
**200** 47:16 49:1
**2000** 67:8
**2002** 18:3 19:18
20:17 61:2,19
67:9 116:1,2
135:23 143:1
**2003** 69:10 108:24
109:9 144:1
**2004** 109:9
**2007** 1:16 18:24
32:14 101:20
127:15 136:17
145:18 160:19
163:9 210:15
**2008** 101:21
**2009** 210:22
**21** 36:16 65:7,17
145:22
**21st** 129:9
**210** 210:11
**22** 35:20
**225-year-old**
163:12
**23** 48:11 109:6
**24** 53:12 109:2
**241** 109:12,12,14
**25** 32:1 34:14 37:14
109:5 153:24
199:8
**25-year-old** 174:14
**250,000** 50:7
**263** 109:10
**27** 142:24
**270** 48:9
**28** 37:18
**29** 1:6,16 4:12 5:16
10:2,21 13:17,24
14:1 15:21 16:19
17:12 20:24 21:19
33:15 35:7,12
36:8,17 38:22
78:4 79:20 80:3

82:23 93:7 94:3
97:7,20 99:2
104:13 105:17
106:9 107:24
118:13 119:15,20
119:23 127:21
128:22 141:4,12
152:19 154:3,11
156:7,22 159:17
180:5 208:11,11
208:13,17

---

**3**

**3** 144:7 176:5,6
**30** 15:7 22:6,8 26:8
27:17 30:3 32:1
66:14 101:10
104:19 105:10,14
106:3,4 122:2,4
123:15 161:22
164:15
**30s** 5:12
**302** 1:23
**31** 210:22
**31st** 88:22
**33** 107:11
**34** 31:22
**35** 198:10
**36** 8:5
**3800** 199:2,4

---

**4**

**4** 131:24
**4-0** 57:1
**40** 15:7 22:6 24:22
26:8 27:17 32:1
37:19 56:22,24
66:14 75:8 105:1
115:12 134:10
146:2 152:4,5
198:11
**40s** 129:19
**40-year-old** 104:16
**41** 9:18 43:2 155:6
**43** 65:9,13,16,18,19
121:21 122:1,4
141:9
**44** 152:17
**450** 34:12 38:22

---

50:18 73:14
**47** 89:1
**48** 47:19 109:1
  133:22 139:24
  140:1

**5**

**5th** 2:13 145:18
**50** 13:5 22:6 24:22
  26:8 27:17 29:19
  37:7 64:18 71:24
  85:16 101:12
  136:14 160:17
  184:9,15
**50s** 106:12 129:18
  129:21
**50,000** 54:10 185:2
**50-year** 7:15
**50-year-old** 104:4
**500** 199:4
**500,000** 184:17
**51st** 19:1
**52** 121:15,21
**56** 47:9,16
**57** 101:13

**6**

**60** 104:9
**60s** 129:21 151:20
**60-year-old** 79:13
  79:14
**65** 4:16 151:21
**655-0477** 1:23
**66** 4:16 63:6,15
  123:6

**7**

**7** 16:24 36:13 83:19
  85:1,2,5
**70** 29:19 53:4
**70s** 57:20 100:9
  129:21
**73** 53:5
**75** 27:17
**750** 199:4
**77** 151:5 178:15
**78** 7:17
**79** 163:8

**8**

**80** 163:7
**80s** 100:9 129:21
**800,000** 186:7
**87** 49:8 63:5 71:11

**9**

**90s** 151:22,22
**95** 42:22
**97** 199:20



In The Matter Of:

# House Judiciary Committee of Delaware

Audiotaped Hearing - Act to amend Title 10 of the Delaware Code

Senate Bill 29

June 19, 2007

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Tape Recorded Hearing

Before the House of Representatives of Delaware

IN RE: SENATE BILL 29: An Act to amend Title 10 of the
Delaware Code by removing the statute of limitations for
civil suits relating to child sexual abuse and adding
related provisions regarding such suits.

The following is an audiotaped hearing before
the House Judiciary Committee held on June 19, 2007,
transcribed by Elaine G. Parrish, RPR, CRR.

WILCOX & FETZER

1330 King Street - Wilmington, Delaware  19801

(302) 655-0477

www.wilfet.com

Page 2

1    SPEAKER OF THE HOUSE: We're getting ready
2  to debate Senate Bill 29, and as all of us know in this
3  chamber it's a very emotional issue. There will be some
4  testimony today that will be very emotional, very
5  graphic, perhaps, and what we ask is that we all - and I
6  know I don't have to tell this chamber that because
7  that's how we operate almost a hundred percent of the
8  time - but I would ask that we be courteous to each
9  other, courteous to the witnesses, and be patient as we
10  work through this debate. You all know that this is not
11  going to be a 15-minute Bill.
12    We're going to try to restrict the comments
13  to what's pertinent to the Bill and we'd ask that we try
14  to refrain from repeating comments that the previous
15  speaker or witness has made so that we can do this
16  expeditiously as possible, yet give it the time and
17  proper vetting that obviously this Bill deserves. We
18  have -- both caucuses have talked about the Bill at
19  length in caucuses, and so I would ask that we comply
20  with those things I just mentioned.
21    So with that, sir, I'd like to yield to
22  Representative Hudson to work Senate Bill 29.
23    The Honorable Representative Deborah
24  Hudson.

Page 3

1    REPRESENTATIVE HUDSON: Thank you,
2  Mr. Speaker. Could I have Senate Bill 29 read in for
3  the third and final time, please?
4    SPEAKER OF THE HOUSE: Mr. Clerk.
5    THE CLERK: Mr. Speaker, Senate Bill number
6  29 sponsored by Senator Peterson and Senator McBride,
7  Representative Hudson and Representative Lavelle and
8  other Senators and Representatives, an act to amend
9  Title 10 of the Delaware Code by removing the statute of
10  limitations for civil suits relating to child sexual
11  abuse and adding related provisions providing such suits
12  regarding such suits.
13    Mr. Speaker, this constitutes the third and
14  final reading of Senate Bill number 29 by title only.
15    SPEAKER OF THE HOUSE: Thank you,
16  Mr. Clerk. Senate Representative Mrs. Hudson.
17    REPRESENTATIVE HUDSON: Well, thank you,
18  Mr. Speaker. Senate Bill 29, as a reminder to everyone
19  in here, does three things: First, it repeals the
20  two-year civil statute of limitations in child sexual
21  abuse cases; second, it provides a look-back period
22  during which victims whose cases have previously been
23  barred by this current ridiculous two-year statute of
24  limitations that they can come forward and sue their

Page 4

1  abusers, and they can sue any legal entity if there is
2  gross negligence; and, third, it permits a person or a
3  legal entity who has been falsely and maliciously
4  accused of child sexual abuse to recover attorneys fees.
5    Now here is just a couple quick facts to
6  get the tone of the Bill. Why do we need this? Why
7  have we been talking about this so much? One in five
8  children are sexually abused. That's one in four girls
9  and one in six boys. The average age of a sexually
10  abused child is nine. One quarter of female victims
11  were abused at age five or younger. Nearly a third of
12  all rapes in the United States are committed against
13  girls younger than 11. 20 percent of them are raped by
14  their own fathers.
15    Child sex abuse is rarely a one-time
16  occurrence. The abusive relationship usually begins
17  when a child is between six and eight and lasts for four
18  years. Although girls are sexually abused more than
19  boys, boys are more likely to die or to be seriously
20  injured from their abuse.
21    Now what do we know about the molesters?
22  We know that 85 percent of these cases involve family
23  members or friends and relatives. Less than ten of
24  these cases involve teachers or clergymen, and

Page 5

1  interestingly enough, the typical child molester turns
2  out to be a Caucasian, heterosexual, married man who
3  considers himself to be religious. On average he will
4  molest between three and 12 children and will average
5  seven to 71 acts of molestation.
6    Some of my colleagues asked that I not
7  bring out the gory details but how can you feel good and
8  work hard on a Bill unless you know the terror behind it
9  and that's why I want to bring this up and that is why I
10  wanted to first start with a witness on this Bill that
11  is a victim.
12    REPRESENTATIVE CATHCART: Mr. Speaker?
13    SPEAKER OF THE HOUSE: Yes. Representative
14  Cathcart.
15    REPRESENTATIVE CATHCART: Before we get
16  into the witnesses I failed to mention something. I
17  know that typically we work the amendments first and we
18  thought for the efficiency of time that we would bring
19  the witnesses up first and then we'll come back and work
20  the amendments. So just let me mention that before
21  someone else does.
22    REPRESENTATIVE HUDSON: Thank you.
23    SPEAKER OF THE HOUSE: Thank you.
24    REPRESENTATIVE HUDSON: That was a good

2 (Pages 2 to 5)

ab4133f8-bb59-4df3-96be-10511ba04c14

A249

Page 6

1  idea. So to follow up on my discussion about why we're
2  here and what the terror is and why we as legislators
3  need to pass this law. I would like to bring a victim
4  who lived in Delaware but has now moved to Florida but
5  yet he drove here today to speak and his name is Mr. Rob
6  Quill and make sure you come to the podium and make sure
7  you talk closely into the mic because there is so many
8  people here in the room and we want to hear you.
9        SPEAKER OF THE HOUSE: Welcome to the
10 chamber, sir. If you would give your name for the
11 record.
12        MR. ROBERT QUILL: Mr. Speaker, Honorable
13 members, my name is Robert Quill. I'm 52 years old and
14 I currently live in Marathon, Florida and have come here
15 once again to Delaware at my own expense to testify here
16 today. I was born and raised in Wilmington, Delaware.
17 My family lived in and were members of the St. Elizabeth
18 Parish. I attended St. Elizabeth Schools and graduated
19 from its high school in 1973. My last job was as a
20 supervisory staff attorney for the United States Court
21 of Appeals for the 11th Circuit located in Atlanta,
22 Georgia. I had been employed as a lawyer by the court
23 for 15 years before retiring on disability.
24        I was placed on full permanent disability

Page 7

1  status by my psychiatrist in 2002 after a diagnosis of
2  severe post-traumatic stress disorder syndrome which was
3  a direct result of the many years of sexual abuse I had
4  been subjected to at the hands of the Roman Catholic
5  priest, Francis G. DeLuca. The sexual abuse began in
6  1968 when I was only 13 years old during a week-long
7  summer alter boy trip to the beach at Wildwood, New
8  Jersey. The abuse continued intensely for many years
9  thereafter. The gory details I will leave out here
10 today but leave them to your imagination. Suffice it to
11 say, this man haunted my entire adolescence, invaded and
12 violated my private parts, invaded and violated my most
13 private moments, events and functions of my life. He
14 invaded and violated my mind and soul. While I am
15 incapable of recalling exactly when the actual sexual
16 abuse finally stopped, its effects never ended. I know
17 that the residual effects profoundly damaged the
18 relationship I had with my parents as well as with my
19 brothers and sisters. Moreover, it led to my decision
20 to move away from Delaware 30 years ago.
21        For over 30 years I have lived with these
22 memories isolated in the deep recesses of my mind.
23 Somehow my psyche learned to lock them away and
24 quarantine them. This was the only way I could cope

Page 8

1  with these unspeakable almost unimaginable experiences
2  of my adolescence. I am here to tell you that I am not
3  a whole person and never will be. I'm unable to form
4  the simple human relationships that whole people take
5  for granted. Without the basic confidence which is so
6  profoundly absent in victims of childhood sexual abuse I
7  fail the most basic social interactions and
8  relationships that in life tend to make all the work
9  worth the effort. I live alone, and, indeed, it is
10 nearly paralyzingly difficult for me to be here today.
11        In a bitter irony, no matter how hard I
12 worked, no matter how professionally successful I
13 became, despite my best efforts, in nearly all matters
14 not related to my work I suffered through unending years
15 of blistering and humiliating social experiences picking
16 my way through life pretending I was okay. In reality I
17 was one of the walking dead, a mere bystander to life.
18 A sense of unworthiness and doom overtook me with
19 recurring bouts of depression leading to a nausea for
20 life that eventually became unbearable. Spirit broken,
21 I stopped believing and just stopped functioning.
22        No longer able to make sense of my life I
23 was fast approaching a decision to end my life as this
24 would be the only relief I would get from a fractured

Page 9

1  and tortured psyche. It turns out that the priest who
2  sexually abused me is a prime example, perhaps the
3  touchstone for exactly why this legislative body should
4  pass the Child Victim's Act, Senate Bill 29, unamended.
5  The Diocese's attorney acknowledged before the House
6  Judiciary Committee a few weeks ago that the Diocese had
7  information in its files dating back to as far as 1962
8  that Francis DeLuca had an appetite for adolescent boys,
9  but for nearly 45 years and under at least four
10 different Bishops nothing was done except to transfer
11 him from one unsuspecting parish to another where he
12 apparently molested adolescent boys in each of the six
13 parishes to which he had been assigned.
14        In 1993 this priest was secretly relieved
15 from active ministries in Delaware and allowed to
16 quietly retire with a Diocesan-paid pension to his
17 hometown in Syracuse, New York. And while it was
18 circulated that he had retired for health reasons, no
19 mention was ever made publicly of his sexual abuse of
20 adolescent boys, nor even were civil or church
21 authorities in Syracuse ever informed that this retired
22 priest was a recidivist child sex offender. But the
23 priest did not stop or alter his pattern of predation.
24 His current criminal arrest there is for molesting his

3 (Pages 6 to 9)

ab4133f8-bb59-4df3-96be-10511ba04c14

Page 10

1   own great nephew for approximately five years from his
2   ages 13 through 17.  In fact, this 77 year old man now
3   faces the loss of liberty because those who should have
4   known better did nothing to protect this priest even
5   from himself, not to mention how gravely absent they
6   weren't protecting the rest of us from the likes of him.
7          It was not until this priest was arrested
8   this past October that the Diocese of Wilmington
9   reluctantly released the names of nearly two dozen
10  sexual predator priests.  Noteworthy, though, is that
11  while the Diocese had at long last so easily released
12  the names of these predator priests after having fought
13  for decades not to do so it still refuses to acknowledge
14  its own role.
15         I am left to wonder who is this God who
16  rapes his children.  These were horribly misguided men.
17  I can not comprehend how so many well-trained,
18  highly-educated Bishops and priests alone and behind
19  closed doors decided it was best to hide and conceal
20  criminal conduct and simply transfer -- to transfer this
21  priest from one place to another where his conduct went
22  unabated for nearly 50 years.  These were cold,
23  calculated decisions among men who operated as if they
24  alone knew what was best for this priest, his victims

Page 11

1   and more importantly for themselves as his enablers.
2          I suggest that this legislative body knows
3   best how to protect Delaware citizens, particularly its
4   children from those predators and their enablers who
5   have and will continue to do them harm.  I am left with
6   the unescapable conclusion that most of DeLuca's damage
7   could have been avoided had his institutional enablers
8   reported his crimes to authorities when they first
9   became aware of them.
10         Who can credibly argue that this pervasive
11  pattern of abuse would not have occurred unabated for 50
12  years without the active assistance of this priest's
13  institutional employers.  How many victims could have
14  been spared had this man's crimes been -- had not been
15  covered up?  We may never know the answer to this
16  question, but we must do our best to answer the question
17  as it pertains to the potential victims.
18         I am convinced that holding the responsible
19  institution liable for their past behavior, their past
20  victims, will control their future behavior and prevent
21  another generation of our children from becoming victims
22  of this insidious pattern.  This Bill in its original
23  unamended form will do precisely that.  To be sure my
24  remarks here today are not just about me.  Again, the

Page 12

1   Diocesan lawyer in responding to questions also informed
2   the Judiciary Committee a few weeks ago that it had
3   active files from nearly 45 victims of clergy child sex
4   abuse occurring before 1987 while holding only 15 active
5   files for children victims whose abuse occurred after
6   1987.
7          The Diocese's suggestion without legitimate
8   rationale reason that it now supports a look-back
9   provision but only as far back as 1987 is frivolous on
10  its face.  Such an approach could -- capriciously and
11  arbitrarily foreclose the claims of 75 percent of its
12  active files for no other reason than that they might be
13  too costly or burdensome to defend.  It suggests without
14  credible explanation that those older cases would be
15  impossible to defend as many of the offenders may no
16  longer be alive.  Moreover, such an approach would not
17  just artificially foreclose 75 percent of the potential
18  claims against the Diocese but would also foreclose the
19  pre-1987 claims of all those other non-institutional
20  cases.  Recall that 85 percent of all cases occur as a
21  result of incest or intra family child sexual abuse.
22  Consequently, such an approach would effectively cut the
23  Bill's power to protect children by identifying those
24  past abusers who are still circulating freely in

Page 13

1   society.  Whose good shepherd is this that lobbies to
2   cut off the relief to 75 percent of the known victims?
3   Clearly those victims cannot be left behind here.
4          Moreover, the Diocese has suggested through
5   its lobbyists efforts that it stands ready, willing and
6   able to assist all victims with counseling, medical
7   expenses and lump sum settlements to make them whole
8   irrespective of the Bill's reach.  One is left to wonder
9   how the Diocese could so easily settle these claims
10  through some nondescript mediation process with
11  undefined rules regulating procedures if it would find
12  it impossible to defend these claims in the already
13  time-honored, time-tested process called the courts of
14  law under the Civil Procedures Act and the rules of
15  evidence.
16         Taking the Diocese at their word then it
17  should therefore not oppose the unamended enactment of
18  Senate Bill 29 in as much as it purports a willingness
19  to do exactly what the codified Bill would require it to
20  do.  Essentially Senate Bill 29 would hold the Diocese
21  to its good word in the manner that trusts, but
22  verifies, under threat of compulsory legal process.
23  Moreover, the Diocese's quiet settlement approach would
24  also gut the Bill of its important effect of publicly

4 (Pages 10 to 13)

Page 14

1 identifying those sexual predators who may be still
2 exposing children to sexual abuse.
3        I stand before you today on behalf of
4 hundreds, if not thousands, of Delaware victims of
5 childhood sexual abuse. I urge this legislative body to
6 act decisively by unanimously passing Senate Bill 29,
7 the Child Victim's Act, unamended. Decent civilized
8 society needs the names of those child sexual predators
9 and to expose those who enable them. Absent that, those
10 enablers will have succeeded once again as they will
11 remain unaccountable for their conduct. Thank you for
12 allowing me to speak here today.
13       SPEAKER OF THE HOUSE: Thank you, sir, for
14 being with us. Thank you very much.
15       Representative Hudson.
16       REPRESENTATIVE HUDSON: Thank you,
17 Mr. Quill. At this time Representative Valihura has a
18 witness he would like to introduce.
19       SPEAKER OF THE HOUSE: Representative
20 Valihura.
21       REPRESENTATIVE VALIHURA: Thank you,
22 Mr. Speaker. It is my honor as Chairman of the
23 Judiciary Committee to introduce the dean of the
24 Villanova University Law School, Dean Mark Sargent, and

Page 15

1 if we could have the privilege of the floor for Mr.
2 Sargent I'd appreciate it.
3        SPEAKER OF THE HOUSE: Yes, sir.
4 Absolutely. Thank you. Welcome to the chamber, sir.
5 Once again, if you'd give your name for the record.
6 Thank you.
7        MR. MARK SARGENT: Mr. Speaker,
8 distinguished members of the House, I'm Mark Sargent,
9 dean and professor of law at Villanova University School
10 of Law in Pennsylvania. Thank you for the opportunity
11 to address this distinguished body. I'll begin by
12 saying that the views and opinions I express here are
13 solely my own and do not purport to represent the views
14 of Villanova University or its School of Law.
15       I also want to state that I am not being
16 compensated for my testimony. I do not represent and
17 have never represented for compensation or otherwise the
18 Diocese of Delaware, any other Diocese, parish,
19 religious order, cleric or other individual in sexual
20 abuse or other legal matters. I am here today to
21 express my personal concern about legislation that is
22 obviously well intentioned, but would, in its present
23 form, undermine the administration of justice and
24 constitute bad public policy.

Page 16

1        I want to begin by expressing my regret,
2 the regret I feel in both testifying and writing about
3 the deficiencies of this type of legislation. As any
4 person of good faith, my heart is with the innocent
5 victims, not with the molesters or their enablers. I
6 wish I could indulge in the uncomplicated, righteous
7 fury that so many victims and their advocates and
8 ordinary people feel and not be in the position of
9 criticizing their legislative proposals. I also regret
10 that principal criticism of legislation such as Senate
11 Bill 29 too often is met with rancor, accusations of
12 insensitivity or indifference to the plight of victims,
13 or, even worse, a corrupt desire to curry favor with the
14 Bishops. I come before you as a lawyer, a student of
15 the law. A concerned citizen and a concerned Catholic
16 who believes there is a better way to serve the goals
17 that we all share of preventing and punishing sexual
18 abusive children.
19       I'm sure that you have all heard the
20 arguments establishing the deficiencies of Senate Bill
21 29, so I'll restate them only briefly. First of all,
22 statutes of limitation are often referred to as
23 technicalities or loopholes behind which the church
24 cynically hides. The statutes are often challenged by

Page 17

1 the rhetorical question: How can justice be time
2 barred, as if the answer to that question were obvious
3 and if statutes of limitation did not themselves ever
4 serve justice. But as you undoubtedly know, statutes of
5 limitation are not mere technicalities. They exist for
6 a reason for several reasons. Evidence ages, parties
7 and witnesses age, disappear or become legally
8 incompetent, uncertainty and ambiguity grows with time.
9 Also there are sound public policy reasons for
10 encouraging people to come forward with claims promptly
11 and there are mechanisms for tolling the statute of
12 limitations when they are prevented from doing so.
13       Regardless of what one thinks about the
14 behavior of molesters, or of the Diocese, Bishops or
15 Diocesan officials and whatever moral opprobrium they
16 have incurred as Defendants in our legal system, they
17 are as entitled to the benefits of the civil justice
18 system as anyone else.
19       Second, the need for limitations, the
20 statute of limitations, is particularly acute when the
21 civil suit is not against an abusive priest who is often
22 judgment proof, but against Diocese, Bishops and
23 Diocesan officials. In such cases the issue is usually
24 not whether an individual priest actually abused an

5 (Pages 14 to 17)

ab4133f8-bb59-4df3-96be-10511ba04c14

A252

Page 18

1 individual child but whether those responsible for him
2 in some way facilitated, either affirmatively or
3 passively, his behavior in a way that would make them
4 liable for damages. These cases turn on relatively
5 subtle legal theories, are usually grounded in some kind
6 of negligence, and are often ambiguous factually. To be
7 sure, the Diocese will have extensive records that may
8 shed light on the matter and in some cases they obtain a
9 smoking gun. The records often will not be dispositive
10 of the matter. Eliminating the statute of limitations
11 entirely will make it very difficult for judges and
12 juries to do justice in very old cases.
13       Third, it has been argued that eliminating
14 the statute of limitations will not create a problem.
15 The plaintiff, after all, has the burden of proof and
16 the jury can simply sort things out as they always do.
17 I'm not here to argue that the jury system is deficient.
18 I will always -- I will point out, however, that the law
19 has always regarded juries as inherently fallible. In
20 fact, the law of evidence exists in part to exclude from
21 juries evidence whose reliability a jury cannot fairly
22 assess. The law strives to make decision making by
23 juries more rational and predictable rather than less.
24 Eliminating the statute of limitations would have the

Page 19

1 opposite effect by confronting juries with cases they
2 should not be required to decide. They will find it
3 difficult to decide those cases fairly when the evidence
4 and testimony is incomplete, uncertain or unavailable or
5 when standards of behavior, social values and
6 relationships have changed.
7       As to the burden of proof, the playing
8 field is really not level between the plaintiff and
9 defendants in this kind of case. The plaintiff has a
10 structural advantage. The victim can always testify.
11 Whether witnesses favorable to the defense can testify
12 is a far more questionable matter given the passage of
13 time.
14       Achieving justice is not merely a matter of
15 opening the courthouse door. It is also a matter of
16 what happens when you are inside.
17       Let me turn now to the most troubling
18 aspect of Senate Bill 29, the idea of a two-year window
19 for reviving time barred claims. This sounds simple,
20 innocuous and only fair. It's just a, quote, look-back
21 which sounds harmless but there is much to be said
22 against it. Eliminating the statute of limitations
23 retrospectively undermines the basic purposes of the
24 statute even more clearly than when it's eliminated

Page 20

1 prospectively. Opening a window will, as it has in
2 California, revive truly ancient cases. In California
3 the courts have had to contend with claims dating back
4 to the 1930s, 1940s and 1950s. Opening a window can
5 also create enormous liabilities as has happened in
6 California, raising serious questions about
7 proportionality and the impact of abuse settlements or
8 verdicts on the beneficiaries of the church's
9 charitable, educational and spiritual programs.
10 Retroactively reviving time-barred claims is actually
11 far more dangerous than prospectively eliminating the
12 statute which at least will give institutions the
13 opportunity to plan to some extent.
14       Finally, let me comment on the simplest
15 argument made in support of opening the window for
16 time-barred claims, i.e. the argument that the church
17 can afford it. That claim is based on an entirely too
18 optimistic view of what Catholic Dioceses actually have,
19 an entirely too narrow view of what it actually needs to
20 perform its mission, or, I dare say, even an
21 indifference to whether the church should be able to
22 perform its mission.
23       The recent spate of Diocesan bankruptcies
24 was caused not by a cynical desire to avoid trials that

Page 21

1 would expose the truth but a simple recognition that
2 both victims and Dioceses would be saddled with enormous
3 legal costs for an extensive period of time, that church
4 assets will not be sufficient to satisfy the anticipated
5 tort liabilities, and that some sort of orderly
6 settlement is needed so that the church's available
7 assets are not absorbed by the first plaintiffs in the
8 door.
9       Furthermore, whether in the bankruptcy
10 context or not, Diocesan abuse settlements have resulted
11 in a significant diminishment of many Dioceses capacity
12 to serve those who rely upon them, particularly their
13 poorest constituencies. A two-year window would
14 guarantee that that would happen in Delaware. I'm sure
15 you have heard or will hear that there hasn't been any
16 serious negative effect on the activities of the church
17 in California. With all due respect, I disagree with
18 that claim. In California the church's capacity to
19 serve is shrinking just as its Catholic population is
20 growing exponentially as a result in the rapid growth of
21 the Latino population. Real property is being sold at
22 the time when it is most needed to accommodate growth in
23 this population. A rise in the rate of closures of
24 Catholic schools has already occurred, especially in

6 (Pages 18 to 21)

ab4133f8-bb59-4df3-96be-10511ba04c14

A253

Page 22

1  rural and inner city areas that have to be subsidized.
2        Lacking liquidity, Dioceses are being
3  forced to borrow from commercial lenders in order to
4  meet their obligations under the settlements. Churches
5  are struggling with insurers who are reluctant to
6  contribute to settlements because they believe that
7  there are actually viable legal defenses against the
8  claim if it were presented in court. So I don't think
9  we can dismiss the risk to the constituency served by
10 the church.
11       In conclusion, I would respectfully urge
12 that the two-year window or any window provision of
13 Senate Bill number 29 not be enacted. Thank you.
14       SPEAKER OF THE HOUSE: Thank you for your
15 testimony. Representative Hudson.
16       REPRESENTATIVE HUDSON: Yes, of the
17 witness, question to the witness, please.
18       SPEAKER OF THE HOUSE: Open dialogue with
19 the witness, Representative.
20       REPRESENTATIVE HUDSON: Thank you. Open
21 dialogue. Sir, it's interesting that you're following
22 what we're doing in Delaware. I'm glad you read the
23 News Journal, or how did you know about our case?
24       MR. MARK SARGENT: How did I know about it?

Page 23

1        REPRESENTATIVE HUDSON: About our Bill and
2  our situation?
3        MR. MARK SARGENT: Well, I have written
4  about what's going on in Delaware before.
5        REPRESENTATIVE HUDSON: Were you invited to
6  attend today?
7        MR. MARK SARGENT: Yes.
8        REPRESENTATIVE HUDSON: And who was your --
9  who invited you to attend?
10       MR. MARK SARGENT: I was invited by the law
11 firm of Stradley Ronon.
12       REPRESENTATIVE HUDSON: And did Stradley
13 Ronon represent the Archdiocese of Philadelphia in their
14 lawsuit?
15       MR. MARK SARGENT: Yes, they did.
16       REPRESENTATIVE HUDSON: So even though you
17 are independent you have worked for the law firm that
18 has a bias.
19       MR. MARK SARGENT: I do not work for
20 Stradley Ronon.
21       REPRESENTATIVE HUDSON: Okay.
22       MR. MARK SARGENT: I do not work for
23 Stradley Ronon either as an independent consultant or as
24 a lawyer in any capacity. They are familiar with my

Page 24

1  writing about this, including my writing that was very
2  critical of their representation of the Diocese of
3  Philadelphia.
4        REPRESENTATIVE HUDSON: Well, I just
5  thought that was important to know. I found your
6  comments very interesting but they were so strong
7  supporting the church. And I would also say that we in
8  Delaware, I think you should know this, too, have the
9  finest court in the nation, so I don't think they're
10 worrying about all your fears that you projected today.
11       One of my colleagues asked if you paid for
12 your time here today yourself or if someone paid --
13 compensated you money.
14       MR. MARK SARGENT: No one has paid me for
15 my time here today.
16       REPRESENTATIVE HUDSON: One of my
17 colleagues back here asked me.
18       MR. MARK SARGENT: No one has paid me.
19       REPRESENTATIVE HUDSON: Thank you. That
20 was all.
21       SPEAKER OF THE HOUSE: Thank you.
22 Representative Kowalko, questions or comments towards
23 the --
24       REPRESENTATIVE KOWALKO: Open dialogue with

Page 25

1  the witness? In your testimony you referred to the
2  responsibility of the church to its constituency and the
3  ability to pursue that. Do you not consider the abused
4  children the Catholic Church's constituency?
5        MR. MARK SARGENT: Of course I do.
6        REPRESENTATIVE KOWALKO: Thank you.
7        SPEAKER OF THE HOUSE: Any other questions
8  for the witness? Once again, thank you for your
9  testimony. You may be excused. Thank you, sir.
10 Representative Hudson.
11       REPRESENTATIVE HUDSON: Thank you. And
12 since his testimony was so much about the church if the
13 next witness I could call Father Thomas Doyle, please.
14 While he's coming I'll save time and give you a bit of
15 information about him. He's a Catholic priest and a
16 member of the Dominican order. He was first an Air
17 Force chaplain in Dover Air Force Base, very
18 interesting. He is a staff -- he is a canon lawyer
19 which is a church lawyer. His specialty is cases of
20 abuse and he has written many documents, and I think if
21 he can just speak to us for about five minutes on what
22 he knows best that would be very helpful. Thank you.
23       SPEAKER OF THE HOUSE: Thank you, once
24 again, sir, if you would give your name for the record.

7 (Pages 22 to 25)

ab4133f8-bb59-4df3-96be-10511ba04c14

A254

Page 26

1      FATHER THOMAS DOYLE:  Yes.  My name is
2  Thomas Doyle.
3      SPEAKER OF THE HOUSE:  Yes, sir, you may
4  continue.  Thank you.
5      FATHER THOMAS DOYLE:  Thank you for the
6  opportunity and the privilege to speak before you here
7  today on behalf of boys and girls, men and women who
8  cannot be here and on behalf of their parents.  I have
9  been a Catholic priest for 37 years.  I consider the
10  most important ministry that I have fulfilled in those
11  years to be the time spent trying to be a support, a
12  friend, an encourager of men and women whose lives have
13  been devastated because of the sexual abuse of clergy,
14  priests and Bishops.
15      My experience reaches back 25 years, 24
16  years, to 1984 during which time I was assigned to the
17  Vatican Embassy in Washington, D.C.  Over that timespan
18  between then and now I have been involved with victims
19  and their families throughout the United States and in
20  several foreign countries.  I have spent more hours than
21  I can count listening to victims and to their mothers
22  and fathers.  And if I have a passion and a sustaining
23  strength in all of this, because it is admittedly
24  unbelievably difficult and painful to be part of this

Page 27

1  movement, part of this phenomena, but my passion is
2  based on the fact that I know the victims.  The youngest
3  I have ever spoken with and listened to was a
4  ten-year-old boy and the oldest is a woman who is now 92
5  and only came forward at the age of 89 to speak about
6  the rape she had been subjected to by a Catholic priest
7  over and over and over between the time she was 12 and
8  13.
9      And, finally, my passion is definitely
10  strengthened and edged over the past several years
11  because I have experienced this in my own family.  The
12  rape of a close family member, not at the hands of a
13  priest but at the hands of a couple of thugs, but I have
14  seen what happens when this goes through your life, the
15  devastation, the destruction, the death, the living
16  death that these people go through.  Over the years I
17  have had contact with - extensive and sometimes
18  non-extensive - with more victims than I can count, with
19  their parents, with their friends, their siblings, but
20  also with the priest perpetrators.
21      Robert's story about coverup, about
22  deception, about lying, by those who were in charge of
23  his abuser is unfortunately not unique.  What you heard
24  that man say to you is the story of tens of thousands.

Page 28

1  And I'd like to say at the beginning of my summary that
2  this issue, the sexual abuse of children and the
3  vulnerable is not a Catholic issue.  It's not us against
4  the Catholic Church.  It's not a situation of people who
5  want to bleed the Catholic Church of its funds and its
6  money.  And at the outset I would like to say the
7  testimony that I have just heard I find to be shocking
8  and surprising and completely removed from my own
9  awareness, which is extensive going back 20 some years.
10      So just a couple of anecdotes about
11  California.  In California the open window introduced
12  about a thousand cases, I think about 850 of them were
13  cases of time-barred cases who were of sexually abused
14  by clergy or Catholic religious, by religious I mean a
15  brother or a sister.  Of these there were only two that
16  were known to have been false arms, false accusations.
17  The largest settlement was a settlement reached in the
18  Diocese of Orange, California for approximately 100
19  million dollars.  Half of that was paid by insurance
20  carriers and the other half was a loan which is now paid
21  back.  And within the past year the Diocese announced
22  and turned over the first shovel of dirt, as I
23  understand, for a new cathedral that will cost
24  approximately 300 million dollars.

Page 29

1      The Catholic Diocese of Oakland in
2  California recently announced the plans for a new
3  cathedral in Oakland.  According to the Oakland Tribune,
4  and here I'm quoting from the local newspaper, the
5  city's rising cathedral of Christ the Light complex is
6  the most expensive in American history.  This is in the
7  state of California where the church is apparently been
8  financially debilitated because it has been asked to
9  acknowledge the hundreds of victims that it ignored,
10  whose perpetrators it facilitated and hid and lied
11  about.
12      But this is not -- it's a Catholic issue
13  only in the sense that the revelations of extensive
14  clergy sexual abuse and the coverup by church leaders
15  have provoked a sharply increased awareness of the
16  almost unbelievable extent of childhood sexual abuse in
17  our society.  Ten percent, as Representative Hudson told
18  us, have been abused by teachers or clergy.  But this
19  has -- this whole incidence of sexual abuse of children
20  has been under the radar.  We haven't wanted to talk
21  about it, acknowledge it, because children are devalued.
22  They're possessions of the parents.  You rape a child
23  you get off much more easily in many ways than if you
24  rape an adult.

8 (Pages 26 to 29)

ab4133f8-bb59-4df3-96be-10511ba04c14

Page 30

1    We have learned in all of this that
2 churches and other institutions will go to scandalous
3 lengths to protect themselves to the detriment of the
4 abuse victims. The vociferous objections and the
5 opposition of churches, including the Roman Catholic
6 Church and other denominations to legislative reform is
7 certainly part of the proof. In state after state the
8 legislative reform has been introduced and been urged.
9 The most vociferous active opponents have been the
10 churches, especially the Catholic Church.
11    Another evidence of the fact of the lengths
12 that the churches will go is the trashing of victims in
13 the legal process. I have seen situations where lawyers
14 who have represented Catholic Dioceses have hired
15 private investigators to go through the trash and the
16 garbage of the victims and the witnesses and their
17 families, to interview their neighbors, to find out
18 information on them and to try to use this in court.
19    The majority of the victims live lives
20 trapped in pain, shame and trauma. I have spoken with
21 many who cannot come forward, will not come forward, and
22 only after a great deal of pain and fear will even
23 disclose to one or two people what's happened to them.
24 Would you go to court? Would you see a lawyer? Would

Page 31

1 you go to the Bishop? Absolutely not. I can't. I
2 can't talk about it. I don't even want to go out in the
3 daytime one man said to me.
4    Why are the victims of rape and sexual
5 assault penalized? Because the devastating effects of
6 the crime committed against them prohibit them, impede
7 them from coming forward for many, many years until they
8 can see some tiny bit of support and get rid of some of
9 the fear they have of going forward and going public.
10    Why are the criminals enabled? Why are
11 they protected because of the presumption that no one
12 can get a fair trial after an arbitrarily decided upon
13 number of years? It's up to the courts to determine
14 there is no proof, that there are no witnesses. This
15 simply offers an opportunity. There have been no gross
16 devastation in California. There has been no overriding
17 miscarriage of justice in the process there.
18    The evidence and the experience with
19 churches and other private institutions in every state
20 and in foreign countries which has been evidenced by
21 civil court processes and grand jury reports proves that
22 the welfare of children and justice for victims is
23 clearly not guaranteed by the internal processes of
24 these institutions. We don't need the statute of

Page 32

1 limitations. We don't need to have this window. We
2 don't need to extend. We'll take care of the victims.
3 It hasn't happened in the past. It's not happening now
4 and there is no guarantee that it will happen in the
5 future. The only reason the institutions, including the
6 churches, have the child protective programs they have,
7 the vetting program -- the vetting programs for
8 employees and for clergy, the lay review boards, the
9 only reason these exist is because these institutions
10 have been forced to put them into place. Forced by
11 massive negative publicity, by the secular media and
12 especially by the courts, the lawsuits and the grand
13 juries. There was nothing effective until this
14 happened.
15    The churches and some private institutions
16 have raised numerous irrelevant, I consider, objections
17 and gone to extraordinary lengths to convince the public
18 and to convince lawmakers that legislation to extend a
19 statute of limitations or eliminate it would threaten
20 due process, would penalize the church, bring it to its
21 financial knees, cause it to abandon its ministries.
22 This has not happened. Parishes have been closed. This
23 was true. This was in the works. It's because of
24 demographic changes, not because of massive payouts to

Page 33

1 victims. I know of no Diocese or religious order that
2 has suffered in its ministries, in its -- in the work it
3 does with people or with its parishes because of this
4 issue. It is, in short, a red herring, a big red
5 herring.
6    The only fear that continued lawsuits bring
7 is that it will expose the secret files with more
8 revelations of clergy sexual abuse and coverup. I have
9 seen thousands of Diocesan files and personnel files and
10 what I have seen has been shocking and scandalous beyond
11 description and it has clearly fortified the suspicion
12 that churches and private institutions, and not just the
13 Catholic Church, do, indeed, favor their image, favor
14 their financial stability, favor their structures to the
15 detriment of the victims.
16    There have been over 5,000 civil suits
17 against Catholic entities alone. There have been
18 hundreds against entities, other denominations and other
19 private institutions. Most of these end up in
20 settlement. But those that have ended up in trials with
21 the ensuing publicity clearly show a history of
22 institutions failing to provide true care, and in the
23 case of churches pastoral care, and justice for the men
24 and the women, its priests, its ministers and its rabbis

9 (Pages 30 to 33)

Page 34

1  have sexually assaulted and whose lives have been
2  effectively ruined.
3         Churches and many institutions continued to
4  blanket themselves in secrecy about known sexual
5  abusers, about reports from victims and steps taken to
6  provide a safer environment for children and the
7  vulnerable. Speaking only about my own denomination,
8  Diocese after Diocese refuses to publicly disclose the
9  names of known abusers. In a number of other situations
10 they're put back on the streets because only about 200
11 to 250 have ever been imprisoned out of the thousands
12 that have been known. They have been put back on the
13 streets and Dioceses have refused to determine or to
14 disclose where they are. Whether you're a priest, an
15 undertaker, a scuba diver, an airline pilot or a
16 legislator, if you are a compulsive sexual predator you
17 will act out until you take your last breath.
18        I'd like to end with some questions. Why
19 do representatives and defenders of the churches and of
20 private institutions publicly state all so often how
21 horrified they are by child sexual abuse yet privately
22 campaign ceaselessly to defeat any measures, legislative
23 and otherwise which are the most effective means of
24 protecting children now and in the future? Why do

Page 35

1  churches preach their concern for victims, their
2  commitment to compassionate care and justice and then
3  place ultimate value and concern on their buildings,
4  their image, their influence and their power?
5         And finally, why in a civilized,
6  enlightened society such as our own have so many church
7  and civic leaders, lawmakers and businessmen, put the
8  emotional, the spiritual and the legal welfare of the
9  most vulnerable and harmed persons in our society, the
10 victims, last?
11        Thank you.
12        SPEAKER OF THE HOUSE: Thank you for your
13 testimony. Any questions of the witness?
14 Representative Wagner.
15        REPRESENTATIVE WAGNER: Thank you very much
16 for being here. I appreciate your comment. I just want
17 to be real clear so that I understand what you were
18 saying. You can answer this with a yes or a no. Do you
19 know any incident where the local parish has had to foot
20 the bill for these programs or close services that they
21 are doing because of a lawsuit?
22        FATHER THOMAS DOYLE: No.
23        REPRESENTATIVE WAGNER: This can be a yes
24 or no also. Do you have any reason to believe that the

Page 36

1  local parishes in Delaware, if this law passes and if
2  people are subsequently prosecuted and found to be
3  perpetrators of this type of behavior, that the local
4  parishes will in any way suffer financially because of
5  those convictions?
6        FATHER THOMAS DOYLE: No.
7        REPRESENTATIVE WAGNER: Thank you.
8        SPEAKER OF THE HOUSE: Representative --
9  I'm sorry, Representative Lavelle and then
10 Representative Hudson in that order.
11        REPRESENTATIVE LAVELLE: Thank you,
12 Mr. Speaker. Hello, father, how are you today?
13        FATHER THOMAS DOYLE: I'm well, thank you.
14        REPRESENTATIVE LAVELLE: I am going to ask
15 questions of a priest and a lawyer is probably two
16 things I shouldn't do.
17        FATHER THOMAS DOYLE: I can always tell you
18 I don't know the answer.
19        REPRESENTATIVE LAVELLE: That would be
20 fine. Whatever you do don't make me look dumb. There
21 was an article in the News Journal yesterday, you were
22 quoted in the article, I was quoted in the article. I
23 just wanted to read you a quote and make sure that you
24 felt that that adequately captured either verbatim or at

Page 37

1  least certainly the essence of your comment in the
2  newspaper. It is at the end of the article. Doyle, the
3  priest and attorney, said changing the statute of
4  limitations is essential to the real change in both the
5  private and public arenas. Quote, the experience with
6  the Catholic Church has proven that this denomination
7  and other denominations, as well as other private and
8  public institutions, will only change when forced to do
9  so by a power greater than themselves and that that
10 power has been the media, public opinion and especially
11 the U.S. legal system he said, end quote.
12        FATHER THOMAS DOYLE: I said that and I
13 stand by that and I firmly believe it. I'll repeat it
14 again because sometimes you can't hear too well. I
15 firmly believe from my experience that the only thing
16 that will make certain entities, especially churches,
17 change in this area, is a power greater than themselves
18 that is a combination of the media, the legislatures and
19 the courts. That's the only thing that has brought
20 about change thus far. All of the programs and policies
21 we know of, that's why they are there.
22        REPRESENTATIVE LAVELLE: Thank you, Father.
23 And, again, back to your quote. And other
24 denominations, as well as private and public

10  (Pages 34 to 37)

ab4133f8-bb59-4df3-96be-10511ba04c14

A257

1 institutions. Public institutions. State of Delaware,
2 State of California, the 50 states that this country is
3 so fortunate to be made up of, public institutions, do
4 you think public institutions -- first of all, do you
5 think public institutions, not necessarily
6 intentionally, employ pedophiles?
7       FATHER THOMAS DOYLE: I'm sorry?
8       REPRESENTATIVE LAVELLE: Do public
9 institutions not intentionally obviously, but do
10 pedophiles work for public institutions?
11       FATHER THOMAS DOYLE: I'm sure they do.
12       REPRESENTATIVE LAVELLE: Thank you. So to
13 change behavior we need laws to change behavior. You
14 have said that. We need to force behavior. I am
15 offended, sir, I am offended at the behavior of the
16 Catholic Church in this issue. I am a Catholic. I am
17 offended by what they have done and what they have
18 failed to do. I'm also a State lawmaker. I am charged
19 by making sure that the State of Delaware does what it
20 needs to do through laws. We do it every day. Tell the
21 public what to do. We often tell the State of Delaware
22 what to do. So I appreciate your comment and
23 confirmation that this is not a misquote, that public
24 institutions will change only when forced to change to a

1 system, a power I believe you used, sir, greater than
2 what they are and that is the force of law and public
3 opinion.
4       You may not be familiar, sir, that in the
5 last year, and I know my colleagues are familiar, there
6 has been four arrests of public school employees for the
7 rape or sexual abuse of children in the last year.
8 Would that concern you?
9       FATHER THOMAS DOYLE: It would certain
10 concern me. What concerns me more, though, is the fact
11 that the private institutions, especially the churches,
12 have more of a propensity and a track record of moving
13 known abusers around from place to place under the cloak
14 of secrecy. If you rape a kid when you're a fourth
15 grade teacher chances of you being promoted to seventh
16 grade are kind of nil.
17       REPRESENTATIVE LAVELLE: I have anecdotal
18 comments. I think we hear the pass the trash comments,
19 and I agree with you that they shouldn't be passing
20 anyone in the public or private institution. I would
21 suggest to you from calls that I have got on some of
22 these cases that there is a concern that perhaps the
23 State failed or didn't do what it should have done. I
24 have a picture of two children here. Does one of these

1 children deserve more protection under the law than the
2 other one?
3       FATHER THOMAS DOYLE: No argument, I mean
4 I'm not arguing with you.
5       REPRESENTATIVE LAVELLE: No. No, as
6 Representative Wagner said, a simple yes or no.
7       FATHER THOMAS DOYLE: No.
8       REPRESENTATIVE LAVELLE: Does one of these
9 children deserve more protection under the law than the
10 other one?
11       FATHER THOMAS DOYLE: Not unless one of
12 them has special needs or something like that.
13       REPRESENTATIVE LAVELLE: Well, as a matter
14 of fact one of them does.
15       FATHER THOMAS DOYLE: Okay. He probably
16 does.
17       REPRESENTATIVE LAVELLE: But the answer is
18 these children and these children are representative of
19 children across the State, do not in your opinion, sir,
20 in your learned opinion, you're an attorney, you're a
21 priest, you have spent tremendous amount of time, good
22 effort, forcing change with churches and private
23 institutions, but your opinion is that neither of these
24 children deserve lesser protection under the law?

1       FATHER THOMAS DOYLE: No.
2       REPRESENTATIVE LAVELLE: Thank you, sir. I
3 appreciate you coming today and I hope that we can
4 change the church and have positive impact on all the
5 citizens of the State of Delaware. Thank you for taking
6 the time to come. I appreciate it.
7       SPEAKER OF THE HOUSE: I have
8 Representative Hudson, Representative Valihura and then
9 Representative Wagner in that order.
10       REPRESENTATIVE HUDSON: Yes. I was just
11 going to thank the speaker and to say that since I
12 questioned the last speaker of why he was here I would
13 like to say that I invited this man here today and he
14 paid his own expenses to be here and he has a seven
15 o'clock appointment in Virginia but he doesn't care --
16       FATHER THOMAS DOYLE: The seven o'clock
17 appointment is dead. I find this is much more important
18 for being here.
19       SPEAKER OF THE HOUSE: Thank you for being
20 here with us. Now I have Representative Valihura and
21 Representative Wagner, sounds like the gentleman --
22       FATHER THOMAS DOYLE: Am I done?
23       SPEAKER OF THE HOUSE: No. You're still
24 with us for just a few more minutes but I'll get you out

11 (Pages 38 to 41)

ab4133f8-bb59-4df3-96be-10511ba04c14

A258

Page 42

1 of here as quick as we can. Representative Valihura.
2      REPRESENTATIVE VALIHURA: Just a comment,
3 Mr. Speaker. We had a sexual predator in my district or
4 just outside my district in Claymont and there is
5 anecdote -- better than anecdotal evidence that the
6 schools moved that individual around and those were
7 public schools.
8      SPEAKER OF THE HOUSE: Thank you, sir.
9 Representative Wagner.
10      REPRESENTATIVE WAGNER: Thank you. Yes, I,
11 too, have a question about something I read in the paper
12 yesterday and because I have no way of knowing if it's
13 correct you might can help me out. This month the
14 Catholic -- it's from the News Journal, this month the
15 Catholic Diocese of Wilmington backed away from its
16 previous opposition to eliminating the statute of
17 limitations. A statement in the June 7th edition of the
18 Diocese newspaper, The Dialogues, says Diocesan
19 officials want SB 29 amended to remove sovereign
20 immunity coverage for state institutions. Do you know
21 if that's correct?
22      FATHER THOMAS DOYLE: That I can't speak to
23 that. I don't know. My only fear would be that a good
24 Bill as you have get bogged down as has happened in

Page 43

1 other -- in other states where the church will come in
2 and start doing a lot of weaving and bobbing and weaving
3 and end up with amendments to the Bills and all of a
4 sudden the main point is gone. The point here is the
5 protection of children which is more important in my
6 humble opinion than buildings, than money, than parish
7 plants and so on and so forth. These are programs for
8 the future. You know, these are things that are
9 protecting real, live human beings, the most, you know,
10 devastated in our midst.
11      REPRESENTATIVE WAGNER: Thank you.
12      SPEAKER OF THE HOUSE: Representative
13 Lavelle.
14      REPRESENTATIVE LAVELLE: Mr. Speaker, very
15 brief. Thank you again, sir. California, you spoke to
16 California, California in this issue of sovereign and
17 limited immunity which we'll get into later, I'm sure
18 you're familiar with the concept, do you know did
19 California waive the immunity?
20      FATHER THOMAS DOYLE: That I can't speak to
21 that. That I don't know.
22      SPEAKER OF THE HOUSE: Thank you. Any
23 other questions for the witness? Thank you and thank
24 you for being with us.

Page 44

1      FATHER THOMAS DOYLE: Thank you and thank
2 you.
3      SPEAKER OF THE HOUSE: Representative
4 Hudson.
5      REPRESENTATIVE HUDSON: Yes.
6 Representative Stone has a witness.
7      SPEAKER OF THE HOUSE: Representative
8 Stone.
9      REPRESENTATIVE STONE: Thank you,
10 Mr. Speaker. Mr. Speaker, I'd like to ask for personal
11 privilege of the floor for Mr. Larry Zutz who represents
12 the Zutz Insurance group who is here to speak with the
13 House about the issue regarding insurance regarding
14 these types of claims.
15      SPEAKER OF THE HOUSE: Thank you,
16 Representative. It's an honor to have you with us
17 today. Once again if you'd give your name and company
18 for the record.
19      MR. LARRY ZUTZ: Thank you, Mr. Speaker. I
20 am showing you my best side and to distinguished members
21 of the House. My name is Larry Zutz and I'm president
22 of the Zutz --
23      REPRESENTATIVE VALIHURA: Speak directly --
24      MR. LARRY ZUTZ: You can't hear me?

Page 45

1 I'll -- is that better?
2      SPEAKER OF THE HOUSE: Yes.
3      MR. LARRY ZUTZ: Better? Okay. I'll try.
4 Not a powerful voice.
5      SPEAKER OF THE HOUSE: It's okay.
6      MR. LARRY ZUTZ: But I'm here not to
7 promote or to argue against the specifics of this
8 legislation. I'm really here to answer questions which
9 I have done on previous occasions. I'll make an
10 anecdotal comment at the front end and really turn it
11 over to you because my purpose here is limited to deal
12 with the potential impacts of what -- whatever
13 legislation you pass as it reflects on the insurance
14 industry and the underwriting fraternity.
15 Jargonistically speaking, this coverage is called SAM
16 coverage, sexual abuse and molestation. It didn't used
17 to exist until a dozen, 15, 20 years ago. The industry
18 is infamous for identifying new exposures and creating
19 new coverages to relate to those exposures.
20      I guess in terms of simple background what
21 you should know is that sexual abuse and molestation
22 coverage has become a restricted market over the last
23 dozen years because of the frequency of claims,
24 certainly in certain directions, and the costs of the

12 (Pages 42 to 45)

ab4133f8-bb59-4df3-96be-10511ba04c14

Page 46

1  insurance has risen dramatically.  The other thing in
2  terms of general background, where I wouldn't expect
3  most of you to be knowledgeable about this, there are
4  two different forms of coverage by which this type of
5  insurance is underwritten.  One is called claims made
6  and the other is called occurrence coverage.  Claims
7  made insurance is a fairly, relatively speaking, newer
8  form of coverage in the insurance industry.  It is
9  tracking when the claim is made.  By and large, other
10  than prior acts protection features, which I'm sure will
11  come out in questions, claims made insurance is
12  responsive to when the claim is made, not when the
13  alleged offensive conduct took place.
14         Occurrence coverage is historically the
15  standard by which general liability coverages have been
16  underwritten in the industry and that looks to when the
17  offensive conduct took place.  Interestingly, both forms
18  of insurance coverage are offered on a limited basis
19  with regard to sexual abuse and molestation coverage.
20         I really want to turn this over to you
21  folks to deal with the questions you have about what if
22  legislation is passed in one context or another.  If you
23  don't have questions, then I promise you I will launch
24  into an historical perspective to that might be

Page 47

1  enlightening about other types of situations that could
2  be seen as comparable but I think this would be better
3  done if you ask the questions and I'll try my best to
4  answer.  So with that I think I'm --
5         SPEAKER OF THE HOUSE:  Larry, did you give
6  your name and company for the record?
7         MR. LARRY ZUTZ:  I thought I did.  Well,
8  maybe you couldn't hear.  Larry Zutz.  I'm president of
9  Zutz Insurance which is part of Hilb, Rogal & Hobbs for
10  the last 15 months.  Zutz Insurance has been around for
11  67 years in Wilmington, Delaware.
12         SPEAKER OF THE HOUSE:  Thank you, sir.
13  Representative Stone.
14         REPRESENTATIVE STONE:  Thank you,
15  Mr. Speaker.  Open dialogue with the witness, please?
16         SPEAKER OF THE HOUSE:  Yes.
17         REPRESENTATIVE STONE:  Mr. Zutz, thank you
18  for being here today.  As the Chair of the Insurance
19  Committee I was very honored to introduce you and I know
20  that you are considered absolutely an expert on this
21  type of insurance.  You started out by telling us that
22  it's called sexual abuse and molestation insurance and
23  you referred to it as SAM, I guess acronyms are used
24  today for everything.  So certainly it doesn't surprise

Page 48

1  me that this one has one as well.
2         Would you share with me what the impact has
3  been on the availability and premiums of this type of
4  insurance in Delaware, obviously because there have been
5  lawsuits filed here, as well as in perhaps some of the
6  other jurisdictions where lawsuits are prevalent?
7         MR. LARRY ZUTZ:  I'll try my best.  As I
8  mentioned earlier it's a newer form of coverage.  The
9  industry alleges that it didn't under SAM that it
10  harbored this exposure historically, probably doesn't go
11  back much more than 20 years ago.  The early iterations
12  were done on an occurrence basis and I mentioned they
13  are still underwritten by several companies, several of
14  the leading companies that underwrite Delaware not for
15  profits and other businesses.  The impact in terms of
16  greater frequency of claims, as well as some large shock
17  numbers, catastrophic loss potentials, has greatly
18  restricted the availability of this coverage nationwide.
19         Delaware will never make a market when it
20  comes to almost anything as subject matter in the
21  insurance world.  We're simply too small.  We don't have
22  credibility in our numbers.  Delaware is seen as a more
23  favorable judicial environment.  I speak in part as a
24  Delaware lawyer in this regard and I'm biased on behalf

Page 49

1  of our Delaware judicial system, but we are better
2  certainly than states that are around us and nationwide
3  as many of you have heard in different contexts.  The
4  National Chamber of Commerce basically rates Delaware as
5  top in all ten categories that it evaluates.
6         Having said that, reinsurance is the tail
7  that wags the dog in this.  This is not rocket science.
8  It is licensed gambling.  That is what insurance is.  It
9  is to offer the abstraction of a promise to pay on
10  behalf of the insured based on certain contingencies.
11  Because there have been more and more not less and less
12  of these suits there is a draining marketplace, and
13  there isn't anything out there in the immediate future,
14  whether this legislation is passed or not, that says
15  that this will be a more widely available type of
16  insurance.  So we'll be impacted as much as what goes on
17  around us as much as what happens here.
18         REPRESENTATIVE STONE:  Thank you.  We have
19  heard a lot of comments already today about both the
20  church and the public sector in regards to the impacts
21  of this legislation.  I want to focus for a moment if I
22  could on nonprofits, on organizations like the Boys and
23  Girls Club, on organizations like the Little League.
24  Can a Delaware nonprofit organization purchase SAM

13 (Pages 46 to 49)

ab4133f8-bb59-4df3-96be-10511ba04c14

Page 50

1  coverage to cover a past act?  In other words, can they
2  buy coverage retroactively for something that may be, as
3  I describe it in this Bill, infinity?
4      MR. LARRY ZUTZ:  That's a really good
5  question and it doesn't admit to an easy answer.  First
6  of all, most Delaware not for profits, not that we
7  handle most of those, have been insured on a continuing
8  basis in the State of Delaware.  Interestingly, and this
9  was actually surprising me to me where I have canvassed
10  the lead underwriters in the last several weeks knowing
11  that I was being asked to show up here, the fact is I
12  was surprised that most of the Delaware not for profits
13  have been insured on an occurrence basis.  What that
14  means is that they have prior acts as it relates to the
15  insurances that they have previously purchased.  And so
16  if a Boys and Girls Club has been buying insurance on an
17  occurrence basis for 15 years, they have for each one of
18  those policy periods - it's like a gold certificate you
19  don't want to throw those insuring agreements away -
20  they have coverage for their prior acts.  As you deal
21  with claims that come in you track back to when the
22  offensive conduct took place.  Assuming that the
23  insurance company is still around, viable, solvent,
24  there would be coverage on a continuing basis.

Page 51

1      If your question is not for profits or
2  other entities that have not purchased coverage, the
3  overpowering likelihood is that it would only be offered
4  to them on a claims-made basis with what's called
5  jargonistically speaking retro date inceptions, which
6  means there would be no prior acts protection under
7  those circumstances.
8      REPRESENTATIVE STONE:  This expansion of
9  the statute of limitations for claims of abuse, would
10  you share with me what your thoughts are on what that
11  will do to insurance premiums on organizations like the
12  Boys and Girls Club, like a Little League, like the
13  YMCA?
14      MR. LARRY ZUTZ:  Again, this is not rocket
15  science.  We're talking licensed gambling and insurance
16  companies take risk for value.  In an environment where
17  there is the perception of greater risk, several things
18  always happen:  Availability shrinks and the cost of
19  coverage goes up.  And so in terms of statutes of
20  limitation, keeping in mind that most of the Delaware
21  not for profits, as I understand it, have been insured
22  on an occurrence basis, and the at least subliminal
23  underwriting fabric, the judgements that are part of
24  that are that there were statutes of limitation in place

Page 52

1  when the coverages were purchased and so if that gets
2  retrospectively removed, it in a sense pulls the rug out
3  from under underwriters who have previously written
4  those coverages.
5      However, this really becomes a wait to see
6  attitude, and in discussions that I have had with
7  underwriters nobody said to me that if this legislation
8  - and I was real careful to point out retrospective look
9  in this that looks backward for a two-year period with
10  the standard being gross negligence - most of you know
11  this even better than I do - looking forward it's new
12  negligence, we're talking about respondeat superior
13  conduct in this and the vicarious liability that the
14  organizations have, no one said they would instantly
15  pull out.  They all expressed a concern that would be
16  wait to see what would happen with regard to claims.
17      And so you can draw upon whatever are the
18  other experiences in other jurisdictions.  I think that
19  this legislation, as I understand it, is more refined
20  than in some other places but I'm not here to offer
21  myself as an expert as to what happened in California,
22  what happened in the State of Washington.  It would be
23  wait to see what happens in terms of claims.  I hope
24  that that responds.

Page 53

1      REPRESENTATIVE STONE:  Thank you.  Thank
2  you very much.
3      SPEAKER OF THE HOUSE:  Representative
4  Manolakos.  Mr. Terry Manolakos.
5      REPRESENTATIVE MANOLAKOS:  Open dialogue
6  with the witness?
7      SPEAKER OF THE HOUSE:  Yes, sir.
8      REPRESENTATIVE MANOLAKOS:  Mr. Zutz, the
9  previous witness testified that there were a lot of
10  concerns about cost to the institutions and my question
11  is fairly simple to you.  When institutions purchase the
12  SAM insurance what level of liability or what percentage
13  is the institution responsible for in the case of an
14  award against them generally speaking?
15      MR. LARRY ZUTZ:  Well, if we're having an
16  insurance discussion here policy limits govern and if
17  you deal with a judicial pronouncement that exceeds the
18  limits of the policy, the organization is on the hook
19  for its own shortfall in that.  Right now you're going
20  to find million dollar limits being about the maximum
21  that can be purchased, maybe two in some specified
22  circumstances, and church-related organizations which
23  three, four, five years ago could still get up to ten
24  million of coverage are down to two.

14 (Pages 50 to 53)

ab4133f8-bb59-4df3-96be-10511ba04c14

A261

Page 54

1    REPRESENTATIVE MANOLAKOS: Thank you.
2    MR. LARRY ZUTZ: You're welcome. There
3 have to be more insurance-related questions.
4    SPEAKER OF THE HOUSE: Representative
5 Valihura.
6    REPRESENTATIVE VALIHURA: Thank you,
7 Mr. Speaker. Open dialogue?
8    SPEAKER OF THE HOUSE: Yes, sir.
9    REPRESENTATIVE VALIHURA: Thank you. Do
10 you have a most pressing concern about this legislation
11 with respect to the insurance industry?
12    MR. LARRY ZUTZ: The uncertainty that it
13 imposes. I guess in terms of simplistic analysis by
14 lifting statutes of limitation claims that have been
15 previously time barred no longer will be. And so it is
16 obviously more likely that claims that wouldn't be
17 brought because they simply couldn't be brought might be
18 brought. My standing here and saying if California had
19 a thousand cases that Delaware is going to have 50, I
20 don't have a clue under those circumstances. I mean, as
21 you have heard more eloquently than I could offer,
22 statutes of limitation are part of our common law
23 antecedents. They do work injustices, unfairnesses, if
24 you will, but these principles have reposed and been on

Page 55

1 the books for hundreds of years even before there was a
2 United States of America. And so the lawyer in me is
3 nervous about the uncertainty principle. That's as
4 much, I think, Representative Valihura, as I can say.
5    REPRESENTATIVE VALIHURA: I neglected to
6 say up front, as I do every time you're before us is
7 that I am a client of yours and I do get my insurance
8 from you and so but I do want to make that disclosure up
9 front. But would it surprise you to learn that tomorrow
10 in the Judiciary Committee we have another Bill to do
11 away with a statute of limitations.
12    MR. LARRY ZUTZ: Would it surprise me?
13    REPRESENTATIVE VALIHURA: Yes.
14    MR. LARRY ZUTZ: Yes, because as I
15 recollect, our society, Delaware, the nations, doesn't
16 fool with statutes of limitations all that often.
17    REPRESENTATIVE VALIHURA: And if we started
18 to get a reputation of fooling around with our statute
19 of limitations here in the State what might that do to
20 the insurance business in the state? And not looking at
21 it from the insurance business perspective but from the
22 buyer of (inaudible to reporter) insurance.
23    MR. LARRY ZUTZ: It's unsettling. It's not
24 necessarily a disaster because it's a function of what

Page 56

1 happens as a result of changing that fabric.
2    REPRESENTATIVE VALIHURA: Do you have any
3 experience with other legislative changes that might
4 have some bearing on this particular situation on what
5 might be expected here?
6    MR. LARRY ZUTZ: I think we all do in
7 certain contexts. Probably the best analogy involves
8 pollution liability coverages. The insurance industry
9 didn't underwrite for the exposures, whether it was
10 seepage in the ground or black lung disease. And there
11 was a whole series of cases that really began in the
12 60s, the 70s and the 80s, the insurance industry said we
13 didn't underwrite for this, we never collected premium
14 for it, we're not responsible for it. The industry lost
15 repeatedly because in contracts of adhesion, which
16 insurance contracts typically are, it's included unless
17 it's excluded, and so, finally, the industry got to the
18 point where it said it's excluded, things calmed down.
19 But the fact is there were thousands of underwriters for
20 comprehensive general liability coverages back in the
21 middle of the previous century leading up to the new
22 century. When it came to pollution liability coverages,
23 as a result of the expanded concept of liability on the
24 part of insurers the market basically disappeared, and,

Page 57

1 truly, there have only been a few that have crawled
2 back, AIG is one, people that really understand how to
3 take risks for big bucks and can handle the big hits in
4 terms of exposures.
5    We have got -- we have got comparable
6 situations as it relates to flood coverage. All the
7 legislation that actually ended up creating floodplains
8 that the industry uses it's all been changed because of
9 development in runoff patterns. You can't force a risk
10 taker to take risks if the feeling is that they're going
11 to get murdered by doing it. And so what really
12 happened was there are no flood coverages except they
13 are underwritten by the federal government. It's paper
14 that's issued by insurance companies but the exposures
15 are underwritten by the federal government. TRIA,
16 Terrorism Risk Insurance Act, World Trade Center goes
17 down, the insurance industry says we're not going to
18 stand for this. And so at the federal level it expired,
19 it's been extended, it's being analyzed and may be
20 extended again. The exposures are largely being
21 underwritten by the federal government.
22    And so you deal with the background here
23 where you can't -- you can't lead this horse to water
24 and make him drink. And so if we fail greatly with the

15 (Pages 54 to 57)

ab4133f8-bb59-4df3-96be-10511ba04c14

Page 58

1  responsibilities that arguably might not have existed
2  earlier it Makes us a less appealing place to take
3  risks.  And so far we're handling it pretty well as a
4  state, and as I said early on in today's comments, I'm
5  not dealing with anybody that said in articulating the
6  features of this legislation that they'll pull out of
7  Delaware tomorrow.  You should expect increased costs.
8  There is another feature to this, it's called CEOL,
9  combined expenses/outside limits, and a lot of these
10  coverages offer the expenses related to litigation
11  outside policy limits.  Almost everyone that I talked to
12  said those expenses will now become part of limits.  So
13  that's reduced coverage under the circumstances, and
14  even with it you should expect higher deductibles that
15  will be imposed.
16        SPEAKER OF THE HOUSE:  Representative
17  Viola, questions of the witness?
18        REPRESENTATIVE VIOLA:  Just in reference, I
19  mean we're debating SB 29, but yet there was just a case
20  very recently settled or awarded I guess here in the
21  State for I believe something along the line of 40
22  million dollars or somewhere in that neighborhood, and
23  that proceeded and I guess in a sense was successful
24  without this legislation.  Not that this isn't needed.

Page 59

1  My point being I guess you're saying or indicating that
2  this piece of legislation is going to open up a door for
3  higher costs for insurance.  You have a case that just
4  got settled for 41 million.
5        MR. LARRY ZUTZ:  I don't believe it was
6  settled for 41 million.  There is some curiosities in
7  that case and the educational institution and the
8  Diocese of Wilmington were not parties in the ultimate
9  net outcome and no money has passed hands.  And it was a
10  Pennsylvania priest who is implicated in this and that
11  was a suit, as I understand it, that was against a
12  priest who never really made an appearance.
13        Believe me, underwriters are aware of this
14  but that doesn't have the same impact as changing the
15  statute of limitations.  It's part of the environment
16  and it's already an early statement that you better
17  watch out because things are changing.
18        SPEAKER OF THE HOUSE:  Any other questions
19  of the witness?  You may be excused, sir.  I don't
20  believe there is any other questions at this time.
21  Representative Hudson, any other witnesses?
22        REPRESENTATIVE HUDSON:  Thank you.
23  Mr. Zutz is a constituent of mine.  I'm happy to see him
24  here.  I guess on a lighter note there could be more

Page 60

1  insurance sold in this state, but the next witness is
2  also Representative Stone's.
3        SPEAKER OF THE HOUSE:  Representative
4  Stone.
5        REPRESENTATIVE STONE:  Thank you,
6  Mr. Speaker.  I would like to introduce to the chamber
7  Mr. George Krupanski who is with the Delaware Boys and
8  Girls Club here in Delaware.
9        SPEAKER OF THE HOUSE:  Thank you.  Welcome
10  to the chamber, sir.
11        REPRESENTATIVE STONE:  We're supposed to
12  disclose everything of course, so I'd just like to share
13  with my colleagues that I serve on the board of
14  directors of the Greater Dover Boys and Girls Club and I
15  have a long-standing friendship and working relationship
16  with Mr. Krupanski.  Welcome.  It's nice to have you
17  here.
18        MR. GEORGE KRUPANSKI:  Thank you.
19        SPEAKER OF THE HOUSE:  Once again, if
20  you'll give your name and organization for the record.
21        MR. GEORGE KRUPANSKI:  Sure.  My name is
22  George Krupanski.  I am the president and CEO of the
23  Boys and Girls Club of Delaware, representing tens of
24  thousands of Delaware's youth across the state.

Page 61

1  Mr. Speaker and members of the House, at the outset let
2  me say that we support the goal of Senate Bill 29.  As
3  someone who has dedicated his life towards dedicating
4  opportunities for our youth, inspiring their dreams and
5  steering them from a life of crime and drugs to a life
6  of a productive, successful member of our community, I
7  am repulsed by the notion of any adult sexually abusing
8  a minor, absolutely repulsed, and believe those
9  offenders should be held accountable.
10        My concern is simple, my testimony short.
11  My concern focuses mostly on the agency.  We urge you to
12  consider that the legislation would have a significant
13  impact on nonprofits in our State.  We simply have not
14  and were never required to keep records of our coaches,
15  volunteers, dating back 30, 40 years ago.  If someone
16  came forward tomorrow claiming they were sexually abused
17  by a coach 30 years ago I'd have no way of knowing, no
18  way of digging out such records, probably no insurance
19  coverage because I now learned through Mr. Zutz's
20  testimony that the gold certificate you need to hang on
21  to we don't have those going back 15 years ago.  I have
22  no way of disproving gross negligence.
23        We would want to take such a charge very
24  seriously and we would address that matter

16 (Pages 58 to 61)

ab4133f8-bb59-4df3-96be-10511ba04c14

Page 62

1  appropriately.  We just simply would not know where to
2  begin.  I do believe that amendments offered to this
3  Bill should have some limitation on retroactivity as it
4  relates to the agency and require actual knowledge on
5  the part of the nonprofit.
6          I urge you to consider such amendments.  I
7  am not a lawyer but I am on the front lines of trying to
8  keep our youth out of trouble and into mentoring
9  relationships with counselors and coaches who are good
10  people that would never cross that line.  I welcome the
11  opportunity to work with you and make this legislation
12  to work as intended to truly help kids who have been
13  victimized by the adults they trusted.  Thank you.
14          SPEAKER OF THE HOUSE:  Thank you for your
15  testimony, sir.  Representative Hudson.
16          REPRESENTATIVE HUDSON:  Thank you, sir.
17  The last witness that we have today is a professor,
18  Marci Hamilton.  She came here also at her own expense
19  from Pennsylvania.  She had clerked for Associate
20  Justice Sandra Day O'Connor.  She has a JD from the
21  University of Pennsylvania, and she just wrote a book
22  "How to Deliver Us From Evil, What the Clergy Abuse
23  Crisis Has Taught Us".  May she come up for testimony?
24          SPEAKER OF THE HOUSE:  Yes.  Welcome to our

Page 63

1  chamber and if you would give your name also for the
2  record.
3          MS. MARCI HAMILTON:  It's Marci Hamilton,
4  Mr. Speaker, thank you very much.  Thanks very much for
5  this opportunity to talk about this extraordinarily
6  important Bill.  It is a part of a movement in the
7  United States which is part and parcel of the movement
8  for civil rights for children.  Children have not in the
9  United States been given the kind of protections that we
10  need and we learned about what we have been doing wrong
11  from the publicity surrounding the Catholic Church's
12  problems.  But the Catholic Church's problems were just
13  an opportunity to learn.  What we learned is that we
14  have been doing it wrong.
15          Our children have been abused.  Only ten
16  percent of victims ever come forward.  There is a lot of
17  suffering out there.  And the reason they don't come
18  forward is because the laws that we passed have favored
19  perpetrators and predators over children.  What you're
20  being asked to do today is a very simple policy choice.
21  There is only two sides to the equation.  The one side
22  are the perpetrators and the predators and the other
23  side are the children.
24          I have been working on this issue for a

Page 64

1  number of years now and I think it has become crystal
2  clear to me that it is absolutely necessary to abolish
3  the statute of limitations on childhood sexual abuse and
4  to create windows because our child abuse victims are
5  not capable of coming forward in the ridiculous time
6  limits that we have given them.  It's not just Delaware.
7  It's all over the country.  Only Maine and Alaska have
8  abolished those statute of limitations at this point.
9  Only California has enacted a window.  So Delaware is on
10  the forefront of what is in effect a revolution for
11  children.
12          Let me just make a few quick responses to
13  some of the things that you have heard today.  I think
14  it's unfortunate when facts do not make it into
15  testimony and you have been led astray in a number of
16  ways.
17          I have been the constitutional litigator
18  for clergy abuse victims across the country in
19  California, Wisconsin, New Hampshire.  I have been the
20  Constitutional First Amendment advisor in the Spokane,
21  the Portland and now the San Diego Archdiocese
22  bankruptcies.  I have seen how these cases happen on the
23  ground.  I have seen the financials.  I have seen the
24  impact, and I can tell you with all truthfulness that no

Page 65

1  services have been cut in the United States as a result
2  of a victim.  It's just a fact.  When you are told that,
3  it's worthwhile asking where did you get your data
4  because that data isn't out there.  There has been no
5  closure of services, in part because our states and our
6  federal government actually pay 86 to 87 percent into
7  Catholic charities funds.  Almost all of the money that
8  goes into Catholic charities comes from the public fist.
9  So that the notion that you're even dealing with a Bill
10  that is going to cut services is ridiculous.
11          But let me back up and say again, we
12  learned about the problem from the church, but with all
13  due respect to the church it's irrelevant.  What we're
14  dealing with here, the vast majority of these victims
15  are incest victims.
16          I get e-mails all the time from all over
17  the country of people coming forward to tell their
18  stories of child abuse, ages 40, 50, 60, 70.  A woman
19  e-mailed me about two months ago or three months ago at
20  this point to tell me that she was an incest victim
21  living in Florida and she had been abused in New York.
22  She called her father when she turned 42 and said to her
23  father, you sexually abused me my entire childhood and I
24  am going to get justice.  I want to meet with you and I

17 (Pages 62 to 65)

ab4133f8-bb59-4df3-96be-10511ba04c14

A264

Page 66

1  want to tell you what you did to me and I want to bring
2  a lawsuit because of what you have done to my life. You
3  have ruined my life because you insisted on raping me on
4  a regular basis. The father's answer was, well, dear,
5  it's too late. The statute of limitations ran years
6  ago. Don't kid yourselves, the predators know the
7  statute of limitations. They count on it. They expect
8  it. They know what to rely on in the legal system and
9  there is no better protection for them than the statute
10  of limitations.
11       The only way that we will ever learn the
12  identities of the vast majority of the predators that
13  live in our neighborhoods and teach our children and
14  sell ice cream to our children, the only way we'll ever
15  learn those identities is through a civil window because
16  the criminal statute of limitations ran long ago and you
17  can't open it up. The criminal statute of limitations
18  constitutionally is incapable of being opened and so the
19  only option is opening the civil statute of limitations
20  backwards to find out that 90 percent of those instances
21  that we never have heard about yet and going forward and
22  giving the victims as long as possible.
23       With respect to insurance, I always find it
24  interesting that that issue is raised because in

Page 67

1  California there has been a window in effect since 2003.
2  To my knowledge no insurance industry has gone out of
3  business even though insurance companies have, in fact,
4  paid in the settlements. Maine and Alaska, as I
5  mentioned, have abolished the statute of limitations in
6  childhood sexual abuse. I have heard absolutely no
7  evidence that the insurance industry has gone out of
8  business in those two states.
9       The real question for this chamber is what
10  is best for children and there really isn't much of an
11  option out there. In order to fix the law the only
12  thing that can be done is to let them take their time
13  until they're capable of coming forward. So many of
14  these victims take 40, 50, 60 years. They don't get the
15  time, we don't find out who the perpetrators are. And
16  if we don't find out who the perpetrators are, we don't
17  find out who the other victims are either.
18       The beauty of the window - and I'll close
19  with this - the beauty of the window in California was
20  that when a victim would come forward about a particular
21  perpetrator and that perpetrator's name would be in the
22  newspaper, other victims would come forward and say oh,
23  my God, I thought I was the only one. And they found
24  out that they were not the only crime victims, that

Page 68

1  there were others out there, and we learned about the
2  suffering of these victims in a way that we never would
3  have learned otherwise. So I stand before you as
4  someone who believes passionately in the justice of a
5  window and also in the abolition of the statute of
6  limitations.
7       SPEAKER OF THE HOUSE: Any questions or
8  comments for the witness? Representative Lavelle.
9       REPRESENTATIVE LAVELLE: Thank you,
10  Mr. Speaker. Welcome. Again, I'm really stretching my
11  luck today going against a constitutional scholar and a
12  lawyer and a priest but it's my 15th wedding anniversary
13  so --
14       MS. MARCI HAMILTON: Congratulations.
15       REPRESENTATIVE LAVELLE: Thank you and take
16  sympathy on me. I appreciate you coming. I appreciate
17  you pointing out the fact that I think we have become
18  aware of that 85 percent, I think is the number you
19  used, that these cases are cases of incest. There is
20  cases of priest abuse that are clearly documented.
21  There is cases of teacher abuse. I suspect that all you
22  have gone through, public employees, we're not going to
23  pick on the teachers in question, that have been
24  documented as well. I stand in support of all these

Page 69

1  victims. I stand in support of all these victims past,
2  present and future and I'm sure you do as well, right?
3       MS. MARCI HAMILTON: I stand in favor of
4  helping all of the victims. I am on public record of
5  being in favor of abolishing the statute of limitations
6  in all circumstances. But I am also on the record as
7  understanding that there is a wide difference under our
8  constitutional system between the public and the private
9  sphere. And with respect to those two spheres right now
10  we're very well educated, sadly, on what's going on in
11  the private sphere. We have a number of cases across
12  the country involving the private sphere. We are very
13  well aware of what needs to be done.
14       With respect to the public sphere, I have
15  no doubt, actually, that that is the future challenge,
16  but we do not have the data yet. We have just the
17  beginnings of some of the data and it is my view that
18  there is no question that the Bill as written is worthy
19  of passage for public policy reasons for children. With
20  respect to what to do with respect to the public
21  entities, sovereign immunity is part of the founding of
22  the United States. I think it's something that needs to
23  be considered carefully, subject to its own hearings,
24  subject to its own Bill. So I agree with you in

18 (Pages 66 to 69)

ab4133f8-bb59-4df3-96be-10511ba04c14

A265

Page 70

1  principle. Do I have the data yet to assess the
2  comparison of the two? I don't.
3           REPRESENTATIVE LAVELLE: Thank you very
4  much. And could not one of the challenges of gathering
5  that data is that there is a prohibition for the most
6  part of filing lawsuits against public institutions for
7  situations like we're talking about today?
8           MS. MARCI HAMILTON: Well, as I understand
9  this Bill, the window opens up equally for private and
10 public, and learning about the past is key, is what we
11 just can't otherwise know, and so the only distinction,
12 as I understand the Bill, is going forward. And the
13 question is going forward whether or not a public
14 employee is going to be subject to gross negligence or
15 regular negligence. I take that that's the distinction?
16          REPRESENTATIVE LAVELLE: I think. Again,
17 I'm not aware, but you're right, the distinction is that
18 they would not waive in the future, there is an
19 argument, and we know it as an argument.
20          MS. MARCI HAMILTON: But it's not -- it's
21 not a hundred percent sovereign immunity, right? It is
22 limited immunity because gross negligence does permit
23 the lawsuit to go forward.
24          REPRESENTATIVE LAVELLE: And we'll get into

Page 71

1  that. I do appreciate that. Did California waive its
2  immunity?
3           MS. MARCI HAMILTON: Right now what's
4  happening in California, in fact it was just argued at
5  the California Supreme Court, is they're trying to
6  figure out whether or not the Bill was intended to cover
7  teachers. So far the courts have ruled it is not.
8           REPRESENTATIVE LAVELLE: So there is
9  confusion within the intent in the California Bill to
10 cover teachers or not?
11          MS. MARCI HAMILTON: It was not intended to
12 cover teachers. There have been some who have been
13 trying to use it and so far the courts have said that it
14 does not.
15          REPRESENTATIVE LAVELLE: It does not. So
16 the courts have blessed the continued immunity in
17 California public schools.
18          MS. MARCI HAMILTON: The courts have
19 deferred to the legislature.
20          REPRESENTATIVE LAVELLE: So the legislature
21 is ultimately responsible for making the decisions about
22 what we waive for and who we waive to and who we hold
23 accountable, et cetera --
24          MS. MARCI HAMILTON: Absolutely.

Page 72

1           REPRESENTATIVE LAVELLE: You mentioned -
2  and then I'll stop, Mr. Speaker - pedophiles know the
3  law.
4           MS. MARCI HAMILTON: Yeah.
5           REPRESENTATIVE LAVELLE: Pedophiles know
6  the law. They know what they can get away with and they
7  know what they can't. So they know what sort of law we
8  pass, don't they?
9           MS. MARCI HAMILTON: Absolutely.
10          REPRESENTATIVE LAVELLE: They know the law
11 we pass. We should stand for all victims. I'll ask the
12 same question that I asked Father Doyle, ma'am. I have
13 a picture of two children here, should one of them
14 receive more or less protection under the law?
15          MS. MARCI HAMILTON: It's a ridiculous
16 question. No one would answer that question -- no one
17 would ever answer that question --
18          SPEAKER OF THE HOUSE: Ladies and
19 gentlemen, please.
20          MS. MARCI HAMILTON: -- in any way other
21 than all children deserve to be protected. The question
22 here is not do all children need to be protected. The
23 question here is what is the best legislative means of
24 doing it. And as I said earlier, it is patently clear

Page 73

1  that we know what we need to do for the private
2  institutions. It is not so clear with respect to the
3  public institutions. So I favor ongoing research into
4  that question.
5           REPRESENTATIVE LAVELLE: Thank you. But
6  you did say it is kind of silly of me to even ask the
7  questions I think was the essence of your response.
8  Well, why wouldn't it, right?
9           MS. MARCI HAMILTON: It is silly of you to
10 ask that question because it's got nothing to do with
11 the legislative proposal.
12          REPRESENTATIVE LAVELLE: With all due
13 respect, ma'am, I believe it does. These are my
14 children: One goes to a private school, one goes to a
15 public school. We'll get into that later with my
16 colleagues. Thank you.
17          MS. MARCI HAMILTON: I have exactly the
18 same situation.
19          REPRESENTATIVE LAVELLE: That's good.
20 Thank you.
21          SPEAKER OF THE HOUSE: Any other questions
22 or comments for the witness? Thank you for your
23 testimony. You may be excused. Thank you.
24 Representative Hudson.

19 (Pages 70 to 73)

ab4133f8-bb59-4df3-96be-10511ba04c14

A266

Page 74

1    REPRESENTATIVE HUDSON: Thank you. That
2 ends the witnesses that we had planned, so it's on the
3 agenda to move to the amendments.
4    SPEAKER OF THE HOUSE: Yes.
5    REPRESENTATIVE HUDSON: I believe
6 Representative Lavelle is first.
7    SPEAKER OF THE HOUSE: Thank you.
8    REPRESENTATIVE LAVELLE: Mr. Speaker, may I
9 have House Amendment 2 to Senate Bill 29 read in?
10    SPEAKER OF THE HOUSE: Yes, you may.
11    REPRESENTATIVE LAVELLE: Thank you,
12 Mr. Speaker.
13    SPEAKER OF THE HOUSE: Would you present
14 your amendment first --
15    REPRESENTATIVE LAVELLE: Well, House
16 Amendment 1 was stricken. House Amendment 2 was
17 refiled.
18    SPEAKER OF THE HOUSE: Okay. Thank you.
19 Mr. Clerk.
20    THE CLERK: Mr. Speaker, House Amendment
21 number 2 to Senate Bill number 29 sponsored by
22 Representative Lavelle. Mr. Speaker, this constitutes
23 the first reading of House Amendment 2 to Senate Bill 29
24 by title only.

Page 75

1    SPEAKER OF THE HOUSE: On the amendment,
2 Representative Lavelle.
3    REPRESENTATIVE LAVELLE: Can I have an
4 amendment to the amendment?
5    SPEAKER OF THE HOUSE: Please present your
6 amendment. Once again we'll wait until all the members
7 have a copy of the amendment.
8    Mr. Clerk.
9    THE CLERK: Mr. Speaker, this is amendment
10 number 1 to House Amendment number 2 to Senate Bill
11 number 29 sponsored by Representative Lavelle.
12 Mr. Speaker this constitutes the first reading of House
13 Amendment number 1 to House Amendment 2 to Senate Bill
14 29 by title only.
15    SPEAKER OF THE HOUSE: Thank you. On the
16 amendment, Representative Lavelle.
17    REPRESENTATIVE LAVELLE: Thank you,
18 Mr. Speaker. House Amendment number 1 to House -- I'm
19 sorry to House Amendment 2 Senate Bill 29 simply
20 clarifies that we're not trying to change the
21 Constitution and that's what it clarifies because that
22 can't be done through a statutory change. It's a
23 two-shot deal as we all know, so that is what the
24 amendment is for. Any questions on the amendment to the

Page 76

1 amendment?
2    SPEAKER OF THE HOUSE: No. Representative
3 Lavelle.
4    REPRESENTATIVE LAVELLE: Questions on the
5 amendment to the amendment, sir?
6    SPEAKER OF THE HOUSE: No. All in favor of
7 House Amendment number 1 to House Amendment number 2 to
8 Senate Bill 29 indicate by saying aye.
9    (Whereupon various members of the House
10 responded aye.)
11    SPEAKER OF THE HOUSE: Opposed? Motion
12 carries.
13    House Amendment number 1 is now with House
14 Amendment number 2 to Senate Bill 29.
15    Representative Lavelle.
16    REPRESENTATIVE LAVELLE: Thank you,
17 Mr. Speaker. House Amendment number 2 would simply
18 require every institution in the State, public and
19 private, to be equally responsible for the protection
20 and care of our children. I have spoken to all of my
21 colleagues, some ad nauseam about this amendment and the
22 intent of this amendment. We had testimony today that
23 demonstrates that pedophiles are everywhere. We had
24 testimony today that has demonstrated that institutions,

Page 77

1 institutions made up of men and women have often and
2 unfortunately failed our children. Pedophiles
3 unfortunately are through our society. There is no
4 prohibition unfortunately. There are steps we can take
5 to try to keep these monsters out of our public and
6 private institutions and we should take those steps:
7 Criminal background checks, the first whiff of
8 impropriety of sexual abuse or a question that something
9 wrong is going on to remove those alleged abusers from
10 that classroom, from that church, from that Little
11 League field, to find out if those allegations are true
12 or not. So it's accountability for all of our children.
13 It's protection for all of our children, leaving none
14 behind. Perhaps we should be the first state. The last
15 witness indicated other states have struggled with this,
16 have not really addressed it for lack of data.
17    Let's not wait for more data that shows
18 there is pedophiles in the ranks of public employees
19 because we know there are. There has been four arrests
20 in the last year of public school employees, for either
21 the rape or molestation of our children. In the last
22 year. One of those students was a special needs student
23 in one of our school districts. I don't know this
24 individual's -- this victim's, I'm sorry, I don't know

20 (Pages 74 to 77)

ab4133f8-bb59-4df3-96be-10511ba04c14

A267

Page 78

1 this victim's developmental issues but many disabled
2 cannot speak, cannot defend themselves. There is cases
3 that I have read for cases in the State of Delaware
4 where CP patients who default to the care of the State
5 have been molested by their caretakers who work for the
6 State of Delaware. We should be the first state. We
7 should eliminate the statute of limitations. We should
8 provide for the window so past victims can come forward
9 and face their accusers in court and we should exempt no
10 one from this law.
11     Mr. Speaker, if there is any questions on
12 the amendment I'd be happy to take them.
13     SPEAKER OF THE HOUSE: Representative
14 Kowalko.
15     REPRESENTATIVE KOWALKO: Open dialogue?
16     SPEAKER OF THE HOUSE: Open dialogue, sir.
17     REPRESENTATIVE KOWALKO: Representative
18 Lavelle, would you agree that that Senate Bill 29 as
19 written, specifically lines 8 to 10, is intended to
20 repeal the statute of limitations in civil suits
21 relating to child sexual abuse cases?
22     REPRESENTATIVE LAVELLE: Well, yeah, I
23 believe the intent is to do that and the intent is to
24 have the window apply equally to the State and private

Page 79

1 institutions.
2     REPRESENTATIVE KOWALKO: Yeah. On that
3 particular matter, it is the intent, it is the specific
4 subset of Bill 29 --
5     REPRESENTATIVE LAVELLE: That is the
6 intent, thank you, sir.
7     REPRESENTATIVE KOWALKO: -- that it is to
8 lift the statute of limitations.
9     REPRESENTATIVE LAVELLE: Thank you, sir,
10 that is the intent. I don't think the language does it.
11 Thanks for prodding me and helping me with my
12 presentation. I don't think the language does that
13 because of issues of waiving -- of having to explicitly
14 waive limited sovereign immunity. Yes, that's the
15 intent, and, by the way, I'll have -- I'll ask Ron Smith
16 to come down, the House attorney, and sort of explain
17 that to some of us.
18     REPRESENTATIVE KOWALKO: Would you agree
19 with me that with me as written in lines 11 through 15
20 that upon reaching the probable level of gross
21 negligence -- provable level of gross negligence, that
22 the coverage -- that the sovereign immunity protection
23 of any legal entity, any legal entity, is, in fact,
24 lifted for this look-back period of time, and, in fact,

Page 80

1 equalizes the protection by law afforded both public and
2 private entities.
3     REPRESENTATIVE LAVELLE: No, I do not agree
4 that that's what it does. I agree perhaps that that's
5 the intent, but I do not agree that that's what the
6 language does, and, again, I'll ask for Ron Smith to
7 address this issue. And, do you mind, Mr. Kowalko?
8     SPEAKER OF THE HOUSE: Would you like to
9 ask for personal privilege of Ron Smith.
10     REPRESENTATIVE LAVELLE: I'd like to ask
11 for personal privilege of Ron Smith.
12     SPEAKER OF THE HOUSE: Okay. Without
13 objection so ordered.
14     REPRESENTATIVE LAVELLE: On this particular
15 question.
16     MR. RON SMITH: Ron Smith, house attorney.
17     SPEAKER OF THE HOUSE: Representative
18 Kowalko, questions of the witness.
19     MR. RON SMITH: How do you do, sir?
20     REPRESENTATIVE KOWALKO: Thank you. Do you
21 -- you did agree on the first one, though, Mr. Lavelle,
22 do you want me to reiterate both questions for
23 Mr. Smith?
24     REPRESENTATIVE LAVELLE: He's the lawyer.

Page 81

1 He can answer the questions (inaudible to reporter) good
2 for clarity, sir.
3     REPRESENTATIVE KOWALKO: Mr. Smith, do you
4 agree that Senate Bill 29, as written, and in particular
5 lines 8 through 10, is specifically intended to repeal
6 the statute of limitations in civil suits related to
7 child sexual abuse cases?
8     MR. RON SMITH: Not as asked. It limits
9 the exception to two years. It creates a window. After
10 that the statute of limitations applies again.
11     REPRESENTATIVE KOWALKO: But it is specific
12 -- the Bill is specifically written to repeal the
13 statute of limitations, could that be a fair synopsis?
14     MR. RON SMITH: For only two years. It is
15 not a permanent doing away with the statute of
16 limitations.
17     REPRESENTATIVE KOWALKO: Would you agree --
18 I agree with that.
19     Would you agree that as written in lines 11
20 through 15 that upon reaching a provable level of gross
21 negligence that the sovereign immunity protections of
22 any legal entity is, in fact, lifted for this look-back
23 period of time and, in fact, equalizes protection by law
24 afforded to both private and public entities?

21 (Pages 78 to 81)

ab4133f8-bb59-4df3-96be-10511ba04c14

A268

Page 82

1    MR. RON SMITH: I would not agree as
2  worded. It does not define what is meant by a public
3  entity. It is vague on that point. The Constitutional
4  cases on this issue are very clear, that the General
5  Assembly must explicitly exempt the State to create the
6  liability. In other words, you must be specific, and
7  expressly determine your intention is to waive the
8  sovereign immunity requirements that otherwise would be
9  applicable. This, as it's worded on line 12, simply
10  says other public entity. It does not define what that
11  is.
12    REPRESENTATIVE KOWALKO: Is the State a
13  public entity?
14    MR. RON SMITH: It can be. It would be up
15  to the court to decide whether the State would be
16  covered by that provision or not.
17    REPRESENTATIVE KOWALKO: I'm not talking
18  about an interpretation of that provision. I'm asking
19  if the State is a public entity.
20    MR. RON SMITH: That would be a decision
21  for a court to make. We have not defined it in this
22  provision.
23    REPRESENTATIVE KOWALKO: Then the court
24  could determine that the State is not a public entity is

Page 83

1  what you're saying?
2    MR. RON SMITH: It could determine that it
3  is not the intent to waive sovereign immunity.
4    REPRESENTATIVE KOWALKO: No. I didn't ask
5  that question. I asked if the court could determine
6  that the State is not a public entity.
7    MR. RON SMITH: That -- the court will
8  decide how it believes the legislature intended this
9  legislation to be enacted.
10    REPRESENTATIVE KOWALKO: Just out of
11  curiosity, the question I'm asking is this, have you
12  ever experienced a court of law that declared that a
13  State was not a public entity?
14    MR. RON SMITH: No.
15    REPRESENTATIVE KOWALKO: Thank you.
16  Looking forward at your amendment, Representative
17  Lavelle, wouldn't it be more appropriately applied as
18  stand-alone legislation if, in fact, your intention is
19  to hold the State of Delaware accountable and equally
20  liable as all other entities and, in fact, lifting
21  sovereign immunity protections?
22    REPRESENTATIVE LAVELLE: No, I don't
23  believe so. Open dialogue, Mr. Speaker?
24    SPEAKER OF THE HOUSE: Yes, sir.

Page 84

1    REPRESENTATIVE LAVELLE: That these issues
2  are intertwined. We're talking about children. We
3  shouldn't be looking to ask where the child may or may
4  not go to school, who may or may not be under the
5  responsibility to care for that child. They're all
6  children. They're all children. They're not children
7  here and children there. Looking -- I'm looking to
8  explicitly, with no room for a court to guess what my
9  intent was, to remove that from any argument that the
10  State is stepping up to the plate because this is such a
11  serious issue and is explicitly waiving sovereign and
12  limited immunity for the sexual abuse of children.
13    REPRESENTATIVE KOWALKO: With all due
14  respect, open dialogue, I believe that sovereign
15  immunity is a separate issue from what we're dealing
16  here with Senate Bill 29. Senate Bill 29's intent to
17  enable a look-back and enable a lifting of statute of
18  limitations of civil suits specifically for these cases,
19  and I believe that, with all due respect to Mr. Smith,
20  that lines 11 through 14 provide that under the meaning
21  of the criteria of gross negligence. Thank you.
22    SPEAKER OF THE HOUSE: Thank you. Any
23  other questions of the witness? I have Representative
24  Hudson and Representative Gilligan. Any questions for

Page 85

1  the witness, Representative Hudson?
2    REPRESENTATIVE HUDSON: Yes. Mr. Smith,
3  most of what you said applies to amendment five, right?
4    MR. RON SMITH: Correct.
5    REPRESENTATIVE HUDSON: So we're within ten
6  minutes of correcting everything you said, correct?
7    MR. RON SMITH: Correct. Amendment 5
8  addresses that same concern.
9    REPRESENTATIVE HUDSON: Okay. So -- thank
10  you.
11    REPRESENTATIVE LAVELLE: But,
12  Mr. Speaker --
13    SPEAKER OF THE HOUSE: Yes, open dialogue.
14    REPRESENTATIVE LAVELLE: But I know we're
15  jumping ahead, but so people don't expect - Amendment 5
16  does not waive for the future. It waives for this
17  two-year period, is that correct, Mr. Smith?
18    MR. RON SMITH: This whole act will only
19  apply for two years as written. Without this amendment
20  or some other amendment that would --
21    REPRESENTATIVE LAVELLE: All you're doing
22  with this Bill is you're waiving the statute of
23  limitations for two years. After that, the statute of
24  limitations comes back. The sovereign immunity question

22 (Pages 82 to 85)

ab4133f8-bb59-4df3-96be-10511ba04c14

A269

Page 86

1  is a defense question and the language here does not
2  expressly say sovereign immunity. It can be interpreted
3  that way but it's subject to interpretation.
4      Open dialogue, Mr. Speaker?
5      SPEAKER OF THE HOUSE: Yes, sir.
6      REPRESENTATIVE LAVELLE: But on Senate Bill
7  29 itself there is also this future provision outside of
8  the window and as currently drafted I don't believe that
9  the State waives or even the intent to waive under an
10  amended 29 sovereign and limited immunity for future
11  cases of child abuse.
12      MR. RON SMITH: That is correct. It's just
13  addressing these two years as written.
14      REPRESENTATIVE LAVELLE: Okay. Thank you,
15  sir.
16      SPEAKER OF THE HOUSE: Okay. I have
17  Representative Gilligan and Representative Marshall in
18  that order. Representative Gilligan, question of the
19  witness?
20      REPRESENTATIVE GILLIGAN: I'm interested in
21  seeing House Amendment number 5 but I don't suppose
22  we're going to see that for awhile.
23      SPEAKER OF THE HOUSE: We're not on House
24  Amendment number 5. That was an error. Representative

Page 87

1  Hudson mentioned House Amendment number 5 but we're
2  right now on House Amendment number 2.
3      REPRESENTATIVE GILLIGAN: I don't have any
4  questions on this amendment right now.
5      SPEAKER OF THE HOUSE: Okay.
6      REPRESENTATIVE GILLIGAN: Mr. Speaker, I do
7  wish to have a roll call, however, on the amendment I
8  will say that right now.
9      SPEAKER OF THE HOUSE: Okay. Thank you for
10  your request then. That's up to the sponsor.
11      REPRESENTATIVE LAVELLE: Mr. Speaker, I
12  intended to do that as well, so thank you Representative
13  Gilligan.
14      SPEAKER OF THE HOUSE: Okay.
15  Representative Marshall. Thank you for your patience.
16      REPRESENTATIVE MARSHALL: Thank you,
17  Mr. Speaker. Thank you. Mr. Smith, could you help me
18  understand and give me an example, perhaps, of the Bill
19  without the amendment, I'm talking just going forward
20  now, I'm not talking about the look-back provision, the
21  Bill going forward in subsection A you would allow a
22  suit based on negligence, gross negligence, intentional,
23  willful conduct, I mean, as long as there is a cause of
24  action an entity can be sued. Okay. So the standard is

Page 88

1  as low as negligence or whatever you can bring cause of
2  action for. The sovereign immunity, the qualified
3  immunity on the State and the State's actors is set at
4  gross negligence and if I -- I'm trying to get an
5  understanding here of the legal lay of the land. If
6  Representative Lavelle's amendment passes then it would
7  say the State can be held not just to the higher
8  standard of gross negligence but also to what all the
9  other entities would, like the Boys and Girls Club, the
10  YMCA, that regular negligence standard. My question for
11  you is this, can you give me an example of in the child
12  sex abuse situation where could a school do or a
13  principal do that is simply negligent that -- that if we
14  did not pass Representative Lavelle's amendment these
15  children would not have the protection? I'm trying to
16  get a sense of the difference between simple negligence
17  versus the gross negligence; in other words, passing
18  Representative Lavelle's amendment, not passing
19  Representative Lavelle's amendment.
20      MR. RON SMITH: Well, gross negligence
21  obviously implies a reckless disregard, whereas simple
22  negligence is a lot easier to establish. It's not
23  reckless disregard. It's just not paying attention.
24      REPRESENTATIVE MARSHALL: Could you give

Page 89

1  me, I appreciate that very much and I understand the
2  legalese of it. I understand what gross negligence is
3  and I understand what negligence is. But can you give
4  me any concrete example of what would be - and maybe
5  this is an unfair question because it just hasn't
6  happened yet - but I'm really trying to get at is what
7  is a situation of negligence where we're going to be
8  saying it's okay that the State is not sued for this
9  versus gross negligence where we say, you know what, the
10  State loses its immunity because we decided it's so bad.
11  I'm just trying to get a sense of what the distinction
12  is.
13      MR. RON SMITH: It's very difficult without
14  knowing specific circumstances of what has happened say
15  in the school and what the administration knew or didn't
16  know, and whether they complied with all the
17  requirements, background checks and things of that
18  nature. Any error could amount to simple negligence,
19  whereas they just overlooked or they didn't follow
20  through on something could be simple negligence. Then
21  depending on what they overlooked and how much knowledge
22  they had it could amount to gross negligence. That's
23  the whole court process.
24      REPRESENTATIVE MARSHALL: Okay. That helps

23 (Pages 86 to 89)

ab4133f8-bb59-4df3-96be-10511ba04c14

Page 90

1  somewhat. Thank you very much.
2          SPEAKER OF THE HOUSE: I have
3  Representative Stone, questions of the witness?
4          REPRESENTATIVE STONE: Mr. Speaker, I have
5  a question for the sponsor and then a question for the
6  witness. So I hate for you to dismiss --
7          SPEAKER OF THE HOUSE: Okay. Please,
8  Representative Lavelle.
9          REPRESENTATIVE STONE: -- the witness, if I
10  may, open dialogue with the sponsor?
11         SPEAKER OF THE HOUSE: Yes.
12         REPRESENTATIVE STONE: Representative
13  Lavelle, you're obviously a sponsor of Senate Bill 29
14  and my question is pretty simple. Did you intend for
15  the public sector to be included in this Bill?
16         REPRESENTATIVE LAVELLE: Open dialogue,
17  Mr. Speaker?
18         SPEAKER OF THE HOUSE: Yes, sir.
19         REPRESENTATIVE LAVELLE: Yes,
20  Representative Stone that has always been my intent. I
21  don't view as I said before and I'm sure I'll say again,
22  a distinction between children. That has always been my
23  intent.
24         REPRESENTATIVE STONE: Thank you very much.

Page 91

1  Now my question is for the witness.
2          SPEAKER OF THE HOUSE: Yes, Representative.
3          REPRESENTATIVE STONE: Mr. Speaker, open
4  dialogue?
5          SPEAKER OF THE HOUSE: Yes, Representative.
6          REPRESENTATIVE STONE: Mr. Smith, thank you
7  for being here. Isn't it true that when legal
8  agreements are sometimes being hashed out you might have
9  one side of the legal agreement perhaps thinking that
10  part of an issue is already covered in the agreement?
11  But you might have the other part of the agreeing
12  parties think well, it isn't clear to me that it's
13  covered in the agreement, so I would like to add some
14  language so that there is never a question that that was
15  our intent and that the additional language does, in
16  fact, clarify that that was the intent and it becomes
17  part of the agreement?
18         MR. RON SMITH: Very often that's the case.
19         REPRESENTATIVE STONE: Very often that's
20  the case. If you asked a dozen lawyers, no, bear with
21  me, please, if you asked a dozen lawyers whether or not
22  they believe the public sector is included in this Bill,
23  you might get at least a dozen different answers, would
24  that be true, safe to say?

Page 92

1          MR. RON SMITH: I think you would get
2  disagreement.
3          REPRESENTATIVE STONE: Half a dozen. Okay.
4  And the only way that will ever be determined is by very
5  costly, very lengthy litigation?
6          MR. RON SMITH: Absolutely.
7          REPRESENTATIVE STONE: So if we are all in
8  agreement in this room that the intent of the sponsors
9  of this Bill was to include the public sector in it,
10  there is absolutely no harm brought about by
11  Representative Lavelle's amendment because what it does,
12  as you have so eloquently pointed out, is it clarifies
13  that the public sector is to be included. I commend
14  Representative Lavelle for offering this amendment. I
15  commend him for his attempt to make sure that there is
16  no distinction going forward in the State of Delaware
17  that the intent of this General Assembly was to protect
18  all of our children.
19         Close your eyes for a moment and imagine
20  that you have two children standing in front of you who
21  have been abused, one by a private -- by someone who is
22  a teacher or a counselor in a private institution, and
23  the other who has been abused by someone who works in a
24  public institution. Tell me that you're comfortable

Page 93

1  telling those children that they are going to be treated
2  differently because they were abused by two different
3  people. I don't think that's what we're here to do
4  today. I don't think any of us would be comfortable in
5  setting up a different standard for Delaware's children,
6  and I thank you for offering the amendment and I intend
7  to support it and I would ask my colleagues to support
8  it as well.
9          SPEAKER OF THE HOUSE: I have
10  Representative Hudson next.
11         REPRESENTATIVE HUDSON: Thank you.
12  Mr. Smith, in the look-back period are the private and
13  public victims treated the same?
14         MR. RON SMITH: Yes, in this Bill.
15         REPRESENTATIVE HUDSON: Okay. So everybody
16  knows that.
17         MR. RON SMITH: That assumes that the
18  courts would -- would say sovereign immunity has been
19  waived.
20         REPRESENTATIVE HUDSON: Right.
21         MR. RON SMITH: That is -- the issue is
22  whether we're expressly stating that to meet any court
23  requirement that our intent be expressly stated.
24         REPRESENTATIVE HUDSON: Well, and if you

24 (Pages 90 to 93)

ab4133f8-bb59-4df3-96be-10511ba04c14

A271

Page 94

1 want to speak to the attorney who wrote the Bill he's
2 here if anyone wants to do that. But let me move to
3 another part that I think is a little complicated but we
4 have to talk about it. A State employee that commits
5 gross negligence, which is what I would call child
6 sexual abuse, would not have immunity because that would
7 be an act of gross negligence. So Representative
8 Lavelle is right to be worried about a child under a
9 school's supervision, but the gross negligence would put
10 them in a level where they would be, well, probably
11 arrested, et cetera, but in terms of the civil situation
12 they would be sued. Isn't that right?
13        MR. RON SMITH: Correct.
14        REPRESENTATIVE HUDSON: Okay. Well, then I
15 think I made my point and we'll --
16        SPEAKER OF THE HOUSE: Representative
17 Wagner, comments or questions to the witness?
18        REPRESENTATIVE WAGNER: I'm not sure. I
19 think it's to the witness. I'm not really sure. It
20 might be to Representative Kowalko because I'm trying to
21 figure this out and I'm lost. Okay. If -- if what
22 we're talking about, personal privilege for
23 communication?
24        SPEAKER OF THE HOUSE: Yes.

Page 95

1        REPRESENTATIVE WAGNER: Thank you. If what
2 we're doing is clarifying that this is what we mean
3 about sovereign immunity, then I would like to ask I
4 guess the witness and then perhaps Representative
5 Kowalko why someone would be opposed to this. If you
6 tell me I'm opposed to it because that means it is an
7 amendment and it goes back to the Senate and it might
8 not get through this session then I understand that.
9 But I don't understand anything, I'm not understanding
10 why someone is opposed to simply clarifying something
11 that deals with sexual abuse of children unless we just
12 want to be argumentive. I just -- I don't know what
13 damage it does to clarify this. So is there any damage
14 done to clarify this?
15        MR. RON SMITH: Well, if the intent is to
16 not have the State and its institutions.
17        SPEAKER OF THE HOUSE: Can you talk into
18 the mic a little more?
19        MR. RON SMITH: Is the intent is to not
20 have the State raise the defense of sovereign immunity
21 then the amendment makes it very clear, it expressly
22 states that that is what the legislative intent is and
23 the courts have been reluctant to read in a legislative
24 intent that is not very clearly stated when you're

Page 96

1 addressing waiver of sovereign immunity.
2        REPRESENTATIVE WAGNER: Then my question,
3 if I could, to Representative Kowalko because I was
4 trying to follow what he was saying, can I assume, maybe
5 I can't, can you tell me if you are in favor of not
6 having the State sovereign immunity in this so that the
7 kids -- do you want the kids to be treated the same or
8 do you want them treated differently?
9        REPRESENTATIVE KOWALKO: I always want the
10 kids treated the same. What I don't think is the
11 intention of this Bill, Senate Bill 29 and never has
12 been, is to go forward and waive sovereign immunity of
13 the State. And I think if that is -- is, in fact,
14 inserted into this Bill, yes, it will go back to the
15 Senate and fall.
16        REPRESENTATIVE WAGNER: Okay. Then that
17 then -- my question, I think I'm clear now, you just
18 like many of us here, are in favor of in these types of
19 abuses that the State does not invoke sovereign immunity
20 and say we're not responsible. You're in favor of the
21 kids being treated the same. Your fear is, not the
22 issue of sovereign immunity, but your fear is that we
23 will not have time to finish this Bill and get it back
24 to the Senate and get it passed and you want a Bill to

Page 97

1 be put in place.
2        REPRESENTATIVE KOWALKO: No. No. One of
3 my fears is that this issue will not be addressed, and
4 this issue is the ability of our children, of those
5 children who have been molested, of those children whose
6 futures have been ruined and that the attempts to cover
7 up this issue have been and been made and have been
8 many, that they have access to recourse - and they're no
9 longer children at this time - and that this Bill
10 provides for that. And I believe that the issue of
11 sovereign immunity in leading forward should be
12 addressed as separate legislation because it's a very
13 serious consequence that we need to address the issue of
14 waiving of sovereign immunity that we look at it more
15 intently.
16        Now, as far as this Bill's application to
17 it, it does not waive sovereign immunity so much as it
18 institutes a gross negligence requirement which, in
19 effect, does have the prospect -- does have the actual
20 effect much waiving sovereign immunity.
21        REPRESENTATIVE WAGNER: Okay. If I could
22 continue this conversation with the witness. If you are
23 talking about waiving sovereign immunity in this Bill
24 are we talking about waiving it in any other

25 (Pages 94 to 97)

ab4133f8-bb59-4df3-96be-10511ba04c14

A272

Page 98

1  circumstances except in context of this Bill?
2      MR. RON SMITH:  Only for this Bill.
3      REPRESENTATIVE WAGNER:  Okay.  So what
4  we're talking about is waiving sovereign immunity for
5  this Bill and this Bill alone.  What we're saying is
6  this clarifies that is the intent, so I fail to
7  understand why you're afraid of sovereign immunity
8  issues swirling about everything because it has nothing
9  to do with anything that's not in this Bill.  Sovereign
10  immunity in this context is for this Bill.  The
11  clarification makes it clear.  If you want kids treated
12  the same in this instance when you're talking about
13  abuse it seems that the clarification would be a good
14  thing.  If, in fact, what you're worried about is the
15  Bill may not have a chance to go back to the Senate and
16  get passed and therefore the Bill will not be put in
17  place which we need to be put in place, that I
18  understand.  Other than that I don't understand why
19  you're afraid of clarifying it.  Thank you.
20      SPEAKER OF THE HOUSE:  Thank you,
21  Representative.  Any questions, any additional questions
22  for the witness?  No other questions.  You may be
23  excused.  Thank you, Mr. Smith.
24      Representative Lavelle.

Page 99

1      REPRESENTATIVE LAVELLE:  Thank you,
2  Mr. Speaker.  I stand for all victims, again, past,
3  present and future, regardless of who assaulted them,
4  regardless of the institution that was to care for them.
5  I am not here to make anyone uncomfortable with this
6  vote.  I am not here to call into questions anyone's
7  integrity with this vote.  I understand there is concern
8  about this amendment amongst other reasons that attorney
9  Flynn may have had something to do with it.  I
10  understand that was a concern.  These are -- this is my
11  intent.  These are my words.  I do not intend to put any
12  of you on either side of this aisle in a position where
13  you would say someone could accuse you of simply
14  accepting a church amendment.  This is not a church
15  amendment for clarity.  This is Greg Lavelle's
16  amendment.  These are Greg Lavelle's intentions.  But I
17  am not going to put you all in that position.
18      Mr. Speaker, I move that we table House
19  Amendment 2 to Senate Bill 29 as amended by House
20  Amendment number 1.
21      SPEAKER OF THE HOUSE:  Hear a second?
22      UNIDENTIFIED REPRESENTATIVE:  Second.
23      SPEAKER OF THE HOUSE:  Motion has been made
24  and seconded to table House Amendment number 2 with

Page 100

1  House Amendment number 1 to House Amendment number 2 on
2  the speaker's table.  All in favor signify by saying
3  aye.
4      (Whereupon various members of the House of
5  Representatives replied aye.)
6      SPEAKER OF THE HOUSE:  Opposed?  Motion
7  carries.  House Amendment number 2 with House Amendment
8  number 1 to House Amendment number 2 to Senate Bill 29
9  laid on the Speaker's table.
10      Representative Hudson.
11      REPRESENTATIVE HUDSON:  Thank you,
12  Mr. Speaker.  I have House Amendment number 3.  May I
13  have it read in, sir?
14      SPEAKER OF THE HOUSE:  Yes, you may.
15  Mr. Clerk.
16      THE CLERK:  Mr. Speaker, House Amendment
17  number 3 to Senate Bill number 29 sponsored by
18  Representative Hudson.  Mr. Speaker, this constitutes
19  the first reading of this Amendment 3 to Senate Bill 29
20  by title only.
21      SPEAKER OF THE HOUSE:  Okay.  On the
22  amendment, Representative Hudson.
23      REPRESENTATIVE HUDSON:  Greg, so what are
24  you doing?

Page 101

1      SPEAKER OF THE HOUSE:  Hang in there with
2  us.  The sponsor of the Bill is working on discussing
3  her amendment, so . . .  Representative Hudson, on
4  House Amendment number 3.
5      REPRESENTATIVE HUDSON:  Yes.  House
6  Amendment number 3 was suggested to me by our
7  Representative in the Joint Finance Committee.  It seems
8  that it's more appropriate when you have a Bill with a
9  fiscal note if you say that the Bill would be effective
10  when the funds are appropriated.  So this is just an
11  encouragement for JFC to appropriate money for this Bill
12  and if there is no other questions, voice vote on this
13  amendment.
14      SPEAKER OF THE HOUSE:  All in favor of
15  House Amendment number 3 to Senate Bill 29 indicate by
16  saying aye.
17      (Whereupon various members of the House of
18  Representatives replied aye.)
19      SPEAKER OF THE HOUSE:  Opposed?  Motion
20  carries.  House Amendment number 3 is now part of Senate
21  Bill 29.  On the Bill's amendment, Representative
22  Hudson.
23      REPRESENTATIVE HUDSON:  I'm sorry, what did
24  you say?

26 (Pages 98 to 101)

ab4133f8-bb59-4df3-96be-10511ba04c14

Page 102

1    SPEAKER OF THE HOUSE: House Amendment
2 number 3 is part of the Bill, Senate Bill 29.
3    REPRESENTATIVE HUDSON: Thank you. And I
4 believe there is more amendments.
5    SPEAKER OF THE HOUSE: Okay.
6 Representative Lavelle.
7    REPRESENTATIVE LAVELLE: Mr. Speaker, I
8 have an amendment to produce.
9    SPEAKER OF THE HOUSE: Please present your
10 amendment.
11    REPRESENTATIVE LAVELLE: Yes.
12    SPEAKER OF THE HOUSE: Once again, we'll
13 wait until all the members have a copy of the amendment.
14    Mr. Clerk.
15    THE CLERK: Mr. Speaker, House Amendment
16 number 4 to Senate Bill 29 sponsored by Representative
17 Lavelle. Mr. Speaker, this constitutes the first
18 reading of House Amendment number 4 to Senate Bill 29 by
19 title only.
20    SPEAKER OF THE HOUSE: Representative
21 Lavelle on the amendment.
22    REPRESENTATIVE LAVELLE: Thank you,
23 Mr. Speaker. House Amendment number 4 does the same
24 thing, the intent, the end result is the same as House

Page 103

1 Amendment number 2. House Amendment number 4 is the
2 exact language from last year's House Substitute 1 to
3 House Bill 450. Tony Flynn had nothing to do with it.
4 I'm not looking to put anybody in a box. I want you
5 comfortable with the intent and where the amendment came
6 from. This language is the exact language from last
7 year's HS 1 to HB 450. Many of you were sponsors and
8 co-sponsors of that legislation. The intent is to
9 waive, unquestionably waive, sovereign and limited
10 immunity and the window and the intent to waive
11 sovereign and limited immunity in the future. I'd ask
12 for personal privilege from Ron Smith just to clarify
13 that from a legal standpoint.
14    SPEAKER OF THE HOUSE: Yes, sir, without
15 objection so ordered.
16    MR. RON SMITH: Ron Smith, House attorney.
17    REPRESENTATIVE LAVELLE: Mr. Smith, in your
18 estimation does this achieve the same intent of House
19 Amendment number 2 just using different words?
20    MR. RON SMITH: Yes.
21    REPRESENTATIVE LAVELLE: So there is always
22 in legal writing ways to get to the same end simply
23 using different words and this does that?
24    MR. RON SMITH: Correct.

Page 104

1    REPRESENTATIVE LAVELLE: We don't need to
2 go through all your testimony again. I have no further
3 questions, Mr. Speaker.
4    SPEAKER OF THE HOUSE: You may be excused
5 Mr. Smith. Representative Lavelle.
6    REPRESENTATIVE LAVELLE: Mr. Speaker, I
7 stand for all victims past, present and future. I stand
8 for all victims. There are 122,000 public school
9 students in the State of Delaware, approximately 15,000
10 of those public school students are special needs or
11 special education. Some of those public school students
12 have severe developmental issues. My son is one of
13 them. I stand for all victims, Mr. Speaker. We care
14 for by default in this State some of the most
15 vulnerable, some of the most at-risk people in our
16 State. Many of those people come from families that are
17 equally at risk and vulnerable and often cannot speak
18 for themselves, either literally in the case of many
19 children, or figuratively in the case of some of these
20 families.
21    The amendment is simple. My intent is
22 simple. We include everyone. We leave no one out. We
23 should not fear this. We should embrace this amendment.
24 The words that best support my amendment, Mr. Speaker,

Page 105

1 and ladies and gentlemen, are the words of many of the
2 victims' advocates, equal access to courts, equal
3 treatment under the law, the ability to face an accuser
4 after years of abuse or in the future, let no one hide,
5 treat all children equally. Mr. Speaker, that is all
6 this amendment does. It costs the State nothing. We
7 should deal with this issue today. If we want to be the
8 first state, we should be the first state that stands up
9 for all of our children, all of our children, beyond
10 question, and that's what I ask you, ladies and
11 gentlemen, to do today, leave no child behind in the
12 future. Leave no victim behind ever.
13    Mr. Speaker, unless there are any questions
14 I'll ask for a roll call.
15    SPEAKER OF THE HOUSE: Thank you,
16 Representative Lavelle. I have Representative Valihura,
17 Representative Gilligan, Representative Hudson.
18 Representative Valihura, open dialogue.
19    REPRESENTATIVE VALIHURA: Thank you. Open
20 dialogue with the sponsor, please. Thank you. I have
21 now listened to 11 and a half hours of public testimony.
22 I have had countless, countless private conversations
23 with the sponsor. I have had numerous discussions with
24 my colleagues. I have yet to hear the reason why this

27 (Pages 102 to 105)

Page 106

1  should not be added to this Bill, and I am rising now to
2  see if I can't get a public explanation as to why we
3  should not add this to this Bill before we vote on it.
4        SPEAKER OF THE HOUSE:  I have
5  Representative Gilligan and then Representative Hudson,
6  in that order.  Open dialogue, sir.
7        REPRESENTATIVE GILLIGAN:  Thank you,
8  Mr. Speaker.  Representative Valihura, I think it
9  confuses the issue.  We feel the original Bill deals
10  with both public and private sector.  If we're going to
11  get a Bill here this evening I suggest we defeat this
12  and we pass the Bill.  We are in the same place today,
13  sir, as we were this time last year, and you wanted an
14  answer, that's my answer.
15        SPEAKER OF THE HOUSE:  Ladies and
16  gentlemen, I know it's an emotional issue and there is a
17  lot of support in this chamber for you but there are
18  some others that want to discuss the issue and if you
19  continue to keep clapping we can't allow that.  And I
20  understand why you're here and I support why you're
21  here, but, please, out of respect for the members who
22  are asking questions and debating here in there a little
23  longer.  You have been very patient and I and my
24  colleagues appreciate it.  Representative.

Page 107

1        REPRESENTATIVE GILLIGAN:  Representative, I
2  respect Representative Valihura.  I know what he's
3  doing.  I know where his heart is.  I just feel this
4  amendment is going too far.  We believe the Bill does
5  what he wants done and we feel that the Bill would be
6  better off without this amendment.  We'll pass it
7  tonight.  He can get it back to the Senate if it passes,
8  it gets upstairs, and this year we will have a Bill
9  which we could have had last year.
10        REPRESENTATIVE VALIHURA:  Open dialogue.
11        SPEAKER OF THE HOUSE:  Yes, sir.
12        REPRESENTATIVE VALIHURA:  Now I am
13  completely confused.
14        SPEAKER OF THE HOUSE:  Representative
15  Valihura.
16        REPRESENTATIVE VALIHURA:  And if there was
17  ever, ever a need to make a clarifying amendment we have
18  just heard it.  I had a constitutional lawyer testify
19  that this Bill doesn't deal with sovereign immunity, a
20  constitutional lawyer who went to law school with me,
21  who graduated at the top of her class and now you're
22  telling me just the opposite.  I don't know who to
23  believe.  I believe that if you're doing this, you
24  better make it clear, and apparently everyone is in

Page 108

1  agreement that we ought to waive sovereign immunity and
2  we ought to do it.  So if we're going to do it, let's
3  make it crystal clear.
4        SPEAKER OF THE HOUSE:  Any other questions?
5  Representative Maier and then I'll come back.  I'm
6  sorry, Representative Hudson.
7        REPRESENTATIVE HUDSON:  That's all right.
8  I'll yield to Representative Maier.
9        SPEAKER OF THE HOUSE:  Okay.
10  Representative Maier and then I'll come back to
11  Representative Hudson.
12        REPRESENTATIVE MAIER:  I believe I'm
13  needing clarification for the reason why the Bill didn't
14  pass last year, if you don't mind.
15        SPEAKER OF THE HOUSE:  Okay.
16  Representative Lavelle, can you help Representative
17  Maier out?
18        REPRESENTATIVE LAVELLE:  Thank you, Mr.
19  Speaker.  Okay.  I'll give Representative Maier my
20  analysis of why the Bill didn't pass last year.  Last
21  year we struggled with the question of sovereign and
22  limited immunity.  We -- as in this amendment that we're
23  contemplating today.  This was in HS 1 to HB 450, this
24  exact language.  There was concern over the cost to the

Page 109

1  State.  I think that's misplaced but there was concern,
2  legitimate concern on the cost to the State.  What would
3  it do to the school districts.  We have had an
4  opportunity, Representative Gilligan, to move and learn
5  more about all of this, all of us have.  I know I have.
6  So I do think we have moved forward.  Through amendments
7  we gave back immunity to the State because of cost
8  considerations, and then we kind of took it out again in
9  another amendment and we gave it to the school districts
10  again in a limited way.  And at the end of the day we
11  got a Bill back at 3:30 in the morning or thereabout
12  that limited lawsuits, did not provide for a window, and
13  limited lawsuits to strictly the abuser, and it
14  contained, I believe, most of the issues of sovereign
15  and limited immunity and the Bill did not get voted on.
16  As the lead sponsor in the House at that time said I
17  don't believe it's a good idea to work legislation at
18  3:30 in the morning, I don't care what it is, and
19  particularly an issue that's as important as this is,
20  that we should see it in the light of day, that's why I
21  believe and that's the history of why it didn't pass and
22  that's what I believe and others can disagree with me.
23        REPRESENTATIVE MAIER:  So, open dialogue,
24  Mr. Speaker?

28 (Pages 106 to 109)

ab4133f8-bb59-4df3-96be-10511ba04c14

1    SPEAKER OF THE HOUSE:  Yes.
2    REPRESENTATIVE MAIER:  So the Bill that
3 came to us at 3:30 in the morning, how does that differ
4 with what we should do with or without your amendment?
5    REPRESENTATIVE LAVELLE:  Significantly.  It
6 did not provide for a window.  There was no back
7 lawsuits and it allowed for future lawsuits only suits
8 against the abuser.  It changed the statute of
9 limitations to 18 years, age of majority plus 25, so you
10 had to be 43 -- you couldn't file lawsuit after being 43
11 in future cases.  So there are significant differences.
12    REPRESENTATIVE MAIER:  So this is a new,
13 improved Bill.  It's had many hours of debate as we
14 heard.  The committees and the Senate has given us their
15 opinion as to this issue, and as the House we have every
16 right to do whatever we feel is appropriate to change or
17 amend what the Senate sends to us and then they can do
18 as they will over there.  I don't agree with
19 Representative Kowalko that they won't pass this Bill
20 should we amend it.  It's already amended with or
21 without the changes that Representative Lavelle is
22 advocating.
23    The next question I have is do we know how
24 our governor feels about this Bill, amended or not

1 amended, and I would like to ask if anyone could answer
2 that question?
3    SPEAKER OF THE HOUSE:  Representative
4 Hudson may be able to answer that.
5    REPRESENTATIVE LAVELLE:  I do not know,
6 sir.
7    REPRESENTATIVE MAIER:  Has anyone asked her
8 how --
9    SPEAKER OF THE HOUSE:  Representative
10 Gilligan, can you answer that question?  She asked a
11 question if anyone has heard how the governor stands
12 on --
13    REPRESENTATIVE GILLIGAN:  I have not
14 spoken, I have not spoken to the governor about the
15 legislation.  I'm just looking at Senate Bill 29 that
16 must have 30, 35 sponsors and there was no amendment.
17 It was a perfectly good Bill that was introduced into
18 the Senate.  It passed the Senate.  Now we come over
19 here and there is amendments that's going to make it
20 difficult to enact this into the law.  What I'm asking
21 is that this amendment be defeated and we go on and we
22 approve the Bill.
23    SPEAKER OF THE HOUSE:  Representative, I'd
24 like to remind you, sir, that the sponsor of the

1 amendment to the Bill is, in fact, the sponsor of the
2 Bill.  Representative Hudson --
3    REPRESENTATIVE GILLIGAN:  This the Bill was
4 all right at one time.
5    SPEAKER OF THE HOUSE:  Okay.  But I'm just
6 saying the amendment that was attached to this Bill is
7 the prime sponsor amended her Bill.
8    REPRESENTATIVE GILLIGAN:  Mr. Speaker, at
9 one time this Bill was fine.  It had already sponsors
10 when it was introduced.
11    SPEAKER OF THE HOUSE:  Okay.  Thank you.
12    REPRESENTATIVE GILLIGAN:  The point I'm
13 trying to make now we have amendment.  Anyway, I'd like
14 to help Representative Lavelle, sir, why don't you
15 introduce your thoughts in a separate Bill and let us
16 pass this?
17    SPEAKER OF THE HOUSE:  Representative
18 Kowalko, I know your comment, there was a comment
19 directed towards you and maybe you'd like to respond.
20    REPRESENTATIVE KOWALKO:  Yeah, let me
21 correct that.  I never said that my objection to any of
22 these amendments is because it will not pass muster in
23 the Senate.  I will say again, and I reiterate, that
24 Senate Bill 29 as it is written provides for a lifting

1 of sovereign immunity and it is quite specific and quite
2 all encompassing in that regard.  And that this
3 amendment - and I might correct the Speaker that this
4 amendment that we're discussing was not written by
5 Representative Hudson, it was written by Representative
6 Lavelle.
7    SPEAKER OF THE HOUSE:  Absolutely.  Let me
8 correct you, sir.  I said House Amendment number 3, the
9 minority leader brought up the fact that we amended the
10 Bill, and I said the House Amendment number 3 was mended
11 by the prime sponsor of the Bill.
12    REPRESENTATIVE KOWALKO:  Yeah, but
13 different amendment, different reasons.
14    SPEAKER OF THE HOUSE:  Right.
15    REPRESENTATIVE KOWALKO:  Yeah, but with all
16 due respect, the firing of the ghost writer of the
17 previous amendment is not distracting or it's changing
18 the fact that Senate Bill 29 standing on its own has all
19 of the protection that we need for a private --
20 equalization for private, public entities and also does
21 waive the sovereign immunity.
22    SPEAKER OF THE HOUSE:  Okay.  Thank you,
23 sir.  Representative Viola was first and I have
24 Representative Stone, Representative Wagner and I'll

ab4133f8-bb59-4df3-96be-10511ba04c14

Page 114

1  save Representative Hudson for last if you don't mind.
2  Representative Viola.
3      REPRESENTATIVE VIOLA:  Thank you,
4  Mr. Speaker.  My only comment to Representative Lavelle
5  and Representative Valihura is I also listened to the
6  constitutional attorney and what I heard her say, not to
7  put words into her mouth, was -- or at least what I
8  thought I heard was very -- very deliberately to say
9  sovereign immunity should be dealt with on its own
10  merits in a separate piece of legislation.  That's what
11  I heard.  And somebody can correct me if I'm not wrong
12  but that's what I thought I heard.  That it should be
13  dealt with in a separate piece of legislation.
14      SPEAKER OF THE HOUSE:  Representative
15  Lavelle, do you want to respond?
16      REPRESENTATIVE LAVELLE:  Open dialogue,
17  sure, sir.
18      SPEAKER OF THE HOUSE:  Yes.
19      REPRESENTATIVE LAVELLE:  Representative,
20  with all due respect to the constitutional scholar, she
21  doesn't get a vote.  I do.  We set the intent.  We set
22  the legislation and that's what we're charged with
23  doing.  We had a House attorney stand up and say that
24  you need the clarity.  So, yeah, there is differences of

Page 115

1  opinion.  And we should provide clarity when we can
2  provide clarity.  Representative, if this amendment were
3  to fail, which I don't believe it will, Mr. Speaker,
4  would you support changing sovereign and limited
5  immunity to essentially do this in a separate Bill this
6  year?
7      REPRESENTATIVE VIOLA:  I can't answer that
8  without seeing the piece of legislation and I think it
9  would be crazy for me to say yes or no.
10      REPRESENTATIVE LAVELLE:  Right in front of
11  you, sir.
12      SPEAKER OF THE HOUSE:  I have
13  Representative Stone, Representative Wagner,
14  Representative Hudson in that order.  Open dialogue.
15      REPRESENTATIVE STONE:  Thank you,
16  Mr. Speaker.  I am just rising because I'd like to make
17  a comment.  I have heard a lot of people here talk about
18  this Bill, Senate Bill 29, and actually act kind of
19  surprised or incredulous that any member of the House of
20  Representatives would be amending it.  That happens in
21  this chamber all the time.  House Bills go to the
22  Senate.  They get amended in the Senate.  They come back
23  to us.  Senate Bills come to this House chamber.  We
24  amend them.  We send them back to the Senate.  This Bill

Page 116

1  already has one amendment on it, it's Representative
2  Hudson's House Amendment number 3.  I believe it will
3  have House Amendment number 5 on it in the next few
4  moments.  It's going back to the Senate anyhow, and that
5  is why we have two chambers in this General Assembly
6  because it is with the actions of both chambers that we
7  are able to craft the best kind of legislation and the
8  best kind of public policy that we can possibly craft
9  for the citizens of Delaware.  No Senator or
10  Representative has a monopoly on the ability to craft
11  good legislation.  It is a -- it's teamwork and that's
12  what we're seeing here tonight.
13      So I think that the surprise that I'm
14  hearing from some of my colleagues that a Representative
15  would dare to amend a Senate Bill is just very
16  disingenuous.
17      SPEAKER OF THE HOUSE:  I have
18  Representative Wagner, Representative Valihura, then
19  I'll go back to Representative Hudson, save you for
20  last.
21      REPRESENTATIVE WAGNER:  Thank you,
22  Mr. Speaker.  I'm really trying to get my arms around,
23  you have -- some of the folks in this chamber have some
24  very difficult issues with this.  I'm trying to get my

Page 117

1  arms around it.  I can't figure it out.  And
2  Representative Kowalko and I can not figure it get this
3  figured out.  So if I can ask Representative Gilligan,
4  because I have great respect for him, and we agree on
5  most things, basically most Bills we do, now if you can
6  simply help me out.
7      I know that we all wanted a Bill passed
8  last year.  This is a very serious issue, and I know
9  that we want to get a Bill passed this year and we agree
10  on that.  I know we want to treat kids equally.  Now, it
11  seems the discussion is between whether we already have
12  basic language that would cover the opposite of
13  sovereign immunity in the Bill or whether we need to say
14  in addition to the Bill we're going to do away with
15  sovereign immunity.  So some folks here think it's
16  already covered in the Bill.  Some folks are just saying
17  well, let's clarify it and put it in again.
18      Now, I can understand a couple things.  I
19  can understand if the fear is because sovereign immunity
20  is a very serious issue that we don't want to talk about
21  that unless it is a separate Bill.  But that would be
22  the hold issue of sovereign immunity and not just as it
23  pertains to this very narrow usage of it.  I
24  legitimately can understand and can appreciate if there

30 (Pages 114 to 117)

ab4133f8-bb59-4df3-96be-10511ba04c14

A277

Page 118

1  is concern and this was the only amendment that it might
2  hold up the Bill and it wouldn't get through because
3  we're towards the end of the session and we might not
4  get it done and we want to get this Bill passed this
5  time by the governor.
6      So if you can help me understand, and I'm
7  missing something here and I don't know what it is, why
8  people are opposed to approve this clarified language on
9  here because I know they want the Bill to pass and I
10 know they want kids treated the same way. Can you help
11 me? I don't understand.
12     SPEAKER OF THE HOUSE: Representative
13 Gilligan.
14     REPRESENTATIVE GILLIGAN: Thank you,
15 Mr. Speaker. No, I don't think I can help you. We
16 don't believe the amendment is necessary. We feel the
17 Bill speaks for itself and the Bill does what we want to
18 do. It takes both the private and the public sector.
19     SPEAKER OF THE HOUSE: Representative
20 Valihura.
21     REPRESENTATIVE WAGNER: I think that says a
22 lot. Thank you.
23     SPEAKER OF THE HOUSE: Thank you.
24 Representative Valihura.

Page 119

1      REPRESENTATIVE VALIHURA: Let me make this
2  very clear. I have been inside the courtroom. I have,
3  indeed, made this argument myself. I have had the
4  argument made against me. The fact that your
5  legislation fails, your amendment fails, will be used
6  against you in this setting, and this setting would be
7  that when the issue comes before the court as to whether
8  or not sovereign immunity has been waived, the lawyer
9  will argue they didn't pass the amendment and therefore
10 sovereign immunity hasn't been waived. Don't kid
11 yourselves here, ladies and gentlemen, if you don't vote
12 for, this amendment sovereign immunity will not be
13 waived. Every argument that has been made today will
14 fail. Thank you.
15     SPEAKER OF THE HOUSE: Representative
16 Hudson, thank you for your patience.
17     REPRESENTATIVE HUDSON: Thank you. But if
18 gross negligence is the standard, then that's very
19 clear. Child sexual abuse -- child sexual abuse is a
20 gross negligent act and therefore it is covered.
21     My other point was to Mr. Lavelle, could I
22 have open dialogue with him for a moment?
23     SPEAKER OF THE HOUSE: Yes.
24     REPRESENTATIVE HUDSON: Mr. Lavelle, in a

Page 120

1  perfect world which amendment is your first choice,
2  number 2 or number 4?
3      REPRESENTATIVE LAVELLE: Miss Hudson, they
4  both do the same thing. I don't want anyone to be
5  uncomfortable with the words or who may have crafted
6  those words, so we'll vote for number 4.
7      REPRESENTATIVE HUDSON: Well, I'm not
8  uncomfortable. Let's set that straight. But I have a
9  couple questions because this seems very different.
10 Does this deal with simple negligence or gross
11 negligence?
12     REPRESENTATIVE LAVELLE: Mr. Smith --
13 Mr. Speaker, may I have personal privileges from the
14 floor?
15     SPEAKER OF THE HOUSE: Yes, without
16 objections.
17     REPRESENTATIVE LAVELLE: I'm not an
18 attorney so I'll defer to Mr. Smith.
19     REPRESENTATIVE HUDSON: Well, I would
20 wonder what the goal of the Bill was, simple negligence
21 or gross negligence.
22     REPRESENTATIVE LAVELLE: Excellent question
23 Representative. It is my understanding that the goal of
24 the Bill is gross negligence. It is my understanding

Page 121

1  that with the amendment that standard does not change.
2  It is my understanding that with the amendment gross
3  negligence becomes the standard, we set the standard, we
4  apply the standard, and we live by the standard. Gross
5  negligence, Mr. Smith, you can correct me if I'm wrong
6  in my understanding.
7      MR. RON SMITH: Line 15 of the Bill itself
8  still is in the Bill with the amendment and it would
9  still require a finding of gross negligence on the legal
10 entity.
11     REPRESENTATIVE HUDSON: Okay. Mr. --
12 Mr. Speaker, may I speak to Mr. Smith now?
13     SPEAKER OF THE HOUSE: Yes, you may.
14     REPRESENTATIVE HUDSON: Okay. Line number
15 five in the amendment, what is a political subdivision
16 of the State?
17     MR. RON SMITH: That would be counties,
18 municipalities, things of that nature.
19     REPRESENTATIVE HUDSON: Like -- okay. Was
20 that what you intended, Mr. Lavelle?
21     REPRESENTATIVE LAVELLE: Yes, this is the
22 language from last year from House Substitute 1 to House
23 Bill 450.
24     REPRESENTATIVE HUDSON: And you said,

31 (Pages 118 to 121)

ab4133f8-bb59-4df3-96be-10511ba04c14

A278

Page 122

1  Mr. Lavelle, that this amendment costs nothing?  You
2  just said that.  I quoted you when you said it.  But
3  wasn't this amendment the one that does have an
4  increased cost?
5        REPRESENTATIVE LAVELLE:  Excellent
6  question, Representative.  There was no fiscal note
7  applied to House Substitute 1 to House Bill 450 last
8  year.  No fiscal note was ever filed with it.  I can
9  only assume, as to all these rumors that we had heard,
10 and I heard them as well, turned out to be just that.
11 There were no rumors, so there is no costs.
12       REPRESENTATIVE HUDSON:  Okay.
13       REPRESENTATIVE LAVELLE:  But cost is not a
14 concern to me, ma'am.  I know it's a concern to some.  I
15 have never been in a camp that said cost is a concern.
16 We're not -- we're not asking Boys and Girls Clubs,
17 clearly cost is a concern to them.  Cost to the State is
18 not a concern to them.  No cost is a concern to me.  No
19 fiscal note was filed on the bill last year, therefore I
20 can assume there is no additional costs to the
21 additional costs to State.  Any suits would be paid for
22 out of the self insurance fund, I believe, and/or
23 general funds.
24       UNIDENTIFIED REPRESENTATIVE:  I heard no

Page 123

1  suits were filed.
2        REPRESENTATIVE LAVELLE:  I'm sure we have
3  done the right thing.
4        REPRESENTATIVE HUDSON:  Back to Mr. Smith,
5  may I ask him another question?
6        SPEAKER OF THE HOUSE:  Yes.  You may
7  continue.
8        REPRESENTATIVE HUDSON:  Mr. Smith, you had
9  Mr. Lavelle do an amendment to Amendment 2 because the
10 word Constitution was there improperly.  Is it properly
11 listed in House Amendment number 4?
12       MR. RON SMITH:  This legislation is not an
13 amendment to the Constitution.
14       REPRESENTATIVE HUDSON:  Okay.
15       MR. RON SMITH:  It can't do that and the
16 inference from the way House Amendment number 2 was
17 originally written it was saying it was overriding the
18 Constitution itself.
19       REPRESENTATIVE HUDSON:  Right.
20       MR. RON SMITH:  Now there are provisions
21 that sovereign immunity can be waived if - and there is
22 case law on it - if the General Assembly expresses its
23 intent to do that.
24       REPRESENTATIVE HUDSON:  Thank you.

Page 124

1  Mr. Speaker, the reason why I stood up was actually
2  because I stood up a long time ago, if you remember.
3        SPEAKER OF THE HOUSE:  Yes.
4        REPRESENTATIVE HUDSON:  I thought it might
5  be a nice idea that since this is a new amendment that
6  perhaps we ought to bring up the attorney who wrote
7  Senate Bill 29 and see if this fits in with the goal and
8  if it -- if there is anything that he might want to add,
9  no offense to Mr. Smith, I talked to him all afternoon
10 about it, but I just think to be thorough it would be
11 important to bring up Mr. Jeff Clark.
12       SPEAKER OF THE HOUSE:  Without objection so
13 ordered.
14       MR. JEFF CLARK:  Jeff Clark, Senate
15 attorney.
16       SPEAKER OF THE HOUSE:  Representative
17 Hudson.
18       REPRESENTATIVE HUDSON:  Have you read
19 Senate Amendment number 4?
20       MR. JEFF CLARK:  Yes, I have, ma'am, I have
21 to say I have listened to a good bit of the debate.  To
22 be clear, Senate Bill 29 is a statute of limitations
23 Bill.  The Bill does not change the status quo as it's
24 written with regard to sovereign immunity.  Sovereign

Page 125

1  immunity is a defense as statute of limitations is a
2  defense.  When a complaint is filed and a defendant
3  files an answer they're free to plead statute of
4  limitations as a defense.  The State under the status
5  quo can plead sovereign immunity and qualified immunity
6  to the extent it applies, just as a private entity could
7  plead bankruptcy as a defense which would not --
8  obviously would not apply to the State.  It's really
9  apples and oranges the type of situation.
10       With regard to Senate -- or House amendment
11 number 4, to be clear and so the chamber -- I mean so
12 the General Assembly understands what it's doing with
13 this, this would make a simple negligent standard the
14 same type of standard that someone would be sued for if
15 they rear ended another automobile at a traffic light
16 apply to the State going forward across the board for
17 any of the enumerated sexual offenses that are listed in
18 this Bill.  That is a very broad brush to apply in a
19 case like this.  I mean ultimately that has to be a
20 policy call as to whether this Bill is converted from a
21 statute of limitations Bill to also cover sovereign
22 immunity.  Again, that is a policy call.
23       Either -- one other comment, and as I have
24 looked through House Amendment number 4 is it waives all

32 (Pages 122 to 125)

A279

ab4133f8-bb59-4df3-96be-10511ba04c14

Page 126

1  of the immunity provisions of Chapter 40 in the title --
2  of Chapter 40 in this title and that would include, for
3  instance, taking off the cap of $300,000 and that's for
4  as a policy decision for this chamber to make as it
5  would be for the Senate as to what effect that would
6  have with different groups that are affected by that, if
7  that were to happen.  That's why I -- I can not
8  emphasize enough that it is an apples and oranges
9  situation.
10         This is a -- Senate Bill 29 is a statute of
11 limitations Bill.  It's a statute of limitations Bill
12 and perhaps some of the confusion has come into play
13 here because this statute of limitations Bill gives
14 sovereign immunity-like protection to private entities
15 during the look-back provision.  It's a statute of
16 limitations Bill that gives that extra protection during
17 the look-back provision to private entities.  And
18 that's --
19         REPRESENTATIVE HUDSON:  Are you saying
20 maybe that the content of House Amendment 4 doesn't even
21 fit under the title of Senate Bill 29?
22         MR. JEFF CLARK:  No, Senator, I can't give
23 you -- Representative, I'm used to talking to Senators.
24 I apologize.  No, it would fit within the scope of the

Page 127

1  Bill.
2         REPRESENTATIVE HUDSON:  Okay.  I wasn't
3  sure how far you were going with that.  All right.
4  Let's see, what else do I want to ask.  Well, maybe
5  someone else has a question.
6         SPEAKER OF THE HOUSE:  I think
7  Representative Valihura, questions of the witness?
8         REPRESENTATIVE VALIHURA:  Yes.  Thank you,
9  Mr. Clark, for being here this evening.  Mr. Clark, tell
10 me can you add some clarity as the draftsperson of this
11 legislation as to whether or not there was an intent to
12 waive sovereign immunity in the Bill?
13         MR. JEFF CLARK:  Senator, on the face of
14 the Bill --
15         REPRESENTATIVE VALIHURA:  I'm not there
16 yet.  You'll have to bear with me.  Maybe a couple of
17 years I'll be a Senator but I'm still a Representative.
18         MR. JEFF CLARK:  I'm sorry, sir.
19         SPEAKER OF THE HOUSE:  He did like that.
20         MR. JEFF CLARK:  I'm sorry, sir.  I'm
21 sorry.  I apologize.
22         SPEAKER OF THE HOUSE:  He did like that.
23         REPRESENTATIVE VALIHURA:  I did like, I
24 must say it did sound pretty good.

Page 128

1         MR. JEFF CLARK:  I was in the military
2  before so I'm well conditioned to say sir and well
3  conditioned to say senators when I respond to folks
4  here.  Representative, as far as the Bill is clear on
5  its face that it is a statute of limitations Bill that
6  neither adds to, nor takes away, from the status quo
7  with regard to sovereign immunity and qualified
8  immunity.  That is a separate defense of the laundry
9  list and as you would well know, Representative, in
10 filing an answer, the defendant would do in a case they
11 would list a laundry list of defenses, and statute of
12 limitations would be one, sovereign immunity would be
13 another, qualified immunity would be another defense,
14 and the Bill does not change that.  I mean, the State
15 would be subject to suit if qualified immunity did not
16 apply otherwise.  So really it's not -- the Bill is
17 quite clear with what it does.
18         REPRESENTATIVE VALIHURA:  Well, I
19 appreciate your view, but we have a difference of
20 opinion in the chamber, and we have a difference of
21 intention of the Bill.  I also believe that these are
22 two defenses, are they not, sovereign immunity and
23 statute of limitations?
24         MR. JEFF CLARK:  They are two separate

Page 129

1  defenses.
2         REPRESENTATIVE VALIHURA:  And is there any
3  legal reason why we can't include defenses in a Bill?
4         MR. JEFF CLARK:  No, sir, there would be no
5  legal impediment.  It would be a policy decision.
6         REPRESENTATIVE VALIHURA:  I'm sorry.
7         MR. JEFF CLARK:  It would be a policy
8  decision as to whether that --
9         REPRESENTATIVE VALIHURA:  Right.  That
10 would be a policy decision as to whether we wanted to do
11 that, right.  That's your understanding?
12         MR. JEFF CLARK:  That would be correct,
13 sir.
14         REPRESENTATIVE VALIHURA:  Very well.  Thank
15 you.
16         SPEAKER OF THE HOUSE:  Before we go back to
17 Representative Wagner, Representative Schwartzkopf, did
18 you have any -- okay.  Representative Maier for the
19 witness, then I have Representative Short, Brian Short
20 so --
21         REPRESENTATIVE MAIER:  Yes, please.  Thank
22 you.  Mr. Speaker --
23         SPEAKER OF THE HOUSE:  Open dialogue with
24 the witness, yes.

33 (Pages 126 to 129)

ab4133f8-bb59-4df3-96be-10511ba04c14

Page 130

1    REPRESENTATIVE MAIER: All right.
2  Mr. Clark, could you give your opinion as to whether
3  Representative Lavelle's amendment would provide clarity
4  to a court? That seems to be kind of a point that needs
5  to be --
6    MR. JEFF CLARK: That's correct,
7  Representative. It would provide clarity for a court
8  that the General Assembly intends the State to be
9  subject to suit for simple negligence. That's a simple
10  deviation from the ordinary standard of care, which is
11  much different than the liability that the State faces
12  now for wrongful death cases. It would be a different
13  standard from a wrongful death case that was caused by a
14  State employee. It would be a different standard for
15  personal injury cases. It would carve out an exception
16  and that certainly it calls for a lot of different
17  policy considerations in my opinion.
18    REPRESENTATIVE MAIER: So also in your
19  opinion you might think that should we go through this
20  door it might open the door to have this apply to
21  wrongful death in other areas, is that correct?
22    MR. JEFF CLARK: It would, Representative.
23  It would open the door in a lot of regards. I mean,
24  with regard to -- for instance, now municipalities have

Page 131

1  their liability and the General Assembly has spoken,
2  said their liabilities cap at $300,000. And this -- it
3  would take that away. So what would be the effect of
4  insurance policies if municipalities had gone out and
5  purchased, if you go down this road and you open up this
6  can of worms and you address these additional policy
7  issues.
8    REPRESENTATIVE MAIER: And the State's cap,
9  we don't have one?
10    MR. JEFF CLARK: The 300,000 dollar cap
11  with regard to that is in the County Municipal Court
12  Claims Act which would be waived under this amendment as
13  would be the --
14    REPRESENTATIVE MAIER: And school
15  districts, how would it impact them?
16    MR. JEFF CLARK: It would keep -- make the
17  school districts - and this is going forward - it would
18  make school districts liable for simple negligence,
19  simple -- negligently hiring employees, for not
20  investigating them properly and just merely exceeding
21  the ordinary standard of care in that. It would hold
22  them liable for negligently supervising its employees
23  which under current law now it would have to be -- they
24  would have to be found to be grossly negligent in order

Page 132

1  to be found liable in that regard.
2    REPRESENTATIVE MAIER: So it lowers the
3  level?
4    MR. JEFF CLARK: Yes. Yes, ma'am.
5    REPRESENTATIVE MAIER: Okay. Thank you.
6    SPEAKER OF THE HOUSE: I have Brian --
7  Representative Short, I'm sorry, you have a question for
8  the --
9    REPRESENTATIVE BRIAN SHORT: Thank you,
10  Mr. Speaker. Not being a lawyer, a quick question for
11  you. Representative Lavelle is very interested in
12  creating equality between the public sector and the
13  non-public sector. Does the non-public sector enjoy
14  defenses that the public sector cannot enjoy?
15    MR. JEFF CLARK: Bankruptcy is the first
16  one that comes to mind, Representative.
17    REPRESENTATIVE SHORT: I was just trying to
18  establish whether, in fact, we can create a level
19  playing field.
20    SPEAKER OF THE HOUSE: Representative
21  Marshall, comments or questions for the witness? Anyone
22  else have questions or comments for the witness?
23  Representative Wagner, thank you.
24    REPRESENTATIVE WAGNER: Thank you. Okay.

Page 133

1  This will be quick. Representative Valihura said
2  something, I want to see if I understood it correctly.
3  You can help me. We have now spent a great deal of time
4  talking about the issue of sovereign immunity. If we
5  defeat this amendment then when a court case comes up
6  can an attorney go to the discussion of this Bill and
7  say that it was not legislative intent to have sovereign
8  immunity because we defeated the amendment?
9    MR. JEFF CLARK: Representative, it's my
10  opinion that if this amendment does not get added to the
11  Bill that will not become an issue. The issue -- the
12  Bill will stay merely a statute of limitations Bill that
13  qualified immunity analysis, that sovereign immunity
14  analysis will continue just as it does now if an action
15  happened a year ago. It will be treated the same way.
16  The public entities will be subject to lawsuit in the
17  same way.
18    REPRESENTATIVE WAGNER: But you don't think
19  an attorney -- if we had not had that discussion, this
20  discussion, if it passes, then I understand. If it
21  doesn't pass now because we spent a lot of time and we
22  may end up saying we do not think based on this vote
23  that there should be limited sovereign.
24    MR. JEFF CLARK: Representative, it goes

34 (Pages 130 to 133)

ab4133f8-bb59-4df3-96be-10511ba04c14

A281

Page 134

1  back to how do you frame the issue, how do you frame
2  what you want to do with this Bill. And if this is a
3  statute of limitations Bill, this statute of limitations
4  Bill applies to public entities. It applies to private
5  entities. It applies to the State. It applies to
6  individuals as a statute of limitations Bill, which is
7  exactly what this is.
8          REPRESENTATIVE WAGNER: Thank you.
9          SPEAKER OF THE HOUSE: Any other questions
10 for the witness? You may be excused. I have
11 Representative Schwartzkopf, he's been very patient,
12 thank you, Representative Marshall in that order and
13 I'll go back to Representative Hudson. Representative
14 Schwartzkopf, open dialogue.
15         REPRESENTATIVE SCHWARTZKOPF: Thank you,
16 Mr. Speaker. I have a comment or statement I'd like to
17 make. I'm pretty much in a pickle here. I had a very
18 nice conversation with the sponsor of the amendment the
19 other day about the protection of all of our children
20 and I agree with that. And I gave my word that day that
21 I would support the amendment as long as I felt it would
22 not be jeopardized getting back to the Senate. I still
23 feel that way. I stand here today - Greg, I have to
24 apologize to you publicly, I have to have retract my

Page 135

1  support, not for the passage of your amendment, but I
2  don't feel that this Bill will stand a very good chance
3  of getting back through the Senate. And the reason I
4  say that is because the Senate has not had any debate
5  yet whatsoever about sovereign immunity.
6          We're talking about two separate policy
7  issues here. We're talking about statutes of
8  limitations that was debated for hours in the Senate.
9  And it comes over here and we're doing exactly what
10 Representative Stone said we have every right to do, and
11 that is amend the Bill and change it, do whatever we
12 want, and that's what we can do. But these people here
13 today want a Bill passed before we leave here and that
14 Bill is to protect our children, and it's to look back
15 and to look forward. And that's what Senate Bill 29
16 does.
17         I'm afraid that if we attach this
18 amendment, Greg, I'm afraid that we would not end up
19 with a Bill. I offer you my support to take this away,
20 come back with a separate Bill, I'll sign on to it with
21 you. I'm just afraid that if we take the sovereign
22 immunity debate and put it back in the Senate that's
23 where it's going to stay. We're not going to have the
24 time to get it back through and we will not have a Bill

Page 136

1  to protect these kids to offer them the look-back and
2  the moving forward.
3          I don't know, I mean I heard Representative
4  Valihura say tell me a reason why we shouldn't do this
5  and this is one of the reasons I think. I think what we
6  have done is we have taken a second huge, huge, huge
7  policy issue and stuck it on a Bill that we -- I think
8  both Houses agree with on the statute of limitations. I
9  think if it was just that it would be through in no
10 problems. But I think now with the second issue
11 attached I think it will come out of here but I don't
12 think it will come out of there, and I really have some
13 concerns that we're going to end up on June 30th with
14 nothing again and these people up here will not stand
15 for that and they shouldn't stand for that.
16         SPEAKER OF THE HOUSE: Thank you,
17 Representative. Representative Marshall. Okay. Any
18 other comments? Representative Lavelle, you have an
19 amendment before us. Representative Hudson.
20         REPRESENTATIVE HUDSON: Yes, before
21 Representative Lavelle speaks I would just say that I
22 regard this as an unfriendly amendment and I think
23 Representative Schwartzkopf was eloquent in expressing a
24 lot about what I feel. I'm a compromiser, but I feel

Page 137

1  that the sovereign immunity is in the Bill, I would say
2  that State employees if they conduct gross negligence
3  they are free to be sued, that's what I need to know.
4  The lawyers have said that's true. I feel comfortable
5  to know that someone that conducts child sexual abuse
6  will be recognized as doing something grossly negligent
7  by our State and I think that our courts would agree
8  with that. So I feel that this amendment is very
9  unfriendly and I would just ask for my colleagues to
10 vote no on this.
11         SPEAKER OF THE HOUSE: Representative
12 Lavelle.
13         REPRESENTATIVE LAVELLE: Thank you, Mr.
14 Speaker. Thank you, Representative Schwartzkopf. I
15 appreciate your candor. The status quo is not
16 acceptable. We have heard that. Children get abused.
17 We have heard that. Institutions hide the abuser. We
18 have heard that. We are not free from all those
19 afflictions. It is our responsibility, first and
20 foremost, to care for their -- our children, all of our
21 children. How many children could theoretically be
22 abused between now and when we fix this at some point in
23 the future? The Senate wrestled last year with the
24 issue of sovereign and limited immunity. It has always

35 (Pages 134 to 137)

ab4133f8-bb59-4df3-96be-10511ba04c14

A282

Page 138

1  been my intent to protect all of our children,
2  Mr. Speaker. I stand for our victims, all our victims,
3  Mr. Speaker. Let us set the standard and live by it.
4  Set the standard and live by it. No special treatment
5  for the State.
6       Representative Hudson, you're right, a
7  teacher could be sued, the district that hides or
8  enables that teacher cannot without this amendment. Let
9  us lead the nation in this issue. Let us be the first
10 state in the country to raise sovereign and limited
11 immunity and say we stand for everyone. Let's not
12 differentiate between victims based on their employers.
13 Let us protect all children, including the 120,000
14 children who go to our public schools every day,
15 Mr. Speaker. Let us stand for all victims, Mr. Speaker.
16       Roll call on the amendment.
17       SPEAKER OF THE HOUSE: Madam Chief Clerk,
18 please call the roll on House Amendment number 4 to
19 Senate Bill 29.
20       MADAM CHIEF CLERK: You have Pam Maier with
21 her hand up.
22       SPEAKER OF THE HOUSE: Oh, I'm sorry.
23 Representative Maier, you had your hand up before the
24 roll call?

Page 139

1       REPRESENTATIVE MAIER: If you don't mind, I
2  just, I have a question to Representative Lavelle. Did
3  you attempt to get this amended in the Senate? Did you
4  attempt to have this language worked prior to it coming
5  to the House?
6       REPRESENTATIVE LAVELLE: No,
7  Representative, I'm unable to amend Bills that are in
8  the Senate. I was with -- I have always operated under
9  the understanding that the State would be held equally
10 responsible. We have HS 1 to HB 450 from last year that
11 dealt with this issue. I can't amend Bills in the
12 Senate. I can't control the Senate any more than you
13 can, Representative.
14       REPRESENTATIVE MAIER: But I would think
15 that if it was really important to you, you would not
16 have gone to a Senator and asked them to put it on
17 the -- I mean I'm just wondering, you know, about --
18       REPRESENTATIVE LAVELLE: I appreciate your
19 concerns, Senator -- I mean Representative, I'm sorry.
20 Again, we're talking about all children, not some
21 children. We're talking about my child, my children,
22 one goes to a public, one goes to a private, even the
23 priest lawyer said before that if it was a special needs
24 student maybe they would deserve more protection,

Page 140

1  special protection. I have a special needs child. You
2  know, he's representative of all of these children,
3  Representative. I'm sorry, I can't amend Bills in the
4  Senate.
5       REPRESENTATIVE MAIER: Thank you.
6       REPRESENTATIVE LAVELLE: Thank you. Call
7  the roll, Mr. Speaker.
8       SPEAKER OF THE HOUSE: Madam Chief Clerk,
9  please call the roll on House Amendment number 4 to
10 Senate Bill 29.
11       MADAM CHIEF CLERK: Mr. Blakey.
12       REPRESENTATIVE BLAKEY: Yes.
13       MADAM CHIEF CLERK: Mr. Blakey yes.
14 Mr. Booth.
15       REPRESENTATIVE BOOTH: Yes.
16       MADAM CHIEF CLERK: Mr. Booth yes.
17 Mr. Brady.
18       REPRESENTATIVE BRADY: No.
19       MADAM CHIEF CLERK: Mr. Brady no.
20 Mr. Carey.
21       REPRESENTATIVE CAREY: Yes.
22       MADAM CHIEF CLERK: Mr. Carey yes. Mr.
23 Cathcart.
24       REPRESENTATIVE CATHCART: Yes.

Page 141

1       MADAM CHIEF CLERK: Mr. Cathcart yes.
2  Mr. Ennis.
3       REPRESENTATIVE ENNIS: No.
4       MADAM CHIEF CLERK: Mr. Ennis no.
5  Mr. Ewing.
6       REPRESENTATIVE EWING: No.
7       MADAM CHIEF CLERK: Mr. Ewing no.
8  Mr. Gilligan.
9       REPRESENTATIVE GILLIGAN: No.
10       MADAM CHIEF CLERK: Mr. Gilligan no.
11 Mrs. Hall-Long.
12       REPRESENTATIVE HALL-LONG: No.
13       MADAM CHIEF CLERK: Mrs. Hall-Long no.
14 Mr. Hastings.
15       REPRESENTATIVE HASTINGS: Yes.
16       MADAM CHIEF CLERK: Mr. Hastings yes.
17 Mr. Hocker.
18       REPRESENTATIVE HOCKER: No.
19       MADAM CHIEF CLERK: Mr. Hocker no. Miss
20 Hudson.
21       REPRESENTATIVE HUDSON: No.
22       MADAM CHIEF CLERK: Miss Hudson no.
23 Mr. Johnson.
24       REPRESENTATIVE JOHNSON: No.

36 (Pages 138 to 141)

ab4133f8-bb59-4df3-96be-10511ba04c14

A283

Page 142

1      MADAM CHIEF CLERK: Mr. Johnson no.
2  Miss Keeley.
3      REPRESENTATIVE KEELEY:  No.
4      MADAM CHIEF CLERK: Miss Keeley no.
5  Mr. Kowalko.
6      REPRESENTATIVE KOWALKO:  No.
7      MADAM CHIEF CLERK: Mr. Kowalko no.  Mr.
8  Lavelle.
9      REPRESENTATIVE LAVELLE.  Yes.
10     MADAM CHIEF CLERK: Mr. Lavelle yes.
11 Mr. Lee.
12     REPRESENTATIVE LEE:  Yes.
13     MADAM CHIEF CLERK: Mr. Lee yes.
14 Mr. Lofink.
15     REPRESENTATIVE LOFINK:  No.
16     MADAM CHIEF CLERK: Mr. Lofink no.
17 Mrs. Longhurst.
18     REPRESENTATIVE LONGHURST:  No.
19     MADAM CHIEF CLERK: Mrs. Longhurst no.
20 Mrs. Maier.
21     REPRESENTATIVE MAIER:  No.
22     MADAM CHIEF CLERK: Mrs. Maier no.
23 Mr. Manolakos.
24     REPRESENTATIVE MANOLAKOS:  Yes.

Page 143

1      MADAM CHIEF CLERK: Mr. Manolakos yes.
2  Mrs. Marshall.
3      REPRESENTATIVE MARSHALL:  Yes.
4      MADAM CHIEF CLERK: Mrs. Marshall yes.
5  Mrs. McWilliams.
6      REPRESENTATIVE McWILLIAMS:  No.
7      MADAM CHIEF CLERK: Mrs. McWilliams no.
8  Mr. Miro.
9      REPRESENTATIVE MIRO:  No.
10     MADAM CHIEF CLERK: Mr. Miro no.
11 Mr. Mitchell.
12     REPRESENTATIVE MITCHELL:  No.
13     MADAM CHIEF CLERK: Mr. Mitchell no.
14 Mr. Mulrooney.
15     REPRESENTATIVE MULROONEY:  No.
16     MADAM CHIEF CLERK: Mr. Mulrooney no.
17 Mr. Oberle.
18     REPRESENTATIVE OBERLE:  Yes.
19     MADAM CHIEF CLERK: Mr. Oberle yes.
20 Mr. Outten.
21     REPRESENTATIVE OUTTEN:  No.
22     MADAM CHIEF CLERK: Mr. Outten no.
23 Mrs. Plant.
24     REPRESENTATIVE PLANT:  No.

Page 144

1      MADAM CHIEF CLERK: Mrs. Plant no.
2  Mrs. Schooley.
3      REPRESENTATIVE SCHOOLEY:  No.
4      MADAM CHIEF CLERK: Mrs. Schooley no.
5  Mr. Schwartzkopf.
6      REPRESENTATIVE SCHWARTZKOPF:  No.
7      MADAM CHIEF CLERK: Mr. Schwartzkopf no.
8  Mr. B. Short.
9      REPRESENTATIVE B. SHORT:  No.
10     MADAM CHIEF CLERK: Mr. B. Short no.  Mr.
11 D. Short.
12     REPRESENTATIVE D. SHORT:  Yes.
13     MADAM CHIEF CLERK: Mr. D. Short yes.
14 Mrs. Stone.
15     REPRESENTATIVE STONE:  Yes.
16     MADAM CHIEF CLERK: Mrs. Stone yes.
17 Mrs. Thornburg.
18     REPRESENTATIVE THORNBURG:  Yes.
19     MADAM CHIEF CLERK: Mrs. Thornburg yes.
20 Mr. Valihura.
21     REPRESENTATIVE VALIHURA:  Yes.
22     MADAM CHIEF CLERK: Mr. Valihura yes.
23 Mr. Viola.
24     REPRESENTATIVE VIOLA:  No.

Page 145

1      MADAM CHIEF CLERK: Mr. Viola no.
2  Mrs. Wagner.
3      REPRESENTATIVE WAGNER:  Yes.
4      MADAM CHIEF CLERK: Mrs. Wagner yes.
5  Mr. Walls.
6      REPRESENTATIVE WALLS:  No.
7      MADAM CHIEF CLERK: Mr. Walls no.
8  Mr. Williams.
9      REPRESENTATIVE WILLIAMS:  No.
10     MADAM CHIEF CLERK: Mr. Williams no.
11 Mr. Speaker.
12     SPEAKER OF THE HOUSE:  Yes.
13     MADAM CHIEF CLERK: Mr. Speaker yes.
14     SPEAKER OF THE HOUSE:  Representative
15 Lavelle.
16     REPRESENTATIVE LAVELLE:  How am I voting,
17 Madam Chief Clerk?
18     MADAM CHIEF CLERK: Mr. Lavelle recorded
19 yes.
20     REPRESENTATIVE LAVELLE:  Yes.
21     SPEAKER OF THE HOUSE:  Representative
22 Maier.
23     REPRESENTATIVE MAIER: I believe I heard
24 the chief clerk say I voted no.  I actually went not

37 (Pages 142 to 145)

ab4133f8-bb59-4df3-96be-10511ba04c14

## Page 146

1 voting, but I vote a yes.
2     MADAM CHIEF CLERK: Mrs. Maier from not
3 voting to yes.
4     Mr. Speaker, the roll call reveals 17 yes,
5 24 no.
6     SPEAKER OF THE HOUSE: Not having received
7 this constitution majority vote, House Amendment number
8 4 to Senate Bill 29 declared defeated.
9     Representative Hudson.
10     REPRESENTATIVE HUDSON: Roll call.
11     SPEAKER OF THE HOUSE: Madam Chief Clerk,
12 please call the roll on Senate Bill 29 with House
13 Amendment number 3.
14     MADAM CHIEF CLERK: Mr. Blakey.
15     REPRESENTATIVE BLAKEY: Yes.
16     MADAM CHIEF CLERK: Mr. Blakey yes.
17 Mr. Booth.
18     REPRESENTATIVE BOOTH: Yes.
19     MADAM CHIEF CLERK: Mr. Booth yes.
20 Mr. Brady.
21     REPRESENTATIVE BRADY: Yes.
22     MADAM CHIEF CLERK: Mr. Brady yes.
23 Mr. Carey.
24     REPRESENTATIVE CAREY: Yes.

## Page 147

1     MADAM CHIEF CLERK: Mr. Carey yes. Mr.
2 Cathcart.
3     REPRESENTATIVE CATHCART: Yes.
4     MADAM CHIEF CLERK: Mr. Cathcart yes.
5 Mr. Ennis.
6     REPRESENTATIVE ENNIS: Yes.
7     MADAM CHIEF CLERK: Mr. Ennis yes.
8 Mr. Ewing.
9     REPRESENTATIVE EWING: Yes.
10     MADAM CHIEF CLERK: Mr. Ewing yes.
11 Mr. Gilligan.
12     REPRESENTATIVE GILLIGAN: Yes.
13     MADAM CHIEF CLERK: Mr. Gilligan yes.
14 Mrs. Hall-Long.
15     REPRESENTATIVE HALL-LONG: Yes.
16     MADAM CHIEF CLERK: Mrs. Hall-Long yes.
17 Mr. Hastings.
18     REPRESENTATIVE HASTINGS: Yes.
19     MADAM CHIEF CLERK: Mr. Hastings yes. Mr.
20 Hocker.
21     REPRESENTATIVE HOCKER: Yes.
22     MADAM CHIEF CLERK: Mr. Hocker yes. Miss
23 Hudson.
24     REPRESENTATIVE HUDSON: Yes.

## Page 148

1     MADAM CHIEF CLERK: Mr. Johnson.
2     REPRESENTATIVE JOHNSON: Yes.
3     MADAM CHIEF CLERK: Mr. Johnson yes. Miss
4 Keeley.
5     REPRESENTATIVE KEELEY: Yes.
6     MADAM CHIEF CLERK: Miss Keeley yes.
7 Mr. Kowalko.
8     REPRESENTATIVE KOWALKO: Yes.
9     MADAM CHIEF CLERK: Mr. Kowalko yes. Mr.
10 Lavelle.
11     REPRESENTATIVE LAVELLE: Not voting.
12     MADAM CHIEF CLERK: Mr. Lavelle not voting.
13 Mr. Lee.
14     REPRESENTATIVE LEE: Yes.
15     MADAM CHIEF CLERK: Mr. Lee yes.
16 Mr. Lofink.
17     REPRESENTATIVE LOFINK: Yes.
18     MADAM CHIEF CLERK: Mr. Lofink yes.
19 Mrs. Longhurst.
20     REPRESENTATIVE LONGHURST: Yes.
21     MADAM CHIEF CLERK: Mrs. Longhurst yes.
22 Mrs. Maier.
23     REPRESENTATIVE MAIER: Yes.
24     MADAM CHIEF CLERK: Mrs. Maier yes.

## Page 149

1 Mr. Manolakos.
2     REPRESENTATIVE MANOLAKOS: Yes.
3     MADAM CHIEF CLERK: Mr. Manolakos yes.
4 Mrs. Marshall.
5     REPRESENTATIVE MARSHALL: Yes.
6     MADAM CHIEF CLERK: Mrs. Marshall yes.
7 Mrs. McWilliams.
8     REPRESENTATIVE McWILLIAMS: Yes.
9     MADAM CHIEF CLERK: Mrs. McWilliams yes.
10 Mr. Miro.
11     REPRESENTATIVE MIRO: Yes.
12     MADAM CHIEF CLERK: Mr. Miro yes.
13 Mr. Mitchell.
14     REPRESENTATIVE MITCHELL: Yes.
15     MADAM CHIEF CLERK: Mr. Mitchell yes.
16 Mr. Mulrooney.
17     REPRESENTATIVE MULROONEY: Yes.
18     MADAM CHIEF CLERK: Mr. Mulrooney yes.
19 Mr. Oberle.
20     REPRESENTATIVE OBERLE: Yes.
21     MADAM CHIEF CLERK: Mr. Oberle yes.
22 Mr. Outten.
23     REPRESENTATIVE OUTTEN: Yes.
24     MADAM CHIEF CLERK: Mr. Outten yes.

38 (Pages 146 to 149)

ab4133f8-bb59-4df3-96be-10511ba04c14

Page 150

1  Mrs. Plant.
2      REPRESENTATIVE PLANT:  Yes.
3      MADAM CHIEF CLERK:  Mrs. Plant yes.
4  Mrs. Schooley.
5      REPRESENTATIVE SCHOOLEY:  Yes.
6      MADAM CHIEF CLERK:  Mrs. Schooley yes.
7  Mr. Schwartzkopf.
8      REPRESENTATIVE SCHWARTZKOPF:  Yes.
9      MADAM CHIEF CLERK:  Mr. Schwartzkopf yes.
10 Mr. B. Short.
11     REPRESENTATIVE B. SHORT:  Yes.
12     MADAM CHIEF CLERK:  Mr. B. Short yes.  Mr.
13 D. Short.
14     REPRESENTATIVE D. SHORT:  Yes.
15     MADAM CHIEF CLERK:  Mr. D. Short yes.
16 Mrs. Stone.
17     REPRESENTATIVE STONE:  Yes.
18     MADAM CHIEF CLERK:  Mrs. Stone yes.
19 Mrs. Thornburg.
20     REPRESENTATIVE THORNBURG:  Yes.
21     MADAM CHIEF CLERK:  Mrs. Thornburg yes.
22 Mr. Valihura.
23     REPRESENTATIVE VALIHURA:  Yes.
24     MADAM CHIEF CLERK:  Mr. Valihura yes.

Page 151

1  Mr. Viola.
2      REPRESENTATIVE VIOLA:  Yes.
3      MADAM CHIEF CLERK:  Mr. Viola yes.
4  Mrs. Wagner.
5      REPRESENTATIVE WAGNER:  Yes.
6      MADAM CHIEF CLERK:  Mrs. Wagner yes.
7  Mr. Walls.
8      REPRESENTATIVE WALLS:  Yes.
9      MADAM CHIEF CLERK:  Mr. Walls yes.
10 Mr. Williams.
11     REPRESENTATIVE WILLIAMS:  Yes.
12     MADAM CHIEF CLERK:  Mr. Williams yes.
13 Mr. Speaker.
14     SPEAKER OF THE HOUSE:  Yes.
15     MADAM CHIEF CLERK:  Mr. Speaker yes.
16     SPEAKER OF THE HOUSE:  Representative
17 Lavelle.
18     REPRESENTATIVE LAVELLE:  Thank you,
19 Mr. Speaker.  Voting yes.
20     MADAM CHIEF CLERK:  Mr. Lavelle from not
21 voting to yes.
22     SPEAKER OF THE HOUSE:  Representative
23 Cathcart.
24     MADAM CHIEF CLERK:  Mr. Speaker, the roll

Page 152

1  call reveals 41 yes.
2      SPEAKER OF THE HOUSE:  Having received its
3  constitution majority vote Senate Bill 29 with House
4  Amendment number 3 declared passed the House.

Page 153

1  State of Delaware        }
2                           }
3  County of New Castle     }
4
5
6
7      C E R T I F I C A T E
8
9      I, Elaine G. Parrish, Registered Professional
10 Reporter and Notary Public, do hereby certify that the
11 foregoing record, pages 1 to 153 inclusive, is a
12 transcript of my stenographic notes taken from an
13 audiotape in the above-captioned matter.
14     IN WITNESS WHEREOF, I have hereunto set my
15 hand and seal this 17th day of September, 2007, at
16 Wilmington.
17
18
19
20     Elaine G. Parrish
21     Certification No. 170-RPR
22     (Expires January 31, 2009)
23
24

39  (Pages 150 to 153)



In The Matter Of:

# House Judiciary Committee of Delaware

---

## Audiotaped Hearing - Act to amend Title 10 of the Delaware Code

## Senate Bill 29

## June 19, 2007

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

**A**

abandon 32:21
ability 25:3 97:4
    105:3 116:10
able 8:22 13:6
    20:21 111:4 116:7
abolish 64:2
abolished 64:8 67:5
abolishing 69:5
abolition 68:5
above-captioned
    153:13
absent 8:6 10:5
    14:9
absolutely 15:4
    31:1 47:20 61:8
    64:2 67:6 71:24
    72:9 92:6,10
    113:7
absorbed 21:7
abstraction 49:9
abuse 1:8 3:11,21
    4:4,15,20 7:3,5,8
    7:16 8:6 9:19
    11:11 12:4,5,21
    14:2,5 15:20 20:7
    21:10 25:20 26:13
    28:2 29:14,16,19
    30:4 33:8 34:21
    39:7 45:16,21
    46:19 47:22 51:9
    62:22 64:3,4,18
    65:18 67:6 68:20
    68:21 77:8 78:21
    81:7 84:12 86:11
    88:12 94:6 95:11
    98:13 105:4
    119:19,19 137:5
abused 4:8,10,11
    4:18 9:2 17:24
    25:3 28:13 29:18
    61:16 63:15 65:21
    65:23 92:21,23
    93:2 137:16,22
abuser 27:23
    109:13 110:8
    137:17
abusers 4:1 12:24

34:5,9 39:13 77:9
abuses 96:19
abusing 61:7
abusive 4:16 16:18
    17:21
acceptable 137:16
accepting 99:14
access 97:8 105:2
accommodate
    21:22
accountability
    77:12
accountable 61:9
    71:23 83:19
accusations 16:11
    28:16
accuse 99:13
accused 4:4
accuser 105:3
accusers 78:9
achieve 103:18
Achieving 19:14
acknowledge 10:13
    29:9,21
acknowledged 9:5
acronyms 47:23
act 1:6 3:8 9:4
    13:14 14:6,7
    34:17 50:1 57:16
    85:18 94:7 115:18
    119:20 131:12
action 87:24 88:2
    133:14
actions 116:6
active 9:15 11:12
    12:3,4,12 30:9
activities 21:16
actors 88:3
acts 5:5 46:10
    50:14,20 51:6
actual 7:15 62:4
    97:19
acute 17:20
ad 76:21
add 91:13 106:3
    124:8 127:10
added 106:1
    133:10

adding 1:8 3:11
addition 117:14
additional 91:15
    98:21 122:20,21
    131:6
address 15:11
    61:24 80:7 97:13
    131:6
addressed 77:16
    97:3,12
addresses 85:8
addressing 86:13
    96:1
adds 128:6
adequately 36:24
adhesion 56:15
administration
    15:23 89:15
admit 50:5
admittedly 26:23
adolescence 7:11
    8:2
adolescent 9:8,12
    9:20
adult 29:24 61:7
adults 62:13
advantage 19:10
advisor 64:20
advocates 16:7
    105:2
advocating 110:22
affirmatively 18:2
afflictions 137:19
afford 20:17
afforded 80:1
    81:24
afraid 98:7,19
    135:17,18,21
afternoon 124:9
age 4:9,11 17:7
    27:5 110:9
agency 61:11 62:4
agenda 74:3
ages 10:2 17:6
    65:18
ago 7:20 9:6 12:2
    45:17 48:11 53:23
    61:15,17,21 65:19

65:19 66:6,16
    124:2 133:15
agree 39:19 69:24
    78:18 79:18 80:3
    80:4,5,21 81:4,17
    81:18,19 82:1
    110:18 117:4,9
    134:20 136:8
    137:7
agreeing 91:11
agreement 91:9,10
    91:13,17 92:8
    108:1
agreements 50:19
    91:8
ahead 85:15
AIG 57:2
Air 25:16,17
airline 34:15
aisle 99:12
Alaska 64:7 67:4
alive 12:16
allegations 77:11
alleged 46:13 77:9
alleges 48:9
allow 87:21 106:19
allowed 9:15 110:7
allowing 14:12
alter 7:7 9:23
ambiguity 17:8
ambiguous 18:6
amend 1:6 3:8
    110:17,20 115:24
    116:15 135:11
    139:7,11 140:3
amended 42:19
    86:10 99:19
    110:20,24 111:1
    112:7 113:9
    115:22 139:3
amending 115:20
amendment 64:20
    74:9,14,16,16,20
    74:23 75:1,4,4,6,7
    75:9,10,13,13,16
    75:18,19,24,24
    76:1,5,5,7,7,13,14
    76:17,21,22 78:12

83:16 85:3,7,15
    85:19,20 86:21,24
    87:1,2,4,7,19 88:6
    88:14,18,19 92:11
    92:14 93:6 95:7
    95:21 99:8,14,15
    99:16,19,20,24
    100:1,1,7,7,8,12
    100:16,19,22
    101:3,4,6,13,15
    101:20,21 102:1,8
    102:10,13,15,18
    102:21,23 103:1,1
    103:5,19 104:21
    104:23,24 105:6
    107:4,6,17 108:22
    109:9 110:4
    111:16,21 112:1,6
    112:13 113:3,4,8
    113:10,13,17
    115:2 116:1,2,3
    118:1,16 119:5,9
    119:12 120:1
    121:1,2,8,15
    122:1,3 123:9,9
    123:11,13,16
    124:5,19 125:10
    125:24 126:20
    130:3 131:12
    133:5,8,10 134:18
    134:21 135:1,18
    136:19,22 137:8
    138:8,16,18 140:9
    146:7,13 152:4
amendments 5:17
    5:20 43:3 62:2,6
    74:3 102:4 109:6
    111:19 112:22
America 55:2
American 29:6
amount 40:21
    89:18,22
analogy 56:7
analysis 54:13
    108:20 133:13,14
analyzed 57:19
ancient 20:2
and/or 122:22

**anecdotal** 39:17
42:5 45:10
**anecdote** 42:5
**anecdotes** 28:10
**anniversary** 68:12
**announced** 28:21
29:2
**answer** 11:15,16
17:2 35:18 36:18
40:17 45:8 47:4
50:5 66:4 72:16
72:17 81:1 106:14
106:14 111:1,4,10
115:7 125:3
128:10
**answers** 91:23
**antecedents** 54:23
**anticipated** 21:4
**anybody** 58:5
103:4
**anyone's** 99:6
**Anyway** 112:13
**apologize** 126:24
127:21 134:24
**apparently** 9:12
29:7 107:24
**appealing** 58:2
**Appeals** 6:21
**appearance** 59:12
**appetite** 9:8
**apples** 125:9 126:8
**applicable** 82:9
**application** 97:16
**applied** 83:17
122:7
**applies** 81:10 85:3
125:6 134:4,4,5,5
**apply** 78:24 85:19
121:4 125:8,16,18
128:16 130:20
**appointment** 41:15
41:17
**appreciate** 15:2
35:16 38:22 41:3
41:6 68:16,16
71:1 89:1 106:24
117:24 128:19
137:15 139:18

**approach** 12:10,16
12:22 13:23
**approaching** 8:23
**appropriate** 101:8
101:11 110:16
**appropriated**
101:10
**appropriately** 62:1
83:17
**approve** 111:22
118:8
**approximately**
10:1 28:18,24
104:9
**arbitrarily** 12:11
31:12
**Archdiocese** 23:13
64:21
**area** 37:17
**areas** 22:1 130:21
**arenas** 37:5
**arguably** 58:1
**argue** 11:10 18:17
45:7 119:9
**argued** 18:13 71:4
**arguing** 40:4
**argument** 20:15,16
40:3 70:19,19
84:9 119:3,4,13
**argumentive** 95:12
**arguments** 16:20
**arms** 28:16 116:22
117:1
**arrest** 9:24
**arrested** 10:7 94:11
**arrests** 39:6 77:19
**article** 36:21,22,22
37:2
**articulating** 58:5
**artificially** 12:17
**asked** 5:6 24:11,17
29:8 50:11 63:20
72:12 81:8 83:5
91:20,21 111:7,10
139:16
**asking** 65:3 82:18
83:11 106:22
111:20 122:16

**aspect** 19:18
**assault** 31:5
**assaulted** 34:1 99:3
**Assembly** 82:5
92:17 116:5
123:22 125:12
130:8 131:1
**assess** 18:22 70:1
**assets** 21:4,7
**assigned** 9:13
26:16
**assist** 13:6
**assistance** 11:12
**Associate** 62:19
**assume** 96:4 122:9
122:20
**assumes** 93:17
**Assuming** 50:22
**astray** 64:15
**Atlanta** 6:21
**attach** 135:17
**attached** 112:6
136:11
**attempt** 92:15
139:3,4
**attempts** 97:6
**attend** 23:6,9
**attended** 6:18
**attention** 88:23
**attitude** 52:6
**attorney** 6:20 9:5
37:3 40:20 79:16
80:16 94:1 99:8
103:16 114:6,23
120:18 124:6,15
133:6,19
**attorneys** 4:4
**at-risk** 104:15
**audiotape** 153:13
**audiotaped** 1:15
**authorities** 9:21
11:8
**automobile** 125:15
**availability** 48:3,18
51:18
**available** 21:6
49:15
**average** 4:9 5:3,4

**avoid** 20:24
**avoided** 11:7
**award** 53:14
**awarded** 58:20
**aware** 11:9 59:13
68:18 69:13 70:17
**awareness** 28:9
29:15
**awhile** 86:22
**aye** 76:8,10 100:3,5
101:16,18

___

**B**

**B** 144:8,9,10
150:10,11,12
**back** 5:19 9:7 12:9
20:3 24:17 26:15
28:9,21 34:10,12
37:23 48:11 50:21
56:20 57:2 61:15
61:21 65:11 85:24
95:7 96:14,23
98:15 107:7 108:5
108:10 109:7,11
110:6 115:22,24
116:4,19 123:4
129:16 134:1,13
134:22 135:3,14
135:20,22,24
**backed** 42:15
**background** 45:20
46:2 57:22 77:7
89:17
**backward** 52:9
**backwards** 66:20
**bad** 15:24 89:10
**bankruptcies** 20:23
64:22
**bankruptcy** 21:9
125:7 132:15
**barred** 3:23 17:2
19:19 54:15
**Base** 25:17
**based** 20:17 27:2
49:10 87:22
133:22 138:12
**basic** 8:5,7 19:23
117:12
**basically** 49:4

56:24 117:5
**basis** 46:18 48:12
50:8,13,17,24
51:4,22 66:4
**beach** 7:7
**bear** 91:20 127:16
**bearing** 56:4
**beauty** 67:18,19
**becoming** 11:21
**began** 7:5 56:11
**beginning** 28:1
**beginnings** 69:17
**begins** 4:16
**behalf** 14:3 26:7,8
48:24 49:10
**behavior** 11:19,20
17:14 18:3 19:5
36:3 38:13,13,14
38:15
**beings** 43:9
**believe** 22:6 35:24
37:13,15 39:1
58:21 59:5,13,20
61:8 62:2 73:13
74:5 78:23 83:23
84:14,19 86:8
91:22 97:10 102:4
107:4,23,23
108:12 109:14,17
109:21,22 115:3
116:2 118:16
122:22 128:21
145:23
**believes** 16:16 68:4
83:8
**believing** 8:21
**beneficiaries** 20:8
**benefits** 17:17
**best** 8:13 10:19,24
11:3,16 25:22
44:20 47:3 48:7
56:7 67:10 72:23
104:24 116:7,8
**better** 10:4 16:16
42:5 45:1,3 47:2
49:1 52:11 59:16
66:9 107:6,24
**beyond** 33:10

105:9
**bias** 23:18
**biased** 48:24
**big** 33:4 57:3,3
**bill** 1:6 2:2,11,13
  2:17,18,22 3:2,5
  3:14,18 4:6 5:8,10
  9:4 11:22 13:18
  13:19,20,24 14:6
  16:11,20 19:18
  22:13 23:1 35:20
  42:24 50:3 55:10
  61:2 62:3 63:6
  65:9 69:18,24
  70:9,12 71:6,9
  74:9,21,23 75:10
  75:13,19 76:8,14
  78:18 79:4 81:4
  81:12 84:16,16
  85:22 86:6 87:18
  87:21 90:13,15
  91:22 92:9 93:14
  94:1 96:11,11,14
  96:23,24 97:9,23
  98:1,2,5,5,9,10,15
  98:16 99:19 100:8
  100:17,19 101:2,8
  101:9,11,15,21
  102:2,2,16,18
  103:3 106:1,3,9
  106:11,12 107:4,5
  107:8,19 108:13
  108:20 109:11,15
  110:2,13,19,24
  111:15,17,22
  112:1,2,3,6,7,9,15
  112:24 113:10,11
  113:18 115:5,18
  115:18,24 116:15
  117:7,9,13,14,16
  117:21 118:2,4,9
  118:17,17 120:20
  120:24 121:7,8,23
  122:7,19 124:7,22
  124:23,23 125:18
  125:20,21 126:10
  126:11,11,13,16
  126:21 127:1,12

127:14 128:4,5,14
  128:16,21 129:3
  133:6,11,12,12
  134:2,3,4,6 135:2
  135:11,13,14,15
  135:19,20,24
  136:7 137:1
  138:19 140:10
  146:8,12 152:3
**Bills** 43:3 115:21
  115:23 117:5
  139:7,11 140:3
**Bill's** 12:23 13:8
  97:16 101:21
**Bishop** 31:1
**Bishops** 9:10 10:18
  16:14 17:14,22
  26:14
**bit** 25:14 31:8
  124:21
**bitter** 8:11
**black** 56:10
**Blakey** 140:11,12
  140:13 146:14,15
  146:16
**blanket** 34:4
**bleed** 28:5
**blessed** 71:16
**blistering** 8:15
**board** 60:13 125:16
**boards** 32:8
**bobbing** 43:2
**body** 9:3 11:2 14:5
  15:11
**bogged** 42:24
**book** 62:21
**books** 55:1
**Booth** 140:14,15,16
  146:17,18,19
**born** 6:16
**borrow** 22:3
**bouts** 8:19
**box** 103:4
**boy** 7:7 27:4
**boys** 4:9,19,19 9:8
  9:12,20 26:7
  49:22 50:16 51:12
  60:7,14,23 88:9

122:16
**Brady** 140:17,18
  140:19 146:20,21
  146:22
**breath** 34:17
**Brian** 129:19 132:6
  132:9
**brief** 43:15
**briefly** 16:21
**bring** 5:7,9,18 6:3
  32:20 33:6 66:1
  88:1 124:6,11
**broad** 125:18
**broken** 8:20
**brother** 28:15
**brothers** 7:19
**brought** 37:19
  54:17,17,18 92:10
  113:9
**brush** 125:18
**bucks** 57:3
**buildings** 35:3 43:6
**burden** 18:15 19:7
**burdensome** 12:13
**business** 55:20,21
  67:3,8
**businesses** 48:15
**businessmen** 35:7
**buy** 50:2
**buyer** 55:22
**buying** 50:16
**bystander** 8:17

___C___

**C** 153:7,7
**calculated** 10:23
**California** 20:2,2,6
  21:17,18 28:11,11
  28:18 29:2,7
  31:16 38:2 43:15
  43:16,16,19 52:21
  54:18 64:9,19
  67:1,19 71:1,4,5,9
  71:17
**call** 25:13 87:7 94:5
  99:6 105:14
  125:20,22 138:16
  138:18,24 140:6,9
  146:4,10,12 152:1

**called** 13:13 45:15
  46:5,6 47:22 51:4
  58:6 65:22
**calls** 39:21 130:16
**calmed** 56:18
**camp** 122:15
**campaign** 34:22
**candor** 137:15
**canon** 25:18
**canvassed** 50:9
**cap** 126:3 131:2,8
  131:10
**capable** 64:5 67:13
**capacity** 21:11,18
  23:24
**capriciously** 12:10
**captured** 36:24
**care** 32:2 33:22,23
  35:2 41:15 76:20
  78:4 84:5 99:4
  104:13 109:18
  130:10 131:21
  137:20
**careful** 52:8
**carefully** 69:23
**caretakers** 78:5
**Carey** 140:20,21,22
  146:23,24 147:1
**carriers** 28:20
**carries** 76:12 100:7
  101:20
**carve** 130:15
**case** 19:9 22:23
  33:23 53:13 58:19
  59:3,7 91:18,20
  104:18,19 123:22
  125:19 128:10
  130:13 133:5
**cases** 3:21,22 4:22
  4:24 12:14,20,20
  17:23 18:4,8,12
  19:1,3 20:2 25:19
  28:12,13,13 39:22
  54:19 56:11 64:22
  68:19,19,20,21
  69:11 78:2,3,21
  81:7 82:4 84:18
  86:11 110:11

130:12,15
**Castle** 153:3
**catastrophic** 48:17
**categories** 49:5
**Cathcart** 5:12,14
  5:15 140:23,24
  141:1 147:2,3,4
  151:23
**cathedral** 28:23
  29:3,5
**Catholic** 7:4 16:15
  20:18 21:19,24
  25:4,15 26:9 27:6
  28:3,4,5,14 29:1
  29:12 30:5,10,14
  33:13,17 37:6
  38:16,16 42:14,15
  63:11,12 65:7,8
**Caucasian** 5:2
**caucuses** 2:18,19
**cause** 32:21 87:23
  88:1
**caused** 20:24
  130:13
**ceaselessly** 34:22
**Center** 57:16
**century** 56:21,22
**CEO** 60:22
**CEOL** 58:8
**certain** 37:16 39:9
  45:24 49:10 56:7
**certainly** 30:7 37:1
  45:24 47:24 49:2
  130:16
**certificate** 50:18
  61:20
**Certification**
  153:21
**certify** 153:10
**cetera** 71:23 94:11
**Chair** 47:18
**Chairman** 14:22
**challenge** 69:15
**challenged** 16:24
**challenges** 70:4
**chamber** 2:3,6 6:10
  15:4 49:4 60:6,10
  63:1 67:9 106:17

115:21,23 116:23
125:11 126:4
128:20
**chambers** 116:5,6
**chance** 98:15 135:2
**chances** 39:15
**change** 37:4,8,17
37:20 38:13,13,24
38:24 40:22 41:4
75:20,22 110:16
121:1 124:23
128:14 135:11
**changed** 19:6 57:8
110:8
**changes** 32:24 56:3
110:21
**changing** 37:3 56:1
59:14,17 113:17
115:4
**chaplain** 25:17
**Chapter** 126:1,2
**charge** 27:22 61:23
**charged** 38:18
114:22
**charitable** 20:9
**charities** 65:7,8
**checks** 77:7 89:17
**chief** 138:17,20
140:8,11,13,16,19
140:22 141:1,4,7
141:10,13,16,19
141:22 142:1,4,7
142:10,13,16,19
142:22 143:1,4,7
143:10,13,16,19
143:22 144:1,4,7
144:10,13,16,19
144:22 145:1,4,7
145:10,13,17,18
145:24 146:2,11
146:14,16,19,22
147:1,4,7,10,13
147:16,19,22
148:1,3,6,9,12,15
148:18,21,24
149:3,6,9,12,15
149:18,21,24
150:3,6,9,12,15

150:18,21,24
151:3,6,9,12,15
151:20,24
**child** 1:8 3:10,20
4:4,10,15,17 5:1
9:4,22 12:3,21
14:7,8 18:1 29:22
32:6 34:21 64:4
65:18 78:21 81:7
84:3,5 86:11
88:11 94:5,8
105:11 119:19,19
137:5 139:21
140:1
**childhood** 8:6 14:5
29:16 64:3 65:23
67:6
**children** 4:8 5:4
10:16 11:4,21
12:5,23 14:2
16:18 25:4 28:2
29:19,21 31:22
34:6,24 39:7,24
40:1,9,18,18,19
40:24 43:5 63:8,8
63:15,19,23 64:11
66:13,14 67:10
69:19 72:13,21,22
73:14 76:20 77:2
77:12,13,21 84:2
84:6,6,6,7,12
88:15 90:22 92:18
92:20 93:1,5
95:11 97:4,5,5,9
104:19 105:5,9,9
134:19 135:14
137:16,20,21,21
138:1,13,14
139:20,21,21
140:2
**choice** 63:20 120:1
**Christ** 29:5
**church** 9:20 16:23
20:16,21 21:3,16
22:10 24:7 25:2
25:12,19 28:4,5
29:7,14 30:6,10
32:20 33:13 35:6

37:6 38:16 41:4
43:1 49:20 65:12
65:13 77:10 99:14
99:14
**churches** 22:4 30:2
30:5,10,12 31:19
32:6,15 33:12,23
34:3,19 35:1
37:16 39:11 40:22
**church's** 20:8 21:6
21:18 25:4 63:11
63:12
**church-related**
53:22
**Circuit** 6:21
**circulated** 9:18
**circulating** 12:24
**circumstances** 51:7
53:22 54:20 58:13
69:6 89:14 98:1
**citizen** 16:15
**citizens** 11:3 41:5
116:9
**city** 22:1
**city's** 29:5
**civic** 35:7
**civil** 1:8 3:10,20
9:20 13:14 17:17
17:21 31:21 33:16
63:8 66:15,19
78:20 81:6 84:18
94:11
**civilized** 14:7 35:5
**claim** 20:17 21:18
22:8 46:9,12
**claiming** 61:16
**claims** 12:11,18,19
13:9,12 17:10
19:19 20:3,10,16
44:14 45:23 46:5
46:6,11 48:16
50:21 51:9 52:16
52:23 54:14,16
131:12
**claims-made** 51:4
**clapping** 106:19
**clarification** 98:11
98:13 108:13

**clarified** 118:8
**clarifies** 75:20,21
92:12 98:6
**clarify** 91:16 95:13
95:14 103:12
117:17
**clarifying** 95:2,10
98:19 107:17
**clarity** 81:2 99:15
114:24 115:1,2
127:10 130:3,7
**Clark** 124:11,14,14
124:20 126:22
127:9,9,13,18,20
128:1,24 129:4,7
129:12 130:2,6,22
131:10,16 132:4
132:15 133:9,24
**class** 107:21
**classroom** 77:10
**Claymont** 42:4
**clear** 35:17 64:2
72:24 73:2 82:4
91:12 95:21 96:17
98:11 107:24
108:3 119:2,19
124:22 125:11
128:4,17
**clearly** 13:3 19:24
31:23 33:11,21
68:20 95:24
122:17
**clergy** 12:3 26:13
28:14 29:14,18
32:8 33:8 62:22
64:18
**clergymen** 4:24
**cleric** 15:19
**clerk** 3:4,5,16
74:19,20 75:8,9
100:15,16 102:14
102:15 138:17,20
140:8,11,13,16,19
140:22 141:1,4,7
141:10,13,16,19
141:22 142:1,4,7
142:10,13,16,19
142:22 143:1,4,7

143:10,13,16,19
143:22 144:1,4,7
144:10,13,16,19
144:22 145:1,4,7
145:10,13,17,18
145:24 146:2,11
146:14,16,19,22
147:1,4,7,10,13
147:16,19,22
148:1,3,6,9,12,15
148:18,21,24
149:3,6,9,12,15
149:18,21,24
150:3,6,9,12,15
150:18,21,24
151:3,6,9,12,15
151:20,24
**clerked** 62:19
**client** 55:7
**cloak** 39:13
**close** 27:12 35:20
67:18 92:19
**closed** 10:19 32:22
**closely** 6:7
**closure** 65:5
**closures** 21:23
**Club** 49:23 50:16
51:12 60:8,14,23
88:9
**Clubs** 122:16
**clue** 54:20
**coach** 61:17
**coaches** 61:14 62:9
**Code** 1:7 3:9
**codified** 13:19
**cold** 10:22
**colleagues** 5:6
24:11,17 39:5
60:13 73:16 76:21
93:7 105:24
106:24 116:14
137:9
**collected** 56:13
**combination** 37:18
**combined** 58:9
**come** 3:24 5:19 6:6
6:14 16:14 17:10
30:21,21 41:6

43:1 46:11 50:21
62:23 63:16,17
67:20,22 78:8
79:16 104:16
108:5,10 111:18
115:22,23 126:12
135:20 136:11,12
**comes** 48:20 65:8
85:24 119:7
132:16 133:5
135:9
**comfortable** 92:24
93:4 103:5 137:4
**coming** 25:14 31:7
41:3 64:5 65:17
67:13 68:16 139:4
**commend** 92:13,15
**comment** 20:14
35:16 37:1 38:22
42:2 45:10 112:18
112:18 114:4
115:17 125:23
134:16
**comments** 2:12,14
24:6,22 39:18,18
49:19 58:4 68:8
73:22 94:17
132:21,22 136:18
**Commerce** 49:4
**commercial** 22:3
**commitment** 35:2
**commits** 94:4
**committed** 4:12
31:6
**Committee** 1:16
9:6 12:2 14:23
47:19 55:10 101:7
**committees** 110:14
**common** 54:22
**communication**
94:23
**community** 61:6
**companies** 48:13
48:14 51:16 57:14
67:3
**company** 44:17
47:6 50:23
**comparable** 47:2

57:5
**comparison** 70:2
**compassionate**
35:2
**compensated** 15:16
24:13
**compensation**
15:17
**complaint** 125:2
**completely** 28:8
107:13
**complex** 29:5
**complicated** 94:3
**complied** 89:16
**comply** 2:19
**comprehend** 10:17
**comprehensive**
56:20
**compromiser**
136:24
**compulsive** 34:16
**compulsory** 13:22
**conceal** 10:19
**concept** 43:18
56:23
**concern** 15:21 35:1
35:3 39:8,10,22
52:15 54:10 61:10
61:11 85:8 99:7
99:10 108:24
109:1,2 118:1
122:14,14,15,17
122:18,18
**concerned** 16:15
16:15
**concerns** 39:10
53:10 136:13
139:19
**conclusion** 11:6
22:11
**concrete** 89:4
**conditioned** 128:2
128:3
**conduct** 10:20,21
14:11 46:13,17
50:22 52:13 87:23
137:2
**conducts** 137:5

**confidence** 8:5
**confirmation** 38:23
**confronting** 19:1
**confused** 107:13
**confuses** 106:9
**confusion** 71:9
126:12
**Congratulations**
68:14
**consequence** 97:13
**Consequently**
12:22
**consider** 25:3 26:9
32:16 61:12 62:6
**considerations**
109:8 130:17
**considered** 47:20
69:23
**considers** 5:3
**constituencies**
21:13
**constituency** 22:9
25:2,4
**constituent** 59:23
**constitute** 15:24
**constitutes** 3:13
74:22 75:12
100:18 102:17
**constitution** 75:21
123:10,13,18
146:7 152:3
**constitutional**
64:17,20 68:11
69:8 82:3 107:18
107:20 114:6,20
**constitutionally**
66:18
**consultant** 23:23
**contact** 27:17
**contained** 109:14
**contemplating**
108:23
**contend** 20:3
**content** 126:20
**context** 21:10
46:22 98:1,10
**contexts** 49:3 56:7
**contingencies**

49:10
**continue** 11:5 26:4
97:22 106:19
123:7 133:14
**continued** 7:8 33:6
34:3 71:16
**continuing** 50:7,24
**contracts** 56:15,16
**contribute** 22:6
**control** 11:20
139:12
**conversation** 97:22
134:18
**conversations**
105:22
**converted** 125:20
**convictions** 36:5
**convince** 32:17,18
**convinced** 11:18
**cope** 7:24
**copy** 75:7 102:13
**correct** 42:13,21
85:4,6,7,17 86:12
94:13 103:24
112:21 113:3,8
114:11 121:5
129:12 130:6,21
**correcting** 85:6
**correctly** 133:2
**corrupt** 16:13
**cost** 28:23 51:18
53:10 108:24
109:2,7 122:4,13
122:15,17,17,18
**costly** 12:13 92:5
**costs** 21:3 45:24
58:7 59:3 105:6
122:1,11,20,21
**counseling** 13:6
**counselor** 92:22
**counselors** 62:9
**count** 26:21 27:18
66:7
**counties** 121:17
**countless** 105:22
105:22
**countries** 26:20
31:20

**country** 38:2 64:7
64:18 65:17 69:12
138:10
**County** 131:11
153:3
**couple** 4:5 27:13
28:10 117:18
120:9 127:16
**course** 25:5 60:12
**court** 6:20,22 22:8
24:9 30:18,24
31:21 71:5 78:9
82:15,21,23 83:5
83:7,12 84:8
89:23 93:22 119:7
130:4,7 131:11
133:5
**courteous** 2:8,9
**courthouse** 19:15
**courtroom** 119:2
**courts** 13:13 20:3
31:13 32:12 37:19
71:7,13,16,18
93:18 95:23 105:2
137:7
**cover** 50:1 71:6,10
71:12 97:6 117:12
125:21
**coverage** 42:20
45:15,16,22 46:4
46:6,8,14,18,19
48:8,18 50:1,2,20
50:24 51:2,19
53:24 57:6 58:13
61:19 79:22
**coverages** 45:19
46:15 52:1,4 56:8
56:20,22 57:12
58:10
**covered** 11:15
82:16 91:10,13
117:16 119:20
**coverup** 27:21
29:14 33:8
**co-sponsors** 103:8
**CP** 78:4
**craft** 116:7,8,10
**crafted** 120:5

crawled 57:1
crazy 115:9
cream 66:14
create 18:14 20:5
    64:4 82:5 132:18
creates 81:9
creating 45:18 57:7
    132:12
credibility 48:22
credible 12:14
credibly 11:10
crime 31:6 61:5
    67:24
crimes 11:8,14
criminal 9:24
    10:20 66:16,17
    77:7
criminals 31:10
Crisis 62:23
criteria 84:21
critical 24:2
criticism 16:10
criticizing 16:9
cross 62:10
CRR 1:17
crystal 64:1 108:3
curiosities 59:6
curiosity 83:11
current 3:23 9:24
    131:23
currently 6:14 86:8
curry 16:13
cut 12:22 13:2 65:1
    65:10
cynical 20:24
cynically 16:24

D

D 144:11,12,13
    150:13,14,15
damage 11:6 95:13
    95:13
damaged 7:17
damages 18:4
dangerous 20:11
dare 20:20 116:15
data 65:3,4 69:16
    69:17 70:1,5
    77:16,17

date 51:5
dating 9:7 20:3
    61:15
day 38:20 62:20
    109:10,20 134:19
    134:20 138:14
    153:15
daytime 31:3
dead 8:17 41:17
deal 30:22 45:11
    46:21 50:20 53:17
    57:22 75:23 105:7
    107:19 120:10
    133:3
dealing 58:5 65:9
    65:14 84:15
deals 95:11 106:9
dealt 114:9,13
    139:11
dean 14:23,24 15:9
dear 66:4
death 27:15,16
    130:12,13,21
debate 2:2,10
    110:13 124:21
    135:4,22
debated 135:8
debating 58:19
    106:22
debilitated 29:8
Deborah 2:23
decades 10:13
Decent 14:7
deception 27:22
decide 19:2,3 82:15
    83:8
decided 10:19
    31:12 89:10
decision 7:19 8:23
    18:22 82:20 126:4
    129:5,8,10
decisions 10:23
    71:21
decisively 14:6
declared 83:12
    146:8 152:4
dedicated 61:3
dedicating 61:3

deductibles 58:14
deep 7:22
default 78:4 104:14
defeat 34:22
    106:11 133:5
defeated 111:21
    133:8 146:8
defend 12:13,15
    13:12 78:2
defendant 125:2
    128:10
defendants 17:16
    19:9
defenders 34:19
defense 19:11 86:1
    95:20 125:1,2,4,7
    128:8,13
defenses 22:7
    128:11,22 129:1,3
    132:14
defer 120:18
deferred 71:19
deficiencies 16:3
    16:20
deficient 18:17
define 82:2,10
defined 82:21
definitely 27:9
Delaware 1:2,7,22
    3:9 6:4,15,16 7:20
    9:15 11:3 14:4
    15:18 21:14 22:22
    23:4 24:8 36:1
    38:1,19,21 41:5
    47:11 48:4,14,19
    48:22,24 49:1,4
    49:24 50:6,8,12
    51:20 54:19 55:15
    58:7 60:7,8,23
    64:6,9 78:3,6
    83:19 92:16 104:9
    116:9 153:1
Delaware's 60:24
    93:5
deliberately 114:8
Deliver 62:11
DeLuca 7:5 9:8
DeLuca's 11:6

demographic 32:24
demonstrated
    76:24
demonstrates
    76:23
denomination 34:7
    37:6
denominations
    30:6 33:18 37:7
    37:24
depending 89:21
depression 8:19
describe 50:3
description 33:11
deserve 40:1,9,24
    72:21 139:24
deserves 2:17
desire 16:13 20:24
despite 8:13
destruction 27:15
details 5:7 7:9
determine 31:13
    34:13 82:7,24
    83:2,5
determined 92:4
detriment 30:3
    33:15
devalued 29:21
devastated 26:13
    43:10
devastating 31:5
devastation 27:15
    31:16
development 57:9
developmental
    78:1 104:12
deviation 130:10
diagnosis 7:1
dialogue 22:18,21
    24:24 47:15 53:5
    54:7 78:15,16
    83:23 84:14 85:13
    86:4 90:10,16
    91:4 105:18,20
    106:6 107:10
    109:23 114:16
    115:14 119:22
    129:23 134:14

Dialogues 42:18
die 4:19
Diego 64:21
differ 110:3
difference 69:7
    88:16 128:19,20
differences 110:11
    114:24
different 9:10 46:4
    49:3 91:23 93:2,5
    103:19,23 113:13
    113:13 120:9
    126:6 130:11,12
    130:14,16
differentiate
    138:12
differently 93:2
    96:8
difficult 8:10 18:11
    19:3 26:24 89:13
    111:20 116:24
digging 61:18
diminishment
    21:11
Diocesan 12:1
    17:15,23 20:23
    21:10 33:9 42:18
Diocesan-paid 9:16
Diocese 9:6 10:8,11
    12:18 13:4,9,16
    13:20 15:18,18
    17:14,22 18:7
    24:2 28:18,21
    29:1 33:1 34:8,8
    42:15,18 59:8
Dioceses 20:18
    21:2,11 22:2
    30:14 34:13
Diocese's 9:5 12:7
    13:23
direct 7:3
directed 112:19
directions 45:24
directly 44:23
directors 60:14
dirt 28:22
disability 6:23,24
disabled 78:1

disagree 21:17 109:22
disagreement 92:2
disappear 17:7
disappeared 56:24
disaster 55:24
disclose 30:23 34:8 34:14 60:12
disclosure 55:8
discuss 106:18
discussing 101:2 113:4
discussion 6:1 53:16 117:11 133:6,19,20
discussions 52:6 105:23
disease 56:10
disingenuous 116:16
dismiss 22:9 90:6
disorder 7:2
dispositive 18:9
disproving 61:22
disregard 88:21,23
distinction 70:11 70:15,17 89:11 90:22 92:16
distinguished 15:8 15:11 44:20
distracting 113:17
district 42:3,4 138:7
districts 77:23 109:3,9 131:15,17 131:18
diver 34:15
documented 68:20 68:24
documents 25:20
dog 49:7
doing 17:12 22:22 35:21 43:2 57:11 63:10,14 72:24 81:15 85:21 95:2 100:24 107:3,23 114:23 125:12 135:9 137:6

dollar 53:20 131:10
dollars 28:19,24 58:22
Dominican 25:16
doom 8:18
door 19:15 21:8 59:2 130:20,20,23
doors 10:19
doubt 69:15
Dover 25:17 60:14
Doyle 25:13 26:1,2 26:5 35:22 36:6 36:13,17 37:2,12 38:7,11 39:9 40:3 40:7,11,15 41:1 41:16,22 42:22 43:20 44:1 72:12
dozen 10:9 45:17 45:23 91:20,21,23 92:3
drafted 86:8
draftsperson 127:10
draining 49:12
dramatically 46:1
draw 52:17
dreams 61:4
drink 57:24
drove 6:5
drugs 61:5
due 21:17 32:20 65:13 73:12 84:13 84:19 113:16 114:20
dumb 36:20
D.C 26:17

_____
E
E 153:7,7
earlier 48:8 58:2 72:24
early 48:11 58:4 59:16
easier 88:22
easily 10:11 13:9 29:23
easy 50:5
edged 27:10
edition 42:17

educated 69:10
education 104:11
educational 20:9 59:7
effect 13:24 19:1 21:16 64:10 67:1 97:19,20 126:5 131:3
effective 32:13 34:23 101:9
effectively 12:22 34:2
effects 7:16,17 31:5
efficiency 5:18
effort 8:9 40:22
efforts 8:13 13:5
eight 4:17
either 18:2 23:23 36:24 67:17 77:20 99:12 104:18 125:23
Elaine 1:17 153:9 153:20
eliminate 32:19 78:7
eliminated 19:24
eliminating 18:10 18:13,24 19:22 20:11 42:16
Elizabeth 6:17,18
eloquent 136:23
eloquently 54:21 92:12
Embassy 26:17
embrace 104:23
emotional 2:3,4 35:8 106:16
emphasize 126:8
employ 38:6
employed 6:22
employee 70:14 94:4 130:14
employees 32:8 39:6 68:22 77:18 77:20 131:19,22 137:2
employers 11:13 138:12

enable 14:9 84:17 84:17
enabled 31:10
enablers 11:1,4,7 14:10 16:5
enables 138:8
enact 111:20
enacted 22:13 64:9 83:9
enactment 13:17
encompassing 113:2
encouragement 101:11
encourager 26:12
encouraging 17:10 57:7 125:15
ended 7:16 33:20
ends 74:2
enjoy 132:13,14
enlightened 35:6
enlightening 47:1
Ennis 141:2,3,4 147:5,6,7
enormous 20:5 21:2
ensuing 33:21
entire 7:11 65:23
entirely 18:11 20:17,19
entities 33:17,18 37:16 51:2 69:21 80:2 81:24 83:20 88:9 113:20 126:14,17 133:16 134:4,5
entitled 17:17
entity 4:1,3 79:23 79:23 81:22 82:3 82:10,13,19,24 83:6,13 87:24 121:10 125:6
enumerated 125:17
environment 34:6 48:23 51:16 59:15
equal 105:2,2
equality 132:12
equalization

113:20
equalizes 80:1 81:23
equally 70:9 76:19 78:24 83:19 104:17 105:5 117:10 139:9
equation 63:21
error 86:24 89:18
especially 21:24 30:10 32:12 37:10 37:16 39:11
essence 37:1 73:7
essential 37:4
essentially 13:20 115:5
establish 88:22 132:18
establishing 16:20
estimation 103:18
et 71:23 94:11
evaluates 49:5
evening 106:11 127:9
events 7:13
eventually 8:20
everybody 93:15
evidence 13:15 17:6 18:20,21 19:3 30:11 31:18 42:5 67:7
evidenced 31:20
Evil 62:22
Ewing 141:5,6,7 147:8,9,10
exact 103:2,6 108:24
exactly 7:15 9:3 13:19 73:17 134:7 135:9
example 9:2 87:18 88:11 89:4
exceeding 131:20
exceeds 53:17
Excellent 120:22 122:5
exception 81:9 130:15

**exclude** 18:20
**excluded** 56:17,18
**excused** 25:9 59:19
  73:23 98:23 104:4
  134:10
**exempt** 78:9 82:5
**exist** 17:5 32:9
  45:17
**existed** 58:1
**exists** 18:20
**expanded** 56:23
**expansion** 51:8
**expect** 46:2 58:7,14
  66:7 85:15
**expected** 56:5
**expeditiously** 2:16
**expense** 6:15 62:18
**expenses** 13:7
  41:14 58:10,12
**expenses/outside**
  58:9
**expensive** 29:6
**experience** 26:15
  31:18 37:5,15
  56:3
**experienced** 27:11
  83:12
**experiences** 8:1,15
  52:18
**expert** 47:20 52:21
**expired** 57:18
**Expires** 153:22
**explain** 79:16
**explanation** 12:14
  106:2
**explicitly** 79:13
  82:5 84:8,11
**exponentially**
  21:20
**expose** 14:9 21:1
  33:7
**exposing** 14:2
**exposure** 48:10
**exposures** 45:18,19
  56:9 57:4,14,20
**express** 15:12,21
**expressed** 52:15
**expresses** 123:22

**expressing** 16:1
  136:23
**expressly** 82:7 86:2
  93:22,23 95:21
**extend** 32:2,18
**extended** 57:19,20
**extensive** 18:7 21:3
  27:17 28:9 29:13
**extent** 20:13 29:16
  125:6
**extra** 126:16
**extraordinarily**
  63:5
**extraordinary**
  32:17
**eyes** 92:19
**e-mailed** 65:19
**e-mails** 65:16

---

**F**

**F** 153:7
**fabric** 51:23 56:1
**face** 12:10 78:9
  105:3 127:13
  128:5
**faces** 10:3 130:11
**facilitated** 18:2
  29:10
**fact** 10:2 18:20
  27:2 30:11 39:10
  40:14 50:11 56:19
  65:2 67:3 68:17
  71:4 79:23,24
  81:22,23 83:18,20
  91:16 96:13 98:14
  112:1 113:9,18
  119:4 132:18
**facts** 4:5 64:14
**factually** 18:6
**fail** 8:7 57:24 98:6
  115:3 119:14
**failed** 5:16 38:18
  39:23 77:2
**failing** 33:22
**fails** 119:5,5
**fair** 19:20 31:12
  81:13
**fairly** 18:21 19:3
  46:7 53:11

**faith** 16:4
**fall** 96:15
**fallible** 18:19
**false** 28:16,16
**falsely** 4:3
**familiar** 23:24 39:4
  39:5 43:18
**families** 26:19
  30:17 104:16,20
**family** 4:22 6:17
  12:21 27:11,12
**far** 9:7 12:9 19:12
  20:11 37:20 58:3
  71:7,13 97:16
  107:4 127:3 128:4
**fast** 8:23
**father** 25:13 26:1,5
  35:22 36:6,12,13
  36:17 37:12,22
  38:7,11 39:9 40:3
  40:7,11,15 41:1
  41:16,22 42:22
  43:20 44:1 65:22
  65:23 72:12
**fathers** 4:14 26:22
**father's** 66:4
**favor** 16:13 33:13
  33:13,14 69:3,5
  73:3 76:6 96:5,18
  96:20 100:2
  101:14
**favorable** 19:11
  48:23
**favored** 63:18
**fear** 30:22 31:9
  33:6 42:23 96:21
  96:22 104:23
  117:19
**fears** 24:10 97:3
**feature** 58:8
**features** 46:10 58:6
  57:21 65:6
**feel** 5:7 16:2,8
  106:9 107:3,5
  110:16 118:16
  134:23 135:2
  136:24,24 137:4,8

**feeling** 57:10
**feels** 110:24
**fees** 4:4
**felt** 36:24 134:21
**female** 4:10
**FETZER** 1:21
**field** 19:8 77:11
  132:19
**figuratively** 104:19
**figure** 71:6 94:21
  117:1,2
**figured** 117:3
**file** 110:10
**filed** 48:5 122:8,19
  123:1 125:2
**files** 9:7 12:3,5,12
  33:7,9,9 125:3
**filing** 70:6 128:10
**final** 3:3,14
**finally** 7:16 20:14
  27:9 35:5 56:17
**Finance** 101:7
**financial** 32:21
  33:14
**financially** 29:8
  36:4
**financials** 64:23
**find** 13:11 19:2
  28:7 30:17 41:17
  53:20 66:20,23
  67:15,16,17 77:11
**finding** 121:9
**fine** 36:20 112:9
**finest** 24:9
**finish** 96:23
**firing** 113:16
**firm** 23:11,17
**firmly** 37:13,15
**first** 3:19 5:10,17
  5:19 11:8 16:21
  21:7 25:16 28:22
  38:4 50:5 64:20
  74:6,14,23 75:12
  77:7,14 78:6
  80:21 100:19
  102:17 105:8,8
  113:23 120:1
  132:15 137:19

  138:9
**fiscal** 101:9 122:6,8
  122:19
**fist** 65:8
**fit** 126:21,24
**fits** 124:7
**five** 4:7,11 10:1
  25:21 53:23 85:3
  121:15
**fix** 67:11 137:22
**flood** 57:6,12
**floodplains** 57:7
**floor** 15:1 44:11
  120:14
**Florida** 6:4,14
  65:21
**Flynn** 99:9 103:3
**focus** 49:21
**focuses** 61:11
**folks** 46:21 116:23
  117:15,16 128:3
**follow** 6:1 89:19
  96:4
**following** 1:15
  22:21
**fool** 55:16
**fooling** 55:18
**foot** 35:19
**force** 25:17,17
  38:14 39:2 57:9
**forced** 22:3 32:10
  32:10 37:8 38:24
**forcing** 40:22
**foreclose** 12:11,17
  12:18
**forefront** 64:10
**foregoing** 153:11
**foreign** 26:20 31:20
**foremost** 137:20
**form** 8:3 11:23
  15:23 46:8 48:8
**forms** 46:4,17
**forth** 43:7
**fortified** 33:11
**fortunate** 38:3
**forward** 3:24 17:10
  27:5 30:21,21
  31:7,9 52:11

61:16 63:16,18
64:5 65:17 66:21
67:13,20,22 70:12
70:13,23 78:8
83:16 87:19,21
92:16 96:12 97:11
109:6 125:16
131:17 135:15
136:2
**fought** 10:12
**found** 24:5 36:2
67:23 131:24
132:1
**founding** 69:21
**four** 4:8,17 9:9
39:6 53:23 77:19
**fourth** 39:14
**fractured** 8:24
**frame** 134:1,1
**Francis** 7:5 9:8
**fraternity** 45:14
**free** 125:3 137:3,18
**freely** 12:24
**frequency** 45:23
48:16
**friend** 26:12
**friends** 4:23 27:19
**friendship** 60:15
**frivolous** 12:9
**front** 45:10 55:6,9
62:7 92:20 115:10
**fulfilled** 26:10
**full** 6:24
**function** 55:24
**functioning** 8:21
**functions** 7:13
**fund** 122:22
**funds** 28:5 65:7
101:10 122:23
**further** 104:2
**Furthermore** 21:9
**fury** 16:7
**future** 11:20 32:5
34:24 43:8 49:13
69:2,15 70:18
85:16 86:7,10
99:3 103:11 104:7
105:4,12 110:7,11

137:23
**futures** 97:6

—————
**G**
**G** 1:17 7:5 153:9,20
**gambling** 49:8
51:15
**garbage** 30:16
**gathering** 70:4
**general** 46:2,15
56:20 82:4 92:17
116:5 122:23
123:22 125:12
130:8 131:1
**generally** 53:14
**generation** 11:21
**gentleman** 41:21
**gentlemen** 72:19
105:1,11 106:16
119:11
**George** 60:7,18,21
60:22
**Georgia** 6:22
**getting** 2:1 134:22
135:3
**ghost** 113:16
**Gilligan** 84:24
86:17,18,20 87:3
87:6,13 105:17
106:5,7 107:1
109:4 111:10,13
112:3,8,12 117:3
118:13,14 141:8,9
141:10 147:11,12
147:13
**girls** 4:8,13,18 26:7
49:23 50:16 51:12
60:8,14,23 88:9
122:16
**give** 2:16 6:10 15:5
20:12 25:14,24
44:17 47:5 60:20
63:1 87:18 88:11
88:24 89:3 108:19
126:22 130:2
**given** 19:12 63:9
64:6 110:14
**gives** 126:13,16
**giving** 66:22

**glad** 22:22
**go** 27:16 30:2,12,15
30:24 31:1,2
48:10 70:23 84:4
96:12,14 98:15
104:2 111:21
115:21 116:19
129:16 130:19
131:5 133:6
134:13 138:14
**goal** 61:2 120:20,23
124:7
**goals** 16:16
**God** 10:15 67:23
**goes** 27:14 49:16
51:19 57:16 65:8
73:14,14 95:7
133:24 139:22,22
**going** 2:11,12 23:4
28:9 31:9,9 36:14
41:11 53:19 54:19
57:10,17 59:2
61:21 65:10,24
66:21 68:11,22
69:10 70:12,13,14
77:9 86:22 87:19
87:21 89:7 92:16
93:1 99:17 106:10
107:4 108:2
111:19 116:4
117:14 125:16
127:3 131:17
135:23,23 136:13
**gold** 50:18 61:20
**good** 5:7,24 13:1,21
16:4 40:21 42:23
50:4 62:9 73:19
81:1 98:13 109:17
111:17 116:11
124:21 127:24
135:2
**gory** 5:7 7:9
**govern** 53:16
**government** 57:13
57:15,21 65:6
**governor** 10:24
111:11,14 118:5
**grade** 39:15,16

**graduated** 6:18
107:21
**grand** 31:21 32:12
**granted** 8:5
**graphic** 2:5
**gravely** 10:5
**great** 10:1 30:22
117:4 133:3
**greater** 37:9,17
39:1 48:16 51:17
60:14
**greatly** 48:17 57:24
**Greg** 99:15,16
100:23 134:23
135:18
**gross** 4:2 31:15
52:10 61:22 70:14
70:22 79:20,21
81:20 84:21 87:22
88:4,8,17,20 89:2
89:9,22 94:5,7,9
97:18 119:18,20
120:10,21,24
121:2,4,9 137:2
**grossly** 131:24
137:6
**ground** 56:10
64:23
**grounded** 18:5
**group** 44:12
**groups** 126:6
**growing** 21:20
**grows** 17:8
**growth** 21:20,22
**guarantee** 21:14
32:4
**guaranteed** 31:23
**guess** 45:20 47:23
54:13 58:20,23
59:1,24 84:8 95:4
**gun** 18:9
**gut** 13:24

—————
**H**
**half** 28:19,20 92:3
105:21
**Hall-Long** 141:11
141:12,13 147:14
147:15,16

**Hamilton** 62:18
63:3,3 68:14 69:3
70:8,20 71:3,11
71:18,24 72:4,9
72:15,20 73:9,17
**Hampshire** 64:19
**hand** 138:21,23
153:15
**handle** 50:7 57:3
**handling** 58:3
**hands** 7:4 27:12,13
59:9
**hang** 61:20 101:1
106:22
**happen** 21:14 32:4
51:18 52:16 64:22
126:7
**happened** 20:5
30:23 32:3,14,22
42:24 52:21,22
57:12 89:6,14
133:15
**happening** 32:3
71:4
**happens** 19:16
27:14 49:17 52:23
56:1 115:20
**happy** 59:23 78:12
**harbored** 48:10
**hard** 5:8 8:11
**harm** 11:5 92:10
**harmed** 35:9
**harmless** 19:21
**hashed** 91:8
**Hastings** 141:14,15
141:16 147:17,18
147:19
**hate** 90:6
**haunted** 7:11
**HB** 103:7 108:23
139:10
**health** 9:18
**hear** 6:8 21:15
37:14 39:18 44:24
47:8 99:21 105:24
**heard** 16:19 21:15
27:23 28:7 49:3
49:19 54:21 64:13

66:21 67:6 107:18
110:14 111:11
114:6,8,11,12
115:17 122:9,10
122:24 136:3
137:16,17,18
145:23
**hearing** 1:1,15
116:14
**hearings** 69:23
**heart** 16:4 107:3
**held** 1:16 61:9 88:7
139:9
**Hello** 36:12
**help** 42:13 62:12
87:17 108:16
112:14 117:6
118:6,10,15 133:3
**helpful** 25:22
**helping** 69:4 79:11
**helps** 89:24
**hereunto** 153:14
**herring** 33:4,5
**heterosexual** 5:2
**hid** 29:10
**hide** 10:19 105:4
137:17
**hides** 16:24 138:7
**high** 6:19
**higher** 58:14 59:3
88:7
**highly-educated**
10:18
**Hilb** 47:9
**hired** 30:14
**hiring** 131:19
**historical** 46:24
**historically** 46:14
48:10
**history** 29:6 33:21
109:21
**hits** 57:3
**Hobbs** 47:9
**Hocker** 141:17,18
141:19 147:20,21
147:22
**hold** 13:20 71:22
83:19 117:22

118:2 131:21
**holding** 11:18 12:4
**hometown** 9:17
**honor** 14:22 44:16
**Honorable** 2:23
6:12
**honored** 47:19
**hook** 53:18
**hope** 41:3 52:23
**horribly** 10:16
**horrified** 34:21
**horse** 57:23
**hours** 26:20 105:21
110:13 135:8
**house** 1:2,16 2:1
3:4,15 5:13,23 6:9
9:5 14:13,19 15:3
15:8 22:14,18
24:21 25:7,23
26:3 35:12 36:8
41:7,19,23 42:8
43:12,22 44:3,7
44:13,15,21 45:2
45:5 47:5,12,16
53:3,7 54:4,8
58:16 59:18 60:3
60:9,19 61:1
62:14,24 68:7
72:18 73:21 74:4
74:7,9,10,13,15
74:16,18,20,23
75:1,5,10,12,13
75:15,18,18,19
76:2,6,7,7,9,11,13
76:13,17 78:13,16
79:16 80:8,12,16
80:17 83:24 84:22
85:13 86:5,16,21
86:23,23 87:1,2,5
87:9,14 90:2,7,11
90:18 91:2,5 93:9
94:16,24 95:17
98:20 99:18,19,21
99:23,24 100:1,1
100:4,6,7,7,8,12
100:14,16,21
101:1,4,5,14,15
101:17,19,20

102:1,1,5,9,12,15
102:18,20,23,24
103:1,2,3,14,16
103:18 104:4
105:15 106:4,15
107:11,14 108:4,9
108:15 109:16
110:1,15 111:3,9
111:23 112:5,11
112:17 113:7,8,10
113:14,22 114:14
114:18,23 115:12
115:19,21,23
116:2,3,17 118:12
118:19,23 119:15
119:23 120:15
121:13,22,22
122:7,7 123:6,11
123:16 124:3,12
124:16 125:10,24
126:20 127:6,19
127:22 129:16,23
132:6,20 134:9
136:16 137:11
138:17,18,22
139:5 140:8,9
145:12,14,21
146:6,7,11,12
151:14,16,22
152:2,3,4
**Houses** 136:8
**HS** 103:7 108:23
139:10
**Hudson** 2:22,24 3:1
3:7,16,17 5:22,24
14:15,16 22:15,16
22:20 23:1,5,8,12
23:16,21 24:4,16
24:19 25:10,11
29:17 36:10 41:8
41:10 44:4,5
59:21,22 62:15,16
73:24 74:1,5
84:24 85:1,2,5,9
87:1 93:10,11,15
93:20,24 94:14
100:10,11,18,22
100:23 101:3,5,22

101:23 102:3
105:17 106:5
108:6,7,11 111:4
112:2 113:5 114:1
115:14 116:19
119:16,17,24
120:3,7,19 121:11
121:14,19,24
122:12 123:4,8,14
123:19,24 124:4
124:17,18 126:19
127:2 134:13
136:19,20 138:6
141:20,21,22
146:9,10 147:23
147:24
**Hudson's** 116:2
**huge** 136:6,6,6
**human** 8:4 43:9
**humble** 43:6
**humiliating** 8:15
**hundred** 2:7 70:21
**hundreds** 14:4 29:9
33:18 55:1

---

**I**

**ice** 66:14
**idea** 6:1 19:18
109:17 124:5
**identifying** 12:23
14:1 45:18
**identities** 66:12,15
**ignored** 29:9
**image** 33:13 35:4
**imagination** 7:10
**imagine** 92:19
**immediate** 49:13
**immunity** 42:20
43:17,19 69:21
70:21,22 71:2,16
79:14,22 81:21
82:8 83:3,21
84:12,15 85:24
86:2,10 88:2,3
89:10 93:18 94:6
95:3,20 96:1,6,12
96:19,22 97:11,14
97:17,20,23 98:4
98:7,10 103:10,11

107:19 108:1,22
109:7,15 113:1,21
114:9 115:5
117:13,15,19,22
119:8,10,12
123:21 124:24
125:1,5,5,22
126:1 127:12
128:7,8,12,13,15
128:22 133:4,8,13
133:13 135:5,22
137:1,24 138:11
**immunity-like**
126:14
**impact** 20:7 41:4
48:2,15 59:14
61:13 64:24
131:15
**impacted** 49:16
**impacts** 45:12
49:20
**impede** 31:6
**impediment** 129:5
**implicated** 59:10
**implies** 88:21
**important** 13:24
24:5 26:10 41:17
43:5 63:6 109:19
124:11 139:15
**importantly** 11:1
**imposed** 58:15
**imposes** 54:13
**impossible** 12:15
13:12
**imprisoned** 34:11
**improperly** 123:10
**impropriety** 77:8
**improved** 110:13
**inaudible** 55:22
81:1
**incapable** 7:15
66:18
**inceptions** 51:5
**incest** 12:21 65:15
65:20 68:19
**incidence** 29:19
**incident** 35:19
**include** 92:9

104:22 126:2 129:3
included 56:16 90:15 91:22 92:13
including 24:1 30:5 32:5 138:13
inclusive 153:11
incompetent 17:8
incomplete 19:4
increased 29:15 58:7 122:4
incredulous 115:19
incurred 17:16
independent 23:17 23:23
indicate 76:8 101:15
indicated 77:15
indicating 59:1
indifference 16:12 20:21
individual 15:19 17:24 18:1 42:6
individuals 134:6
individual's 77:24
indulge 16:6
industry 45:14,17 46:8,16 48:9 54:11 56:8,12,14 56:17 57:8,17 67:2,7
infamous 45:18
inference 123:16
infinity 50:3
influence 35:4
information 9:7 25:15 30:18
informed 9:21 12:1
inherently 18:19
injured 4:20
injury 130:15
injustices 54:23
inner 22:1
innocent 16:4
innocuous 19:20
insensitivity 16:12
inserted 96:14
inside 19:16 119:2

insidious 11:22
insisted 66:3
inspiring 61:4
instance 98:12 126:3 130:24
instances 66:20
instantly 52:14
institutes 97:18
institution 11:19 39:20 53:13 59:7 76:18 92:22,24 99:4
institutional 11:7 11:13
institutions 20:12 30:2 31:19,24 32:5,9,15 33:12 33:19,22 34:3,20 37:8 38:1,1,3,4,5 38:9,10,24 39:11 40:23 42:20 53:10 53:11 70:6 73:2,3 76:24 77:1,6 79:1 95:16 137:17
insurance 28:19 44:12,13 45:13 46:1,5,7,8,11,18 47:9,10,18,21,22 48:4,21 49:8,16 50:16,23 51:11,15 53:12,16 54:11 55:7,20,21,22 56:8,12,16 57:14 57:16,17 59:3 60:1 61:18 66:23 67:2,3,7 122:22 131:4
insurances 50:15
insurance-related 54:3
insured 49:10 50:7 50:13 51:21
insurers 22:5 56:24
insuring 50:19
integrity 99:7
intend 90:14 93:6 99:11
intended 62:12

71:6,11 78:19 81:5 83:8 87:12 121:20
intends 130:8
intensely 7:8
intent 71:9 76:22 78:23,23 79:3,6 79:10,15 80:5 83:3 84:9,16 86:9 90:20,23 91:15,16 92:8,17 93:23 95:15,19,22,24 98:6 99:11 102:24 103:5,8,10,18 104:21 114:21 123:23 127:11 133:7 138:1
intention 82:7 83:18 96:11 128:21
intentional 87:22
intentionally 38:6 38:9
intentioned 15:22
intentions 99:16
intently 97:15
interactions 8:7
interested 86:20 132:11
interesting 22:21 24:6 25:18 66:24
interestingly 5:1 46:17 50:8
internal 31:23
interpretation 82:18 86:3
interpreted 86:2
intertwined 84:2
interview 30:17
intra 12:21
introduce 14:18,23 47:19 60:6 112:15
introduced 28:11 30:8 111:17 112:10
invaded 7:11,12,14
investigating 131:20

investigators 30:15
invited 23:5,9,10 41:13
invoke 96:19
involve 4:22,24
involved 26:18
involves 56:7
involving 69:12
irony 8:11
irrelevant 32:16 65:13
irrespective 13:8
isolated 7:22
issue 2:3 17:23 28:2 28:3 29:12 33:4 38:16 43:16 44:13 63:24 66:24 80:7 82:4 84:11,15 91:10 93:21 96:22 97:3,4,7,10,13 105:7 106:9,16,18 109:19 110:15 117:8,20,22 119:7 133:4,11,11 134:1 136:7,10 137:24 138:9 139:11
issued 57:14
issues 78:1 79:13 84:1 98:8 104:12 109:14 116:24 131:7 135:7
iterations 48:11
i.e 20:16

———————————

J
January 153:22
jargonistically 45:15 51:5
JD 62:20
Jeff 124:11,14,14 124:20 126:22 127:13,18,20 128:1,24 129:4,7 129:12 130:6,22 131:10,16 132:4 132:15 133:9,24
jeopardized 134:22
Jersey 7:8
JFC 101:11

job 6:19
Johnson 141:23,24 142:1 148:1,2,3
Joint 101:7
Journal 22:23 36:21 42:14
judgements 51:23
judges 18:11
judgment 17:22
judicial 48:23 49:1 53:17
Judiciary 1:16 9:6 12:2 14:23 55:10
jumping 85:15
June 1:16 42:17 136:13
juries 18:12,19,21 18:23 19:1 32:13
jurisdictions 48:6 52:18
jury 18:16,17,21 31:21
justice 15:23 17:1,4 17:17 18:12 19:14 31:17,22 33:23 35:2 62:20 65:24 68:4

———————————

K
Keeley 142:2,3,4 148:4,5,6
keep 61:14 62:8 77:5 106:19 131:16
keeping 51:20
key 70:10
kid 39:14 66:6 119:10
kids 62:12 96:7,7 96:10,21 98:11 117:10 118:10 136:1
kind 18:5 19:9 39:16 63:9 73:6 109:8 115:18 116:7,8 130:4
King 1:22
knees 32:21
knew 10:24 89:15

**know** 2:2,6,10 4:21
4:22 5:8,17 7:16
11:15 17:4 22:23
22:24 24:5,8 27:2
33:1 35:19 36:18
37:21 39:5 42:20
42:23 43:8,9,18
43:21 45:21 47:19
52:10 62:1 66:6,8
70:11,19 72:2,5,6
72:7,7,10 73:1
75:23 77:19,23,24
85:14 89:9,16
95:12 106:16
107:2,3,22 109:5
110:23 111:5
112:18 117:7,8,10
118:7,9,10 122:14
128:9 136:3 137:3
137:5 139:17
140:2
**knowing** 42:12
50:10 61:17 89:14
**knowledge** 62:4
67:2 89:21
**knowledgeable**
46:3
**known** 10:4 13:2
28:16 34:4,9,12
39:13
**knows** 11:2 25:22
93:16
**Kowalko** 24:22,24
25:6 78:14,15,17
79:2,7,18 80:7,18
80:20 81:3,11,17
82:12,17,23 83:4
83:10,15 84:13
94:20 95:5 96:3,9
97:2 110:19
112:18,20 113:12
113:15 117:2
142:5,6,7 148:7,8
148:9
**Krupanski** 60:7,16
60:18,21,22

――――――――――
**L**
――――――――――
**lack** 77:16

**Lacking** 22:2
**ladies** 72:18 105:1
105:10 106:15
119:11
**laid** 100:9
**land** 88:5
**language** 79:10,12
80:6 86:1 91:14
91:15 103:2,6,6
108:24 117:12
118:8 121:22
139:4
**large** 46:9 48:16
**largely** 57:20
**largest** 28:17
**Larry** 44:11,19,21
44:24 45:3,6 47:5
47:7,8 48:7 50:4
51:14 53:15 54:2
54:12 55:12,14,23
56:6 59:5
**lasts** 4:17
**late** 66:5
**Latino** 21:21
**launch** 46:23
**laundry** 128:8,11
**Lavelle** 3:7 36:9,11
36:14,19 37:22
38:8,12 39:17
40:5,8,13,17 41:2
43:13,14 68:8,9
68:15 70:3,16,24
71:8,15,20 72:1,5
72:10 73:5,12,19
74:6,8,11,15,22
75:2,3,11,16,17
76:3,4,15,16
78:18,22 79:5,9
80:3,10,14,21,24
83:17,22 84:1
85:11,14,21 86:6
86:14 87:11 90:8
90:13,16,19 92:14
94:8 98:24 99:1
102:6,7,11,17,21
102:22 103:17,21
104:1,5,6 105:16
108:16,18 110:5

110:21 111:5
112:14 113:6
114:4,15,16,19
115:10 119:21,24
120:3,12,17,22
121:20,21 122:1,5
122:13 123:2,9
132:11 136:18,21
137:12,13 139:2,6
139:18 140:6
142:8,9,10 145:15
145:16,18,20
148:10,11,12
151:17,18,20
**Lavelle's** 88:6,14
88:18,19 92:11
99:15,16 130:3
**law** 6:3 13:14 14:24
15:9,10,14 16:15
18:18,20,22 23:10
23:17 36:1 39:2
40:1,9,24 54:22
67:11 72:3,6,7,10
72:14 78:10 80:1
81:23 83:12 105:3
107:20 111:20
123:22 131:23
**lawmaker** 38:18
**lawmakers** 32:18
35:7
**laws** 38:13,20
63:18
**lawsuit** 23:14 35:21
66:2 70:23 110:10
133:16
**lawsuits** 32:12 33:6
48:5,6 70:6
109:12,13 110:7,7
**lawyer** 6:22 12:1
16:14 23:24 25:18
25:19 30:24 36:15
48:24 55:2 62:7
68:12 80:24
107:18,20 119:8
132:10 139:23
**lawyers** 30:13
91:20,21 137:4
**lay** 32:8 88:5

**lead** 50:10 57:23
109:16 138:9
**leader** 113:9
**leaders** 29:14 35:7
**leading** 8:19 48:14
56:21 97:11
**League** 49:23
51:12 77:11
**learn** 55:9 63:13
66:11,15 109:4
**learned** 7:23 30:1
40:20 61:19 63:10
63:13 65:12 68:1
68:3
**learning** 70:10
**leave** 7:9,10 104:22
105:11,12 135:13
**leaving** 77:13
**led** 7:19 64:15
**Lee** 142:11,12,13
148:13,14,15
**left** 10:15 11:5 13:3
13:8
**legal** 4:1,3 13:22
15:20 17:16 18:5
21:3 22:7 30:13
35:8 37:11 66:8
79:23,23 81:22
88:5 91:7,9
103:13,22 121:9
129:3,5
**legalese** 89:2
**legally** 17:7
**legislation** 15:21
16:3,10 32:18
45:8,13 46:22
49:14,21 52:7,19
54:10 57:7 58:6
58:24 59:2 61:12
62:11 83:9,18
97:12 103:8
109:17 111:15
114:10,13,22
115:8 116:7,11
119:5 123:12
127:11
**legislative** 9:3 11:2
14:5 16:9 30:6,8

34:22 56:3 72:23
73:11 95:22,23
133:7
**legislator** 34:16
**legislators** 6:2
**legislature** 71:19
71:20 83:8
**legislatures** 37:18
**legitimate** 12:7
109:2
**legitimately** 117:24
**lenders** 22:3
**length** 2:19
**lengths** 30:3,11
32:17
**lengthy** 92:5
**lesser** 40:24
**let's** 77:17 108:2
117:17 120:8
127:4 138:11
**level** 19:8 53:12
57:18 79:20,21
81:20 94:10 132:3
132:18
**liabilities** 20:5 21:5
131:2
**liability** 46:15
52:13 53:12 56:8
56:20,22,23 82:6
130:11 131:1
**liable** 11:19 18:4
83:20 131:18,22
132:1
**liberty** 10:3
**licensed** 49:8 51:15
**lied** 29:10
**life** 7:13 8:8,16,17
8:20,22,23 27:14
61:3,5,5 66:2,3
**lift** 79:8
**lifted** 79:24 81:22
**lifting** 54:14 83:20
84:17 112:24
**light** 18:8 29:5
109:20 125:15
**lighter** 59:24
**likelihood** 51:3
**likes** 10:6

**limitation** 16:22
  17:3,5 51:20,24
  54:14,22 62:3
**limitations** 1:7 3:10
  3:20,24 17:12,19
  17:20 18:10,14,24
  19:22 32:1,19
  37:4 42:17 51:9
  55:11,16,19 59:15
  64:3,8 66:5,7,10
  66:16,17,19 67:5
  68:6 69:5 78:7,20
  79:8 81:6,10,13
  81:16 84:18 85:23
  85:24 110:9
  124:22 125:1,4,21
  126:11,11,13,16
  128:5,12,23
  133:12 134:3,3,6
  135:8 136:8
**limited** 43:17 45:11
  46:18 70:22 79:14
  84:12 86:10 103:9
  103:11 108:22
  109:10,12,13,15
  115:4 133:23
  137:24 138:10
**limits** 53:16,18,20
  58:9,11,12 64:6
  81:8
**line** 58:21 62:10
  82:9 121:7,14
**lines** 62:7 78:19
  79:19 81:5,19
  84:20
**liquidity** 22:2
**list** 128:9,11,11
**listed** 123:11
  125:17
**listened** 27:3
  105:21 114:5
  124:21
**listening** 26:21
**literally** 104:18
**litigation** 58:10
  92:5
**litigator** 64:17
**little** 49:23 51:12

77:10 94:3 95:18
  106:22
**live** 6:14 8:9 30:19
  43:9 66:13 121:4
  138:3,4
**lived** 6:4,17 7:21
**lives** 26:12 30:19
  34:1
**living** 27:15 65:21
**loan** 28:20
**lobbies** 13:1
**lobbyists** 13:5
**local** 29:4 35:19
  36:1,3
**located** 6:21
**lock** 7:23
**Lofink** 142:14,15
  142:16 148:16,17
  148:18
**long** 10:11 66:16,22
  87:23 124:2
  134:21
**longer** 8:22 12:16
  54:15 97:9 106:23
**Longhurst** 142:17
  142:18,19 148:19
  148:20,21
**long-standing**
  60:15
**look** 36:20 52:8
  97:14 135:14,15
**looked** 125:24
**looking** 52:11
  55:20 83:16 84:3
  84:7,7 103:4
  111:15
**looks** 46:16 52:9
**look-back** 3:21
  12:8 19:20 79:24
  81:22 84:17 87:20
  93:12 126:15,17
  136:1
**loopholes** 16:23
**loses** 89:10
**loss** 10:3 48:17
**lost** 56:14 94:21
**lot** 43:2 49:19 53:9
  58:9 63:16 88:22

106:17 115:17
  118:22 130:16,23
  133:21 136:24
**low** 88:1
**lowers** 132:2
**luck** 68:11
**lump** 13:7
**lung** 56:10
**lying** 27:22

---

## M

**Madam** 138:17,20
  140:8,11,13,16,19
  140:22 141:1,4,7
  141:10,13,16,19
  141:22 142:1,4,7
  142:10,13,16,19
  142:22 143:1,4,7
  143:10,13,16,19
  143:22 144:1,4,7
  144:10,13,16,19
  144:22 145:1,4,7
  145:10,13,17,18
  146:2,11,14,16,19
  146:22 147:1,4,7
  147:10,13,16,19
  147:22 148:1,3,6
  148:9,12,15,18,21
  148:24 149:3,6,9
  149:12,15,18,21
  149:24 150:3,6,9
  150:12,15,18,21
  150:24 151:3,6,9
  151:12,15,20,24
**Maier** 108:5,8,10
  108:12,17,19
  109:23 110:2,12
  111:7 129:18,21
  130:1,18 131:8,14
  132:2,5 138:20,23
  139:1,14 140:5
  142:20,21,22
  145:22,23 146:2
  148:22,23,24
**main** 43:4
**Maine** 64:7 67:4
**majority** 30:19
  65:14 66:12 110:9
  146:7 152:3

**making** 18:22
  38:19 71:21
**maliciously** 4:3
**man** 5:2 7:11 10:2
  27:24 31:3 41:13
**manner** 13:21
**Manolakos** 53:4,4
  53:5,8 54:1
  142:23,24 143:1
  149:1,2,3
**man's** 11:14
**Marathon** 6:14
**Marci** 62:18 63:3,3
  68:14 69:3 70:8
  70:20 71:3,11,18
  71:24 72:4,9,15
  72:20 73:9,17
**Mark** 14:24 15:7,8
  22:24 23:3,7,10
  23:15,19,22 24:14
  24:18 25:5
**market** 45:22
  48:19 56:24
**marketplace** 49:12
**married** 5:2
**Marshall** 86:17
  87:15,16 88:24
  89:24 132:21
  134:12 136:17
  143:2,3,4 149:4,5
  149:6
**massive** 32:11,24
**matter** 8:11,12
  18:8,10 19:12,14
  19:15 40:13 48:20
  61:24 79:3 153:13
**matters** 8:13 15:20
**maximum** 53:20
**ma'am** 72:12 73:13
  122:14 124:20
  132:4
**McBride** 3:6
**McWilliams** 143:5
  143:6,7 149:7,8,9
**mean** 28:14 40:3
  54:20 58:19 87:23
  95:2 125:11,19
  128:14 130:23

136:3 139:17,19
**meaning** 84:20
**means** 34:23 50:14
  51:6 72:23 95:6
**meant** 82:2
**measures** 34:22
**mechanisms** 17:11
**media** 32:11 37:10
  37:18
**mediation** 13:10
**medical** 13:6
**meet** 22:4 65:24
  93:22
**member** 25:16
  27:12 61:6 115:19
**members** 4:23 6:13
  6:17 15:8 44:20
  61:1 75:6 76:9
  100:4 101:17
  102:13 106:21
**memories** 7:22
**men** 10:16,23 26:7
  26:12 33:23 77:1
**mended** 113:10
**mention** 5:16,20
  9:19 10:5
**mentioned** 2:20
  48:8,12 67:5 72:1
  87:1
**mentoring** 62:8
**mere** 8:17 17:5
**merely** 19:14
  131:20 133:12
**merits** 114:10
**met** 16:11
**mic** 6:7 95:18
**middle** 56:21
**midst** 43:10
**military** 128:1
**million** 28:19,24
  53:20,24 58:22
  59:4,6
**mind** 7:14,22 51:20
  80:7 108:14 114:1
  132:16 139:1
**mine** 59:23
**ministers** 33:24
**ministries** 9:15

32:21 33:2
**ministry** 26:10
**minor** 61:8
**minority** 113:9
**minutes** 25:21
41:24 85:6
**Miro** 143:8,9,10
149:10,11,12
**miscarriage** 31:17
**misguided** 10:16
**misplaced** 109:1
**misquote** 38:23
**missing** 118:7
**mission** 20:20,22
**Mitchell** 143:11,12
143:13 149:13,14
149:15
**molest** 5:4
**molestation** 5:5
45:16,21 46:19
47:22 77:21
**molested** 9:12 78:5
97:5
**molester** 5:1
**molesters** 4:21 16:5
17:14
**molesting** 9:24
**moment** 49:21
92:19 119:22
**moments** 7:13
116:4
**money** 24:13 28:6
43:6 59:9 65:7
101:11
**monopoly** 116:10
**monsters** 77:5
**month** 42:13,14
**months** 47:10
65:19,19
**moral** 17:15
**morning** 109:11,18
110:3
**mothers** 26:21
**Motion** 76:11
99:23 100:6
101:19
**mouth** 114:7
**move** 7:20 74:3

94:2 99:18 109:4
**moved** 6:4 42:6
109:6
**movement** 27:1
63:6,7
**moving** 39:12
136:2
**Mulrooney** 143:14
143:15,16 149:16
149:17,18
**Municipal** 131:11
**municipalities**
121:18 130:24
131:4
**murdered** 57:11
**muster** 112:22

**N**

**name** 6:5,10,13
15:5 25:24 26:1
44:17,21 47:6
60:20,21 63:1
67:21
**names** 10:9,12 14:8
34:9
**narrow** 20:19
117:23
**nation** 24:9 138:9
**National** 49:4
**nations** 55:15
**nationwide** 48:18
49:2
**nature** 89:18
121:18
**nausea** 8:19
**nauseam** 76:21
**nearly** 4:11 8:10,13
9:9 10:9,22 12:3
**necessarily** 38:5
55:24
**necessary** 64:2
118:16
**need** 4:6 6:3 17:19
31:24 32:1,2
38:13,14 61:20
63:10 72:22 73:1
97:13 98:17 104:1
107:17 113:19
114:24 117:13

137:3
**needed** 21:6,22
58:24
**needing** 108:13
**needs** 14:8 20:19
38:20 40:12 69:13
69:22 77:22
104:10 130:4
139:23 140:1
**negative** 21:16
32:11
**neglected** 55:5
**negligence** 4:2 18:6
52:10,12 61:22
70:14,15,22 79:21
79:21 81:21 84:21
87:22,22 88:1,4,8
88:10,16,17,20,22
89:2,3,7,9,18,20
89:22 94:5,7,9
97:18 119:18
120:10,11,20,21
120:24 121:3,5,9
130:9 131:18
137:2
**negligent** 88:13
119:20 125:13
131:24 137:6
**negligently** 131:19
131:22
**neighborhood**
58:22
**neighborhoods**
66:13
**neighbors** 30:17
**neither** 40:23 128:6
**nephew** 10:1
**nervous** 55:3
**net** 59:9
**never** 7:16 8:3
11:15 15:17 48:19
56:13 59:12 61:14
62:10 66:21 68:2
91:14 96:11
112:21 122:15
**new** 7:7 9:17 28:23
29:2 45:18,19
52:11 56:21 64:19

65:21 110:12
124:5 153:3
**newer** 46:7 48:8
**News** 22:23 36:21
42:14
**newspaper** 29:4
37:2 42:18 67:22
**nice** 60:16 124:5
134:18
**nil** 39:16
**nine** 4:10
**nondescript** 13:10
**nonprofit** 49:24
62:5
**nonprofits** 49:22
61:13
**non-extensive**
27:18
**non-institutional**
12:19
**non-public** 132:13
132:13
**Notary** 153:10
**note** 59:24 101:9
122:6,8,19
**notes** 153:12
**Noteworthy** 10:10
**notion** 61:7 65:9
**number** 3:5,14
22:13 31:13 34:9
64:1,15 68:18
69:11 74:21,21
75:10,10,11,13,18
76:7,7,13,14,17
86:21,24 87:1,2
99:20,24 100:1,1
100:7,8,8,12,17
100:17 101:4,6,15
101:20 102:2,16
102:18,23 103:1,1
103:19 113:8,10
116:2,3 120:2,2,6
121:14 123:11,16
124:19 125:11,24
138:18 140:9
146:7,13 152:4
**numbers** 48:17,22
**numerous** 32:16

105:23

**O**

**Oakland** 29:1,3,3
**Oberle** 143:17,18
143:19 149:19,20
149:21
**objection** 80:13
103:15 112:21
124:12
**objections** 30:4
32:16 120:16
**obligations** 22:4
**obtain** 18:8
**obvious** 17:2
**obviously** 2:17
15:22 38:9 48:4
54:16 88:21 90:13
125:8
**occasions** 45:9
**occur** 12:20
**occurred** 11:11
12:5 21:24
**occurrence** 4:16
46:6,14 48:12
50:13,17 51:22
**occurring** 12:4
**October** 10:8
**offended** 38:15,15
38:17
**offender** 9:22
**offenders** 12:15
61:9
**offense** 124:9
**offenses** 125:17
**offensive** 46:13,17
50:22
**offer** 49:9 52:20
54:21 58:10
135:19 136:1
**offered** 46:18 51:3
62:2
**offering** 92:14 93:6
**offers** 31:15
**officials** 17:15,23
42:19
**oh** 67:22 138:22
**okay** 8:16 23:21
40:15 45:3,5

74:18 80:12 85:9
86:14,16 87:5,9
87:14,24 89:8,24
90:7 92:3 93:15
94:14,21 96:16
97:21 98:3 100:21
102:5 108:9,15,19
112:5,11 113:22
121:11,14,19
122:12 123:14
127:2 129:18
132:5,24 136:17
**old** 6:13 7:6 10:2
18:12
**older** 12:14
**oldest** 27:4
**once** 6:15 14:10
15:5 25:8,23
44:17 60:19 75:6
102:12
**one-time** 4:15
**ongoing** 73:3
**open** 22:18,20
24:24 28:11 47:15
53:5 54:7 59:2
66:17 78:15,16
83:23 84:14 85:13
86:4 90:10,16
91:3 105:18,19
106:6 107:10
109:23 114:16
115:14 119:22
129:23 130:20,23
131:5 134:14
**opened** 66:18
**opening** 19:15 20:1
20:4,15 66:19
**opens** 70:9
**operate** 2:7
**operated** 10:23
139:8
**opinion** 37:10 39:3
40:19,20,23 43:6
110:15 115:1
128:20 130:2,17
130:19 133:10
**opinions** 15:12
**opponents** 30:9

**opportunities** 61:4
**opportunity** 15:10
20:13 26:6 31:15
62:11 63:5,13
109:4
**oppose** 13:17
**opposed** 76:11 95:5
95:6,10 100:6
101:19 118:8
**opposite** 19:1
107:22 117:12
**opposition** 30:5
42:16
**opprobrium** 17:15
**optimistic** 20:18
**option** 66:19 67:11
**Orange** 28:18
**oranges** 125:9
126:8
**order** 15:19 22:3
25:16 33:1 36:10
41:9 67:11 86:18
106:6 115:14
131:24 134:12
**ordered** 80:13
103:15 124:13
**orderly** 21:5
**ordinary** 16:8
130:10 131:21
**organization** 49:24
53:18 60:20
**organizations**
49:22,23 51:11
52:14 53:22
**original** 11:22
106:9
**originally** 123:17
**ought** 108:1,2
124:6
**outcome** 59:9
**outset** 28:6 61:1
**outside** 42:4 58:11
86:7
**Outten** 143:20,21
143:22 149:22,23
149:24
**overlooked** 89:19
89:21

**overpowering** 51:3
**overriding** 31:16
123:17
**overtook** 8:18
**o'clock** 41:15,16
**O'Connor** 62:20

**P**

**pages** 153:11
**paid** 24:11,12,14
24:18 28:19,20
41:14 67:4 122:21
**pain** 30:20,22
**painful** 26:24
**Pam** 138:20
**paper** 42:11 57:13
**paralyzingly** 8:10
**parcel** 63:7
**parents** 7:18 26:8
27:19 29:22
**parish** 6:18 9:11
15:18 35:19 43:6
**parishes** 9:13 32:22
33:3 36:1,4
**Parrish** 1:17 153:9
153:20
**part** 18:20 26:24
27:1 30:7 47:9
48:23 51:23 54:22
56:24 58:12 59:15
62:5 63:6,7 65:5
69:21 70:6 91:10
91:11,17 94:3
101:20 102:2
**particular** 56:4
67:20 79:3 80:14
81:4
**particularly** 11:3
17:20 21:12
109:19
**parties** 17:6 59:8
91:12
**parts** 7:12
**pass** 6:3 9:4 39:18
45:13 72:8,11
88:14 106:12
107:6 108:14,20
109:21 110:19
112:16,22 118:9

119:9 133:21
**passage** 19:12
69:19 135:1
**passed** 46:22 49:14
59:9 63:18 96:24
98:16 111:18
117:7,9 118:4
135:13 152:4
**passes** 36:1 88:6
107:7 133:20
**passing** 14:6 39:19
88:17,18
**passion** 26:22 27:1
27:9
**passionately** 68:4
**passively** 18:3
**pastoral** 33:23
**patently** 72:24
**patience** 87:15
119:16
**patient** 2:9 106:23
134:11
**patients** 78:4
**pattern** 9:23 11:11
11:22
**patterns** 57:9
**pay** 49:9 65:6
**paying** 88:23
**payouts** 32:24
**pedophiles** 38:6,10
72:2,5 76:23 77:2
77:18
**penalize** 32:20
**penalized** 31:5
**Pennsylvania**
15:10 59:10 62:19
62:21
**pension** 9:16
**people** 6:8 8:4 16:8
17:10 27:16 28:4
30:23 33:3 36:2
57:2 62:10 65:17
85:15 93:3 104:15
104:16 115:17
118:8 135:12
136:14
**percent** 2:7 4:13,22
12:11,17,20 13:2

29:17 63:16 65:6
66:20 68:18 70:21
**percentage** 53:12
**perception** 51:17
**perfect** 120:1
**perfectly** 111:17
**perform** 20:20,22
**period** 3:21 21:3
52:9 79:24 81:23
85:17 93:12
**periods** 50:18
**permanent** 6:24
81:15
**permit** 70:22
**permits** 4:2
**perpetrator** 67:21
**perpetrators** 27:20
29:10 36:3 63:19
63:22 67:15,16
**perpetrator's**
67:21
**person** 4:2 8:3 16:4
44:10 80:9,11
94:22 103:12
120:13 130:15
**personal** 15:21
**personnel** 33:9
**persons** 35:9
**perspective** 46:24
55:21
**pertains** 11:17
117:23
**pertinent** 2:13
**pervasive** 11:10
**Peterson** 3:6
**phenomena** 27:1
**Philadelphia** 23:13
24:3
**pick** 68:23
**picking** 8:15
**pickle** 134:17
**picture** 39:24 72:13
**piece** 59:2 114:10
114:13 115:8
**pilot** 34:15
**place** 10:21 32:10
35:3 39:13,13
46:13,17 50:22

51:24 58:2 97:1 98:17,17 106:12
**placed** 6:24
**places** 52:20
**plaintiff** 18:15 19:8 19:9
**plaintiffs** 21:7
**plan** 20:13
**planned** 74:2
**plans** 29:2
**Plant** 143:23,24 144:1 150:1,2,3
**plants** 43:7
**plate** 84:10
**play** 126:12
**playing** 19:7 132:19
**plead** 125:3,5,7
**please** 3:3 22:17 25:13 47:15 72:19 75:5 90:7 91:21 102:9 105:20 106:21 129:21 138:18 140:9 146:12
**plight** 16:12
**plus** 110:9
**podium** 6:6
**point** 18:18 43:4,4 52:8 56:18 59:1 64:8 65:20 82:3 94:15 112:12 119:21 130:4 137:22
**pointed** 92:12
**pointing** 68:17
**policies** 37:20 131:4
**policy** 15:24 17:9 50:18 53:16,18 58:11 63:20 69:19 116:8 125:20,22 126:4 129:5,7,10 130:17 131:6 135:6 136:7
**political** 121:15
**pollution** 56:8,22
**poorest** 21:13

**population** 21:19 21:21,23
**Portland** 64:21
**position** 16:8 99:12 99:17
**positive** 41:4
**possessions** 29:22
**possible** 2:16 66:22
**possibly** 116:8
**post-traumatic** 7:2
**potential** 11:17 12:17 45:12
**potentials** 48:17
**power** 12:23 35:4 37:9,10,17 39:1
**powerful** 45:4
**preach** 35:1
**precisely** 11:23
**predation** 9:23
**predator** 10:10,12 34:16 42:3
**predators** 11:4 14:1,8 63:19,22 66:6,12
**predictable** 18:23
**premium** 56:13
**premiums** 48:3 51:11
**present** 15:22 69:2 74:13 75:5 99:3 102:9 104:7
**presentation** 79:12
**presented** 22:8
**president** 44:21 47:8 60:22
**pressing** 54:10
**presumption** 31:11
**pretending** 8:16
**pretty** 58:3 90:14 127:24 134:17
**prevalent** 48:6
**prevent** 11:20
**prevented** 17:12
**preventing** 16:17
**previous** 2:14 42:16 45:9 53:9 56:21 113:17
**previously** 3:22

50:15 52:3 54:15
**pre-1987** 12:19
**priest** 7:5 9:1,14,22 9:23 10:4,7,21,24 17:21,24 25:15 26:9 27:6,13,20 34:14 36:15 37:3 40:21 59:10,12 68:12,20 139:23
**priests** 10:10,12,18 26:14 33:24
**priest's** 11:12
**prime** 9:2 112:7 113:11
**principal** 16:10 88:13
**principle** 55:3 70:1
**principles** 54:24
**prior** 46:10 50:14 50:20 51:6 139:4
**private** 7:12,13 30:15 31:19 32:15 33:12,19 34:20 37:5,7,24 39:11 39:20 40:22 69:8 69:11,12 70:9 73:1,14 76:19 77:6 78:24 80:2 81:24 92:21,22 93:12 105:22 106:10 113:19,20 118:18 125:6 126:14,17 134:4 139:22
**privately** 34:21
**privilege** 15:1 26:6 44:11 80:9,11 94:22 103:12
**privileges** 120:13
**probable** 79:20
**probably** 36:15 40:15 48:10 56:7 61:18 94:10
**problem** 18:14 65:12
**problems** 63:12,12 136:10
**procedures** 13:11

13:14
**proceeded** 58:23
**process** 13:10,13 13:22 30:13 31:17 32:20 89:23
**processes** 31:21,23
**prodding** 79:11
**produce** 102:8
**productive** 61:6
**Professional** 153:9
**professionally** 8:12
**professor** 15:9 62:17
**profits** 48:15 50:6 50:12 51:1,21
**profoundly** 7:17 8:6
**program** 32:7
**programs** 20:9 32:6,7 35:20 37:20 43:7
**prohibit** 31:6
**prohibition** 70:5 77:4
**projected** 24:10
**promise** 46:23 49:9
**promote** 45:7
**promoted** 39:15
**promptly** 17:10
**pronouncement** 53:17
**proof** 17:22 18:15 19:7 30:7 31:14
**propensity** 39:12
**proper** 2:17
**properly** 123:10 131:20
**property** 21:21
**proportionality** 20:7
**proposal** 73:11
**proposals** 16:9
**prosecuted** 36:2
**prospect** 97:19
**prospectively** 20:1 20:11
**protect** 10:4 11:3 12:23 30:3 92:17

135:14 136:1 138:1,13
**protected** 31:11 72:21,22
**protecting** 10:6 34:24 43:9
**protection** 40:1,9 40:24 43:5 46:10 51:6 66:9 72:14 76:19 77:13 79:22 80:1 81:23 88:15 113:19 126:14,16 134:19 139:24 140:1
**protections** 63:9 81:21 83:21
**protective** 32:6
**provable** 79:21 81:20
**proven** 37:6
**proves** 31:21
**provide** 33:22 34:6 78:8 84:20 109:12 110:6 115:1,2 130:3,7
**provides** 3:21 97:10 112:24
**providing** 3:11
**provision** 12:9 22:12 82:16,18,22 86:7 87:20 126:15 126:17
**provisions** 1:9 3:11 123:20 126:1
**provoked** 29:15
**psyche** 7:23 9:1
**psychiatrist** 7:1
**public** 15:24 17:9 31:9 32:17 37:5,8 37:10,24 38:1,3,4 38:5,8,10,21,23 39:2,6,20 42:7 49:20 65:8 68:22 69:4,8,14,19,20 70:6,10,13 71:17 73:3,15 76:18 77:5,18,20 80:1 81:24 82:2,10,13

82:19,24 83:6,13
90:15 91:22 92:9
92:13,24 93:13
104:8,10,11
105:21 106:2,10
113:20 116:8
118:18 132:12,14
133:16 134:4
138:14 139:22
153:10
**publicity** 32:11
33:21 63:11
**publicly** 9:19 13:24
34:8,20 134:24
**pull** 52:15 58:6
**pulls** 52:2
**punishing** 16:17
**purchase** 49:24
53:11
**purchased** 50:15
51:2 52:1 53:21
131:5
**purport** 15:13
**purports** 13:18
**purpose** 45:11
**purposes** 19:23
**pursue** 25:3
**put** 32:10 34:10,12
35:7 94:9 97:1
98:16,17 99:11,17
103:4 114:7
117:17 135:22
139:16

---

**Q**

**qualified** 88:2
125:5 128:7,13,15
133:13
**quarantine** 7:24
**quarter** 4:10
**question** 11:16,16
17:1,2 22:17
42:11 50:5 51:1
53:10 67:9 68:23
69:18 70:13 72:12
72:16,16,17,21,23
73:4,10 77:8
80:15 83:5,11
85:24 86:1,18

88:10 89:5 90:5,5
90:14 91:1,14
96:2,17 105:10
108:21 110:23
111:2,10,11
120:22 122:6
123:5 127:5 132:7
132:10 139:2
**questionable** 19:12
**questioned** 41:12
**questions** 12:1 20:6
24:22 25:7 34:18
35:13 36:15 43:23
45:8 46:11,21,23
47:3 54:3 58:17
59:18,20 68:7
73:7,21 75:24
76:4 78:11 80:18
80:22 81:1 84:23
84:24 87:4 90:3
94:17 98:21,21,22
99:6 101:12 104:3
105:13 106:22
108:4 120:9 127:7
132:21,22 134:9
**quick** 4:5 42:1
64:12 132:10
133:1
**quiet** 13:23
**quietly** 9:16
**Quill** 6:6,12,13
14:17
**quite** 113:1,1
128:17
**quo** 124:23 125:5
128:6 137:15
**quote** 19:20 36:23
37:5,11,23
**quoted** 36:22,22
122:2
**quoting** 29:4

---

**R**

**R** 153:7
**rabbis** 33:24
**radar** 29:20
**raise** 95:20 138:10
**raised** 6:16 32:16
66:24

**raising** 20:6
**ran** 66:5,16
**rancor** 16:11
**ranks** 77:18
**rape** 27:6,12 29:22
29:24 31:4 39:7
39:14 77:21
**raped** 4:13
**rapes** 4:12 10:16
**rapid** 21:20
**raping** 66:3
**rarely** 4:15
**rate** 21:23
**rates** 49:4
**rational** 18:23
**rationale** 12:8
**reach** 13:8
**reached** 28:17
**reaches** 26:15
**reaching** 79:20
81:20
**read** 3:2 22:22
36:23 42:11 74:9
78:3 95:23 100:13
124:18
**reading** 3:14 74:23
75:12 100:19
102:18
**ready** 2:1 13:5
**real** 21:21 35:17
37:4 43:9 52:8
67:9
**reality** 8:16
**really** 19:8 45:8,10
46:20 50:4 52:5
56:11 57:2,11
59:12 67:10 68:10
77:16 89:6 94:19
116:22 125:8
128:16 136:12
139:15
**rear** 125:15
**reason** 12:8,12 17:6
32:5,9 35:24
63:17 105:24
108:13 124:1
129:3 135:3 136:4
**reasons** 9:18 17:6,9

69:19 99:8 113:13
136:5
**Recall** 12:20
**recalling** 7:15
**receive** 72:14
**received** 146:6
152:2
**recesses** 7:22
**recidivist** 9:22
**reckless** 88:21,23
**recognition** 21:1
**recognized** 137:6
**recollect** 55:15
**record** 6:11 15:5
25:24 39:12 44:18
47:6 60:20 63:2
69:4,6 153:11
**recorded** 1:1
145:18
**records** 18:7,9
61:14,18
**recourse** 97:8
**recover** 4:4
**recurring** 8:19
**red** 33:4,4
**reduced** 58:13
**reference** 58:18
**referred** 16:22 25:1
47:23
**refiled** 74:17
**refined** 52:19
**reflects** 45:13
**reform** 30:6,8
**refrain** 2:14
**refused** 34:13
**refuses** 10:13 34:8
**regard** 46:19 48:24
52:16 113:2
124:24 125:10
128:7 130:24
131:11 132:1
136:22
**regarded** 18:19
**regarding** 1:9 3:12
44:13,13
**regardless** 17:13
99:3,4
**regards** 49:20

130:23
**Registered** 153:9
**regret** 16:1,2,9
**regular** 66:4 70:15
88:10
**regulating** 13:11
**reinsurance** 49:6
**reiterate** 80:22
112:23
**relate** 45:19
**related** 1:9 3:11
8:14 58:10 81:6
**relates** 50:14 57:6
62:4
**relating** 1:8 3:10
78:21
**relationship** 4:16
7:18 60:15
**relationships** 8:4,8
19:6 62:9
**relatively** 18:4 46:7
**relatives** 4:23
**released** 10:9,11
**reliability** 18:21
**relief** 8:24 13:2
**relieved** 9:14
**religious** 5:3 15:19
28:14,14 33:1
**reluctant** 22:5
95:23
**reluctantly** 10:9
**rely** 21:12 66:8
**remain** 14:11
**remarks** 11:24
**remember** 124:2
**remind** 111:24
**reminder** 3:18
**remove** 42:19 77:9
84:9
**removed** 28:8 52:2
**removing** 1:7 3:9
**repeal** 78:20 81:5
81:12
**repeals** 3:19
**repeat** 37:13
**repeatedly** 56:15
**repeating** 2:14
**replied** 100:5

101:18
**reported** 11:8
**reporter** 55:22
  81:1 153:10
**reports** 31:21 34:5
**reposed** 54:24
**represent** 15:13,16
  23:13
**representation**
  24:2
**representative** 2:22
  2:23 3:1,7,7,16,17
  5:12,13,15,22,24
  14:15,16,17,19,21
  22:15,16,19,20
  23:1,5,8,12,16,21
  24:4,16,19,22,24
  25:6,10,11 29:17
  35:14,15,23 36:7
  36:8,9,10,11,14
  36:19 37:22 38:8
  38:12 39:17 40:5
  40:6,8,13,17,18
  41:2,8,8,9,10,20
  41:21 42:1,2,9,10
  43:11,12,14 44:3
  44:5,6,7,9,16,23
  47:13,14,17 49:18
  51:8 53:1,3,5,8
  54:1,4,6,9 55:4,5
  55:13,17 56:2
  58:16,18 59:21,22
  60:2,3,5,11 62:15
  62:16 68:8,9,15
  70:3,16,24 71:8
  71:15,20 72:1,5
  72:10 73:5,12,19
  74:11,15,22 75:2
  75:3,11,16,17
  76:2,4,15,16
  78:15,15,17,17,22
  79:2,5,7,9,18 80:3
  80:10,14,17,20,24
  81:3,11,17 82:12
  82:17,23 83:4,10
  83:15,16,22 84:1
  84:13,23,24 85:1

85:2,5,9,11,14,21
86:6,14,17,17,18
86:20,24 87:3,6
87:11,12,15,16
88:6,14,18,19,24
89:24 90:3,4,8,9
90:12,12,16,19,20
90:24 91:2,3,5,6
91:19 92:3,7,11
92:14 93:10,11,15
93:20,24 94:7,14
94:16,18,20 95:1
95:4 96:2,3,9,16
97:2,21 98:3,21
98:24 99:1,22
100:10,11,18,22
100:23 101:3,5,7
101:21,23 102:3,6
102:7,11,16,20,22
103:17,21 104:1,5
104:6 105:16,16
105:17,17,18,19
106:5,5,7,8,24
107:1,1,2,10,12
107:14,16 108:5,6
108:7,8,10,11,12
108:16,16,18,19
109:4,23 110:2,5
110:12,19,21
111:3,5,7,9,13,23
112:2,3,8,12,14
112:17,20 113:5,5
113:12,15,23,24
113:24 114:1,2,3
114:4,5,14,16,19
114:19 115:2,7,10
115:13,13,14,15
116:1,10,14,18,18
116:19,21 117:2,3
118:12,14,19,21
118:24 119:1,15
119:17,24 120:3,7
120:12,17,19,22
120:23 121:11,14
121:19,21,24
122:5,6,12,13,24
123:2,4,8,14,19
123:24 124:4,16

124:18 126:19,23
127:2,7,8,15,17
127:23 128:4,9,18
129:2,6,9,14,17
129:17,18,19,21
130:1,3,7,18,22
131:8,14 132:2,5
132:7,9,11,16,17
132:20,23,24
133:1,9,18,24
134:8,11,12,13,13
134:15 135:10
136:3,17,17,18,19
136:20,21,23
137:11,13,14
138:6,23 139:1,2
139:6,7,13,14,18
139:19 140:2,3,5
140:6,12,15,18,21
140:24 141:3,6,9
141:12,15,18,21
141:24 142:3,6,9
142:12,15,18,21
142:24 143:3,6,9
143:12,15,18,21
143:24 144:3,6,9
144:12,15,18,21
144:24 145:3,6,9
145:14,16,20,21
145:23 146:9,10
146:15,18,21,24
147:3,6,9,12,15
147:18,21,24
148:2,5,8,11,14
148:17,20,23
149:2,5,8,11,14
149:17,20,23
150:2,5,8,11,14
150:17,20,23
151:2,5,8,11,16
151:18,22
**representatives** 1:2
  3:8 34:19 100:5
  101:18 115:20
**represented** 15:17
  30:14
**representing** 60:23
**represents** 44:11

**repulsed** 61:7,8
**reputation** 55:18
**request** 87:10
**require** 13:19 62:4
  76:18 121:9
**required** 19:2
  61:14
**requirement** 93:23
  97:18
**requirements** 82:8
  89:17
**research** 73:3
**residual** 7:17
**respect** 21:17 54:11
  65:13 66:23 69:9
  69:14,20,20 73:2
  73:13 84:14,19
  106:21 107:2
  113:16 114:20
  117:4
**respectfully** 22:11
**respond** 112:19
  114:15 128:3
**respondeat** 52:12
**responded** 76:10
**responding** 12:1
**responds** 52:24
**response** 73:7
**responses** 64:12
**responsibilities**
  58:1
**responsibility** 25:2
  84:5 137:19
**responsible** 11:18
  18:1 53:13 56:14
  71:21 76:19 96:20
  139:10
**responsive** 46:12
**rest** 10:6
**restate** 16:21
**restrict** 2:12
**restricted** 45:22
  48:18
**result** 7:3 12:21
  21:20 56:1,23
  65:1 102:24
**resulted** 21:10
**retire** 9:16

**retired** 9:18,21
**retiring** 6:23
**retract** 134:24
**retro** 51:5
**retroactively** 20:10
  50:2
**retroactivity** 62:3
**retrospective** 52:8
**retrospectively**
  19:23 52:2
**reveals** 146:4 152:1
**revelations** 29:13
  33:8
**review** 32:8
**revive** 20:2
**reviving** 19:19
  20:10
**revolution** 64:10
**rhetorical** 17:1
**rid** 31:8
**ridiculous** 3:23
  64:5 65:10 72:15
**right** 53:19 69:2,9
  70:17,21 71:3
  73:8 85:3 87:2,4,8
  93:20 94:8,15
  108:7 110:16
  112:4 113:14
  115:10 123:3,19
  127:3 129:9,11
  130:1 135:10
  138:6
**righteous** 16:6
**rights** 63:8
**rise** 21:23
**risen** 46:1
**rising** 29:5 106:1
  115:16
**risk** 22:9 51:16,17
  57:9,16 104:17
**risks** 57:3,10 58:3
**road** 131:5
**Rob** 6:5
**Robert** 6:12,13
**Robert's** 27:21
**rocket** 49:7 51:14
**Rogal** 47:9
**role** 10:14

**roll** 87:7 105:14
  138:16,18,24
  140:7,9 146:4,10
  146:12 151:24
**Roman** 7:4 30:5
**Ron** 79:15 80:6,9
  80:11,16,16,19
  81:8,14 82:1,14
  82:20 83:2,7,14
  85:4,7,18 86:12
  88:20 89:13 91:18
  92:1,6 93:14,17
  93:21 94:13 95:15
  95:19 98:2 103:12
  103:16,16,20,24
  121:7,17 123:12
  123:15,20
**Ronon** 23:11,13,20
  23:23
**room** 6:8 84:8 92:8
**RPR** 1:17
**rug** 52:2
**ruined** 34:2 66:3
  97:6
**ruled** 71:7
**rules** 13:11,14
**rumors** 122:9,11
**runoff** 57:9
**rural** 22:1

**S**
**saddled** 21:2
**sadly** 69:10
**safe** 91:24
**safer** 34:6
**SAM** 45:15 47:23
  48:9 49:24 53:12
**San** 64:21
**Sandra** 62:20
**Sargent** 14:24 15:2
  15:7,8 22:24 23:3
  23:7,10,15,19,22
  24:14,18 25:5
**satisfy** 21:4
**save** 25:14 114:1
  116:19
**saying** 15:12 35:18
  54:18 59:1 76:8
  83:1 89:8 96:4

**98:5 100:2 101:16**
  112:6 117:16
  123:17 126:19
  133:22
**says** 42:18 49:14
  57:17 82:10
  118:21
**SB** 42:19 58:19
**scandalous** 30:2
  33:10
**scholar** 68:11
  114:20
**school** 6:19 14:24
  15:9,14 39:6
  73:14,15 77:20,23
  84:4 88:12 89:15
  104:8,10,11
  107:20 109:3,9
  131:14,17,18
**Schooley** 144:2,3,4
  150:4,5,6
**schools** 6:18 21:24
  42:6,7 71:17
  138:14
**school's** 94:9
**Schwartzkopf**
  129:17 134:11,14
  134:15 136:23
  137:14 144:5,6,7
  150:7,8,9
**science** 49:7 51:15
**scope** 126:24
**scuba** 34:15
**seal** 153:15
**second** 3:21 17:19
  99:21,22 136:6,10
**seconded** 99:24
**secrecy** 34:4 39:14
**secret** 33:7
**secretly** 9:14
**sector** 49:20 90:15
  91:22 92:9,13
  106:10 118:18
  132:12,13,13,14
**secular** 32:11
**see** 30:24 31:8 52:5
  52:16,23 59:23
  86:22 106:2

**109:20 124:7**
  127:4 133:2
**seeing** 86:21 115:8
  116:12
**seen** 27:14 30:13
  33:9,10 47:2
  48:22 64:22,23,23
**seepage** 56:10
**self** 122:22
**sell** 66:14
**Senate** 1:6 2:2,22
  3:2,5,14,16,18 9:4
  13:18,20 14:6
  16:10,20 19:18
  22:13 61:2 74:9
  74:21,23 75:10,13
  75:19 76:8,14
  78:18 81:4 84:16
  84:16 86:6 90:13
  95:7 96:11,15,24
  98:15 99:19 100:8
  100:17,19 101:15
  101:20 102:2,16
  102:18 107:7
  110:14,17 111:15
  111:18,18 112:23
  112:24 113:18
  115:18,22,22,23
  115:24 116:4,15
  124:7,14,19,22
  125:10 126:5,10
  126:21 134:22
  135:3,4,8,15,22
  137:23 138:19
  139:3,8,12,12
  140:4,10 146:8,12
  152:3
**Senator** 3:6,6 116:9
  126:22 127:13,17
  139:16,19
**senators** 3:8 126:23
  128:3
**send** 115:24
**sends** 110:17
**sense** 8:18,22 29:13
  52:2 58:23 88:16
  89:11
**separate** 84:15

**97:12 112:15**
  114:10,13 115:5
  117:21 128:8,24
  135:6,20
**September** 153:15
**series** 56:11
**serious** 20:6 21:16
  84:11 97:13 117:8
  117:20
**seriously** 4:19
  61:24
**serve** 16:16 17:4
  21:12,19 60:13
**served** 22:9
**services** 35:20 65:1
  65:5,10
**session** 95:8 118:3
**set** 88:3 114:21,21
  120:8 121:3 138:3
  138:4 153:14
**setting** 93:5 119:6,6
**settle** 13:9
**settled** 58:20 59:4,6
**settlement** 13:23
  21:6 28:17,17
  33:20
**settlements** 13:7
  20:7 21:10 22:4,6
  67:4
**seven** 5:5 41:14,16
**seventh** 39:15
**severe** 7:2 104:12
**sex** 4:15 9:22 12:3
  88:12
**sexual** 1:8 3:10,20
  4:4 7:3,5,15 8:6
  9:19 10:10 12:21
  14:1,2,5,8 15:19
  16:17 26:13 28:2
  29:14,16,19 31:4
  33:8 34:4,16,21
  39:7 42:3 45:16
  45:21 46:19 47:22
  64:3 67:6 77:8
  78:21 81:7 84:12
  94:6 95:11 119:19
  119:19 125:17
  137:5

**sexually** 4:8,9,18
  9:2 28:13 34:1
  61:7,16 65:23
**shame** 30:20
**share** 16:17 48:2
  51:10 60:12
**sharply** 29:15
**shed** 18:8
**shepherd** 13:1
**shock** 48:16
**shocking** 28:7
  33:10
**short** 33:4 61:10
  129:19,19 132:7,9
  132:17 144:8,9,10
  144:11,12,13
  150:10,11,12,13
  150:14,15
**shortfall** 53:19
**shovel** 28:22
**show** 33:21 50:11
**showing** 44:20
**shows** 77:17
**shrinking** 21:19
**shrinks** 51:18
**siblings** 27:19
**side** 44:20 63:21,23
  91:9 99:12
**sides** 63:21
**sign** 135:20
**significant** 21:11
  61:12 110:11
**Significantly** 110:5
**signify** 100:2
**silly** 73:6,9
**simple** 8:4 19:19
  21:1 40:6 45:20
  53:11 61:10 63:20
  88:16,21 89:18,20
  90:14 104:21,22
  120:10,20 125:13
  130:9,9 131:18,19
**simplest** 20:14
**simplistic** 54:13
**simply** 10:20 18:16
  31:15 48:21 54:17
  61:13 62:1 75:19
  76:17 82:9 88:13

95:10 99:13
103:22 117:6
**sir** 2:21 6:10 14:13
15:3,4 22:21 25:9
25:24 26:3 38:15
39:1,4 40:19 41:2
42:8 43:15 47:12
53:7 54:8 59:19
60:10 62:15,16
76:5 78:16 79:6,9
80:19 81:2 83:24
86:5,15 90:18
100:13 103:14
106:6,13 107:11
111:6,24 112:14
113:8,23 114:17
115:11 127:18,20
128:2 129:4,13
**sister** 28:15
**sisters** 7:19
**situation** 23:2 28:4
56:4 73:18 88:12
89:7 94:11 125:9
126:9
**situations** 30:13
34:9 47:1 57:6
70:7
**six** 4:9,17 9:12
**small** 48:21
**Smith** 79:15 80:6,9
80:11,16,16,19,23
81:3,8,14 82:1,14
82:20 83:2,7,14
84:19 85:2,4,7,17
85:18 86:12 87:17
88:20 89:13 91:6
91:18 92:1,6
93:12,14,17,21
94:13 95:15,19
98:2,23 103:12,16
103:16,17,20,24
104:5 120:12,18
121:5,7,12,17
123:4,8,12,15,20
124:9
**smoking** 18:9
**social** 8:7,15 19:5
**society** 13:1 14:8

29:17 35:6,9
55:15 77:3
**sold** 21:21 60:1
**solely** 15:13
**solvent** 50:23
**somebody** 114:11
**somewhat** 90:1
**son** 104:12
**sorry** 36:9 38:7
75:19 77:24
101:23 108:6
127:18,20,21
129:6 132:7
138:22 139:19
140:3
**sort** 18:16 21:5
72:7 79:16
**soul** 7:14
**sound** 17:9 127:24
**sounds** 19:19,21
41:21
**sovereign** 42:19
43:16 69:21 70:21
79:14,22 81:21
82:8 83:3,21
84:11,14 85:24
86:2,10 88:2
93:18 95:3,20
96:1,6,12,19,22
97:11,14,17,20,23
98:4,7,9 103:9,11
107:19 108:1,21
109:14 113:1,21
114:9 115:4
117:13,15,19,22
119:8,10,12
123:21 124:24,24
125:5,21 126:14
127:12 128:7,12
128:22 133:4,7,13
133:23 135:5,21
137:1,24 138:10
**spared** 11:14
**spate** 20:23
**speak** 6:5 14:12
25:21 26:6 27:5
42:22 43:20 44:12
44:23 48:23 78:2

94:1 104:17
121:12
**speaker** 2:1,15 3:2
3:4,5,13,15,18
5:12,13,23 6:9,12
14:13,19,22 15:3
15:7 22:14,18
24:21 25:7,23
26:3 35:12 36:8
36:12 41:7,11,12
41:19,23 42:3,8
43:12,14,22 44:3
44:7,10,10,15,19
45:2,5 47:5,12,15
47:16 53:3,7 54:4
54:7,8 58:16
59:18 60:3,6,9,19
61:1 62:14,24
63:4 68:7,10 72:2
72:18 73:21 74:4
74:7,8,10,12,13
74:18,20,22 75:1
75:5,9,12,15,18
76:2,6,11,17
78:11,13,16 80:8
80:12,17 83:23,24
84:22 85:12,13
86:4,5,16,23 87:5
87:6,9,11,14,17
90:2,4,7,11,17,18
91:2,3,5 93:9
94:16,24 95:17
98:20 99:2,18,21
99:23 100:6,12,14
100:16,18,21
101:1,14,19 102:1
102:5,7,9,12,15
102:17,20,23
103:14 104:3,4,6
104:13,24 105:5
105:13,15 106:4,8
106:15 107:11,14
108:4,9,15,19
109:24 110:1
111:3,9,23 112:5
112:8,11,17 113:3
113:7,14,22 114:4
114:14,18 115:3

115:12,16 116:17
116:22 118:12,15
118:19,23 119:15
119:23 120:13,15
121:12,13 123:6
124:1,3,12,16
127:6,19,22
129:16,22,23
132:6,10,20 134:9
134:16 136:16
137:11,14 138:2,3
138:15,15,17,22
140:7,8 145:11,12
145:13,14,21
146:4,6,11 151:13
151:14,15,16,19
151:22,24 152:2
**speaker's** 100:2,9
**speaking** 34:7
45:15 46:7 51:5
53:14
**speaks** 118:17
136:21
**special** 40:12 77:22
104:10,11 138:4
139:23 140:1,1
**specialty** 25:19
**specific** 79:3 81:11
82:6 89:14 113:1
**specifically** 78:19
81:5,12 84:18
**specifics** 45:7
**specified** 53:21
**spent** 26:11,20
40:21 133:3,21
**sphere** 69:9,11,12
69:14
**spheres** 69:9
**Spirit** 8:20
**spiritual** 20:9 35:8
**Spokane** 64:20
**spoke** 43:15
**spoken** 27:3 30:20
76:20 111:14,14
131:1
**sponsor** 87:10 90:5
90:10,13 101:2
105:20,23 109:16

111:24 112:1,7
113:11 134:18
**sponsored** 3:6
74:21 75:11
100:17 102:16
**sponsors** 92:8
103:7 111:16
112:9
**St** 6:17,18
**stability** 33:14
**staff** 6:20 25:18
**stand** 14:3 37:13
57:18 68:3,24
69:1,3 72:11 99:2
104:7,7,13 114:23
134:23 135:2
136:14,15 138:2
138:11,15
**standard** 46:15
52:10 87:24 88:8
88:10 93:5 119:18
121:1,3,3,4,4
125:13,14 130:10
130:13,14 131:21
138:3,4
**standards** 19:5
**standing** 54:18
92:20 113:18
**standpoint** 103:13
**stands** 13:5 105:8
111:11
**stand-alone** 83:18
**start** 5:10 43:2
**started** 47:21 55:17
**state** 15:15 29:7
30:7,7 31:19
34:20 38:1,2,18
38:19,21 39:23
40:19 41:5 42:20
50:8 52:22 55:19
55:20 58:4,21
60:1,24 61:13
76:18 77:14 78:3
78:4,6,6,24 82:5
82:12,15,19,24
83:6,13,19 84:10
86:9 88:3,7 89:8
89:10 92:16 94:4

95:16,20 96:6,13
96:19 104:9,14,16
105:6,8,8 109:1,2
109:7 121:16
122:17,21 125:4,8
125:16 128:14
130:8,11,14 134:5
137:2,7 138:5,10
139:9 153:1
**stated** 93:23 95:24
**statement** 42:17
59:16 134:16
**states** 4:12 6:20
26:19 38:2 43:1
49:2 55:2 63:7,9
65:1,5 67:8 69:22
77:15 95:22
**State's** 88:3 131:8
**stating** 93:22
**status** 7:1 124:23
125:4 128:6
137:15
**statute** 1:7 3:9,20
3:23 17:11,20
18:10,14,24 19:22
19:24 20:12 31:24
32:19 37:3 42:16
51:9 55:11,18
59:15 64:3,8 66:5
66:7,9,16,17,19
67:5 68:5 69:5
78:7,20 79:8 81:6
81:10,13,15 84:17
85:22,23 110:8
124:22 125:1,3,21
126:10,11,13,15
128:5,11,23
133:12 134:3,3,6
136:8
**statutes** 16:22,24
17:3,4 51:19,24
54:14,22 55:16
135:7
**statutory** 75:22
**stay** 133:12 135:23
**steering** 61:5
**stenographic**
153:12

**stepping** 84:10
**steps** 34:5 77:4,6
**Stone** 44:6,8,9
47:13,14,17 49:18
51:8 53:1 60:4,5
60:11 90:3,4,9,12
90:20,24 91:3,6
91:19 92:3,7
113:24 115:13,15
135:10 144:14,15
144:16 150:16,17
150:18
**Stone's** 60:2
**stood** 124:1,2
**stop** 9:23 72:2
**stopped** 7:16 8:21
8:21
**stories** 65:18
**story** 27:21,24
**Stradley** 23:11,12
23:20,23
**straight** 120:8
**Street** 1:22
**streets** 34:10,13
**strength** 26:23
**strengthened** 27:10
**stress** 7:2
**stretching** 68:10
**stricken** 74:16
**strictly** 109:13
**strives** 18:22
**strong** 24:6
**structural** 19:10
**structures** 33:14
**struggled** 77:15
108:21
**struggling** 22:5
**stuck** 136:7
**student** 16:14
77:22 139:24
**students** 77:22
104:9,10,11
**subdivision** 121:15
**subject** 48:20 69:23
69:24 70:14 86:3
128:15 130:9
133:16
**subjected** 7:4 27:6

**subliminal** 51:22
**subsection** 87:21
**subsequently** 36:2
**subset** 79:4
**subsidized** 22:1
**Substitute** 103:2
121:22 122:7
**subtle** 18:5
**succeeded** 14:10
**successful** 8:12
58:23 61:6
**sudden** 43:4
**sue** 3:24 4:1
**sued** 87:24 89:8
94:12 125:14
137:3 138:7
**suffer** 36:4
**suffered** 8:14 33:2
**suffering** 63:17
68:2
**Suffice** 7:10
**sufficient** 21:4
**suggest** 11:2 39:21
106:11
**suggested** 13:4
101:6
**suggestion** 12:7
**suggests** 12:13
**suit** 17:21 59:11
87:22 128:15
130:9
**suits** 1:8,9 3:10,11
3:12 33:16 49:12
78:20 81:6 84:18
110:7 122:21
123:1
**sum** 13:7
**summary** 28:1
**summer** 7:7
**superior** 52:12
**supervising** 131:22
**supervision** 94:9
**supervisory** 6:20
**support** 20:15
26:11 31:8 61:2
68:24 69:1 93:7,7
104:24 106:17,20
115:4 134:21

135:1,19
**supporting** 24:7
**supports** 12:8
**suppose** 86:21
**supposed** 60:11
**Supreme** 71:5
**sure** 6:6,6 11:23
16:19 18:7 21:14
36:23 38:11,19
43:17 46:10 60:21
69:2 90:21 92:15
94:18,19 114:17
123:2 127:3
**surprise** 47:24 55:9
55:12 116:13
**surprised** 50:12
115:19
**surprising** 28:8
50:9
**surrounding** 63:11
**suspect** 68:21
**suspicion** 33:11
**sustaining** 26:22
**swirling** 98:8
**sympathy** 68:16
**syndrome** 7:2
**synopsis** 81:13
**Syracuse** 9:17,21
**system** 17:16,18
18:17 37:11 39:1
49:1 66:8 69:8

---

**T**

**T** 153:7,7
**table** 99:18,24
100:2,9
**tail** 49:6
**take** 8:4 32:2 34:17
51:16 57:3,10
58:2 61:23 67:12
67:14 68:15 70:15
77:4,6 78:12
131:3 135:19,21
**taken** 34:5 136:6
153:12
**taker** 57:10
**takes** 118:18 128:6
**talk** 6:7 29:20 31:2
63:5 94:4 95:17

115:17 117:20
**talked** 2:18 58:11
124:9
**talking** 4:7 51:15
52:12 70:7 82:17
84:2 87:19,20
94:22 97:23,24
98:4,12 126:23
133:4 135:6,7
139:20,21
**Tape** 1:1
**Taught** 62:23
**teach** 66:13
**teacher** 39:15
68:21 92:22 138:7
138:8
**teachers** 4:24 29:18
68:23 71:7,10,12
**teamwork** 116:11
**technicalities** 16:23
17:5
**tell** 2:6 8:2 36:17
38:20,21 64:24
65:17,20 66:1
92:24 95:6 96:5
127:9 136:4
**telling** 47:21 93:1
107:22
**ten** 4:23 29:17 49:5
53:23 63:15 85:5
**tend** 8:8
**tens** 27:24 60:23
**ten-year-old** 27:4
**terms** 45:20 46:2
48:15 51:19 52:23
54:13 57:4 94:11
**terror** 5:8 6:2
**Terrorism** 57:16
**Terry** 53:4
**testified** 53:9
**testify** 6:15 19:10
19:11 107:18
**testifying** 16:2
**testimony** 2:4
15:16 19:4 22:15
25:1,9,12 28:7
35:13 61:10,20
62:15,23 64:15

73:23 76:22,24
104:2 105:21
**thank** 3:1,15,17
5:22,23 14:11,13
14:14,16,21 15:4
15:6,10 22:13,14
22:20 24:19,21
25:6,8,9,11,22,23
26:4,5 35:11,12
35:15 36:7,11,13
37:22 38:12 41:2
41:5,11,19 42:8
42:10 43:11,15,22
43:23,23 44:1,1,9
44:15,19 47:12,14
47:17 49:18 53:1
53:1 54:1,6,9
59:22 60:5,9,18
62:13,14,16 63:4
68:9,15 70:3 73:5
73:16,20,22,23
74:1,7,11,18
75:15,17 76:16
79:6,9 80:20
83:15 84:21,22
85:9 86:14 87:9
87:12,15,16,17
90:1,24 91:6 93:6
93:11 95:1 98:19
98:20,23 99:1
100:11 102:3,22
105:15,19,20
106:7 108:18
112:11 113:22
114:3 115:15
116:21 118:14,22
118:23 119:14,16
119:17 123:24
127:8 129:14,21
132:5,9,23,24
134:8,12,15
136:16 137:13,14
140:5,6 151:18
**Thanks** 63:4 79:11
**theoretically**
137:21
**theories** 18:5
**thereabout** 109:11

**thing** 37:15,19 46:1
67:12 98:14
102:24 120:4
123:3
**things** 2:20 3:19
18:16 36:16 43:8
51:17 56:18 59:17
64:13 89:17 117:5
117:18 121:18
**think** 22:8 24:8,9
25:20 28:12 38:4
38:5 39:18 47:2,4
52:18 55:4 56:6
64:1,13 68:17,18
69:22 70:16 73:7
79:10,12 91:12
92:1 93:3,4 94:3
94:15,19 96:10,13
96:17 106:8 109:1
109:6 115:8
116:13 117:15
118:15,21 124:10
127:6 130:19
133:18,22 136:5,5
136:7,9,10,11,12
136:22 137:7
139:14
**thinking** 91:9
**thinks** 17:13
**third** 3:3,13 4:2,11
18:13
**Thomas** 25:13 26:1
26:2,5 35:22 36:6
36:13,17 37:12
38:7,11 39:9 40:3
40:7,11,15 41:1
41:16,22 42:22
43:20 44:1
**Thornburg** 144:17
144:18,19 150:19
150:20,21
**thorough** 124:10
**thought** 5:18 24:5
47:7 67:23 114:8
114:12 124:4
**thoughts** 51:10
112:15
**thousand** 28:12

54:19
**thousands** 14:4
27:24 33:9 34:11
56:19 60:24
**threat** 13:22
**threaten** 32:19
**three** 3:19 5:4
53:23 65:19
**throw** 50:19
**thugs** 27:13
**time** 2:8,16 3:3
5:18 14:17 17:1,8
19:13,19 21:3,22
24:12,15 25:14
26:11,16 27:7
40:21 41:6 54:15
55:6 59:20 64:5
65:16 67:12,15
79:24 81:23 96:23
97:9 106:13
109:16 112:4,9
115:21 118:5
124:2 133:3,21
135:24
**timespan** 26:17
**time-barred** 20:10
20:16 28:13
**time-honored**
13:13
**time-tested** 13:13
**tiny** 31:8
**title** 1:6 3:9,14
74:24 75:14
100:20 102:19
121:1,21
**today** 2:4 6:5,16
7:10 8:10 11:24
14:3,12 15:20
23:6 24:10,12,15
26:7 36:12 41:3
41:13 44:17 47:18
47:24 49:19 62:17
63:20 64:13 68:11
70:7 76:22,24
93:4 105:7,11
106:12 108:23
119:13 134:23
135:13

**today's** 58:4
**told** 29:17 65:2
**tolling** 17:11
**tomorrow** 55:9
58:7 61:16
**tone** 4:6
**tonight** 107:7
116:12
**Tony** 103:3
**top** 49:5 107:21
**tort** 21:5
**tortured** 9:1
**touchstone** 9:3
**track** 39:12 50:21
**tracking** 46:9
**Trade** 57:16
**traffic** 125:15
**transcribed** 1:17
**transcript** 153:12
**transfer** 9:10 10:20
10:20
**trapped** 30:20
**trash** 30:15 39:18
**trashing** 30:12
**trauma** 30:20
**treat** 105:5 117:10
**treated** 93:1,13
96:7,8,10,21
98:11 118:10
133:15
**treatment** 105:3
138:4
**tremendous** 40:21
**TRIA** 57:15
**trial** 31:12
**trials** 20:24 33:20
**Tribune** 29:3
**trip** 7:7
**trouble** 62:8
**troubling** 19:17
**true** 32:23 33:22
77:11 91:7,24
137:4
**truly** 20:2 57:1
62:12
**trusted** 62:13
**trusts** 13:21
**truth** 21:1

**truthfulness** 64:24
**try** 2:12,13 30:18
45:3 47:3 48:7
77:5
**trying** 26:11 62:7
71:5,13 75:20
88:4,15 89:6,11
94:20 96:4 112:13
116:22,24 132:17
**turn** 18:4 19:17
45:10 46:20
**turned** 28:22 65:22
122:10
**turns** 5:1 9:1
**two** 10:9 28:15
30:23 36:15 39:24
46:4 53:21,24
63:21 65:19 67:8
69:9 70:2 72:13
81:9,14 85:19,23
86:13 92:20 93:2
116:5 128:22,24
135:6
**two-shot** 75:23
**two-year** 3:20,23
19:18 21:13 22:12
52:9 85:17
**type** 16:3 36:3 46:4
47:21 48:3 49:15
125:9,14
**types** 44:14 47:1
96:18
**typical** 5:1
**typically** 5:17
56:16

_____

**U**

**ultimate** 35:3 59:8
**ultimately** 71:21
125:19
**unabated** 10:22
11:11
**unable** 8:3 139:7
**unaccountable**
14:11
**unamended** 9:4
11:23 13:17 14:7
**unanimously** 14:6
**unavailable** 19:4

unbearable 8:20
unbelievable 29:16
unbelievably 26:24
uncertain 19:4
uncertainty 17:8
  54:12 55:3
uncomfortable
  99:5 120:5,8
uncomplicated
  16:6
undefined 13:11
undermine 15:23
undermines 19:23
understand 28:23
  35:17 51:21 52:19
  57:2 59:11 70:8
  70:12 87:18 89:1
  89:2,3 95:8,9 98:7
  98:18,18 99:7,10
  106:20 117:18,19
  117:24 118:6,11
  133:20
understanding
  69:7 88:5 95:9
  120:23,24 121:2,6
  129:11 139:9
understands
  125:12
understood 133:2
undertaker 34:15
underwrite 48:14
  56:9,13
underwriters 50:10
  52:3,7 56:19
  59:13
underwriting
  45:14 51:23
underwritten 46:5
  46:16 48:13 57:13
  57:15,21
undoubtedly 17:4
unending 8:14
unescapable 11:6
unfair 89:5
unfairnesses 54:23
unfortunate 64:14
unfortunately
  27:23 77:2,3,4

unfriendly 136:22
  137:9
UNIDENTIFIED
  99:22 122:24
unimaginable 8:1
unique 27:23
United 4:12 6:20
  26:19 55:2 63:7,9
  65:1 69:22
University 14:24
  15:9,14 62:21
unquestionably
  103:9
unsettling 55:23
unspeakable 8:1
unsuspecting 9:11
unworthiness 8:18
upstairs 107:8
urge 14:5 22:11
  61:11 62:6
urged 30:8
usage 117:23
use 30:18 71:13
uses 57:8
usually 4:16 17:23
  18:5
U.S 37:11

_____

V

vague 82:3
Valihura 14:17,20
  14:21 41:8,20
  42:1,2 44:23 54:5
  54:6,9 55:4,5,13
  55:17 56:2 105:16
  105:18,19 106:8
  107:2,10,12,15,16
  114:5 116:18
  118:20,24 119:1
  127:7,8,15,23
  128:18 129:2,6,9
  129:14 133:1
  136:4 144:20,21
  144:22 150:22,23
  150:24
value 35:3 51:16
values 19:5
various 76:9 100:4
  101:17

vast 65:14 66:12
Vatican 26:17
verbatim 36:24
verdicts 20:8
verifies 13:22
versus 88:17 89:9
vetting 2:17 32:7,7
viable 22:7 50:23
vicarious 52:13
victim 5:11 6:3
  19:10 65:2,20
  67:20 105:12
victimized 62:13
victims 3:22 4:10
  8:6 10:24 11:13
  11:17,20,21 12:3
  12:5 13:2,3,6 14:4
  16:5,7,12 21:2
  26:18,21 27:2,18
  29:9 30:4,12,16
  30:19 31:4,22
  32:2 33:1,15 34:5
  35:1,10 63:16
  64:4,18 65:14,15
  66:22 67:14,17,22
  67:24 68:2 69:1,1
  69:4 72:11 78:8
  93:13 99:2 104:7
  104:8,13 105:2
  138:2,2,12,15
victim's 9:4 14:7
  77:24 78:1
view 20:18,19
  69:17 90:21
  128:19
views 15:12,13
Villanova 14:24
  15:9,14
Viola 58:17,18
  113:23 114:2,3
  115:7 144:23,24
  145:1 151:1,2,3
violated 7:12,12,14
Virginia 41:15
vociferous 30:4,9
voice 45:4 101:12
volunteers 61:15
vote 99:6,7 101:12

106:3 114:21
  119:11 120:6
  133:22 137:10
  146:1,7 152:3
voted 109:15
  145:24
voting 145:16
  146:1,3 148:11,12
  151:19,21
vulnerable 28:3
  34:7 35:9 104:15
  104:17

_____

W

Wagner 35:14,15
  35:23 36:7 40:6
  41:9,21 42:9,10
  43:11 94:17,18
  95:1 96:2,16
  97:21 98:3 113:24
  115:13 116:18,21
  118:21 129:17
  132:23,24 133:18
  134:8 145:2,3,4
  151:4,5,6
wags 49:7
wait 52:5,16,23
  75:6 77:17 102:13
waive 43:19 70:18
  71:1,22,22 79:14
  82:7 83:3 85:16
  86:9 96:12 97:17
  103:9,9,10 108:1
  113:21 127:12
waived 93:19 119:8
  119:10,13 123:21
  131:12
waiver 96:1
waives 85:16 86:9
  125:24
waiving 79:13
  84:11 85:22 97:14
  97:20,23,24 98:4
walking 8:17
Walls 145:5,6,7
  151:7,8,9
want 5:9 6:8 15:15
  16:1 28:5 31:2
  35:16 42:19 46:20

49:21 50:19 55:8
  61:23 65:24 66:1
  66:1 80:22 94:1
  95:12 96:7,8,9,24
  98:11 103:4 105:7
  106:18 114:15
  117:9,10,20 118:4
  118:9,10,17 120:4
  124:8 127:4 133:2
  134:2 135:12,13
wanted 5:10 29:20
  36:23 106:13
  117:7 129:10
wants 94:2 107:5
Washington 26:17
  52:22
wasn't 122:3 127:2
watch 59:17
water 57:23
way 7:24 8:16
  16:16 18:2,3 36:4
  42:12 61:17,18,22
  66:11,14 68:2
  72:20 79:15 86:3
  92:4 109:10
  118:10 123:16
  133:15,17 134:23
ways 29:23 64:16
  103:22
weaving 43:2,2
wedding 68:12
weeks 9:6 12:2
  50:10
week-long 7:6
welcome 6:9 15:4
  54:2 60:9,16
  62:10,24 68:10
welfare 31:22 35:8
well-trained 10:17
went 10:21 107:20
  145:24
weren't 10:6
we'll 5:19 32:2
  43:17 49:16 66:14
  70:24 73:15 75:6
  94:15 102:12
  107:6 120:6
we're 2:1,12 6:1

22:22 48:21 51:15
52:12 53:15 56:14
57:17 58:3,19
60:11 65:13 68:22
69:10 70:7 75:20
84:2,15 85:5,14
86:22,23 87:1
89:7 93:3,22
94:22 95:2 96:20
98:4,5 106:10
108:2,22 113:4
114:22 116:12
117:14 118:3
122:16,16 135:6,7
135:9,23 136:13
139:20,21
**whatsoever** 135:5
**WHEREOF**
153:14
**whiff** 77:7
**wide** 69:7
**widely** 49:15
**WILCOX** 1:21
**Wildwood** 7:7
**willful** 87:23
**Williams** 145:8,9
145:10 151:10,11
151:12
**willing** 13:5
**willingness** 13:18
**Wilmington** 1:22
6:16 10:8 42:15
47:11 59:8 153:16
**window** 19:18 20:1
20:4,15 21:13
22:12,12 28:11
32:1 64:9 66:15
67:1,18,19 68:5
70:9 78:8,24 81:9
86:8 103:10
109:12 110:6
**windows** 64:4
**Wisconsin** 64:19
**wish** 16:6 87:7
**witness** 2:15 5:10
14:18 22:17,17,19
25:1,8,13 35:13
43:23 44:6 47:15

53:6,9 58:17
59:19 60:1 62:17
68:8 73:22 77:15
80:18 84:23 85:1
86:19 90:3,6,9
91:1 94:17,19
95:4 97:22 98:22
127:7 129:19,24
132:21,22 134:10
153:14
**witnesses** 2:9 5:16
5:19 17:7 19:11
30:16 31:14 59:21
74:2
**woman** 27:4 65:18
**women** 26:7,12
33:24 77:1
**wonder** 10:15 13:8
120:20
**wondering** 139:17
**word** 13:16,21
123:10 134:20
**worded** 82:2,9
**words** 50:1 82:6
88:17 99:11
103:19,23 104:24
105:1 114:7 120:5
120:6
**work** 2:10,22 5:8
5:17,19 8:8,14
23:19,22 33:2
38:10 54:23 62:11
62:12 78:5 109:17
**worked** 8:12 23:17
139:4
**working** 60:15
63:24 101:2
**works** 32:23 92:23
**world** 48:21 57:16
120:1
**worms** 131:6
**worried** 94:8 98:14
**worrying** 24:10
**worse** 16:13
**worth** 8:9
**worthwhile** 65:3
**worthy** 69:18
**wouldn't** 46:2

54:16 73:8 83:17
118:2
**wrestled** 137:23
**writer** 113:16
**writing** 16:2 24:1,1
103:22
**written** 23:3 25:20
52:3 69:18 78:19
79:19 81:4,12,19
85:19 86:13
112:24 113:4,5
123:17 124:24
**wrong** 63:10,14
77:9 114:11 121:5
**wrongful** 130:12,13
130:21
**wrote** 62:21 94:1
124:6
**www.wilfet.com**
1:24

_____

**Y**

**yeah** 72:4 78:22
79:2 112:20
113:12,15 114:24
**year** 10:2 28:21
39:5,7 77:20,22
106:13 107:8,9
108:14,20,21
115:6 117:8,9
121:22 122:8,19
133:15 137:23
139:10
**years** 4:18 6:13,23
7:3,6,8,20,21 8:14
9:9 10:1,22 11:12
26:9,11,15,16
27:10,16 28:9
31:7,13 45:17,23
47:11 48:11 50:17
53:23 55:1 61:15
61:17,21 64:1
66:5 67:14 81:9
81:14 85:19,23
86:13 105:4 110:9
127:17
**year's** 103:2,7
**yesterday** 36:21
42:12

**yield** 2:21 108:8
**YMCA** 51:13 88:10
**York** 9:17 65:21
**younger** 4:11,13
**youngest** 27:2
**youth** 60:24 61:4
62:8

_____

**Z**

**Zutz** 44:11,12,19
44:21,22,24 45:3
45:6 47:7,8,9,10
47:17 48:7 50:4
51:14 53:8,15
54:2,12 55:12,14
55:23 56:6 59:5
59:23
**Zutz's** 61:19

_____

**$**

**$300,000** 126:3
131:2

_____

**1**

**1** 74:16 75:10,13,18
76:7,13 99:20
100:1,8 103:2,7
108:23 121:22
122:7 139:10
153:11
**10** 1:6 3:9 78:19
81:5
**100** 28:18
**11** 4:13 79:19 81:19
84:20 105:21
**11th** 6:21
**12** 5:4 27:7 82:9
**120,000** 138:13
**122,000** 104:8
**13** 7:6 10:2 27:8
**1330** 1:22
**14** 84:20
**15** 6:23 12:4 45:17
47:10 50:17 61:21
79:19 81:20 121:7
**15th** 68:12
**15,000** 104:9
**15-minute** 2:11
**153** 153:11

**17** 10:2 146:4
**17th** 153:15
**170-RPR** 153:21
**18** 110:9
**19** 1:16
**1930s** 20:4
**1940s** 20:4
**1950s** 20:4
**1962** 9:7
**1968** 7:6
**1973** 6:19
**19801** 1:22
**1984** 26:16
**1987** 12:4,6,9
**1993** 9:14

_____

**2**

**2** 74:9,16,21,23
75:10,13,19 76:7
76:14,17 87:2
99:19,24 100:1,7
100:8 103:1,19
120:2 123:9,16
**20** 4:13 28:9 45:17
48:11
**200** 34:10
**2002** 7:1
**2003** 67:1
**2007** 1:16 153:15
**2009** 153:22
**24** 26:15 146:5
**25** 26:15 110:9
**250** 34:11
**29** 1:6 2:2,22 3:2,6
3:14,18 9:4 13:18
13:20 14:6 16:11
16:21 19:18 22:13
42:19 58:19 61:2
74:9,21,23 75:11
75:14,19 76:8,14
78:18 79:4 81:4
84:16 86:7,10
90:13 96:11 99:19
100:8,17,19
101:15,21 102:2
102:16,18 111:15
112:24 113:18
115:18 124:7,22
126:10,21 135:15

```
        138:19 140:10          60 65:18 67:14
        146:8,12 152:3         60s 56:12
29's 84:16                     655-0477 1:23
                               67 47:11
─────────────────────    ─────────────────────
          3                          7
3 100:12,17,19           7th 42:17
   101:4,6,15,20         70 65:18
   102:2 113:8,10        70s 56:12
   116:2 146:13          71 5:5
   152:4                 75 12:11,17 13:2
3:30 109:11,18           77 10:2
   110:3                 ─────────────────────
30 7:20,21 61:15,17                8
   111:16                8 78:19 81:5
30th 136:13              80s 56:12
300 28:24                85 4:22 12:20 68:18
300,000 131:10           850 28:12
302 1:23                 86 65:6
31 153:22                87 65:6
35 111:16                89 27:5
37 26:9                  ─────────────────────
─────────────────────              9
          4              90 66:20
4 102:16,18,23           92 27:4
   103:1 120:2,6
   123:11 124:19
   125:11,24 126:20
   138:18 140:9
   146:8
40 58:21 61:15
   65:18 67:14 126:1
   126:2
41 59:4,6 152:1
42 65:22
43 110:10,10
45 9:9 12:3
450 103:3,7 108:23
   121:23 122:7
   139:10
─────────────────────
          5
5 85:7,15 86:21,24
   87:1 116:3
5,000 33:16
50 10:22 11:11 38:2
   54:19 65:18 67:14
52 6:13
─────────────────────
          6
```

Westlaw.

### DELAWARE 2007 SESSION LAWS
### FIRST REGULAR SESSION OF THE 144TH GENERAL ASSEMBLY

Copr. © 2007 Thomson/West

Additions and deletions are not identified in this document.

Ch. 102
S.B. No. 29
COURTS--CHILD ABUSE--STATUTE OF LIMITATIONS

AN ACT TO AMEND TITLE 10 OF THE DELAWARE CODE BY REMOVING THE STATUTE OF LIMITATIONS FOR CIVIL SUITS RELATING TO CHILD SEXUAL ABUSE AND ADDING RELATED PROVISIONS REGARDING SUCH SUITS.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE:

Section 1. Title 10 of the Delaware Code is hereby amended by adding to Chapter 81 a new Section 8145 which shall read as follows:

<< DE ST TI 10 § 8145 >>

"§ 8145. Civil suits for damages based upon sexual abuse of a minor by an adult.

(a) A cause of action based upon the sexual abuse of a minor by an adult may be filed in the Superior Court of this State at any time following the commission of the act or acts that constituted the sexual abuse. A civil cause of action for sexual abuse of a minor shall be based upon sexual acts that would constitute a criminal offense under the Delaware Code.

(b) For a period of two years following the effective date of this bill, victims of child sexual abuse that occurred in this State who have been barred from filing suit against their abusers by virtue of the expiration of the former civil statute of limitations, shall be permitted to file those claims in the Superior Court of this State. If the person committing the act of sexual abuse against a minor was employed by an institution, agency, firm, business, corporation, or other public or private legal entity that owned a duty of care to the victim, or the accused and the minor were engaged in some activity over which the legal entity had some degree of responsibility or control, damages against the legal entity shall be awarded under this subsection only if there is a finding of gross negligence on the part of the legal entity

(c) A person against whom a suit is filed may recover attorney's fees where the Court determines that a false accusation was made with no basis in fact and with malicious intent. A verdict in favor of the accused shall not be the sole basis for a determination that an accusation was false. The Court must make an independent finding of an improper motive to award attorneys' fees under this section."

Section 2. This bill shall be known as the "Child Victim's Act".

Section 3. If any provision of this act or the applications thereof to any person or circumstance is held invalid, the invalidity shall not affect other provisions or applications of the act which shall be given effect without the invalid provision or application; and, to that end, the provisions of this act are declared to be severable.

Section 4. This Act shall become effective upon the specific appropriation of funds for such purposes in the Annual Appropriations Act.

Approved July 10, 2007.

DE LEGIS 102 (2007)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

 

## State of Delaware
The Official Website for the First State

Visit the Governor | General Assembly | Courts | Elected Officials | State Agencies

State Phone Directory | Help | Search | This Site

Your Search...

Citizen Services | Business Services | Tourism Info.

**Governor Ruth Ann Minner**

HOME
Biography
In the News
Initiatives
Photo Gallery
Office Locations

SERVICES

INFORMATION



Tuesday, July 10, 2007

### Governor Minner Signs Senate Bill 29

*Dover* – Today Governor Ruth Ann Minner signed Senate Bill 29, legislation that amends Title 10 of the Delaware Code by removing the statute of limitations for civil suits relating to child sexual abuse. The bill, sponsored by Senator Karen Peterson, Senator David McBride, Representative Deborah Hudson, and Representative Greg Lavelle, also provides a two-year window in which victims can bring a civil action in cases previously barred by the current statute.

"Ever since we passed Megan's Law in 1998, we've been working to refine and strengthen Delaware's laws relating to sex offenders," said Governor Ruth Ann Minner. "Sexual predators that victimize children are learning that Delaware is not going to tolerate their horrendous crimes against the children of our state. I applaud the efforts of Senator Peterson and all of the co-sponsors for taking the lead on passing this vitally important legislation."

This legislation changes the statute of limitations, which is currently two years, so that going forward there will no longer be a statute of limitations for a cause of action based upon the sexual abuse of a minor. Additionally, SB 29 provides that victims of child sexual abuse, who are barred from filing a law suit against their abuser due to the expiration of a statute of limitation, can file a claim in Superior Court for a period of two years.

"Rep. Deborah Hudson and I are proud to have played a role in getting this landmark legislation passed," said Senator Karen Peterson, the bill's author and primary sponsor. "As a result of its passage, Delaware's children are safer, child sexual abuse victims can finally get justice, and those who molest children will find that they no longer have a safe haven in Delaware."

Last Updated: Wednesday, 25-Jul-2007 13:08:12 EDT

site map | about this site | contact us | translate | delaware.gov



*Joan Hearing*

**ROBERT J. VALIHURA, JR.**
STATE REPRESENTATIVE
Tenth District

HOUSE OF REPRESENTATIVES
STATE OF DELAWARE
LEGISLATIVE HALL
DOVER, DELAWARE 19901

COMMITTEES
Judiciary, Chair
Revenue & Finance, Vice-Chair
Sunset Committee/Policy Analysis &
Government Accountability, Vice-Chair
Economic Development,
Banking & Insurance
Housing & Community Affairs

### COMMITTEE MEETING MINUTES
Judiciary Committee
May 10, 2007

Representative Valihura called the meeting to order at 11:40AM. Members in attendance were Rep. Hudson, Rep. Johnson, Rep. Marshall, Rep. Lavelle, Rep. Wagner, and Rep. Mitchell. Please see attached attendance sheets for all other present.

Rep. Valihura announced that this meeting was a special hearing for **SB29, RELATING TO CHILD SEXUAL ABUSE AND ADDING RELATED PROVISIONS REGARDING SUCH SUITS (Sponsor: Peterson).** He then had the committee members present themselves to the public and introduced Senator Peterson and Rep. Hudson, the prime sponsors of the bill.

Rep. Hudson, the prime sponsor of the bill in the House, stated that the purpose of the legislation is to look after children who have been victims of sexual abuse. She stated that the bill would not only protect children, but would also take care of adults who suffered sexual abuse in their childhoods. She explained that the bill is entitled the Child Victims Act and has three main objectives: repealing the two-year statute of limitations in bringing suits against child sex abusers, providing a look-back period of two years from the date of enactment in which victims can sue their abusers and the legal entity that enabled the abuse to happen, and allows a person or entity who is falsely and maliciously accused of abuse to obtain attorney fees from the accuser.

Rep. Hudson then stated that one in five children are sexually abused and provided some additional statistics regarding child sex abuse. She stated that the average age a child is abused is nine and that 1/3 of all rapes in the Untied States are committed against girls under 11 years old. She also stated that the abuse is rarely a one-time occurrence and the average time of abuse is 4 years. She then stated that 85% of molestations involve a family member or close family friend and only 10% are committed by clergy or teachers. She stated that the average child molester will abuse 3-12 children in his or her lifetime, averaging 70-71 molestations per child. She stated that child sex abuse is a very serious problem in Delaware and that the purpose of the legislation is to help victims of child sexual abuse and nothing else.

Rep. Valihura stated that he had a few technical questions regarding the bill. He stated that it differs from last year's bill and asked why the statute of limitations was repealed entirely while it was only extended last year. Senator Peterson responded that in the

---

11 Laurel Ridge Lane, Wilmington, Delaware 19807
Home: 302-888-1253  House Office: 302-577-8723  Fax: 302-577-6396  E-mail: valihura@aol.com
PRINTED ON RECYCLED PAPER

A00315

original draft of last year's bill, there was no statute of limitation. She stated that when she combined her bill with the similar one proposed by Rep. Lavelle into HB450, a compromise was made but that the original intent was to have no statute of limitations at all. Rep. Lavelle responded that in HB450, the statute of limitation became age of maturation plus 25 years. He stated that the American Psychological Association found that most people would be ready and able to file suits against their abusers by that time. Sen. Peterson added that the original bill was modeled after a Vermont bill and it also contained the look-back period.

Rep. Valihura asked what the reasoning was for doing away with the statute of limitation period entirely. Sen. Peterson responded that she has been in contact with many victims over the age of 43 (which would have been the effective final age to file suit) and their lives have been completely destroyed and they still suffer from the abuse so there should be no outer limit. She stated that HB66 was passed unanimously a few years ago to repeal the statute of limitation for filing a criminal claim against an abuser and that the civil remedy should be consistent. Rep. Valihura asked if there are any other civil remedies that have no statute of limitations. Sen. Peterson responded that she is not aware of any. Rep. Hudson stated that to set a date when a victim can no longer sue is wrong and arbitrary. She stated that this abuse hurts so many people and feels that there should be no barrier to suing.

Rep. Lavelle brought up the $18 million fiscal note attached to last year's bill and stated that it is unlikely that they will be able to find the money to fund this. Rep. Hudson responded that she has a copy of the fiscal note dated 6/27/06 and it says the total cost would be $200,000, not $18 million. Rep. Lavelle responded that the fiscal note she is referring to was on the substitute bill, not the original HB450. Sen. Peterson added that she went to find what was included in the $18M fiscal note and no one in the Controller General's Office could verify it and the figure was just a phantom number. She stated that the $200,000 fiscal note included the purchase of insurance by the state. Rep. Lavelle stated that school districts in the state have come to him to say that they do not have the money to purchase insurance.

Rep. Valihura also had a question about the length of the look-back provision and asked why two years was decided to be the most appropriate. Rep. Hudson responded that some of the bill's supporters wanted to make it 5 years and they compromised to 2 years to meet the needs of the victims and be reasonable. Rep. Valihura asked if any other states have a look-back provision. Rep. Hudson responded that Illinois is considering it and California currently has a one year period. She stated that 2-year period is what is right for Delaware and they do not need a track record from other states to prove it.

Rep. Valihura then asked a question about Subsection B, sentence 2. He asked if their intent to have that section only apply to the suits initiated during the look-back period or all sexual abuse suits. Sen. Peterson responded that they only intended the ability to sue an outside entity to be applicable to cases brought from the look-back period.

A00316

After the committee was finished with their questions, Rep. Valihura opened the meeting up to members of the public who wanted to speak on the bill. Nelson Lamb was the first person to speak in support of the bill. Please see his attached testimony.

The next person to speak in support of the bill was Valerie Marek, Executive Director of SOAR (Survivors of Abuse And Recovery). Kay Preston of SOAR also spoke in support. Please see their attached testimony.

Rob Quill, a survivor of childhood sexual abuse, was the next to speak in support of the bill. Please see his attached testimony.

Jean Lange, a survivor of childhood sexual abuse, spoke next in support of the bill. Please see her attached testimony.

The Honorable Vincent Bifferato, Chairman of the Catholic Diocese Review Board, was the next to speak. He stated that he supports the bill, but believes that the government immunity must be abolished. He stated that he served on the Delaware Superior Court for 32 years and that consistency is one of the most important factors in the administration of justice. He further said that doing away with statute of limitations reduces consistency. He also stated that some claims are just too old to be brought to trial and that the burden of proof would be very difficult to establish in the old cases. Rep. Hudson asked if the statute of limitations has ever been waived. He stated that he was not aware of a specific instance and that he does not have a problem with the statute of limitations being extended, but does not believe it should be done away with completely. Senator Peterson asked if he opposed the repeal of the statute of limitations in criminal charges. He stated that his problem with it is that if the abuser's employers or organization are sued, they must defend these cases even though they may not have the appropriate records. He stated that the basic problem is consistency and that it will be impossible to prove these cases. Sen. Peterson stated that the burden of proof is on the accuser and that this bill just opens the door for suits, it does not guarantee they will be successful. She also stated that county law requires the Catholic Church to keep such records and that in California which has a one-year look back period, 99% of the suits were brought against the Catholic Church.

Rep. Lavelle asked if someone is found guilty of child sex abuse in the civil proceedings, will he or she have to register as a sex offender even if there were no criminal charges. The Honorable Vincent Bifferato stated that he is not sure, but believes that they should. Rep. Hudson asked who he was representing today. He stated that he is speaking as chairman of the Catholic Diocese Review Board and that he wants to see government immunity removed as to better protect all children. Sen. Peterson asked if the Diocese supports the bill and he responded that he is not speaking on the entire bill, just House Amendment 2.

Rep. Lavelle, the sponsor of the amendment, explained that HA2 confirms that the state is not immune from liability. He stated that the state should have the same full responsibility as any other entity does in protecting children. He stated that the purpose of

A00317

the amendment is to make it very clear that state immunity is waived so the point cannot be argued by lawyers. He stated that the state is an equal and full partner in the protection of children and that more children are under the care of the state on any given day than any other entity. Rep. Hudson agreed that the state should not be immune from liability and asked a representative of the Attorney General's Office to discuss the amendment.

Larry Lewis of the Attorney General's Office explained that as of now, state entities would be offered sovereign immunity which is a constitutional protection. He stated that states would be able to raise sovereign immunity as long as gross negligence was not involved on their part. He stated that the amendment would abolish the possibility of both sovereign and qualified immunity altogether in these cases. Rep. Marshall asked if the waiver of immunity except in cases of gross negligence only applies to the look-back period. Mr. Lewis responded that he believes so, but it is for the state solicitor to interpret. Sen. Peterson stated that the proposed amendment would waive sovereign immunity for the entire bill, not just the look-back period. She stated that state employees lose their right to sovereign immunity at the point of gross negligence. She stated that state employees already have sovereign immunity in other tort remedies and they are not taking defenses away from the other entities, so they do not want to take it away for the state. She stated that if the amendment passed, the state would be responsible for the school district's gross negligence which she believes would inflate the fiscal note and could kill the bill. Rep. Lavelle responded that it was not his intent to inflate the fiscal note and just wants equal liability for public and private entities. He stated that going forward without the amendment would allow the state to have a defense that private entities do not enjoy. Mr. Lewis stated that this is disparity under current law.

Rep. Johnson asked if the amendment was friendly. Sen. Peterson responded that in her opinion it is intended to kill the bill by removing sovereign immunity for this tort and not every other one. Rep. Lavelle disagreed and stated that he takes offense at her suggestion. He stated that he believes everyone should be treated the same because the egregious nature of the offense and that state employees should not receive any sort of immunity. Rep. Valihura stated that all members of the General Assembly are working in good faith and no one would intentionally sabotage a bill. He stated that Rep. Lavelle has only the best of intentions with his amendment. Rep. Lavelle stated that he has been consistent on this issue since last year.

Sen. Peterson asked Jeff Clark, the chief Senate attorney who wrote the bill, to explain if state employees can be sued both from the look-back period and in the future. Mr. Clark responded that yes, if certain conditions are met, sovereign immunity can be waived as the bill currently reads in both suits from the look-back period and future suits. He stated that sovereign immunity is a well-embedded concept and you may want a separate bill to address that issue. Rep. Valihura asked what the intention was to allow the entities to be sued. Sen. Peterson responded that the abuser may be long gone or unable to pay so the entity that was grossly negligent and enabled the abuse to happen should be held responsible so the victim can receive the appropriate compensation.

A00318

Reverend John Hynes, pastor at the St. Catherine of Siena Catholic Church, spoke on the bill next. Please see attached for his testimony. Rep. Marshall asked him to explain what would happen to a Catholic school that was successfully sued. Rev. Hynes explained that most of the suits are brought against the Diocese that runs the school and they would be forced to find the money to pay the damages by selling off assets like schools and churches. Sen. Peterson pointed out that other Dioceses in the country had to declare bankruptcy in order to pay damages, but only did it to protect the assets and were able to come out of bankruptcy fairly quickly. She asked Rev. Hynes to discuss how the Diocese of Boston dealt with paying damages since they had the biggest judgment against them. Rev. Hynes stated that he does not know as he is only speaking as a local priest. He stated that the $41 million payout is a large sum that would require many assets to be sold off. He stated that no amount of damages is going to heal the wounds of the accuser and that the Church runs off volunteered contributions and cannot afford such huge sums. Sen. Peterson responded that not one school or church had to be closed in Boston as a direct result of the pay-out. She stated that the reason schools had to be closed was because Catholics in the area were disgusted with the actions of the Diocese and boycotted collection. She stated that the declared bankruptcies of other Dioceses were bogus and intended to protect the church assets; they were not true Chapter 7 Indigent claims. Rev. Hynes responded that he sees justice as restoring what was taken away from someone while others may see it as a dollar amount. Sen. Peterson asked what if your livelihood was taken away as Rob Quill's was, doesn't the church owe him something?

The next person to speak in support of the bill was Christine Geisler. She stated that she was sexually abused on a daily basis between the ages of 6 and 9. She stated that she waited six years to tell anyone about the abuse and bring charges and there was still plenty of evidence to convict her abuser. She stated that no amount of money will help her, but it may help someone else. She stated that this bill is about punishing the abusers and that they should not be protected. She stated that the perpetrators are not worried about being caught and too many children are sexually abused as a result. She stated that this bill would allow for increased accountability and hopefully prevent abusers from hurting more people.

The next person to speak in support of the bill was Polli Funk, the Public Policy Director of ContactLifeline, Inc. She read a letter of support for the bill which is attached.

The final member of the public to speak in support of the bill was Susan Day, another survivor of childhood sexual abuse. Please see her attached testimony.

Since not everyone who signed up to speak had a chance to, Rep. Valihura stated that there would be another hearing held on the bill before it is voted on. He ensured the public that everyone who wishes to speak would be afforded the opportunity and that there would be adequate public notice. Rep. Valihura adjourned the meeting at 2:00PM.

Respectfully Submitted By,

*Renee Bartuccio*

Renee Bartuccio

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on October 16, 2007, I electronically filed this **Pleading** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

> Anthony G. Flynn, Esquire
> Young Conaway Stargatt & Taylor LLP
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, DE 19899-0391
> aflynn@ycst.com

> Mark Reardon, Esquire
> Elzufon Austin Reardon Tarlov & Mondell
> 300 Delaware Avenue, Suite 1700
> P.O. Box 1630
> Wilmington, DE 19899
> mreardon@elzufon.com

> Stephen P. Casarino, Esquire
> Casarino Christman & Shalk, P.A.
> 800 North King Street, Suite 200
> P.O. Box 1276
> Wilmington, DE 19899
> scasarino@casarino.com

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**