IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT QUILL, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | C.A.No. 07-435-SLR |
| | : | |
| CATHOLIC DIOCESE OF WILMINGTON, | : | |
| INC., a Delaware corporation; ST. | : | |
| ELIZABETH'S CATHOLIC CHURCH, a | : | |
| Delaware corporation;  Rev. FRANCIS G. | : | |
| DELUCA, individually and in his official | : | |
| capacity; and Rev. MICHAEL A. | : | |
| SALTARELLI, in his official capacity, | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT DELUCA'S MOTION
FOR PROTECTIVE ORDER**

Although defendant DeLuca has violated the plain terms of the Rule 16 Scheduling Order

in filing his protective order motion without prior "approval from the court following a discovery

conference," out of an abundance of caution, plaintiff submits this response to the defense

motion.

This latest defense motion is yet another in a long series of delaying tactics intended to

further postpone the day of reckoning of an acknowledged child molester who has already

admitted in court pleadings to sexually abusing plaintiff.  After terrorizing plaintiff and numerous

other young children in this state for decades,[1] defendant DeLuca was transferred from active

public ministry by defendant Catholic Diocese of Wilmington ("Diocese") and allowed to move

---

[1]  Defendant Diocese received its first "admitted, corroborated or otherwise substantiated
allegations of sexual abuse of minors" by DeLuca in 1966. (Compl. & Diocese Ans. ¶¶ 77, 43).

to New York state where he continued his criminal ways, was subsequently convicted of molesting yet another young boy there and was recently released from prison.

<u>**Facts**</u>

As explained below, defendant DeLuca's factual recitation and accusations of ethical wrongdoing are flatly contradicted by the written record of communications between counsel, as well as by other evidence.

**A. DeLuca Refuses to File an Answer.** On July 12, 2007, Plaintiff filed his Complaint. (D.I. 1). Personal service on defendant DeLuca was achieved on July 19, 2007 at 12:46 p.m. at his residence in Syracuse, N.Y. (D.I. 8).[2] Under Fed.R.Civ.P. 12(a)(1)(A), DeLuca's Answer was due on August 8, 2007.

On July 31, 2007, counsel received a telephone call from Mr. Steve Casarino, Esquire, who stated that he had been retained by DeLuca to represent him. DeLuca then was given a one week extension of time until August 15, 2007 to respond to the Complaint.[3]

On August 3, 2007, counsel e-mailed Mr. Casarino, inquiring whether he would accept service of a First Amended Complaint. (Tab A at 1). Mr. Casarino never responded to this written request.

On August 8, 2007, plaintiff filed his First Amended Complaint. (D.I. 11). That same day, counsel telephoned Mr. Casarino, who orally agreed to accept service of the First Amended

---

[2] He was also served by certified mail and by service on the Secretary of State. (<u>See</u> D.I. 9, 4).

[3] Unlike defense counsel who relies upon his plainly faulty memory for the factual sequence of events, undersigned counsel relies upon written e-mails to defense counsel (attached at Tab A), as well as contemporaneously created file memos and e-mails between plaintiff's counsel which counsel would be more than happy to present to the court for *in camera* review so that privilege may be preserved.

Complaint, which then was served upon him by U.S. Mail.

On August 30, 2007, Mr. Casarino called plaintiff's counsel, requesting a short extension of time to file an Answer to the First Amended Complaint until mid September. The extension was granted only upon condition of (1) an immediate entry of appearance, and (2) a stipulation being filed with the court regarding constitutional issues. When Mr. Casarino then refused to meet these conditions precedent, several e-mails and telephone calls soon followed. (Tab A at 2-3). Mr. Casarino never responded to any of these communications.

On September 5, 2007, counsel e-mailed Mr. Casarino yet again and stated that plaintiff would move for a default judgment if the aforementioned entry of appearance and stipulation were not filed by the next day. (Tab A at 4). On September 6, 2007, Mr. Casarino contacted counsel by telephone and blamed his staff for his failure to live up to his agreement. He then stated that he would immediately enter his appearance in the case and comply with the agreement so that case scheduling could begin. However, this did not occur and Mr. Casarino yet again refused to live up to his agreement.

More than one month later, on October 8, 2007, counsel again e-mailed Mr. Casarino, again requesting that he enter his long delayed appearance in the case. (Tab A at 6). On October 12, 2007, Mr. Casarino then entered his appearance on behalf of defendant DeLuca. (D.I. 26). However, Mr. Casarino continued to fail to live up to his earlier agreement and still did not file the stipulation regarding the Answer.

**B. Plaintiff Moves for Default Judgment and the Clerk Enters the Default in Appearance.** In light of two months of gamesmanship by Mr. Casarino and his client's refusal to file an Answer or any other responsive pleading, despite personal service of each Complaint several months prior, plaintiff moved for a default judgment and entry of default on October 19th.

(D.I. 31-32).

The Clerk entered DeLuca's default in appearance on November 13th.  (D.I. 43).

**C.  Plaintiff Agrees to Lift the Default if a Deposition Is Immediately Scheduled in Delaware.**  During the November 14th teleconference with the Court, Mr. Casarino agreed on DeLuca's behalf to appear for an immediate deposition.

> Mr. Casarino: Father DeLuca is around.  He's alive.  He's not in good health.  But *he can ... be deposed fairly quickly*.

> Mr. T. Neuberger: I'd like to address Mr. Casarino's last representation.  We would agree to lift the default judgment that the Clerk has entered against Father DeLuca provided we can accept his invitation that we could depose him in the near future. We would hope in December or January that we could depose him down here.

(Tab B - Transcript at 18) (double emphasis added).  Thus, plaintiff accepted DeLuca's invitation to depose him "fairly quickly" and "in the near future" in exchange for lifting the default judgment.  (Id.). By entering its subsequent Order, the Court acknowledged the agreement of the parties.  (D.I. 47).

Mr. Casarino never stated that DeLuca was unable to be deposed.  Instead, he stated the direct opposite - that DeLuca "can ... be deposed fairly quickly."  (Tab B at 18).  No mention was ever made of any medical condition which would delay the deposition.  Six days later, while flip-flopping and denying that lifting the default was contingent on a prompt deposition date, Mr. Casarino again acknowledged, in writing, that DeLuca "is available for a deposition."  (Tab C).[4] Again, no mention was ever made of a medical condition that would delay the deposition.

**D.  DeLuca Finally Files His Answer and Admits Sexually Abusing Plaintiff.**  More

---

[4] Plaintiff's comprehensive response to Mr. Casarino's false claims is attached at Tab D. In keeping with his prior practice, Mr. Casarino refused to ever respond.

4

than four months after the filing of this case, following Mr. Casarino's statement at the

teleconference that he had "conferred" with his client and "I have an answer ready to go" (Tab B

at 17), on November 16th, DeLuca filed his Answer (D.I. 49) in which he admitted that he

sexually abused plaintiff.  Specifically, DeLuca admitted that -

> Beginning in 1968, when plaintiff was thirteen years old, DeLuca
> began a course of unpermitted, harmful, and offensive sexual
> contact upon plaintiff.

(Compl. & DeLuca Ans. at ¶ 94).

**E.  DeLuca Then Flip-Flops and Decides to Deny What He Previously Admitted.**

Ten days later, DeLuca flip-flopped and filed an amended Answer, somehow abruptly now

denying what he had previously clearly admitted - that he had sexually abused plaintiff.

(Compare D.I. 49 at ¶ 94 with D.I. 50 at ¶ 94).[5]

**F.  Plaintiff Notices DeLuca's Deposition and DeLuca Refuses to Attend.**  In light of

DeLuca's abrupt change in his Answer the case became more complex and so , plaintiff

immediately noticed his deposition for December 20 and 21, 2007.  (D.I. 51).  However, on

December 18th, Mr. Casarino telephoned counsel and indicated that his client would not attend

---

[5]  That a party and his counsel would play fast and loose with the Court in this matter is
disappointing, although not surprising given that DeLuca also denied in his Answer (D.I. 49-50
at ¶¶ 1,7) the previously undisputed and widely publicized fact that he was convicted by a New
York criminal court of felony sexual abuse and endangering the welfare of a child (see Diocese
& St. Elizabeth's Ans. D.I. 19, 23 at ¶¶ 1,7), arising out of his sexual abuse of yet another young
boy.  See Dingle v. Mulvee, et al., C.A.No. 07-09-025-JTV (Del.Super.) (the civil case of the
young man who DeLuca sexually abused in Syracuse for many years and for which DeLuca was
criminally convicted).  Of course, if DeLuca had never been convicted and imprisoned, it begs
the question why Mr. Casarino represented to the Court during the November 14th teleconference
that his client had just been released from prison.  (Tab B at 17).  DeLuca noted the same in his
motion for protective order. (D.I. 62 at 3).

his deposition.  (See D.I. 56).[6]

**G.  The Court Orders DeLuca's Attendance.**  After bringing DeLuca's gamesmanship to the Court's attention (D.I. 56), the Court then issued an Order compelling DeLuca's deposition on or before January 15, 2009 or a rule to show cause would issue as to why sanctions, including a default judgment, should not be entered against him.  (D.I. 58).  The deposition next was promptly re-noticed for January 14 and 15, 2007.  (D.I. 60).

**H.  DeLuca's Latest Delaying Tactic.**  On Wednesday, defendant DeLuca moved for a protective order, requesting that his deposition be indefinitely delayed because he was slightly depressed. (D.I. 62).

<u>Discussion</u>

**A.  Introduction.**  In his motion, DeLuca requests three types of relief: (1) that his deposition be postponed "until such time as Fr. DeLuca is mentally capable of being deposed;" (2) that his deposition be taken in Syracuse, New York; and (3) that if his deposition takes place in Delaware, plaintiff be forced to pay for DeLuca's travel, lodging and other expenses. (D.I. 62 at 1).  Plaintiff will address these matters in turn.

**B.  The Claim of Mental Incompetence.**  First, it is clear that this claim is a clear attempt at sandbagging and defense counsel sat on a letter dated December 10, 2007, for nearly one month.  Why was this letter not produced earlier so that plaintiff could depose this doctor and the deposition schedule not be interrupted?  Why was this December 10th letter not sent to plaintiff's counsel on December 18th when DeLuca first refused to attend his December 20th deposition?

---

[6]  Mr. Casarino's claim is patently false that he explained to counsel that DeLuca had been seen by a doctor, was suffering from depression and could not be deposed for that reason.

Second, despite his counsel's claim DeLuca is in dire health (D.I. 62 at 3), it is notable that the only competent evidence presented - a short, conclusory letter from DeLuca's own protective family doctor - merely states that DeLuca is depressed. No mention is made of any of the other problems asserted by his counsel. Similarly, this conclusory letter also fails to articulate any harm that would befall DeLuca if he testified and there has been no showing of any medical harm that would flow from his testimony. Nor has there been any evidence that DeLuca will testify inaccurately or that his memory has been affected in any way.

Moreover, the level of claimed depression is not specified. The defendant's own doctor has not even characterized it as major or chronic - a notable omission. Indeed, the level of depression is so slight it is simply being treated by an extremely low dose of an anti-anxiety medication.[7] Further, plaintiff respectfully submits that a certain level of anxiety is reasonably expected as a convicted and admitted child molester begins to contemplate answering deposition questions about anally raping a young boy. Such 'deposition jitters' cannot be the basis for delaying a deposition.

Additionally, depression is a psychiatric diagnosis which requires analysis of the mind and human psyche. However, DeLuca's family doctor is not a psychiatrist. Instead, he practices internal medicine. He simply is not the proper individual to take the next step and make the psychiatric prognosis that a deposition would be harmful and that giving testimony should not proceed. Instead, he offers a conclusion without any foundation in medical science - such as

---

[7] Counsel notes that many of his clients, in addition to being treated by much stronger types of prescription drugs, are treated by 4-5 times the dose of this particular medication and that such medication has never stood in the way of their sworn testimony. Moreover, this defense logic of disqualifying a person from testifying whenever they are being treated for anxiety or depression would disqualify a significant percentage of the U.S. population, an absurd result.

symptoms from clinical examination, test results or articulated criteria found in the DSM IV

manual for psychiatric disorders.

This is not a case such as Schorr v. Briarwood Estates Ltd. Partnership, 178 F.R.D. 488,

492 (N.D.Ohio 1998), where a party has provided specific medical documentation of a

psychological condition by a medical professional qualified to present such evidence.  In Schorr,

the Court noted that the party seeking protection -

> substantiates her claim by providing specific documentation from a psychological expert
> in the field of Post Traumatic Stress Disorder (PTSD). This expert provides the court with
> specific examples of behavior he observed upon his clinical examination of Plaintiff and
> asserts that, based on those observations, Plaintiff indeed suffers from PTSD, and that
> questioning without the requested limitations may affect her mental health.

Id. at 492.

> Given this evidence, the court finds that Plaintiff has made a specific and documented
> factual showing that the deposition is likely to be dangerous to her health, unless limited.

Id.  Conversely in our present case, all we have is a claim of a psychological condition from an

individual neither qualified nor trained to make a prognosis.  Even then, this short conclusion is

not backed up or supported by any "specific examples of behavior ... observed upon his clinical

examination" of DeLuca.  Id.  Thus DeLuca has simply presented no record evidence that the

deposition would be dangerous to his health.

The other cases cited by defendant also are clearly distinguishable.  Unlike the witness in

In re McCorhill Pub., Inc., 91 B.R. 223 (Bankr. S.D.N.Y. 1988), there is no evidence that

DeLuca is in a "vegetative state of senile dementia."  Id. at 225.  Nor is there any medical

evidence that DeLuca's "life will be placed in jeopardy by exposing this infirm and senile 80 year

old man to a pre-trial deposition."  Id.  Similarly, in Medlin v. Andrew, 113 F.R.D. 650, 652

(M.D.N.C. 1987), the party submitted a letter from their trained psychiatrist, explaining that the

party's mental state was progressively deteriorating and that a deposition would cause a mental breakdown and hospitalization.  In our present case, all we have is a conclusory letter from the defendant's family doctor that DeLuca is depressed.  DeLuca has simply presented no record evidence that the deposition would be dangerous to his health.  Thus, defendant has failed to make a proper showing to back up his motion.

Lastly, the most compelling evidence that DeLuca is able to give competent testimony without any medical risk or ramifications whatsoever comes from repeated representations by his own counsel.  First, at the November 14, 2007 teleconference, Mr. Casarino represented to this Court that DeLuca "can ... be deposed fairly quickly." (Tab B at 18).  Six days later, he stated the same in writing to plaintiff's counsel, noting that DeLuca "is available for a deposition."  (Tab C).  Finally, Mr. Casarino has repeatedly noted that if DeLuca receives an all expenses paid trip to Delaware, his slight depression would not be a bar to his deposition.  (Tab C; see D.I. 62 at 1).  This directly contradicts his newly discovered medical claim.

### C.  The Deposition Should Take Place in Delaware.

**1.  The General Presumption Is Overcome.**  As the Complaint and case history thus far reveals, this is not a typical case.  Plaintiff fully acknowledges the "general presumption that a defendant's deposition will be held in the district of the defendant's residence." Traynor v. Liu, 495 F.Supp.2d 444, 452 (D.Del. 2007).  However, this "presumption is not a strong one and operates primarily when other factors do not favor any particular site for the depositions" Zurich Ins. Co. v. Essex Crane Rental Corp., 1991 WL 12133 at *2 (S.D.N.Y. Jan. 29, 1991).  The factors to be considered in overcoming the presumption are whether plaintiff's choice of forum was effectively constrained, as well as cost, convenience and litigation efficiency.  Devlin v. Transp. Comm. Int'l Union, 2000 WL 28173, at *3 (S.D.N.Y. Jan. 14, 2000).  Here, these factors

favor conducting the deposition in Delaware.

### 2. Plaintiff's Only Choice of Forum Was Delaware So the Presumption is Overcome.

The "presumption loses its force in cases where the plaintiff's choice of forum is effectively constrained." <u>Six West Retail Acquisition v. Sony Theatre Management Corp.</u>, 203 F.R.D. 98, 107 (S.D.N.Y. 2001).

Here, plaintiff's only choice of forum where the Court would have jurisdiction over all necessary defendants was Delaware. Contrary to defense claims, this case could not have been brought in the New York courts (state or federal) because those courts would not have had long arm jurisdiction over the key institutional defendants - defendants Diocese and St. Elizabeth's - who transferred a known child abuser to plaintiff's Delaware parish church and school where he sexually abused plaintiff for many years. As a result, plaintiff was left to rely upon the Delaware courts, where he chose to invoke the Court's diversity jurisdiction under 28 U.S.C. § 1332(a), and more importantly, the venue of the District of Delaware under 28 U.S.C. § 1391(a)(2). Accordingly, because "plaintiff's choice of forum was effectively constrained," <u>Six West</u>, 203 F.R.D. at 107, the presumption has been overcome.

### 3. As DeLuca Concedes, Litigation Efficiency Favors a Delaware Deposition.

DeLuca also concedes that "for litigation efficiency, it is generally better to have depositions in the jurisdiction where the action is filed," which is Delaware. (D.I. 62 at 6).

As recent experience in the sister cases in state court has revealed, in person court intervention during or immediately after the deposition of the priest perpetrator is always necessary to, among other things, resolve the numerous frivolous claims of privilege or threaten the defendant with imprisonment when he no-shows on the morning of his deposition despite written orders (and sometimes even a written opinion) of the Court to the contrary. Given the

ever mounting history of acrimony in this case thus far, counsel reasonably expects that such regular court intervention also will be necessary in this case at DeLuca's deposition.

Similarly, the numerous counsel for all of the parties to this case are located in Delaware. Efficiency dictates that it is better for one person to travel from Syracuse to Wilmington, than 8-10 persons to travel from Wilmington to Syracuse. In the same way, the relevant discovery and other documentary evidence also is located here and it may be quickly and easily accessed as the need arises during the ebb and flow of the deposition. See Devlin, 2000 WL 28173, *4 (noting that location of records to be used during the deposition are a relevant consideration).

**4. It Would Cost Significantly Less for DeLuca to Come to Delaware Than for All of the Numerous Counsel to Go to Syracuse.** As one court has noted, this consideration -

> may be looked at from two perspectives: the impact that the choice of site has on total costs and the relative ability of the parties to bear expenses.

Devlin, 2000 WL 28173, at *3.

First, as referenced above, given that all of the attorneys for the parties are located in Wilmington, Delaware, it would be significantly less costly in total for DeLuca to come here than for all of the attorneys to go to him.

Second, despite DeLuca's pleas of poverty, it is equally clear that he is better off than is plaintiff. As the Complaint makes clear, plaintiff has been on full and permanent disability status for years now, following his psychiatric diagnosis of severe Post Traumatic Stress Disorder arising from the many years of sexual abuse he suffered as a young child. (D.I. 11 at ¶ 66). Indeed, plaintiff's deteriorated mental state affecting his ability to work and earn a living is reflected in the fact that Eleventh Circuit Court of Appeals, the federal Office of Personnel

Management and the Social Security Administration all approved his disability status.  (Id.).

     **5. Convenience Also Weighs in Favor of a Delaware Deposition.**  DeLuca also complains that it would be "inconvenient" for him to travel to Delaware.  (D.I. 62 at 6).  Putting to the side the inconvenience plaintiff suffered when DeLuca repeatedly anally raped and otherwise violently sexually abused him over 300 times during his childhood, plaintiff notes the irony in the defense request.

     **a. Testifying in Delaware is a Reasonably Foreseeable Consequence of Raping Young Children in Delaware.**  DeLuca has been duly served with legal process and is a party to a court case pending in this Delaware federal court.  This case seeks to hold DeLuca accountable for anally raping plaintiff numerous times in Delaware, while DeLuca lived in Delaware and worked in Delawwre for his Delaware employers.[8]  That DeLuca ultimately fled the state to avoid the criminal authorities is irrelevant to whether he must answer for his actions here in Delaware.  If DeLuca did not want to be "inconvenienced" by lawsuits in Delaware, he should not have anally raped young boys in Delaware.  The 'inconvenience' of which DeLuca complains is of his own making - he has unclean hands.

     "The equitable doctrine of unclean hands applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation."  Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 174 (3d Cir. 2001).  Here, DeLuca cannot now complain that he is being inconvenienced by being called to account in a Delaware court for anally raping plaintiff in Delaware when plaintiff was a young child going to school and church in Delaware.  As a matter of law, the doctrine of unclean hands mandates

---

    [8] DeLuca was a prolific child abuser.  Counsel represents at least nine other survivors of DeLuca's rape and sexual abuse, for the time frame of the 1950's to the present.

that inconvenience of DeLuca's own making cannot serve as a weight in the equitable scale against taking his deposition in the same state in which he committed his crimes.  Id.

Contrary to defense claims, it is well recognized that "instances of defendants having to appear for depositions at the place of trial are not unusual."  Financial General Bankshares, Inc. v. Lance, 80 F.R.D. 22 (D.D.C. 1978) (citing cases and treatises); see In re: Vitamin Antitrust Litig., 2001 WL 35814468, *3 (D.D.C. Sept. 11, 2001) (citing cases and noting that "there are numerous cases in which courts have ordered depositions of foreign defendants taken in the United States, rather than at the defendant's principal place of business.").

**b. This Deposition Has Come as No Surprise.**  Plaintiff has sought DeLuca's deposition since the November 14, 2007 teleconference.  His deposition was duly noticed on November 26th for December 20th and 21st, only to have DeLuca refuse to appear. Following the Court's intervention and Order, on December 20th plaintiff again noticed DeLuca's deposition for January 14th and 15th, 2007.  DeLuca certainly can not claim to have been surprised by the deposition notice or to have not been given enough time to appear.  Additionally, given that he claims to be retired, it is equally clear that his work schedule will not be interrupted.

**c. The Distance is Far From Overwhelming.**  Syracuse, New York is a 4 ½ hour, 271 mile drive from Wilmington, Delaware.  This pales in comparison to the 20 hour, 1285 mile drive that plaintiff must endure to travel up from Marathon, Florida to see his abuser face to face at this long sought deposition.  Even if plaintiff was only traveling from the Eleventh Circuit in Atlanta, Georgia, it would still be a 12 1/4 hour, 757 mile trip.

Even giving defendant DeLuca the benefit of the doubt regarding his fear of driving such distances, a quick web search reveals that there are both Greyhound and Trailways bus stations in Syracuse with reasonably priced buses that travel to Wilmington on a regular basis.  This is far

from burdensome and this light burden should not require reversal of the traditional American

rule that each party bear his own expenses.  Traynor, 495 F.Supp.2d at 452.[9]

      **D.  To the Extent The Court Believes That The Parties Should Not Bear Their Own**

**Costs, They Should be Borne By Defendants Diocese and/or St. Elizabeth's.**  As noted

above, plaintiff is in his own precarious financial position.  To the extent the Court believes that

DeLuca should be compensated for his expenses in coming to Wilmington for his deposition,

plaintiff submits that those expenses should be borne by the parties most able to bear them - the

Diocese and/or St. Elizabeth's.

      As noted above, defendant Diocese received its first "admitted, corroborated or otherwise

substantiated allegations of sexual abuse of minors" by DeLuca in 1966. (Compl. & Diocese Ans.

¶¶ 77, 43).  Counsel for Diocese admitted this in sworn testimony before the Delaware General

Assembly last year.  (Id. at ¶ 77).  Given that DeLuca was a priest/employee/teacher of these

institutional defendants at the time of the abuse (and as one of the sister cases has revealed, he

continues to receive a monthly pension from the Diocese for his years of dedicated service), it is

not unreasonable to require them to pay DeLuca's expenses for traveling here to account for his

actions while in their employ.

      In Terry v. Modern Woodmen of Amer., 57 F.R.D. 141 (W.D.Mo. 1972), the Court held

that the deponent - an employee/agent of the corporate defendant and whose tortuous conduct

---

     [9]  To the extent the Court believes that the deposition should take place in Syracuse so as
not to inconvenience DeLuca, in accordance with our District's long established precedent the
Court should require DeLuca to pay the traveling expenses of plaintiff and his attorneys in
journeying to that location.  See Fischer & Porter Co. v. Sheffield Corp., 31 F.R.D. 534, 538
(D.Del. 1962) (requiring the defendant to pay the traveling expenses for plaintiff and his counsel
when the deposition occurred in Ohio out of convenience to the defense deponent).  However, if
the Court ultimately concludes that plaintiff should bear the costs, either of traveling to Syracuse
or of DeLuca traveling to Wilmington, plaintiff respectfully requests that the Court order that
such expenses may be taxed as compensable costs at the conclusion of the case.

was at crux of the plaintiff's lawsuit - was required to travel from Texas and appear in Kansas City, Missouri for his deposition by plaintiff's counsel.  That federal court held that the corporate defendant was required to bear the cost because "the defendant is most able to bear the expense of the trip."  Id. at 144.  The same logic applies in our present case.  To the extent the Court believes it is necessary to shift the expense burden, it should be borne by those parties most able to bear it - Diocese and/or St. Elizabeth's.[10]

Plaintiff waives an answering brief in support of this Motion.

Respectfully Submitted,

THE NEUBERGER FIRM, P.A.

/s/ Stephen J. Neuberger
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
RAEANN WARNER, ESQ. (#4931)
Two East Seventh Street, Suite 302
Wilmington, DE  19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com
RW@NeubergerLaw.com


ROBERT JACOBS, ESQ. (#244)
THOMAS C. CRUMPLAR, ESQ. (#942)
JACOBS & CRUMPLAR, P.A.
Two East Seventh Street, Suite 400

---

[10]  Out of an abundance of caution, plaintiff briefly notes that a requirement that plaintiff conduct (from Wilmington) a telephone/video deposition of DeLuca (in Syracuse) would work a substantial hardship on plaintiff by preventing the deposition from occurring in person.  The in person presence of plaintiff's counsel is necessary and required for the effective face to face confrontation which, given DeLuca's advanced age and purported poor health, may be the only method to preserve persuasive testimony if he passes away prior to trial.  Additionally, such an approach would deprive plaintiff of his long sought after right to confront the man who anally raped him and sexually abused him for so many years.

Wilmington, DE 19801
(302) 656-5445
Bob@JandCLaw.com
Dated: January 4, 2008          Tom@JandCLaw.com

# Tab A

**Stephen J. Neuberger**

| | |
|---|---|
| **From:** | Stephen J. Neuberger |
| **Sent:** | Friday, August 03, 2007 10:55 PM |
| **To:** | 'Flynn, Anthony' |
| **Cc:** | 'scasarino@casarino.com'; Thomas S. Neuberger; 'Robert Jacobs'; Thomas Crumplar |
| **Subject:** | Quill v. Diocese |

Tony,

Following up on your e-mail this morning regarding the Quill case. I have an alternative approach which I hope will address your concerns, in the near term at least. Plaintiff will be filing a First Amended Complaint on Wednesday, August 8th. With the resetting of the 20 day response deadline, please let me know if this will give you the immediate relief you need.

Steve Casarino - I know you and Tom N. spoke earlier this week. Will you accept service of the First Amended Complaint on Rev. DeLuca's behalf?

-Steve

***********************************
Stephen J. Neuberger, Esq.
The Neuberger Firm
Attorneys and Counsellors at Law
Two East Seventh Street, Suite 302
Wilmington, DE 19801-3707
Phone: 302-655-0582
Fax: 302-655-9329
E-Mail: SJN@NeubergerLaw.com

## Stephen J. Neuberger

**From:**  Thomas S. Neuberger

**Sent:**  Tuesday, September 04, 2007 9:12 AM

**To:**  Sterphen P. Casarino Esq. (scasarino@casarino.com)

**Cc:**  Cheryl A. Hertzog, Esq.; Raeann Warner, Esq.; Stephen J. Neuberger (work); Thomas Stephen Neuberger, Esq.

**Subject:** Quill v. DeLuca et al

Steve,

I hope you had a nice weekend.  Please send over today the stipulation we discussed on August 30th in this case.

Tom

*****************************************
Thomas S. Neuberger, Esquire
The Neuberger Firm
Attorneys And Counsellors At Law
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801-3707
Phone 302.655.0582
Fax 302.655.9329
Email: TSN@NeubergerLaw.com

**Stephen J. Neuberger**

| | |
|---|---|
| **From:** | Thomas S. Neuberger |
| **Sent:** | Wednesday, September 05, 2007 3:03 PM |
| **To:** | Thomas S. Neuberger; Sterphen P. Casarino Esq. (scasarino@casarino.com) |
| **Cc:** | Cheryl A. Hertzog, Esq.; Raeann Warner, Esq.; Stephen J. Neuberger (work); Thomas Stephen Neuberger, Esq.; Thomas C. Crumplar, Esq.; Robert Jacobs |
| **Subject:** | urgent RE: Quill v. DeLuca et al |
| **Importance:** | High |

Steve,

Why have you not gotten back to me with a stipulation?  You or your staff must do so by tomorrow.  This is federal court.   Otherwise I will have to move for a default.

Are you in trial, do you not have staff?

Tom

*****************************************
Thomas S. Neuberger, Esquire
The Neuberger Firm
Attorneys And Counsellors At Law
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801-3707
Phone 302.655.0582
Fax 302.655.9329
Email: TSN@NeubergerLaw.com

**From:** Thomas S. Neuberger
**Sent:** Tuesday, September 04, 2007 9:12 AM
**To:** Sterphen P. Casarino Esq. (scasarino@casarino.com)
**Cc:** Cheryl A. Hertzog, Esq.; Raeann Warner, Esq.; Stephen J. Neuberger (work); Thomas Stephen Neuberger, Esq.
**Subject:** Quill v. DeLuca et al

Steve,

I hope you had a nice weekend.  Please send over today the stipulation we discussed on August 30th in this case.

Tom

*****************************************
Thomas S. Neuberger, Esquire
The Neuberger Firm
Attorneys And Counsellors At Law
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801-3707
Phone 302.655.0582
Fax 302.655.9329
Email: TSN@NeubergerLaw.com

## Stephen J. Neuberger

| | |
|---|---|
| **From:** | Thomas S. Neuberger |
| **Sent:** | Wednesday, September 05, 2007 4:50 PM |
| **To:** | Thomas S. Neuberger; 'Sterphen P. Casarino Esq. (scasarino@casarino.com)' |
| **Cc:** | Cheryl Hertzog; Raeann Warner; Stephen J. Neuberger; Thomas S. Neuberger; Thomas C. Crumplar, Esq.; Robert Jacobs |
| **Subject:** | RE: urgent RE: Quill v. DeLuca et al |

Steve,

I have just reviewed a pleading Mark Reardon filed with the court yesterday. In it he takes the position that since there has been no entry of appearance by an attorney for defendant DeLuca the court should delay scheduling issues for the entire case.

I cannot allow such prejudice to accrue to my client.

So please by 9am tomorrow file an entry of appearance in this case. Otherwise, after 9am I will file papers seeking a default in the case against DeLuca and that will remove the prejudice accruing to my client by Reardon's claims and the fact no entry of appearance has been filed.

Sorry to have to force this issue, but your delay in preparing the stipulation we discussed, your failure to respond to my emails, and Reardon's official position leaves me with no choice.

Tom

*****************************************
Thomas S. Neuberger, Esquire
The Neuberger Firm
Attorneys And Counsellors At Law
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801-3707
Phone 302.655.0582
Fax 302.655.9329
Email: TSN@NeubergerLaw.com

**From:** Thomas S. Neuberger
**Sent:** Wednesday, September 05, 2007 3:03 PM
**To:** Thomas S. Neuberger; Sterphen P. Casarino Esq. (scasarino@casarino.com)
**Cc:** Cheryl A. Hertzog, Esq.; Raeann Warner, Esq.; Stephen J. Neuberger (work); Thomas Stephen Neuberger, Esq.; Thomas C. Crumplar, Esq.; Robert Jacobs
**Subject:** urgent RE: Quill v. DeLuca et al
**Importance:** High

Steve,

Why have you not gotten back to me with a stipulation? You or your staff must do so by tomorrow. This is federal court. Otherwise I will have to move for a default.

Are you in trial, do you not have staff?

Tom

*****************************************
Thomas S. Neuberger, Esquire
The Neuberger Firm

Attorneys And Counsellors At Law
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801-3707
Phone 302.655.0582
Fax 302.655.9329
Email: TSN@NeubergerLaw.com

**From:** Thomas S. Neuberger
**Sent:** Tuesday, September 04, 2007 9:12 AM
**To:** Sterphen P. Casarino Esq. (scasarino@casarino.com)
**Cc:** Cheryl A. Hertzog, Esq.; Raeann Warner, Esq.; Stephen J. Neuberger (work); Thomas Stephen Neuberger, Esq.
**Subject:** Quill v. DeLuca et al

Steve,

I hope you had a nice weekend.  Please send over today the stipulation we discussed on August 30th in this case.

Tom

*****************************************
Thomas S. Neuberger, Esquire
The Neuberger Firm
Attorneys And Counsellors At Law
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801-3707
Phone 302.655.0582
Fax 302.655.9329
Email: TSN@NeubergerLaw.com

**Stephen J. Neuberger**

---

**From:**    Thomas S. Neuberger

**Sent:**    Monday, October 08, 2007 1:30 PM

**To:**    Sterphen P. Casarino Esq. (scasarino@casarino.com)

**Subject:** Quill v. DeLuca

Steve,

Please immediately enter your appearance in this case.  I believe the lack of your entry is delaying the judge in scheduling it.  Thanks.

Tom

*****************************************
Thomas S. Neuberger, Esquire
The Neuberger Firm
Attorneys And Counsellors At Law
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801-3707
Phone 302.655.0582
Fax 302.655.9329
Email: TSN@NeubergerLaw.com

# Tab B

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4
     ROBERT QUILL,              :    CIVIL ACTION
 5                              :
                     Plaintiff, :
 6                              :
         vs.                    :
 7                              :
     CATHOLIC DIOCES OF         :
 8   WILMINGTON, INC., a        :
     Delaware corporation; ST.  :
 9   ELIZABETH'S CATHOLIC       :
     CHURCH, a Delaware         :
10   corporation; Rev. FRANCIS  :
     G. DELUCA, individually and:
11   in his official capacity;  :
     and Rev. MICHAEL A.        :
12   SALTARELLI, in his official:
     capacity,                  :
13                              :
                                :
14            Defendants.  :    NO. 07-435 (SLR)

15                               - - -

16
                           Wilmington, Delaware
17                         Wednesday, November 14, 2007
                           8:35 o'clock, a.m.
18                         *** Telephone conference

19                               - - -

20
     BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.
21                               - - -

22


23


24                         Valerie J. Gunning
                           Official Court Reporter
25
```

2

```
 1   APPEARANCES:

 2
                 THE NEUBERGER FIRM
 3               BY:  THOMAS S. NEUBERGER, ESQ. and
                     STEPHEN J. NEUBERGER, ESQ.
 4

 5
                     -and-
 6

 7
                 JACOBS & CRUMPLAR, P.A.
 8               BY:  THOMAS C. CRUMPLAR, ESQ.

 9

10                   Counsel for Plaintiff

11

12
                 YOUNG, CONAWAY, STARGATT & TAYLOR LLP
13               BY:  ANTHONY G. FLYNN, ESQ. and.
                     NEILLI M. WALSH, ESQ.
14

15
                     Counsel for Defendants
16                   Catholic Diocese of Wilmington, Inc. and
                     Michael A. Saltarelli
17

18

19
                 ELZUFON AUSTIN REARDON TARLOV & MONDELL
20               BY:  MARK REARDON, ESQ.

21

22                   Counsel for Defendant
                     St. Elizabeth's Catholic Church
23

24                           -   -   -
25
```

3

```
1
2                    P R O C E E D I N G S
3
4              (REPORTER'S NOTE:  The following telephone
5       conference was held in chambers, beginning at 8:35 a.m.)
6
7              THE COURT:  Good morning, counsel.  This is
8       Judge Robinson, and Valerie is actually here as a Court
9       Reporter.
10             I don't generally have Court Reporters at
11      scheduling conferences, but this case is already messy, and
12      with pending motions, I thought it might be helpful to put
13      you all on the record.
14             You need to identify yourselves each time you
15      speak so that our record is clear, because there are lots of
16      people on the phone.
17             So I think -- you all are there; right?
18             (Counsel respond, "Good morning, your Honor.")
19             THE COURT:  All right.  Good.
20             It seems like there are a couple of issues that
21      we need to get under control so that we can process this
22      case fairly to everyone involved.
23             One is the question of whether there are truly
24      motions that involve legal issues that do not involve any
25      issues of fact that could be disputed and whether those
```

4

1    should be resolved.  In the meantime, whether the plaintiff

2    has cause for expediting the final resolution of this case

3    and putting the defendants to the task of a foreshortened

4    discovery period and perhaps to get to trial.

5              So those are the two things that I'm dealing

6    with in trying to reach a fair resolution here.

7              So let's address the first question, and that is

8    whether there are legal issues, potentially dispositive

9    legal issues, that do not involve disputed issues of fact

10   that should be addressed by the Court sooner rather than

11   later.

12             I will start with plaintiff's counsel and then

13   have defendants' counsel respond.

14             MR. T. NEUBERGER:  Your Honor, in Tab A, which

15   was attached to the --

16             THE COURT:  Mr. Neuberger, I know who you are,

17   but for purposes of the record --

18             MR. T. NEUBERGER:  I apologize.  This is Tom

19   Neuberger, for the plaintiff.

20             Your Honor, I was saying in Tab A, which is

21   attached to the scheduling order that we sent over

22   yesterday, our pleading in this regard is found.

23             The defendants, in their answer, have defended

24   on the grounds of the Act, the Child Victims Act, which was

25   enacted on July 11th, I think, of this year, is

1    unconstitutional as written and as applied.

2            We move for judgment on the pleadings under Rule

3    12(c) on the issue of the act being unconstitutional as

4    written.  I represent nine other -- eight other victims of,

5    alleged victims of Father DeLuca as well as more than 30

6    individuals under the Act to have claims that can either be

7    filed in diversity or in the State courts.

8            A judgment, a ruling as to whether the act is

9    constitutional under the federal Constitution would advance

10   the resolution of all of those cases as well as save people

11   enormous expense and emotional energy if the act were found

12   to be unconstitutional.  For the reasons stated in my memo,

13   Rule 12(c) is the appropriate vehicle to decide such

14   constitutional questions.

15           The defendants are taking the position that the

16   as-written issue should be conflated with the as-applied

17   issue and saved for the end of the case.

18           As I've tried to indicate, they've taken the

19   exact opposite position in State Court, in Naval Commander

20   Ken Whitwell's case, which was filed immediately after this

21   case.  That case is in front of Judge Young, and if you

22   would look at Tab A and Exhibit A to Tab A, you would find

23   the same defendants' letter to Judge Young, where they ask

24   Judge Young to stay discovery and have moved to declare the

25   act unconstitutional under both the Federal and State

6

1    Constitutions.

2             They seem to be engaging in forum-shopping

3    there.  Judge Young has ordered discovery to go forward,

4    but the briefing to be done at the same time, and I

5    think their opening brief is due next week, before

6    Thanksgiving.

7             We filed our brief on October 15th, and.

8    under the rules, the defense brief was due on October 31st,

9    I believe.  They filed an emergency motion to stay the

10   resolution of that issue.  Among ourselves, we had given

11   them an extension to November 9th to file their brief, and

12   if the Court rules that this briefing should go forward

13   because of the importance of the constitutional issues and

14   it is an efficient way of handling constitutional

15   litigation, I suggest that their brief -- their answering

16   brief be filed on November 19th, and because of the

17   Thanksgiving holiday, that our brief be filed on

18   November 30th, our reply brief on November 30th, 11 days

19   later.

20             In all of these cases throughout the United

21   States, when these types of cases come up, the

22   constitutional issue has to be resolved.  An as-written

23   challenge is appropriate, and I believe my client, who sued

24   in diversity and was a supervisory staff attorney in the

25   federal court system in the Eleventh Circuit, he is

1      asserting his right to have a federal forum decide the

2      constitutionality of the federal questions in this case and

3      I think it's appropriate at the beginning of the case,

4      because of the public importance of a case, that the issue

5      be resolved.  And so we hope that it's taken under

6      advisement and in due course the Court would rule on the

7      constitutional issue, and then we can engage in discovery

8      simultaneously with that.

9                     That's all I need to say, your Honor.

10                    THE COURT:  All right.  Thank you.

11                    Do any other of the plaintiff's lawyers want to

12      add to that or should I move to the defendants?

13                    MR. T. NEUBERGER:  No.  You can just move to the

14      defendants.

15                    THE COURT:  All right.  Let's hear a response

16      from the defendants, particularly with respect to the

17      different postures you all seem to be taking in the

18      different cases.

19                    MR. FLYNN:  Good morning, your Honor.  Anthony

20      Flynn, on behalf of the defendants, Diocese of Wilmington

21      and Bishop Saltarelli.

22                    Your Honor, first of all, St. Elizabeth's and

23      Father DeLuca are the parties in the State Court to the

24      Whitwell case.

25                    Furthermore, Mr. Neuberger is incorrect.  The

8

1    defendant Diocese has not moved to dismiss not only the

2    Whitwell case but any other case based on the constitutional

3    ground.  Other defendants in the Whitwell case have done

4    so.  We have filed a motion to dismiss based only on the

5    res judicata effect of the prior judgment in the federal

6    court Whitwell case.  And far from the defendants

7    forum-shopping on this issue, it was the plaintiff

8    who chose not to refile the Whitwell case in State

9    Court.

10          Nevertheless, the constitutional issue is

11   certainly one that the Court is going to need to address,

12   but it is a four-pronged fact-bound analysis in our view,

13   which is why we did not file a motion to dismiss on that

14   ground in the State Court case in Whitwell.

15          In addition to the analysis under both the

16   U.S. and Delaware Constitutions, as to the facial

17   constitutionality or unconstitutionality of the statute, a

18   second level of analysis is whether as applied in the facts

19   and circumstances of a given case, the statute would work

20   (inaudible) of due process to the defendants because of the

21   age of the case and for other reasons.

22          Our view, that issue -- we very likely will

23   raise that issue, but only after there's a factual record in

24   the case, and to us, it seems inappropriate and certainly a

25   waste of the Court's time to be wrestling in the abstract

1    with the constitutional issue without hearing the

2    whole issue.  The motion for judgment on the pleadings

3    raises only one of the four issues that the Court

4    is going to need to address to deal with the constitutional

5    issue.

6              So on the constitutional question, we think that

7    that is an issue that should be reserved for the time the

8    Court sets aside for dispositive motions.

9              There is another pending motion, our motion to

10   dismiss the case on jurisdictional grounds.  That is not

11   fact intensive.  Plaintiffs have filed their answering

12   brief.  Our reply brief was stayed by your Honor's order,

13   but that is an issue we have raised, frankly, simply because

14   the statute is clear:  That jurisdiction over revived barred

15   claims is only in Superior Court and it's just an issue that

16   needs to be resolved at the outset of this case one way or

17   the other, which is why we raise it now.

18             THE COURT:  And with respect to the

19   constitutional issue, you believe that no matter which

20   decision I come to on the issue raised by plaintiff's brief,

21   that it cannot be dispositive and it cannot help the case as

22   it moves forward?

23             MR. FLYNN:  Yes, that's correct, your Honor.  We

24   believe that you will not be able to resolve the -- all of

25   the -- all of the aspects of the constitutional issue based

1    on plaintiff's motion.

2              THE COURT:  All right.  Well, I am not going to

3    make a decision right at the moment about briefing of all of

4    these things.

5              MR. T. NEUBERGER:  I'm sorry, your Honor.

6    Are we going to hear from St. Elizabeth's and I could

7    reply?

8              This is Tom Neuberger, your Honor.

9              THE COURT:  Well, all right.  Actually, before I

10   hear -- well, all right.

11             MR. T. NEUBERGER:  That's okay.

12             THE COURT:  Any one of the other defendants?

13             MR. REARDON:  Mark Reardon, for St. Elizabeth's,

14   your Honor.

15             We adopt and support wholly Mr. Flynn's

16   comments.

17             MR. CASARINO:  And this is Stephen Casarino.

18             I do the same, your Honor.

19             MR. T. NEUBERGER:  Thank you, your Honor.

20             Your Honor, this is Tom Neuberger again.  Might

21   I briefly reply?

22             THE COURT:  If possible, yes.

23             MR. T. NEUBERGER:  Yes, your Honor.  There's a

24   joint defense in State Court, Commander Whitwell's case.

25   The Archdiocese of Philadelphia's lawyers are down here

1    defending the Norbertine religious order, et cetera, et

2    cetera.  They're working in tandem.  The letter, which is

3    attached at Tab A of October 17th, 2007, makes it very

4    clear that the Catholic Diocese is adopting the position

5    on the constitutionality of Section 81, 8145.  For them

6    to say that they have -- they are not seeking the benefit

7    of that litigation tactic is a misstatement.  We have

8    not forum-shopped with Commander Whitwell's action in

9    State Court, which could have been filed in Federal

10    Court.

11            I think the Court may remember during the

12    pretrial conference for Commander Whitwell's case that we

13    had agreed in discussions with the Court that should the

14    Act pass, that this Court would not have to revisit

15    Commander Whitwell's case and that we would file it in

16    State Court.  So we are simply following up on our

17    assurance to the Court at that time earlier -- earlier in

18    the year.

19            If the case -- if the act is unconstitutional,

20    then the case is over, your Honor.  I mean, that's the whole

21    point.  This case is over, not eight other victims of DeLuca

22    are over, and the 30 other victims that I represent are

23    over.

24            There are no -- there are no fact-driven issues

25    as to the constitutionality of the Act as written.  We're

1    not talking about an -- an as-applied challenge.  Their

2    position has always been that as applied, there can be due

3    process problems because evidence has been destroyed or lost

4    due to the passage of time.  This case will not be the

5    vehicle for that.  Defendant DeLuca is still alive.  He's 78

6    years old and should be getting out of prison any day now in

7    Syracuse, New York, so there's no problem with that.  We're

8    in the process of exchanging an enormous volume of Rule 26

9    documents backing up our case and our allegations:

10    Photographs, handwritten love notes from DeLuca to my

11    client, et cetera, et cetera.

12          Those kinds of fact-driven issues will not be in

13    this case at the end of discovery that would provide the

14    basis for an as-applied challenge.  But if they want to make

15    one at that time, at summary judgment, you know, they can.

16    But right now, we're trying to find out if this whole group

17    of cases can go forward, if the legislature was within its

18    prerogatives to enact health and safety legislation in this

19    regard, and there are three areas of the case law:  Federal

20    case law that get addressed here.  Equal protection, et

21    cetera, et cetera, and those are in the briefs, Tab C, in

22    front of your Honor.

23          So we think it is appropriate and certainly of

24    assistance to the citizens of the State of Delaware, who are

25    trying to draw the benefit of this act to in due course rule

1      at the beginning of this case on the constitutional

2      question.

3              THE COURT:  All right.  Well, let me set all

4      that aside.  I'm not -- well, without reading all of the

5      briefs, which, of course, I haven't, I'm not sure I

6      understand the defendants' argument that briefing would

7      basically waste my time, so I'm not sure I can make a

8      decision about that.

9              But let's move to perhaps the more complicated,

10     more complicated, if possible, issue, and that is the

11     plaintiff's request that this case somehow be expedited and

12     to get this case to a trial.  And part of that, of course,

13     is whether I have time to try this on an expedited basis,

14     and the other issue is whether we can't expedite the matter,

15     to some extent, without harming the defendants' right to

16     full discovery and full briefing on all the issues that

17     require briefing.

18             So I certainly know your position on this,

19     Mr. Neuberger.  Let me hear from defendants on this issue

20     first.

21             MR. FLYNN:  Thank you, your Honor.  Again,

22     it's Anthony Flynn, on behalf of defendants Diocese and

23     Bishop.

24             Your Honor, the schedule that we have proposed

25     is, we would think, a typical scheduling, and your Honor

1    certainly knows what a typical schedule in your cases

2    is.

3              This case involves facts that are 40 years

4    old.  It is going to take a tremendous amount of effort to

5    first identify who are witnesses with relevant knowledge,

6    track them down and then to interview, and, if necessary,

7    depose them.

8              We think that -- we're not asking for an undue

9    amount of time.  We're asking for the normal amount of time

10   that one would require to discover a case, particularly one

11   of this nature.  We undoubtedly are going to identify in

12   depositions, for example, other witnesses that are going to

13   need to be pursued and their depositions taken or at least

14   them being interviewed.

15             With respect to the plaintiffs, one other thing

16   about discovery.  I apologize.

17             The plaintiff has identified in his initial

18   disclosures 11 witnesses by name and unspecified number of

19   other witnesses.  In addition to that, there are three

20   expert -- experts identified by name and two others by

21   category.  So we're talking, at a minimum, about more than a

22   dozen depositions only of the witnesses that plaintiff has

23   identified as well as all the expert discovery.  That just

24   can't be done in a highly expedited way, particularly given

25   the extreme aiming of the facts of this case, the underlying

1    circumstances of this case.

2              With respect to plaintiff's health problems,

3    first, I have to say it's entirely unclear that they are

4    based upon what the submissions are, but -- and I would note

5    in this regard that Mr. Quill has been well enough in recent

6    months to come to Delaware on at least four occasions,

7    testify before the General Assembly in support of the

8    legislation that enables the suit, also to come to Delaware

9    to participate in a press conference regarding his lawsuit

10   and to work with his counsel, actively with his counsel in

11   preparing his case.

12             But if his health is really a problem and

13   preserving his testimony is crucial, we're certainly more

14   than willing to work with plaintiff's counsel once we have

15   this volume of documents that Mr. Neuberger has referred to,

16   to take his deposition very promptly, so that his testimony

17   is preserved.

18             There is a theme in plaintiff's response in

19   their order that, you know, this is a strategy of delay by

20   defendants, but I want to point out a couple of things.

21             One is, we filed a motion to dismiss on

22   jurisdictional grounds, but we answered the complaint.  We

23   did not seek in this case to stay discovery, for example,

24   pending resolution of that motion, and, indeed, we have

25   agreed with plaintiff to make a preliminary production of

1    documents, Father DeLuca's personnel file, by the end of

2    this month, before we received a request for production,

3    formal request.

4         So in our view, we need to have a schedule that

5    allows for the defendants to adequately investigate and

6    discover the case, but equally as important, to allow the

7    Court to resolve that, not just the constitutional issues,

8    but the other novel questions under Delaware law regarding

9    the scope of fiduciary duties and quasi-contractual theories

10   that are set forth in plaintiff's complaint.  The Court is

11   going to need time not only to brief, but to hear argument,

12   and to consider those issues before we get this case in a

13   posture for trial.

14        THE COURT:  And before we go back to plaintiff's

15   counsel or any other defendant's counsel, describe for me

16   again what kind of discovery we're looking at, because in my

17   more complex cases, it's the document discovery that takes

18   months and months and months, because there's an exchange of

19   millions of pages of documents.  In this case, my impression

20   is that it isn't particularly document-heavy.  I mean, the

21   plaintiff has his documents and they should be ready.  But

22   it is basically tracking down witnesses and deposing them.

23        Do I have a correct impression?

24        MR. FLYNN:  Again, Tony Flynn, on behalf of

25   Diocese and the Bishop.

```
 1                 That's partially correct, your Honor.
 2       Certainly, the search for sentient witnesses is going to be
 3       a critical part of the case.  The proposed order, comment to
 4       both orders, is the list of the areas of discovery.  The
 5       plaintiff has identified 13 areas of discovery.  We've
 6       identified another 13 and St. Elizabeth's five.  There is
 7       under way a search for documents.  A problem we're going to
 8       have, of course, is finding them, given the age of them.  It
 9       will be more the search for them, I think, rather than
10       actual production and review of them that will be the
11       problem, but you're right to say that the location of and
12       deposing of witnesses is going to be extremely
13       time-consuming, much more so I think than in a typical
14       case.
15                 THE COURT:  All right.  Anyone else from the
16       defendants' side before I go back to Mr. Neuberger?
17                 MR. CASARINO:  Your Honor, Steve Casarino.
18                 I'm not sure if this is the time to talk about
19       it or I can wait until a little later, but the Court may
20       realize that a default judgment has been entered against
21       Father DeLuca, and I think it properly -- I'm going to ask
22       Tom if he'll waive that.  Father DeLuca is out of jail now.
23       He got out about two weeks ago.  I have conferred with him
24       last Saturday and I have an answer ready to go.
25                 I was going to file a motion to open the
```

18

1    default, but I thought the Court had stayed everything, so I

2    figured I'd wait until this conference.

3            Father DeLuca is around.  He's alive.  He's not

4    in good health.  But he can -- he can be deposed fairly

5    quickly, but otherwise I take the position of the other

6    defendants, that we do need some time to explore the

7    plaintiff's case and depose witnesses.

8            MR. T. NEUBERGER:  Your Honor, this is Tom

9    Neuberger.

10            If I could, I'd like to address Mr. Casarino's

11    last representation.  We would agree to lift the default

12    judgment that the Clerk has entered against Father DeLuca

13    provided we can accept his invitation that we could depose

14    him in the near future.  We would hope in December or in

15    January that we could depose him down here and then we'd

16    just hope that -- well, we would expect that Mr. Casarino

17    would produce any Rule 26 documents shortly before the

18    deposition.

19            And then, lastly, that our lifting the default,

20    we would -- we would hope that that would not affect the

21    status of the issue of should we go forward on the Rule 12,

22    12(c) briefing.  Okay?

23            So Mr. Casarino and I have been -- have been in

24    touch about this, and as long as we can get his deposition,

25    we're fine with that.

1          Now, your Honor, if I could go back to the

2    question of expediting the case, immediately after it was

3    filed on July 12th, I've been in communication with the

4    defendants and in an attempt to put in place a six-month

5    discovery schedule, which is certainly reasonable and within

6    the parameters of discovery schedules used in this court

7    that would have expired on February 28th.  Okay.  So that

8    would have given them six months and instead all we got were

9    motions for extensions and things like that, and now we're

10   four months down the line from July 12th and they want

11   basically a 12 to 13-month discovery plan contending, in

12   effect, this is a complex case.

13          Our position is it is not a complex case.  First

14   of all, it is not a document-heavy case.  Usually in these

15   cases, there are three or four documents, a few photos or

16   pictures.  We have boxes of -- a box of pictures and even a

17   portrait from an artist in town, and we've got cards and

18   things like that.  But it's all stuff we're ready to turn

19   over.  We've been busily scanning it this month.  We've

20   already shared with them a four-page summary of the expert

21   report of our main expert.

22          They also know what the conclusions are of our

23   forensic psychiatrist, Dr. Tavani.  There are no complicated

24   issues relating to experts in this case.  We'll have to use

25   an economist to run numbers on the loss of his -- of my

1    client's federal pension with the judiciary and seven to ten

2    years of wage loss.

3              We have told them we will use a vocational

4    expert to say that had he not been abused, he would have

5    been not just a federal supervisory staff attorney, but a

6    white-shoe lawyer in a prominent firm in Atlanta, and that

7    affected his earnings, none of which are complicated or

8    abnormal or I don't think present Daubert issues.  In fact,

9    our expert, Father Doyle, testified nationally in these

10   cases and defendants should have a fair amount of experience

11   with him.

12             On the witnesses, your Honor, basically, we had

13   two categories of witnesses.  My client -- I believe one may

14   have been his brother, a sister.  Yes, he does have, you

15   know, four or five brothers and sisters.  If they want

16   to go out and depose them, that's fine.  DeLuca himself,

17   maybe the present pastor of a church on their recordkeeping,

18   Father Seeney (phonetic), the number two person in the

19   Diocese, who, you know, retired DeLuca, let's say, in 1993,

20   and would be the person most familiar with his -- his record

21   here.

22             There are no unusual issues of surprise here.

23   They had foreknowledge.  Mr. Flynn testified in front

24   of the General Assembly that as far back as 1966, the

25   Diocese had received complaints about DeLuca.  Our abuse

1  does not start until '68, so their duty, their duty to

2  protect is clear.

3           That's the universe of fact witnesses about what

4  happened.  All this stuff about going out and, you know,

5  finding other staffers and everything else, they've only

6  identified, I think, one witness in their Rule 26

7  disclosures from their side.  Okay.  They have not

8  identified anybody.

9           And then we had some damages witnesses.

10  You know, the Chief Judge down there in the Eleventh

11  Circuit, the prior Chief Judge.  You know, people who work

12  with my client and one other or two other staff attorneys on

13  the, you know, on the issue of, you know, his skills as a

14  lawyer and the fact that he could have been a white-shoe

15  lawyer.

16           All these are things that can be done in six

17  months, your Honor.  Okay.  All these are things that could

18  be done on a rocket docket.  We're willing to clear our --

19  our schedules and move this -- move this case along.  We've

20  been willing to do it since July 12th, move it along on a

21  six-month time frame.  There's nothing here that indicates

22  that this is really a complex case.

23           Now, on the reason for expediting it, your

24  Honor, I was burned in another case in this court where, in

25  a telephone conference like this that the Court ordered

1    under seal, and I will be asking that this conference be put

2    under seal if we talk about these health issues, but I had

3    to raise up my life-threatening brain tumor, and no sooner

4    than it went out to three sets of lawyers in this sealed

5    thing, that I'm getting calls from the News Journal and

6    reports on my health conditions, you know, that I've had to

7    deal with since 2003.  You know, that were circulating

8    throughout the State of Delaware.  Okay.

9            My client, as I have said in the sealed

10   papers, is suffering from two chronic life-threatening

11   diseases as well as constant suicidal ideation.  Dr. Tavani

12   has given me that oral report, which I summarized for the

13   Court before she went on vacation.  He has testified

14   publicly in the general assembly, in front of Mr. Reardon,

15   and I believe Mr. Flynn about his constant bouts with

16   suicidal ideation.

17           These are the things he is living with, and I

18   will be glad if everything here is sealed and they are

19   directed as we had proposed at Page 6 of our draft

20   confidentiality order, that subject to the provisions of a

21   subsequent confidential order being issued by the Court,

22   until further order of this Court, the Court orders that all

23   medical records relating to the medical condition of

24   plaintiff in the past or present and all expert reports

25   relating thereto be sealed and treated as highly

1    confidential, for the eyes of the attorneys for the parties

2    only.  No reference to the contents of these records is to

3    be made in any public pleading or in open court without

4    further order of the Court.

5             I will be glad to go -- if everyone will agree

6    that they're subject to that order, subject to the contempt

7    powers of this Court in a civil or criminal context, I.

8    will be glad to go into more detail on the two chronic

9    life-threatening diseases that my client is dealing

10   with.

11            THE COURT:  I, frankly, don't think I -- I don't

12   think we need to.  I think I've made up my mind about most

13   of these things.  I have one more question for defense

14   counsel, though.

15            Apparently, you are briefing some issue in

16   Superior Court.  And if it is the constitutionality -- if it

17   is the same issue posed by Mr. Neuberger in his motion, I

18   guess my question is, I'm not confident that I find it

19   appropriate for Judge Young to be deciding the federal

20   constitutionality of this statute and your telling me that I

21   shouldn't address it yet.

22            So perhaps you can elaborate on what's going on

23   in Superior Court.

24            MR. FLYNN:  Yes, your Honor.  Again, Tony Flynn

25   on behalf of the Diocese and the Bishop.

1              I want to reiterate, the Diocese and the Bishop

2    have not sought relief in the Superior Court in any case on

3    the unconstitutionality of the statute.  Other defendants in

4    the Whitwell case have filed a motion.  It is a different

5    motion than the issue, or -- than Mr. Neuberger's motion in

6    this case addresses.  The focus of it is the

7    unconstitutionality of the statute under the Delaware

8    Constitution, not the Federal Constitution.

9              But the parties -- the defendants before your

10   Honor have not, except by way of affirmative defense, raised

11   this issue in the -- in State Court.  We may be compelled to

12   do so by Judge Young, but we are not yet in that posture, so

13   that's -- and because we believe it's a fact-bound issue,

14   that's why we have not done so.  We think we need a factual

15   record to persuade the Court that -- of the

16   unconstitutionality of the statute, which also speaks to the

17   schedule.

18             We need to make sure we move heaven and earth to

19   find what we can about this 40-year-old case.  And if we're

20   not able to do that, it is a further reason why -- of the

21   problem of this case.

22             This is the first case under this statute to be

23   filed.  And we -- I think have the right, but absolutely

24   need, in order to fairly present the due process argument,

25   to discover this case fully, so we can present those

1    arguments to the Court.

2             Mr. Neuberger also mentions experts.  You know,

3    there are a number of experts in this case, and I -- I will

4    not say until we see the report, we have a generic report

5    from Father Doyle, what -- you know, that we might be

6    challenging under a Daubert analysis his testimony or

7    otherwise, which has been the subject of attack in other

8    jurisdictions.

9             And this lost wage claim, your Honor, is going

10   to require a substantial amount of, not just expert, but

11   fact discovery.

12            Now, so, we're -- all we're asking for, I

13   submit, is a normal schedule in this case, and, indeed,

14   it is a schedule very similar to the schedule that the

15   plaintiff's counsel have proposed in the Eden and McClure

16   cases in State Court.  That's all we're looking for.

17            MR. T. NEUBERGER:  Your Honor, this is Tom

18   Neuberger again.

19            If I might just reply, I printed out the --

20   they have a four-page speaking motion to dismiss by the

21   Norbertines, the people who run Archmere Academy, your

22   Honor, in State Court.  And Judge Young has given the

23   parties -- he issued a very strict briefing order.  He says,

24   I will give you four pages on each issue you seek to

25   present.  Okay.  So if they present three or four or five

```
 1    constitutional arguments, you know, they can have 20 pages
 2    of briefing on the constitutional issue.  We, I think, used
 3    about 35 pages in our brief on the -- just the federal
 4    constitutional issues alone.
 5              I'm looking at Page -- Paragraphs 8 and 9.
 6    Paragraph 8 of their speaking motion and, you know, they're
 7    talking about California, 539 U.S. 607611 2003.  They're
 8    citing to federal law on statutes of limitations.  Earlier,
 9    they cite to state court decisions on state -- state
10    principles.
11              I think, ultimately, what I think the law in
12    Delaware is going to be when the Delaware Supreme Court --
13    when the Delaware Supreme Court reviews the state
14    constitutional questions, the Delaware Supreme Court I think
15    has been very clear that interpreting the due process
16    clause, the law of the land provision of the Delaware State
17    Constitution, that it is on all fours with whatever the
18    federal principles are on the law of the land.
19              So whatever this Federal Court, meaning your
20    Honor, decides on federal issues, would probably be very
21    helpful to the Delaware State Court.  But the Delaware State
22    Court is not the vehicle to be deciding federal
23    constitutional issues, okay, and we presented just the
24    federal constitutional issues here.  We're not asking this
25    Court to rule on any State constitutional issues.  That's up
```

1    to Judge Young.

2              And I would think that if -- in the interests of

3    judicial economy and everything, a ruling by the -- the

4    Federal Court here in Delaware on the federal issues will be

5    taken as persuasive and probably followed by Judge Young, by

6    Judge Scott, by all the Superior Court judges who are

7    wrangling with these cases.  Okay.

8              Your Honor, when they say they don't want a

9    delay, you know, I address that in Tab B, which is attached

10   to you, back in August, when they came in for their -- their

11   initial round of extensions that have now put us down four

12   years.  Okay.

13             It took us four-and-a-half years to start --

14   three-and-a-half years to start taking depositions in the

15   Eric Eden case, which was the first one filed in front of

16   Judge Scott.  Okay.  We're now confronted with 198, I.

17   think, invocations of the Fifth Amendment right against

18   self-incrimination for preventing just the deposition

19   of the defendant from going forward, and that is being

20   briefed.

21             I hope that when the Court gets through these

22   two main issues and we talk about the scheduling order, that

23   perhaps we could write in some periodic telephone

24   conferences with the Court, so the Court could help manage

25   this case and keep it under control as issues arise.

1          We think we're facing the same delay tactic that

2     we face in all the other cases.  They hope our witnesses

3     die.  If my client commits suicide, yeah, they could have

4     taken his deposition, that's all fine and dandy, but it's

5     not his case.  My position is my client -- my client could

6     take his life at any time or my client could die of chronic

7     life-threatening diseases, and if consistent with the

8     Court's other obligations to other plaintiffs and if the

9     defendants, which are in big law firms, free up the

10    resources and we go out and do six months of discovery, we

11    could have a trial some time six months -- some time after

12    six months from now.

13          We're willing to try the case in five days.  Ten

14    days has been the norm in Superior Court.  We're willing to

15    do it in five days to the prejudice of my client.  If we

16    can't expedite it and they're demanding ten days, well,

17    then, we would take -- we would seek the same ten days.

18    But we can try our case in an expedited manner and we

19    can discover it in an expedited manner.  So can the

20    defendants.

21               THE COURT:  All right.

22               MR. CASARINO:  Your Honor, this is Steve

23    Casarino.

24               May I say something?

25               THE COURT:  Yes.  Sure.

```
 1              MR. CASARINO:  First off, Father DeLuca has not
 2    been involved in any owe litigation, so any of this nonsense
 3    about what the defendants have done in other cases does not
 4    apply to him.
 5              It appears to me that Tom definitely has his
 6    case prepared and he may only need six months, but the
 7    defendant, at least this defendant, does not have his case
 8    prepared, and it's going to take us time to do the
 9    appropriate discovery.  I mean, Mr. Neuberger said he can
10    clear up his calendar.  I can't clear up mine, your Honor.
11    I have other things to do.  This may be his only case, but
12    it's not mine.  I'm willing to do a reasonable discovery,
13    but I think it's to our prejudice to force this case to move
14    quickly, as Mr. Neuberger suggests.
15              MR. FLYNN:  Your Honor, Tony Flynn.  If I may be
16    heard briefly.
17              Your Honor, I really have to say I resent
18    Mr. Neuberger thinking that the Diocese hopes that Mr. Quill
19    dies before trial.  I think that's very inappropriate and
20    it's a theme in the submissions to the Court accusing us of
21    lack of candor and misleading the Court, which are just
22    improper, in my view.
23              We're asking in this case, and we should focus
24    on this case, for a reasonable discovery period.  The title
25    of the motion in the Whitwell case makes clear it is not the
```

1    Diocese filing that motion.  It is the Norbertines filing

2    that motion.  We did not sign those pleadings.  We have not

3    brought that constitutional issue to the Court in the

4    Whitwell case.

5                So I just wanted to make it clear that in this

6    case, we are not doing something different than we have done

7    in any other case.

8                THE COURT:  All right.  Hold on.  I'm getting

9    some dates together to propose to you and then I will let

10   you be on your way and I've got to get back to my trial.

11               All right.  Well, unfortunately, the problem I

12   have is that, with one judge down, my trial calendar is not

13   working out the way I would like it to.  I certainly

14   understand Mr. Neuberger's concerns and so we are not going

15   to dawdle in this case, but I think we are going to play by

16   the rules to the extent that we can.

17               So I think the defendants do need at least six

18   months of discovery, so I'm going to have the motion

19   practice, summary judgment motions, due on June 6th.

20               Now, how you put the discovery package together,

21   I don't care.  I hope you can work it out in terms of

22   dividing up fact discovery and expert discovery.  I don't

23   care.  If you can't work it out, I will just pluck dates out

24   on my own, but your summary judgment motions are due on

25   June 6th, 2008.

1          Now, I usually give myself 60 days after summary

2    judgment motions are fully briefed.  They'd be briefed in

3    June.  I usually give myself 60 days, particularly in a

4    complicated case like this, so that would be July, August.

5    Trial should be scheduled in September.

6          My problem is, is that I'm already double-booked

7    in September of 2008.  And so I think what I'm going to do

8    is I'm going to schedule you to start trial on August 25th,

9    and I will do everything I can -- in other words, I will

10   take less time on my end getting to your motions in order to

11   get you to trial.  So that's August 25th, 2008, and I will

12   put you in for the following week just in case we get to the

13   pretrial and I decide that this case really shouldn't be

14   tried and I'm on your calendar.

15         With respect to the pretrial, I will schedule

16   that for the Monday before, on August 18th, at 4:30.  That

17   means that motions in limine would be due on August 4th,

18   with responses due on August 11th.

19         It seems to me that given the fact that you all

20   may have discovery issues as we go along given the

21   circumstances of the case, rather than allowing you to file

22   discovery motions, I am going to meet with you if there are

23   discovery problems.  So I'm going to schedule a discovery

24   conference in February of next year, and if you've got

25   issues, you safe them for February, and I will address

1    them.

2              A VOICE:  Okay.

3              THE COURT:  And I'm looking at Monday,

4    February 11th, at 4:30, for our first discovery conference,

5    and we'll take it from there in terms of scheduling others.

6              So you need to -- if you need to look at my web

7    page and get the form for patent cases for that particular

8    part of the discovery, of the schedule.

9              The other thing I want to note is that this case

10    is going to be referred to a Magistrate Judge, not a

11    specific Magistrate Judge, so you need to change that

12    language.

13              A VOICE:  Okay.

14              THE COURT:  With respect to the pending motions,

15    certainly, I will -- well, as far as I know, the motion for

16    default, will that be formally withdrawn?

17              MR. T. NEUBERGER:  Yes, your Honor.  We'll come

18    up with whatever stipulation is necessary, your Honor.

19              THE COURT:  All right.

20              MR. T. NEUBERGER:  Mr. Casarino and I.

21              THE COURT:  I definitely need to address the

22    motions to dismiss.  And I guess my dilemma is twofold:

23    Number one, Mr. Neuberger, I am not confident when I can get

24    to your motion.  I mean, I've got so many motions that are

25    in line before yours that I might not even get to it until

1    next year.

2             MR. T. NEUBERGER:  I understand that, your

3    Honor.  No.  I've always expected that we would not hear for

4    three to four months.

5             THE COURT:  Well, the question --

6             MR. T. NEUBERGER:  At least from it going under

7    submission.  I mean, that's all I'm saying.

8             THE COURT:  All right.  But --

9             MR. T. NEUBERGER:  It took me two to three years

10   before Judge Scott ruled on the motions to dismiss in the

11   first Eden case, your Honor, so, you know, three or four

12   months or whatever the normal delay is once it's submitted.

13   I mean, that's perfectly acceptable.  That's just due

14   process.  That's the way it goes.  Okay.

15            I'm not asking that the constitutional issue

16   go to the top of any pile with the Court.  I'm not asking

17   you to alter your work flow.  I'm saying they should file

18   their answering brief, we'll do our reply, it's submitted

19   and the Court, I know, in due course, will address the

20   issue.

21            THE COURT:  Well, if you will let me, the

22   question is:  If, in fact, it is the defendants' contention

23   that the constitutional -- that the entire constitutional --

24   that there are facets to the constitutional issue that are

25   not addressed and cannot be addressed by your motion, my

1    question is:  Why should I address the constitutionality of

2    this statute at all until -- when everything is going to be

3    addressed as of June 6th?

4              And I guess, because it is not my normal course

5    to allow summary judgment motions until the end of discovery

6    and this may or may not be dispositive I guess I am

7    questioning whether it makes any sense for it still to

8    be on the books as opposed to addressing all issues at the

9    close of discovery in a clean fashion as I do in every other

10   case.

11             MR. T. NEUBERGER:  Your Honor, in our brief, in

12   our -- in Tab A, which is our submission to their motion to

13   stay the briefing, it seems very clear that the case law

14   under Rule 12 -- this is not a summary judgment.  In the

15   alternative, I styled it a summary judgment motion, but

16   Rule 12(c) is a vehicle which is designed precisely to deal

17   with statutory issues, issues that arise from the enactment

18   of new statutes.  And classically, in constitutional law,

19   there's this distinction between an as applied and an

20   as-written challenge.  Okay.

21             As written means, you know, in its various

22   aspects, you know, the statute can't be sustained.  Okay.

23   As applied in the particular instances of this case with

24   whatever factual nuances there are, a constitutional statute

25   in its application has unconstitutional dimensions.

1          THE COURT:  Well, quite --

2          MR. T. NEUBERGER:  Go ahead, your Honor.

3          THE COURT:  I'm just saying, it seems to me that

4    you should not -- I'm not exactly sure what -- I mean, it

5    surprises me -- generally, it's the defendants who file what

6    they term to be issue or case-dispositive motions and want a

7    stay of discovery.  You seem -- and I don't know what

8    interest you're promoting.  On the one hand, you want

9    expedition and you want discovery to go forward and you're

10   complaining about stalling.  On the other hand, you're

11   asking the Court to step into the case before the record is

12   completely made to decide an issue.

13          I don't quite understand it.  I don't have

14   the time.  And so, under the circumstances, I'm no

15   going to allow the motion to go forward.  It just seems

16   to me as though I can only do so much and my rules are there

17   so that I don't have to make these sorts of decisions on a

18   case-by-case basis, and so I'm going to deny the motion

19   without prejudice to renew with summary judgment

20   motions.

21          Now, if you ever agree that there is a

22   dispositive legal issue that I need to address, you let me

23   know.  But absent agreement, my default rule applies, and

24   that is no summary judgment motions until the end of

25   discovery.  And under the circumstances, I just think it

1    makes more sense and I am going to do that.

2              I will issue my order.  Somebody will get back

3    to me the scheduling order that is consistent with the dates

4    I've given you.  I will put them on my calendar in the

5    meantime.  And I will decide the motions to dismiss when I

6    can.  I'm not sure when that will be.

7              Counsel, I'm due back in court, so thank you for

8    your time this morning.

9              (Counsel respond, "Thank you, your Honor.")

10             (Telephone conference concluded at 9:25 a.m.)

11                        -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Tab C



# CASARINO, CHRISTMAN & SHALK, P.A.

### ATTORNEYS AT LAW
### 800 NORTH KING STREET
### SUITE 200
### P.O. BOX 1276
### WILMINGTON. DELAWARE 19899

STEPHEN P. CASARINO
COLIN M. SHALK
BETH H. CHRISTMAN
DONALD M. RANSOM
KENNETH M. DOSS
THOMAS P. LEFF
MATTHEW E. O'BYRNE
SARAH C. BRANNAN
J'AIME L. WALKER **

** ADMITTED IN PA and NJ ONLY

REPLY TO OUR MAILING ADDRESS:
P.O. BOX 1276
WILMINGTON, DE 19899

(302) 594-4500
FAX: (302) 594-4509

November 20, 2007

Thomas C. Crumplar, Esq.
Jacobs & Crumplar, P.A.
2 East 7th Street
P.O. Box 1271
Wilmington, DE 19899

> RE:    Quill v. Deluca
> C.A. No.:  07-435 SLR

Dear Tom:

I acknowledge your November 16, 2007 fax. I don't recall that the lifting of the default judgment was contingent upon a prompt deposition date. I did represent to the court that I would have an answer filed in a couple of days. I recall mentioning that Father Deluca, although not in the best of health is available for a deposition.

My preference would be to take the deposition of Mr. Quill before that of Father Deluca. We need to know what Mr. Quill is alleging before Father Deluca should be responding.

Also, the deposition of Father Deluca should be taken in New York. We can do it in Delaware if you can pay his expenses in coming here.

Very truly yours,

STEPHEN P. CASARINO

SPC:pw

RECEIVED
NOV 2 6 2007
By

# Tab D

## Stephen J. Neuberger

**From:**     Stephen J. Neuberger [SJN@NeubergerLaw.com]

**Sent:**     Monday, November 26, 2007 10:37 PM

**To:**     scasarino@casarino.com

**Cc:**     Flynn, Anthony; Thomas Crumplar; Robert Jacobs; Thomas S. Neuberger; Mark Reardon

**Subject:** Quill v. Diocese (D.Del.)

Steve,

I write in response to your letter to Tom Crumplar dated November 20th.

(1).  At the Rule 16 teleconference, you represented to the Court that your client is "not in good health" and "he can be deposed fairly quickly."  (Transcript at 18).

Then in response to your query to Tom N. as to whether plaintiff would agree to lift the default which was entered against your client after more than 3 months passed without him filing his long overdue Answer (Transcript at 17), Tom stated "[w]e would agree to lift the default judgment ... provided we can accept his invitation that we could depose him in the near future.  We would hope in December or in January that we could depose him down here."  (Transcript at 18).

The Court then noted the parties agreement in entering its recent order addressing the default judgment motions.

Accordingly, it appears your statement to Tom C. in your letter was mistaken.  The lifting of the default was contingent upon a prompt deposition date.

(2).  Next, we have noticed the deposition of your client for December 20 and 21st at 10:00am at our offices. Given your client's advanced age and admitted failing health, it will be taken for trial use and recorded by both video and stenographic means.  You will wish to prepare accordingly.

(3).  Third, it appears that your client's memory also is failing, which only heightens the urgency of preserving his testimony of the relevant events as soon as possible.  For example, two weeks ago, following your representation to the Court at the Rule 16 that you had conferred with your client and had your Answer ready to file (page 17), your client filed his Answer in which he admitted to sexually abusing, raping and molesting my client Mr. Quill. Today, an Amended Answer was filed in which your client now denies that same conduct.  This flip-flop causes me serious concern as to your client's memory of the key events in this case which makes time of the essence in preserving his testimony.

(4).  The deposition of Father DeLuca will be taken at my office in Wilmington.  That was the agreement of the parties on which the court has subsequently relied.  You never raised any issue of expenses when this was discussed and agreed upon with Judge Robinson.  Second, the admitted sexual abuse, rape and molestation occurred in Delaware as well as nearly all of the events at issue in this case.  In other words, your client is a defendant who has been duly served in a court case pending in a Delaware federal court.  That case seeks to hold your client accountable for his tortious actions which occurred in Delaware, while he lived and worked in Delaware.  That your client has since fled the state is irrelevant to his obligation to appear, attend and answer for his actions.  His deposition will be taken here and no expenses will be paid.

(5).  As to your preference to depose my client first because you "need to know what Mr. Quill is alleging," First, I suggest you read the Complaint.  We spent a great deal of time adding factual detail to it so that you would clearly be on notice of what is being alleged.  Similar complaints in several of the sister cases have been met with motions to strike, purportedly because too much detail was included in the Complaint.  Second, as you represented to the Court during the teleconference (Transcript at 29), you have a busy schedule and it will be

some time before you are in a position to conduct a deposition.  Given your client's failing health and memory as well as the expedited discovery schedule in this case, such delay is needless, wasteful and impracticable.  Lastly, the deposition of your client has been long sought and duly noticed.  Under our District's long established first filed rule, we will rely upon our right to take your client's deposition before any others.

 -Steve

***********************************
Stephen J. Neuberger, Esq.
The Neuberger Firm
Attorneys and Counsellors at Law
Two East Seventh Street, Suite 302
Wilmington, DE 19801-3707
Phone: 302-655-0582
Fax: 302-655-9329
E-Mail: SJN@NeubergerLaw.com

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

January 4, 2008, I electronically filed this Pleading with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:

Anthony G. Flynn, Esquire
Young Conaway Stargatt & Taylor LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
aflynn@ycst.com

Mark Reardon, Esquire
Elzufon Austin Reardon Tarlov & Mondell
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899
mreardon@elzufon.com

Stephen P. Casarino, Esquire
Casarino Christman & Shalk, P.A.
800 North King Street, Suite 200
P.O. Box 1276
Wilmington, DE 19899
scasarino@casarino.com


/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

/ Quill, Robert / Pleadings / Motion for Protective Order - AB

17